No. 26-5138

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

NEWSGUARD TECHNOLOGIES,

*Plaintiff-Appellant,*

v.

FEDERAL TRADE COMMISSION and ANDREW N. FERGUSON,
in his official capacity as Chairman of the Federal Trade Commission,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the District of Columbia, No. 1:26-cv-00353-DLF

**BRIEF OF APPELLANT**

Robert Corn-Revere
James C. Grant
Sara E. Berinhout
Samuel Rudovsky
FOUNDATION FOR INDIVIDUAL
 RIGHTS AND EXPRESSION
700 Pennsylvania Ave. SE, Ste. 340
Washington, DC 20003
(215) 717-3473
bob.corn-revere@fire.org
jim.grant@fire.org
sara.berinhout@fire.org
sam.rudovsky@fire.org

*Counsel for Plaintiff-Appellant*

**CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES**

Pursuant to D.C. Circuit Rule 28(a)(1) and Federal Rule of Appellate Procedure 26.1, counsel for Plaintiff-Appellant NewsGuard Technologies certifies as follows:

**A.      Parties and *Amici*.**

Plaintiff-Appellant is NewsGuard Technologies. NewsGuard has no parent corporation or any publicly held corporation that owns 10% or more of its stock. Defendants-Appellees are the Federal Trade Commission and Andrew N. Ferguson, in his official capacity as Chairman of the Federal Trade Commission. No intervenors or *amici* have appeared to date.

**B.      Rulings Under Review.**

Plaintiff-Appellant appeals from the order issued on April 22, 2026, by the Honorable Dabney L. Friedrich (D.D.C. Case No. 1:26-cv-00353-DLF), denying Plaintiff's Motion for Preliminary Injunction. App.727.

**C.      Related Cases.**

Counsel for Plaintiff-Appellant is not aware of any related cases within the meaning of D.C. Circuit Rule 28(a)(1)(C).

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES .............. i

TABLE OF AUTHORITIES .................................................................. iv

GLOSSARY OF ABBREVIATIONS...................................................................x

JURISDICTIONAL STATEMENT .....................................................................1

STATEMENT OF THE ISSUE ...........................................................................1

STATEMENT OF THE CASE .............................................................................1

    A.    NewsGuard's Ratings and Reporting About Online News Sources.................................................................................................1

    B.    NewsGuard's Services to Customers.....................................................3

    C.    NewsGuard's Reporting and Publishing of Its Analyses. ....................6

    D.    Attacks on NewsGuard by Publishers Unhappy with Ratings..............7

    E.    Putative Congressional Investigations Targeting NewsGuard..............9

    F.    Administration Officials' Public Attacks Targeting NewsGuard.........10

    G.    FTC's Tactics and Threats to Suppress Other Platforms. ...................14

    H.    The FTC's CID and Investigation of Media Matters. .........................16

    I.    The FTC's CID to NewsGuard. ..........................................................18

    J.    The FTC's Omnicom Consent Order Blacklisting NewsGuard. ........20

    K.    The FTC's *Dentsu* Consent Orders and Withdrawal of Its CIDs........24

    L.    Harms to NewsGuard, Its Customers, and Speech Rights from the FTC's Actions. ..........................................................................26

    M.    The District Court's Denial of NewsGuard's Preliminary Injunction Motion. .........................................................................29

SUMMARY OF ARGUMENT ........................................................................31

ARGUMENT ...................................................................................................33

I.    Standard of Review ...................................................................................33

II.    The District Court Misapplied the First Amendment Irreparable Harm Standard...................................................................................................33

A.      NewsGuard Established Irreparable Harm Because the Harassment Campaign and Merger Condition Directly Restricts the Dissemination of NewsGuard's Protected Speech.........................34

B.      Because the Merger Condition Operates as a Direct Restriction on Speech, NewsGuard was Not Required to Separately Prove Chill. ...........................................................................................38

C.      The District Court Mischaracterized NewsGuard's Injury as Ordinary Financial Harm Rather than a Present, Concrete Burden on its Journalistic Expression..................................40

III.      The FTC's Retaliatory Campaign Against NewsGuard Inflicted Irreparable Harm and Violates the First Amendment...................................45

A.      The Record Shows the FTC Engaged in a Retaliatory Campaign Against NewsGuard Because of its Protected Expression.................46

B.      Chairman Ferguson and the FTC Violated the First Amendment's Prohibition Against Retaliation for Speech. ................47

C.      The District Court Denied Injunctive Relief Because it Applied the Wrong Standard.............................................................49

IV.      Withdrawal of the CID Does Not Moot the Case. .......................................53

CONCLUSION .......................................................................................................54

CERTIFICATE OF COMPLIANCE .....................................................................56

CERTIFICATE OF SERVICE...............................................................................57

# TABLE OF AUTHORITIES

**Cases**

*Am. Acad. of Pediatrics v. U.S. Dep't of Health & Human Servs.*,
816 F. Supp. 3d 27 (D.D.C. 2026) .......................................................................34

*Am. Bar Ass'n v. U.S. Dep't of Justice*,
783 F. Supp. 3d 236 (D.D.C. 2025) ....................................................................40

*Am. Family Ass'n, Inc. v. City & Cnty. of San Francisco*,
277 F.3d 1114 (9th Cir. 2002) ............................................................................45

*Aref v. Lynch*,
833 F.3d 242 (D.C. Cir. 2016)............................................................................48

*Ateba v. Jean-Pierre*,
No. 23-2321, 2023 WL 5748567 (D.D.C. Sept. 6, 2023) ...................................40

*Backpage.com, LLC v. Dart*,
807 F.3d 229 (7th Cir. 2015) ...............................................................33, 45, 52

*Bailey v. Fed. Bureau of Prisons*,
No. 24-1219, 2024 WL 3219207 (D.D.C. June 28, 2024)...................................40

*Bantam Books, Inc. v. Sullivan*,
372 U.S. 58 (1963)...............................................................................................45

*Bronx Household of Faith v. Bd. of Educ.*,
331 F.3d 342 (2d Cir. 2003) ........................................................................37, 39

*Cate v. Oldham*,
707 F.2d 1176 (11th. Cir. 1983) ...................................................................39, 52

*Chaplaincy of Full Gospel Churches v. England*,
454 F.3d 290 (D.C. Cir. 2006) .......................................................30, 35–39, 51

*Consortium for Indep. Journalism, Inc. v. United States*,
No. 23-7088, 2025 WL 919504 (S.D.N.Y. Mar. 26, 2025)............................7, 48

*Davis v. Pens. Ben. Guar. Corp.*,
571 F.3d 1288 (D.C. Cir. 2009)..........................................................................33

*Elrod v. Burns*,
427 U.S. 347 (1976)..................................................................38

*Endocrine Society v. FTC*,
2026 WL 1257289 (D.D.C. May 7, 2026) ...............................42, 44, 50

*First Choice Women's Resource Centers, Inc. v. Davenport*,
146 S. Ct. 1114 (2026) .......................................................53, 54

*FTC v. Dentsu US, Inc.*,
No. 4:26-cv-469 (N.D. Tex. 2026) .....................24–26, 29, 37, 46–47

*FTC v. H.J. Heinz Co.*,
246 F.3d 708 (D.C. Cir. 2001)......................................................33

*FTC v. Whole Foods Mkt., Inc.*,
548 F.3d 1028 (D.C. Cir. 2008)....................................................33

*Hanson v. District of Columbia*,
120 F.4th 223 (D.C. Cir. 2024) ...............................................34–35

*Hartman v. Moore*,
547 U.S. 250 (2006)........................................................32, 47, 52

*Heffernan v. City of Paterson*,
578 U.S. 266 (2016)...........................................................50–51

*Houston Cmty. Coll. Sys. v. Wilson*,
595 U.S. 468 (2022)................................................................47

*Jenner & Block LLP v. U.S. Dep't of Justice*,
784 F. Supp.3d 76 (D.D.C. 2025) ..............................................51

*Kelly v. Hegseth*,
820 F. Supp. 3d 1 (D.D.C. 2026) ........................................32, 51–53

*League of Women Voters v. Newby*,
838 F.3d 1 (D.C. Cir. 2016)....................................................30, 33

*Mahmoud v. Taylor*,
606 U.S. 522 (2025)......................................................34, 38, 45

*Media Matters for Am. v. Bailey*,
2024 WL 3924573 (D.D.C. Aug. 23, 2024) ....................................................16, 50

*Media Matters for Am. v. FTC*,
2026 WL 1354245 (D.C. Cir. May 4, 2026) ....................................................17, 50

*Media Matters for Am. v. FTC*,
805 F. Supp. 3d 105 (D.D.C. 2025) ....................................................14–17, 50

*Media Matters for Am. v. FTC*,
No. 25-5302, 2025 WL 2988966 (D.C. Cir. Oct. 23, 2025) ........................17, 50

*Media Matters for Am. v. Paxton*,
138 F.4th 563 (D.C. Cir. 2025)....................................15, 34, 38, 45, 48–50, 52

*Media Matters for Am. v. Paxton*,
732 F. Supp. 3d 1 (D.D.C. 2024) ........................................................15

*Miami Herald Publ'g Co. v. Tornillo*,
418 U.S. 241 (1974).........................................................................48

*Mills v. District of Columbia*,
571 F.3d 1304 (D.C. Cir. 2009).............................................................42

*Minneapolis Star and Tribune Co. v. Minnesota Commissioner of Revenue*,
460 U.S. 575 (1983).........................................................................42

*Moody v. NetChoice, LLC*,
603 U.S. 707 (2024).........................................................................31

*Nat'l Pub. Radio, Inc. v. Trump*,
2026 WL 877434 (D.D.C. 2026) .............................................................53

*Nat'l Rifle Ass'n of Am. v. Vullo*,
602 U.S. 175 (2024)......................................................................45, 49

*Nat'l Treasury Emps. Union v. United States*,
927 F.2d 1253 (D.C. Cir. 1991).......................................................34–36, 38, 50

*New York Times Co. v. Sullivan*,
376 U.S. 254 (1964).........................................................................48

*News Am. Publ'g, Inc. v. FCC*,
844 F.2d 800 (D.C. Cir. 1988)..................................................26, 37

*Nieves v. Bartlett*,
587 U.S. 391 (2019)......................................................................47

*Perry v. Sindermann*,
408 U.S. 593 (1972)......................................................................47

*Playboy Ent. Grp., Inc. v. United States*,
30 F. Supp. 2d 702 (D. Del. 1998) ........................................43–44

*Pursuing Am.'s Greatness v. Fed. Election Comm'n*,
831 F.3d 500 (D.C. Cir. 2016)......................................................39

*Roman Catholic Diocese of Brooklyn v. Cuomo*,
592 U.S. 14 (2020)........................................................................34

*Rosenberger v. Rector & Visitors of Univ. of Virginia*,
515 U.S. 819 (1995)......................................................................47

*Sanders v. McClellan*,
463 F.2d 894 (D.C. Cir. 1972).....................................................39

*Trinity Lutheran Church of Columbia, Inc. v. Comer*,
582 U.S. 449 (2017)......................................................................54

*Turner v. U.S. Agency for Glob. Media*,
502 F. Supp. 3d 333 (D.D.C. 2020) ............................................53

*United States v. Playboy Ent. Grp., Inc.*,
529 U.S. 803 (2000)................................................................42–44

*Wisconsin Gas Co. v. FERC*,
758 F.2d 669 (D.C. Cir. 1985)......................................................41

*World Pro. Ass'n. for Transgender Health v. FTC*,
2026 WL 1257321 (D.D.C. 2026) ...............................................50

**Statutes**

28 U.S.C.
§ 1292(a)(1) .....................................................................................1

§ 1331.................................................................................................................1

§ 2201.................................................................................................................1

§ 2202.................................................................................................................1

**Other Authorities**

Andrew Ferguson (@AFergusonFTC), X (Nov. 12, 2024, at 1:51 ET)..................11

Andrew Ferguson (@AFergusonFTC), X (Nov. 27, 2024, at 14:33 ET)...............11

*Brand Danger: NewsGuard Finds 349 Top Global Brands Funding Misinformation About the Hamas-Israel Conflict with Programmatic Ads*, NewsGuard (Nov. 29, 2023) ......................................................................................5

Concurring Statement of Commissioner Andrew Ferguson, *FTC v. 1661, Inc. d/b/a GOAT* (Dec. 2, 2024) ...............................................................................12

Kari Donovan, *Bannon's WarRoom, Show Clip Roundup 11/30/2024 [AM]*, WarRoom (Nov. 30, 2024) .................................................................................12

Letter from Brendan Carr, FCC Comm'r, to CEOs of Alphabet, Microsoft, Meta, and Apple (Nov. 13, 2024)........................................................................12

Maggie Miller, *State Department Eliminates Key Office Tasked with Fighting Foreign Disinformation*, Politico (Apr. 16, 2025, at 13:25 ET)...........11

Matt Skibinski, *Special Report: How Some of the World's Largest Brands Funded the Misinformation Behind the Capitol Riot*, NewsGuard (Jan. 12, 2021) ....................................................................................................................5

Matt Skibinski, *Thousands of the World's Most Trusted Brands Funded COVID-19 Misinformation*, NewsGuard ................................................................5

Mike Benz (@MikeBenzCyber), X (Nov. 24, 2024, at 23:59 ET)..........................11

*One Year, 100 Myths: NewsGuard Has Identified More Than 100 False Narratives About the War in Ukraine*, NewsGuard (Feb. 16, 2023).....................5

Press Release, Fed. Trade Comm'n, Federal Trade Commission Launches Inquiry into Tech Censorship (Feb. 20, 2025) .....................................................13

Press Release, Media Matters, Media Matters secures complete and total victory against Federal Trade Commission (May 4, 2026)................................17

Press Release, PunchBowl News, FTC Commissioner Andrew N. Ferguson for FTC Chairman ..................................................................................13

Statement from Gordon Crovitz, NewsGuard Co-CEO, on Brendan Carr Letter (Nov. 15, 2024) ...............................................................................13

# GLOSSARY OF ABBREVIATIONS

Pursuant to D.C. Circuit Rule 28(a)(3), the following abbreviations are used in this Brief:

**FTC**  Federal Trade Commission

**CID**  Civil Investigative Demand

## JURISDICTIONAL STATEMENT

This action arises under the First and Fourth Amendments to the U.S. Constitution and the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202. The U.S. District Court for the District of Columbia has jurisdiction under 28 U.S.C. § 1331 and the First and Fourth Amendments to the U.S. Constitution. The district court's Order, dated April 22, 2026, denied Appellant's Motion for Preliminary Injunction. App.727. Appellant filed a timely notice of appeal on the same date, which was docketed in this Court on April 28, 2026. App.739. This Court has jurisdiction over this interlocutory appeal under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUE

Whether the district court erred in denying NewsGuard's motion for a preliminary injunction for lack of irreparable harm where NewsGuard alleged and showed ongoing First Amendment injury from a campaign of retaliation—both directly and through coercion of intermediaries—severely limiting its ability to disseminate news ratings, daily newsletters, and journalism about online misinformation to news consumers, advertisers and other subscribers.

## STATEMENT OF THE CASE

**A.    NewsGuard's Ratings and Reporting About Online News Sources.**

NewsGuard is a journalistic service founded in 2018 to provide assessments and reporting about the reliability of online news sources for consumers, businesses, and the public. App.112 ¶ 4 (Declaration of Matthew Skibinski, NewsGuard's Chief

Operating Officer). NewsGuard was founded by former *Wall Street Journal* publisher Gordon Crovitz and Steven Brill who founded *The American Lawyer* and Court TV. App.111 ¶ 3.

Messrs. Brill and Crovitz created NewsGuard because they believed online users would benefit from transparent reports about the accuracy and reliability of news and information websites. NewsGuard developed a rating process for assessing reliability based on nine criteria that assess adherence to long-established practices of journalistic credibility and transparency—such as whether a news source references multiple sources and differing viewpoints in its reporting; takes action to correct errors; discloses ownership and financing of the site; or publishes demonstrably false information. App.112 ¶ 5.

NewsGuard fully discloses the criteria and explains how ratings are determined. App.67 (citing NewsGuard website, available at https://www.newsguardtech.com/ratings/rating-process-criteria). Each of the nine criteria accounts for a weighted number of points, so together they can assign rated news websites an overall rating from 0 to 100 that reflects the extent to which it adheres to the criteria in NewsGuard's judgment. App.113 ¶ 6. NewsGuard also provides a "Nutrition Label" accompanying each website's listed score, with details of NewsGuard's findings and a grid showing its judgment of the site's performance on each of the nine criteria. *See, e.g.*, App.113 ¶ 8; App.133–145, App.146–161

(examples of full versions of Nutrition Labels). NewsGuard also contacts publishers to give them an opportunity to respond or object and includes their comments in Nutrition Labels. App.113 ¶ 9.

The ratings and Nutrition Labels (which run to 4,000–10,000 words) are painstakingly prepared and reviewed by journalist analysts and NewsGuard executives. App.113 ¶ 8–9. As of February 2026, NewsGuard has rated 38,742 news sources, including 12,765 websites, since its founding. App.114 ¶ 10.

## B.      NewsGuard's Services to Customers.

NewsGuard markets its services and publishes its analyses and commentary to consumers, advertisers, and other businesses, as well as to the public generally.



App.114 ¶ 11–12. Consumers can get NewsGuard reliability ratings through a monthly online subscription, which provides a browser extension that shows NewsGuard trust score icons next to links in online search results and social media

feeds. App.114 ¶ 12. Hovering over an icon brings up a short description of the site and a link to "See the Full Nutrition Label" for a detailed description of NewsGuard's review and rating of the news source and why it received the score it did. App.115 ¶ 13.

Businesses also subscribe to NewsGuard's ratings and analyses, and NewsGuard offers tailored services for their needs. For example, news aggregators and public relations firms with interests in distinguishing between reliable and unreliable online content contract with NewsGuard. App.115–16 ¶ 14. Historically, ad agencies and advertisers have also contracted for NewsGuard's ratings and analyses to help make informed decisions about where (*i.e.*, on which websites) to place and not place ads. App.116 ¶ 15. Agencies and advertisers have relied on NewsGuard and the data it provides out of their concerns for "brand safety."

This is tailored to the reality that placement of online ads occurs predominantly through programmatic advertising campaigns—automated software-based services for buying and selling digital ad placements. An average programmatic ad campaign runs on 44,000 websites at once. App.70 (citing Press Release, Association of National Advertisers). Major brands cannot know all of the tens of thousands of websites where their ads might appear, so they rely on ad agencies and others to avoid placements that may be "brand unsafe" for the advertiser, *i.e.*, those that could undermine their brands in the eyes of consumers.

App.116 ¶ 16. Nonetheless, through these automated program placements, major brands have seen their ads unintentionally appear on websites advancing dangerous health treatments,[1] promoting election misinformation,[2] making false claims about the Israel-Hamas conflict,[3] or spreading Russian propaganda.[4] For example, NewsGuard reported that in 2019 Berkshire Hathaway's subsidiary GEICO unintentionally was the largest advertiser on Sputnik News, a Kremlin-controlled website. *See* App.116–17 ¶ 18.

---

[1] App.70–71 (citing Matt Skibinski, *Thousands of the World's Most Trusted Brands Funded COVID-19 Misinformation*, NewsGuard, https://www.newsguardtech.com/special-report-advertising-on-covid-19-misinformation (last viewed Feb. 11, 2026)).

[2] App.70–71 (citing Matt Skibinski, *Special Report: How Some of the World's Largest Brands Funded the Misinformation Behind the Capitol Riot*, NewsGuard (Jan. 12, 2021), https://www.newsguardtech.com/special-reports/special-report-advertising-on-election-misinformation).

[3] App.70–71 (citing *Brand Danger: NewsGuard Finds 349 Top Global Brands Funding Misinformation About the Hamas-Israel Conflict with Programmatic Ads*, NewsGuard (Nov. 29, 2023), https://www.newsguardtech.com/press/brand-danger-newsguard-finds-349-top-global-brands-funding-misinformation-about-the-hamas-israel-conflict-with-programmatic-ads).

[4] App.70–71 (citing *One Year, 100 Myths: NewsGuard Has Identified More Than 100 False Narratives About the War in Ukraine*, NewsGuard (Feb. 16, 2023), https://www.newsguardtech.com/press/one-year-100-myths-newsguard-has-identified-more-than-100-false-narratives-about-the-war-in-ukraine).

### C. NewsGuard's Reporting and Publishing of Its Analyses.

NewsGuard is a journalistic organization that publishes its ratings and analyses of news sources to consumer and business customers. NewsGuard also draws on the work of its journalists in monitoring news on websites and social media to publish its daily newsletter (entitled "Reality Check") to over 60,000 subscribers on "how false claims spread—and who's behind them." *See* App.412, 482. Its journalists have published numerous special reports available to subscribers and the public addressing issues such as brands unintentionally advertising on brand-unsafe websites, false narratives, foreign malign actor disinformation campaigns, the promotion of healthcare hoaxes, and other misinformation; this journalism is often referenced and cited by other media outlets. App.114 ¶ 11, App.116–17 ¶ 18.

NewsGuard has also conducted research studies about online misinformation and, more specifically, advertisers' inadvertent support of news websites promoting false information or propaganda through programmatic ad campaigns. App.117 ¶ 19. In sum, NewsGuard has become a recognized, prominent public voice regarding online misinformation. As a result, the company has attracted the ire of some news publishers whom NewsGuard's reporting has identified as promoting misinformation (and who score poorly in NewsGuard's ratings). App.118 ¶ 21–22.

**D.     Attacks on NewsGuard by Publishers Unhappy with Ratings.**

Over the years, NewsGuard has faced criticisms from across the political spectrum that its ratings are biased in one direction or another. In one year, for example, one advocacy group produced a report claiming NewsGuard's ratings are biased against conservative publishers while another published a separate report claiming NewsGuard's ratings are biased in favor of conservatives. App.118 ¶ 21.

Most attacks have come from news publishers that receive lower scores based on NewsGuard's application of journalistic criteria. App.118 ¶ 22. In 2023, *Consortium News*, a left-leaning website that received low reliability ratings, sued NewsGuard for defamation (and claims under the First Amendment notwithstanding NewsGuard's private-actor status), but the court dismissed the complaint, holding NewsGuard's ratings were constitutionally protected editorial opinion. *Consortium for Indep. Journalism, Inc. v. United States*, No. 23-7088, 2025 WL 919504, at *16–20 (S.D.N.Y. Mar. 26, 2025); App.118 ¶ 23.

At the same time, Newsmax, a conservative cable news network and digital media company, mounted a campaign attacking NewsGuard. Beginning in 2023 and for several years Newsmax has asserted repeatedly in its programs and publications that NewsGuard is biased against conservative media. App.118 ¶ 24. Newsmax also received low ratings for veracity and adherence to journalistic standards. But perhaps more relevant to its motivation for attacking NewsGuard, its ratings are markedly

lower than those for Fox News, the *National Review*, and the *Washington Times*. App.118 ¶ 25.

Newsmax's attacks were baseless. Ratings of Newsmax (and all news sources) are based on NewsGuard's nonpartisan journalistic criteria and are agnostic to the political or editorial viewpoints of publishers. Many left-leaning outlets receive lower scores than comparable right-leaning sources. *See* App.119 ¶ 26; App.162–76 (Washington Post article). For example, Fox News receives a higher reliability rating than MSNBC, while the conservative *Washington Examiner* outscores the liberal *Daily Beast*.

As reported by the *Washington Post* in 2024 (*see* App.119 ¶ 26):



**E.    Putative Congressional Investigations Targeting NewsGuard.**

Whatever else may be said about Newsmax's attacks on NewsGuard, the timing was opportune. When Republicans took control of the House in 2023, around the time of Newsmax's targeting of NewsGuard, several committees opened investigations and issued statements taking aim at media and tech companies for supposed anti-conservative bias. App.120 ¶ 27.

The House Oversight and Small Business Committees opened an investigation in June 2024, with Oversight Committee Chairman James Comer appearing on Newsmax and agreeing that "[NewsGuard's] goal is obviously to bully conservative media out of existence." App.120 ¶ 28 (citing news article). However, after NewsGuard presented evidence to the committee that its ratings are apolitical and nonpartisan, the investigation did not proceed. *Id*.

In September 2024, the House Small Business Committee released an interim staff report entitled "Small Business: Instruments and Casualties of the Censorship-Industrial Complex," which also took aim at NewsGuard with unsubstantiated claims of bias. App.120 ¶ 29 (citing House Committee Report). That effort also did not proceed further. *Id*.

In early 2025, the Senate Judiciary Committee launched an investigation into alleged coordination between the Biden Administration, tech companies, and third parties like NewsGuard, allegedly to propagate and amplify anti-conservative media

bias. In early 2025, the committee held a hearing on what it called the "Censorship Industrial Complex." NewsGuard cooperated, addressed the Committee's questions, and again explained and provided evidence that NewsGuard's ratings are entirely nonpartisan. *See* App.120 ¶ 30. This investigation also did not continue. *Id.*

**F.     Administration Officials' Public Attacks Targeting NewsGuard.**

As a Commissioner on the FTC and continuing after he was appointed Chairman by President Trump, Appellee Andrew Ferguson has promoted an ideologically motivated effort to pursue and censor NewsGuard and other organizations that address the reliability of online sources. As reflected in his public statements and those of others in the administration (notably Brendan Carr, Chairman of the FCC), Ferguson's view is that (1) the federal government can regulate "purely private censorship," *i.e.*, the government can investigate and punish private parties' speech and editorial views if the government thinks they are biased; (2) providing website ratings or analyses to advertisers to help them protect brand safety constitutes collusive and impermissible "ad boycotts"; and (3) the government can use its full panoply of powers to pressure, intimidate, and coerce parties—directly and indirectly—to censor speech the government cannot ban outright. As discussed below, Ferguson's specious theory is wrong under the law, but that has not stopped him from pursuing it—and in particular, to attack NewsGuard.

On November 12, 2024, then-Commissioner Ferguson posted on X about the closure of the U.S. Department of State's Global Engagement Center[5] by referring to NewsGuard specifically, asserting it had supposedly "led collusive ad-boycotts—possibly in violation of our antitrust laws—to censor the speech of conservative and independent media in the United States."[6] Shortly afterward, Ferguson appeared in a podcast interview discussing how a new Republican-led FTC could act against organizations he considered to be part of the "censorship industrial complex."[7] Again he called out NewsGuard and warned that "antitrust laws may have something to do with what's been going on [with] … advertiser boycotts."[8]

---

[5] The Global Engagement Center was an interagency entity established in 2016 to expose and counter foreign propaganda and disinformation, which was closed in April 2025 by Secretary of State Rubio following accusations by GOP lawmakers that the office censored conservative voices. *See* App.121 ¶ 31 (citing Maggie Miller, *State Department Eliminates Key Office Tasked with Fighting Foreign Disinformation*, Politico (Apr. 16, 2025, at 13:25 ET), https://www.politico.com/news/2025/04/16/state-department-shutters-gec-foreign-disinformation-00292982).

[6] *See* App.121 ¶ 31 (citing Andrew Ferguson (@AFergusonFTC), X (Nov. 12, 2024, at 1:51 ET), https://x.com/AFergusonFTC/status/1856152760850243905). In fact, NewsGuard's work for the State Department traced how Russian influence operations spread throughout Latin America via Venezuelan state media. It had nothing to do with NewsGuard's ratings of news sources.

[7] *See* App.121 ¶ 32 (citing Mike Benz (@MikeBenzCyber), X (Nov. 24, 2024, at 23:59 ET), https://x.com/mikebenzcyber/status/1860835679560765841).

[8] *Id.* (citing Andrew Ferguson (@AFergusonFTC), X (Nov. 27, 2024, at 14:33 ET), https://x.com/AFergusonFTC/status/1861780403092099278 (Ferguson post on X forwarding podcast host's tweet that Ferguson had "laid out a compelling vision

Later in November 2024, during an interview on Steve Bannon's WarRoom podcast, Ferguson reiterated his view of the importance of going after "purely private censorship" and the "censorship industrial complex."[9] "[P]rogressives, Silicon Valley, everyone who is fighting 'disinformation,' they're not just going to give up because of the election …. And that's where I think that it's really important that the FTC take investigative steps in the new administration under President Trump."[10]

In December 2024, then-Commissioner Ferguson asserted the FTC "ought to conduct … an investigation" because, he said, NewsGuard "seems to give a free pass to … major left-leaning outlets."[11] At the time, Ferguson was a candidate for FTC chairman, and in public statements to promote his candidacy he touted his "track

---

for how the FTC can take on advertiser boycott collusion in the Internet censorship space")).

[9] *See* App.122 ¶ 33 (citing Kari Donovan, *Bannon's WarRoom, Show Clip Roundup 11/30/2024 [AM]*, WarRoom (Nov. 30, 2024), https://warroom.org/bannons-warroom-show-clip-roundup-11-30-2024-am).

[10] FCC Chairman Brendan Carr has echoed Ferguson's attacks on NewsGuard. *See* App.76 (citing Letter from Brendan Carr, FCC Comm'r, to CEOs of Alphabet, Microsoft, Meta, and Apple (Nov. 13, 2024), https://www.fcc.gov/sites/default/files/DOC-407732A1.pdf (letter from then-commissioner Carr claiming NewsGuard was part of a "censorship cartel," saying the incoming Trump administration would investigate and take action against companies that used NewsGuard's services for brand safety)).

[11] *See* App.77 (citing Concurring Statement of Commissioner Andrew Ferguson, *FTC v. 1661, Inc. d/b/a GOAT* (Dec. 2, 2024), https://www.ftc.gov/system/files/ftc_gov/pdf/ferguson-goat-concurrence.pdf).

record of standing up to … the radical left" and pledged he would "[i]nvestigate … advertiser boycotts" and progressives who are targeting disinformation.[12] NewsGuard responded, explaining that Ferguson's claims about NewsGuard ratings were simply false.[13]

But the facts did not deter the FTC or stay its vendetta against NewsGuard. In February 2025, after Ferguson became Chairman, the Commission issued a Request for Information ("RFI") seeking public comment on "Technology Platform Censorship," asserting that social media providers and other "tech platforms" are engaged in "censorship" that is "potentially illegal."[14] This began the FTC's tactic of using its investigative and regulatory powers to threaten and try to cow organizations that were seeking to speak out about misinformation and falsehoods of news publishers online.

---

[12] *See* App.77 (citing Press Release, PunchBowl News, FTC Commissioner Andrew N. Ferguson for FTC Chairman, https://punchbowl.news/wp-content/uploads/FTC-Commissioner-Andrew-N-Ferguson-Overview.pdf).

[13] *Id.* (citing Statement from Gordon Crovitz, NewsGuard Co-CEO, on Brendan Carr Letter (Nov. 15, 2024), https://www.newsguardtech.com/wp-content/uploads/2024/11/NewsGuard-Statement-on-Brendan-Carr-Letter.pdf).

[14] *See* App.78 (citing Press Release, Fed. Trade Comm'n, Federal Trade Commission Launches Inquiry into Tech Censorship (Feb. 20, 2025), https://www.ftc.gov/news-events/news/press-releases/2025/02/federal-trade-commission-launches-inquiry-tech-censorship; and Request for Public Comment Regarding Technology Platform Censorship, https://www.ftc.gov/system/files/ftc_gov/pdf/P251203CensorshipRFI.pdf).

In an April 2025 interview, Chairman Ferguson explained how the FTC could use its "tremendous array of investigative tools" and "coercive power—formal and informal" to demand compliance to its views about supposed online "censorship." He said: "The regulators can show up, they can audit, they can investigate, they can cost you a lot of money, and the path of least resistance is: 'Do what we say.'" App.230. Ferguson's message was clear that the FTC would use its powers and the burdens and expenses it can impose not to determine if there was any legitimate basis for regulation, but rather to intimidate and coerce NewsGuard and others to do what the FTC demands. As he said, the FTC's investigative powers and tools "are expensive when applied to you even if we don't win at the end of the day," so the message is "knuckle under." *Id.*

### G. FTC's Tactics and Threats to Suppress Other Platforms.

The FTC's tactics toward NewsGuard are part of a broader retaliatory campaign against tech and media companies, including other review and rating services, for exercising their First Amendment rights. For example, in May 2025, the FTC launched a broad, intrusive investigation of Media Matters for America (a nonprofit media watchdog organization), when it published articles about the rise of "extremist and racist rhetoric" on X after Elon Musk acquired the platform, reporting that X began placing major companies' ads "next to pro-Nazi content." *Media*

14

*Matters for Am. v. FTC*, 805 F. Supp. 3d 105, 113 (D.D.C. 2025). Musk responded by promising to file a "thermonuclear lawsuit against Media Matters." *Id.*

And Republican allies picked up Musk's vendetta and advanced it, including through state attorneys general and the FTC and FCC. Stephen Miller (the current White House deputy chief of staff) accused Media Matters of "fraud" for its reporting, urging the "2 dozen+ conservative state Attorneys General" to go after the organization. *Id.* at 114. The AGs of Texas and Missouri also took up the cudgel and issued overbroad, oppressive CIDs to Media Matters. *Id.* But Media Matters sued in federal court in the District of Columbia and won preliminary injunctions precluding both investigations. *Id.*

In the case preliminarily enjoining the Texas CID, *Media Matters for Am. v. Paxton*, 732 F. Supp. 3d 1 (D.D.C. 2024), *aff'd*, 138 F.4th 563 (D.C. Cir. 2025), this Court, in affirming the injunction, opined that Media Matters was the "target of a government campaign of retaliation" and an "arguably bad-faith investigation" infringing "exercise of their First Amendment rights" and imposing "special burdens on their newsgathering activities and operation of their media company." 138 F.4th at 581. And in the case concerning the Missouri investigation, the district court held: "A reasonable factfinder is likely to interpret Defendants' words as targeting Media Matters not for legitimate law enforcement purposes but instead for its

protected First Amendment activities." *Media Matters for Am. v. Bailey*, 2024 WL 3924573, at \*15 (D.D.C. Aug. 23, 2024).

**H.     The FTC's CID and Investigation of Media Matters.**

But the FTC was undeterred by the failed cases brought by the Texas and Missouri AGs or the rulings of this Court or the district court below that the states' actions and coercion against Media Matters were pretextual pursuits in likely violation of the First Amendment. The FTC decided to go after Media Matters with an extensive, burdensome CID of its own.

On May 20, 2025, the FTC issued a CID to Media Matters with 20 detailed specifications demanding all documents and information about methodologies for addressing online speech or misinformation; all communications with tech companies or platforms; everything related to Media Matters' newsgathering, reporting, and editorial decisions; all programs, policies, and analyses; all of the company's financial reports and information, and more. *Media Matters*, 805 F. Supp. 3d at 116–17.

Media Matters filed suit again in the District of Columbia, alleging the FTC violated First and Fourth Amendment rights by pursuing its onerous investigation in retaliation for Media Matters' speech. Media Matters moved for a preliminary injunction to bar the FTC's investigation from going forward, which the district court granted, noting: "This case presents a straightforward First Amendment

16

violation." *Id.* at 111. The court rejected the government's argument that the FTC Act foreclosed any suit in the district court, observing *inter alia* that reading the statute to preclude Media Matters' First Amendment claims would "foreclose all meaningful judicial review." *Id*. at 124 (quotation marks and citation omitted).

The FTC sought a stay of the preliminary injunction pending appeal from this Court, which denied the government's request. This Court accepted the district court's findings that the broad scope of the CID, together with public statements of Chairman Ferguson, were sufficient to support a preliminary conclusion that the FTC's investigation was retaliatory. 2025 WL 2988966, at *7–9. (D.C. Cir. Oct. 23, 2025) (per curiam). After oral argument on the appeal before this Court, the FTC decided to withdraw its CID to Media Matters and entered a settlement agreement, committing not to pursue any similar CID or investigation of Media Matters going forward.[15]

The FTC's CID to Media Matters is just one of many the Commission issued and pursued against advertisers and ad agencies, third-party review services, and others. In addition to NewsGuard and Media Matters, the FTC also pursued Global

---

[15] *See* Order, *Media Matters for Am. v. FTC*, 2026 WL 1354245, at *1 (D.C. Cir. May 4, 2026) (dismissing the appeal); Press Release, Media Matters, Media Matters secures complete and total victory against Federal Trade Commission (May 4, 2026), https://www.mediamatters.org/angelo-carusone/media-matters-secures-complete-and-total-victory-against-federal-trade-commission.

Disinformation Index (a nonprofit news review service), Integrated Ad Science, Inc. (a brand safety platform), and reportedly a total of sixteen companies and nonprofit organizations in pursuit of its theory of some supposed "advertising boycott." App.81–82.

## I. The FTC's CID to NewsGuard.

On May 20, 2025, the same day the FTC issued its CID to Media Matters, the FTC also issued a sweeping CID to NewsGuard—21 pages long, containing 31 Specifications demanding vast numbers of confidential and sensitive documents. App.242–64 (FTC Civil Investigative Demand). It required production of all documents relating to NewsGuard's News Reliability Ratings and NewsGuard's methodology and work product; all documents about news sources rated; any and all analyses of the effects of NewsGuard's ratings on advertisers and publishers; identification of all NewsGuard customers; and essentially all communications from or to NewsGuard. *See* App.124–25 ¶ 40; App.242–264 (Specifications 5, 8, 11, 12, 14–16). The CID also required production of materials relating to NewsGuard's journalism and reporting, as well as every financial statement, budget, cost center report, and any other financial report of NewsGuard. App.242–264 (Specifications 5, 27, 28). The CID demands encompassed all documents from January 1, 2018, *i.e.*, NewsGuard's entire existence.

The CID raised serious concerns, not only because it was extraordinarily overbroad and burdensome, but also because it targeted speech and associational rights of the company and its customers. NewsGuard raised its concerns throughout its dealings with FTC staff, attempting to explain that NewsGuard's ratings, its editorial decisions, and its dealings with customers are plainly protected First Amendment activities. App.125 ¶ 42. NewsGuard tried to work with FTC staff, participating in ten meet-and-confer discussions and producing over 40,000 pages of documents over the course of eight months. *Id.* ¶ 43.

Responding to the CID was a time-consuming and expensive effort. NewsGuard's executives and staff spent hundreds of hours working to provide information and documents. NewsGuard's expenses rose to the point that legal fees alone amounted to more than 30% of NewsGuard's total revenues from its sales of brand-safety services to advertising industry customers. App.127 ¶ 49.

By January 2026, FTC staff made clear to NewsGuard that its good faith efforts to cooperate were futile. On January 15, 2026, two days after the parties' last meet-and-confer discussion, FTC staff sent a letter purporting to be a "good faith effort to reduce NewsGuard's burden," but which was in reality a doubling down on the CID's unconstitutional demands. App.126 ¶ 45.

Despite NewsGuard's seven months' efforts to cooperate, FTC staff simply repeated several of the most intrusive, infringing demands made from the outset,

including: (1) identification of all NewsGuard subscribers; (2) communications with customers; (3) identification of all entities to which NewsGuard had ever assigned a News Reliability Rating; (4) the particulars of each rating over time; and (5) documents to show how NewsGuard developed methodologies for ratings. *Id.* ¶ 46. At the same time, FTC staff insisted NewsGuard remained obligated to provide all documents called for by the *original* CID. App.126–27 ¶ 48.

The January 15, 2026, letter made clear the FTC would continue to pursue NewsGuard with the aim of imposing burdens and expense regardless of whether it had any legitimate grounds, until, in Chairman Ferguson's words, the company "knuckle[d] under." App.230. NewsGuard refused to do so, and accordingly filed a petition to quash the CID with the FTC, App.28 ¶ 106 (citing Petition to Quash), and in the district court below filed this action and preliminary injunction motion.

### J. The FTC's Omnicom Consent Order Blacklisting NewsGuard.

As it turned out, the FTC's CID was only a first salvo in its retaliatory censorship campaign against NewsGuard. As NewsGuard was attempting to negotiate in good faith with the FTC concerning the CID, the Commission was working separately to use a merger-review proceeding as a pretext to impose an order explicitly aimed at blacklisting NewsGuard. In an unprecedented move, the FTC imposed a condition on the merger of Omnicom Group Inc. (Omnicom), and The Interpublic Group of Companies, Inc. (IPG)—the world's third and fourth

largest companies involved in media buying for ad agencies and advertisers—specifically targeting NewsGuard by prohibiting the merged company or its affiliates from contracting with NewsGuard or using its rating services.

Omnicom had announced on December 9, 2024, that it had entered into an agreement to acquire IPG. App.127 ¶¶ 50–51. The companies worked with the FTC through the first half of 2025 to obtain approval of the merger, although these discussions were not made public. And on June 23, 2025, the FTC filed a *pro forma* complaint concerning the merger while simultaneously announcing a proposed consent order. App.127–28 ¶ 53. The proposed order did not require any divestiture or other structural changes for the new combined company, despite the fact it would be the world's largest advertising agency and media buying company. Rather, the draft order focused on precluding Omnicom or its agencies from doing business with any news rating service or entity that "[d]irects Advertisers' advertising spend based on the Media Publisher's political or ideological viewpoints, or the political or ideological viewpoints expressed in content that the Media Publisher sells advertising to run alongside of." App.128 ¶ 54.

This condition was intended to target and debilitate—if not eliminate—news rating services, per Chairman Ferguson's oft-stated views that such organizations were biased against conservative publications. NewsGuard was at the top of the FTC's and Ferguson's hit list. When the proposed consent order was made public,

Ferguson released a statement specifically calling out NewsGuard as an organization that "ha[s] publicly sought to use the chokepoint of the advertising industry to effect political or ideological goals" and alleging that NewsGuard steers "advertising revenue with 'an unavoidable partisan lens.'" App.128 ¶ 55. While no basis was cited for this, *id.*, it made clear that Chairman Ferguson's and the FTC's motivations in proposing and effecting the Omnicom merger conditions were entirely political and aimed squarely at censoring speech.

Following FTC publication of the proposed order, Newsmax, which (as noted) received low ratings from NewsGuard and thus had long criticized it as biased against conservative news sources, ran a series of stories contending the order did not go far enough. This was because, as written, the order would not prohibit Omnicom from using NewsGuard. App.128 ¶ 56. Of course, that reflected—as Newsmax well knew—that NewsGuard does not direct or recommend "advertising spend" based on "political or ideological viewpoints." *Id.* Rather, its ratings are strictly based on nonpartisan standards for journalistic accuracy and veracity.

Also, during the comment period for the proposed consent order, Newsmax filed a letter urging the FTC to expand the prohibitory condition to ensure Omnicom and its ad agencies "can no longer use biased rating organizations, fact checkers, and other third-parties to engage in censorship of disfavored news outlets." App.129 ¶ 58; App.285–99 (Newsmax letter). And Newsmax was not subtle about who it was

targeting. Its fourteen-page letter mentioned NewsGuard over a dozen times. On air and online, Newsmax commentators said the proposed order was inadequate because it "says nothing at all about stopping these agencies from using third-party ratings services like NewsGuard to block media like Newsmax." App.129 ¶ 59; App.300–303 (Newsmax article). Newsmax also lobbied Chairman Ferguson, members of Congress, and the President online. In posts on X directed to Ferguson, Newsmax asserted the FTC's proposed order was insufficient because it "[f]ully allows Omnicom to use left-wing NewsGuard." App.129 ¶ 60; App.304–05 (Newsmax post).

Meanwhile, numerous First Amendment scholars and free speech organizations submitted comments regarding the initial proposed order to explain its unconstitutionality. App.130 (citing examples). But to no avail. When the FTC subsequently issued a revised order, it made no mention of these comments, and disregarded the First Amendment concerns. App.130 ¶ 62.

Instead, the FTC removed the consent order terms about using third-party services with "political or ideological bias," which (as Newsmax knew) would not cover NewsGuard. The final Consent Order, adopted September 26, 2025, replaced those terms with a prohibition against the merged Omnicom entity or its affiliates using third-party services that evaluate "viewpoints as to the veracity of news reporting" and "adherence to journalistic standards or ethics." App.130 ¶ 63; *see*

App.308 (Omnicom Consent Order). There was no further comment period when NewsGuard could address or object to this revised language.

**K.      The FTC's *Dentsu* Consent Orders and Withdrawal of Its CIDs.**

On April 16, 2026, NewsGuard received notice the FTC was withdrawing its CID, which had been the subject of eleven months of dealings and litigation, including this action. *See* App.706–07. The only explanation was that the Commission had "entered, and a federal district court [had] approved, a settlement in *Federal Trade Commission, et al. v. Dentsu US, Inc., et al.*, No. 26-cv-469 (N.D. Tex)." App.707. That settlement, the FTC asserted, "resolved the issues related to NewsGuard that gave rise to the CID." App.707.

The *Dentsu* Consent Orders were three agreed orders, stipulated permanent injunctions, and final judgments entered by the U.S. District Court for the Northern District of Texas as to Dentsu US, Inc. ("Dentsu"), GroupM Worldwide LLC ("WPP"), and Publicis, Inc. ("Publicis"), three of the four largest remaining global ad agency holding companies after the Omnicom-IPG merger. *See FTC v. Dentsu US, Inc.*, No. 4:26-cv-469 (N.D. Tex. 2026), App.628–53, App.654–79, App.680–705. The *Dentsu* Consent Orders impose conditions that are, as the FTC concedes, "materially identical to those in the Omnicom consent order." App.583. Under both, Omnicom—and now Dentsu, WPP, and Publicis—are prohibited from using third-party services that evaluate "viewpoints as to the veracity of news reporting" or

"adherence to journalistic standards or ethics." *Compare* App.628–53 (Dentsu Consent Order), App.654–79 (WPP Consent Order), App.680–705 (Publicis Consent Order) at §§ II.C, III.B, *with* App.306–14 (Omnicom Consent Order) at §§ I.D, II.A. NewsGuard was again the FTC's target for these prohibitions.

The FTC obtained the *Dentsu* Consent Orders with a rush filing and cooperation of the Texas district court. The Commission submitted its complaint and stipulated proposed final order the morning of April 15, 2026. The district court accepted and entered the FTC's order less than four hours later, with no notice to NewsGuard (or anyone else), no hearing, and no opportunity to be heard.

By extending the blacklist of NewsGuard's services to three additional major industry participants, the FTC substantially broadened the scope of its retaliation campaign against NewsGuard. Together with the Omnicom Consent Order, the FTC-imposed prohibition on using third-party news rating services (*i.e.*, NewsGuard) now applies to five of the six largest global advertising agencies.

The FTC contended its "latest action [in obtaining the *Dentsu* consent orders] demonstrates that the Omnicom consent order was part of a comprehensive investigation against unlawful collusion in the digital advertising market," App.585–86, but the orders themselves and the FTC's complaint purportedly supporting them show nothing of the sort. Under the terms of the consent orders, Dentsu, WPP, and Publicis admitted no wrongdoing and were absolved of any liability. *See, e.g.*,

App.631 ¶ 4. The *Dentsu* complaint does not show or even allege any of these companies ever conspired or entered into any agreement with one another or with any other ad agencies. It does not show or allege any ad boycott. The prohibitory provisions of the consent orders again targeted NewsGuard "with the precision of a laser beam." *News Am. Publ'g, Inc. v. FCC*, 844 F.2d 800, 814 (D.C. Cir. 1988).

The FTC asserted that, "[f]ollowing the Commission's successful [*i.e.*, uncontested] lawsuit against Dentsu, WPP, and Publicis," it "no longer requires compliance with the CID" to NewsGuard. App.585. The FTC went even further, representing that "[t]he relief obtained in *Dentsu* … marks the culmination of the Commission's investigation in this area," stating that it had withdrawn not only the NewsGuard CID, but also the other 16 CIDs. App.585. In short, the FTC announced it was abandoning the field and its burdensome CIDs, having not discovered or revealed anything.

L.     **Harms to NewsGuard, Its Customers, and Speech Rights from the FTC's Actions.**

The FTC's multi-pronged pursuit of NewsGuard has threatened and harmed the speech rights of NewsGuard and its customers in numerous ways. The CID and persistent FTC demands that NewsGuard produce all documents concerning its journalism and editorial decision making (along with its many other demands) were not only burdensome and expensive for NewsGuard, App.127, 132 ¶¶ 49, 69, but were also a direct threat to NewsGuard's First Amendment rights as a publisher. For

the government to purport to require a journalistic organization to lay bare every communication for a seven-year period about every review it prepared and provided to subscribers, and every article, study, and analysis it published to the public, is a chilling threat to speech rights.

NewsGuard felt the chill. The FTC's CID and nearly year-long "investigation," along with the publicized statements of Chairman Ferguson assailing NewsGuard, caused the company to pull back from publishing analyses and opinions about advertising reliability and brand safety issues arising from programmatic ad campaigns.[16] App.494–97 (Transcript of Preliminary Injunction Hearing, "Hearing Transcript"). More generally, NewsGuard stopped referring to "misinformation," as this had come to be a triggering term for Ferguson, other administration officials, and conservative publishers. App.494.

The harm to NewsGuard and to its customers' First Amendment rights grew and was compounded by the Omnicom Consent Order. For example, the week after the Consent Order came out, a longstanding client that had done significant business with Omnicom informed NewsGuard it would not be renewing its contract. The

---

[16] From early 2020 through the first quarter of 2025, NewsGuard published 26 public reports about advertisers inadvertently financing misinformation through their ad placements. Following the issuance of the CID, NewsGuard stopped publishing such reports entirely for fear that doing so would exacerbate the FTC's campaign of retribution. NewsGuard published no reports on this topic for the remainder of 2025. *See* App.494–97.

customer said it was satisfied with NewsGuard's service but had been in contact with Omnicom and was ceasing its relationship due to "[r]ecent developments that require us to take a more cautious approach to this area of our business." App.131 ¶ 66 (Skibinski Declaration); *see also* App.496–97 (Hearing Transcript).

NewsGuard similarly had a contract with IPG dating back to 2019 to make available data about news publisher reliability for advertiser brands IPG represented. App.131 ¶ 67. Before the merger, IPG touted this arrangement in press releases and industry event panels. But, with the Consent Order prohibiting IPG from working with NewsGuard, NewsGuard predicted it was doubtful IPG would continue its contract, *id.*, and that proved true. IPG did not renew with NewsGuard when its contract came up for renewal in April 2026.

Harms from the FTC's pursuit of NewsGuard and the Omnicom Consent Order have continued and grown. In recent months, a major supply-side/demand-side platform for digital advertising[17] cancelled its five-year contract with NewsGuard based on apparent concerns that using NewsGuard's ratings and analyses would be viewed unfavorably by the FTC.

---

[17] A supply-side platform is one that markets and sells programmatic digital advertising for online publishers, while a demand-side platform represents advertisers seeking to place digital online ads.

The emerging and ongoing harm to NewsGuard and speech rights is not just loss of business or revenues. The Omnicom Consent Order imposed a blacklist, cutting off a major chunk of ad agency customers to whom NewsGuard could speak. The *Dentsu* Consent Orders made the blacklist near complete by extending the ban on using NewsGuard services to five of the world's six largest ad agency holding companies—some 85% of the market. The FTC's actions are not just chilling, they are a government-imposed censorship mandate cutting off a large swath of customers and potential customers to whom NewsGuard can speak.

**M.     The District Court's Denial of NewsGuard's Preliminary Injunction Motion.**

In mid-January 2026, after the FTC's announcement of the Omnicom Consent Order and the futility of NewsGuard's efforts to work with the FTC became apparent, NewsGuard filed suit in the D.C. District Court, asserting claims for the commission's retaliatory actions and censorship on February 6, 2026. App.1–52. NewsGuard filed a motion for preliminary injunction five days later. App.57–110. The district court heard argument on the motion on March 4, 2026, App.490–553 (Hearing Transcript), and issued an oral ruling denying the motion six weeks later, on April 22, 2026. App.728–38 (Transcript of Oral Ruling).

The district court did not question NewsGuard's showings on three of the four preliminary injunction elements—likely success on the merits, balance of the equities, and that an injunction is in the public interest. App.730 (citing the elements

29

as stated in *League of Women Voters v. Newby*, 838 F.3d 1, 6 (D.C. Cir. 2016)). It based its ruling solely on its view that NewsGuard "failed to demonstrate imminent, irreparable harm." *Id.* The court also said the FTC's withdrawal of its CID "obviate[d] the need for an order enjoining … any action to enforce the CID." But the court made no mention of the ongoing Omnicom Consent Order prohibition on using NewsGuard services. App.731–33.

In so ruling, the court expressed a narrow view of requisite harm to support a preliminary injunction. It said first "[t]here is no per se rule that a violation of freedom of expression automatically constitutes irreparable harm," App.732 (citing *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 301 (D.C. Cir. 2006)), without recognizing the difference between accusations of harm to speech rights versus a showing that such harm had occurred and was continuing. The court's reasoning, as explained in its ruling, was that a publisher such as NewsGuard can obtain preliminary injunctive relief only based on chilling of future speech, App.732, despite the fact that the FTC's actions already had censored NewsGuard and were continuing to foreclose NewsGuard's ability to communicate with customers and the public. The court opined that NewsGuard's loss of contracts and customers from the Omnicom Consent Order were merely monetary losses that could not support injunctive relief. App.734.

## SUMMARY OF ARGUMENT

In our constitutional scheme, the government has no legitimate role to decide "what counts as the right balance of private expression—to 'un-bias' what it thinks [is] biased." *Moody v. NetChoice, LLC*, 603 U.S. 707, 719 (2024). Chairman Ferguson's use of FTC authority to suppress NewsGuard's journalism based on his belief that it unfairly rates conservative news sites violates this basic principle. "On the spectrum of dangers to free expression, there are few greater than allowing the government to change the speech of private actors in order to achieve its own conception of speech nirvana." *Id.* at 741–42.

The district court's denial of NewsGuard's motion for a preliminary injunction for failing to show irreparable injury misreads applicable law. The court misapplied the standard for irreparable injury and held the adverse impact of the FTC's retaliatory campaign on NewsGuard only inflicted a "pocketbook injury" that does not constitute irreparable harm. With respect to NewsGuard's retaliation claim, the court erroneously found that the test for retaliation—whether government action would chill a person of ordinary firmness—applies only at the merits stage and not when seeking a preliminary injunction. Both conclusions are wrong under this Court's settled law.

The district court made three legal errors in holding NewsGuard did not establish irreparable harm. First, it misread this Court's precedents distinguishing

bare, unsupported constitutional allegations, which do not establish irreparable harm, from direct restrictions on speech, for which irreparable harm is presumed. Second, because the Omnicom merger condition directly restricts NewsGuard's dissemination of protected expression, the district court erred by requiring NewsGuard to separately show a chilling effect. Third, the court mischaracterized the harms flowing from the FTC actions targeting NewsGuard as ordinary financial harm rather than a present, concrete burden on NewsGuard's and its subscribers' First Amendment rights.

The district court also misapplied the standard for irreparable injury in First Amendment retaliation cases. The prohibition against government retaliation for protected speech is essentially a *per se* rule, as such retaliation serves no legitimate governmental interest. A public official who tries to shut down an avenue of expression of ideas and opinions through actual or threatened imposition of government power or sanction violates the First Amendment, and government action sufficient to chill a person of ordinary firmness inherently inflicts irreparable injury, contrary to the holding below. "It is the *fact* of '[o]fficial reprisal for protected speech' that inflicts injury, not whether that reprisal has its intended effect of silencing opposing views." *Kelly v. Hegseth*, 820 F. Supp. 3d 1, 23 (D.D.C. 2026) (quoting *Hartman v. Moore*, 547 U.S. 250, 256 (2006)) (emphasis in original). The decision below should be reversed.

**ARGUMENT**

## I. Standard of Review

"This court reviews the district court's legal conclusions as to each of the four [preliminary injunction] factors de novo, and its weighing of them for abuse of discretion." *Newby*, 838 F.3d at 6 (citation omitted). "Legal conclusions—including whether the movant has established irreparable harm—are reviewed de novo." *Davis v. Pens. Ben. Guar. Corp.*, 571 F.3d 1288, 1291 (D.C. Cir. 2009); *see also FTC v. Whole Foods Mkt., Inc.*, 548 F.3d 1028, 1034 (D.C. Cir. 2008) (quoting *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 713 (D.C. Cir. 2001)) (de novo review applies where the district court's denial of preliminary relief "'rests on an erroneous premise as to the pertinent law.'"). Where the record is clear, this Court may "independently grant an injunction" without remanding to the district court. *Newby*, 838 F.3d at 7; *see Backpage.com, LLC v. Dart*, 807 F.3d 229, 239 (7th Cir. 2015) (reversing denial of preliminary relief and directing the issuance of an injunction).

## II. The District Court Misapplied the First Amendment Irreparable Harm Standard.

The district court made three legal errors to hold that NewsGuard did not establish irreparable harm. First, it misread this Court's precedents distinguishing bare, unsupported constitutional allegations, which do not establish irreparable harm, from direct restrictions on speech, for which irreparable harm is presumed. Second, the district court further erred by requiring NewsGuard to separately show

a chilling effect in addition to the merger condition that directly restricts NewsGuard's dissemination of protected expression. Third, the court mischaracterized the harms flowing from the FTC actions targeting NewsGuard as ordinary financial harm rather than a present, concrete burden on NewsGuard's and its subscribers' First Amendment rights.

A. **NewsGuard Established Irreparable Harm Because the Harassment Campaign and Merger Condition Directly Restricts the Dissemination of NewsGuard's Protected Speech.**

It is well settled that "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Mahmoud v. Taylor*, 606 U.S. 522, 569 (2025) (quoting *Roman Catholic Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020)); *Media Matters for Am. v. Paxton*, 138 F.4th 563, 585 (D.C. Cir. 2025) (same). In this Circuit, to obtain a preliminary injunction, the moving party must show that its "First Amendment interests are either threatened or in fact being impaired at the time relief is sought," *Paxton*, 138 F.4th at 585 (quoting *Nat'l Treasury Emps. Union v. United States*, 927 F.2d 1253, 1254–55 (D.C. Cir. 1991)), rather than simply allege First Amendment injury. *Am. Acad. of Pediatrics v. U.S. Dep't of Health & Human Servs.*, 816 F. Supp. 3d 27, 61 (D.D.C. 2026). Those principles highlight an important distinction.

Although a bare allegation of a constitutional violation is insufficient to establish irreparable harm, *Hanson v. District of Columbia*, 120 F.4th 223, 244 (D.C.

Cir. 2024), irreparable harm may be presumed when the government takes actions that directly limit a party's ability to speak, publish, or distribute protected expression, or threatens to do so. *See Chaplaincy of Full Gospel Churches*, 454 F.3d at 301 (citation omitted). The district court recognized the first principle but overlooked the second.

NewsGuard did not merely allege a First Amendment violation. It documented a viewpoint-based retaliatory campaign that began with abusive investigative demands and culminated in a merger condition barring a major intermediary—the world's largest advertising agency holding company—from using NewsGuard's journalistic services and editorial judgments. *See* App.1–52. That is a present impairment of NewsGuard's protected expression, not an abstract or speculative harm.

*National Treasury Employees Union* (*NTEU*) *v. United States* explains the distinction between mere allegations and actual First Amendment injury. There, then-Judge Thomas wrote that a plaintiff seeking preliminary relief for First Amendment harm must show that its "First Amendment interests are either threatened or in fact being impaired at the time relief is sought." 927 F.2d 1253, 1254–55 (D.C. Cir. 1991) (citation and brackets omitted). The plaintiffs were federal employees who sought to enjoin a law prohibiting them from receiving honoraria for delivering speeches or writing articles. *Id.* at 1253. This Court denied preliminary

relief because the law did not limit the employees' ability to speak while the case proceeded and permitted reimbursement for "all of the necessary expenses" the employees incurred. *Id.* at 1255. Because there was no evidence the employees would "cease speaking or writing" during the litigation—and any financial injury was readily compensable—there was no irreparable harm. *Id.* at 1255–56.

This case is different. Whereas *NTEU* involved a law that affected compensation for speech but did not prevent the plaintiffs from speaking while the case proceeded, here the Consent Order forbids the merged Omnicom entity from using NewsGuard's editorial product at all. There is no prospect for regaining the lost speech opportunities foreclosed in the interim or later recovering "expenses," as in *NTEU*. The merger condition entirely forecloses a major channel through which NewsGuard disseminates its protected editorial analyses. That is direct, ongoing, present impairment.

*Chaplaincy of Full Gospel Churches* likewise illustrates the distinction between asserted and actual impairments of protected rights. This Court explained that a plaintiff who "merely allege[s] a violation of freedom of expression" does not establish irreparable harm. 454 F.3d at 301. It distinguished bare allegations from cases involving direct restrictions on speech, holding that "[w]here a plaintiff alleges injury from a rule or regulation that directly limits speech, the irreparable nature of

36

the harm may be presumed." *Id.* (quoting *Bronx Household of Faith v. Bd. of Educ.*, 331 F.3d 342, 349–50 (2d Cir. 2003)).

The Omnicom Consent Order does precisely that. NewsGuard disseminates its News Reliability Ratings to business subscribers, including advertising agencies that use those ratings to make informed decisions about where to place advertisements. *See* App.6–10. The merger condition directly restricts that dissemination channel by prohibiting the world's largest advertising agency from using third-party services that evaluate "viewpoints as to the veracity of news reporting" and "adherence to journalistic standards or ethics." *See* App.308. That language targets NewsGuard "with the precision of a laser beam." *News Am. Publ'g, Inc.*, 844 F.2d at 814.[18] And, as this prohibition was implemented because of the antipathy of Chairman Ferguson and Newsmax toward NewsGuard, *see supra*, Sec.I.J., it is clear that this condition of the merger was *intended* to significantly impair NewsGuard's ability to speak, as it has done.

Moreover, the dictum in *Chaplaincy* that "there is no per se rule that a violation of freedom of expression automatically constitutes irreparable harm,"

---

[18] The *Dentsu* Consent Order, imposed in April 2026, expanded the FTC's retaliatory campaign against NewsGuard by extending the prohibition on using services that assess reliability of news sources to Dentsu, WPP, and Publicis, thus cutting off five of the six largest global advertising agencies from working with NewsGuard. *See supra*, Sec. I.K.

App.732 (quoting 454 F.3d at 301) (formatting altered), cannot be read to override the Supreme Court's and this Court's repeated holdings that "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Mahmoud*, 606 U.S. at 569; *Paxton*, 138 F.4th at 585. *Chaplaincy* did not create an exception to the *Elrod* rule.[19] It simply applied the principle established in *NTEU*: while a litigant must do more than *assert* a constitutional harm, preliminary relief is warranted once it shows that its "First Amendment interests are either threatened or in fact being impaired at the time relief is sought." *Paxton*, 138 F.4th at 585 (quoting *NTEU*, 927 F.2d at 1254–55).

NewsGuard made that showing. The Omnicom Consent Order forbids the world's largest advertising agency from using NewsGuard's editorial judgments because the FTC disapproves of NewsGuard's perceived viewpoint. It operates as a government-imposed blacklist prohibiting Omnicom and its affiliates from using NewsGuard's journalistic services, and NewsGuard has already lost customers as a result. *See* App.90. That is classic irreparable harm.

**B.    Because the Merger Condition Operates as a Direct Restriction on Speech, NewsGuard was Not Required to Separately Prove Chill.**

The district court also erred in holding that a plaintiff seeking preliminary relief for First Amendment harm must always show a chilling effect, and thus

---

[19] *See Elrod v. Burns*, 427 U.S. 347 (1976).

requiring NewsGuard to show a chilling effect in addition to direct, viewpoint-based restriction of its speech. *See* App.732 (citing *Chaplaincy of Full Gospel Churches*, 454 F.3d at 301). That is not what this Court said in *Chaplaincy of Full Gospel Churches*, and it is not the law.

A plaintiff seeking a preliminary injunction must show his speech was chilled only where "*it is not clear* that a particular statute, policy, or practice will have any actual adverse effect on protected First Amendment liberties." 454 F.3d at 301 (emphasis added). By contrast, where government action "directly limits speech"— as here—a plaintiff need not separately establish chill. *Id.* (quoting *Bronx Household of Faith*, 331 F.3d at 349–50).

In other words, chill may be relevant to the irreparable harm inquiry where the asserted First Amendment injury is uncertain or indirect. But it is not required in a case like this, where government action directly suppresses, penalizes, or prohibits protected expression. *See Cate v. Oldham*, 707 F.2d 1176, 1188–89 (11th Cir. 1983) (distinguishing "direct penalization … of First Amendment rights," which "constitutes irreparable injury," from "incidental" effects). That distinction is central to this Court's irreparable harm analysis. *Compare Sanders v. McClellan*, 463 F.2d 894, 903 (D.C. Cir. 1972) (assessing chilling effects because the challenged government action did not result in "direct suppression of speech"), *with Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016)

(presuming irreparable harm where the challenged rule directly barred the plaintiff from using candidate names in the titles of its web pages).

Courts in this Circuit understand and regularly apply this distinction. *See, e.g.*, *Ateba v. Jean-Pierre*, No. 23-2321, 2023 WL 5748567, at *5 (D.D.C. Sept. 6, 2023) (where speech is "directly curtailed," a plaintiff need not establish chill); *Bailey v. Fed. Bureau of Prisons*, No. 24-1219, 2024 WL 3219207, at *9 (D.D.C. June 28, 2024) (presuming irreparable harm because the alleged injury arose from "a direct limitation" on speech); *Am. Bar Ass'n v. U.S. Dep't of Justice*, 783 F. Supp. 3d 236, 247 (D.D.C. 2025) (irreparable harm established where termination of federal grant money "directly punishe[d]" protected expressive activity).

Here, the FTC has done more than issue a threat. After publicly targeting NewsGuard's ratings services and issuing a sweeping CID, the FTC used the Omnicom-IPG merger to prevent NewsGuard from disseminating its speech to the world's largest advertising agency. *See* App.29. Such adverse actions easily establish irreparable harm.

**C.    The District Court Mischaracterized NewsGuard's Injury as Ordinary Financial Harm Rather than a Present, Concrete Burden on its Journalistic Expression.**

The FTC's financial burdening of NewsGuard's business operations directly threatens, and currently restricts, NewsGuard's speech. That threat is not incidental: It is the entire purpose of the FTC's actions. The district court thus erred in

characterizing this harm as ordinary "pocketbook injuries" insufficient to support preliminary injunctive relief on grounds that "recoverable monetary loss" is irreparable harm "only where the loss threatens the very existence of the movant's business." App.734, 735 (citing *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)). That is wrong for several reasons.

First, the rule in *Wisconsin Gas* does not apply in the First Amendment context. That case involved natural gas regulations that threatened to make contracts more expensive; it had nothing to do with free expression. Where a plaintiff's business is itself protected expression, a burden on that business is an impairment of First Amendment rights. Second, the court's suggestion that NewsGuard can merely "reinitiate" its contract with IPG if the Court ultimately holds the merger condition unlawful, App.735, 736, overlooks immediate ongoing injury because of the speech that NewsGuard is *currently* barred from disseminating to the merged entity and their agencies and affiliates. Third, the district court erroneously concluded NewsGuard did not allege its speech had been chilled, App.732, when the record showed the opposite. *See* App.131–32 (Skibinski Declaration); App.494–98 (Hearing Transcript).

These principles are applied time and again in Supreme Court and D.C. Circuit precedent, and for good reason. Were it otherwise, the government could not be preliminarily enjoined from violating First Amendment rights of a media business

unless it threatened to extinguish the entity entirely. That is not the law. Once a plaintiff whose "very business" is their editorial product shows a direct threat to its speech, it "*easily clears* the irreparable-harm requirement to warrant preliminary relief." *Endocrine Society v. FTC*, 2026 WL 1257289, at \*10, 14 (D.D.C. May 7, 2026) (emphasis added) (citing *Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009)).

This is why, for instance, the Supreme Court in *Minneapolis Star and Tribune Co. v. Minnesota Commissioner of Revenue* struck down Minnesota's "use tax" on paper and ink products consumed in the production of newspaper publications. 460 U.S. 575 (1983). While the tax created, by definition, a financial injury, the Court readily held that it was also an unconstitutional "burden on the interests protected by the First Amendment." *Id.* at 585.

Similarly, in *United States v. Playboy Entertainment Group, Inc.*, the Supreme Court struck down a statute requiring cable television operators to restrict viewership of sexual programming during particular times of day. 529 U.S. 803 (2000). The Court held that economic burdens on a media organization that "burden[] speech because of its content" "must receive strict scrutiny" just like any content-based speech prohibition. *Id.* at 815. As the Court explained: "It is of no moment that the statute does not impose a complete prohibition. The distinction between laws burdening and laws banning speech is but a matter of degree." *Id.* at 812.

The district court dismissed this tenet of *Playboy*, reasoning that its discussion of business harm in that case came from a part of the opinion for "why the statute in question constituted a content-based restriction." App.735 (citing *Playboy Ent. Grp.*, 529 U.S. at 811). But so what? The fact that the Court explained why strict scrutiny applied in that case in no way undermines its *holding* that government action limiting a publisher's market "as a penalty for its programming choice" is *First Amendment injury*. App.734. And it is precisely the type of First Amendment injury the FTC is inflicting on NewsGuard.

The court also tried to distinguish *Playboy* by observing it involved "a permanent injunction, not a preliminary one," and that a party seeking a preliminary injunction "must show that it is facing ongoing irreparable harm warranting the Court's immediate intervention." App.735. However, a preliminary injunction was denied in *Playboy* only because the adverse economic impact of the law had not been shown "[a]t the time of the preliminary injunction hearing." *Playboy Ent. Grp., Inc. v. United States*, 30 F. Supp. 2d 702, 711 (D. Del. 1998). After evidence was presented at trial demonstrating the adverse business impact, the court granted injunctive relief, finding the law "diminishes Playboy's opportunities to convey, and the opportunity of Playboy's viewers to receive, protected speech" *Id*. at 717–18, *aff'd*, 529 U.S. at 812 ("The effect of the federal statute on the protected speech is now apparent."). The standard for irreparable harm did not change between the

43

preliminary injunction hearing and the decision on a permanent injunction; it was only a question of what proof existed at the relevant stage of the proceedings.

Unlike *Playboy*, here there was no lack of evidence of harm at the preliminary injunction stage demonstrating adverse impacts of the FTC's actions. NewsGuard showed it has already lost contracts because of the Omnicom merger condition that prevented opportunities to speak, and that as this litigation has progressed, the FTC extended the same condition to other advertising companies, only increasing the First Amendment injury.

NewsGuard's "very business" is protected journalism. *See Endocrine Society*, 2026 WL 1257289 at \*10. And the Omnicom Consent Order not only "stifles" and "burdens" NewsGuard's speech, it outright blocks communication of a journalism enterprise to its subscribers and customers. NewsGuard's sole means of earning an income is engaging in protected expression; its business activities are synonymous with its First Amendment activities. *See Playboy Ent. Grp.,* 30 F. Supp. 2d at 717– 18 (lost revenues diminish "opportunities to convey, and the opportunity of … viewers to receive, protected speech"). So when NewsGuard's business activities are impeded, its First Amendment rights are abridged as well.

This is more than sufficient to satisfy irreparable harm for preliminary injunctive relief. The district court's alternative formulation, that a party seeking injunctive relief can prevail only by showing a loss that "threatens the very existence

of the movant's business," and that such a showing might justify a permanent injunction but not a preliminary one, would all but rule out preliminary injunctions in First Amendment cases. That is simply not correct, and it is why when it comes to freedom of expression, "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Mahmoud*, 606 U.S. at 569; *see also Paxton*, 138 F.4th at 585 (same).

### III. The FTC's Retaliatory Campaign Against NewsGuard Inflicted Irreparable Harm and Violates the First Amendment.

A public official who tries to shut down an avenue of expression of ideas and opinions through "actual or threatened imposition of government power or sanction" violates the First Amendment. *Backpage.com, LLC v. Dart*, 807 F.3d 229, 230 (7th Cir. 2015) (quoting *Am. Family Ass'n, Inc. v. City & Cnty. of San Francisco*, 277 F.3d 1114, 1125 (9th Cir. 2002)). As the Supreme Court recently reaffirmed unanimously, a government official "cannot do indirectly what he or she is barred from doing directly." *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 190 (2024); *see Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67–69 (1963). This Court held in *Paxton* that such a retaliatory campaign against a media plaintiff inflicts irreparable injury and must be enjoined. 138 F.4th at 585. But the court below failed to follow this authority and denied NewsGuard's motion for a preliminary injunction because it applied the wrong test for irreparable injury.

**A.    The Record Shows the FTC Engaged in a Retaliatory Campaign Against NewsGuard Because of its Protected Expression.**

Defendants' campaign to stifle NewsGuard began with Chairman Ferguson's politically-coded pledges to stand up to the "radical left" and to go after progressives who are targeting disinformation—falsely calling out NewsGuard by name—as he lobbied for his current position. App.77. Once in office, Chairman Ferguson described the investigatory and regulatory tools at his disposal to get FTC targets to "knuckle under" and to "[d]o what we say." App.230. And he quickly followed up on that pledge when the Commission promulgated its burdensome, abusive CID to NewsGuard, demanding virtually all internal documents, including sensitive reporting and client information, dating back to the company's founding in 2018. App.242–64 (Civil Investigative Demand). The FTC then approved the Omnicom-IPG Consent Order, which operates as an ongoing blacklist against NewsGuard's provision of brand safety services to the largest advertising agencies in the world. App.90. The Commission has since imposed the same prohibitions on another three global ad agencies. App.628–53 (Dentsu Consent Order), App.654–79 (WPP Consent Order), App.680–705 (Publicis Consent Order).

This retaliatory campaign has undeniably abridged NewsGuard's speech and blocked its journalistic output to subscribers. The blunderbuss CID demands devoured countless hours of NewsGuard staff and outside counsel time, forcing NewsGuard to divert revenue and resources away from its core journalistic mission.

App.28 ¶ 104. The Consent Order foreclosing Omnicom (and IPG, which it merged with) from using NewsGuard's service already has had a direct and substantial effect on NewsGuard, and further losses are imminent. App.35–37 ¶¶ 131–35. This blacklist has now been extended to other advertising firms. App.628–705 (Dentsu, WPP, and Publicis Consent Orders).

### B. Chairman Ferguson and the FTC Violated the First Amendment's Prohibition Against Retaliation for Speech.

The prohibition against government retaliation for protected speech is essentially a *per se* rule, as such retaliation serves no legitimate governmental interest. *See Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 829 (1995) "[T]he First Amendment prohibits government officials from subjecting an individual to retaliatory actions … for speaking out." *Hartman v. Moore*, 547 U.S. 250, 256 (2006). *See also Houston Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 474 (2022) (quoting *Nieves v. Bartlett*, 587 U.S. 391, 398 (2019)); *Perry v. Sindermann,* 408 U.S. 593, 597 (1972) (the government may not punish a person or deprive him of a benefit to limit "constitutionally protected speech"). And even more pointedly, the government may not restrict or regulate speech "when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger*, 515 U.S. at 829.

A government official engages in unconstitutional retaliation when (1) he targets activity protected by the First Amendment; (2) the adverse action is sufficient

to deter a person of ordinary firmness from speaking again; and (3) there is a causal link between the exercise of the constitutional right and the official's action. *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016). The FTC's actions targeting NewsGuard meet each of these conditions.

First, there is no dispute NewsGuard's business is constitutionally protected. The First Amendment protects journalistic judgment and editorial decisions. *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 254–56 (1974); *New York Times Co. v. Sullivan*, 376 U.S. 254, 269 (1964). NewsGuard's evaluation of news sites for accuracy and reliability and its publication of reports and analyses is "quintessential First Amendment activit[y]," *Paxton*, 138 F.4th at 584, and in publishing its ratings NewsGuard is "obviously engaged in conduct protected under the First Amendment." *Id.* NewsGuard's rating system is akin to "a newspaper's editorial section." *Consortium for Indep. Journalism, Inc.*, 2025 WL 919504, at *18 n.11. Defendants have never questioned this, nor could they.

Second, there can be no doubt Chairman Ferguson's campaign against NewsGuard and the FTC's actions implementing it would deter a person of ordinary firmness from speaking. This Court has encountered such behavior before and concluded it easily met the test for unconstitutional retaliation. In *Paxton*, for example, the Court noted that "Media Matters is the target of a government campaign of retaliation, including an investigation, a press release, and a sweeping

CID" and that "[s]uch a campaign of retaliation in response to Appellees' exercise of their First Amendment rights reflects concrete and present harm." 138 F.4th at 581. Here, in addition to an investigation and sweeping CID, the conditions of the Omnicom Consent Order operate as a direct prohibition on speech. Notably, the Supreme Court in *Vullo* held it offends the First Amendment for regulators to enter consent decrees granting concessions to regulated companies on condition they cease doing business with a disfavored speaker. 602 U.S. at 185–86, 198. Yet that is precisely what the FTC has done in this case.

Third, causality is established because NewsGuard's protected speech is what triggered the FTC's retaliatory campaign. Retaliation cases can be hard to prove because retaliatory acts usually happen behind closed doors. *See*, *e.g.*, *Vullo*, 602 U.S. at 198. But the record here—replete with FTC Chairman Ferguson's own public statements—confirms these actions were taken to restrict NewsGuard's journalistic activities. Taking just one example, the FTC modified the Omnicom-IPG Consent Order in direct response to Newsmax's complaint that it did not cover NewsGuard. App.32–34 ¶¶ 120–26. Unlike the typical retaliation case, the defendants here shouted their illicit purpose from the rooftops.

### C. The District Court Denied Injunctive Relief Because it Applied the Wrong Standard.

Such overt use of regulatory power as a means of retaliation cries out for injunctive relief, as a string of recent cases in the D.C. Circuit reflect. *See*, *e.g.*,

*Paxton*, 138 F.4th at 584 (affirming grant of preliminary injunction); *Media Matters for Am. v. FTC*, 805 F. Supp. 3d 105 (D.D.C. 2025) (granting preliminary injunction), *stay pending appeal denied*, No. 25-5302, 2025 WL 2988966, at *5 (D.C. Cir. Oct. 23, 2025) (per curiam), *appeal dismissed*, 2026 WL 1354245 (D.C. Cir. May 4, 2026); *Media Matters for Am. v. Bailey*, 2024 WL 3924573, at *18 (D.D.C. Aug. 23, 2024) (granting preliminary injunction); *Endocrine Society*, 2026 WL 1257289, at *14–15 (granting preliminary injunction); *World Pro. Ass'n for Transgender Health v. FTC*, 2026 WL 1257321, at * 2, 4 (D.D.C. 2026) ("preliminary relief is warranted on WPATH's First Amendment retaliation claim alone"). The district court, however, denied injunctive relief because it applied the wrong standard not just for assessing irreparable harm generally, but also for doing so in retaliation cases.

The district court erred by requiring NewsGuard to establish *subjective* chill. The court concluded the objective ordinary firmness inquiry is merely "a component of the merits standard" of a retaliation claim and "not the standard by which the Court assesses irreparable harm." App. 732–33. As described below, although the irreparable harm inquiry is distinct from the merits standard in certain contexts, *e.g.*, *National Treasury Employees Union*, 927 F.2d at 1254–56, that conclusion does not follow in cases involving First Amendment retaliation.

In such cases there is no requirement to show speech was chilled. In *Heffernan v. City of Paterson*, 578 U.S. 266 (2016), for example, the Supreme Court held that

a police department likely violated the First Amendment for demoting an officer on the mistaken belief he had engaged in politicking when he picked up some political signs to deliver to his bedridden mother. The Court noted the city "acted upon a constitutionally harmful policy whether Heffernan did or did not in fact engage in political activity." *Id.* at 273. The officer could not have been "chilled" since he was not engaged in politicking. But the Court held that "the government's reason for demoting Heffernan is what counts" because "the First Amendment begins by focusing upon *the activity of the Government.*" *Id*. (emphasis added). *See Jenner & Block LLP v. U.S. Dep't of Justice*, 784 F. Supp.3d 76, 94 n.6 (D.D.C. 2025) (explaining "[w]hat matters is the administration's motive").[20]

If the rule were otherwise, principled speakers would be hard pressed to ever obtain a preliminary injunction. *Kelly v. Hegseth* is directly on point. There, Senator Mark Kelly advanced a First Amendment retaliation claim after Secretary of Defense Pete Hegseth sent a censure letter and subjected him to retirement grade proceedings after Kelly published a video with five other members of Congress reminding members of the armed forces they may refuse illegal orders. *See Kelly v. Hegseth*, 820 F. Supp. 3d 1, 11–12 (D.D.C. 2026). In rejecting Secretary Hegseth's argument

---

[20] This tracks the reasoning regarding Establishment Clause violations in cases like *Chaplaincy of Full Gospel Churches*, because "the Establishment Clause is implicated as soon as the government engages in impermissible action." 454 F.3d at 302.

that Senator Kelly had "pled himself out of irreparable injury" by continuing to speak despite government coercion, the court put it plainly: "Please! That is not the law." *Id.* at 23. Such a rule, the court recognized, would "preclude intrepid speakers from ever showing irreparable First Amendment harm." *Id.* (internal citations omitted).

First Amendment injury from a retaliatory threat does not turn on the victim's subjective response. As Judge Richard Posner explained in *Backpage.com*, "a threat is actionable and thus can be enjoined even if it turns out to be empty—the victim ignores it, and the threatener folds his tent." 807 F.3d at 231. It is "the *fact* of 'official reprisal for protected speech' that inflicts injury, not whether that reprisal has its intended effect of silencing opposing views." *Hegseth*, 820 F. Supp. 3d at 23 (quoting *Hartman v. Moore*, 547 U.S. 250, 256 (2006)) (emphasis in original).

Contrary to the decision below, courts frequently grant preliminary injunctive relief against retaliation for speech under the "ordinary firmness" standard. *See*, *e.g.*, *Paxton*, 138 F.4th at 585 (irreparable harm is established where a plaintiff "suffer[s] from a campaign of retaliation against [it] in response to [its] exercise of [its] First Amendment rights"); *Cate v. Oldham*, 707 F.2d 1176, 118–19 (11th. Cir. 1983) (a plaintiff need not "prove actual, current chill" to establish irreparable injury because "direct retaliation by the state for having exercised First Amendment freedoms in the past is particularly proscribed by the First Amendment"); *Dart*, 807 F.3d at 238 ("Sheriff Dart's campaign of suffocation [was] bound to cause irreparable injury to

Backpage"); *Hegseth*, 820 F. Supp. 3d at 23 ("'These current and anticipated harms are sufficient to demonstrate irreparable harm'") (quoting *Turner v. U.S. Agency for Glob. Media*, 502 F. Supp. 3d 333, 385 (D.D.C. 2020); *Nat'l Pub. Radio, Inc. v. Trump*, 2026 WL 877434, at *28 (D.D.C. 2026) (characterizing the irreparable injury as the government's direct retaliation). This Court should apply the "reasonable firmness" test in the same way and reverse the decision below.

## IV. Withdrawal of the CID Does Not Moot the Case.

The district court said nothing about the ongoing injury imposed by the Omnicom Consent Order. Accordingly, the court's conclusion that the FTC's withdrawal of the CID "obviate[s] the need for an order enjoining the defendants from initiating any action to enforce the CID," App.731, has no effect on the need for immediate injunctive relief from the FTC's retaliatory campaign against NewsGuard. But even with respect to those aspects of the case arising from the CID, the district court misapplied the law.

Voluntary cessation of unconstitutional activity alone does not moot a First Amendment challenge. In *First Choice Women's Resource Centers, Inc. v. Davenport*, 146 S. Ct. 1114 (2026), the Supreme Court addressed First Amendment injury and mootness principles in the context of government investigative demands. It reiterated that the voluntary cessation doctrine imposes a "heavy burden" on a defendant, who must show there is no reasonable expectation it will resume the

challenged conduct. *Id.* at 1130 (quoting *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 457 n.1 (2017)). No such showing has been made here. And given Chairman Ferguson's and the FTC's multi-pronged campaign of harassment against NewsGuard, merely withdrawing the CID does not satisfy this burden of proof.

## CONCLUSION

For the reasons set forth above, the Court should reverse the lower court's decision and remand with instructions to grant NewsGuard's Motion for a Preliminary Injunction.

Dated: June 30, 2026

Respectfully Submitted,

/s/ Robert Corn-Revere
Robert Corn-Revere
  (D.C. Bar No. 375415)
James C. Grant
  (WA Bar No. 14358)
Sara E. Berinhout
  (MA Bar No. 703217)
Samuel Rudovsky
  (PA Bar No. 335724)
  Not Admitted to the D.C. Bar. D.C.
  Practice limited to U.S. federal courts
  and related matters under D.C. Ct. App.
  R. 49(c)(3).
FOUNDATION FOR INDIVIDUAL
  RIGHTS AND EXPRESSION
700 Pennsylvania Ave. SE, Ste. 340
Washington, DC 20003
(215) 717-3473
bob.corn-revere@fire.org
jim.grant@fire.org
sara.berinhout@fire.org
sam.rudovsky@fire.org

*Counsel for Plaintiff-Appellant*

**CERTIFICATE OF COMPLIANCE**

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by the Fed. R. App. P. 32(f), this document contains 11,994 words.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font.

Dated: June 30, 2026                    Respectfully Submitted,

                                        /s/ Robert Corn-Revere
                                        Robert Corn-Revere
                                        FOUNDATION FOR INDIVIDUAL
                                           RIGHTS AND EXPRESSION

                                        *Counsel for Plaintiff-Appellant*

# CERTIFICATE OF SERVICE

I hereby certify that on June 30, 2026, the foregoing Brief for Appellant was electronically filed with the Clerk of this Court using the CM/ECF system, which will send a notification to the attorneys of record in this matter who are registered with the Court's CM/ECF system.

Dated: June 30, 2026

Respectfully Submitted,

/s/ Robert Corn-Revere
Robert Corn-Revere
FOUNDATION FOR INDIVIDUAL
   RIGHTS AND EXPRESSION

*Counsel for Plaintiff-Appellant*