NOT YET SCHEDULED FOR ORAL ARGUMENT

**No. 26-5138**

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

NEWSGUARD TECHNOLOGIES,

*Plaintiff-Appellant,*

v.

FEDERAL TRADE COMMISSION and ANDREW N. FERGUSON,
in his official capacity as Chairman of the Federal Trade Commission,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the District of Columbia, No. 1:26-cv-00353-DLF

---

# APPENDIX FOR APPELLANT

---

Robert Corn-Revere
James C. Grant
Sara E. Berinhout
Samuel Rudovsky
FOUNDATION FOR INDIVIDUAL
RIGHTS AND EXPRESSION
700 Pennsylvania Ave. SE, Ste. 340
Washington, DC 20003
(215) 717-3473
bob.corn-revere@fire.org
jim.grant@fire.org
sara.berinhout@fire.org
sam.rudovsky@fire.org

*Counsel for Plaintiff-Appellant*

**TABLE OF CONTENTS**

Complaint ........................................................................................................001

Plaintiff's Motion for Preliminary Injunction .....................................................053

Memorandum in Support of Plaintiff's Motion for Preliminary Injunction..........057

Declaration of Matthew Skibinski in Support of Plaintiff's Motion for Preliminary Injunction........................................................................................ 111

Exhibit 1 to Plaintiff's Motion for Preliminary Injunction ..................................133

Exhibit 2 to Plaintiff's Motion for Preliminary Injunction ..................................146

Exhibit 3 to Plaintiff's Motion for Preliminary Injunction ..................................162

Exhibit 4 to Plaintiff's Motion for Preliminary Injunction ..................................177

Exhibit 5 to Plaintiff's Motion for Preliminary Injunction ..................................192

Exhibit 6 to Plaintiff's Motion for Preliminary Injunction ..................................194

Exhibit 7 to Plaintiff's Motion for Preliminary Injunction ..................................196

Exhibit 8 to Plaintiff's Motion for Preliminary Injunction ..................................204

Exhibit 9 to Plaintiff's Motion for Preliminary Injunction ..................................209

Exhibit 10 to Plaintiff's Motion for Preliminary Injunction ................................214

Exhibit 11 to Plaintiff's Motion for Preliminary Injunction.................................217

Exhibit 12 to Plaintiff's Motion for Preliminary Injunction ................................220

Exhibit 13 to Plaintiff's Motion for Preliminary Injunction ................................225

Exhibit 14 to Plaintiff's Motion for Preliminary Injunction ................................240

Exhibit 15 to Plaintiff's Motion for Preliminary Injunction ................................242

Exhibit 16 to Plaintiff's Motion for Preliminary Injunction ................................265

Exhibit 17 to Plaintiff's Motion for Preliminary Injunction ................................268

Exhibit 18 to Plaintiff's Motion for Preliminary Injunction ................................272

Exhibit 19 to Plaintiff's Motion for Preliminary Injunction ................................279

Exhibit 20 to Plaintiff's Motion for Preliminary Injunction ................................285

Exhibit 21 to Plaintiff's Motion for Preliminary Injunction ................................300

Exhibit 22 to Plaintiff's Motion for Preliminary Injunction ................................304

Exhibit 23 to Plaintiff's Motion for Preliminary Injunction ................................306

Proposed Order Granting Plaintiff's Motion for Preliminary Injunction.............315

Defendants' Opposition to Plaintiff's Motion for Preliminary Injunction ............317

Plaintiff's Reply in Support of Motion for Preliminary Injunction.......................374

Defendants' Notice of the Commission's Order Regarding NewsGuard's Petition to Quash ..........................................................................................409

Exhibit A to Defendants' Notice of the Commission's Order Regarding NewsGuard's Petition to Quash.......................................................................411

Exhibit B to Defendants' Notice of the Commission's Order Regarding NewsGuard's Petition to Quash.......................................................................428

Transcript of Preliminary Injunction Motion Hearing ........................................490

Notice of Supplemental Authority.......................................................................554

*X Corp. v. World Federation of Advertisers et al.*...............................................557

Defendants' Response to Plaintiff's Notice of Supplemental Authority ...............580

Defendants' Notice of Withdrawal of Civil Investigative Demand and Notice of Related Litigation...........................................................................................583

Exhibit 1 to Defendants' Notice of Withdrawal of Civil Investigative Demand and Notice of Related Litigation..........................................................587

Exhibit 2 to Defendants' Notice of Withdrawal of Civil Investigative Demand and Notice of Related Litigation..........................................................628

Exhibit 3 to Defendants' Notice of Withdrawal of Civil Investigative Demand and Notice of Related Litigation ............ 654

Exhibit 4 to Defendants' Notice of Withdrawal of Civil Investigative Demand and Notice of Related Litigation ............ 680

Exhibit 5 to Defendants' Notice of Withdrawal of Civil Investigative Demand and Notice of Related Litigation ............ 706

Plaintiff's Response to Defendants' Notice of Withdrawal of Civil Investigative Demand and Notice of Related Litigation ............ 708

Exhibit 1 to Plaintiff's Response to Defendants' Notice of Withdrawal of Civil Investigative Demand and Notice of Related Litigation ............ 716

Order Denying Motion for Preliminary Injunction ............ 727

Transcript of Oral Ruling ............ 728

Notice of Appeal ............ 739

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

NEWSGUARD TECHNOLOGIES, INC., 25 W. 52nd Street, 15th Floor New York, NY 10019

*Plaintiff*,

v.

FEDERAL TRADE COMMISSION and ANDREW FERGUSON, in his official capacity as Chairman of the Federal Trade Commission, 600 Pennsylvania Avenue NW, Washington, DC 20580

*Defendants*.

Civil Action No.:

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

JURY TRIAL DEMANDED

(Rule 57 Speedy Hearing Request)

## INTRODUCTION

1. The most basic rule of the First Amendment is that the Free Speech Clause "constrains governmental actors and protects private actors." *Manhattan Cmty. Access Corp. v. Halleck*, 587 U.S. 802, 804 (2019). And "[o]n the spectrum of dangers to free expression, there are few greater than allowing the government to change the speech of private actors in order to achieve its own conception of speech nirvana." *Moody v. NetChoice, LLC*, 603 U.S. 707, 741–4-2 (2024).

2. Yet the Federal Trade Commission ("FTC" or the "Commission") under Chairman Andrew Ferguson has set out to do exactly that. In a multi-faceted campaign extending almost a year, the Chairman and the FTC have used the Commission's considerable regulatory powers to attack and punish a private news organization—NewsGuard Technologies, Inc. ("NewsGuard")—to impose their view of speech nirvana.

3. Under the guise of a supposed antitrust investigation, the FTC has demanded all documents (memos, emails, texts, reporters' notes, subscriber lists, analyses, financial reports, and more) that NewsGuard has created or received since its founding in 2018. Then, in the context of a merger review (approving creation of the world's largest advertising agency holding company, Omnicom), the Commission entered an order requiring that NewsGuard be put on an unprecedented speech-based blacklist—*i.e.*, the merged company had to agree not to subscribe to or rely on

NewsGuard's ratings and journalism because such ratings reflect "viewpoints as to the veracity of news reporting" and "adherence to journalistic standards or ethics."[1]

4. While the FTC has jurisdiction over unfair competition in commerce and agreements that unreasonably restrain trade, 15 U.S.C. §§ 1, 45, here it is brazenly using its power not for any issue concerning trade or commerce, but rather to censor speech. And it has done so simply out of disagreement with NewsGuard's First Amendment-protected journalistic judgments about the reliability of news sources.

5. The FTC has pursued its campaign because Chairman Ferguson does not like NewsGuard's news ratings, which he views as biased against conservative publications. That is wrong—NewsGuard's ratings and journalism about news sources are non-partisan and based on fully disclosed journalistic criteria. But the FTC's actions are plainly unconstitutional even if that were not the case. The First Amendment does not allow the government to pick and choose speech based on what it likes or dislikes. In our constitutional scheme the government's legitimate role is not to decide "what counts as the right balance of private expression—to 'un-bias' what it thinks [is] biased." *Moody*, 603 U.S. at 719.

6. Chairman Ferguson's public statements that the Commission would use its "tremendous array of investigative tools [and] coercive power" to force online publishers to "Do what we say"[2] presaged the extraordinarily broad Civil

---

[1] *In re Omnicom Group Inc.*, ¶¶ 1.D, 2.A, No. C-4823 (Sept. 26, 2025).

[2] *Transcript: FTC Chairman Andrew Ferguson Keynote Part II*, ProMarket (Apr. 21, 2025), https://www.promarket.org/2025/04/21/transcript-ftc-chairman-andrew-ferguson-keynote-part-ii/.

Investigative Demand ("CID") designed to burden and bleed NewsGuard, as well as the blacklist imposed in the Omnicom Consent Order. This later proscription came at the urging of Newsmax, a conservative media company that has long chafed that it receives lower NewsGuard ratings (for what NewsGuard identified as its failures to follow basic journalistic practices) than other conservative news outlets.

7. "No government agency should be in the business of policing speech" then-commissioner Ferguson said in late 2024, shortly before he was appointed chair of the FTC.[3] That statement was correct, but, as it turns out, policing private parties' speech is exactly what the FTC and Chairman Ferguson have done in their campaign against NewsGuard. Their view apparently is that using FTC powers to suppress speech is inappropriate *except* when it is speech the government doesn't like. That is wrong. The FTC's actions against NewsGuard are unconstitutional and should be enjoined by this Court.

## **JURISDICTION AND VENUE**

8. This action arises under the First and Fourth Amendments to the U.S. Constitution and the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202.

9. This Court has jurisdiction under 28 U.S.C. § 1331 and the First and Fourth Amendments to the U.S. Constitution.

[3] Andrew Ferguson (@AFergusonFTC), X (Nov. 11, 2024, at 8:51 PM), https://x.com/AFergusonFTC/status/1856152760850243905?s=20.

10. The Court has authority to issue the requested relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, Rules 57 and 65 of the Federal Rules of Civil Procedure, and the Court's inherent equitable powers.

11. Subject matter jurisdiction exists under Article III because Plaintiff has suffered and will continue to suffer injuries-in-fact; there is a sufficient causal connection between Plaintiff's injuries and Defendants' actions, and a favorable decision from this Court granting Plaintiff relief will redress those injuries.

12. This dispute is ripe because Plaintiff's rights are being violated, and Plaintiff will suffer further imminent invasions of those rights in the absence of relief from this Court.

13. Venue is proper under 28 U.S.C. § 1391(e)(1) because the Commission has its principal place of business and Chairman Ferguson performs his official duties in the District of Columbia. Venue is also proper because a substantial part of the events giving rise to Plaintiff's claims occurred in the District.

## PARTIES

***Plaintiff***

14. Plaintiff NewsGuard is a nonpartisan media organization that uses fully disclosed journalistic criteria to rate the reliability of online news sources.

***Defendants***

15. Defendant Federal Trade Commission is a U.S. government agency tasked with protecting consumers and promoting fair competition; preventing unfair,

deceptive, and anticompetitive business practices; and enforcing federal consumer protection and antitrust laws.

16. Defendant Andrew Ferguson is Chairman of the Federal Trade Commission. He was appointed to the position by President Donald Trump on January 20, 2025.

## FACTUAL ALLEGATIONS

### I. NewsGuard's Ratings and Reporting About Online News Sources.

17. NewsGuard was founded in 2018 with the mission of providing internet users the context they need to make informed decisions about whether to rely (and the degree to which they can rely) on online sources of news.[4]

18. NewsGuard was founded by two veteran journalists, Steven Brill and Gordon Crovitz. Mr. Brill previously established *The American Lawyer*, Court TV, The Yale Journalism Initiative, and the Clear Registered Traveler program. Mr. Crovitz spent more than 35 years at *The Wall Street Journal* as publisher, and as an editorial writer and opinion columnist.

19. Messrs. Brill and Crovitz created NewsGuard because they believed online users would benefit from transparent and fully disclosed reports about the accuracy and reliability of news and information websites. From its launch, NewsGuard has been nonpartisan, and it has based its reviews and analyses on fully disclosed criteria focusing on long-standing journalistic standards.

[4] *Brill and Crovitz Announce Launch of NewsGuard to Fight Fake News*, NewsGuard (Mar. 5, 2018), https://www.newsguardtech.com/press/announcing-newsguard/.

20. NewsGuard's guiding principle has been that no government entity should be in the business of deciding what news people consume, but neither should those decisions be left to unknown and unaccountable algorithms or partisan advocacy groups. Rather, NewsGuard believes people should have nonpartisan, journalistically sound information available to make their own decisions.

21. NewsGuard is comprised of a team of journalists who review online news websites to create ratings based on disclosed criteria concerning the reliability of news reporting by sites and their transparency. NewsGuard has rated 38,742 news sources, including 12,765 websites.

22. NewsGuard publishes reliability ratings of online news websites based on nine criteria, which it fully discloses.[5] These criteria assess adherence to basic, long-established practices of journalistic credibility and transparency. They include, for example, whether a publication repeatedly publishes provably false information, references multiple sources and differing viewpoints, effectively corrects errors, and fully discloses ownership and financing of the news site.

23. Each of the nine criteria is assigned a weighted number of points, which can total to a maximum of 100 points. Based on analysts' judgments of a news provider's performance on the criteria, each site is assigned an overall score of 0 to 100 and a rating indicating the extent to which it adheres to the weighted criteria in NewsGuard's judgment.

[5] https://www.newsguardtech.com/ratings/rating-process-criteria/.

24. NewsGuard also provides a "Nutrition Label" accompanying each website's listed score, which sets forth in detail NewsGuard's findings and ultimate determination. Nutrition Labels include a grid showing NewsGuard's judgment of the site's performance on each of the nine criteria and an explanation of the content on the site, who's behind it, and why it received the score it did. The Nutrition Labels also provide evidence and examples to explain NewsGuard's judgments and indicate the history of the site's ratings.

25. Every score and Nutrition Label is reviewed and fact-checked by senior NewsGuard personnel before publication to ensure they are as fair and accurate as possible.

26. The NewsGuard ratings are also informed by discussions with news publishers that are being rated. Online news sites are given the opportunity to provide feedback on NewsGuard's findings before publication. NewsGuard includes relevant comments from website publishers as part of the Nutrition Labels it publishes.

27. NewsGuard periodically updates its ratings for websites. If a site changes practices, its performance on one or more of the nine criteria may change. More than 2,000 websites have improved their transparency or credibility practices as a result of engaging with NewsGuard through the rating process.

## II. NewsGuard's Subscribers and Customers.

### A. Consumer Subscribers.

28. Consumers access NewsGuard's reliability ratings through an online subscription. The monthly subscription also gives subscribers access to public reports the company produces about false claims spreading in the news.

29. Subscribers get access to NewsGuard's reliability ratings and Nutrition Labels through browser extensions on their computers and through mobile apps for Apple or Android devices.

30. As individuals browse the internet, NewsGuard displays trust score icons next to links in their search results and social media feeds. Hovering over each icon brings up a short description of the site and a link to "See the Full Nutrition Label" for a detailed description of the site and why it received its score.

31. Beyond its ratings of news outlets, NewsGuard has also become a leading source of journalism about foreign disinformation such as Russian,[6] Chinese,[7] and Iranian[8] influence campaigns targeting Americans, and has exposed how violent

[6] Eva Maitland & Madeline Roache, *Russia's War on Ukraine: Three Years, Three Hundred and Two False Claims | NewsGuard*, NEWSWEEK (Feb. 21, 2025), https://www.newsweek.com/russia-ukraine-disinformation-newsguard-2034104.

[7] Steven Lee Myers, *DeepSeek's Answers Include Chinese Propaganda, Researchers Say*, N.Y. TIMES (Jan. 31, 2025), https://www.nytimes.com/2025/01/31/technology/deepseek-chinese-propaganda.html.

[8] Gordon Crovitz, *For Iran, Disinformation Comes Just Behind Assassination*, The Hill (Nov. 21, 2024), https://thehill.com/opinion/international/5000222-iran-disinformation-trump-threat.

Hamas propaganda videos were promoted to teens on platforms such as TikTok, Facebook, and X during the war in Gaza.[9]

**B. Business Customers.**

32. NewsGuard's reliability ratings are also used by business subscribers, including by advertisers to make informed decisions about the websites on which to place their ads.

33. The internet's growth and continually increasing share of advertising dollars has also spawned a multi-billion-dollar industry focusing on brand safety.

34. An online advertiser does not place ads on websites one-by-one. Online ads are predominantly placed through programmatic advertising campaigns, *i.e.*, automated software-based buying and selling of digital ad placements. An average programmatic ad campaign runs on 44,000 websites.[10] These campaigns are ordinarily managed and directed by ad agencies.

35. Given the automated processes and the large scale of programmatic campaigns, advertisers and ad agencies cannot know of all the tens of thousands of websites where their ads might appear. This is why they value information about the suitability of websites for their ads and brands. A key service that agencies now

[9] McKenzie Sadeghi, *Violent, Celebratory Hamas Videos Garner Millions of Views, Despite Bans by Tech Platforms*, NewsGuard (Oct. 26, 2023), https://www.newsguardtech.com/special-reports/violent-celebratory-hamas-videos-garner-millions-of-views-despite-bans-by-tech-platforms.

[10] *See ANA Provides "First Look" at In-Depth Programmatic Transparency Study*, ANA (June 19, 2023), https://www.ana.net/content/show/id/pr-2023-06-programmaticstudy.

provide to their advertising clients is avoiding ad placements that may be harmful to their brands (referred to in industry parlance as "brand unsafe").

36. Major international brands have had their advertisements unintentionally placed through programmatic ad campaigns on websites that NewsGuard identifies as advancing dangerous health treatments,[11] promoting election misinformation,[12] or making false claims about the Israel-Hamas conflict.[13]

37. In the advertising industry, ad placements such as these are considered among the most problematic sorts of brand unsafe placements, yet research shows that 67% of top brands inadvertently advertise on websites with such content.[14]

38. Advertisers are especially sensitive to unintentionally funding foreign influence operations through their advertising. NewsGuard has identified hundreds of websites that spread Russian propaganda, with many unintentionally funded by Western brand advertising.

---

[11] Matt Skibinski, *Thousands of the World's Most Trusted Brands Funded COVID-19 Misinformation*, NewsGuard, https://www.newsguardtech.com/special-report-advertising-on-covid-19-misinformation/.

[12] Matt Skibinski, *Special Report: How Some of the World's Largest Brands Funded the Misinformation Behind the Capitol Riot*, NewsGuard (Jan. 12, 2021), https://www.newsguardtech.com/special-reports/special-report-advertising-on-election-misinformation/.

[13] *Brand Danger: NewsGuard Finds 349 Top Global Brands Funding Misinformation About the Hamas-Israel Conflict with Programmatic Ads*, NewsGuard (Nov. 29, 2023), https://www.newsguardtech.com/press/brand-danger-newsguard-finds-349-top-global-brands-funding-misinformation-about-the-hamas-israel-conflict-with-programmatic-ads/.

[14] Wajeeha Ahmad, et al., *Companies Inadvertently Fund Online Misinformation Despite Consumer Backlash*, 630 NATURE 123, 124 (2024).

39. For example, NewsGuard reported that in 2019 Berkshire Hathaway's subsidiary GEICO was unintentionally the largest advertiser on Sputnik News, a Kremlin-controlled website.[15] NewsGuard has also reported that many other brands unintentionally placed ads on the pro-Russian site Pravda (*e.g.*, Hertz, Google, Sotheby's, Petco, LendingTree, Cars.com, AAA, Norton, and Toshiba).[16]

40. NewsGuard and Comscore estimated that in 2021, overall, some $2.6 billion of advertising per year appears unintentionally on websites they deem untrustworthy, including ones that publish false content.[17]

## II. NewsGuard Has Been Targeted by Administration Officials, Lawmakers, and Others.

### A. Attacks on NewsGuard by Publishers Unhappy with Ratings.

41. For several years, NewsGuard has faced criticisms from news websites across the political spectrum that NewsGuard's ratings are biased in one direction or another.

[15] L. Gordon Crovitz, *How Amazon, Geico and Walmart Fund Propaganda*, N.Y. Times (Jan. 21, 2020), https://www.nytimes.com/2020/01/21/opinion/fake-news-russia-ads.html.

[16] *One Year, 100 Myths: NewsGuard Has Identified More Than 100 False Narratives About the War in Ukraine*, NewsGuard (Feb. 16, 2023), https://www.newsguardtech.com/press/one-year-100-myths-newsguard-has-identified-more-than-100-false-narratives-about-the-war-in-ukraine/.

[17] Matt Skibinski, *Special Report: Top Brands Are Spending $2.6 Billion to Misinformation Websites Each Year*, NewsGuard https://www.newsguardtech.com/special-reports/brands-send-billions-to-misinformation-websites-newsguard-comscore-report/.

42. In one year, for example (actually within a period of a few months), one advocacy group produced a report claiming NewsGuard's ratings are biased *against* conservatives while another published a separate report claiming NewsGuard's ratings are biased *toward* conservatives.

43. In 2023, *Consortium News*, a left-leaning website that had received low reliability ratings, sued NewsGuard for defamation and supposed claims under the First Amendment. *Consortium for Indep. Journalism, Inc. v. United States*, 2025 WL 919504, at *1 (S.D.N.Y. Mar. 26, 2025). The U.S. District Court for the Southern District of New York dismissed the suit , holding that NewsGuard's ratings of *Consortium News* were protected editorial opinion. *See id.* at *17–18.

**B. Newsmax Campaign Against NewsGuard.**

44. At the same time, Newsmax—a conservative cable news network and digital media company which also received low reliability ratings under NewsGuard's journalistic criteria—mounted a campaign to urge Republican lawmakers and members of the administration including FTC Commissioner (and later Chairman) Ferguson to use state powers to silence NewsGuard. While Newsmax has a constitutional right to criticize NewsGuard and lobby government officials, the First Amendment bars those officials from acting on Newsmax's behalf in an attempt to snuff out NewsGuard's speech.

45. Beginning in 2022 and for several years, Newsmax asserted repeatedly in its programs and publications that NewsGuard was biased against conservative media and websites.

46. Newsmax's attacks ignored the facts that NewsGuard ratings are based on nonpartisan journalistic criteria and are agnostic to the political or editorial viewpoints of online sources. Many left-leaning outlets receive lower scores than comparable right-leaning sources (*e.g.*, Fox News scores higher than MSNBC, the conservative *Washington Examiner* outscores the liberal *Daily Beast,* and the conservative *Daily Caller* outscores the liberal *Daily Kos*).[18] As reflected in a summary reported by the *Washington Post*:




[18] Statement from Gordon Crovitz, NewsGuard, on Brendan Carr Letter (Nov. 15, 2024), https://www.newsguardtech.com/wp-content/uploads/2024/11/NewsGuard-Statement-on-Brendan-Carr-Letter.pdf.

Source: *Washington Post*.[19]

47. Newsmax's offensive against NewsGuard appears to be motivated by the fact that it has received lower reliability ratings than other conservative news sources such as Fox News, the *National Review*, and the *Washington Times*. Newsmax competes with these sites for advertisers.

**C. Putative Congressional Investigations Targeting NewsGuard.**

48. Newsmax lobbied for a congressional investigation of NewsGuard, and when Republicans took control of the House in 2023, several committees opened investigations, including the Oversight and Small Business Committees.

49. Oversight Committee Chairman James Comer appeared on Newsmax, agreeing with comments of the show's host that "their [NewsGuard's] goal is obviously to bully conservative media out of existence."[20]

50. After NewsGuard presented evidence to the committee that its ratings are apolitical and nonpartisan, the investigation did not proceed.

51. In September 2024, the House Small Business Committee released an interim staff report entitled "Small Business: Instruments and Casualties of the

---

[19] Will Oremus & Naomi Nix, *This Company Rates News Sites' Credibility. The Right Wants It Stopped*, WASH. POST (Dec. 24, 2024), https://www.washingtonpost.com/technology/2024/12/24/newsguard-disinformation-censorship-free-speech/.

[20] Ted Johnson, *Attacking the Watchdog: How Media Rating Site NewsGuard Ended Up As a Target for GOP Lawmakers and Regulators*, Deadline (Dec. 19, 2024), https://deadline.com/2024/12/newsguard-newsmax-trump-fcc-1236202249.

Censorship-Industrial Complex," which took aim at NewsGuard with unsubstantiated claims of bias.[21]

52. Around the same time, the Senate Judiciary Committee launched an investigation into alleged coordination between the Biden Administration, tech companies, and third parties like NewsGuard, to allegedly propagate and amplify anti-conservative media bias.

53. In early 2025, the Judiciary Committee held a hearing on what it termed the "Censorship Industrial Complex." NewsGuard cooperated, addressed the Committee's questions, and provided evidence that NewsGuard's ratings are apolitical and do not reflect any anti-conservative bias. The Committee found no evidence to the contrary, and the investigation has not proceeded.

54. Meanwhile, Senator Ted Cruz, Chairman of the Senate Commerce Committee, publicized a letter he sent to Microsoft pressuring the company to renounce support of NewsGuard and its educational Media Literacy Initiative.[22]

[21] H. Comm. on Small Bus., 118th Cong., *Small Business: Instruments and Casualties of the Censorship-Industrial Complex* 42–59 (Interim Staff Rep. 2024), https://smallbusiness.house.gov/uploadedfiles/house_committee_on_small_business_-_cic_report_september_2024.pdf.

[22] Press Release, U.S. Senate Committee on Commerce, Science, and Transportation, *Sen. Cruz's Investigation Leads Microsoft to Disavow Support for Biased Indoctrination Tool* (Feb. 6, 2025), https://www.commerce.senate.gov/2025/2/sen-cruz-s-investigation-leads-microsoft-to-disavow-support-for-newsguard-s-biased-indoctrination-tool.

**D. Public Assertions of FTC Chairman Ferguson and Other Administration Officials Targeting NewsGuard.**

55. Defendant Andrew Ferguson has been a long-time critic of NewsGuard. Even before he was appointed by President Trump to be FTC chairman, Ferguson promoted an ideologically motivated effort to pursue and censor NewsGuard.

56. In November 2024, then-Commissioner Ferguson responded to a post on X about the closure of the U.S. Department of State's Global Engagement Center by referring to NewsGuard specifically and asserting it had supposedly "led collusive ad-boycotts—possibly in violation of our antitrust laws—to censor the speech of conservative and independent media in the United States."[23]

57. Brendan Carr, the Chairman of the Federal Communications Commission appointed by President Trump, has echoed Ferguson's attacks on NewsGuard.

58. In a November 2024 letter to the CEOs of Alphabet, Microsoft, Meta, and Apple, then-Commissioner Carr alleged NewsGuard was part of a "censorship cartel" with technology companies and that the company "leverag[es] its partnerships with advertising agencies to effectively censor[] targeted outlets."[24]

59. Carr said the incoming Trump Administration would investigate and take action against NewsGuard and companies that used its services for protecting

---

[23] Andrew Ferguson (@AFergusonFTC), *supra* note 3.

[24] Letter from Brendan Carr, FCC Comm'r to CEOs (Nov. 13, 2024), https://www.fcc.gov/sites/default/files/DOC-407732A1.pdf.

brand safety, declaring that the so-called "cartel" must be "completely dismantled." *Id.* NewsGuard responded that the claims in Carr's letter were false.[25]

60. Echoing Carr's threats, in December 2024 then-Commissioner Ferguson asserted the FTC "ought to conduct … an investigation," incorrectly claiming that NewsGuard "seems to give a free pass to … major left-leaning outlets."[26]

61. Following the public (and publicized) statements of Carr and Ferguson, in January 2025, President Trump named these two individuals to chair the FCC and the FTC respectively.

62. The next month, the FTC issued a Request for Information ("RFI") seeking public comment on "Technology Platform Censorship," asserting that social media providers and other "tech platforms" are engaged in "censorship" that is "potentially illegal."[27] The Commission's RFI did not mention that the Supreme Court has made clear that editorial decisions by publications, websites, and platforms are firmly protected by the First Amendment. *Moody*, 603 U.S. at 734, 741–42.

63. In an April 2025 interview, Chairman Ferguson explained how the FTC could use its "tremendous array of investigative tools" and "coercive power—formal

---

[25] Statement from Gordon Crovitz, *supra* note 18.

[26] Concurring Statement of Commissioner Andrew Ferguson, *FTC v. 1661, Inc. d/b/a GOAT* (Dec. 2, 2024), https://www.ftc.gov/system/files/ftc_gov/pdf/ferguson-goat-concurrence.pdf.

[27] Press Release, Fed. Trade Comm'n, *Federal Trade Commission Launches Inquiry Into Tech Censorship* (Feb. 20, 2025), https://www.ftc.gov/news-events/news/press-releases/2025/02/federal-trade-commission-launches-inquiry-tech-censorship; *see* Request for Public Comment Regarding Technology Platform Censorship, https://www.ftc.gov/system/files/ftc_gov/pdf/P251203CensorshipRFI.pdf.

and informal" to demand compliance to its views about supposed online "censorship." Ferguson laid out a roadmap of the tactics his FTC would ultimately use against NewsGuard: "The regulators can show up, they can audit, they can investigate, they can cost you a lot of money, and the path of least resistance is: 'Do what we say'."[28]

64. Ferguson's message was clear that the FTC would use its powers and the burdens and expenses it can impose not to determine if there was any legitimate basis for regulation, but rather to intimidate and coerce NewsGuard to do what the FTC demands. He noted that the FTC's investigative powers and tools "are expensive when applied to you even if we don't win at the end of the day, so knuckle under."[29]

65. Ferguson's comments are similar to not-so-veiled threats by FCC Chairman Carr about Jimmy Kimmel's late-night comedy monologue mentioning Charlie Kirk, which the administration found objectionable. Carr stated that ABC and its affiliates had to "find ways to change conduct and take action … on Kimmel or there's going to be additional work for the FCC ahead," and "we can do this the easy way or the hard way."[30]

---

[28] *Transcript: FTC Chairman Andrew Ferguson Keynote Part II*, *supra* note 2.

[29] *Id.*

[30] Brian Stelter, *How Brendan Carr, the Attack-Dog FCC Chair, Helped Take Down Jimmy Kimmel with Words, Not Actions*, CNN (Sept. 18, 2025), https://www.cnn.com/2025/09/18/media/brendan-carr-jimmy-kimmel-fcc-first-amendment; *see* Mike Wendling, *What does the FCC do – and can it revoke a TV network's license?* BBC (Sept. 19, 2025), https://www.bbc.com/news/articles/c87yel3wgqgo

**E. The FTC's Tactics Toward NewsGuard Mirror Actions Taken to Suppress Other Platforms, Journalists, and News Ratings Organizations**

66. The FTC's tactics toward NewsGuard are part of a broader retaliatory campaign against tech and media companies (including other review and rating services) for exercising their First Amendment rights.

67. In May 2025, the FTC launched an extraordinarily broad, intrusive investigation of Media Matters for America, a nonprofit journalistic and media watchdog organization.

68. Media Matters published several articles about the rise of "extremist and racist rhetoric" on X (renamed from Twitter) after Elon Musk's acquisition of the platform, reporting that X began placing major companies' ads "next to pro-Nazi content." *Media Matters for Am. v. Fed. Trade Comm'n*, 2025 WL 2378009, at *2–3 (D.D.C. Aug. 15, 2025).

69. Musk responded in November 2023 by promising to file a "thermonuclear lawsuit against Media Matters." *Id.* at *3.

70. Musk's vendetta was picked up by administration officials, state attorneys general, and the FCC and FTC.

71. At the time, Ferguson was a candidate for FTC chairman, and in public statements to promote his candidacy, he touted that he had a "track record of standing up to … the radical left" and would "[i]nvestigate advertiser boycotts" and "'progressives who are targeting disinformation.'"[31]

---

[31] Press Release, PunchBowl News, FTC Commissioner Andrew N. Ferguson for FTC Chairman, https://punchbowl.news/wp-content/uploads/FTC-Commissioner-

72. On November 19, 2023, Stephen Miller (the current White House deputy chief of staff) accused Media Matters of "fraud" for its reporting, urging the "2 dozen+ conservative state Attorneys General" to go after the organization. *Media Matters*, 2025 WL 2378009, at *3.

73. The attorneys general of Texas and Missouri took up the cudgel and issued overbroad, oppressive CIDs to Media Matters. Media Matters sued and won preliminary injunctions precluding both investigations in this Court.

74. In the case concerning the Texas CID, this Court entered a preliminary injunction blocking the investigation, *Media Matters for Am. v. Paxton*, 732 F. Supp. 3d 1 (D.D.C. 2024), which the D.C. Circuit affirmed. 138 F.4th 563, 569 (D.C. Cir. 2025). The Circuit Court opined that Media Matters was the "target of a government campaign of retaliation" and an "arguably bad faith investigation" infringing "exercise of their First Amendment rights and imposing special burdens on their newsgathering activities and operation of their media company." *Id.* at 581.

75. In the case concerning the Missouri investigation, this Court found: "A reasonable factfinder is likely to interpret Defendants' words as targeting Media Matters not for legitimate law enforcement purposes but instead for its protected First Amendment activities." *Media Matters for Am. v. Bailey*, 2024 WL 3924573, at *15 (D.D.C. Aug. 23, 2024).

---

Andrew-N-Ferguson-Overview.pdf; *see* Kari Donovan, *Bannon's WarRoom, Show Clip Roundup 11/30/2-24 [AM]*, War Room (Nov. 30, 2024), https://warroom.org/bannons-warroom-show-clip-roundup-11-30-2024-am/.

76. But the FTC was undeterred by the failed cases of the Texas and Missouri AGs or the rulings of this Court and the D.C. Circuit that the states' actions and coercion against Media Matters were pretextual pursuits in likely violation of the First Amendment.

77. On May 20, 2025, the FTC issued an extensive CID to Media Matters with 20 detailed specifications demanding all documents and information about methodologies for addressing online speech or misinformation; communications with tech companies or platforms; everything related to Media Matters' newsgathering, reporting, and editorial decisions; all programs, policies, and analyses; and all financial reports and information of the company, among many other demands. *See Media Matters for America v. FTC*, — F. Supp. 3d —, 2025 WL 2378009, at *5 (D.D.C. Aug. 15, 2025).

78. Media Matters filed suit in June 2025, alleging the FTC violated First Amendment rights by launching an onerous investigation in retaliation for Media Matters' speech, and violated the First and Fourth Amendments by unreasonably requiring production of sensitive and privileged materials impinging on associational rights. *Id.* at *6. Media Matters moved for a preliminary injunction to bar the FTC's investigation from going forward.

79. This Court granted the preliminary injunction, noting: "This case presents a straightforward First Amendment violation." *Id.* at *1. The Court rejected the government's argument that the FTC Act foreclosed any suit in the district court, observing *inter alia* that reading the statute to preclude Media Matters' First

Amendment claims would "foreclose all meaningful judicial review." *Id.* at *11 (internal quotation omitted).

80. Given the FTC's comments characterizing Media Matters and the investigation in ideological terms, the timing of the CID (coming on the heels of other failed attempts at retribution), the extraordinary scope of the CID, and the FTC's pretextual explanations for why it targeted Media Matters, the Court held Media Matters was likely to prevail on the merits. *Id*. at *19–21.

81. The FTC moved in the D.C. Circuit for a stay of the District Court's preliminary injunction order pending appeal. The Circuit Court denied the emergency request. 2025 WL 2988966 (D.C. Cir. Oct. 23, 2025).[32]

82. True to Chairman Ferguson's threats and telegraphed strategy that companies in the FTC's sights should simply "knuckle under" (because FTC investigations "are expensive even if we don't win"), the FTC turned to NewsGuard and targeted it with burdensome and groundless regulatory action in retaliation for the company's First Amendment activities.

## III. The FTC Targeted NewsGuard With a Sweeping CID and Threatened Regulatory Action.

83. On May 20, 2025, the FTC issued a sweeping CID to NewsGuard, 21 pages long, containing 31 Specifications (with dozens of subparts) demanding vast numbers of confidential and sensitive documents.

[32] The FTC has appealed the Media Matters preliminary injunction order, and that appeal remains pending. *Media Matters for America v. FTC*, No. 25-5302 (D.C. Cir.).

84. The CID requires production of "all documents relating to NewsGuard's News Reliability Ratings and any other rating[s];" identification of all NewsGuard customers; and essentially all communications from or to NewsGuard. *See* FTC Civil Investigative Demand, FTC File No. 251-0061 (May 20, 2025), attached hereto as Exhibit A (the "NewsGuard CID"); *see, e.g.,* NewsGuard CID Specifications 5, 8, 26.

85. The Specifications go further, demanding all materials about NewsGuard's work product and methodology, including data sets; all documents about websites and news sources rated; all ratings and reviews issued; all communications regarding ratings; any and all analyses of the effects of NewsGuard's ratings on advertisers and publishers; and any studies relating to social media or digital advertising. NewsGuard CID Specifications 5, 11, 12, 14–16.

86. Among its all-inclusive document demands, the CID also requires production of information, materials, and communications relating to NewsGuard's journalism and reporting, including reporters' notes and sources. *See* NewsGuard CID Specification 5.

87. The CID Specifications regarding NewsGuard's finances are likewise overbroad and intrusive, calling for production of every financial statement, budget, profit and loss statement, cost center report, profitability report, and any other financial report prepared by or for NewsGuard. NewsGuard CID Specifications 27, 28.

88. The CID specifies the applicable time frame for responses and document production to be January 1, 2018, to the present. NewsGuard CID at 8 (Instruction I1). NewsGuard was founded and began operations in 2018.

89. Thus, the FTC's CID effectively demands production of virtually all documents, information, and records of NewsGuard from the company's inception to the present, including those relating to NewsGuard's analyses, methodology, editorial judgments, customers, journalism and reporting.

90. Under the FTC Act, the agency was required to state the specific conduct constituting an alleged violation that is the subject of investigation and the provision of law applicable to such violation. 15 U.S.C. § 57b-1(c)(2). The FTC did not do that in the NewsGuard CID, leaving the company to guess about what the agency alleged was at issue or how it could have anything to do with legitimate enforcement of antitrust or competition laws.

91. NewsGuard had substantial and overarching concerns about the CID, particularly that it was targeted at free speech and associational rights of the company and its customers.

92. NewsGuard raised its concerns from the outset and throughout its dealings with FTC staff attorneys, attempting to explain that NewsGuard's ratings, its editorial decisions, and its dealings with customers are plainly protected First Amendment activities.

93. Nonetheless, NewsGuard sought to work constructively with FTC staff to provide such information that it could without infringement of First Amendment rights.

94. In furtherance of NewsGuard's good faith efforts, its counsel participated in ten meet-and-confer discussions and exchanged a similar number of letters back and forth with FTC staff from the time of the initial promulgation of the CID through January 2026, including meet-and-confer discussions on May 28; June 4, 12, 18, and 27; July 10, 17, 18, and 31; August 4, 15, and 21; September 8 and 11; November 17, 2025; and January 13, 2026.

95. Throughout this period, NewsGuard provided over 40,000 pages of documents in multiple rounds of production to the FTC staff.

96. In the discussions concerning the CID, NewsGuard demonstrated (as it had earlier in information provided to congressional committees) that its ratings utilize established journalistic standards and practices.

97. In addition to explaining its news ratings process, NewsGuard also submitted to FTC staff evidence to show that the company's share of the market for advertiser brand safety tools is so *de minimis*—less than 0.1%—that NewsGuard could not possibly be a legitimate target of an antitrust investigation of that market. By January 2026, FTC staff made clear to NewsGuard that its good faith efforts to cooperate were a futile exercise.

98. On January 15, 2026, two days after the parties' last meet-and-confer discussion, FTC staff sent a letter purporting to be a "good faith effort to reduce

NewsGuard's burden," but which was in reality a doubling down on the CID's unconstitutional demands.

99. Despite NewsGuard's seven months' efforts to cooperate, FTC staff simply repeated several of the most intrusive, infringing demands the FTC had made from the outset, including: (1) identification of all NewsGuard subscribers; (2) communications with customers; (3) identification of all entities to which NewsGuard had ever assigned a News Reliability Rating; (4) the particulars of each rating assigned to each entity over time; and (5) documents to show how NewsGuard has developed methodologies for ratings (including internal correspondence).

100. The FTC's persistent, repeated demands for identification of NewsGuard's subscribers (and production of all communications with subscribers) is particularly troubling. Given the tactics and pronouncements of Chairman Ferguson and FCC Chairman Carr about targeting tech and media companies supposedly associated with a "censorship cartel," NewsGuard has ample grounds for concern that the FTC aims to find NewsGuard's customers to pressure them, too. Though today such improper tactics to impose informal censorship are called "jawboning," the FTC's demands are also reminiscent of the witch hunts of the McCarthy era.

101. NewsGuard has explained to FTC staff that the demands for customer lists and communications plainly violate First Amendment rights of free speech and association, but explanations of the law have fallen on deaf ears at the FTC.

102. Throughout the dealings with NewsGuard, FTC staff has refused to give assurances that NewsGuard's productions and disclosures satisfied the CID, and they

reiterated that position in the January 15, 2026, letter. FTC staff instead has insisted that NewsGuard remains obligated to provide all documents and information called for by the original CID.

103. At the same time, FTC staff has been amenable to extensions and delays, dragging out the process through numerous back-and-forths and thereby increasing NewsGuard's expenses and continuing its uncertainty.

104. Since the FTC issued the CID and as it has continued its pursuit of NewsGuard, the legal expenses to the company have approached 30% of the revenue derived from the brand-safety services NewsGuard provides to clients. The FTC's "investigation" has also required NewsGuard to devote other resources and time of staff and executives, all of which continues to interfere with the company's core mission.

105. The FTC staff's January 15, 2026, letter makes clear that only capitulation by NewsGuard will satisfy the FTC's demands. The FTC will continue to pursue NewsGuard with the aim of imposing burden and expense regardless of whether it has any legitimate grounds to investigate until, in Ferguson's words, the company "knuckles under."

106. Recognizing that further efforts to cooperate with the FTC were futile, NewsGuard filed a petition to quash with the FTC pursuant to 16 C.F.R. § 2.10(a) on January 16, 2026.[33] The FTC has taken no action on that motion to date.

[33] Petition to Quash, Civil Investigative Demand Dated May 20, 2025, to NewsGuard Techs., Inc., FTC File No. 251-0061 (Jan. 16, 2026).

## IV. The FTC Entered an Order Blacklisting NewsGuard.

107. Unbeknownst to NewsGuard at the time, the FTC's CID was only a first round in its retaliatory censorship campaign against NewsGuard. As NewsGuard was attempting to work in good faith with the FTC in early 2025, the Commission was working separately to use a merger-review proceeding as an excuse to impose an order aimed at blacklisting NewsGuard.

108. In an unprecedented move that went beyond unconstitutional "jawboning" to a direct order prohibiting private parties from using NewsGuard's ratings and journalism, the FTC imposed a condition on the merger of Omnicom Group Inc. (Omnicom), and The Interpublic Group of Companies, Inc. (IPG) to specifically target NewsGuard by prohibiting the company or any of its affiliates from contracting with NewsGuard or using its rating services.

109. Omnicom and IPG were the world's third and fourth largest companies involved in media buying for ad agencies and advertisers, and combined they would become the world's largest advertising agency and media buying company.

110. Omnicom announced on December 4, 2024, that it had entered into an agreement to acquire IPG. The companies negotiated with the FTC through the first half of 2025 to obtain approval of the merger.

111. On June 23, 2025, the FTC filed a *pro forma* complaint concerning the merger while simultaneously announcing that it had accepted a proposed consent order from the companies.[34]

[34] Press Release, FTC Prevents Anticompetitive Coordination in Global Advertising Merger (June 23, 2025), https://www.ftc.gov/news-events/news/press-

112. The proposed order did not require any divestiture or other structural changes for the new combined company, despite that it would be the world's largest media-buying advertising agency.

113. Rather, the draft order focused on precluding Omnicom or its agencies from doing business with any news rating service or entity that "[d]irects Advertisers' advertising spend based on the Media Publisher's political or ideological viewpoints, or the political or ideological viewpoints expressed in content that the Media Publisher sells advertising to run alongside of."[35]

114. This condition in the proposed order was intended to target and debilitate if not eliminate news rating services, per Chairman Ferguson's oft-stated views that such organizations were biased against conservative websites and publications.

115. NewsGuard was at the top of the FTC's and Chairman Ferguson's hit list. When the proposed consent order was made public, Ferguson released a statement specifically calling out NewsGuard as an organization that "ha[s] publicly sought to use the chokepoint of the advertising industry to effect political or

releases/2025/06/ftc-prevents-anticompetitive-coordination-global-advertising-merger.

[35] Proposed Decision & Order, *Omnicom Grp. Inc.*, FTC File No. 251-0049, 2025 WL 2355514 (June 23, 2025).

ideological goals" and alleging that NewsGuard steers "advertising revenue with 'an unavoidable partisan lens.'"[36]

116. While none of this was true, it made clear that Chairman Ferguson's and the FTC's motivations in proposing and effecting the Omnicom merger conditions were political and ideological.

117. Following the FTC's publication of the draft order, Newsmax ran a series of stories contending it did not go far enough because, as written, it would not prohibit Omnicom from using NewsGuard's rating services.[37]

118. This was because, as Newsmax well knew, NewsGuard does not direct or recommend "advertising spend" based on "political or ideological viewpoints." NewsGuard's ratings are strictly based on fully disclosed standards for journalistic accuracy and veracity.

119. Newsmax filed a letter during the comment period for the draft consent order urging the FTC to expand the prohibitory condition. Applying its own ideological and political gloss, Newsmax urged the restriction should be expanded to ensure Omnicom and its ad agencies "can no longer use biased rating organizations,

---

[36] Statement of Chairman Andrew N. Ferguson, *Omnicom Grp. Inc.*, FTC File No. 251-0049, at 5 & n.34 (June 23, 2025), https://www.ftc.gov/system/files/ftc_gov/pdf/omnicom-ipg-ferguson-statement_0.pdf.

[37] *See, e.g.*, Paul Bond, *Megamerger Omnicom, IPG Mum About NewsGuard Bias*, Newsmax (June 26, 2025, at 17:35 ET), https://www.newsmax.com/us/news-bias-ftc-omnicom/2025/06/26/id/1216643/.

fact checkers, and other third parties to engage in censorship of disfavored news outlets."[38]

120. Newsmax was not subtle about its aim. Its fourteen-page letter mentioned NewsGuard more than a dozen times. Newsmax echoed Chairman Ferguson's repeated statements that NewsGuard's reviews and ratings of news sources based on journalistic standards were "biased" because some conservative-leaning websites and publications scored poorly.

121. Not content to rely on the official FTC comment process, Newsmax took to the internet to lobby Chairman Ferguson, members of Congress, and the President. In posts on X directed to Chairman Ferguson, Newsmax asserted the FTC's proposed order was inadequate because it "makes no mention of 'censorship' or 'targeting conservatives' and '[f]ully allows Omnicom to use left-wing NewsGuard."[39] Newsmax admitted its comments and advocacy to the FTC were specifically targeted at NewsGuard.[40]

---

[38] Newsmax Media Inc., Comment Letter on Proposed Consent Order 13 (July 28, 2025), https://www.regulations.gov/comment/FTC-2025-0066-0008; *see also Newsmax's Tabacco Slams FTC Approval of Omnicom-IPG Merger*, Newsmax (Aug. 3, 2025, at 07:23 ET), https://www.newsmax.com/newsfront/tabacco-ftc-omnicom/2025/08/02/id/1221045 (objecting that the draft order "says nothing at all about stopping these agencies from using third-party services like NewsGuard to block media like Newsmax").

[39] NEWSMAX (@NEWSMAX), X (July 31, 2025, at 21:58 ET), https://x.com/NEWSMAX/status/1951100290775630054status/19511002907756300 54.

[40] *CPAC, IMC Want FTC to Stop Omnicom-IPG Merger*, Newsmax (July 29, 2025, at 12:49 ET), https://www.newsmax.com/newsfront/cpac-imc-omnicom-ipg/2025/07/29/id/1220531.

122. Conservative advocacy groups joined the chorus with Newsmax, submitting a letter urging the FTC impose a merger condition barring Omnicom from working with "ostensibly neutral third-party monitors such as NewsGuard," which the groups claimed "in practice serve as gatekeepers that suppress conservative and heterodox content."[41]

123. The groups submitting the letter did not mention, however, that they are supported by Newsmax and CPAC, the Conservative Political Action Committee (which is also supported by Newsmax).

124. Numerous First Amendment scholars and free speech organizations also submitted comments regarding the initial proposed order, explaining its unconstitutionality,[42] but the FTC made no mention of these comments and disregarded First Amendment concerns.

125. The FTC subsequently issued a revised order removing terms about using third-party services with "political or ideological bias." Instead, the FTC revised the Consent Order to prohibit the merged Omnicom entity or its ad agencies from

[41] Indep. Media Council & CPAC Found. Ctr. for Regul. Freedom, Comment Letter on Proposed Consent Order 2 (July 28, 2025), https://www.regulations.gov/comment/FTC-2025-0066-0010.

[42] *See, e.g.*, Public Knowledge, Comment Letter on Proposed Consent Order (July 28, 2025), https://www.regulations.gov/comment/FTC-2025-0066-0013; TechFreedom, Comment Letter on Proposed Consent Order (July 28, 2025), https://www.regulations.gov/comment/FTC-2025-0066-0015; Vikram David Amar & Ashutosh Bhagwat, Comment Letter on Proposed Consent Order (July 28, 2025), https://www.regulations.gov/comment/FTC-2025-0066-0009.

using third-party services that evaluate "viewpoints as to the veracity of news reporting" and "adherence to journalistic standards or ethics."[43]

126. In its press release announcing the final Consent Order, the FTC stated that it revised the order "in response to public comments."[44] But the only public comments advocating such censure came from Newsmax and groups it funds.

127. There is no indication in the public record that Omnicom proposed or advocated for the censorial provision in the Consent Order aimed at precluding use of NewsGuard services and ratings. And it would be unusual, at the least, for an ad agency and marketing company to seek restrictions on use of services designed to protect advertisers' reputations and brand safety.

128. In short, the FTC ordered that Omnicom and all its affiliates and ad agencies cannot contract with or use nonpartisan review and ratings services based on journalistic criteria.

129. This condition targets NewsGuard "with the precision of a laser beam." *News Am. Publ'g, Inc. v. FCC*, 844 F.2d 800, 814 (D.C. Cir. 1988).

---

[43] Order, *Omnicom Grp. Inc.*, FTC Docket No. C-4823, ¶¶ 1.D, 2.A (Sept. 26, 2025), https://www.ftc.gov/system/files/ftc_gov/pdf/OmnicomOrder.pdf.

[44] Press Release, FTC Alters Final Consent Order in Response to Public Comments, Preventing Coordination in Global Advertising Merger (Sept. 26, 2025), https://www.ftc.gov/news-events/news/press-releases/2025/09/ftc-alters-final-consent-order-response-public-comments-preventing-coordination-global-advertising.

130. There was no further comment period when NewsGuard could address or object to this revised language. The FTC adopted this as the final order on September 26, 2025.

131. The revised merger condition in the Omnicom Consent Order amounts to a government-imposed blacklist. It prohibits Omnicom and its ad agencies and affiliates from using NewsGuard's services. Other agencies and companies seeking to use NewsGuard's ratings and services also face the prospect of FTC investigations, enforcement actions, and liability if they do not divorce themselves from dealings with NewsGuard.

132. Oddly, after the FTC altered the Consent Order at Newsmax's insistence, the Commission seemingly still did not appreciate the effect of the order. In announcing the final Consent Order, the FTC stated: "The order eliminates Omnicom's ability to deny advertising dollars to media publishers based on their political or ideological viewpoint." But the terms about "political and ideological" services had been eliminated earlier.[45] If the FTC had not adopted Newsmax's suggested revision, the condition would not have reached NewsGuard at all.

133. The FTC's Consent Order has adversely affected NewsGuard's business already. In addition to the direct restrictions imposed on Omnicom and its affiliates, other NewsGuard clients have been scared away by the FTC's actions.

134. One long-time client that has done significant business with IPG and Omnicom indicated it would not renew its contract after the Consent Order, noting

---

[45] *See id.*

"recent developments that require us to take a more cautious approach to this area of our business."

135. Given the breadth and punitive nature of the Omnicom Consent Order, likely other NewsGuard customers will follow suit.

**FIRST CAUSE OF ACTION**
**First Amendment Violation**
**(Unconstitutional Retaliation Based on Perceived Viewpoints)**

132. The First Amendment "prohibits government officials from subjecting individuals to 'retaliatory actions' after the fact for having engaged in protected speech." *Houston Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 474 (2022) (quoting *Nieves v. Bartlett*, 587 U.S. 391, 398 (2019)).

133. A government official engages in unconstitutional retaliation when he (1) targets activity protected by the First Amendment; (2) takes action that is sufficient to deter a person of ordinary firmness from speaking again; and (3) there is a causal link between the exercise of the constitutional right and the official's adverse action. *Aref v. Lynch*, 833 F.3d 242, 290 (D.C. Cir. 2016). The FTC's actions targeting NewsGuard meet each of these conditions.

134. The First Amendment protects matters of journalistic judgment and editorial decisions. *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 254-56 (1974); *New York Times Co. v. Sullivan*, 376 U.S. 254, 269 (1964).

135. NewsGuard's rating service is quintessential journalistic activity, and it is "obviously engaged in conduct protected under the First Amendment." *Media Matters*, 138 F.4th at 584; *see also Consortium for Indep. Journalism*, 2025 WL

919504, at *18 n.11 (NewsGuard's use of journalistic criteria as a news rating system is akin to "a newspaper's editorial section").

136. Defendants have taken regulatory actions against NewsGuard targeting its journalistic activity that would deter a person of ordinary firmness from continuing to engage in protected activity. These actions include the FTC's overly broad and punitive CID and the Consent Order terms in connection with the Omnicom merger that target NewsGuard and seek to undermine or destroy NewsGuard's business.

137. The CID's blunderbuss demands have burdened NewsGuard by diverting revenue and resources away from NewsGuard's core mission. NewsGuard's staff has had to devote countless hours to responding to the FTC's demands.

138. FTC staff has not engaged in genuine good faith negotiations with NewsGuard concerning the overbroad scope or the First Amendment infringing aspects of the CID. The FTC's tack instead has been to drag out its "investigation" and thereby add still more costs and burdens on NewsGuard.

139. The possibility that the FTC will seek to enforce the CID in federal court raises the specter of additional legal expenses and diversion of resources.

140. Additionally, the FTC's Consent Order foreclosing Omnicom from serving the advertisers it represents by continuing to facilitate their use of NewsGuard's service has had a direct and substantial effect on NewsGuard, which has already lost customer contracts. NewsGuard expects and is preparing to lose additional customer relationships in the coming months.

141. Omnicom faces the prospect of violating the consent decree if it continues to serve its thousands of clients by working with NewsGuard. NewsGuard also expects, given current market dynamics, that other advertising agencies will propose to merge in the coming years, and that the FTC will similarly require abandoning any agency relationship with NewsGuard as a condition of such a merger.

142. The FTC's actions were designed to chill NewsGuard's First Amendment-protected speech, journalism, and editorial activities by intruding on NewsGuard's news judgment and to violate NewsGuard's First Amendment association rights by disrupting its client relationships by exposing them to government retaliation.

143. The FTC's various actions targeting NewsGuard, including the CID and the Omnicom merger conditions, are sufficient to chill a reasonable publisher in NewsGuard's position from engaging in protected expression. *See Aref*, 833 F.3d at 258. A combination of adverse actions and statements by officials is sufficient to demonstrate retaliatory motive. *E.g.*, *Am. Acad. of Pediatrics v. U.S. Dep't of Health & Hum. Servs.*, 2026 WL 80796, at *16-20 (D.D.C. Jan. 11, 2026).

144. Here, there is a direct causal connection between NewsGuard's protected journalistic activity and the FTC's retaliatory actions. The FTC's campaign against NewsGuard is based on the false premise that its news rating service disfavors conservative viewpoints. This is incorrect, but even if true, it would be a patently unconstitutional basis for government action.

145. For purposes of this constitutional review, the government's motivation to restrict speech is what matters. *Heffernan v. City of Paterson*, 578 U.S. 266, 273 (2016).

146. Government retaliation is even more of a concern where the speech restriction is based on a disfavored viewpoint. "Viewpoint discrimination is … an egregious form of content discrimination" and is essentially unconstitutional *per se*. *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 829-30 (1995). "Viewpoint discrimination is poison to a free society," *Iancu v. Brunetti*, 588 U.S. 388, 399 (2019) (Alito, J., concurring), and the government lacks any legitimate interest is selectively penalizing disfavored viewpoints. *Healy v. James*, 408 U.S. 169, 187-88 (1972).

147. Chairman Ferguson has spoken publicly of his "intent to target media groups and other actors in language that focuses on their viewpoints and the content of their speech." *Media Matters for Am. v. FTC*, 2025 WL 2988966, at *8 (D.C. Cir. Oct. 23, 2025) (per curiam). He has called for investigations of what he called Big Tech "censorship," and he specifically named NewsGuard as a target.

148. When the Omnicom Consent Order was first proposed, Chairman Ferguson released a statement explicitly calling out NewsGuard as an organization that "ha[s] publicly sought to use the chokepoint of the advertising industry to effect political or ideological goals" and alleging that NewsGuard steers "advertising revenue with 'an unavoidable partisan lens.'"

149. Chairman Ferguson's various statements that frame the FTC's investigations and other regulatory actions in ideological terms provide an unambiguous causal link to the adverse actions taken against NewsGuard. *See*, *e.g.*, *Media Matters for Am. v. FTC*, __ F. Supp. 3d __, 2025 WL 2378009 (D.D.C. Aug. 15, 2025), *stay pending appeal denied*, 2025 WL 2988966 (D.C. Cir. 2025), *appeal docketed*, No. 25-5302 (D.C. Cir. Aug. 19, 2025). His statements and the FTC's actions ignore "a central tenet of the First Amendment that the government must remain neutral in the marketplace of ideas." *FCC v. Pacifica Found.*, 438 U.S. 726, 745-46 (1978).

150. Although Chairman Ferguson purports to be acting within the context of enforcing antitrust law, the FTC is using a statutory regime designed to focus on economic conduct to regulate the speech of private actors. Using antitrust laws to govern private speech falls clearly outside the FTC's statutory mandate.

151. Chairman Ferguson's references to a valid regulatory purpose under antitrust law are purely pretextual. His numerous statements focusing on NewsGuard and the timing of the CID make clear that "retaliatory animus was the but-for cause of the FTC's CID." *Media Matters*, 2025 WL 2378009, at *2.

152. The sweeping scope of the actions targeting NewsGuard provides further evidence of pretext. *Id.* at *21. The CID's "demands . . . go well beyond the investigation's purported scope," which is apparently an effort by the FTC to determine whether NewsGuard "has information about the use of 'brand suitable' or 'brand safe' lists to 'coordinate ad placement.'" *Id.*

153. Likewise, the conditions imposed by the Omnicom Consent Order are disconnected from any valid regulatory purpose. The government "may not interfere with private actors' speech to advance its own vision of ideological balance." *Moody*, 603 U.S. at 741.

154. This Court has jurisdiction over actions arising under the Constitution, including challenges to unconstitutional action by federal agencies that violate the First Amendment. *Trudeau v. FTC*, 456 F.3d 178, 185-86 (D.C. Cir. 2006). In particular, this jurisdiction includes claims for unconstitutional retaliation. *Id.* at 190 & n.22 (collecting cases); *accord Hubbard v. U.S. Env't Prot. Agency*, 809 F.2d 1, 11 n.15 (D.C. Cir. 1986) ("the court's power to enjoin unconstitutional acts by the government … is inherent in the Constitution itself") (citing *Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803)). And it includes challenges to overly broad investigations that intrude on First and Fourth Amendment rights. *See, e.g.*, *Media Matters v. Paxton*, 138 F.4th at 563.

155. In deciding whether the FTC has exceeded its constitutional authority, federal courts owe no duty of deference to the agency. *Loper Bright Enters. v. Raimondo*, 603 US 369, 392-93 (2024). This principle is especially important in determining whether a federal agency has engaged in unconstitutional retaliation. Not only is the agency self-interested, but "courts, not agencies, are expert on the First Amendment." *Porter v. Califano*, 592 F.2d 770, 780 n.15 (5th Cir. 1979). Administrative agencies receive no deference "when reviewing a potential violation

of a constitutional right." *Tex. Off. of Pub. Util. Couns. v. FCC*, 183 F.3d 393, 410 (5th Cir. 1999).

156. By engaging in a campaign of retaliation for disfavored speech, the FTC has forfeited any claim to a presumption of regularity. *Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of the President*, 774 F. Supp. 3d 86, 889 (D.D.C. 2025) ("The retaliatory nature of the Executive Order at issue … is clear from its face"). As numerous judges have pointed out, "courts have seen instance after instance of departures from this tradition" of assuming that executive or administrative authority is in service of a good faith application of law. *Fed. Educ. Ass'n. v. Trump*, 795 F. Supp. 3d 74, 88-92 (D.D.C. 2025) (collecting numerous cases), *stay pending appeal denied*, 2025 WL 2738626, at *8 (D.C. Cir. Sept. 25, 2025) (Pan, J., concurring) (upholding denial of presumption of regularity where executive action "reflects retaliatory motive"); *see also Am. Acad. of Pediatrics*, 2026 WL 80796, at *20 (constellation of factors rebuts presumption of regularity).

**<u>SECOND CAUSE OF ACTION</u>**
**First and Fourth Amendment Violations**
**(Unjustified and Overly Burdensome CIDs)**

157. Even if there were no retaliatory motive, the FTC's CIDs served on NewsGuard are overly broad and intrusive.

158. The First and Fourth Amendments impose important restrictions on the reach of administrative subpoenas. *See Okla. Press Publ'g Co. v. Walling*, 327 U.S. 186, 208–11 (1946). In particular, the First Amendment affords NewsGuard a privilege that protects it from having to disclose information if doing so would chill

its constitutional rights of free speech and free expression. *See Perry v. Schwarzenegger*, 591 F.3d 1147, 1160 (9th Cir. 2009).

159. These constitutional protections are interrelated; when an administrative subpoena seeks materials that could fall under First Amendment protection, courts require that the Fourth Amendment's standards be met with "scrupulous exactitude." *Zurcher v. Stanford Daily*, 436 U.S. 547, 564 (1978) (citing *Stanford v. Texas*, 379 U.S. 476, 485 (1965)).

160. Investigating a news organization because of its perceived editorial policies is not a valid governmental interest. "It is particularly important that the exercise of the power of compulsory process be carefully circumscribed when the investigative process tends to impinge upon such highly sensitive areas as freedom of speech or press." *Sweezy v. New Hampshire*, 354 U.S. 234, 245 (1957).

161. First Amendment case law makes clear that "before a state or federal body can compel disclosure of information which would trespass upon [F]irst [A]mendment freedoms, a 'subordinating interest of the State' must be proffered, and it must be 'compelling.'" *FEC v. Machinists Non-Partisan Pol. League*, 655 F.2d 380, 389 (D.C. Cir. 1981) (quoting *NAACP v. Alabama*, 357 U.S. 449, 463 (1958)).

162. The FTC's investigation of NewsGuard is a classic fishing expedition. The CID did not "state the nature of the conduct constituting the alleged violation which is under investigation and the provision of law applicable to such violation" as required by 15 U.S.C. § 57b-1(c)(2). Instead, the CID simply provided a boilerplate

statement that it was seeking information "to determine whether there is, has been, or may be a violation of any laws administered by the Federal Trade Commission."

163. The FTC's extensive demands intrude on NewsGuard's constitutionally protected editorial processes. Overall, the CID's Specifications demand vast numbers of confidential, highly sensitive documents, a request that effectively encompasses virtually all the company's emails, reporters' notes and drafts, texts, and other documents created since its founding in 2018. The CID also demands the identities of, NewsGuard's subscribers and all communications with them.

164. NewsGuard met and conferred with FTC staff on ten occasions and has produced more than 40,000 pages of responsive documents in a good faith effort to comply. Despite NewsGuard's efforts, the FTC demands additional document productions.

165. A January 15, 2026, letter, misleadingly characterized as a "good-faith effort to reduce NewsGuard's burden," actually doubles down on the FTC's unconstitutional demands. The letter reiterates the CID's most burdensome requests, including for productions encompassing the identities of and communications with NewsGuard's customers, the identity of all entities to which NewsGuard has ever assigned a News Reliability Rating (as well as how they were rated), the rating methodology, and "internal correspondence about the process of developing the methodology."

166. The CID's requests for information identifying NewsGuard's customers target information protected by NewsGuard's First Amendment associational rights.

The CID demands "all communications between NewsGuard and any advertiser, advertising agency, or any person acting as an agent of an advertiser … with whom NewsGuard had a commercial relationship relating to NewsGuard News Reliability Ratings" and the names of customers.

167. NewsGuard is a journalistic organization with a First Amendment right to associate with its customers to engage in the free exchange of ideas protected by the Constitution. *See NAACP*, 357 U.S. at 460 ("It is beyond debate that freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the 'liberty' assured by the Due Process Clause of the Fourteenth Amendment, which embraces freedom of speech."). Because "compulsory disclosure of organizational ties can constitute a significant encroachment on freedom of association," *Familias Unidas v. Briscoe*, 619 F.2d 391, 399 (5th Cir. 1980), it can only be justified if it is narrowly tailored to further a sufficiently important government interest, *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 609–10 (2021). The FTC's open-ended demand for customer identities untethered to any legitimate investigatory interest is the antithesis of a constitutionally tailored information request.

168. "[I]mplicit in the right to engage in activities protected by the First Amendment [is] a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Brock v. Loc. 375, Plumbers Int'l Union of Am.*, 860 F.2d 346, 349 (9th Cir. 1988) (quoting *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984)). Accordingly, "before requiring that

organizations reveal sensitive information about their members and supporters," the government must satisfy "exacting scrutiny." *Ams. for Prosperity*, 594 U.S. at 609.

169. The FTC's expansive investigation of NewsGuard cannot satisfy exacting scrutiny. A government actor's "intentional service of [a] CID" can be "the act that caused chilling effects" on a media organization's First Amendment rights, as serving a CID "legally obligate[s]" the organization "to produce records." *Media Matters v. Paxton*, 732 F. Supp. 3d at 22.

170. This Court has jurisdiction over actions arising under the Constitution, including challenges to unconstitutional action by federal agencies that violate the First Amendment. *Trudeau*, 456 F.3d at 185-86.

**<u>THIRD CAUSE OF ACTION</u>**
**First Amendment Violation**
**(Unlawful Targeting of NewsGuard's First Amendment Activity Via Intermediaries)**

171. A public official who tries to shut down an avenue of expression of ideas and opinions through "actual or threatened imposition of government power or sanction" violates the First Amendment. *Backpage.com, LLC v. Dart*, 807 F.3d 229, 230 (7th Cir. 2015) (quoting *Am. Family Ass'n, Inc. v. City & County of San Francisco*, 277 F.3d 1114, 1125 (9th Cir. 2002)).

172. A government official cannot do indirectly what he or she is barred from doing directly. *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 190 (2024); *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963). Specifically, "[a] government official cannot coerce a private party to punish or suppress disfavored speech on her behalf." *Vullo*, 602 U.S. at 190 (citing *Bantam Books*, 372 U.S. at 67-69*)*. No doubt,

government officials may criticize private speakers, and in doing so can "rely on the merits and force of [their] ideas, the strength of [their] convictions, and [their] ability to inspire others," but they cannot "use the power of the State to punish or suppress disfavored expression." *Id.* at 188.

173. This means the First Amendment bars the government from penalizing speech indirectly by applying regulatory pressure on third-party intermediaries. For example, in *Bantam Books* the Supreme Court held the government could not apply pressure on third-party booksellers in order to impose a blacklist on publications. 372 U.S. at 71. And in *Backpage.com*, the Seventh Circuit enjoined a sheriff and held that he had violated the First Amendment by pressuring credit card companies to stop doing business with a classified advertising website because he objected to the content of ads om the site. *Backpage.com,* 807 F.3d at 235.

174. The Supreme Court unanimously reaffirmed this principle in *Vullo*, where it held the New York Department of Financial Services ("DFS") could not leverage its regulatory authority over insurance companies to penalize the National Rifle Association for its political positions on gun control. State officials advised the regulated insurance companies that doing business with the NRA sent the wrong message and entered agreements with companies that "agreed not to provide any NRA-endorsed insurance programs." 602 U.S. at 184-85. In particular, the Court held it offends the First Amendment for DFS to enter consent decrees granting regulatory concessions to regulated insurance companies on condition they cease doing business with a disfavored speaker. *Id.* at 198.

175. Such an "intermediary strategy" is particularly threatening to the First Amendment because it "allows government officials to expand their regulatory jurisdiction to suppress the speech of organizations that they have no direct control over." *Id*. at 197-98 (cleaned up). It magnifies the effectiveness of speech suppression efforts because it targets entities with less incentive to resist the government's censorial efforts—the "business partners" of the disfavored speaker. *Id*. at 198.

176. To state a claim that the government is violating the First Amendment through the coercion of a third party, a plaintiff must plausibly allege conduct that, viewed in context, could reasonably be understood to convey a threat of adverse government action in order to punish or suppress the plaintiff's speech. *Id*. at 191.

177. Chairman Ferguson's many statements and the FTC's direct actions targeting NewsGuard represent an unconstitutional attempt to impose a regulatory penalty on NewsGuard because of its news rating service.

178. Chairman Ferguson's repeated statements that NewsGuard allegedly "censors" conservative news sites (because some receive poor ratings) evinces a fundamental misunderstanding of the concept of censorship. First, "[t]he Free Speech Clause of the First Amendment *constrains* governmental actors and *protects* private actors." *Halleck*, 587 US at 804 (emphasis added). And second, it is not the government's legitimate role to decide "what counts as the right balance of private expression—to 'un-bias' what it thinks biased." *Moody*, 603 U.S. at 719.

179. By accusing NewsGuard of providing "biased" evaluations of news sites, Chairman Ferguson has inverted the relationship between the government and the

First Amendment. NewsGuard is a private business that offers assessments of the quality of news sites based on disclosed journalistic criteria. As a matter of law, NewsGuard cannot be a censor. But by asserting FTC control over the market for NewsGuard's services, Chairman Ferguson has embraced the censor's role.

180. The FTC has taken concrete steps to undermine NewsGuard's business by imposing conditions in the Consent Order approving the Omnicom-IPC merger that requires the merged company to cease doing business with NewsGuard. The Consent Order effectively imposes a blacklist on NewsGuard's services. The First Amendment associational rights implicated by the CID's demand for NewsGuard's customer lists are eclipsed by the consent decree, which imposes an absolute prohibition on Omnicom's association with NewsGuard.

181. Those conditions were imposed after Chairman Ferguson repeatedly criticized NewsGuard for what he perceived to be its editorial viewpoint and after he described what regulatory strategies he would use against NewsGuard. The conditions were also added at the behest of news organizations that disagree with NewsGuard's journalistic standards (and in NewsGuard's judgment fail to meet the standards).

182. NewsGuard has already lost business as a consequence of the Consent Order, and the loss of substantial additional business is likely imminent.

183. The Consent Order as imposed by the FTC violates the First Amendment for the same reason as the publication blacklist in *Bantam Books*, the

pressure campaign on credit card companies in *Backpage.com*, and the consent decree conditions barring business relationships with the NRA in *Vullo*.

184. NewsGuard has standing to challenge the merger conditions, as they adversely affect its business, and this Court has jurisdiction to hear that challenge. NewsGuard's constitutional challenge is wholly collateral to the FTC's merger review provisions, the constitutional questions are outside the agency's expertise, and precluding district court review would foreclose all meaningful judicial review of the FTC's actions. *Axon Enter., Inc. v. FTC*, 598 U.S. 175, 186 (2023); *see Porter*, 592 F.2d at 780 n.15.

## CONCLUSION

The Supreme Court unanimously reaffirmed just two terms ago that "the First Amendment prohibits government officials from wielding their power selectively to punish or suppress speech, directly or … through private intermediaries." *Vullo*, 602 U.S. at 198. This rule applies equally when federal regulators operate quietly behind closed doors as it does when they shout their unconstitutional intentions from the rooftops. Here, Chairman Ferguson telegraphed his intention to suppress NewsGuard's speech even before taking office and then implemented this strategy in plain sight. Although he tries to dress his campaign against NewsGuard in the garb of FTC authority, "this wolf comes as a wolf." *Morrison v. Olson*, 487 U.S. 654, 699 (1988) (Scalia, J., dissenting). This Court must require Chairman Ferguson and the FTC to operate within constitutional bounds.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests the following relief:

A. Declare the FTC's CID to NewsGuard constitutes a First Amendment retaliatory action in violation of Plaintiff's rights under the First Amendment to the U.S. Constitution.

B. Declare the FTC's CID to NewsGuard violates Plaintiff's rights under the First and Fourth Amendments of the U.S. Constitution.

C. Declare the Omnicom-IPG merger condition barring the merged entity from doing business with news rating services violates Plaintiff's rights under the First Amendment to the U.S. Constitution.

D. Preliminarily enjoin the FTC, Chairman Ferguson, his officers, agents, servants, and employees from initiating any action to enforce the CID in violation of Plaintiff's constitutional rights.

E. Preliminarily enjoin the FTC, Chairman Ferguson, his officers, agents, servants, and employees from initiating any action to enforce the Omnicom-IPG merger condition in violation of Plaintiff's constitutional rights.

F. Permanently enjoin the FTC, Chairman Ferguson, his officers, agents, servants, and employees from initiating any action to enforce the CID or further investigating Plaintiff in violation of its constitutional rights.

G. Permanently enjoin the FTC, Chairman Ferguson, his officers, agents, servants, and employees from initiating any action to enforce the Omnicom-IPG

merger condition in violation of Plaintiff's constitutional rights or to enforce any similar merger condition.

H. Grant Plaintiff any and all other relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

In compliance with Federal Rule of Civil Procedure 38, Plaintiff demands a trial by jury on all issues so triable.

Dated: February 5, 2026

Respectfully Submitted,

/s/ Robert Corn-Revere
Robert Corn-Revere
(D.C. Bar No. 375415)
James C. Grant
(WA Bar No. 14358)
Sara E. Berinhout
(MA Bar No. 703217)
FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION
700 Pennsylvania Ave. SE, Ste. 340
Washington, DC 20003
(215) 717-3473
bob.corn-revere@fire.org
jim.grant@fire.org
sara.berinhout@fire.org

*Counsel for Plaintiff*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NEWSGUARD TECHNOLOGIES, INC.,<br><br>*Plaintiff*,<br><br>v.<br><br>FEDERAL TRADE COMMISSION and ANDREW FERGUSON, in his official capacity as Chairman of the Federal Trade Commission,<br><br>*Defendants*. | Civil Action No.: 1:26-cv-00353-DLF<br><br>**ORAL ARGUMENT REQUESTED** |

## PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

Plaintiff NewsGuard Technologies, Inc. ("NewsGuard") moves under Federal Rule of Civil Procedure 65 for a preliminary injunction against all Defendants, and submits the following, as elaborated upon in the accompanying Memorandum in Support of Motion for Preliminary Injunction.

On May 20, 2025, the Federal Trade Commission ("FTC") issued an expansive CID to NewsGuard demanding a vast number of confidential and sensitive documents. The CID requires production of virtually all documents, information, and records of NewsGuard from the company's inception to the present, including materials relating to NewsGuard's analyses, methodology, editorial judgments, journalism, and reporting. It further requires identification of NewsGuard's customers and subscribers, as well as production of NewsGuard's communications and financial records.

Defendants also imposed a condition on the merger of Omnicom Group Inc. ("Omnicom") and the Interpublic Group of Companies, Inc. ("IPG") that prohibits the merged entity from contracting with NewsGuard or using its rating services. Following a multiyear campaign by Newsmax urging lawmakers and administration officials to use state power to silence NewsGuard's speech, Defendants barred Omnicom from using third-party services that evaluate "viewpoints as to the veracity of news reporting" and "adherence to journalistic standards or ethics," a condition that directly targets NewsGuard and its rating service.[1]

Defendants' actions violate NewsGuard's First and Fourth Amendment rights. First, the FTC's CID and the conditions imposed by the Omnicom Consent Order represent unconstitutional retaliation because they target NewsGuard's journalistic activity in a manner sufficient to deter a person of ordinary firmness from engaging in protected expression. Second, Defendants' open-ended investigation of NewsGuard—including demands for reporters' notes, subscriber lists, and financial records—infringes NewsGuard's First and Fourth Amendment rights and cannot satisfy constitutional scrutiny. Third, Defendants have unlawfully suppressed NewsGuard's protected expression through the Consent Order by coercing Omnicom to sever business ties with NewsGuard, accomplishing indirectly what Defendants may not do directly.

Defendants' actions are causing NewsGuard irreparable harm by chilling its First Amendment activity, forcing the diversion of resources from journalism to

[1] *In re Omnicom Group Inc.*, ¶¶ 1.D, 2.A, No. C-4823 (Sept. 26, 2025).

regulatory compliance, and deterring NewsGuard's clients from associating with the organization. Because NewsGuard is likely to succeed on the merits, the balance of equities strongly favors injunctive relief: there is a substantial public interest in ensuring that the government complies with the Constitution, and Defendants have no legitimate interest in enforcing unconstitutional regulatory actions. *See Media Matters for Am. v. Paxton*, 138 F.4th 563, 585 (D.C. Cir. 2025).

For these reasons, the Court should grant this Motion and order that:

1. The FTC, Chairman Ferguson, his officers, agents, servants, and employees, during the course of this matter and until otherwise ordered by this Court or the case reaches finality, are enjoined from initiating any action to enforce the CID.
2. The FTC, Chairman Ferguson, his officers, agents, servants, and employees, during the course of this matter and until otherwise ordered by this Court or the case reaches finality, are enjoined from initiating any action to enforce the Omnicom-IPG merger condition.

A proposed order is attached.

Pursuant to Local Civil Rule 7(m), on February 9, 2026, counsel for Plaintiff conferred in good faith with counsel for Defendants prior to filing the present motion to determine whether Defendants oppose the relief sought. Defendants advised they will oppose the motion for a preliminary injunction and requested Plaintiff's agreement to set a date for filing its opposition of forty-five days after the motion is filed. Plaintiff did not consent to the extension of time for filing. On February 10,

2026, Defendants advised Plaintiff's counsel that they plan to request a thirty-day extension for filing a response, which Plaintiff opposes.

Dated: February 11, 2026

Respectfully Submitted,

/s/ Robert Corn-Revere
Robert Corn-Revere
(D.C. Bar No. 375415)
James C. Grant
(WA Bar No. 14358)
Sara E. Berinhout
(MA Bar No. 703217)
FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION
700 Pennsylvania Ave. SE, Ste. 340
Washington, DC 20003
(215) 717-3473
bob.corn-revere@fire.org
jim.grant@fire.org
sara.berinhout@fire.org

*Counsel for Plaintiff*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

NEWSGUARD TECHNOLOGIES, INC.,

*Plaintiff*,

v.

FEDERAL TRADE COMMISSION and ANDREW FERGUSON,

*Defendants*.

Civil Action No.: 1:26-cv-00353-DLF

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

TABLE OF CONTENTS ........ i

TABLE OF AUTHORITIES ........ ii

INTRODUCTION ........ 1

BACKGROUND ........ 2

STANDARD OF REVIEW ........ 27

ARGUMENT ........ 27

I. NewsGuard Is Likely to Prevail on the Merits of Its Claims. ........ 27

A. Chairman Ferguson and the FTC Retaliated Against NewsGuard Because of its Editorial Judgments. ........ 28

B. The FTC's Intermediary Strategy Reflected in the Omnicom-IPG Consent Order Is Unconstitutional Jawboning. ........ 36

C. The FTC's Actions Against NewsGuard Violate the First and Fourth Amendments. ........ 38

II. NewsGuard Will Suffer Irreparable Harm Absent an Injunction. ........ 42

III. The Remaining Equitable Factors Favor Granting Preliminary Relief. ........ 43

CONCLUSION ........ 44

## TABLE OF AUTHORITIES

**Cases**

*Am. Acad. of Pediatrics v. U.S. Dep't of Health & Hum. Servs.*,
No. 25-cv-4505, 2026 WL 80796 (D.D.C. Jan. 11, 2026) ........ 32
*Am. Family Ass'n, Inc. v. City & County of San Francisco*,
277 F.3d 1114 (9th Cir. 2002) ........ 37
*Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 609–10 (2021) ........ 41
*Aref v. Lynch*,
833 F.3d 242 (D.C. Cir. 2016) ........ 28, 29
*Backpage.com, LLC v. Dart*,
807 F.3d 229 (7th Cir. 2015) ........ 37, 38
*Bailey v. Fed. Bureau of Prisons*,
No. 24-1219, 2024 WL 3219207 (D.D.C. June 28, 2024) ........ 42
*Bantam Books, Inc. v. Sullivan*,
372 U.S. 58 (1963) ........ 36, 37
*Bell v. Hood*,
327 U.S. 678 (1946) ........ 2
*Black Lives Matter D.C. v. Trump*,
544 F. Supp. 3d 15 (D.D.C. 2021) ........ 32
*Centro Tepeyac v. Montgomery County*,
722 F.3d 184 (4th Cir. 2013) ........ 43
*Centro Tepeyac v. Montgomery County*,
779 F. Supp. 2d 456 (D. Md. 2011) ........ 43
*Cigar Ass'n of Am. v. U.S. Fed. Drug Admin.*,
317 F. Supp. 3d 555 (D.D.C. 2018) ........ 42
*Consortium for Indep. Journalism, Inc. v. United States*,
23 Civ. 7088 (KPF), 2025 WL 919504 (S.D.N.Y. Mar. 26, 2025) ........ 8, 29
*Constantine v. Rectors & Visitors of George Mason Univ.*,
411 F.3d 474 (4th Cir. 2005) ........ 30
*Cooksey v. Futrell*,
721 F.3d 226 (4th Cir. 2013) ........ 30
*Davis v. District of Columbia*,
158 F.3d 1342 (D.C. Cir. 1998) ........ 42
*Déjà vu of Nashville, Inc. v. Metro. Gov't of Nash. & Davidson Cty.*,
274 F.3d 377 (6th Cir. 2001) ........ 44
*Elrod v. Burns*,
427 U.S. 347 (1976) ........ 42
*Familias Unidas v. Briscoe*,
619 F.2d 391 (5th Cir. 1980) ........ 41
*Fed. Election Comm'n v. Machinists Non-Partisan Pol. League*,
655 F.2d 380 (D.C. Cir. 1981) ........ 40

*Fla. EB5 Invs., LLC v. Wolf*,
443 F. Supp. 3d 7 (D.D.C. 2020)........ 27
*Giovani Carandola, Ltd. v. Bason*,
303 F.3d 507 (4th Cir. 2002)........ 44
*Goodwin v. Dist. of Columbia*,
579 F. Supp. 3d 159 (D.D.C. 2022)........ 32
*Gordon v. Holder*,
721 F.3d 638 (D.C. Cir. 2013)........ 43
*Grajales v. P.R. Ports Auth.*,
682 F.3d 40 (1st Cir. 2012)........ 32
*Hartman v. Moore*,
547 U.S. 250 (2006)........ 28
*Hawkins v. District of Columbia*,
923 F. Supp. 2d 128 (D.D.C. 2013)........ 32
*Healy v. James*,
408 U.S. 169 (1972)........ 39
*Houston Cmty. Coll. Sys. v. Wilson*,
595 U.S. 468 (2022)........ 28
*Huisha-Huisha v. Mayorkas*,
27 F.4th 718 (D.C. Cir. 2022)........ 43
*Iancu v. Brunetti*,
588 U.S. 388 (2019)........ 39
*Jenner & Block LLP v. U.S. Dep't of Just.*,
784 F. Supp. 3d 76 (D.D.C. 2025)........ 30
*Johnson v. District of Columbia*,
726 F. Supp. 3d 8 (D.D.C. 2024)........ 32
*Karem v. Trump*,
960 F.3d 656 (D.C. Cir. 2020)........ 42, 43
*League of Women Voters of the U.S. v. Newby*,
838 F.3d 1 (D.C. Cir. 2016)........ 44
*Lewis v. City of Boston*,
321 F.3d 207 (1st Cir. 2003)........ 31
*Lewis v. Gov't of D.C.*,
161 F. Supp. 3d 15 (D.D.C. 2015)........ 32, 33
*Manhattan Cmty. Access Corp. v. Halleck*,
587 U.S. 802 (2019)........ 1, 39
*Massey v. Johnson*,
457 F.3d 711 (7th Cir. 2006)........ 31
*Media Matters for Am. v. Bailey*,
Civil No. 24-cv-147 (APM), 2024 WL 3924573 (D.D.C. Aug. 23, 2024)........ 1, 17, 31, 33
*Media Matters for Am. v. FTC*,
Civil Action No. 25-1959 (SLS), 2025 WL 2378009 (D.D.C. Aug. 15, 2025)........ passim
*Media Matters for Am. v. Paxton*,
138 F.4th 563 (D.C. Cir. 2025)........ passim

*Media Matters for Am. v. Paxton*,
732 F. Supp. 3d 1 (D.D.C. 2024) .................... 16, 31, 33, 41
*Miami Herald Publ'g Co. v. Tornillo*,
418 U.S. 241 (1974) .................... 28
*Moody v. NetChoice, LLC*,
603 U.S. 707 (2024) .................... 1, 39
*Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*,
429 U.S. 274 (1977) .................... 32
*NAACP v. Alabama ex rel. Patterson*,
357 U.S. 449 (1958) .................... 40
*NAACP. v. Claiborne Hardware Co.*,
458 U.S. 886 (1982) .................... 39
*Nat'l Rifle Ass'n of Am. v. Vullo*,
602 U.S. 175 (2024) .................... 36, 37, 38
*New York Times Co. v. Sullivan*,
376 U.S. 254 (1964) .................... 28
*News Am. Publ'g, Inc. v. FCC*,
844 F.2d 800 (D.C. Cir. 1988) .................... 36
*Nieves v. Bartlett*,
587 U.S. 391 (2019) .................... 28
*Okla. Press Publ'g Co. v. Walling*,
327 U.S. 186 (1946) .................... 40
*Perry v. Schwarzenegger*,
591 F.3d 1147 (9th Cir. 2009) .................... 40
*Perry v. Sindermann,*
408 U.S. 593 (1972) .................... 28
*Prysmian Cables & Sys. USA, LLC v. Szymanski*,
573 F. Supp. 3d 1021 (D.S.C. 2021) .................... 44
*Pursuing Am.'s Greatness v. Fed. Election Comm'n*,
831 F.3d 500 (D.C. Cir. 2016) .................... 27
*Rosenberger v. Rector & Visitors of Univ. of Va.*,
515 U.S. 819 (1995) .................... 40
*Smith v. De Novo Legal, LLC*,
905 F. Supp. 2d 99 (D.D.C. 2012) .................... 34
*Stanford v. Texas*,
379 U.S. 476 1965) .................... 40
*Sweezy v. New Hampshire ex rel. Wyman*,
354 U.S. 234 (1957) .................... 40
*Washington v. Reno*,
35 F.3d 1093 (6th Cir. 1994) .................... 44
*White v. Lee*,
227 F.3d 1214 (9th Cir. 2000) .................... 30
*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) .................... 27

*Wis. Gas Co. v. Fed. Energy Regul. Comm'n*,
758 F.2d 669 (D.C. Cir. 1985) .......... 42
*Zurcher v. Stanford Daily*,
436 U.S. 547 (1978) .......... 40

**Statutes**

15 U.S.C. § 1 .......... 39
15 U.S.C. § 45 .......... 39
15 U.S.C. § 57b-1(c)(2) .......... 41

**Other Authorities**

Andrew Ferguson
(@AFergusonFTC), X (Nov. 11, 2024, at 20:51 ET) .......... 12
Andrew Ferguson
(@AFergusonFTC), X (Nov. 27, 2024, at 09:33 ET) .......... 12
*Brand Danger: NewsGuard Finds 349 Top Global Brands Funding Misinformation About the Hamas-Israel Conflict with Programmatic Ads*, NewsGuard (Nov. 29, 2023) .......... 7
Brendan Carr
(@BrendanCarrFCC), X (Apr. 15, 2020, at 18:47 ET) .......... 15
Brian Stelter,
*How Brendan Carr, the Attack-Dog FCC Chair, Helped Take Down Jimmy Kimmel with Words, Not Actions*, CNN (Sept. 18, 2025) .......... 15
Concurring Statement of Commissioner Andrew Ferguson, *FTC v. 1661, Inc. d/b/a GOAT* (Dec. 2, 2024) .......... 13
Eva Maitland & Madeline Roache,
*Russia's War on Ukraine: Three Years, Three Hundred and Two False Claims | NewsGuard*, Newsweek (Feb. 21, 2025, at 06:00 ET) .......... 4
Gordon Crovitz, Opinion, *For Iran, Disinformation Comes Just Behind Assassination*, Hill (Nov. 21, 2024, at 12:30 ET) .......... 4
H. Comm. on Small Bus., 118th Cong.,
*Small Business: Instruments and Casualties of the Censorship-Industrial Complex* 42–59 (Interim Staff Rep. 2024) .......... 10
Indep. Media Council & CPAC Found. Ctr. for Regul. Freedom,
Comment Letter on Proposed Consent Order 2 (July 28, 2025) .......... 25
Kari Donovan,
*Bannon's WarRoom, Show Clip Roundup 11/30/2024 [AM]*, WarRoom (Nov. 30, 2024) .......... 12
Kendra Barnett,
*EXCLUSIVE: FTC Probe Expands to IAS Over Alleged Ad Boycotts, Lawsuit Reveals*, Adweek (Feb. 7, 2026) .......... 18
L. Gordon Crovitz,
*How Amazon, Geico and Walmart Fund Propaganda*, N.Y. Times (Jan. 21, 2020) .......... 7
Laurence H. Silberman, *Hoover's Institution*,
WALL ST. J., July 20, 2005 .......... 1
Letter from Brendan Carr, FCC Comm'r, to CEOs (Nov. 13, 2024) .......... 13

Maggie Miller,
*State Department Eliminates Key Office Tasked with Fighting Foreign Disinformation*, Politico (Apr. 16, 2025, at 13:25 ET) ..... 11
Matt Skibinski,
*Special Report: How Some of the World's Largest Brands Funded the Misinformation Behind the Capitol Riot*, NewsGuard (Jan. 12, 2021)..... 6
Matt Skibinski,
*Special Report: Top Brands Are Sending $2.6 Billion to Misinformation Websites Each Year*, NewsGuard ..... 7
Matt Skibinski,
*Thousands of the World's Most Trusted Brands Funded COVID-19 Misinformation*, NewsGuard ..... 6
McKenzie Sadeghi,
*Violent, Celebratory Hamas Videos Garner Millions of Views, Despite Bans by Tech Platforms*, NewsGuard (Oct. 26, 2023) ..... 4
Mike Benz
(@MikeBenzCyber), X (Nov. 24, 2024, at 18:59 ET) ..... 12
Mike Wendling,
*What Does the FCC Do – and Can It Revoke a TV Network's License?* BBC (Sept. 19, 2025) ..... 15
NEWSMAX
(@NEWSMAX), X (July 31, 2025, at 21:58 ET)..... 25
Newsmax Media Inc.,
Comment Letter on Proposed Consent Order 13 (July 28, 2025)..... 24
*Newsmax's Tabacco Slams FTC Approval of Omnicom-IPG Merger*, Newsmax (Aug. 3, 2025, at 07:23 ET)..... 24
*One Year, 100 Myths: NewsGuard Has Identified More Than 100 False Narratives About the War in Ukraine*, NewsGuard (Feb. 16, 2023) ..... 7
Order, *Omnicom Grp. Inc.*, FTC Docket No. C-4823, ¶¶ 1.D, 2.A (Sept. 26, 2025)..... 26, 36
Paul Bond,
*Megamerger Omnicom, IPG Mum About NewsGuard Bias*, Newsmax (June 26, 2025, at 17:35 ET)..... 24
Petition to Quash, Civil Investigative Demand Dated May 20, 2025, to NewsGuard Techs., Inc., FTC File No. 251-0061 (Jan. 16, 2026)..... 22
Press Release,
Ass'n of Nat'l Advertisers, ANA Provides "First Look" at In-Depth Programmatic Transparency Study (June 19, 2023) ..... 6
Press Release,
Fed Trade Comm'n, FTC Prevents Anticompetitive Coordination in Global Advertising Merger (June 23, 2025)..... 23
Press Release,
Fed. Trade Comm'n, Federal Trade Commission Launches Inquiry into Tech Censorship (Feb. 20, 2025)..... 14
Press Release,
Omnicom, Omnicom to Acquire Interpublic Group to Create Premier Marketing and Sales Company (Dec. 9, 2024) ..... 22

Press Release,
PunchBowl News, FTC Commissioner Andrew N. Ferguson for FTC Chairman ................ 13
Proposed Decision & Order, *Omnicom Grp. Inc.*, FTC File No. 251-0049, 2025 WL 2355514 (June 23, 2025)........................................................................................................ 23, 36
Pub. Knowledge,
Comment Letter on Proposed Consent Order (July 28, 2025) ............................................ 25
Statement from Gordon Crovitz, NewsGuard Co-CEO, on Brendan Carr Letter (Nov. 15, 2024) .................................................................................................................................... 14
Statement of Chairman Andrew N. Ferguson, *Omnicom Grp. Inc.*, FTC File No. 251-0049, at 5 & n.34 (June 23, 2025) ...................................................................................... 23
Steven Lee Myers,
*DeepSeek's Answers Include Chinese Propaganda, Researchers Say*, N.Y. Times (Jan. 31, 2025) ............................................................................................................... 4
TechFreedom,
Comment Letter on Proposed Consent Order (July 28, 2025) ............................................ 25
Ted Johnson,
*Attacking the Watchdog: How Media Rating Site NewsGuard Ended Up as a Target for GOP Lawmakers and Regulators*, Deadline (Dec. 19, 2024, at 12:17 ET) .................................. 10
*Transcript: FTC Chairman Andrew Ferguson Keynote Part II*, ProMarket (Apr. 21, 2025) 14, 15
Vikram David Amar & Ashutosh Bhagwat,
Comment Letter on Proposed Consent Order (July 28, 2025) ............................................ 25
Wajeeha Ahmad, et al.,
*Companies Inadvertently Fund Online Misinformation Despite Consumer Backlash*, 630 NATURE 123, 124 (2024)..................................................................................... 7
Will Oremus & Naomi Nix,
*This Company Rates News Sites' Credibility. The Right Wants It Stopped.*, WASH. POST (Dec. 24, 2024)............................................................................................................... 9

## INTRODUCTION

As former D.C. Circuit Judge Laurence H. Silberman warned, "the most heinous act in which a democratic government can engage is to use its law enforcement machinery for political ends." *Media Matters for Am. v. Bailey*, Civil No. 24-cv-147 (APM), 2024 WL 3924573, at *18 (D.D.C. Aug. 23, 2024) (quoting Laurence H. Silberman, *Hoover's Institution*, WALL ST. J., July 20, 2005). Yet the Federal Trade Commission ("FTC" or "Commission") under Chairman Andrew N. Ferguson is doing precisely that by deploying agency authority to investigate and penalize Plaintiff NewsGuard Technologies, Inc. ("NewsGuard"). Chairman Ferguson initiated and is pursuing this campaign because he erroneously believes NewsGuard's news rating service is biased against conservative news sources. He is wrong about this—NewsGuard evaluates news sources based on nonpartisan and transparent journalistic criteria that are applied uniformly to news media across the political spectrum.

But his error is more fundamental than that—and far more serious—as it proceeds from the bizarre notion that NewsGuard, a private journalistic organization, somehow can be engaged in "censorship." Chairman Ferguson's belief that the FTC is authorized to be the arbiter of news judgment misunderstands the First Amendment completely, as the Free Speech Clause "*constrains* governmental actors and *protects* private actors." *Manhattan Cmty. Access Corp. v. Halleck*, 587 U.S. 802, 804 (2019) (emphasis added). In our constitutional scheme the government has no legitimate role to decide "what counts as the right balance of private expression—to 'un-bias' what it thinks [is] biased." *Moody v. NetChoice, LLC*, 603 U.S. 707, 719 (2024). Chairman Ferguson's confusion about this basic principle is chilling, for "[o]n the spectrum of dangers to free expression, there are few greater than allowing the government to change the speech of private actors in order to achieve its own conception of speech nirvana." *Id.* at 741-42.

The FTC's campaign against NewsGuard, including an unbounded and intrusive Civil Investigative Demand ("CID") and a Consent Order that bars the world's largest advertising agency holding company and its affiliates from using NewsGuard's services, has already inflicted irreparable injury, and, unless enjoined, will cause far more harm. Administrative agencies that lack—or refuse to acknowledge—constitutional guardrails are a particular threat to a free society. For that reason it is the standard practice of federal courts "to issue injunctions to protect rights safeguarded by the Constitution." *Bell v. Hood*, 327 U.S. 678, 684 (1946). This Court should do so here to prevent further damage to NewsGuard and First Amendment rights.

## BACKGROUND

### A. NewsGuard's Ratings and Reporting About Online News Sources.

NewsGuard is a service founded in 2018 with the aim of providing consumers and companies detailed assessments of the reliability of news sources they might encounter online. Declaration of Matthew Skibinski in Support of Plaintiff's Motion for Preliminary Injunction, ¶ 3 (Feb. 11, 2026) ("Skibinski Decl."). NewsGuard was founded by two veteran journalists, Steven Brill (who previously established *The American Lawyer* and Court TV), and Gordon Crovitz (former publisher of *The Wall Street Journal*). *Id*.

Messrs. Brill and Crovitz created NewsGuard because they believed online users would benefit from transparent reports about the accuracy and reliability of news and information websites. NewsGuard's guiding principle has been that no government entity should be in the business of deciding what news people consume, but neither should those decisions be left to unknown and unaccountable algorithms or partisan advocacy groups. *See id.* ¶ 4.

NewsGuard developed a rating process for assessing the reliability of news outlets based on nine journalistic criteria. These criteria assess adherence to basic, long-established practices of journalistic credibility and transparency. They include, for example, whether a news source

repeatedly publishes demonstrably false information, references multiple sources and differing viewpoints, effectively corrects errors, and fully discloses ownership and financing of the site. *Id.* ¶ 5.

NewsGuard fully discloses the nine criteria and explains how ratings are determined. *See id.* ¶ 5 (https://www.newsguardtech.com/ratings/rating-process-criteria). NewsGuard employs a team of journalists who review news websites to assign ratings and provide assessments. *Id.* ¶ 7. Each of the nine criteria is assigned a weighted number of points, which can total to a maximum of 100 points. Each site is assigned an overall score of 0 to 100 and a rating indicating the extent to which it adheres to the criteria in NewsGuard's judgment. *Id.* ¶ 6.

NewsGuard also provides a "Nutrition Label" accompanying each website's listed score, which sets forth in detail NewsGuard's findings and ultimate determination. Nutrition Labels include a grid showing NewsGuard's judgment of the site's performance on each of the nine criteria, as well as a description of the content on the site, who's behind it, and why it received the score it did. *See, e.g.*, *id.* ¶ 8 & Exs. 1 and 2 (examples of full versions of Nutrition Labels). Nutrition Labels are painstakingly prepared and can run to 10,000 words or more.

The ratings, Nutrition Labels, and assessments for news sites are initially prepared by NewsGuard journalist-analysts, but each is reviewed and fact-checked by senior NewsGuard personnel before publication to ensure they are as fair and accurate as possible. *Id.* ¶ 9. NewsGuard also contacts news site publishers to give them an opportunity to respond or object and includes relevant comments in Nutrition Labels. *Id.*

NewsGuard has rated 38,742 news sources, including 12,765 websites, since its founding. *Id.* ¶ 10.

**B. NewsGuard's Services to Customers.**

NewsGuard's services are available to consumers, businesses, advertisers, and others. *Id.* ¶ 11. Consumers can access NewsGuard reliability ratings through a monthly online subscription, which also gives them access to public reports the company produces about false claims spreading in the news. *Id.*[1] The subscription provides a browser extension that allows individuals using the Internet to see NewsGuard trust score icons next to links in their search results and social media feeds:




*See id.* ¶ 12. Hovering over an icon brings up a short description of the site and a link to "See the Full Nutrition Label" for a detailed description and why it received the score it did. *Id.* ¶ 13.

---

[1] NewsGuard is a leading source of journalism about foreign disinformation such as Russian, Chinese, and Iranian influence campaigns targeting Americans. *See, e.g.*, Eva Maitland & Madeline Roache, *Russia's War on Ukraine: Three Years, Three Hundred and Two False Claims | NewsGuard*, Newsweek (Feb. 21, 2025, at 06:00 ET), https://www.newsweek.com/russia-ukraine-disinformation-newsguard-2034104; Steven Lee Myers, *DeepSeek's Answers Include Chinese Propaganda, Researchers Say*, N.Y. Times (Jan. 31, 2025), https://www.nytimes.com/2025/01/31/technology/deepseek-chinese-propaganda.html; Gordon Crovitz, Opinion, *For Iran, Disinformation Comes Just Behind Assassination*, Hill (Nov. 21, 2024, at 12:30 ET), https://thehill.com/opinion/international/5000222-iran-disinformation-trump-threat. NewsGuard reporting has exposed how violent Hamas propaganda videos were promoted to teens on platforms such as TikTok, Facebook, and X during the war in Gaza. McKenzie Sadeghi, *Violent, Celebratory Hamas Videos Garner Millions of Views, Despite Bans by Tech Platforms*, NewsGuard (Oct. 26, 2023), https://www.newsguardtech.com/special-reports/violent-celebratory-hamas-videos-garner-millions-of-views-despite-bans-by-tech-platforms.




Businesses also subscribe to NewsGuard's ratings and journalism, including, for example, news aggregators and public relations firms with interests in distinguishing between reliable and unreliable online content. *Id.* ¶ 14. Advertisers and ad agencies also use NewsGuard's ratings to help make informed decisions about where (on which websites) ads should and should not be placed. *Id.* ¶ 15.

Online ads predominantly are placed through programmatic ad campaigns, *i.e.*, automated software-based buying and selling of digital ad placements. An average programmatic campaign runs on 44,000 websites at one time.[2] Major brands advertising online cannot know of all the tens of thousands of websites where their ads might appear. So, advertisers rely on ad agencies and automated services to provide methods to avoid ad placements that may be "brand unsafe," meaning ones that could undermine their brands in the consumers' eyes. Skibinski Decl. ¶ 16.

Brand safety for online advertisers has become a multi-billion-dollar industry. *Id.* ¶ 17. This is because, through programmatic ad campaigns, major international brands have had their advertisements unintentionally placed on websites considered unsafe and brand-damaging. *Id.* NewsGuard has reported on these concerns, noting ads inadvertently placed on websites that have been identified as advancing dangerous health treatments,[3] promoting election misinformation,[4] making false claims about the Israel-Hamas conflict,[5] or spreading Russian propaganda.[6] For

[2] *See* Press Release, Ass'n of Nat'l Advertisers, ANA Provides "First Look" at In-Depth Programmatic Transparency Study (June 19, 2023), https://www.ana.net/content/show/id/pr-2023-06-programmaticstudy.

[3] Matt Skibinski, *Thousands of the World's Most Trusted Brands Funded COVID-19 Misinformation*, NewsGuard, https://www.newsguardtech.com/special-report-advertising-on-covid-19-misinformation (last viewed Feb. 11, 2026).

[4] Matt Skibinski, *Special Report: How Some of the World's Largest Brands Funded the Misinformation Behind the Capitol Riot*, NewsGuard (Jan. 12, 2021), https://www.newsguardtech.com/special-reports/special-report-advertising-on-election-misinformation.

[5] *Brand Danger: NewsGuard Finds 349 Top Global Brands Funding Misinformation About the Hamas-Israel Conflict with Programmatic Ads*, NewsGuard (Nov. 29, 2023), https://www.newsguardtech.com/press/brand-danger-newsguard-finds-349-top-global-brands-funding-misinformation-about-the-hamas-israel-conflict-with-programmatic-ads.

[6] *One Year, 100 Myths: NewsGuard Has Identified More Than 100 False Narratives About the War in Ukraine*, NewsGuard (Feb. 16, 2023), https://www.newsguardtech.com/press/one-year-100-myths-newsguard-has-identified-more-than-100-false-narratives-about-the-war-in-ukraine.

example, NewsGuard reported that in 2019 Berkshire Hathaway's subsidiary GEICO was unintentionally the largest advertiser on Sputnik News, a Kremlin-controlled website.[7] *See* Skibinski Decl. ¶ 18. Research studies by NewsGuard and others estimate that 67% of top brands inadvertently advertise on websites with problematic content,[8] totaling some $2.6 billion of advertising per year.[9] Skibinski Decl. ¶ 19.

NewsGuard's customers in the advertising industry include ad agencies, ad targeting platforms, and advertisers themselves. *Id.* ¶ 20. Their continuing loyalty over the years shows that they value NewsGuard's ratings, analyses, and journalism. However, in this area NewsGuard is a small player compared to the large incumbent ad tech companies, accounting for less than 0.1% of the market for brand safety tools. *Id.*

### C. Attacks on NewsGuard by Publishers Unhappy with Ratings.

For several years, NewsGuard has faced criticisms from across the political spectrum that NewsGuard's ratings are biased in one direction or another. In one year, for example (actually within a period of a few months), one advocacy group produced a report claiming NewsGuard's ratings are biased against conservatives while another published a separate report claiming NewsGuard's ratings are biased in favor of conservatives. *Id.* ¶ 21.

Perhaps not surprisingly, many of the attacks on NewsGuard have come from news publishers that receive lower scores based on NewsGuard's application of journalistic criteria. *Id.*

[7] L. Gordon Crovitz, *How Amazon, Geico and Walmart Fund Propaganda*, N.Y. Times (Jan. 21, 2020), https://www.nytimes.com/2020/01/21/opinion/fake-news-russia-ads.html.

[8] Wajeeha Ahmad, et al., *Companies Inadvertently Fund Online Misinformation Despite Consumer Backlash*, 630 NATURE 123, 124 (2024).

[9] Matt Skibinski, *Special Report: Top Brands Are Sending $2.6 Billion to Misinformation Websites Each Year*, NewsGuard, https://www.newsguardtech.com/special-reports/brands-send-billions-to-misinformation-websites-newsguard-comscore-report.

¶ 22. In 2023, *Consortium News*, a left-leaning website that received low reliability ratings, sued NewsGuard for defamation and supposed claims under the First Amendment, but its claims were dismissed, as the court held that NewsGuard's ratings were protected editorial opinion. *Consortium for Indep. Journalism, Inc. v. United States*, 23 Civ. 7088 (KPF), 2025 WL 919504, at *16-20 (S.D.N.Y. Mar. 26, 2025).

At the same time, Newsmax, a conservative cable news network and digital media company, mounted a campaign attacking NewsGuard. Beginning in 2023 and for several years, Newsmax has asserted repeatedly in its programs and publications that NewsGuard is biased against conservative media and websites. Skibinski Decl. ¶ 24. Newsmax also received low ratings for adherence to journalistic standards. *Id.* ¶ 25. But perhaps more relevant to its motivation for attacking NewsGuard, Newsmax's ratings are markedly lower than ratings for other conservative news sources such as Fox News, the *National Review*, and the *Washington Times*, which are Newsmax's competitors for advertising dollars. *See id.*

Newsmax's attacks were and are baseless. NewsGuard's ratings of Newsmax—and all news sources—are based on nonpartisan journalistic criteria and are agnostic to the political or editorial viewpoints of the publishers. Many left-leaning outlets receive lower scores than comparable right-leaning sources. *See id.* ¶ 26 & Ex. 3. For example, Fox News receives a higher reliability rating than MSNBC, while the conservative *Washington Examiner* outscores the liberal *Daily Beast*. As reported by the *Washington Post* in 2024:[10]

[10] Will Oremus & Naomi Nix, *This Company Rates News Sites' Credibility. The Right Wants It Stopped.*, WASH. POST (Dec. 24, 2024), https://www.washingtonpost.com/technology/2024/12/24/newsguard-disinformation-censorship-free-speech.




### D. Putative Congressional Investigations Targeting NewsGuard.

While Newsmax's attacks on NewsGuard were false, its timing was opportune. When Republicans took control of the House in 2023, several committees opened investigations and issued statements taking aim at media and tech companies for supposed anti-conservative bias. Skibinski Decl. ¶ 27.

The House Oversight and Small Business Committees opened an investigation in June, 2024, with Oversight Committee Chairman James Comer appearing on Newsmax and agreeing that "their [NewsGuard's] goal is obviously to bully conservative media out of existence."[11]

[11] Ted Johnson, *Attacking the Watchdog: How Media Rating Site NewsGuard Ended Up as a Target for GOP Lawmakers and Regulators*, Deadline (Dec. 19, 2024, at 12:17 ET), https://deadline.com/2024/12/newsguard-newsmax-trump-fcc-1236202249.

Skibinski Decl. ¶ 28 & Ex. 4. However, after NewsGuard presented evidence to the committee that its ratings are apolitical and nonpartisan, the investigation did not proceed. *Id.* ¶ 28.

In September 2024, the House Small Business Committee released an interim staff report entitled "Small Business: Instruments and Casualties of the Censorship-Industrial Complex," which also took aim at NewsGuard with unsubstantiated claims of bias.[12] That effort also did not proceed further. *Id.* ¶ 29.

In early 2025, the Senate Judiciary Committee held a hearing on what it called the "Censorship Industrial Complex." NewsGuard cooperated, addressed the Committee's questions, again explaining and providing evidence that NewsGuard's ratings are nonpartisan and do not reflect any anti-conservative bias. *See* Skibinski Decl. ¶ 30. The Committee found no evidence to the contrary, and this investigation also has not proceeded. *Id.*

**E. Administration Officials' Public Attacks Targeting NewsGuard.**

Andrew Ferguson has been a longtime critic of NewsGuard. As a Commissioner on the FTC and continuing after he was appointed Chairman by President Trump, Ferguson has promoted an ideologically motivated effort to pursue and censor NewsGuard and other organizations that address the reliability of online sources. As reflected in his public statements and those of others in the administration (notably Brendan Carr, Chairman of the FCC), Ferguson's view is that (1) the federal government can regulate "purely private censorship," *i.e.*, the government can investigate and punish private parties' speech and editorial views if the government thinks they are biased; (2) providing website ratings or analyses to advertisers to help them protect brand safety

[12] H. Comm. on Small Bus., 118th Cong., *Small Business: Instruments and Casualties of the Censorship-Industrial Complex* 42–59 (Interim Staff Rep. 2024), https://smallbusiness.house.gov/uploadedfiles/house_committee_on_small_business_-_cic_report_september_2024.pdf.

constitutes collusive and impermissible "ad boycotts;" and (3) the government can use its full panoply of powers to pressure, intimidate, and coerce parties—directly and indirectly—to censor speech the government cannot ban outright. Ferguson's specious theory is wrong under the law, but that has not stopped him from pursuing it—in particular, to attack NewsGuard.

On November 12, 2024, then-Commissioner Ferguson posted on X about the closure of the U.S. Department of State's Global Engagement Center[13] by referring to NewsGuard specifically, asserting it had supposedly "led collusive ad-boycotts—possibly in violation of our antitrust laws—to censor the speech of conservative and independent media in the United States."[14] Skibinski Decl. ¶ 31 & Ex. 5. In fact, NewsGuard's work for the State Department traced how Russian influence operations spread throughout Latin America via Venezuelan state media. It had nothing to do with NewsGuard's ratings of news sources. Shortly afterward, Ferguson appeared in a podcast interview discussing how a new Republican-led FTC (after President Trump's inauguration) could act against organizations he believes are part of the "censorship industrial complex."[15] Again he called out NewsGuard by name and warned that "antitrust laws

[13] The Global Engagement Center was an interagency entity established in 2016 to expose and counter foreign propaganda and disinformation, closed in April 2025 by Secretary of State Marco Rubio following accusations by GOP lawmakers that the office censored conservative voices. *See* Maggie Miller, *State Department Eliminates Key Office Tasked with Fighting Foreign Disinformation*, Politico (Apr. 16, 2025, at 13:25 ET), https://www.politico.com/news/2025/04/16/state-department-shutters-gec-foreign-disinformation-00292982.

[14] Andrew Ferguson (@AFergusonFTC), X (Nov. 11, 2024, at 20:51 ET), https://x.com/AFergusonFTC/status/1856152760850243905.

[15] Mike Benz (@MikeBenzCyber), X (Nov. 24, 2024, at 18:59 ET), https://x.com/mikebenzcyber/status/1860835679560765841.

may have something to do with what's been going on [with] … advertiser boycotts."[16] Skibinski Decl. ¶ 32 & Ex. 6.

Later in November 2024 during an interview on Steve Bannon's WarRoom podcast, Ferguson reiterated his view of the importance of going after "purely private censorship" and the "censorship industrial complex."[17] Skibinski Decl. ¶ 37 & Ex. 7. "[P]rogressives, Silicon Valley, everyone who is fighting 'disinformation,' they're not just going to give up because of the election …. And that's where I think that it's really important that the FTC take investigative steps in the new administration under President Trump."[18] *Id.*

Brendan Carr, the Chairman of the Federal Communications Commission appointed by President Trump, has echoed Ferguson's attacks on NewsGuard. In a November 2024 letter to the CEOs of Alphabet, Microsoft, Meta, and Apple, then-Commissioner Carr claimed NewsGuard was part of a "censorship cartel" and that the company "leverag[es] its partnerships with advertising agencies to effectively censor[] targeted outlets."[19] Carr said the incoming Trump Administration would investigate and take action against NewsGuard and companies that used its

---

[16] *Id.*; *see also* Andrew Ferguson (@AFergusonFTC), X (Nov. 27, 2024, at 09:33 ET), https://x.com/AFergusonFTC/status/1861780403092099278 (Ferguson post on X forwarding podcast host's tweet that Ferguson had "laid out a compelling vision for how the FTC can take on advertiser boycott collusion in the Internet censorship space").

[17] Kari Donovan, *Bannon's WarRoom, Show Clip Roundup 11/30/2024 [AM]*, WarRoom (Nov. 30, 2024), https://warroom.org/bannons-warroom-show-clip-roundup-11-30-2024-am.

[18] *Id.*

[19] Letter from Brendan Carr, FCC Comm'r, to CEOs (Nov. 13, 2024), https://www.fcc.gov/sites/default/files/DOC-407732A1.pdf.

services for protecting brand safety, declaring that the so-called "cartel" must be "completely dismantled."[20] *See* Skibinski Decl. ¶ 34 & Ex. 8.

Echoing Carr's threats, in December 2024 Commissioner Ferguson asserted the FTC "ought to conduct … an investigation" because, he said, NewsGuard "seems to give a free pass to … major left-leaning outlets."[21] Skibinski Decl. ¶ 35 & Ex. 9. At the time, Ferguson was a candidate for FTC chairman, and in public statements to promote his candidacy, he touted that he had a "track record of standing up to … the radical left" and would "[i]nvestigate advertiser boycotts" and "'progressives who are targeting disinformation.'"[22] Skibinski Decl. ¶ 35 & Ex. 10. Ferguson's and Carr's publicized comments about NewsGuard ratings were simply false. NewsGuard responded and said so, demonstrating that many conservative-leaning news sources earn high reliability ratings while other, liberal publications receive lower ratings based on NewsGuard's journalistic criteria.[23]

But the facts did not deter the FTC or get in the way of its vendetta against NewsGuard. In February 2025, after Ferguson was named Chairman, the Commission issued a Request for Information ("RFI") seeking public comment on "Technology Platform Censorship," asserting

---

[20] *Id.*

[21] Concurring Statement of Commissioner Andrew Ferguson, *FTC v. 1661, Inc. d/b/a GOAT* (Dec. 2, 2024), https://www.ftc.gov/system/files/ftc_gov/pdf/ferguson-goat-concurrence.pdf.

[22] Press Release, PunchBowl News, FTC Commissioner Andrew N. Ferguson for FTC Chairman, https://punchbowl.news/wp-content/uploads/FTC-Commissioner-Andrew-N-Ferguson-Overview.pdf.

[23] Statement from Gordon Crovitz, NewsGuard Co-CEO, on Brendan Carr Letter (Nov. 15, 2024), https://www.newsguardtech.com/wp-content/uploads/2024/11/NewsGuard-Statement-on-Brendan-Carr-Letter.pdf.

that social media providers and other "tech platforms" are engaged in "censorship" that is "potentially illegal."[24] Skibinski Decl. ¶ 37 & Ex. 12.

In an April 2025 interview, Chairman Ferguson explained how the FTC could use its "tremendous array of investigative tools" and "coercive power—formal and informal" to demand compliance to its views about supposed online "censorship." Ferguson laid out a roadmap of tactics his FTC would later use against NewsGuard: "The regulators can show up, they can audit, they can investigate, they can cost you a lot of money, and the path of least resistance is: 'Do what we say.'"[25] Skibinski Decl. ¶ 38 & Ex. 13.

Ferguson's message was clear that the FTC would use its powers and the burdens and expenses it can impose not to determine if there was any legitimate basis for regulation, but rather to intimidate and coerce NewsGuard to do what the FTC demands. He noted that the FTC's investigative powers and tools "are expensive when applied to you even if we don't win at the end of the day, so knuckle under."[26] Or, in the words of FCC Chairman Carr in his not-so-subtle threat to ABC and its affiliate stations about Jimmy Kimmel's late-night comedy monologue mentioning Charlie Kirk (which the administration found objectionable): "[W]e can do this the easy way or the hard way."[27]

---

[24] Press Release, Fed. Trade Comm'n, Federal Trade Commission Launches Inquiry into Tech Censorship (Feb. 20, 2025), https://www.ftc.gov/news-events/news/press-releases/2025/02/federal-trade-commission-launches-inquiry-tech-censorship; *see* Request for Public Comment Regarding Technology Platform Censorship, https://www.ftc.gov/system/files/ftc_gov/pdf/P251203CensorshipRFI.pdf.

[25] *Transcript: FTC Chairman Andrew Ferguson Keynote Part II*, ProMarket (Apr. 21, 2025), https://www.promarket.org/2025/04/21/transcript-ftc-chairman-andrew-ferguson-keynote-part-ii.

[26] *Id.*

[27] Brian Stelter, *How Brendan Carr, the Attack-Dog FCC Chair, Helped Take Down Jimmy Kimmel with Words, Not Actions*, CNN (Sept. 18, 2025), https://www.cnn.com/2025/09/18/media/brendan-carr-jimmy-kimmel-fcc-first-amendment; *see*

In earlier days (and different political climates), Ferguson and Carr said very different things about First Amendment protections and limitations on government powers to restrict or censor speech. Before he was appointed as FTC Chairman, Ferguson said "No government agency should be in the business of policing speech."[28] Before he became FCC Chairman, Carr said that "the government shutting down speech" is "a 1A [First Amendment] issue, but "a private platform doing it [is] not."[29] "It's always a person in power (merely fallible or with a political agenda) that censors speech."[30] But that was then; this is now.

### F. FTC's Tactics and Threats to Suppress Other Platforms.

The FTC's tactics toward NewsGuard are part of a broader retaliatory campaign against tech and media companies (including other review and rating services) for exercising their First Amendment rights.

In May 2025, the FTC launched an extraordinarily broad, intrusive investigation of Media Matters for America (a nonprofit media watchdog organization), when it published articles about the rise of "extremist and racist rhetoric" on X after Elon Musk's acquisition of the platform, reporting that X began placing major companies' ads "next to pro-Nazi content." *Media Matters for Am. v. FTC*, Civil Action No. 25-1959 (SLS), 2025 WL 2378009, at *2–3 (D.D.C. Aug. 15, 2025).

---

Mike Wendling, *What Does the FCC Do – and Can It Revoke a TV Network's License?* BBC (Sept. 19, 2025), https://www.bbc.com/news/articles/c87yel3wgqgo.

[28] Andrew Ferguson (@AFergusonFTC), *supra* note 14.

[29] Brendan Carr (@BrendanCarrFCC), X (Apr. 15, 2020, at 18:47 ET), https://x.com/BrendanCarrFCC/status/1250601632339034114.

[30] *Id*.

Musk responded by promising to file a "thermonuclear lawsuit against Media Matters." *Id.* at *3. Musk's vendetta was picked up and advanced by many Republican allies, including state attorneys general and the FTC and FCC. For example, Stephen Miller (the current White House deputy chief of staff) accused Media Matters of "fraud" for its reporting, urging the "2 dozen+ conservative state Attorneys General" to go after the organization. *Id.*

The attorneys general of Texas and Missouri took up the cudgel and issued overbroad, oppressive CIDs to Media Matters. Media Matters sued and won preliminary injunctions precluding both investigations in this Court.

In the case concerning the Texas CID, this Court entered a preliminary injunction blocking the investigation, which the D.C. Circuit affirmed. *Media Matters for Am. v. Paxton*, 732 F. Supp. 3d 1 (D.D.C. 2024), *aff'd*, 138 F.4th 563, 569 (D.C. Cir. 2025). The Circuit Court opined that Media Matters was the "target of a government campaign of retaliation" and an "arguably bad faith investigation" infringing "exercise of their First Amendment rights and imposing special burdens on their newsgathering activities and operation of their media company." 138 F.4th at 581.

In the case concerning the Missouri investigation, this Court held: "A reasonable factfinder is likely to interpret Defendants' words as targeting Media Matters not for legitimate law enforcement purposes but instead for its protected First Amendment activities." *Media Matters for Am. v. Bailey*, 2024 WL 3924573, at *15 (D.D.C. Aug. 23, 2024).

But the FTC was undeterred by the failed cases of the Texas and Missouri AGs or the rulings of this Court and the D.C. Circuit that the states' actions and coercion against Media Matters were pretextual pursuits in likely violation of the First Amendment. The FTC decided to go after Media Matters with an extensive, burdensome CID of its own.

On May 20, 2025, the FTC issued a CID to Media Matters with 20 detailed specifications demanding all documents and information about methodologies for addressing online speech or misinformation; all communications with tech companies or platforms; everything related to Media Matters' newsgathering, reporting, and editorial decisions; all programs, policies, and analyses; all of the company's financial reports and information, and much more. *Media Matters v. FTC*, 2025 WL 2378009, at *5.

Media Matters filed suit in this Court alleging the FTC violated First and Fourth Amendment rights by pursuing its onerous investigation in retaliation for Media Matters' speech. Media Matters moved for a preliminary injunction to bar the FTC's investigation from going forward, which this Court granted, noting: "This case presents a straightforward First Amendment violation." *Id.* at *1. The Court rejected the government's argument that the FTC Act foreclosed any suit in the district court, observing, *inter alia*, that reading the statute to preclude Media Matters' First Amendment claims would "foreclose all meaningful judicial review." *Id.* at *11 (quotation marks omitted).

The FTC moved in the D.C. Circuit for a stay of the District Court's preliminary injunction order pending appeal. The Circuit Court denied the emergency request. No. 25-5302, 2025 WL 2988966 (D.C. Cir. Oct. 23, 2025) (per curiam).[31]

The FTC's CID to Media Matters is just one of many the Commission has issued and pursued against advertisers and ad agencies, third-party review services, and others in the FTC's pursuit of its theory. In addition to NewsGuard and Media Matters, the FTC has also pursued Global Disinformation Index, a nonprofit news review service, Integrated Ad Science, Inc., a brand

[31] The FTC has appealed the *Media Matters* preliminary injunction order, and that appeal remains pending. No. 25-5302 (D.C. Cir. docketed Aug. 19, 2025).

safety platform, and reportedly a total of at least sixteen media credibility and news rating organizations.[32]

**G. The FTC's Burdensome CID to NewsGuard.**

On May 20, 2025, the FTC issued a sweeping CID to NewsGuard, 21 pages long, containing 31 Specifications (with dozens of subparts) demanding vast numbers of confidential and sensitive documents.

The CID requires production of "all documents relating to NewsGuard's News Reliability Ratings and any other rating[s]"; all materials about NewsGuard's work product and methodology; all documents about websites and news sources rated; all ratings and reviews issued; any and all analyses of the effects of NewsGuard's ratings on advertisers and publishers; and any studies relating to social media or digital advertising; identification of all NewsGuard customers; and essentially all communications from or to NewsGuard. *See* Skibinski Decl. ¶ 40 & Ex. 15 (FTC Civil Investigative Demand, FTC File No. 251-0061 (May 20, 2025)); *see, e.g*., NewsGuard CID Specifications 5, 8, 11, 12, 14-16.

Among its all-inclusive document demands, the CID also requires production of materials relating to NewsGuard's journalism and reporting, including reporters' notes and sources, as well as every financial statement, budget, profit and loss statement, cost center report, profitability report, and any other financial report prepared by or for NewsGuard. NewsGuard CID Specifications 5, 27, 28.

The CID calls for all documents from January 1, 2018, to the present. NewsGuard CID at 8 (Instruction I1). As NewsGuard was founded and began operations in 2018, it is no exaggeration

[32] Kendra Barnett, *EXCLUSIVE: FTC Probe Expands to IAS Over Alleged Ad Boycotts, Lawsuit Reveals*, Adweek (Feb. 7, 2026), https://www.adweek.com/media/exclusive-ftc-probe-expands-to-ias-over-alleged-ad-boycotts-lawsuit-reveals.

to say that the CID demanded virtually all documents, information, and records of NewsGuard, including those relating to NewsGuard's analyses, methodology, editorial judgments, customers, journalism and reporting.

Under the FTC Act, the Commission was required to state the specific conduct constituting an alleged violation that is the subject of investigation and the provision of law applicable to such violation. 15 U.S.C. § 57b-1(c)(2). The FTC did not do that in the NewsGuard CID, leaving the company to guess what the agency alleged was at issue or how it could have anything to do with legitimate enforcement of antitrust or competition laws.

On its face, the CID raised serious concerns, as it was targeted at free speech and associational rights of the company and its customers and was extraordinarily overbroad and burdensome. NewsGuard raised its concerns from the outset and throughout its dealings with FTC staff, attempting to explain that NewsGuard's ratings, its editorial decisions, and its dealings with customers are plainly protected First Amendment activities. Skibinski Decl. ¶ 42.

Still, NewsGuard sought to work constructively with FTC staff to provide such information as it could without infringement of First Amendment rights. NewsGuard participated in ten meet-and-confer discussions over the course of eight months and produced over 40,000 pages of documents. *Id.* ¶ 43.

In the discussions with FTC staff, NewsGuard demonstrated (as it had earlier in information provided to congressional committees) that its ratings utilize established journalistic standards and practices. NewsGuard also submitted information demonstrating that the company's share of the market for advertiser brand safety tools is so *de minimis*—less than 0.1%—that NewsGuard could not possibly be a legitimate target of an antitrust investigation of that market. *Id.* ¶ 44.

By January 2026, FTC staff made clear to NewsGuard that its good faith efforts to cooperate were futile. On January 15, 2026, two days after the parties' last meet-and-confer discussion, FTC staff sent a letter purporting to be a "good faith effort to reduce NewsGuard's burden," but which was in reality a doubling down on the CID's unconstitutional demands. *Id.* ¶ 45 & Ex. 16.

Despite NewsGuard's seven months' efforts to cooperate, FTC staff simply repeated several of the most intrusive, infringing demands made from the outset, including: (1) identification of all NewsGuard subscribers; (2) communications with customers; (3) identification of all entities to which NewsGuard had ever assigned a News Reliability Rating; (4) the particulars of each rating assigned to each entity over time; and (5) documents to show how NewsGuard has developed methodologies for ratings, including internal correspondence. *Id.* ¶ 46.

The FTC's persistent, repeated demands for identification of NewsGuard's subscribers (and production of all communications with them) are especially troubling. Given the tactics and pronouncements of Chairman Ferguson and FCC Chairman Carr about targeting tech and media companies supposedly associated with a "censorship cartel," NewsGuard has ample grounds for concern the FTC aims to find NewsGuard's customers to pressure them, too. *Id.* ¶ 47. NewsGuard has explained to FTC staff that the demands for customer lists and communications plainly violate First Amendment rights of free speech and association, but explanations of the law have fallen on deaf ears at the FTC. *Id.* ¶ 42.

Throughout the dealings with NewsGuard, FTC staff refused to give assurances that NewsGuard's productions and disclosures satisfied the CID, and they reiterated that position in the January 15, 2026 letter. FTC staff instead insisted NewsGuard remains obligated to provide all documents and information called for by the *original* CID. *Id.* ¶ 48.

Responding to the CID was an immensely time-consuming and expensive effort. NewsGuard's executives and staff spent hundreds of hours working to provide information and documents to the FTC. NewsGuard's expenses mounted as the investigation continued, to the point that legal fees alone amounted to more than 30% of NewsGuard's total revenues from its sales of brand-safety services to advertising industry customers. *Id.* ¶ 49.

The January 15, 2026, letter makes clear the FTC will continue to pursue NewsGuard with the aim of imposing burdens and expense regardless of whether it has any legitimate grounds, until, in Chairman Ferguson's words, the company "knuckles under." NewsGuard will not do so, and accordingly filed a petition to quash the CID with the FTC,[33] and filed the present action in this Court.

### H. The FTC's Consent Order Blacklisting NewsGuard.

Unbeknownst to NewsGuard at the time, the FTC's CID was only a first round in its retaliatory censorship campaign against NewsGuard. As NewsGuard was attempting to work in good faith with the FTC concerning the CID in early 2025, the Commission was working separately to use a merger-review proceeding as an excuse to impose an order aimed at blacklisting NewsGuard.

In an unprecedented move, the FTC imposed a condition on the merger of Omnicom Group Inc. (Omnicom), and The Interpublic Group of Companies, Inc. (IPG) to specifically target NewsGuard by prohibiting the merged company or its affiliates from contracting with NewsGuard or using its rating services.

---

[33] Petition to Quash, Civil Investigative Demand Dated May 20, 2025, to NewsGuard Techs., Inc., FTC File No. 251-0061 (Jan. 16, 2026).

Omnicom and IPG were the world's third and fourth largest companies involved in media buying for ad agencies and advertisers. Omnicom announced on December 9, 2024, that it had entered into an agreement to acquire IPG.[34] Skibinski Decl. ¶¶ 50-51. The companies negotiated with the FTC through the first half of 2025 to obtain approval of the merger.

On June 23, 2025, the FTC filed a *pro forma* complaint concerning the merger while simultaneously announcing that it had accepted a proposed consent order from the companies.[35] *Id.* ¶ 53. The proposed order did not require any divestiture or other structural changes for the new combined company, despite that it would be the world's largest advertising agency and media buying company. Rather, the draft order focused on precluding Omnicom or its agencies from doing business with any news rating service or entity that "[d]irects Advertisers' advertising spend based on the Media Publisher's political or ideological viewpoints, or the political or ideological viewpoints expressed in content that the Media Publisher sells advertising to run alongside of."[36] *Id.* ¶ 54.

This condition in the proposed order was intended to target and debilitate if not eliminate news rating services, per Chairman Ferguson's oft-stated views that such organizations were biased against conservative websites and publications. NewsGuard was at the top of the FTC's and Ferguson's hit list. When the proposed consent order was made public, Ferguson released a

---

[34] Press Release, Omnicom, Omnicom to Acquire Interpublic Group to Create Premier Marketing and Sales Company (Dec. 9, 2024), https://www.omc.com/newsroom/omnicom-to-acquire-interpublic-group-to-create-premier-marketing-and-sales-company.

[35] Press Release, Fed Trade Comm'n, FTC Prevents Anticompetitive Coordination in Global Advertising Merger (June 23, 2025), https://www.ftc.gov/news-events/news/press-releases/2025/06/ftc-prevents-anticompetitive-coordination-global-advertising-merger.

[36] Proposed Decision & Order, *Omnicom Grp. Inc.*, FTC File No. 251-0049, 2025 WL 2355514 (June 23, 2025).

statement specifically calling out NewsGuard as an organization that "ha[s] publicly sought to use the chokepoint of the advertising industry to effect political or ideological goals" and alleging that NewsGuard steers "advertising revenue with 'an unavoidable partisan lens.'"[37] *Id.* ¶ 55 & Ex. 18. While none of this was true, it made clear that Chairman Ferguson's and the FTC's motivations in proposing and effecting the Omnicom merger conditions were entirely political and aimed squarely at censoring speech.

As discussed above, Newsmax had been a longtime critic of NewsGuard because Newsmax had received low reliability ratings, which it claimed demonstrated that NewsGuard was biased against conservative news sources generally. Following the FTC's publication of the proposed order, Newsmax ran a series of stories contending it did not go far enough because, as written, it would not prohibit Omnicom from using NewsGuard's rating services.[38] *Id.* ¶ 56. This was because, as Newsmax well knew, NewsGuard does not direct or recommend "advertising spend" based on "political or ideological viewpoints." *Id.* NewsGuard's ratings are strictly based on fully disclosed, nonpartisan standards for journalistic accuracy and veracity. *See id.* ¶ 5.

During the comment period for the proposed consent order, Newsmax filed a letter urging the FTC to expand the prohibitory condition to ensure Omnicom and its ad agencies "can no longer use biased rating organizations, fact checkers, and other third-parties to engage in censorship of

[37] Statement of Chairman Andrew N. Ferguson, *Omnicom Grp. Inc.*, FTC File No. 251-0049, at 5 & n.34 (June 23, 2025), https://www.ftc.gov/system/files/ftc_gov/pdf/omnicom-ipg-ferguson-statement_0.pdf.

[38] *See, e.g.*, Paul Bond, *Megamerger Omnicom, IPG Mum About NewsGuard Bias*, Newsmax (June 26, 2025, at 17:35 ET), https://www.newsmax.com/us/news-bias-ftc-omnicom/2025/06/26/id/1216643.

disfavored news outlets."[39] *Id.* ¶ 58 & Ex. 20. Newsmax was not subtle about who it was targeting. Its fourteen-page letter mentioned NewsGuard more than a dozen times. On air and online, Newsmax commentators said the proposed order was inadequate because it "says nothing at all about stopping these agencies from using third-party ratings services like NewsGuard to block media like Newsmax."[40] *Id.* ¶ 59 & Ex. 21.

Newsmax also took to the internet to lobby Chairman Ferguson, members of Congress, and the President. In posts on X directed to Chairman Ferguson, Newsmax asserted the FTC's proposed order was insufficient because it "makes no mention of 'censorship' or 'targeting conservatives' and '[f]ully allows Omnicom to use left-wing NewsGuard."[41] *Id.* ¶ 60 & Ex. 22.

Conservative advocacy groups joined in with Newsmax, submitting a letter urging the FTC to impose a merger condition barring Omnicom from working with "ostensibly neutral third-party monitors such as NewsGuard," which the groups claimed "in practice serve as gatekeepers that suppress conservative and heterodox content."[42] *Id.* ¶ 61. The groups submitting the letter did not mention, however, that they are supported by Newsmax and CPAC, the Conservative Political Action Committee (which is also supported by Newsmax).

---

[39] Newsmax Media Inc., Comment Letter on Proposed Consent Order 13 (July 28, 2025), https://www.regulations.gov/comment/FTC-2025-0066-0008.

[40] *Newsmax's Tabacco Slams FTC Approval of Omnicom-IPG Merger*, Newsmax (Aug. 3, 2025, at 07:23 ET), https://www.newsmax.com/newsfront/tabacco-ftc-omnicom/2025/08/02/id/1221045 (objecting that the draft order "says nothing at all about stopping these agencies from using third-party services like NewsGuard to block media like Newsmax").

[41] NEWSMAX (@NEWSMAX), X (July 31, 2025, at 21:58 ET), https://x.com/NEWSMAX/status/1951100290775630054status/1951100290775630054.

[42] Indep. Media Council & CPAC Found. Ctr. for Regul. Freedom, Comment Letter on Proposed Consent Order 2 (July 28, 2025), https://www.regulations.gov/comment/FTC-2025-0066-0010.

Numerous First Amendment scholars and free speech organizations also submitted comments regarding the initial proposed order, explaining its unconstitutionality,[43] but the FTC made no mention of these comments and disregarded First Amendment concerns. *Id.* ¶ 62.

The FTC subsequently issued a revised order removing terms about using third-party services with "political or ideological bias," which Newsmax had figured out would not cover NewsGuard. Instead, the FTC revised the Consent Order to prohibit the merged Omnicom entity or its ad agencies from using third-party services that evaluate "viewpoints as to the veracity of news reporting" and "adherence to journalistic standards or ethics."[44] *Id.* ¶ 63 & Ex. 23.

There is no indication in the public record that Omnicom proposed or advocated for the censorial provision in the Consent Order aimed at precluding use of NewsGuard services and ratings. And it would be unusual, at the least, for an ad agency and marketing company to seek restrictions on use of services designed to protect advertisers' reputations and brand safety. In sum, the FTC ordered that Omnicom and all its affiliates and ad agencies cannot contract with or use nonpartisan review and ratings services based on journalistic criteria.

There was no further comment period when NewsGuard could address or object to this revised language. The FTC adopted this as the final order on September 26, 2025. *Id.* ¶ 63 & Ex. 23.

---

[43] *See, e.g.*, Pub. Knowledge, Comment Letter on Proposed Consent Order (July 28, 2025), https://www.regulations.gov/comment/FTC-2025-0066-0013; TechFreedom, Comment Letter on Proposed Consent Order (July 28, 2025), https://www.regulations.gov/comment/FTC-2025-0066-0015; Vikram David Amar & Ashutosh Bhagwat, Comment Letter on Proposed Consent Order (July 28, 2025), https://www.regulations.gov/comment/FTC-2025-0066-0009.

[44] Order, *Omnicom Grp. Inc.*, FTC Docket No. C-4823, ¶¶ 1.D, 2.A (Sept. 26, 2025), https://www.ftc.gov/system/files/ftc_gov/pdf/OmnicomOrder.pdf.

### I. Harms to NewsGuard and Its Customers from the Consent Order.

The FTC's imposition of the Omnicom Consent Order has already had negative impacts on NewsGuard's business, and the harm in all likelihood will continue. For example, after the Consent Order was issued out, a longtime client that does significant business with Omnicom informed NewsGuard that it would not be renewing its contract, not because of any dissatisfaction with NewsGuard's service but because of "[r]ecent developments that require us to take a more cautious approach to this area of our business." *Id.* ¶ 66.

NewsGuard also stands to lose business from the newly merged Omnicom directly as a result of the Consent Order. Since 2019, NewsGuard has had a contract with IPG to make data available to brands represented by the agency that seek information about the reliability of different publishers. IPG has proudly touted this arrangement and data available through the agreement in press releases, industry event panels, and case studies. But it is questionable (or doubtful) that the agency will be able to continue with the contract now that it has been absorbed by Omnicom and is subject to the Consent Order. *Id.* ¶ 67.

The Omnicom Consent Order amounts to a government-imposed blacklist prohibiting Omnicom and its affiliates from using NewsGuard's services. Other agencies and companies seeking to use NewsGuard's ratings and services also face the prospect of FTC investigations, enforcement actions, and liability if they do not divorce themselves from dealings with NewsGuard. Overall, the burdens and restrictions imposed by the FTC through its onerous "investigation" and the prohibition of the Consent Order have made it nearly impossible for NewsGuard to conduct its journalism business. *Id.* ¶ 68.

## STANDARD OF REVIEW

A plaintiff seeking preliminary relief must show: (1) likelihood of success on the merits; (2) likelihood of "suffer[ing] irreparable harm in the absence of preliminary relief;" (3) that "the

balance of equities tips in [their] favor;" and (4) that "an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The final two factors "merge when plaintiff attempts to preliminarily enjoin a government action," *Fla. EB5 Invs., LLC v. Wolf*, 443 F. Supp. 3d 7, 13 (D.D.C. 2020), "because the government's interest is the public interest." *Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016).

## ARGUMENT

### I. NewsGuard Is Likely to Prevail on the Merits of Its Claims.

The common element in the FTC's various actions against NewsGuard is disagreement with its journalistic judgements. The pretextual investigation of NewsGuard through an expansive and burdensome CID as well as the Omnicom merger condition—designed to starve NewsGuard of revenue—violate the First Amendment's prohibition of retaliation against protected speech and its proscription against censorship through intermediaries. These actions violate both the First and Fourth Amendments to the United States Constitution.

#### A. Chairman Ferguson and the FTC Retaliated Against NewsGuard Because of its Editorial Judgments.

"[T]he First Amendment prohibits government officials from subjecting an individual to retaliatory actions … for speaking out." *Hartman v. Moore*, 547 U.S. 250, 256 (2006). *See also Houston Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 474 (2022) (quoting *Nieves v. Bartlett*, 587 U.S. 391, 398 (2019)); *Perry v. Sindermann,* 408 U.S. 593, 597 (1972) (the government may not punish a person or deprive him of a benefit to limit "constitutionally protected speech"). This includes retaliation against journalistic activity. *Paxton*, 138 F.4th at 570. A government official engages in unconstitutional retaliation when (1) he targets activity protected by the First Amendment; (2) the adverse action is sufficient to deter a person of ordinary firmness from speaking again; and (3) there is a causal link between the exercise of the constitutional right and the official's action.

*Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016). The FTC's actions targeting NewsGuard meet each of these conditions.

**1. NewsGuard's News Rating Service Is Protected Journalistic Activity.**

The First Amendment protects journalistic judgment and editorial decisions. *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 254–56 (1974); *New York Times Co. v. Sullivan*, 376 U.S. 254, 269 (1964). NewsGuard's evaluation of news sites for accuracy and reliability is "quintessential First Amendment activit[y]," *Paxton*, 138 F.4th at 584, and in publishing its ratings NewsGuard is "obviously engaged in conduct protected under the First Amendment." *Id.* NewsGuard's rating system is akin to "a newspaper's editorial section." *Consortium for Indep. Journalism, Inc.*, 2025 WL 919504, at *18 n.11. Defendants have never questioned this fact, nor could they.

**2. The FTC's Campaign Against NewsGuard Is Sufficient to Deter Protected Activity.**

Defendants' adverse regulatory actions targeting NewsGuard include the FTC's overly broad and punitive CID and the Omnicom-IPG Consent Order that operates as a blacklist against NewsGuard's provision of brand safety services to the largest advertising agencies in the world. Compl. ¶¶ 107-135. The blunderbuss CID demands have devoured countless hours of NewsGuard staff and outside counsel time, forcing NewsGuard to divert revenue and resources away from its core journalistic mission. Compl. ¶¶ 136-39. The Consent Order foreclosing Omnicom from using NewsGuard's service already has had a direct and substantial effect on NewsGuard, and further losses are imminent. Compl. ¶¶ 140-41; *see also* Skibinski Decl. ¶¶ 65-67.

These actions are sufficient to chill a reasonable publisher in NewsGuard's position from engaging in protected expression. *See Aref*, 833 F.3d at 258. That is their point—the FTC's campaign was designed to chill NewsGuard's First Amendment-protected speech, journalism, and

editorial activities by intruding on NewsGuard's operations and to violate NewsGuard's First Amendment associational rights by disrupting its client relationships. Chairman Ferguson laid out his strategy for retaliation in official statements, interviews, and social media posts explaining how the FTC can use its investigative and coercive powers to force companies like NewsGuard to "knuckle under" and "[d]o what we say." Skibinski Decl. ¶ 38.

As Chairman Ferguson foretold, the FTC's campaign against NewsGuard has been costly and intrusive. The company has produced more than 40,000 pages of documents attempting to comply with the CID, as the FTC continually demanded more disclosures with no end in sight. The sweeping demands include virtually all documents, information, and records of NewsGuard from the company's inception to the present, including those relating to NewsGuard's analyses, methodology, editorial judgments, journalism and reporting. Compl. ¶¶ 83-89, 95-99; *see also* Skibinski Decl. ¶ 40. And the demands did not stop with probing NewsGuard's editorial processes and business practices. The FTC also sought information on NewsGuard's customers and subscribers, demanding disclosure of all communications with them. Compl. ¶¶ 99-102. NewsGuard's legal expenses alone have exceeded 30 percent of the revenue derived from the brand-safety services the company provides to clients, but that does not account for other costs including lost productivity and business opportunities. Compl. ¶ 104.

It is "not a high" bar to show that such burdens would deter a person of reasonable firmness from engaging in protected activity, *Jenner & Block LLP v. U.S. Dep't of Just.*, 784 F. Supp. 3d 76, 95 n.7 (D.D.C. 2025), *appeal docketed*, No. 25-5265 (D.C. Cir. July 22, 2025), and it is of no moment that NewsGuard has refused to "knuckle under." *See Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 500 (4th Cir. 2005) ("We have never held that a plaintiff must prove that the allegedly retaliatory conduct caused her to cease First Amendment activity

altogether."). It is sufficient to show that the FTC's CID would chill certain First Amendment activities of similarly situated individuals and organizations of ordinary firmness. *Id.*; *see also White v. Lee*, 227 F.3d 1214, 1228–29 (9th Cir. 2000) (explaining that an investigation involving "the threat of invoking legal sanctions and other means of coercion, persuasion, and intimidation" "more than meets th[e] standard" of an action that "would chill or silence a person of ordinary firmness from future First Amendment activities"); *Cooksey v. Futrell*, 721 F.3d 226, 236–37 (4th Cir. 2013) (same).

That showing is easily met here, as confirmed by the number of courts that have found similar (and in some cases, identical) tactics constitute retaliatory investigations sufficient to intimidate speakers into silence. *See*, *e.g.*, *Media Matters for Am. v. FTC*, 2025 WL 2378009, at *2 ("There can be no doubt that such a CID would deter a reporter of ordinary firmness from speaking again."), *Paxton*, 732 F. Supp. 3d at 28 ("[T]he threat of administrative and judicial intrusion into newsgathering and editorial process that arises from official process and its possible enforcement" "is sufficient to deter protected speech." (quotation marks omitted)); *Bailey*, 2024 WL 3924573, at *11 ("Paxton's announcement of an investigation and issuance of a CID demanding records relating to Media Matters' organization, funding, and journalism would sufficiently deter a news organization or journalist 'of ordinary firmness' from speaking again.").

But the FTC's campaign against NewsGuard goes even further than just an investigation and includes the Omnicom-IPG merger condition that bars Omnicom and its affiliates and ad agencies from contracting with or using nonpartisan news website review and ratings services based on journalistic criteria. Skibinski Decl. ¶ 63. Not only does this condition prohibit the Omnicom entities from using NewsGuard's services, other agencies and companies seeking to use NewsGuard's ratings and services also face the prospect of FTC investigations, enforcement

actions, and liability if they do not divorce themselves from dealings with NewsGuard. The direct censorship and widespread chilling effects of this condition are obvious.

### 3. The FTC's Retaliatory Campaign Directly Targets NewsGuard Because of Its News Judgments.

There is a direct causal link between NewsGuard's journalism and Defendants' retaliatory acts. By both word and deed, Chairman Ferguson and the FTC have left no doubt they are targeting NewsGuard because they disagree with its editorial judgments. But NewsGuard need not present "direct evidence" of retaliatory motive[45] even though it exists here in abundance. Courts review various factors to assess causation, including suspicious timing of the government's actions, *Johnson v. District of Columbia*, 726 F. Supp. 3d 8, 30 (D.D.C. 2024), and its pretextual explanations for targeting speech. *Goodwin*, 579 F. Supp. 3d at 175. And courts will consider whether the alleged retaliation is part of a broader "campaign" targeting the plaintiff. *Lewis v. Gov't of D.C.*, 161 F. Supp. 3d 15, 29 (D.D.C. 2015). Taken together, a combination of adverse actions and statements by officials is sufficient to demonstrate retaliatory motive. *E.g.*, *Am. Acad. of Pediatrics v. U.S. Dep't of Health & Hum. Servs.*, No. 25-cv-4505, 2026 WL 80796, at *16-20 (D.D.C. Jan. 11, 2026). In this case, all relevant factors confirm Defendants' retaliatory purpose. *See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977).

[45] Plaintiffs "are not required to come forward with … 'the so-called smoking gun,'" *Massey v. Johnson*, 457 F.3d 711, 717 (7th Cir. 2006) (quoting *Lewis v. City of Boston*, 321 F.3d 207, 219 (1st Cir. 2003)), which courts recognize is "rarely available" to prove something so "protean … as an actor's motive or intent," *Grajales v. P.R. Ports Auth.*, 682 F.3d 40, 49 (1st Cir. 2012). While the government's statements about its own motivation provide important (and sometimes dispositive) context, *see Hawkins v. District of Columbia*, 923 F. Supp. 2d 128, 143 (D.D.C. 2013), "direct evidence of retaliatory animus is not required," *Goodwin v. Dist. of Columbia*, 579 F. Supp. 3d 159, 174 (D.D.C. 2022) (quoting *Black Lives Matter D.C. v. Trump*, 544 F. Supp. 3d 15, 46-47 (D.D.C. 2021)).

*First*, this case is particularly notable because Chairman Ferguson publicly explained not just *why* he was targeting NewsGuard, but also *how* he planned to bring the company to heel. Even before he was elevated to the chairmanship, then-Commissioner Ferguson referred to NewsGuard in November 2024 post on X and asserted it had supposedly "led collusive ad-boycotts—possibly in violation of our antitrust laws—to censor the speech of conservative and independent media in the United States."[46] The following month, Ferguson suggested the FTC "ought to conduct … an investigation," incorrectly claiming that NewsGuard "seems to give a free pass to … major left-leaning outlets."[47] After becoming Chairman, Ferguson explained in an April 2025 interview exactly how the FTC could use its "tremendous array of investigative tools" and "coercive power—formal and informal" to demand compliance with its views about supposed online "censorship," and he laid out a roadmap of the tactics his FTC would ultimately use against NewsGuard.[48] Such statements were a prologue to, and an explanation for, the actions the FTC would take against NewsGuard.

Under these circumstances, "[a] reasonable factfinder is likely to interpret Defendants' words as targeting [the plaintiff] not for legitimate law enforcement purposes but instead for its protected First Amendment activities." *Bailey*, 2024 WL 3924573, at *15; *see also id.* at *14 ("Defendant's public statements are direct evidence of retaliatory intent."); *Media Matters v. FTC*, 2025 WL 2378009, at *19–20 ("Chairman Ferguson and his colleagues have made comments characterizing [the plaintiff] and this investigative push 'in ideological terms.'"); *Paxton*, 732 F. Supp. 3d at 28 ("Defendant's description of [plaintiff] as a 'radical anti-free speech' and 'radical

---

[46] Andrew Ferguson (@AFergusonFTC), *supra* note 14.

[47] Concurring Statement of Commissioner Andrew Ferguson, *supra* note 20.

[48] *Transcript: FTC Chairman Andrew Ferguson Keynote Part II*, *supra* note 24.

left-wing organization … is evidence of retaliatory intent."). Chairman Ferguson's numerous statements focusing on NewsGuard make clear that "retaliatory animus was the but-for cause of the FTC's CID." *Media Matters v. FTC*, 2025 WL 2378009, at *2.

*Second*, the timing and sequence of the FTC's actions targeting NewsGuard support a finding of retaliatory purpose. It is reasonable to infer retaliation where a defendant's actions are part of a broader "campaign" targeting the plaintiff, *Lewis*, 161 F. Supp. 3d at 29, as it is here. Chairman Ferguson publicly campaigned for his current position by pledging to crack down on services like NewsGuard (which he specifically named). Compl. ¶¶ 56, 71. Almost immediately after he assumed the chairmanship of the agency, the FTC issued a Request for Information ("RFI") seeking public comment on "Technology Platform Censorship," asserting that social media providers and other "tech platforms" are engaged in "censorship" that is "potentially illegal."[49] This mirrored a series of actions by state governments, purporting to take aim at the so-called "censorship industrial complex." Compl. ¶¶ 66-82. Despite the fact that the state investigations were enjoined as retaliatory (as the FTC's investigation of Media Matters would be), the agency issued its own expansive CID probing every aspect of NewsGuard's business, followed shortly thereafter by the Omnicom merger condition suppressing NewsGuard. Compl. ¶¶ 83-135. Under these circumstances, a court need not suspend disbelief in analyzing causation—where common sense "suggests that there may be more to this story." *Smith v. De Novo Legal, LLC*, 905 F. Supp. 2d 99, 104 (D.D.C. 2012).

*Third*, the sweeping scope of the CID and the restriction in the Omnicom merger condition targeting services that evaluate "viewpoints as to the veracity of news reporting" and "adherence

[49] Press Release, *supra* note 23; *see* Request for Public Comment Regarding Technology Platform Censorship, *supra* note 23.

to journalistic standards or ethics" confirm the causal link to NewsGuard's protected speech. *See Media Matters v. FTC*, 2025 WL 2378009, at *21. The CID requires production of "all documents relating to NewsGuard's News Reliability Ratings and any other rating[s];" identification of all NewsGuard customers; and essentially all communications from or to NewsGuard. Skibinski Decl. ¶ 40 & Ex. 15. It effectively demands production of virtually all NewsGuard documents, including those relating to NewsGuard's analyses, editorial judgments, customers, and journalism. *Id.* This includes all materials about NewsGuard's work product and methodology. And it necessarily includes production of information, materials, and communications relating to NewsGuard's journalism and reporting, including reporters' notes and sources. *See id.*, Specification 5.

The CID Specifications regarding NewsGuard's finances are likewise overbroad and intrusive, calling for production of every financial statement, budget, profit and loss statement, cost center report, profitability report, and any other financial report prepared by or for NewsGuard. *Id*. And its demands for customer lists and correspondence raise special concerns regarding rights of free speech and association. *Id*. And, as noted, contrary to requirements under the FTC Act, the Commission gave no explanation in the CID (or since) of any alleged violation that is the subject of investigation and the provision of law applicable to such violation, it failed to do so in the NewsGuard CID, leaving the company to guess about how the agency's demands relate to any legitimate enforcement of antitrust or competition laws. Its failure to provide any legitimate rationale, coupled with "the sweeping scope of the FTC's CID … suggests pretext on the part of the FTC." *Media Matters v. FTC*, 2025 WL 2378009, at *21.

The terms of the Omnicom Consent Order likewise reflect retaliatory intent. When the Consent Order was first proposed, Chairman Ferguson released a statement explicitly calling out NewsGuard as an organization that "ha[s] publicly sought to use the chokepoint of the advertising

industry to effect political or ideological goals" and alleging that NewsGuard steers "advertising revenue with 'an unavoidable partisan lens.'" Skibinski Decl. ¶ 55 & Ex. 18. In line with this distorted characterization of NewsGuard, the Consent Order as originally proposed would have barred Omnicom or its agencies from doing business with any news rating service or entity that "[d]irects Advertisers' advertising spend based on the Media Publisher's political or ideological viewpoints, or the political or ideological viewpoints expressed in content that the Media Publisher sells advertising to run alongside of." Skibinski Decl. ¶ 54 & Ex. 17 (quoting Proposed Decision & Order, *Omnicom Grp. Inc.*, FTC File No. 251-0049, 2025 WL 2355514 (June 23, 2025)).

Ironically, Newsmax objected to this formulation, telling the Commission that the condition as proposed would not reach NewsGuard, thus undermining its claims (and those of Chairman Ferguson) that NewsGuard was ideologically biased against conservatives. In response, and at the urging of Newsmax, FTC revised the Consent Order to prohibit the merged Omnicom entity or its affiliates from using third-party services that evaluate "viewpoints as to the veracity of news reporting" and "adherence to journalistic standards or ethics."[50] As modified, the condition targets NewsGuard "with the precision of a laser beam," *News Am. Publ'g, Inc. v. FCC*, 844 F.2d 800, 814 (D.C. Cir. 1988), and confirms the causal link between the FTC's actions and NewsGuard's journalism.

**B. The FTC's Intermediary Strategy Reflected in the Omnicom-IPG Consent Order Is Unconstitutional Jawboning.**

Whether or not the FTC's actions might be classified as retaliation, its use of the Omnicom-IPG Consent Order to target NewsGuard violates another First Amendment rule that the Supreme Court recently reaffirmed unanimously: A government official cannot do indirectly what he or she

[50] Order, *Omnicom Grp. Inc.*, FTC Docket No. C-4823, ¶¶ 1.D, 2.A (Sept. 26, 2025), https://www.ftc.gov/system/files/ftc_gov/pdf/OmnicomOrder.pdf.

is barred from doing directly. *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 190 (2024); *see Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963). Specifically, "[a] government official cannot coerce a private party to punish or suppress disfavored speech on her behalf." *Vullo*, 602 U.S. at 190 (citing *Bantam Books*, 372 U.S. at 67–69).

No doubt, government officials may criticize private speakers (as Chairman Ferguson has done) and in doing so can "rely on the merits and force of [their] ideas, the strength of [their] convictions, and [their] ability to inspire others." *Id.* at 188. But the *Vullo* Court drew the constitutional line there; officials cannot "use the power of the State to punish or suppress disfavored expression." *Id.* A public official who tries to shut down an avenue of expression of ideas and opinions through "actual or threatened imposition of government power or sanction" violates the First Amendment. *Backpage.com, LLC v. Dart*, 807 F.3d 229, 230 (7th Cir. 2015) (quoting *Am. Family Ass'n, Inc. v. City & County of San Francisco*, 277 F.3d 1114, 1125 (9th Cir. 2002)).

This means the First Amendment bars the government from penalizing speech indirectly by applying regulatory pressure on third-party intermediaries. For example, in *Bantam Books* the Supreme Court held the government could not apply pressure on third-party booksellers in order to impose a blacklist on publications. 372 U.S. at 71. And in *Backpage.com*, the Seventh Circuit enjoined a sheriff and held that he had violated the First Amendment by pressuring credit card companies to stop doing business with a classified advertising website because he objected to the content of ads on the site. 807 F.3d at 235.

The Supreme Court's unanimous reaffirmation of this principle in *Vullo* is directly on point. The Court held the New York Department of Financial Services ("DFS") could not leverage its regulatory authority over insurance companies to penalize the National Rifle Association for its

political positions on gun control. State officials advised the regulated insurance companies that doing business with the NRA sent the wrong message and entered agreements with companies that "agreed not to provide any NRA-endorsed insurance programs." *Vullo*, 602 U.S. at 184-85. Of particular relevance here, the Court held it offends the First Amendment for regulators to enter consent decrees granting concessions to regulated insurance companies on condition they cease doing business with a disfavored speaker. *Id.* at 198. Yet this is precisely what the FTC has done in this case.

The revised merger condition puts NewsGuard on a government-imposed blacklist. It prohibits Omnicom and its ad agencies and affiliates—now the world's largest ad agency—from using NewsGuard's services. And other agencies and companies seeking to use NewsGuard's ratings and services also face the prospect of FTC investigations, enforcement actions, and liability if they continue to use NewsGuard's services. As a consequence, NewsGuard has already lost business as a direct result of the condition and will lose more unless enforcement of the merger condition is enjoined. *See* Skibinski Decl. ¶¶ 65-67.

The FTC Consent Order violates the First Amendment for the same reason as the publication blacklist in *Bantam Books*, the pressure campaign on credit card companies in *Backpage.com*, and the consent decree conditions barring business relationships with the NRA in *Vullo*. Judge Richard Posner aptly described such an intermediary strategy designed to deprive a media company of revenues as akin to "killing a person by cutting off his oxygen supply rather than by shooting him." *Backpage.com*, 807 F.3d at 231. Accordingly, he found the "only remedy is an injunction against the [government's] violating [the company's] First Amendment rights," which the Seventh Circuit immediately ordered. *Id.* at 238–39. This Court should do the same and enjoin the FTC from enforcing the Omnicom merger condition.

### C. The FTC's Actions Against NewsGuard Violate the First and Fourth Amendments.

The FTC's campaign against NewsGuard violates NewsGuard's First and Fourth Amendment rights. Chairman Ferguson's oft-stated position that he is taking action against NewsGuard to combat what he calls "Big Tech censorship" misunderstands basic constitutional law. The most fundamental rule of the First Amendment is that the Free Speech Clause protects private actors against the government. *Manhattan Cmty. Access Corp.*, 587 U.S. at 804. In our constitutional scheme the government has no legitimate role in deciding "what counts as the right balance of private expression" or to "'un-bias' what it thinks [is] biased." *Moody*, 603 U.S. at 719.

Although Chairman Ferguson attempts to clothe himself as a free speech warrior, "[o]n the spectrum of dangers to free expression, there are few greater than allowing the government to change the speech of private actors in order to achieve its own conception of speech nirvana." *Id.* at 741–42. The Supreme Court has made clear that the First Amendment fully protects editorial decisions by publications, websites, and platforms, *id.* at 734, 741–42, and Chairman Ferguson's claim that he is taking action against news ratings services based on his belief (mistaken or not) that they are biased against conservative news sites gives away the game.

The FTC's jurisdiction over unfair competition in commerce and agreements that unreasonably restrain trade, 15 U.S.C. §§ 1, 45, does not empower it to serve as a referee of journalistic judgments. The Commission simply has no legitimate role to play that would permit it to intervene in the market for advertiser brand safety tools where NewsGuard's position is *de minimis*—less than 0.1%—of that market. Yet even if the FTC had some colorable regulatory hook on which to hang its claim of authority, it would not be able to avoid the inevitable First Amendment conflict. *See NAACP. v. Claiborne Hardware Co.*, 458 U.S. 886, 911 (1982).

Here, the FTC's CID violates the First Amendment not only because it is retaliatory and burdensome, but also because it is an exercise in viewpoint discrimination, as Chairman Ferguson proudly admits. "Viewpoint discrimination is poison to a free society," *Iancu v. Brunetti*, 588 U.S. 388, 399 (2019) (Alito, J., concurring), and the government lacks any legitimate interest in selectively penalizing disfavored viewpoints. *Healy v. James*, 408 U.S. 169, 187–88 (1972). It is "an egregious form of content discrimination" and is essentially unconstitutional *per se*, *Rosenberger v. Rector & Visitors of Univ. of Va*., 515 U.S. 819, 829-30 (1995), yet it is the driver of all of the FTC's actions against NewsGuard.

The sweeping CID demands infringe both NewsGuard's First and Fourth Amendment rights. *See Okla. Press Publ'g Co. v. Walling*, 327 U.S. 186, 208–11 (1946). In particular, the First Amendment affords NewsGuard a privilege that protects it from having to disclose information if doing so would chill its constitutional rights of free speech and free expression. *See Perry v. Schwarzenegger*, 591 F.3d 1147, 1160 (9th Cir. 2009). These constitutional protections are interrelated; when an administrative subpoena seeks materials that could fall under First Amendment protection, courts require that the Fourth Amendment's standards be met with "scrupulous exactitude." *Zurcher v. Stanford Daily*, 436 U.S. 547, 564 (1978) (citing *Stanford v. Texas*, 379 U.S. 476, 485 (1965)).

First Amendment case law makes clear that "before a state or federal body can compel disclosure of information which would trespass upon [F]irst [A]mendment freedoms, a 'subordinating interest of the State' must be proffered, and it must be 'compelling.'" *Fed. Election Comm'n v. Machinists Non-Partisan Pol. League*, 655 F.2d 380, 389 (D.C. Cir. 1981) (quoting *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 463 (1958)). And, in particular, investigating a news organization because the government views its editorial policies as biased is not a valid

governmental interest. "It is particularly important that the exercise of the power of compulsory process be carefully circumscribed when the investigative process tends to impinge upon such highly sensitive areas as freedom of speech or press." *Sweezy v. New Hampshire ex rel. Wyman*, 354 U.S. 234, 245 (1957).

But the FTC has flouted those requirements here, and its investigation of NewsGuard is a classic fishing expedition. The CID did not "state the nature of the conduct constituting the alleged violation which is under investigation and the provision of law applicable to such violation" as required by 15 U.S.C. § 57b-1(c)(2). Instead, the CID simply provided a boilerplate statement that it was seeking information "to determine whether there is, has been, or may be a violation of any laws administered by the Federal Trade Commission." Nevertheless, the CID demands that NewsGuard produce vast numbers of confidential, highly sensitive documents, a request that effectively encompasses virtually all the company's emails, reporters' notes and drafts, texts, and other documents created since its founding. The CID also demands the identities of NewsGuard's subscribers and all communications with them.

This blunderbuss approach not only tramples NewsGuard's editorial rights, the demand for customers' identities and forced disclosure of all communications intrudes on associational rights as well. *See Patterson*, 357 U.S. at 460 ("It is beyond debate that freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the 'liberty' assured by the Due Process Clause of the Fourteenth Amendment, which embraces freedom of speech."). Because "compulsory disclosure of organizational ties can constitute a significant encroachment on freedom of association," *Familias Unidas v. Briscoe*, 619 F.2d 391, 399 (5th Cir. 1980), it can be justified only if narrowly tailored to further a sufficiently important government interest, *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 609–10 (2021). The FTC's open-ended demand for

customer identities untethered to any legitimate investigatory interest cannot satisfy exacting scrutiny. A government actor's "intentional service of [a] CID" can be "the act that caused chilling effects" on a media organization's First Amendment rights, as serving a CID "legally obligate[s]" the organization "to produce records." *Paxton*, 732 F. Supp. 3d at 20, 22.

## II. NewsGuard Will Suffer Irreparable Harm Absent an Injunction.

The CID and the Omnicom Consent Decree have caused—and are causing—NewsGuard ongoing irreparable constitutional injury, economic loss, and associational harm. These injuries easily satisfy the requirements for emergency relief: irreparable harm that is "certain and great, … actual … not theoretical," and "of such imminence that there is a 'clear and present' need for equitable relief." *Wis. Gas Co. v. Fed. Energy Regul. Comm'n*, 758 F.2d 669, 674 (D.C. Cir. 1985) (quoting *Ashland Oil, Inc. v. Fed. Trade Comm'n*, 409 F. Supp. 297, 307 (D.D.C.), *aff'd*, 548 F.2d 977 (D.C. Cir. 1976)).

The Supreme Court has repeatedly held "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality op.); *see also Cigar Ass'n of Am. v. U.S. Fed. Drug Admin.*, 317 F. Supp. 3d 555, 562 (D.D.C. 2018); *Bailey v. Fed. Bureau of Prisons*, No. 24-1219, 2024 WL 3219207, at *9 (D.D.C. June 28, 2024) (noting plaintiff can establish irreparable harm can be established by showing that "First Amendment freedoms are actually" or "imminently will be" lost). As in *Paxton*, where the D.C. Circuit held this Court properly concluded the Texas AG's "campaign of retaliation" led to "self-censorship," such an injury constitutes "irreparable harm." 138 F.4th at 570. And this Court enjoined the FTC's retaliatory CID issued to Media Matters, finding the irreparable injury requirement "is easily met" for the same reasons. *Media Matters v. FTC*, 2025 WL 2378009, at *22. With such constitutional injuries, "there is a 'presumed

availability of federal equitable relief.'" *Davis v. District of Columbia*, 158 F.3d 1342, 1346 (D.C. Cir. 1998) (citation omitted); *see Karem v. Trump*, 960 F.3d 656, 667 (D.C. Cir. 2020).

Here, NewsGuard has alleged "present, concrete, and objective harms" that currently "adversely affect[] [its] newsgathering activities and media business operations." *Paxton*, 138 F.4th at 579. It has been burdened with voluminous and intrusive document demands that have imposed significant costs and diverted the company from its mission. Skibinski Decl. ¶ 49. It has been threatened with disclosure of sensitive editorial materials as well as customer identities and communications. *Id.* ¶¶ 40-41. And it has been barred from future contracts with the largest international advertising agency. *Id.* ¶¶ 63-64. The irreparable harm is obvious, ongoing, and imminent.

**III. The Remaining Equitable Factors Favor Granting Preliminary Relief.**

The remaining equitable factors—the balance of equities and the public interest—strongly favor NewsGuard. "It is well settled that the balance of equities and public interest factors merge if the government is the opposing party." *Paxton*, 138 F.4th at 585. "In other words, '[w]hen a private party seeks injunctive relief against the government,'" the Court "must 'weigh[ ] the benefits to the private party from obtaining an injunction against the harms to the government and the public from being enjoined.'" *Id.* (quoting *Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 734 (D.C. Cir. 2022)).

Both "factors [are] established when there is a likely First Amendment violation." *Centro Tepeyac v. Montgomery County*, 722 F.3d 184, 191 (4th Cir. 2013) (quoting *Centro Tepeyac v. Montgomery County*, 779 F. Supp. 2d 456, 471 (D. Md. 2011)); *see Karem*, 960 F.3d at 668 ("[E]nforcement of an unconstitutional law is always contrary to the public interest.") (quoting *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013)). "The public's

interest in protecting First Amendment rights" is beyond dispute and allowing unconstitutional government action to stand "is always contrary to the public interest." *Pursuing Am.'s Greatness*, 831 F.3d at 511-12 (quoting *Gordon*, 721 F.3d at 653). The balance of equities also favors injunctive relief because "no substantial harm to others can be said to inhere" in allowing a violation of constitutional rights to continue. *Déjà vu of Nashville, Inc. v. Metro. Gov't of Nash. & Davidson Cty.*, 274 F.3d 377, 400 (6th Cir. 2001).

Granting preliminary relief will not harm the government. Because the FTC's investigation and the Consent Order condition are devoid of any legitimate basis, Defendants lack a legitimate interest continuing their pursuit of NewsGuard. Defendants "cannot legitimately claim to be 'harmed' as a result of being restrained from illegal conduct." *Prysmian Cables & Sys. USA, LLC v. Szymanski*, 573 F. Supp. 3d 1021, 1044 (D.S.C. 2021) (collecting cases). "If anything, the system is improved by such an injunction." *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002) (quoting *Giovani Carandola, Ltd. v. Bason*, 147 F. Supp. 2d 383, 395 (M.D.N.C. 2001)); *see also League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (holding there is "substantial public interest" in ensuring the government "abide[s]" by the law (quoting *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994))). The strong public interest in assuring that journalists can report on important matters unencumbered by political pressure requires entry of a preliminary injunction.

## CONCLUSION

For the reasons set forth above, the Court should grant NewsGuard's motion for a preliminary injunction.

Dated: February 11, 2026 Respectfully Submitted,

/s/ Robert Corn-Revere
Robert Corn-Revere
(D.C. Bar No. 375415)
James C. Grant
(WA Bar No. 14358)
Sara E. Berinhout
(MA Bar No. 703217)
FOUNDATION FOR INDIVIDUAL
RIGHTS AND EXPRESSION
700 Pennsylvania Ave. SE, Ste. 340
Washington, DC 20003
(215) 717-3473
bob.corn-revere@fire.org
jim.grant@fire.org
sara.berinhout@fire.org

*Counsel for Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that on February 11, 2026, I electronically filed the foregoing document with the Clerk of the Court using the ECF system, which will send notification of such filing upon all ECF filing participants.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on February 11, 2026.

Dated: February 11, 2026

Respectfully submitted,

By: /s/ Robert Corn-Revere

Robert Corn-Revere

**CERTIFICATE OF COMPLIANCE**

1. This document complies with the page limit of Local Rule LCvR 7(e) because this document does not exceed 45 pages.

2. This document has been prepared in a proportionally spaced typeface using Microsoft Word in 12-point Times New Roman.

Dated: February 11, 2026

Respectfully submitted,

By: /s/ Robert Corn-Revere

Robert Corn-Revere

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NEWSGUARD TECHNOLOGIES, INC.,<br><br>*Plaintiff*,<br><br>v.<br><br>FEDERAL TRADE COMMISSION and ANDREW FERGUSON, in his official capacity as Chairman of the Federal Trade Commission,<br><br>*Defendants*. | Civil Action No. 1:26-cv-00353-DLF |

**DECLARATION OF MATTHEW SKIBINSKI IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

I, Matthew Skibinski, hereby declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, as follows:

1. I submit this declaration in support of Plaintiff's Motion for Preliminary Injunction. I am over the age of 18, am competent to testify, and have personal knowledge of the facts and information set forth in this declaration.

2. I am the Chief Operating Officer of NewsGuard Technologies, Inc. ("NewsGuard"). I am a member of NewsGuard's founding team. In my role as Chief Operating Officer, I help lead NewsGuard's operations and strategy.

3. NewsGuard was founded by veteran journalists and media executives Gordon Crovitz and Steven Brill. Mr. Brill previously established *The American Lawyer*, Court TV, the Yale Journalism Initiative, and the Clear Registered Traveler program. Mr. Crovitz spent over 35 years at *The Wall Street Journal* as publisher, and as an editorial writer and opinion columnist.

4. NewsGuard launched in 2018 with the aim of providing news consumers and companies that interact with online news content with transparent, detailed assessments of the reliability of news sources they might encounter on the Internet. NewsGuard's guiding principle has been that no government entity should be in the business of deciding what news people consume, but neither should those decisions be left to unknown and unaccountable algorithms or partisan advocacy groups.

5. NewsGuard developed a methodology to assess and report on indices of reliability for news sources based on nine basic criteria of journalistic practice: (1) whether a publication repeatedly publishes demonstrably false information; (2) whether it presents information responsibly, for example, by referencing multiple sources including those with first-hand information on a subject or event; (3) whether the site transparently acknowledges errors and regularly publishes clarifications and corrections; (4) whether a source distinguishes between news and opinion; (5) whether it publishes significantly sensationalized or otherwise deceptive headlines; (6) whether the site discloses in a user-friendly manner its ownership and/or financing; (7) whether paid advertising is clearly labeled as such; (8) whether readers are told who is in charge of deciding the content on the site and given a way to contact the site about editorial issues; and (9) whether the names and contact information or biographical information about the content creators are clearly indicated. These criteria are based on widely accepted journalistic standards and are posted publicly on NewsGuard's website with detailed definitions for each. *See* Website Rating Process and Criteria, NewsGuard, https://www.newsguardtech.com/ratings/rating-process-criteria.

6. Each of the nine criteria is assigned a weighted number of points, which can total to a maximum of 100 points. Each site is assigned an overall score of 0 to 100 and a rating indicating the extent to which it adheres to the criteria in NewsGuard's judgment.

7. NewsGuard employs a team of journalists and editors to research each site, contact sources, review content, and assess whether the site passes or fails each of the nine criteria. These findings are captured in a detailed journalistic report about the site's rating, which we call a "Nutrition Label."

8. NewsGuard also provides a "Nutrition Label" accompanying each website's listed score, which sets forth in detail NewsGuard's findings and ultimate determination. Nutrition Labels include a grid showing NewsGuard's judgment of the site's performance on each of the nine criteria, as well as a description of the content on the site, who is behind it, and why it received the score it did. Nutrition Labels ordinarily run to 4,000-10,000 words and are painstakingly prepared and reviewed by journalist analysts and NewsGuard executives. Attached hereto as **Exhibit 1** and **Exhibit 2** are examples of the full Nutrition Labels for *The Wall Street Journal* and Newsmax, respectively.

9. Nutrition Labels are reviewed, edited, and fact-checked by multiple editors. Before being published, each Nutrition Label is shared with the full staff of analysts and executives, who each sign off on the rating before it is published. Once the Nutrition Label is published, all of the details—including how determinations were made, how each criterion is defined, and what evidence supports each criterion determination—are shared with the publisher, and all of this plus any comments from the publication are made available to NewsGuard's subscribers. The entire rating process and rationales for ratings are thus completely transparent.

10. NewsGuard has rated 38,742 news sources, including 12,765 websites, since its founding.

**NewsGuard's Services to Customers**

11. NewsGuard's services are available to consumers, businesses, advertisers, and others. Consumers can access NewsGuard reliability ratings through a monthly online subscription, which also gives them access to public reports the company produces.

12. The subscription provides a browser extension that allows individuals using the Internet to see NewsGuard trust score icons next to links in their search results and social media feeds:



13. Hovering over an icon brings up a short description of the site and a link to "See the Full Nutrition Label" for a detailed description and why it received the score it did:




14. NewsGuard also licenses its ratings to businesses that seek data to help them understand the reliability of different online content—for example, news aggregators and public

relations companies whose businesses rely on understanding how reliable different content online might be.

15. Advertisers and ad agencies also use NewsGuard's ratings to help make informed decisions about where (on which websites) ads should and should not be placed.

16. Online ads predominantly are placed through programmatic advertising campaigns, *i.e.*, automated software-based buying and selling of digital ad placements. An average programmatic ad campaign runs on 44,000 websites at one time.[1] Major brands advertising online cannot know all of the tens of thousands of websites where their ads might appear. So, advertisers rely on ad agencies and automated services to provide methods to identify websites with high quality content that are suitable for ad placements and to avoid ad placements that may be "brand unsafe," meaning ones that could undermine their brands in the eyes of consumers.

17. Brand safety for online advertisers has become a multi-billion-dollar industry. This is because, through programmatic ad campaigns, major international brands have had their advertisements unintentionally placed on websites considered unsafe and brand-damaging.

18. NewsGuard has reported on these concerns, identifying ads inadvertently placed on websites advancing dangerous health treatments,[2] promoting election misinformation,[3] making

---

[1] *See* Press Release, Ass'n of Nat'l Advertisers, ANA Provides "First Look" at In-Depth Programmatic Transparency Study (June 19, 2023), https://www.ana.net/content/show/id/pr-2023-06-programmaticstudy.

[2] Matt Skibinski, *Thousands of the World's Most Trusted Brands Funded COVID-19 Misinformation*, NewsGuard, https://www.newsguardtech.com/special-report-advertising-on-covid-19-misinformation (last viewed Feb. 11, 2026).

[3] Matt Skibinski, *Special Report: How Some of the World's Largest Brands Funded the Misinformation Behind the Capitol Riot*, NewsGuard (Jan. 12, 2021),

false claims about the Israel-Hamas conflict,[4] or spreading Russian propaganda.[5] For example, NewsGuard reported that in 2019 Berkshire Hathaway's subsidiary GEICO was unintentionally the largest advertiser on Sputnik News, a Kremlin-controlled website.[6]

19. Research studies by NewsGuard and others estimate that 67% of top brands inadvertently advertise on websites with this kind of problematic content,[7] totaling some $2.6 billion of advertising per year.[8]

20. NewsGuard's customers in the advertising industry include ad agencies, ad targeting platforms, and advertisers themselves. Their continuing loyalty over the years shows that they value NewsGuard's ratings, analyses, and journalism. However, in this area NewsGuard is a

---

https://www.newsguardtech.com/special-reports/special-report-advertising-on-election-misinformation.

[4] *Brand Danger: NewsGuard Finds 349 Top Global Brands Funding Misinformation About the Hamas-Israel Conflict with Programmatic Ads*, NewsGuard (Nov. 29, 2023), https://www.newsguardtech.com/press/brand-danger-newsguard-finds-349-top-global-brands-funding-misinformation-about-the-hamas-israel-conflict-with-programmatic-ads.

[5] *One Year, 100 Myths: NewsGuard Has Identified More Than 100 False Narratives About the War in Ukraine*, NewsGuard (Feb. 16, 2023), https://www.newsguardtech.com/press/one-year-100-myths-newsguard-has-identified-more-than-100-false-narratives-about-the-war-in-ukraine.

[6] L. Gordon Crovitz, *How Amazon, Geico and Walmart Fund Propaganda*, N.Y. Times (Jan. 21, 2020), https://www.nytimes.com/2020/01/21/opinion/fake-news-russia-ads.html.

[7] Wajeeha Ahmad et al., *Companies Inadvertently Fund Online Misinformation Despite Consumer Backlash*, 630 NATURE 123, 124 (2024).

[8] Matt Skibinski, *Special Report: Top Brands Are Spending $2.6 Billion to Misinformation Websites Each Year*, NewsGuard https://www.newsguardtech.com/special-reports/brands-send-billions-to-misinformation-websites-newsguard-comscore-report.

small player compared to large incumbent ad-tech companies, accounting for less than 0.1% of the market for brand safety tools.

**Attacks on NewsGuard by Publishers Unhappy with Ratings**

21. For several years, NewsGuard has faced criticisms from across the political spectrum that NewsGuard's ratings are biased in one direction or another. In one year, for example (actually within a period of a few months), one advocacy group produced a report claiming NewsGuard's ratings are biased against conservatives while another published a separate report claiming NewsGuard's ratings are biased in favor of conservatives.

22. Attacks on NewsGuard have come from news publishers that receive lower scores based on NewsGuard's application of journalistic criteria.

23. In 2023, *Consortium News*, a left-leaning website that received low reliability ratings, sued NewsGuard for defamation and supposed claims under the First Amendment. The case was dismissed, as the court held that NewsGuard's ratings were protected editorial opinion. *Consortium for Indep. Journalism, Inc. v. United States*, 23 Civ. 7088 (KPF), 2025 WL 919504, at *16–20 (S.D.N.Y. Mar. 26, 2025).

24. Newsmax, a conservative cable news network and digital media company, has mounted a campaign attacking NewsGuard, beginning in 2023 and continuing to the present. Newsmax has asserted repeatedly in its programs and publications that NewsGuard is biased against conservative media and websites.

25. Newsmax also received low ratings for adherence to journalistic standards, ratings that are markedly lower than those for other conservative news sources such as Fox News, the *National Review*, and *The Washington Times*.

26. Newsmax's attacks were and are unfounded. As noted above, NewsGuard's ratings of all news sources are based on nonpartisan journalistic criteria and are agnostic to the political or editorial viewpoints of the publishers. For example, Fox News receives a higher reliability rating than MSNBC, while the conservative *Washington Examiner* outscores the liberal *Daily Beast*. The following is a summary table reported by the *Washington Post* in late 2024:[9]




A copy of the *Washington Post* article is attached hereto as **Exhibit 3.**

[9] Will Oremus & Naomi Nix, *This Company Rates News Sites' Credibility. The Right Wants It Stopped.*, Wash. Post (Dec. 24, 2024), https://www.washingtonpost.com/technology/2024/12/24/newsguard-disinformation-censorship-free-speech.

**Putative Congressional Investigations Targeting NewsGuard**

27. When Republicans took control of the House in 2023, several committees opened investigations and issued statements taking aim at media and tech companies for supposed anti-conservative bias.

28. The House Oversight and Small Business Committees opened an investigation in June 2024, with Oversight Committee Chairman James Comer appearing on Newsmax and agreeing that "their [NewsGuard's] goal is obviously to bully conservative media out of existence."[10] A *Deadline* article reporting on this interview with Comer is attached as **Exhibit 4.** After NewsGuard presented evidence to the committee about its nonpartisan, journalistic ratings process, the investigation did not proceed.

29. In September 2024, the House Small Business Committee released an interim staff report entitled "Small Business: Instruments and Casualties of the Censorship-Industrial Complex," which also took aim at NewsGuard with unsubstantiated claims of bias.[11] That effort also did not proceed further.

30. In early 2025, the Senate Judiciary Committee held a hearing on what it called the "Censorship Industrial Complex." NewsGuard cooperated, addressed the Committee's questions, again explaining and providing evidence that NewsGuard's ratings are nonpartisan and do not reflect anti-conservative bias. That investigation also has not proceeded.

---

[10] Ted Johnson, *Attacking the Watchdog: How Media Rating Site NewsGuard Ended Up as a Target for GOP Lawmakers and Regulators*, Deadline (Dec. 19, 2024, at 12:17 ET), https://deadline.com/2024/12/newsguard-newsmax-trump-fcc-1236202249.

[11] H. Comm. on Small Bus., 118th Cong., *Small Business: Instruments and Casualties of the Censorship-Industrial Complex* 42–59 (Interim Staff Rep. 2024), https://smallbusiness.house.gov/uploadedfiles/house_committee_on_small_business_-_cic_report_september_2024.pdf.

**<u>Administration Officials' Public Attacks Targeting NewsGuard</u>**

31. On November 12, 2024, then-Commissioner Ferguson posted on X (formerly Twitter) about the closure of the U.S. Department of State's Global Engagement Center[12] by referring to NewsGuard specifically, asserting it had supposedly "led collusive ad-boycotts—possibly in violation of our antitrust laws—to censor the speech of conservative and independent media in the United States."[13] A copy of Ferguson's post on X is attached hereto as **Exhibit 5.**

32. Shortly afterward, Ferguson appeared in a podcast interview discussing how a new Republican-led FTC (after Trump's inauguration) could act against organizations he believes are part of the "censorship industrial complex."[14] Again he called out NewsGuard by name and warned that "antitrust laws may have something to do with what's been going on [with] … advertiser boycotts."[15] A copy of Ferguson's post on X concerning the podcast is attached hereto as **Exhibit 6.**

[12] The Global Engagement Center was an interagency entity established in 2016 to expose and counter foreign propaganda and disinformation, closed in April 2025 by Secretary of State Marco Rubio following accusations by GOP lawmakers that the office censored conservative voices. *See* Maggie Miller, *State Department Eliminates Key Office Tasked with Fighting Foreign Disinformation*, Politico (Apr. 16, 2025, at 13:25 ET), https://www.politico.com/news/2025/04/16/state-department-shutters-gec-foreign-disinformation-00292982.

[13] Andrew Ferguson (@AFergusonFTC), X (Nov. 11, 2024, at 20:51 ET), https://x.com/AFergusonFTC/status/1856152760850243905?s=20.

[14] Mike Benz (@MikeBenzCyber), X (Nov. 24, 2024, at 18:59 ET), https://x.com/mikebenzcyber/status/1860835679560765841?s=46&t=2yQS3wsEbvI9bCYB3nT64Q.

[15] *Id.*; *see also* Andrew Ferguson (@A FergusonFTC), X (Nov. 27, 2024, 9:33 AM), https://x.com/AFergusonFTC/status/1861780403092099278 (Ferguson post on X forwarding podcast host's tweet that Ferguson had "laid out a compelling vision for how the FTC can take on advertiser boycott collusion in the Internet censorship space").

33. Later in November 2024 during an interview on Steve Bannon's "War Room" podcast, Ferguson reiterated his view of the importance of going after "purely private censorship" and the "censorship industrial complex."[16] "[P]rogressives, Silicon Valley, everyone who is fighting 'disinformation,' they're not just going to give up because of the election. … And that's where I think that it's really important that the FTC take investigative steps in the new administration under President Trump."[17] A copy of a transcript of the podcast is attached hereto as **Exhibit 7.**

34. Brendan Carr, the Chairman of the Federal Communications Commission appointed by President Trump, has echoed Ferguson's attacks on NewsGuard. In a November 2024 letter to the CEOs of Alphabet, Microsoft, Meta, and Apple, then-Commissioner Carr claimed NewsGuard was part of a "censorship cartel" and that the company "leverag[es] its partnerships with advertising agencies to effectively censor[] targeted outlets."[18] Carr said the incoming Trump Administration would investigate and take action against NewsGuard and companies that used its services for protecting brand safety, declaring that the so-called "cartel" must be "completely dismantled."[19] A copy of Carr's letter is attached hereto as **Exhibit 8.**

35. In December 2024, Commissioner Ferguson asserted the FTC "ought to conduct … an investigation" because, he said, NewsGuard "seems to give a free pass to … major left-leaning

[16] Kari Donovan, *Bannon's WarRoom, Show Clip Roundup 11/30/2024 [AM]*, War Room (Nov. 30, 2024), https://warroom.org/bannons-warroom-show-clip-roundup-11-30-2024-am.

[17] *Id.*

[18] Letter from Brendan Carr, FCC Comm'r to CEOs (Nov. 13, 2024), https://www.fcc.gov/sites/default/files/DOC-407732A1.pdf.

[19] *Id.*

outlets."[20] Attached as **Exhibit 9** is a copy of a concurring statement of Commissioner Ferguson in an unrelated matter making this assertion. At the time, Ferguson was a candidate for FTC chairman, and in public statements promoting his candidacy, he stated that he had a "track record of standing up to … the radical left" and would "[i]nvestigate advertiser boycotts" and "'progressives who are targeting disinformation.'"[21] A copy of Ferguson's statement is attached hereto as **Exhibit 10.**

36. In a November 15, 2024 public statement, NewsGuard responded to Commissioner Carr, demonstrating that many conservative-leaning news sources get high reliability ratings while other, liberal publications get lower ratings based on NewsGuard's journalistic criteria.[22] A copy of this statement from Gordon Crovitz is attached hereto as **Exhibit 11.**

37. In February 2025, the FTC issued a Request for Information ("RFI") seeking public comment on "Technology Platform Censorship," asserting that social media providers and other "tech platforms" are engaged in "censorship" that is "potentially illegal."[23] A copy of the FTC's press release is attached hereto as **Exhibit 12.**

---

[20] Concurring Statement of Commissioner Andrew Ferguson, *FTC v. 1661, Inc. d/b/a GOAT* (Dec. 2, 2024), https://www.ftc.gov/system/files/ftc_gov/pdf/ferguson-goat-concurrence.pdf.

[21] Press Release, PunchBowl News, FTC Commissioner Andrew N. Ferguson for FTC Chairman, https://punchbowl.news/wp-content/uploads/FTC-Commissioner-Andrew-N-Ferguson-Overview.pdf.

[22] Statement from Gordon Crovitz, NewsGuard, on Brendan Carr Letter (Nov. 15, 2024), https://www.newsguardtech.com/wp-content/uploads/2024/11/NewsGuard-Statement-on-Brendan-Carr-Letter.pdf.

[23] Press Release, Fed. Trade Comm'n, *Federal Trade Commission Launches Inquiry Into Tech Censorship* (Feb. 20, 2025), https://www.ftc.gov/news-events/news/press-releases/2025/02/federal-trade-commission-launches-inquiry-tech-censorship; *see* Request for

38. In an April 2025 interview, Chairman Ferguson explained how the FTC could use its "tremendous array of investigative tools" and "coercive power—formal and informal" to demand compliance to its views about supposed online "censorship." Ferguson further stated: "The regulators can show up, they can audit, they can investigate, they can cost you a lot of money, and the path of least resistance is: 'Do what we say.'"[24] A copy of the transcript of Ferguson's comments is attached hereto as **Exhibit 13.**

39. Previously, in 2020 (before he was appointed as FTC Chairman), Ferguson said "No government agency should be in the business of policing speech."[25] Before he became FCC Chairman, Carr said that "the government shutting down speech" is "a 1A [First Amendment] issue," but "a private platform doing it" is not.[26] "It's always a person in power (merely fallible or with a political agenda) that censors speech," he said then.[27] Attached **Exhibit 5** and **Exhibit 14** are posts of Ferguson and Carr on X and Twitter containing these statements.

**<u>The FTC's CID to NewsGuard</u>**

40. On May 20, 2025, the FTC issued a sweeping CID to NewsGuard, 21 pages long, containing 31 Specifications (with dozens of subparts) demanding vast numbers of confidential and sensitive documents. The CID requires production of "all documents relating to NewsGuard's

---

Public Comment Regarding Technology Platform Censorship, https://www.ftc.gov/system/files/ftc_gov/pdf/P251203CensorshipRFI.pdf.

[24] *Transcript: FTC Chairman Andrew Ferguson Keynote Part II*, ProMarket (Apr. 21, 2025), https://www.promarket.org/2025/04/21/transcript-ftc-chairman-andrew-ferguson-keynote-part-ii.

[25] Andrew Ferguson (@AFergusonFTC), *supra* note 13.

[26] Brendan Carr (@BrendanCarrFCC), X (Apr. 15, 2020), at 6:47 PM https://x.com/BrendanCarrFCC/status/1250601632339034114.

[27] *Id.*

News Reliability Ratings and any other rating[s];" all materials about NewsGuard's work product and methodology; all documents about websites and news sources rated; all ratings and reviews issued; any and all analyses of the effects of NewsGuard's ratings on advertisers and publishers; and any studies relating to social media or digital advertising; identification of all NewsGuard customers; and essentially all communications from or to NewsGuard. *See* FTC Civil Investigative Demand, FTC File No. 251-0061 (May 20, 2025) (the "NewsGuard CID"). A copy of the NewsGuard CID is attached hereto as **Exhibit 15.**

41. The CID calls for all documents from January 1, 2018, to the present. NewsGuard CID at 8 (Instruction I1). As NewsGuard was founded and began operations in 2018, it is no exaggeration to say that it demands virtually all documents, information, and records of NewsGuard from the company's inception to the present, including those relating to NewsGuard's analyses, methodology, editorial judgments, customers, journalism, and reporting.

42. NewsGuard responded and objected to the FTC that the CID raised serious concerns, as it was targeted at free speech and associational rights of the company and its customers and was extraordinarily overbroad and burdensome. NewsGuard raised its concerns from the outset and throughout its dealings with FTC staff, attempting to explain that NewsGuard's ratings, its editorial decisions, and its dealings with customers are plainly protected First Amendment activities.

43. NewsGuard nonetheless sought to work constructively with FTC staff to provide such information as it could without infringement of First Amendment rights. NewsGuard participated in ten meet-and-confer discussions over the course of eight months and produced over 40,000 pages of documents in multiple rounds.

44. In the discussions with FTC staff, NewsGuard demonstrated (as it had earlier in information provided to congressional committees) that its ratings utilize established journalistic standards and practices. NewsGuard also submitted information demonstrating that the company's share of the market for advertiser brand safety tools is so *de minimis*—less than 0.1%—that NewsGuard could not possibly be a legitimate target of an antitrust investigation of that market.

45. On January 15, 2026, two days after the parties' last meet-and-confer discussion, FTC staff sent a letter purporting to be a "good faith effort to reduce NewsGuard's burden," but which was in reality a doubling down on the CID's unconstitutional demands. A copy of the FTC staff's letter is attached hereto as **Exhibit 16.**

46. Despite NewsGuard's seven months' efforts to cooperate, FTC staff simply repeated several of the most intrusive, infringing demands made from the outset, including: (1) identification of all NewsGuard subscribers; (2) communications with customers; (3) identification of all entities to which NewsGuard had ever assigned a News Reliability Rating; (4) the particulars of each rating assigned to each entity over time; and (5) documents to show how NewsGuard has developed methodologies for ratings, including internal correspondence.

47. The FTC's repeated demands for identification of NewsGuard's subscribers (and production of all communications with subscribers) are especially troubling because of the many statements of Chairman Ferguson and FCC Chairman Carr about targeting tech and media companies supposedly associated with a "censorship cartel." NewsGuard has ample grounds for concern that the FTC aims to find NewsGuard's customers to pressure them, too.

48. Throughout the dealings with NewsGuard, FTC staff refused to give assurances that NewsGuard's productions and disclosures satisfied the CID, and they reiterated that position

in the January 15, 2026, letter. FTC staff members instead have insisted NewsGuard remains obligated to provide all documents and information called for by the original CID.

49. Responding to the CID was an immensely time-consuming and expensive effort. NewsGuard's executives and staff spent hundreds of hours working to provide information and documents to the FTC. NewsGuard's expenses mounted as the investigation continued, to the point that legal fees alone exceeded 30% of NewsGuard's total revenues from its sales of brand-safety services to advertising industry customers.

**The FTC's Omnicom Consent Order Blacklisting NewsGuard**

50. On December 9, 2024, Omnicom Group Inc. (Omnicom) announced that it had entered into an agreement to acquire The Interpublic Group of Companies, Inc. (IPG).[28]

51. Omnicom and IPG were the world's third- and fourth-largest companies involved in media buying for ad agencies and advertisers, and, combined, they would be the world's largest advertising agency and media buying company.

52. The companies apparently negotiated with the FTC through the first half of 2025 to obtain approval of the merger, although there were no public statements or announcements about these discussions. Despite that NewsGuard was attempting to work with FTC during this time (and throughout 2025) concerning the CID, FTC staff did not mention or address the proposed Omnicom merger with NewsGuard.

53. On June 23, 2025, the FTC filed a *pro forma* complaint concerning the merger while simultaneously announcing that it had accepted a proposed consent order from the

[28] Press Release, Omnicom, Omnicom to Acquire Interpublic Group to Create Premier Marketing and Sales Company (Dec. 9, 2024), https://www.omc.com/newsroom/omnicom-to-acquire-interpublic-group-to-create-premier-marketing-and-sales-company.

companies.[29] Proposed Decision & Order, *Omnicom Grp. Inc.*, FTC File No. 251-0049, 2025 WL 2355514 (June 23, 2025). A copy of the FTC's proposed order is attached hereto as **Exhibit 17.**

54. The substantive provisions of the proposed order focused on precluding Omnicom or its agencies from doing business with any news rating service or entity that "[d]irects Advertisers' advertising spend based on the Media Publisher's political or ideological viewpoints, or the political or ideological viewpoints expressed in content that the Media Publisher sells advertising to run alongside of." *Id.* at *2.

55. When the proposed consent order was made public, Chairman Ferguson released a statement specifically calling NewsGuard an organization that "ha[s] publicly sought to use the chokepoint of the advertising industry to effect political or ideological goals" and alleging that NewsGuard steers "advertising revenue with 'an unavoidable partisan lens.'"[30] A copy of Chairman Ferguson's statement is attached hereto as **Exhibit 18.**

56. Following the FTC's publication of the proposed order, Newsmax ran a series of stories contending the order did not go far enough as it would not prohibit Omnicom from using NewsGuard's rating services, given that NewsGuard does not direct or recommend "advertising spend" based on "political or ideological viewpoints."[31] A June 26, 2025 article from Newsmax article to this effect is attached hereto as **Exhibit 19.**

---

[29] Press Release, Fed. Trade Comm'n, FTC Prevents Anticompetitive Coordination in Global Advertising Merger (June 23, 2025), https://www.ftc.gov/news-events/news/press-releases/2025/06/ftc-prevents-anticompetitive-coordination-global-advertising-merger.

[30] Statement of Chairman Andrew N. Ferguson, *Omnicom Grp. Inc.*, FTC File No. 251-0049, at 5 & n.34 (June 23, 2025) (quoting H. Comm. on Small Bus., *supra* note 11), https://www.ftc.gov/system/files/ftc_gov/pdf/omnicom-ipg-ferguson-statement_0.pdf.

[31] *See, e.g.*, Paul Bond, *Megamerger Omnicom, IPG Mum About NewsGuard Bias*, Newsmax (June 26, 2025, at 17:35 ET), https://www.newsmax.com/us/news-bias-ftc-omnicom/2025/06/26/id/1216643.

57. The FTC set aside a comment period for the proposed consent order. We decided not to comment because, as written, the proposed order did not apply to NewsGuard.

58. Newsmax apparently noticed this issue with the proposed consent order too—and argued in its comments to the FTC and on its network that the proposed consent order should be revised to expressly target NewsGuard. Newsmax filed a letter urging the FTC to expand the prohibitory condition (to ensure Omnicom and its ad agencies "can no longer use biased rating organizations, fact checkers, and other third-parties to engage in censorship of disfavored news outlets").[32] A copy of Newsmax's comment letter is attached as **Exhibit 20.**

59. Similarly, in broadcasts and online, Newsmax commentators said the proposed order was inadequate because it "says nothing at all about stopping these agencies from using third-party ratings services like NewsGuard to block media like Newsmax."[33] Attached as **Exhibit 21** is a Newsmax article of John Tabacco making this statement.

60. Newsmax also lobbied Chairman Ferguson, members of Congress, and the President through social media posts. In a post on X directed to Chairman Ferguson, Newsmax asserted the FTC's proposed order was insufficient because it "makes no mention of 'censorship' or 'targeting conservatives'" and "'[f]ully allows Omnicom to use left-wing NewsGuard."[34] A copy of this post is attached as **Exhibit 22.**

---

[32] Newsmax Media Inc., Comment Letter on Proposed Consent Order 13 (July 28, 2025), https://www.regulations.gov/comment/FTC-2025-0066-0008.

[33] *Newsmax's Tabacco Slams FTC Approval of Omnicom-IPG Merger*, Newsmax (Aug. 3, 2025, at 07:23 ET), https://www.newsmax.com/newsfront/tabacco-ftc-omnicom/2025/08/02/id/1221045.

[34] NEWSMAX (@NEWSMAX), X (July 31, 2025, at 21:58 ET), https://x.com/NEWSMAX/status/1951100290775630054.

61. Two conservative advocacy groups (which are supported by and receive funding from Newsmax) submitted a letter urging the FTC impose a merger condition barring Omnicom from working with "ostensibly neutral third-party monitors such as NewsGuard," which the groups claimed "in practice serve as gatekeepers that suppress conservative and heterodox content."[35]

62. Numerous First Amendment scholars and free speech organizations also submitted comments regarding the initial proposed order, explaining its unconstitutionality,[36] but the FTC made no mention of these comments.

63. The FTC subsequently issued a revised order removing terms about using third-party services with "political or ideological bias." Instead, the FTC revised the Consent Order to prohibit the merged Omnicom entity or its ad agencies from using third-party services that evaluate "viewpoints as to the veracity of news reporting" and "adherence to journalistic standards or ethics."[37] There was no further comment period when NewsGuard could address or object to this revised language. The FTC adopted the final order, a copy of which is attached as **Exhibit 23,** on September 26, 2025.

64. In sum, the FTC ordered that Omnicom and all its affiliates and ad agencies cannot contract with or use nonpartisan review and ratings services based on journalistic criteria,

---

[35] Indep. Media Council & CPAC Found. Ctr. for Regul. Freedom, Comment Letter on Proposed Consent Order 2 (July 28, 2025), https://www.regulations.gov/comment/FTC-2025-0066-0010.

[36] *See, e.g.*, Public Knowledge, Comment Letter on Proposed Consent Order (July 28, 2025), https://www.regulations.gov/comment/FTC-2025-0066-0013; TechFreedom, Comment Letter on Proposed Consent Order (July 28, 2025), https://www.regulations.gov/comment/FTC-2025-0066-0015; Vikram David Amar & Ashutosh Bhagwat, Comment Letter on Proposed Consent Order (July 28, 2025), https://www.regulations.gov/comment/FTC-2025-0066-0009.

[37] Order, *Omnicom Grp. Inc.*, FTC Docket No. C-4823, §§ I.D, II.A (Sept. 26, 2025), https://www.ftc.gov/system/files/ftc_gov/pdf/OmnicomOrder.pdf.

essentially banning the combined merged company and its affiliates from providing brand safety to its clients by subscribing to information about the reliability of news publishers.

**<u>Harms to NewsGuard and Its Customers from the Consent Order</u>**

65. The FTC's imposition of the Omnicom Consent Order has had significant negative impacts on NewsGuard's business, and the harm is likely to continue.

66. For example, after the Consent Order came out, a longtime client that does significant business with Omnicom informed us that they would not be renewing their contract, not because of any dissatisfaction with NewsGuard's service but because of "[r]ecent developments that require us to take a more cautious approach to this area of our business."

67. NewsGuard also stands to lose business from the newly merged Omnicom as a direct result of the Consent Order. Since 2019, NewsGuard has had a contract with IPG to make ratings available to brands represented by the agency that seek information about the reliability of different publishers. IPG has proudly touted this arrangement and data available through the agreement in press releases, industry event panels, and case studies. But it is questionable (or doubtful) that the agency will continue with the contract now that it has been absorbed by Omnicom and is subject to the Consent Order.

68. The Omnicom Consent Order amounts to a government-imposed blacklist prohibiting Omnicom and its affiliates from using NewsGuard's services. Other agencies and companies seeking to use NewsGuard's ratings and services also face the prospect of FTC investigations, enforcement actions, and liability if they do not divorce themselves from dealings with NewsGuard.

69. Overall, the burdens and restrictions imposed by the FTC through its onerous "investigation" and the prohibition of the Consent Order have made it nearly impossible for NewsGuard to conduct its journalism business.

I declare under penalty of perjury under the laws of the United States of America that the foregoing statements are true and correct.

Signed in New York, NY.

Dated: February 11, 2026

Matthew Skibinski

# Exhibit 1

# wsj.com

The website of The Wall Street Journal, a daily newspaper founded in 1889 covering politics, global financial markets, the economy, lifestyle, and arts.

100 / 100

**High Credibility**: This website adheres to all nine standards of credibility and transparency.

- ✓ Does not repeatedly publish false or egregiously misleading content 22 points
- ✓ Gathers and presents information responsibly 18
- ✓ Has effective practices for correcting errors 12.5
- ✓ Handles the difference between news and opinion responsibly 12.5
- ✓ Avoids deceptive headlines 10
- ✓ Website discloses ownership and financing 7.5
- ✓ Clearly labels advertising 7.5
- ✓ Reveals who's in charge, including any possible conflicts of interest 5
- ✓ The site provides names of content creators, along with either contact or biographical information 5

Criteria are listed in order of importance. Learn More.

## Ownership and Financing

Dow Jones publishes The Wall Street Journal, which is owned by the public media conglomerate News Corp, controlled by the Murdoch family. News Corp also owns Barron's, MarketWatch, HarperCollins, the New York Post, and other media entities. Murdoch also owns Fox Corporation.

In addition to producing its print and digital editions, The Wall Street Journal hosts conferences for business leaders. The site is financed through advertisements, subscriptions, and sales of the publication's other products, according to News Corp's annual report. Much of the site's content is only accessible to paid subscribers.

## Content

WSJ.com publishes articles and videos with original reporting covering international politics, financial markets, technology, lifestyle, and the arts. Coverage is particularly focused on business and the economy, displaying stock quotes and a graph of market data on the top of its homepage.

The Journal regularly produces influential reporting on major companies, the economy, and government, such as 2025 stories on Google eliminating minority hiring programs and reviewing its diversity, equity, and inclusion (DEI) programs. In 2024, the Journal posted articles detailing the perils for the sports industry in embracing online gambling and revealing that banks had sold $5.5 billion of X loans to meet rising investor interest in Elon Musk's social media company. The website also published "How Morgan Stanley Courted Dodgy Customers to Build a Wealth-Management Empire---Internal company documents describe the bank's weak anti-money-laundering controls and failure to complete due-diligence reviews as staff expressed alarm: 'We need to kill this'"; and an investigation into "The Toxic Atmosphere at the FDIC," with the subheading "how the federal banking agency failed to address sexual harassment and other toxic workplace behaviors by its employees."

In 2023, reporting produced stories on how Microsoft's $75 billion bid for Activision Blizzard "could give it an unfair advantage to dominate the video-gaming industry"; why a luxury tower built in New York City's Hudson Yards development remains 50 percent empty; and the reasons

behind a recruiting crisis for the U.S. military, which in part is due to disillusioned veterans not wanting their children to follow in their footsteps.

The Journal has written frequently and critically about Facebook, the fall of health technology company Theranos and the cryptocurrency exchange FTX, and the purchase of Twitter by Elon Musk. For example, a January 2023 article, titled ""Facebook Wanted Out of Politics. It Was Messier Than Anyone Expected," detailed stumbling by the tech giant  and how "the company's sometimes tortured efforts over the past 18 months to play down politics and other divisive topics on the platform are outlined in internal documents reviewed by The Wall Street Journal."

A weeklong 2021 series about Facebook ("The Facebook Files"), which received national attention and inspired congressional hearings, included "Facebook Knows Instagram Is Toxic for Teen Girls–Company Documents Show Its own in-depth research shows a significant teen mental-health issue that Facebook plays down in public." The article stated, "For the past three years, Facebook has been conducting studies into how its photo-sharing app affects its millions of young users. Repeatedly, the company's researchers found that Instagram is harmful for a sizable percentage of them, most notably teenage girls."

"The Facebook Files" was based on leaked company documents, and underscored how Facebook has known for years about the harms its platform can cause, including the dissemination of vaccine misinformation and its role in creating and accelerating body-image issues among young girls. "Time and again, the documents show, Facebook's researchers have identified the platform's ill effects. Time and again, despite congressional hearings, its own pledges and numerous media exposés, the company didn't fix them," The Wall Street Journal reported.

The relationship between the Journal and Facebook, now known as Meta, has been contentious. Typical of the tech company's response was a 2021 post titled "What The Wall Street Journal Got Wrong," in which Nick Clegg, Facebook's vice president of global affairs, wrote on a company blog about the weeklong series: "These stories have contained deliberate mischaracterizations of what we are trying to do, and conferred egregiously false motives to Facebook's leadership and employees. At the heart of this series is an allegation that is just plain false: that Facebook conducts research and then systematically and willfully ignores it if the findings are inconvenient for the company."

The fall of Theranos can be traced directly to 2015 articles in the Journal raising doubts about the company's technology, revealing that most of its blood tests were run on commercial blood machines occasionally altered to work with small amounts of blood, as opposed to being run on the proprietary devices the company touted. One of its key original stories that year disclosed how "Under pressure from regulators, laboratory firm Theranos has stopped collecting tiny vials of blood drawn from finger pricks for all but one of its tests, backing away from a method the company has touted as it rose to become one of Silicon Valley's hottest startups." A week later, the newspaper disclosed, "The Walgreens pharmacy chain won't open any new Theranos blood-testing centers until the startup company resolves questions about its technology, throwing a wrench into the startup's grand expansion plans."

On Nov. 10, 2015, reporter John Carreyrou, who did most of the key work for the paper and later wrote the bestseller "Bad Blood: Secrets and Lies in a Silicon Valley Startup," disclosed how

"Safeway spent about $350 million to build clinics in more than 800 of its supermarkets to offer blood tests by startup Theranos. But the tests never began, the clinics are now used largely for flu shots and travel-related vaccines, and the two companies have been negotiating to officially dissolve their partnership." Ultimately, Theranos founder Elizabeth Holmes was indicted and convicted of defrauding investors and, in November 2022, sentenced to 11 years in prison. In May 2023, she began serving her sentence in a federal prison in Texas. According to Bureau of Prisons records, her sentence was then reduced by two years.

Other examples of the paper's influential reporting include a series on TikTok, titled "How TikTok Serves Up Sex and Drug Videos to Minors — The popular app can quickly drive young users into endless spools of adult content, including videos touting drug use and promoting pornography sites."

The newspaper examined the coworking space startup WeWork, "How Adam Neumann's Over-the-Top Style Built WeWork. 'This Is Not the Way Everybody Behaves,'" and published a subsequent three-part podcast on its rise and fall of WeWork, done in conjunction with Gimlet Media. It detailed Boeing's flawed 737 MAX model, "The Four-Second Catastrophe: How Boeing Doomed the 737 MAX." The newspaper's articles span political topics and other themes beyond the financial world, such as an in-depth article headlined "The FBI Lost Our Son," which chronicled the disappearance of U.S. counterterrorism worker Billy Reilly.

WSJ.com contains an opinion section featuring regular columnists, reviews, and other editorials. Its opinion section, particularly the editorial page, has long been known for its conservative posture, summed up by its principle "free markets and free people" — a point of view that is not evident on its news pages.

The Journal has long had a big impact on financial markets, with features such as the popular "Heard on the Street" column that have caused stock prices to rise and fall.

In June 2019, The Wall Street Journal debuted a daily podcast called "The Journal." Described on the site as "a show about money, business and power," the 20-minute program focuses on a different major news story each day. A typical February 2025 episode, titled "The Snowballing Problems at Vail Resorts," examined how the ski company is "facing issues with overcrowding and labor disputes," and be both "the king of the mountain" but also "a victim of its own success."

WSJ.com also offers articles on lifestyle, fashion, travel, and the arts, with headlines such as "How to Write a Great Dating Profile,""Can Men Under 60 Wear Berets?" and "A Day in the Life of Kanye West's Set Designer." The weekend "Review" section includes one of the few robust book sections in a major newspaper.

WSJ.com also offers Chinese and Japanese editions.

### Credibility

The Wall Street Journal has a history of more than 100 years of credible reporting, with bureaus worldwide. Articles are thoroughly sourced, featuring original interviews and outside research

and reporting. Some stories draw on months or more of research and interviews, such as its 2024 expose on “toxic workplace behaviors” at the FDIC. Headlines are straightforward and accurately reflect content. Its editorial page has a reputation for being responsibly provocative and conservative on most issues.

The site’s “About The Wall Street Journal Newsroom” page describes the newspaper’s policies regarding unnamed sources, which the site says should be used in an “extremely judicious” manner, as well as its commitment to seeking diverse sources “where appropriate,” including “people of different genders, races, religions, sexual orientation, geographic base and economic circumstance.”

A Corrections & Amplifications section describes and links to recent corrections made by the paper. Articles that have been corrected also are appended with a description of the correction at the bottom.

In a Jan. 24, 2017, story, the Journal was the first of several major publications to assert that Sergei Millian, a Belarusian American businessman, was the source of some of the most sensational claims in the so-called “Steele dossier.” The dossier, a subsequently discredited opposition-research report, was assembled by Christopher Steele, a former British spy, and linked then-President Trump to a Russian government attempt to interfere in the 2016 presidential campaign.

On Nov. 4, 2021, Igor Danchenko, a Russia analyst who assisted Steele, was indicted by a U.S. grand jury for lying to the FBI. On Nov. 5, 2021, the Journal reported that “A Russia analyst who fed information to the author of a salacious dossier about Donald Trump lied to federal investigators about his interactions with a business-group official he said was a source for the document, according to an indictment unsealed Thursday.”

After the 2021 Danchenko indictment, NewsGuard asked The Wall Street Journal whether it planned to issue a correction about the role attributed to Millian in its 2017 story. In an initial email to NewsGuard, following the indictment, Steve Severinghaus, The Wall Street Journal’s then-senior director for communications, said: “We’re aware of the serious questions raised by the allegations and continue to report and to follow the investigation closely.” Asked in a second email if a correction on Millian’s involvement was planned, Severinghaus declined comment, stating that “as soon as there is an update I will let you know.”

In October 2022, Danchenko was acquitted on four counts of lying to the FBI about one of his sources. Danchenko had asserted that he got a 2016 phone call from a man who did not identify himself, but who Danchenko thought might be Millian. According to The New York Times, "At the trial, prosecutors tried to cast doubt on whether any such call had happened and, if it did, whether Mr. Danchenko really believed at the time that it was Mr. Millian. But the evidence was insufficient to persuade the jury.”

While NewsGuard found the content on WSJ.com to overwhelmingly be accurate, NewsGuard did identify a recent instance of the newspaper advancing a false claim.

In a June 2023 op-ed on then-former President Trump's indictment over his handling of classified documents after he left office, Michael Bekesha, an attorney for Judicial Watch, a conservative watchdog group, defended Trump in an op-ed. “The Presidential Records Act allows the president to decide what records to return and what records to keep at the end of his presidency,” Bekesha wrote.

However, this is not true. The Presidential Records Act requires that outgoing U.S. presidents turn over all records created under their administration before the end of their term. There is no provision that allows former presidents to sort through classified and unclassified documents after leaving office, according to legal experts and government oversight agencies.

The Journal ran a reader's response that disputed Bakesha's claim, and then published Bakesha's own response in which he sought to make a distinction between what did and did not constitute “agency records” under the act. He did not acknowledge the need for presidents to turn over all records created before they leave office, regardless of such a distinction.

In July, 2023, NewGuard sent separate emails to three Wall Street Journal editors, inquiring about why the newspaper did not run a correction. NewsGuard did not receive a response.

Despite this misstep, NewsGuard did not find any other recent instances in which WSJ,com has published uncorrected false and misleading claims. Therefore, the site meets NewsGuard’s standard for gathering and presenting news responsibly.

Commentary is published in a dedicated Opinion section, which contains articles and videos by the editorial board, regular columnists, reviews, and letters to the editor. Each opinion article is also labeled in the headline or at the top of the article.

The Wall Street Journal has won 38 Pulitzer prizes, including the 2023 award for investigative reporting for stories about “financial conflicts of interest among officials at 50 federal agencies, revealing those who bought and sold stocks they regulated and other ethical violations by individuals charged with safeguarding the public’s interest,” according to the contest’s judges.

The paper also won a Pulitzer in 2019 in the national reporting category for its coverage of then-U.S. President Donald Trump’s payoffs to women with whom he allegedly had affairs. In 2017, the paper received the Pulitzer Prize for commentary for columnist Peggy Noonan’s coverage of the 2016 presidential election.

In January 2025, it won the 2024 Hinrich Foundation Award for Distinguished Reporting on Trade from the National Press Foundation for a series of stories on China's phasing out of U.S technology and Beijing's effort to undermine U.S sanctions.

In 2022, the paper won awards from the University of Florida for its TikTok investigations, and the National Press Press Foundation for “coverage of how Beijing has used its power and political leverage to give Chinese companies a permanent advantage in the global marketplace.”

In May 2021, the newspaper won first-place awards from the Society for Advancing Business Editing and Writing (SABEW), including for its work on Facebook's stumbles to police hate speech in India, and for coverage of the failure of a high-profile entertainment startup, titled "Quibi Was Supposed to Revolutionize Hollywood. Here's Why It Failed---The instincts of Jeffrey Katzenberg and Meg Whitman, who headed the startup, proved wrong." It also won the SABEW video category for a documentary, "31 Days in March," chronicling "The Month Coronavirus Unraveled American Business."

In September 2021, the paper won its first national Emmy Award for reporter Joanna Stern's short documentary, "E-Ternal: A Tech Quest to Live Forever," which won in the category of Outstanding Science, Technology or Environmental Coverage." The documentary focused on methods to digitally preserve personal legacies, and those of loved ones, after death.

### Transparency

WSJ.com discloses its ownership by Dow Jones & Company at the bottom of the homepage and other pages, and on the About page. That page also links to a form for contacting the newsroom and for reporting corrections.

A Masthead section identifies the company's top management and editorial leadership.

Articles typically include the name of the writer, with links to the author's biography, social media accounts, and usually their email address.

Advertisements and sponsored content are distinguished from editorial content.

### History

The first products of Dow Jones & Company were brief news items called "flimsies," hand-delivered in New York City's financial district. The company launched The Wall Street Journal in 1889. Co-founder Charles H. Dow created the Dow Jones Industrial Average. The paper was aimed at the business community at a time when most newspapers focused on local or general news.

Bernard Kilgore became managing editor of The Wall Street Journal in 1941 and ran the newspaper for 25 years, expanding it to provide coverage beyond business and finance. The Journal has published many consequential articles over the years, including Pulitzer Prize winning coverage of stock market crashes and insider-trading scandals. In 1985, the Journal's "Heard on the Street" columnist, R. Foster Winans, was convicted on insider-trading charges, after he was found to have traded stocks based on what his column was about to report.

The Journal established its online version in 1996 and was one of the first newspapers to charge for its online content. News Corp acquired the Journal's publisher, Dow Jones, in 2007.

In February 2020, the Chinese government revoked the press credentials of three Wall Street Journal reporters based in Beijing, citing an opinion column in the paper referring to China as "the real sick man of Asia," which China called racist. The move marked the largest

simultaneous expulsion of multiple journalists from an international news agency by the Chinese government since the Mao era.

In 2020, The Wall Street Journal ran a marketing campaign focused on its efforts to clearly separate news and opinion. It came amid what Publisher Almar Latour told readers in an Aug. 12, 2020, letter is an overarching reality in media: "Agenda-driven reporting is on the rise; news and opinion are increasingly blended; and,not surprisingly, trust in the media has reached a new low."

"Markets demand quality," Latour wrote. "As such, there is no room to allow personal biases to mold facts to fit pre-determined narratives whether you are reporting on the economy or politics. Our journalists are committed to that."

The opinion pages would "continue to provoke thought—and, no doubt, emotions—without interference." The pages would remain committed to a philosophy of "free people, free markets," and "their independence, like that of the Journal newsroom, is backstopped by a special committee and is unassailable."

After the 2022 midterm elections, the Journal editorial page signaled that any and all original support of Trump and his presidency was over. An editorial's headline left little ambiguity: "Trump Is the Republican Party's Biggest Loser — He has now flopped in 2018, 2020, 2021 and 2022."

As is its tradition, it did not endorse a candidate in the 2024 presidential race, instead running separate editorials on Kamala Harris and Donald Trump. Its Trump editorial concluded, "A second Trump term poses risks, but the question as ever is compared to what? Voters can gamble on the tumult of Trump, or the continued ascendancy of the Democratic left. We wish it was a better choice, but that's democracy."

In February 2024, the Journal made deep cuts to its Washington bureau, targeting the economics staff in a restructuring that eliminated nearly 20 jobs, according to The Washington Post. Responsibility for the bureau's economics coverage was transferred to the business team in New York, and the U.S.-China news team was disbanded, the Post reported.

The Daily Beast, citing the union representing workers, reported that the Journal laid off 16 reporters and one columnist.

The Washington Post attributed the layoffs to a restructuring that Editor-in-Chief Emma Tucker has been conducting since her arrival in 2022. Tucker said in an email to staff that the Washington office will now cover "politics, policy, defense, law, intelligence and national security," according to the Post, and that those who were laid off can apply for new jobs that the paper has created.

"It is imperative that we have the right structure in Washington to deliver trusted, ambitious reporting for our readers in an election year and beyond," Tucker wrote in a February 2024 email to staff, the Post reported.

*Disclosure: NewsGuard co-CEO Gordon Crovitz was formerly the publisher of The Wall Street Journal, a columnist for the publication, and the executive vice president of Dow Jones and president of its Consumer Media Group.*

*Editor's Note: This Nutrition Label was updated on Feb. 6, 2025. The label was updated previously on Feb. 2, 2024, to include news of layoffs in The Wall Street Journal's Washington bureau, and on Aug. 7, 2023, May 9, 2023, Nov. 23, 2022, Nov. 23, 2021, May 16, 2021, and March 5, 2020.*

Written by: Sarah Brandt

Contributing: Peggy Ackermann

Edited by: Eric Effron, Jim Warren

Send feedback to NewsGuard

## Sources

### Ownership and Financing

https://newscorpcom.files.wordpress.com/2019/08/news-corp-fy19-10-k-as-filed.pdf

https://www.wsj.com/news/author/5464?mod=searchresults_authors

https://conferences.wsj.com//

### Content

https://mediabiasfactcheck.com/wall-street-journal/

https://www.allsides.com/news-source/wall-street-journal-media-bias

https://www.theguardian.com/media/2017/sep/10/the-wall-street-journals-trump-problem

https://www.wsj.com/news/magazine

https://globenewswire.com/news-release/2008/09/08/384258/149807/en/Journal-s-Heard-On-the-Street-Expands-Into-Global-Column-Appearing-On-All-Dow-Jones-News-Platforms.html

https://www.wsj.com/news/heard-on-the-street

https://www.jstor.org/stable/2330704?seq=1#page_scan_tab_contents

https://www.wsj.com/articles/highlights-from-2019-to-read-this-weekend-11573256947

https://www.wsj.com/articles/this-is-not-the-way-everybody-behaves-how-adam-neumanns-over-the-top-style-built-wework-11568823827?mod=article_inline

https://www.wsj.com/articles/the-four-second-catastrophe-how-boeing-doomed-the-737-max-11565966629?mod=article_inline

https://www.wsj.com/articles/the-fbi-lost-our-son-11570806358?mod=article_inline

https://www.wsj.com/articles/can-men-under-60-wear-berets-11583319619

https://www.wsj.com/articles/a-day-in-the-life-of-kanye-wests-set-designer-11583155720

https://www.wsj.com/articles/amazon-competition-shopify-wayfair-allbirds-antitrust-11608235127

https://www.wsj.com/articles/amazon-competition-shopify-wayfair-allbirds-antitrust-11608235127

https://www.wsj.com/articles/amazon-competition-shopify-wayfair-allbirds-antitrust-11608235127

https://www.wsj.com/articles/the-facebook-files-11631713039

https://about.fb.com/news/2021/09/what-the-wall-street-journal-got-wrong/

https://www.wsj.com/articles/tiktok-algorithm-sex-drugs-minors-11631052944

https://www.wsj.com/articles/a-theranos-timeline-the-downfall-of-elizabeth-holmes-a-silicon-valley-superstar-11631576110

https://www.wsj.com/articles/facebook-knows-instagram-is-toxic-for-teen-girls-company-documents-show-11631620739

https://www.wsj.com/articles/hot-startup-theranos-dials-back-lab-tests-at-fdas-behest-1444961864

https://www.wsj.com/articles/walgreens-scrutinizes-theranos-testing-1445644015

https://www.wsj.com/articles/safeway-theranos-split-after-350-million-deal-fizzles-1447205796

https://www.wsj.com/articles/lazard-ceo-ken-jacobs-prepares-to-step-down-yield-reins-to-lieutenant-c33f188e

https://www.wsj.com/articles/hudson-yards-condos-14aed09e

https://www.wsj.com/articles/why-microsofts-75-billion-bid-for-activision-blizzard-hinges-on-call-of-duty-e86df589

https://www.wsj.com/articles/military-recruiting-crisis-veterans-dont-want-their-children-to-join-510e1a25

https://www.wsj.com/podcasts/the-journal/the-hidden-workforce-that-helped-filter-violence-and-abuse-out-of-chatgpt/ffc2427f-bdd8-47b7-9a4b-27e7267cf413

https://www.wsj.com/articles/facebook-politics-controls-zuckerberg-meta-11672929976

https://www.nbcnews.com/news/us-news/disgraced-theranos-founder-elizabeth-holmes-prison-sentence-appears-sh-rcna93593

https://www.wsj.com/articles/fdic-wsj-investigation-6d9e8bf1

https://www.wsj.com/finance/banking/morgan-stanley-wealth-management-investigation-f317c71d

https://www.wsj.com/tech/google-kills-diversity-hiring-targets-04433d7c

https://www.wsj.com/video/series/wsj-take-on-the-week/will-the-sports-industry-regret-getting-into-bed-with-gambling/2B6CE05D-F0F5-488E-A0C6-71ABA8CE784D?mod=WSJvidctr_business_pos1

https://www.wsj.com/finance/banks-sell-5-5-billion-of-x-loans-after-investor-interest-surges-4b84f89c

https://www.wsj.com/podcasts/the-journal/the-snowballing-problems-at-vail-resorts/61bfb0d1-af66-4af8-9e07-a37ae0810600
(February 2025 podcast on Vail Resorts problems)

https://www.wsj.com/lifestyle/relationships/how-to-write-a-great-dating-profile-27312603?mod=lifestyle_feat3_relationships_pos2
(January 2025 lifestyle piece)

### Credibility

https://www.wsj.com/articles/corrections-amplifications-1528506507?mod=searchresults&page=1&pos=12

https://www.wsj.com/articles/color-genomics-katie-jacobs-stanton-on-her-trusted-advisers-1528459202?mod=searchresults&page=1&pos=1&mod=article_inline

https://mediabiasfactcheck.com/wall-street-journal/

https://www.britannica.com/topic/The-Wall-Street-Journal

https://awards.journalists.org/entries/wsj-com/

https://www.wsj.com/articles/new-york-times-wins-three-pulitzer-prizes-wall-street-journal-wins-commentary-prize-1491853776

https://www.dowjones.com/products/wsj/

https://www.pulitzer.org/prize-winners-by-year

https://www.wsj.com/articles/corrections-amplifications-11583280953?mod=wsjfooter&tesla=y

https://www.dowjones.com/press-room/a-note-from-wsj-editor-in-chief-matt-murray/?mod=article_inline&adobe_mc=MCMID%3D35067486330007269660390536436398939094%7CMCORGID%3DCB68E4BA55144CAA0A4C98A5%2540AdobeOrg%7CTS%3D1583370534&adobe_mc=MCMID%3D35067486330007269660390536436398939094%7CMCORGID%3DCB68E4BA55144CAA0A4C98A5%2540AdobeOrg%7CTS%3D1583370812

https://www.wsj.com/articles/about-the-newsroom-1539110913?mod=wsjfooter

https://www.wsj.com/articles/new-york-times-wins-three-pulitzers-washington-post-lands-prize-for-explanatory-reporting-11588624038

https://www.wsj.com/articles/quibi-was-supposed-to-revolutionize-hollywood-heres-why-it-failed-11604343850

https://talkingbiznews.com/they-talk-biz-news/wsj-wins-its-first-emmy-award/

https://nationalpress.org/award-story/the-wall-street-journal-wins-hinrich-trade-award/

https://www.nytimes.com/2022/10/18/us/politics/igor-danchenko-russia-acquittal-trump.html

https://www.wsj.com/articles/igor-danchenko-acquitted-of-lying-to-fbi-about-trump-russia-dossier-11666124849

https://www.pulitzer.org/prize-winners-by-year

https://www.wsj.com/articles/the-wall-street-journal-new-york-times-washington-post-win-pulitzer-prizes-e362c3e5

https://www.wsj.com/articles/clintons-sock-drawer-and-trumps-indictment-documents-pra-personal-files-13986b28?mod=Searchresults_pos4&page=1

https://account.newsguardtech.com/partner/profile/0bff0db5-a937-4c74-9a03-b717a8bc9227

https://www.wsj.com/articles/clinton-sock-drawer-trump-classified-documents-bathroom-19b8035?mod=Searchresults_pos3&page=1

https://www.wsj.com/articles/donald-trump-classified-documents-boxes-pra-records-law-54db97cc?mod=Searchresults_pos1&page=1

https://www.wsj.com/articles/corrections-amplifications-9c4362c3 (July 2023)

https://www.wsj.com/articles/corrections-amplifications-f7d34171 (July 2023)

https://www.brennancenter.org/our-work/research-reports/government-classification-and-mar-lago-documents

### Transparency

https://partners.wsj.com/prudential/business-partners-for-impact/ebay/?utm_medium=display-banner&utm_source=wsj&utm_content=wsj_content_ebay&utm_campaign=2017_dc_focused_initiative&dclid=CKyZsfy_ztsCFRJCAQodWBEJHg

https://customercenter.wsj.com/contact

https://www.wsj.com/masthead?mod=wsjfooter

https://www.wsj.com/articles/about-the-newsroom-1539110913?mod=wsjfooter

### History

https://www.britannica.com/topic/The-Wall-Street-Journal

http://online.wsj.com/public/resources/documents/info-wsjlookback06.html

http://www.niemanlab.org/2016/04/the-wall-street-journal-website-paywalled-from-the-very-beginning-turns-20-years-old-today/

https://www.encyclopedia.com/literature-and-arts/journalism-and-publishing/journalism-and-publishing/wall-street-journal

http://www.newworldencyclopedia.org/entry/The_Wall_Street_Journal

https://www.wsj.com/graphics/djia-components-history/

https://www.wsj.com/articles/SB118591182345183718

https://www.nytimes.com/1986/05/28/business/winans-conviction-upheld.html

https://www.washingtonpost.com/business/china-revokes-3-wall-street-journal-reporters-credentials/2020/02/19/dc0524cc-537a-11ea-80ce-37a8d4266c09_story.html

https://www.wsj.com/articles/china-expels-three-wall-street-journal-reporters-11582100355

https://www.latimes.com/world-nation/story/2020-02-19/china-revokes-3-wall-street-journal-reporters-credentials

https://www.wsj.com/articles/is-there-a-doctor-in-the-white-house-not-if-you-need-an-m-d-11607727380

https://www.cnn.com/2020/12/14/media/wall-street-journal-dr-jill-biden/index.html

https://www.wsj.com/articles/the-biden-team-strikes-back-11607900812

https://www.vox.com/2020/12/12/22171419/wall-street-journal-op-ed-epstein-jill-biden-sexism-elitism

https://www.wsj.com/articles/a-report-to-our-readers-11597188647

https://www.wsj.com/articles/donald-trump-is-the-gops-biggest-loser-midterm-elections-senate-house-congress-republicans-11668034869

https://www.washingtonpost.com/style/media/2024/02/01/wall-street-journal-shakes-up-dc-bureau-with-big-layoffs/

https://www.thedailybeast.com/the-wall-street-journal-slashes-dc-staff-in-newsroom-shake-up

https://www.wsj.com/opinion/donald-trump-candidacy-2024-election-kamala-harris-f8f99a69
(Trump editorial prior to 2024 election)

Terms of Service Privacy Policy

© 2026 NewsGuard® Technologies, Inc. NewsGuard Technologies, Inc. is solely responsible for the content.

PROPRIETARY INFORMATION

# Exhibit 2

# newsmax.com

The website of conservative cable TV network Newsmax, which has repeatedly published false or egregiously misleading claims about U.S. politics and health.

**20** / 100

**Proceed with Maximum Caution**: This website is unreliable because it severely violates basic journalistic standards.

| | Criteria | Points |
|---|---|---|
| ✗ | Does not repeatedly publish false or egregiously misleading content | 22 points |
| ✗ | Gathers and presents information responsibly | 18 |
| ✗ | Has effective practices for correcting errors | 12.5 |
| ✗ | Handles the difference between news and opinion responsibly | 12.5 |
| ✓ | Avoids deceptive headlines | 10 |
| ✗ | Website discloses ownership and financing | 7.5 |
| ✗ | Clearly labels advertising | 7.5 |
| ✓ | Reveals who's in charge, including any possible conflicts of interest | 5 |
| ✓ | The site provides names of content creators, along with either contact or biographical information | 5 |

Criteria are listed in order of importance. Learn More.

### Ownership and Financing

The website is owned by Newsmax Media Inc., a Florida-based company founded by Christopher Ruddy, who is the company's CEO, president, and editor-in-chief. Ruddy has described himself as a close friend of former U.S. President Donald Trump's and frequently offered commentary on the Trump administration for other news organizations.

Ruddy is the majority owner of Newsmax Media, according to a January 2025 article from The Algemeiner Journal, which covers news about the Jewish community and Israel and included Ruddy on its list of "The Top 100 People Positively Influencing Jewish Life."

Newsmax.com runs advertisements, charges for premium content, and links to an online store.

### Content

The website covers U.S. and international politics, culture, technology, and science. Sections are divided into categories including Newsfront, Health, Money, World, Politics, and Opinion.

Newsmax has a cable television network, with programming live-streamed on the site and clips from interviews posted in the site's Newsmax TV section. Individual episodes of Newsmax TV shows are hosted on a separate website, NewsmaxTV.com. Ruddy told Bloomberg Business in 2014 that, compared with Fox News, Newsmax TV is intended to be "more information-based rather than being vituperative and polarizing."

The site publishes primarily conservative columns in its Opinion section. Opinion contributors have included Republican U.S. Sen. Marsha Blackburn of Tennessee, former Republican U.S. Rep. Ron Paul, and Betsy McCaughey, a Republican former lieutenant governor of New York.

Newsmax.com supplements content produced by staff with articles by The Associated Press and Reuters.

### Credibility

While some of Newsmax's videos and articles rely on firsthand interviews with politicians or summarize reports from credible news organizations such as The Wall Street Journal and the Washington Examiner, the site has regularly published articles with false or egregiously misleading claims, including about U.S. politics and health.

For example, a January 2025 article headlined "Stop Voicing Moral Equivalency on Biden, Trump Pardons," said of the Jan. 6, 2021, attack on the Capitol, "then-House Speaker Nancy Pelosi and Washington Mayor Murial Bowser had refused an offer by the former president to deploy 10,000 National Guard troops for extra security and had urged his supporters to march peacefully and patriotically to the Capitol building to make their voices heard."

In fact, there is no evidence that Pelosi or Bowser denied a request for National Guard assistance before or during the attack on the Capitol, or that President Donald Trump authorized 10,000 National Guard troops to be deployed before Jan. 6.

Biden administration Pentagon spokesman John Kirby told The Washington Post in December 2021 that officials found no record that Donald Trump ordered the deployment of National Guard troops. Pelosi's office denied receiving such a request. "The Speaker's Office has made it clear publicly and repeatedly that our office was not consulted or contacted concerning any request for the National Guard ahead of Jan. 6," Pelosi spokesman Drew Hammill told Agence France-Presse in March 2021.

Moreover, the D.C. National Guard is controlled by the U.S. president and the executive branch, not by the Speaker of the House, and Trump would not have needed Pelosi or Bowser's approval to deploy the Guard in the nation's capital.

"Had President Trump ordered 20,000 National Guard soldiers to the Capitol before Jan. 6, it would have happened," Dwight Stirling, CEO of the Center for Law and Military Policy, a think tank whose stated mission is to "strengthen the legal protections of service members and veterans," told PolitiFact in June 2022. "No one can prevent a presidential order from being followed with regard to where troops go or what they do. That it didn't occur is evidence that no such order was issued."

Another January 2025 article titled "Dick Morris to Newsmax: Soros Award Signals Biden's 'Free-for-All,'" quoted an interview with Newsmax contributor Dick Morris on Newsmax TV's "The Count." During the interview, Morris stated: "'The Biden people had hoped that this election could be stolen. They'd hoped that the election irregularities of 2020 could be repeated and intensified, and Donald Trump wouldn't let that happen. He cracked down on fraudulent voting in most of the swing states. You saw very little of that in Georgia and North Carolina, which were epicenters of fraud in the last election."

In fact, top election officials in all 50 states affirmed the integrity of the 2020 election, according to a New York Times report. Numerous federal officials and independent observers have reached the same conclusion. In a Nov. 12, 2020, statement, the U.S. Cybersecurity and Infrastructure Security Agency (CISA), part of the Department of Homeland Security, called the 2020 election "the most secure in American history," stating, "There is no evidence that any voting system deleted or lost votes, changed votes, or was in any way compromised." Then-

Attorney General William Barr told The Associated Press on Dec. 1, 2020, that "we have not seen fraud on a scale that could have effected a different outcome in the election."

None of that countervailing evidence was mentioned in the Newsmax.com article.

A November 2024 article headlined "Ivermectin Has Anticancer Properties," stated: "A number of studies are now showing that ivermectin is a useful anticancer agent, with properties that make it even more effective than almost all chemotherapy drugs. At the least, it should be used as a powerful enhancer for traditional treatments."

In fact, health experts have said there is currently no evidence that ivermectin can successfully treat or cure cancer in humans. Skyler Johnson, a radiation oncology professor at the University of Utah, told PolitiFact in a December 2024 fact-checking article that none of the available research "supports the claim that Ivermectin is an effective treatment for cancer."

As evidence for its claims about ivermectin being a "useful anticancer agent," the Newsmax.com article referenced a study published in the journal NPJ Breast Cancer in March 2021, which the article described as finding "ivermectin could convert [breast cancer] tumors into a state that makes them excellent targets for destruction by immune cells." However, the Newsmax.com article did not mention that this study was conducted in mice, not in humans.

Dr. Peter Lee, chair of the immuno-oncology department at City of Hope Comprehensive Cancer Center in California and co-author of the study, told The Associated Press in February 2023, "Certainly by itself ivermectin is not a cure or even an effective treatment for breast cancer."

An October 2024 article titled "Dems Push to End Citizenship as Voting Requirement," stated: "A Spanish language flyer found inside walls of portable toilets at the Resource Center Matamoros nongovernmental organization (NGO) encampment south of Mexico's border with Texas confirms it all, urging many millions of migrants to vote illegally for Biden once they have arrived inside the U.S."

The article cited a report from the Oversight Project, a research arm of the conservative think tank The Heritage Foundation, saying of the flyers: "Translated from Spanish, the message states, 'Reminder to vote for President Biden when you are in the United States. We need another four years of his mandate to stay open.'"

However, Resource Center Matamoros (RCM)'s founder Gaby Zavala told The Associated Press in an article published in April 2024 – six months before the Newsmax article was posted – that her organization did not produce the flyer. Zavala said: "[The organization] does not encourage immigrants to register to vote or cast ballots in the U.S." This caveat was not included in Newsmax's article.

Moreover, NewsGuard's review of the flyer, using photo verification tool InVid, found inconsistencies with the formatting and numerous grammatical errors, suggesting it was fabricated. The tool identified inconsistencies in the formatting of RCM's logo and in the text

encouraging migrants to vote for Biden — signs of digital tampering. Also the text of the flyer was rife with basic Spanish grammatical errors, including misspelled words.

Because Newsmax.com regularly publishes false or egregiously misleading claims, including about U.S. politics and health, NewsGuard has determined that the site repeatedly publishes false or egregiously misleading content and does not gather and present information responsibly.

In previous reviews of the site, NewsGuard found numerous other examples of content that are consistent with NewsGuard's current determination. Older stories that remain on the site have advanced false claims about U.S. elections, COVID-19 vaccines, and abortion.

Although some headlines on the website have misstated facts, NewsGuard found that the articles that advanced false or egregiously misleading claims generally did not repeat those claims in headlines. For example, the January 2025 article mentioned above that advanced false claims about the 2020 U.S. presidential election was headlined "Dick Morris to Newsmax: Soros Award Signals Biden's 'Free-for-All.'"

Newsmax does not have a stated corrections policy. The most recent correction NewsGuard found in an originally reported Newsmax article was from June 2024. Because of the website's infrequent publishing of corrections, and because the website has not corrected significantly false content that remains on the website, NewsGuard has determined that Newsmax does not meet NewsGuard's standard for having effective corrections practices.

Newsmax discloses its political perspective on its About page, which states: "Newsmax Media, Inc. is a multimedia and broadcasting company that offers independent news with a conservative perspective."

Opinion articles are usually separated from news stories on the homepage and published in a dedicated section. However, content exclusive to subscribers in the site's Platinum section includes a mix of news articles and opinion, without distinguishing between the two.

For example, a January 2025 article titled "Biden's Legacy Will Be a Footnote in the Age of Trump," said of then-President Joe Biden, "His administration will be remembered for what it was: the last gasp of an aging, out-of-touch old guard too stubborn and arrogant to admit their time has passed."

Another January 2025 article headlined "Yes, Trump Could End the War in Ukraine in 100 Days," said of the Biden administration's handling of the Russia-Ukraine war, "While Biden's approach has ensured that the war battled on for three years, it has done nothing to bring it to a dignified or honorable close."

Because Newsmax.com has a dedicated opinion section, yet publishes opinionated content outside that section, NewsGuard has determined that the site does not handle the difference between news and opinion responsibly.

NewsGuard has exchanged emails and telephone calls with Newsmax since 2018, but has not received responses to a total of 25 follow-up emails seeking information about the website's content and editorial practices.

In January 2022, Newsmax CEO Christopher Ruddy asked NewsGuard to send questions by email. However, he did not respond to four emails sent over seven days seeking comment on the articles noted above, the site's approach to corrections, and its handling of opinion. Although the site itself did not reply to these multiple emails, Bill Daddi, president of New York-based DBC Brand Communications (a public relations firm), emailed NewsGuard on Newsmax's behalf in January 2022 and criticized NewsGuard's approach to assessing the accuracy of the site's health claims.

"The issue is, specifically as relates to health reporting, but that also applies to reporting in general, 'facts' are not always absolute and are subject to interpretation by the perspective of those presenting them," Daddi said. "They also evolve. This is certainly true as relates to health research. There are valid and significantly differing opinions on the topics you identified, with science on each evolving and changing over time. To present most health research as 'final' or 'established' is in itself misinformation and just patently not true. Yet it appears you aim to do so here."

In an April 2022 email to NewsGuard, Ruddy said, "We are asking that Newsguard stop sending any emails to Newsmax. We believe Newsguard holds a very liberal bias and we don't see your ratings as neutral or fair. Please alert your team to no longer send us questions. We will not respond."

### Transparency

Newsmax.com does not clearly disclose its ownership. In earlier reviews, NewsGuard found that ownership was identified through a logo for "Newsmax Media" at the bottom of the website. However, as of January 2022, the logo has been changed to only "Newsmax," along with small print that states, "Newsmax, Moneynews, Newsmax Health, and Independent. American. are registered trademarks of Newsmax Media, Inc. Newsmax TV, and Newsmax World are trademarks of Newsmax Media, Inc."

In addition, The Washington Post reported in March 2024 that in 2019 and 2020, Newsmax received a previously unknown $50 million investment from Sheikh Sultan bin Jassim Al Thani, a member of Qatar's royal family and the owner of London-based investment fund Heritage Advisors. The Post reported that Newsmax staff were told "to soften" their coverage of Qatar. Newsmax denied to the Post that it directed staff to slant Qatar coverage. Nevertheless, Newsmax.com does not inform its website readers of the investment.

Because Newsmax.com only identifies Newsmax Media in small print and does not reveal the Qatari sheikh's $50 million investment, NewsGuard has determined that the website does not meet the standard for disclosing ownership and financing.

Ruddy is listed as the site's editor-in-chief in his biography, which is found in the site's Opinion section. The biography also describes him as founder, CEO, and president of Newsmax Media

Inc. NewsGuard has determined that this disclosure, while it is not centrally located on the website, meets NewsGuard's standard for revealing who is in charge.

Most originally reported articles include the writer's name and contact and biographical information, which meets NewsGuard's standard for providing information about content creators.

Sponsored articles on Newsmax.com from native advertising platforms Revcontent and Outbrain are only labeled as "Around the Web." This does not meet NewsGuard's standard for distinguishing advertising from editorial content.

As noted above, although NewsGuard has exchanged emails and telephone calls with Newsmax since 2018, it has not received responses to a total of 25 follow-up emails seeking information about the website's transparency practices.

## History

Newsmax was founded in 1998 by Christopher Ruddy — inspired, he said, by the conservative site the Drudge Report. Michael Clemente, a former Fox News executive, was named CEO of Newsmax TV.

Ruddy's self-styled politics defy easy definition. A conservative and a critic of George W. Bush's war in Iraq, he wrote "The Strange Death of Vincent Foster," a book published in 1997 that promoted conspiracy theories about the suicide of Foster, deputy White House counsel in the Clinton White House. In more recent years, however, Ruddy has donated to the Clinton Foundation, called Bill Clinton "a friend," and defended Hillary Clinton against accusations that donations to the Clinton Foundation influenced her work as U.S. secretary of state.

Although he is not a registered Republican, Ruddy, a former reporter for the New York Post and the Pittsburgh Tribune-Review, told The Atlantic, "My sympathies are with the Republican Party." He is often described as a confidante of Trump's.

Following Donald Trump's defeat in the 2020 U.S. presidential election, Ruddy seized on the opportunity to grow Newsmax's audience with disenchanted Fox News viewers who had tuned out after Fox called the election for former Vice President Joe Biden. Newsmax, which had refused to acknowledge Biden as president-elect, saw its primetime ratings soar in the days and weeks after the election. According to The New York Times, viewership of Newsmax's top shows increased from approximately 58,000 viewers to 1.1 million — a growth spurred by the network's commitment to a pro-Trump election narrative.

"In this day and age, people want something that tends to affirm their views and opinions," Ruddy told The New York Times in a November 2020 interview. However, Vox reported in July 2021 that Newmax's viewership subsequently declined to an average of 114,000 viewers as of July 18, 2021.

In July 2020, The Daily Beast reported that Newsmax was among a string of news sites, including the Washington Examiner, The Jerusalem Post, Politicalite, and Spiked, that had been

duped into publishing opinion articles by a network of fictitious authors advancing pro-Emirati political narratives. Newsmax appears to have published at least four such articles, on topics including the relationship between Dubai's government and its business community, the use of crowdsourcing by mining companies, and potential investment opportunities in Iraq. Three of the four articles had been removed as of NewsGuard's August 2020 review, with the last — the Iraq story — remaining online as of January 2022.

In December 2020, Newsmax was sued for defamation by Eric Coomer, director of product strategy and security at Dominion Voting Systems, after Newsmax reported on the false allegation that Coomer had participated in an "Antifa conference call" to rig the 2020 election.

Newsmax settled the lawsuit in April 2021 without disclosing financial terms, retracted its original story, and apologized to Coomer. "Newsmax has found no evidence that Dr. Coomer interfered with Dominion voting machines or voting software in any way, nor that Dr. Coomer ever claimed to have done so," Newsmax said in a posting on the website. "Nor has Newsmax found any evidence that Dr. Coomer ever participated in any conversation with members of 'Antifa,' nor that he was directly involved with any partisan political organization."

As of January 2022, that retraction and apology had been removed from Newsmax.com.

In September 2024, voting-technology company Smartmatic reached a settlement with Newsmax in a defamation suit that alleged that Newsmax anchors and guests had spread false claims accusing the company of facilitating widespread fraud in the 2020 presidential election. The settlement was announced three days before opening statements in the trial were scheduled to begin.

Newsmax disclosed the terms of the settlement in a March 2025 filing with the U.S. Securities and Exchange Commission. According to the filing, Newsmax paid Smartmatic $40 million in cash and options to purchase up to 2,000 shares of Newsmax stock for $5,000 per share.

A Sept. 26, 2024, statement from Newsmax said, "Newsmax is pleased to announce it has resolved the litigation brought by Smartmatic through a confidential settlement." In a statement to CNN the same day, Smartmatic attorney Erik Connolly said of the settlement, "Lying to the American people has consequences. Smartmatic will not stop until the perpetrators are held accountable."

In August 2025, NewsMax reached a settlement with Dominion Voting Systems, which had sued the outlet in 2021 for defamation. The lawsuit sought $1.6 billion in damages for Newsmax's claims that Dominion had rigged its voting machines to favor Joe Biden in the 2020 election. Newsmax disclosed the settlement's terms in an August 2025 SEC filing stating that it would pay Dominion $67 million in three installments by Jan. 15, 2027.

In an Aug. 18, 2025, story on the website titled "Newsmax Announces Settlement With Dominion Voting Systems," the company defended its coverage, saying, "Newsmax believed it was critically important for the American people to hear both sides of the election disputes that arose in 2020. We stand by our coverage as fair, balanced, and conducted within professional standards of journalism."

The article also stated that the company chose to settle the case because it perceived bias on the part of Delaware Superior Court Judge Eric Davis. “The pattern of judicial rulings that consistently denied Newsmax due process left the company to believe it would not receive a fair trial,” the article stated. “Faced with these rulings and other constraints, Newsmax chose to settle the case.”

*Editor’s Note: This Nutrition Label was updated on Aug. 19, 2025, to include information about the terms of Newsmax’s settlement with Dominion Voting Systems. The label was updated previously on March 14, 2025, March 6, 2025, Sept. 27, 2024, March 30, 2024, Jan. 22, 2024, Jan. 21, 2023, Jan. 20, 2022, Dec. 2, 2020, and Sept. 2, 2020.*

Written by: John Gregory

Contributing: Hilary Hersh

Edited by: Eric Effron, Peggy Ackermann

Send feedback to NewsGuard

## Sources

### Ownership and Financing

https://www.bizjournals.com/pittsburgh/blog/financial-district/2015/11/trib-total-media-consolidating-publications.html

https://appext20.dos.ny.gov/corp_public/CORPSEARCH.ENTITY_INFORMATION?p_token=8E0E25BF67645A3C672BA4851914949DF7B2ACDDF8365B822D12C0D45F0443F4FC8EAE3016D683E3DD3E5E47EB214A1A&p_nameid=98AB34C3F4EE79E0&p_corpid=85B71DDB567A6A77&p_captcha=12115&p_captcha_check=8E0E25BF67645A3C672BA4851914949DF7B2ACDDF8365B822D12C0D45F0443F48100334CA3538CE86C7ECA7145B53E8B&p_entity_name=newsmax&p_name_type=A&p_search_type=BEGINS&p_srch_results_page=0

https://www.algemeiner.com/list/the-top-100-people-positively-influencing-jewish-life-2024/

https://www.nasdaq.com/markets/ipos/company/newsmax-media-inc-99540-26778

https://www.forbes.com/sites/miguelforbes/2017/03/30/newsmax-founder-defies-gravity/

https://www.newsmax.com/insiders/christopherruddy/bio-31/

https://www.theatlantic.com/politics/archive/2017/03/how-chris-ruddy-became-the-medias-favorite-friend-of-trump/519168/

https://www.forbes.com/sites/miguelforbes/2017/03/30/newsmax-founder-defies-gravity/

https://www.washingtonpost.com/blogs/erik-wemple/wp/2015/02/23/newsmax-boss-chris-ruddy-explains-why-he-gave-to-the-clinton-foundation/?utm_term=.29f96b30ffd3

https://www.amazon.com/Strange-Death-Vincent-Foster-Investigation/dp/074324253X

https://www.nytimes.com/2011/07/11/business/media/newsmax-a-compass-for-conservative-politics.html?pagewanted=all

https://www.theatlantic.com/politics/archive/2017/03/how-chris-ruddy-became-the-medias-favorite-friend-of-trump/519168/

https://www.newsmax.com/insiders/christopherruddy/bio-31/

https://www.fec.gov/data/disbursements/?two_year_transaction_period=2012&data_type=processed&committee_id=C00489781&recipient_name=newsmax&min_date=01%2F01%2F2011&max_date=12%2F31%2F2012

https://www.opensecrets.org/news/2012/12/super-pac-for-america/

https://www.usatoday.com/story/news/politics/2014/02/11/super-pac-names/5375699/

https://www.fec.gov/data/disbursements/?two_year_transaction_period=2012&data_type=processed&recipient_name=newsmax&min_date=01%2F01%2F2011&max_date=12%2F31%2F2012

https://www.fec.gov/data/disbursements/?two_year_transaction_period=2014&data_type=processed&recipient_name=newsmax&min_date=01%2F01%2F2013&max_date=12%2F31%2F2014

https://www.fec.gov/data/disbursements/?two_year_transaction_period=2016&data_type=processed&recipient_name=newsmax&min_date=01%2F01%2F2015&max_date=12%2F31%2F2016

https://www.fec.gov/data/disbursements/?data_type=processed&recipient_name=newsmax&two_year_transaction_period=2018

https://www.fec.gov/data/disbursements/?data_type=processed&recipient_name=newsmax&two_year_transaction_period=2020

https://www.vanityfair.com/news/2008/02/scaife200802

https://www.politico.com/blogs/media/2015/02/newsmax-pledged-1m-to-clinton-foundation-202803

https://web.archive.org/web/20180730170554/https://www.newsmax.com/ChristopherRuddy/clinton-foundation-cash-controversy/2015/04/27/id/640856/

https://www.forbes.com/2009/03/06/newsmax-christopher-ruddy-business-media-ruddy.html#780496ba1bf1

https://web.archive.org/save/https://www.newsmax.com/headline/newsmax-tv-michael-clemente-ceo/2018/04/09/id/853426/

https://www.bloomberg.com/research/stocks/private/person.asp?personId=53362991&privcapId=4245059

https://web.archive.org/web/20180730173556/https://www.newsmax.com/newsfront/bill-clinton-scaife-memorial-service/2014/08/02/id/586474/

https://nypost.com/2018/07/18/conservative-media-boss-told-trump-he-opposed-sinclair-tribune-merger/

https://www.mypalmbeachpost.com/news/national/newsmax-thrives-conservative-voice-west-palm-beach/RJYOoEzvyYfY0AOBsenf2J/

Ruddy's stake

https://www.foliomag.com/christopher-ruddy/

https://www.forbes.com/sites/miguelforbes/2017/03/30/newsmax-founder-defies-gravity/

https://www.sun-sentinel.com/florida-jewish-journal/fl-jjps-qatar-0523-20180516-story.html

https://www.politico.com/story/2018/05/08/qatar-newsmax-ruddy-al-jazeera-trump-573242

https://www.marketwatch.com/story/rush-limbaugh-matt-drudge-trail-newsmax

https://www.post-gazette.com/news/crime-courts/2020/01/22/scaife-pittsburgh-settlement-trust-fund-orphans-court-estate-battle-tribune-review/stories/202001220120

https://www.post-gazette.com/local/east/2015/10/06/Scaife-inheritance-tax-return-gives-glimpse-of-lavish-life/stories/201510060160

What became of Scaife's stake

https://www.post-gazette.com/business/pittsburgh-company-news/2015/11/10/Tribune-Review-to-lay-off-153-in-sweeping-restructuring-pittsburgh/stories/201511100147

https://www.wtae.com/article/trib-total-media-announces-layoffs-tribune-review-merging-with-other-newspapers/7475021

https://www.bizjournals.com/pittsburgh/news/2015/11/10/trib-total-media-ceo-we-re-saying-goodbye-to-a-lot.html

https://www.newsmax.com/advertise/

IPO:
https://finance.yahoo.com/news/newsmax-completes-150-million-preferred-140000182.html

### Content

https://www.facebook.com/pg/newsmax/about/?ref=page_internal

https://www.newsmaxtv.com/

https://shop.newsmax.com/Product.aspx?ProductCode=NMM

https://www.bloomberg.com/news/articles/2014-03-06/newsmaxs-chris-ruddy-preps-tv-network-to-rival-fox-news

https://www.politico.com/story/2018/05/08/qatar-newsmax-ruddy-al-jazeera-trump-573242

https://www.newsmax.com/insiders/senmarshablackburn/id-803/

https://www.newsmax.com/insiders/mccaughey/id-115/

https://www.newsmax.com/insiders/ronpaul/id-305/

Original news article:
https://www.newsmax.com/newsfront/donald-trump-executive-orders-education/2025/01/29/id/1197048/

From TV:
https://www.newsmax.com/newsmax-tv/katie-britt-newsmax-patel/2025/01/30/id/1197161/

Reuters:
https://www.newsmax.com/politics/donald-trump-faa-chris-rocheleau/2025/01/30/id/1197175/

AP: https://www.newsmax.com/scitech/helicopter-army-plane/2025/01/30/id/1197107/

### Credibility

WSJ: https://www.newsmax.com/newsfront/china-covid-19-virus/2024/01/17/id/1149908/

Washington Examiner:
https://www.newsmax.com/newsfront/hunter-biden-house-oversight-contempt-charge/2024/01/15/id/1149658/

Jan. 2025, National Guard on Jan. 6:
https://web.archive.org/web/20250130191620/https://www.newsmax.com/LarryBell/blockades-bowser-clemency/2025/01/29/id/1197003/

https://www.politifact.com/factchecks/2022/jun/13/sean-hannity/no-evidence-pelosi-rejected-trumps-authorization-2/

https://www.washingtonpost.com/politics/2021/12/15/no-trump-did-not-order-10000-troops-secure-capitol-jan-6/

https://centerforlaw.org/

https://factcheck.afp.com/pelosi-did-not-reject-appeals-troops-secure-us-capitol

Jan. 2025, Dick Morris 2020 fraud: https://archive.ph/41sLG

https://apnews.com/article/barr-no-widespread-election-fraud-b1f1488796c9a98c4b1a9061a6c7f49d

https://www.cisa.gov/news/2020/11/12/joint-statement-elections-infrastructure-government-coordinating-council-election

https://s.wsj.net/public/resources/documents/PreliminaryReportoftheOASEOMUSA2020.pdf

https://www.nytimes.com/2020/11/10/us/politics/voting-fraud.html

Nov. 2024, ivermectin and cancer: https://web.archive.org/web/20241201214450/https://www.newsmax.com/health/dr-blaylock/ivermectin-cancer-immunity/2024/11/12/id/1187786/

https://archive.ph/IRyco

https://www.politifact.com/factchecks/2024/dec/30/facebook-posts/no-cancer-is-not-a-parasite-and-ivermectin-cant-cu/

https://www.nature.com/articles/s41523-021-00229-5

https://apnews.com/article/fact-check-ivermectin-nih-cancer-cure-629592291079

Oct. 2024, RCM flyer: https://web.archive.org/web/20250130200214/https://www.newsmax.com/larrybell/voting-citizenship-democrats/2024/10/20/id/1184806/

https://apnews.com/article/migrants-shelter-flyer-mexico-voting-conspiracy-theories-e02f14ef0763684f2919dc84e9ef2458

https://www.wakinggiants.me/blog/gabyzavala

https://web.archive.org/web/20240415072344/https://www.resourcecentermatamoros.com/new-page-3

Sept. 2023, Trump National Guard claim: https://web.archive.org/web/20240118160150/https://www.newsmax.com/murdock/ballots-democracy-electoral/2023/09/11/id/1133995/

Jan. 2024, Ladapo DNA claim: https://web.archive.org/web/20240119204244/https://www.newsmax.com/politics/joseph-ladapo-covid-19-vaccines/2024/01/04/id/1148290/

https://www.fda.gov/media/174875/download

https://api.newsguardtech.com/label/medpagetoday.com?cid=3b1a5596-faad-4a67-8282-fe3e724d6251

https://www.factcheck.org/2024/01/faulty-science-underpins-florida-surgeon-generals-call-to-halt-mrna-covid-19-vaccination/

https://www.miamiherald.com/news/coronavirus/article283840483.html

https://www.scientificamerican.com/article/no-covid-mrna-vaccines-wont-damage-your-dna1/

https://www.genome.gov/about-genomics/fact-sheets/Understanding-COVID-19-mRNA-Vaccines

https://archive.vn/WmaCM (voter fraud claim)

Pennsylvania ballots claim: https://web.archive.org/web/20230117204445/https://www.newsmax.com/newsfront/ballots-pennsylvania-midterms/2022/10/29/id/1094013/

https://www.dos.pa.gov/about-us/Documents/statements/2022-10-28-ResponseRepRyan-Letter.pdf

https://www.dos.pa.gov/about-us/Documents/statements/2022-10-27-Statement-UnverifiedMailBallot.pdf

VAERS #1:
https://web.archive.org/web/20230118211547/https://www.newsmax.com/reagan/myocarditis-clots-vaxxed/2022/12/17/id/1100895/

VAERS #2:
https://web.archive.org/web/20230118211554/https://www.newsmax.com/reagan/biologics-pharma-vaers/2022/03/08/id/1060225/

https://www.cdc.gov/vaccines/covid-19/reporting/requirements/supporting-jurisdictions.html

https://www.factcheck.org/2021/12/scicheck-increase-in-covid-19-vaers-reports-due-to-reporting-requirements-intense-scrutiny-of-widely-given-vaccines/

https://www.usatoday.com/story/news/factcheck/2021/06/28/fact-check-covid-19-vaers-death-reports-not-verified/7587577002/

https://vaers.hhs.gov/docs/VAERS_Table_of_Reportable_Events_Following_Vaccination.pdf

https://www.cdc.gov/vaccinesafety/hcproviders/reportingadverseevents.html

https://www.thelancet.com/journals/laninf/article/PIIS1473-3099(22)00320-6/fulltext

https://www.cdc.gov/coronavirus/2019-ncov/vaccines/safety/adverse-events.html

Women's Health Protection Act:
https://web.archive.org/web/20230118183719/https://www.newsmax.com/michaeldorstewitz/casey-plannedparenthood/2022/06/27/id/1076261/

https://www.reuters.com/world/us/bill-that-would-protect-abortion-rights-faces-dim-chances-us-senate-2022-02-28/

https://www.congress.gov/bill/117th-congress/senate-bill/4132/text

https://apnews.com/article/fact-check-abortion-law-democrats-205822809847

October 2019 correction:
https://www.newsmax.com/john-gizzi/george-soros-maine-susan-collins-democrats/2019/10/20/id/937892/

July 2023 correction:
https://www.newsmax.com/us/senate-kids-online/2023/07/23/id/1128196/

January 2024 correction:
https://www.newsmax.com/politics/ron-desantis-faith-leaders/2024/01/14/id/1149509/

June 2024 correction:
https://www.newsmax.com/politics/house-oversight-james-comer/2024/06/17/id/1169013/

Daily Beast/fake columnist articles

https://www.thedailybeast.com/right-wing-media-outlets-duped-by-a-middle-east-propaganda-campaign

https://www.newsmax.com/finance//sovereign-iraq-investment-capital/2020/02/19/id/954770/

http://archive.is/540Qi

https://www.newsmax.com/finance/raphaelbadani/china-canada-trade-relations/2019/11/08/id/940794/

http://archive.is/BYjjO

https://www.newsmax.com/finance/raphaelbadani/crowdsourcing-mining-companies-communities/2020/06/08/id/971058/

http://archive.is/E6ilT

https://www.newsmax.com/Finance/raphaelbadani/dubai-middle-east-turmoil/2020/01/14/id/949758/

http://archive.is/V5BBl

https://www.statnews.com/2020/07/08/a-flawed-covid-19-study-gets-the-white-houses-attention-and-the-fda-may-pay-the-price/

https://www.detroitnews.com/story/news/local/michigan/2020/07/31/anthony-fauci-henry-ford-health-hydroxychloroquine-study-flawed/5559367002/

https://www.ijidonline.com/action/showFullTableHTML?isHtml=true&tableId=tbl0005&pii=S1201-9712%2820%2930534-8

https://www.newsmax.com/archives/christopherruddy/31/2021/12/

https://www.newsmax.com/ruddy/donaldtrump-atlantic/2020/09/05/id/985565/

About page: https://www.newsmax.com/about/

Jan. 2025 news/opinion: https://archive.ph/946pF

Jan. 2025 news/opinion, Russia-Ukraine: https://archive.ph/Fuuml

Dec. 2023 news/opinion:
https://web.archive.org/web/20240117031934/https://www.newsmax.com/platinum/gop-white-house-vice-president/2023/12/20/id/1146578/

Nov. 2023 news/opinion:
https://web.archive.org/web/20240118192138/https://www.newsmax.com/platinum/conservative-lawmakers-museum/2023/11/13/id/1142024/

https://web.archive.org/web/20221230134632/https://www.newsmax.com/platinum/democrats-vacations-winter/2022/12/29/id/1102291/

https://web.archive.org/web/20230117200130/https://www.newsmax.com/platinum/democrats-defund-police/2022/10/21/id/1092814/

https://www.newsbusters.org/blogs/free-speech/joseph-vazquez/2022/01/12/breaking-outlets-slam-newsguard-propaganda-report

### Transparency

https://www.newsmax.com/contact/

https://www.forbes.com/sites/miguelforbes/2017/03/30/newsmax-founder-defies-gravity/2/#4a767a9f67a0

Christopher Ruddy biography https://www.newsmax.com/insiders/christopherruddy/bio-31/

https://www.newsmax.com/allinsiders/

Examples of article with bio and contact info:
https://www.newsmax.com/newsfront/donald-trump-special-counsel-jack-smith/2023/11/09/id/1141636/

https://www.newsmax.com/newsfront/georgia-da-trump-election-interference/2024/01/10/id/1149050/

https://www.netizen.co/

https://www.newsmax.com/unused-NewsmaxFeedBuyLink/

https://www.washingtonpost.com/nation/2024/03/26/qatar-newsmax-investment/?utm_source=postup&utm_medium=email&utm_campaign=MorningMediaNewsfeed_Newsletter_240327080150&recip_id=435557&lyt_id=435557

### History

https://www.facebook.com/pg/newsmax/about/?ref=page_internal

https://www.nytimes.com/2011/07/11/business/media/newsmax-a-compass-for-conservative-politics.html?pagewanted=all

Ruddy/Trump relationship

https://www.theatlantic.com/politics/archive/2017/03/how-chris-ruddy-became-the-medias-favorite-friend-of-trump/519168/

https://www.ft.com/content/8edaa310-1ade-11e8-956a-43db76e69936

https://www.nytimes.com/2017/02/05/us/politics/trump-white-house-aides-strategy.html

https://www.politico.com/story/2018/05/08/qatar-newsmax-ruddy-al-jazeera-trump-573242

\https://www.nytimes.com/2020/11/29/business/media/newsmax-chris-ruddy-trump.html

https://www.npr.org/2021/04/30/992534968/newsmax-issues-retraction-and-apology-to-dominion-employee-over-election-stories

https://www.businessinsider.com/dominion-executive-eric-coomer-defamation-lawsuit-amended-2021-3

Coomer retraction:
https://web.archive.org/web/20210519152130/https://www.newsmax.com/newsfront/eric-coomer-dominion-voting-systems/2021/04/30/id/1019671/

Now removed:
https://www.newsmax.com/newsfront/eric-coomer-dominion-voting-systems/2021/04/30/id/1019671/

Dominion lawsuit:
https://www.nbcnews.com/tech/security/newsmax-oann-sued-maker-voting-machines-rcna1636

Smartmatic lawsuit:
https://www.washingtonpost.com/politics/2021/11/04/smartmatic-sues-newsmax-oan-2020-us-election/

https://www.vox.com/2021/7/28/22594550/newsmax-ratings-dive-explained

https://www.cnn.com/2024/09/26/media/newsmax-smartmatic-settle-defamation-case/index.html

https://www.newsmax.com/newsfront/newsmax-litigation-smartmatic/2024/09/26/id/1181875/

https://abcnews.go.com/US/newsmax-reaches-settlement-smartmatic-claims-2020-election/story?id=114233659

March 2025 SEC filing with Smartmatic settlement terms:
https://www.sec.gov/Archives/edgar/data/2026478/000121390025021989/ea0233655-253g1_newsmax.htm

August 2025 settlement with Dominion Voting Systems

https://www.sec.gov/ix?doc=/Archives/edgar/data/0002026478/000121390025077611/ea025361001-8k_newsmax.htm#fact-identifier-18

https://www.nytimes.com/2025/08/18/business/media/newsmax-dominion-defamation-lawsuit-settlement.html

https://www.newsmax.com/newsfront/newsmax-settlement-dominion/2025/08/18/id/1222903/

https://www.cnn.com/2025/08/18/media/newsmax-dominion-settle-2020-election-defamation-lawsuit?utm_source=business_ribbon

https://apnews.com/article/dominion-voting-newsmax-defamation-trump-2020-3b2366dfdae3a8432afe822bf14fe1ef

Terms of Service Privacy Policy

© 2026 NewsGuard® Technologies, Inc. NewsGuard Technologies, Inc. is solely responsible for the content.

PROPRIETARY INFORMATION

# Exhibit 3

*Democracy Dies in Darkness*

# This company rates news sites' credibility. The right wants it stopped.

NewsGuard, which prizes its nonpartisan criteria, has become a prime target of the GOP's battle against disinformation watchdogs.

December 24, 2024 More than **1 year ago**

By Will Oremus and Naomi Nix

When veteran newsmen L. Gordon Crovitz and Steven Brill started their news site rating company, they were prepared for the inevitable cries of bias from both sides.

What they didn't anticipate was that NewsGuard, their company of about 50 employees, would become the target of congressional investigations and accusations from federal regulators that it was at the vanguard of a vast conspiracy to censor conservative views.

Since 2018, NewsGuard has built a business offering advertisers nonpartisan assessments of online publishers — backed by a team of journalists who assess which sites are reputable and which can't be trusted. It uses a slate of nine standard criteria, such as whether a site corrects errors or discloses its ownership and financing, to produce a zero to 100 percent rating.

Crovitz, a former publisher of the Wall Street Journal and a Republican, and Brill, a left-tending independent who founded Court TV and the American Lawyer magazine, engaged with publishers wanting to understand subpar ratings, sometimes wrangling for hours by phone over the details of a site's correction policy.

But conservatives now question the company's premise. Brendan Carr, President-elect Donald Trump's pick to lead the Federal Communications Commission, accused the company of facilitating a "censorship cartel," in a November letter to leading tech platforms. Noting that key legal protections depend on tech executives operating "in good faith," Carr continued: "It is in this context that I am writing to obtain information about your work with one specific organization — the Orwellian named NewsGuard."

**Right-leaning outlets get mixed scores from NewsGuard**

NewsGuard ratings for selected publishers, with 100 being a perfect score




Source: NewsGuard WILL OREMUS / THE WASHINGTON POST

NewsGuard, backed by legal experts, argues that Carr's letter may violate the First Amendment by threatening the speech rights of private companies.

"The only attempt to censor going on here is by Brendan Carr," Crovitz said in an interview.

At a time when social media, podcasts and partisan outlets are displacing the mainstream media as news sources, the battle over NewsGuard's future is symptomatic of a broader societal struggle over who gets to arbitrate the truth. And Carr's letter potentially heralds a Trump administration prepared to wield state power to win that battle.

When NewsGuard launched, fighting disinformation was still a bipartisan battle. Revelations the year before that Kremlin-backed operatives had manipulated American social networks to mislead and divide Americans had shaken Silicon Valley and troubled Republicans and Democrats alike. Tech executives such as Facebook's Mark Zuckerberg were lambasted by lawmakers in testy televised hearings for their failure to fight fake news.

**NewsGuard**
@NewsGuardRating · Follow

A Russian disinformation network boosted the number of "pink slime" outlets — sites that present themselves as independent local news outlets but are instead funded by partisan groups — to 1,265, outnumbering the websites of 1,213 daily newspapers left in the U.S., according to Show more

4:57 PM · Jun 11, 2024

132 Reply Copy link

Read 4 replies

Despite the battering, tech giants didn't particularly want to play truth police on their platforms. Crovitz and Brill offered them a solution: Pay NewsGuard to sift the real news sites from the propaganda peddlers.

"We're going to apply common sense to a problem the algorithms haven't been able to solve," Brill told "CBS Mornings" that year. "It's going to be very simple … telling the difference between the Denver Post and the Denver Guardian, which is a hoax site."

Users of NewsGuard products — which include a free browser extension for Microsoft Edge and extensions you can buy for other major browsers — see each publisher's credibility score beside any link to its articles in search results or on social media.

A recent Google search for "government shutdown," with NewsGuard's ratings enabled, turned up articles from Rolling Stone magazine, which scored 87.5 percent; NBC's Austin affiliate, which scored 92.5 percent; and World Socialist Web Site, which scored 7.5 percent. Clicking on the rating for each brings up NewsGuard's assessment of the site. (World Socialist Web Site, it warns, is a far-left, for-profit enterprise that has "published false claims about the Russia-Ukraine War." Reached for comment, World Socialist Web Site spokesman Joseph Kishore said NewsGuard's rating "is not based on objective assessment but political prejudice against our socialist perspective.")

But if rating news sites seemed like a straightforward endeavor, navigating an increasingly fractured and partisan information landscape has turned out to be anything but.

## Brand safety

NewsGuard landed a high-profile early client in Microsoft, which incorporated the company's credibility ratings into its Edge browser. Google, Facebook and other internet giants opted to use their own opaque algorithms to decide which sites and posts would rise to the top of users' search results and feeds.

Brill and Crovitz found more demand among online advertisers and brand safety groups looking for tools to ensure their ads don't run on scammy news sites or alongside bogus claims. While other such tools existed, including Integral Ad Science and DoubleVerify, NewsGuard stood out in the way that it publishes its assessments of media outlets.

In addition to its publisher credibility ratings, NewsGuard began tracking specific false narratives that it saw spreading across disreputable sites. Brill said NewsGuard keeps a "catalogue of provably false claims" — not matters of opinion, such as "abortion is bad," but definitively debunked factual claims such as "the moon landing didn't happen."

"There are advertisers that don't want to advertise on a website that has articles saying that Dominion voting machines were rigged or the coronavirus vaccine will kill you," Brill said in an interview.

Jason Kint, CEO of the publisher trade group Digital Content Next, said marketers need to assure brand safety. "Given the Wild West nature of the web, it's important to have tools that can provide accurate data," he said, to "avoid harm to the brand and weed out fraudulent and illegal sites."

The rise of generative artificial intelligence has expanded the potential market for NewsGuard's products. No major AI company wants its flagship chatbot parroting falsehoods it found on fake news sites. Brill and Crovitz declined to say which ones they're working with other than Microsoft.

Six years after its launch, NewsGuard has attained what Brill called "sustainable profitability." But he and Crovitz no longer enjoy friendly bipartisan audiences in Washington.

Instead, they find themselves a central target of Republicans' wide-ranging war on content moderation — a practice many on the right deem censorship — with their reputation and their business at stake.

## The 'censorship-industrial complex'

During his first term, Trump routinely clashed with the mainstream media and social networks over their attempts to fact-check his statements, especially when he began contesting the 2020 election as fraudulent. After the attack on the Capitol on Jan. 6, 2021, the major social networks banned or indefinitely suspended Trump, earning his ire and stoking suspicion on the right that online content moderation was fundamentally a liberal plot to muzzle disfavored views.

That sense helped to motivate Elon Musk's purchase of Twitter in 2022 and intensified with the publication of the "Twitter Files," a series of tweets by a group of journalists Musk handpicked to comb through internal Twitter documents for evidence of overzealous content moderation and anti-conservative bias. Among the documents was a 2021 pitch to Twitter executives by NewsGuard, which Twitter Files co-author Lee Fang called "an opaque proxy for its government and corporate clients to stifle views that simply run counter to their own interests."

When Republicans took control of the House in 2023, newly installed committee chairmen including Jim Jordan (R-Ohio) of the Judiciary Committee, James Comer (R-Kentucky) of the Oversight Committee and Roger Williams (R-Texas) of the Small Business Committee launched investigations into what they deemed censorship of Americans' views. Their targets included Big Tech companies, the Biden administration, misinformation researchers — and NewsGuard.

Williams's Small Business Committee produced a 66-page report in September on what it called the "censorship-industrial complex," which criticized the State Department and Defense Department for awarding hundreds of thousands of dollars in grants to NewsGuard. The report found that NewsGuard selects "winners and losers in the news media space" through its ratings and products for advertisers. It accused the company of bias for, among other things, giving high ratings to mainstream outlets such as the Associated Press and NPR that ran what the report deemed misleading headlines about Donald Trump's comments on the 2024 campaign trail.

Since Trump's election victory, some of his picks for top regulatory positions have made tackling online "censorship" a priority and cast NewsGuard as an emblem of the problem. His pick to succeed trustbuster Lina Khan as Federal Trade Commission chair, Andrew Ferguson, wrote in a December filing that he would support using antitrust laws to break up censorship "cartels," mentioning NewsGuard by name.

Carr's letter last month accused the tech executives of participating in "a censorship cartel that included not only technology and social media companies but advertising, marketing, and so-called 'fact-checking' organizations as well as the Biden-Harris Administration itself." In mentioning that the tech industry's prized liability shield, Section 230, only applies when they operate "in good faith," Carr suggested that working with NewsGuard might be putting that protection at risk.

NewsGuard has also been targeted by conservative regulators over its grants from the Pentagon to track disinformation efforts by Russia, China and Iran targeting Americans and U.S. allies.

Crovitz and Brill said they fought off an attempt by Congress last year to add a restriction to a key defense funding bill that would have barred the Pentagon from using NewsGuard. They believe that effort and Carr's letter followed inaccurate reporting about its work by right-leaning publisher Newsmax, which had expressed dissatisfaction with its low ratings from NewsGuard.

NewsGuard replied to Carr in a Dec. 10 letter, saying his letter cited factual errors about its work that had been reported by Newsmax. The claim that advertising firms use NewsGuard to censor conservative views, for instance, is belied by more conservative outlets being rated as credible than liberal ones, NewsGuard said.

Carr was also wrong about the companies that use its products, the company said. Of the four companies Carr wrote to — Apple, Meta, Microsoft and Google — only Microsoft has publicly acknowledged working with NewsGuard, though it declined to comment on that work for this article. Meta and Google told The Washington Post they do not use NewsGuard's products.

Apple did not respond to requests for comment, and NewsGuard declined to say whether it works with Apple, citing a policy against discussing whether it works with specific companies unless those companies publicly disclose the relationship.

Reached by email, Carr said he had heard back from all four companies and had never assumed that all of them had ties to NewsGuard. "I wanted confirmation from the ones that I did not think worked with NewsGuard that they don't actually work with NewsGuard," he wrote. He said NewsGuard is purposely withholding information about its business.

"Suffice to say that NewsGuard's response and its conduct since I raised these issues a few weeks back has only heightened and underscored my concerns," he said. "NewsGuard's response is a jumble of disinformation, deception and sleight of hand. In other words, it mirrors NewsGuard's business model, in my opinion."

Carr has not responded to NewsGuard's request for a meeting, Crovitz said, "apparently preferring to continue to rely on falsehoods to censor us." Brill said people on the Hill, whom he declined to name, told him Newsmax has been driving the Republican campaign against NewsGuard, offering legislators and regulators airtime whenever they criticize or take action against the company.

Reached via email, Newsmax chief executive Chris Ruddy called Brill "a longtime Democratic Party activist" and said: "Brill is free to make up any ratings he wants, but any business or ad agency that uses them is clearly taking political sides."

## Jawboning

The kind of public pressure NewsGuard faces is making news a perilous environment for advertisers and their clients, industry insiders say.

"All of those companies have business with the government," said one former ad executive, who spoke on the condition of anonymity out of concern for retribution by the Trump administration. "Nobody's going to want to risk their ire. … What marketers will end up doing is avoiding news entirely."

Musk, who has called NewsGuard "a propaganda shop that will produce any lies you want if you pay them enough money," has already achieved that chilling effect. In August, his social media company X filed a lawsuit against the Global Alliance for Responsible Media (GARM), an industry coalition that develops brand safety guidelines, accusing the group of violating antitrust laws. Days later, GARM, which was led by the World Federation of Advertisers, shut down.

In October, another industry effort to encourage advertisers to buy ads on credible news outlets collapsed after one of the agencies involved got a letter from Jordan alleging their work could be illegal.

Some First Amendment experts say Carr leaning on tech companies to distance themselves from NewsGuard is closer to censorship than anything NewsGuard does.

Offering opinions as to news sites' credibility, as NewsGuard does, "is emphatically speech," said Ari Cohn, senior tech policy counsel at the nonpartisan Foundation for Individual Rights and Expression (FIRE).

"For Carr to write to the platforms and basically threaten them that if they utilize this protected expression he's going to go after them is just First Amendment problem upon First Amendment problem," Cohn said.

The irony, he added, is that it comes after four years in which Republican leaders criticized and even sued the Biden administration over allegations of "jawboning," or applying undue government pressure to private entities to suppress speech. That's exactly what Carr is doing now, Cohn argued.

Brill said the pressure from the right hasn't cost the company any clients that he is aware of, but it has taken a toll on the company in other ways. Instead of focusing full-time on its misinformation research and news ratings, it has had to spend money on legal fees and time and energy explaining and defending its practices to politicians, clients and the public.

Crovitz had a more personal complaint about the criticism he has received from some fellow Republicans. "They refer to me as a liberal," he said, "which I find to be slander."

### What readers are saying

The comments largely support NewsGuard's approach to rating news sites' credibility, viewing it as a necessary tool to combat disinformation. Many commenters express concern over the right-wing's opposition to fact-checking and disinformation research, suggesting that such... Show more

This summary is AI-generated. AI can make mistakes and this summary is not a replacement for reading the comments.

# Exhibit 4

☰ DEADLINE TIP US

*BREAKING NEWS*

'Dawson's Creek' & 'Varsity Blues' Star James Van Der Beek Dies At 48: Obit, Career In Photos & Hollywood Tributes

HOME / BUSINESS / NEWS

# Attacking The Watchdog: How Media Rating Site NewsGuard Ended Up As A Target For GOP Lawmakers And Regulators



By Ted Johnson
December 19, 2024 12:17pm

DEADLINE

TIP US




Listen to this article now 12 min listen

Powered by Trinity Audio

00:00 12:04 1.0x

**UPDATED, with Newsmax statement and Brill response:** As Donald Trump targets news outlets for new lawsuits, his choices to lead key regulatory agencies have a media watchdog in their sights.

NewsGuard, a media reliability rating service launched in 2018, has been the source of claims made by Brendan Carr, incoming chair of the FCC, and Andrew Ferguson, incoming chair of the FTC, as well as Capitol Hill figures such as House Speaker Mike Johnson. Their claim: NewsGuard is out to "blacklist conservative news sources," as Johnson put it in a statement last week.

But NewsGuard —along with a host of press freedom advocates — argue that not only are the attacks misguided, but they are, ironically enough, the very type of government pressure that threatens to chill speech protected by the First Amendment.

ADVERTISEMENT

DEADLINE

TIP US

## Related Stories



U.S. Added 130,000 Jobs In January As Hiring Picks Up; Showbiz Sees Employment Increase



Too Big Or Too Small: Five Takeaways As Senators Weigh Local News, TV Ownership Limits And Trump's Surprise…

"The Constitution protects the expression of groups like NewsGuard, which simply provide opinions on the credibility of content and information sources that other services may choose to adopt or ignore at their discretion," Ari Cohn, lead counsel on tech policy for the Foundation for Individual Rights and Expression, or FIRE, recently wrote.

**Watch on Deadline**

of journalists to review news sites and give them a score of 0-100, information that is used by consumers and clients including AI companies, search engines, news aggregators, brands and researchers. Advertisers, for instance, use the data to weigh brand safety, a bigger challenge in an age of programmatic placement.

Carr has long called out major tech platforms for what he sees as censorship of conservative voices, and has even characterized it as a "censorship cartel," while citing a legal rationale for FCC authority over social media content moderation practices. Last month, in a letter to major tech companies, Carr claimed that NewsGuard was "leveraging its partnerships with advertising agencies to effectively [censor] targeted outlets." Earlier this month, Ferguson also singled out NewsGuard in a statement, saying that it is "free to rate websites by whatever metric it wants. But the antitrust laws do not permit third parties to facilitate group boycotts among competitors."

ADVERTISEMENT

NewsGuard, though, says that Carr and Ferguson are being misled in their attacks by one of the news outlets that scored low, Newsmax, rated 20/100 by their service. Newsmax recently settled a lawsuit brought by Smartmatic after it amplified claims that the election systems company help rig the 2020 presidential election.

When House Oversight Committee Chairman James Comer launched an investigation into NewsGuard and appeared on Newsmax last summer, one of its star personalities, Rob Schmitt, said "their goal is obviously to bully conservative media out of existence."

Moreover, NewsGuard disputes the notion that they are going after conservative sites and not liberal ones.

ADVERTISEMENT




Responding to Carr's claims last month, Crovitz emphasized that its service was apolitical and said that "many conservative sites get higher ratings from us than liberal sites get, such as Fox News getting a higher score than MSNBC and The Washington Examiner outscoring The New York Times." He added that "Newsmax may not like our rating, but that is no excuse for them to validate their low rating with inaccurate claims about NewsGuard or to mislead Commissioner Carr."

It's not just Newsmax. Another outlet on the right, One America News Network, also claimed NewsGuard was part of a "radical left" effort to "shut down all opposition," and it reported on Comer's investigation into the media ratings service.

"The tack taken by two conservative and far right ones, OAN and Newsmax, has been to publish stories making false claims about our process, and to lobby members of Congress and regulators to threaten to censor us," Crovitz said.

ADVERTISEMENT

"And then those members of Congress and regulators mysteriously Newsmax or OAN a scoop that they are coming after us and then they get on their television shows," said Brill.

"I think about it as an unvirtuous circle," said Crovitz.

outlet. Newsmax accused DirecTV of a "blatant act of political discrimination and censorship." Republican lawmakers spoke out against the satellite broadcaster, and even threatened to hold hearings, before a distribution deal was ultimately reached.

Newsmax did not respond to a list of questions, but said in a statement, "All you need to know about NewsGuard is that it was founded and headed by Steven Brill, a longtime Democratic party activist and donor and his ratings clearly reflect his political bias. Brill is free to make up any ratings he wants, but any business or ad agency that uses them is clearly taking political sides."

ADVERTISEMENT

OAN did not respond to request for comment.

Brill, though, has spent a career in journalism, not politics. He called Newsmax's claim "pure fiction — as accurate as Newsmax's reporting about voting machines in the 2020 election.

"My only 'activism' for a politician was my work for a Republican mayor of New York when I was a law student. As a journalist I am probably best known for books taking down the Teamsters and teachers unions. When I was not a journalist, I have donated to both Republicans and Democrats. But what counts is that our rating criteria are apolitical and applied equally. Newsmax is bitterly upset that its score is nearly 50 points below Fox News."

In a letter to Carr earlier this month, Brill and Crovitz have pushed back on other claims, including that NewsGuard rated that Chinese state media as credible, and that they judged the Covid lab leak theory as misinformation. Rather, they wrote that NewsGuard was just the type of service that Carr advocated for in Project 2025, the Heritage Foundation playbook for the next administration, rather than leave such selection up to major internet platforms.

ADVERTISEMENT

NewsGuard touts its service to advertisers as a way for brands to use their data "to craft custom news targeting or safety segments based on their standards. Advertisers can use NewsGuard's more than 40 data and metadata points to create a campaign that matches their brand-suitability guidelines."

(Full disclosure: Deadline, which also is rated by NewsGuard, received a 100/100 score.)

NewsGuard outlines how sites are rated and publishes complaints from publishers who take issue their reviews, and some outlets vigorously challenge their score. Among them: The leftward DailyKos and the Russian site Pravda.

One leftward site, Consortium News, sued NewsGuard last year, along with the U.S. government, alleging that a contract with the Department of Defense Cyber Command contract led to "a pattern and practice of labelling, stigmatizing and defaming American media organizations that oppose or dissent from American foreign and defense policy, particularly as to Russia and Ukraine."

ADVERTISEMENT

Consortium News was given a score of 47.5 out of 100, with the NewsGuard Nutrition Label stating that it "frequently published false and misleading claims about the war in Ukraine and other important subjects." NewsGuard said that it had "determined that the site repeatedly publishes false content and does not gather and present information responsibly."

"As a private organization unaffiliated with the United States government, NewsGuard has a First Amendment right to form and disseminate its own opinions about the reliability and journalistic ethics of news outlets," NewsGuard said in response the Consortium lawsuit.

NewsGuard also said that the government contract, which has ended, was not for its rating of news publishers, but a "fingerprints data" service that tracks false narratives being spread online by foreign governments.

Nevertheless, last year, amid GOP attacks on efforts to root out misinformation, a provision was placed into the defense funding bill that singles out NewsGuard and the Global Disinformation Index, placing restrictions on using their data when it comes to recruitment advertising. A similar provision was placed in this year's bill. But Brill has said that NewsGuard does not have, and never has had, any advertising contracts with the U.S. government "in the first place."

ADVERTISEMENT

over right-leaning ones." But Crovitz has disputed the findings as a small sample of the more than 10,000 sites it has rated.

Whether NewsGuard has a political bias is also beside the point, as their critiques and ratings are protected by the Constitution, argue some free speech advocates, who also make another point: What poses a threat is when a government official uses the bully pulpit to threaten some sort of sanction.

Shortly after Carr's attack on NewsGuard, Jacob Sullum, the senior editor at the libertarian site Reason, argued that the company would be protected by the First Amendment even if it "were systematically biased against conservative voices. But there is little evidence to support that claim."

"It is certainly true that fact-checkers and news media analysts are fallible and may be biased, and there is no shortage of complaints about specific calls that NewsGuard has made," Sullum wrote. "But the crucial difference between a business like NewsGuard and the government is that only the latter has the power to coerce compliance. People are free to evaluate NewsGuard's judgments, accept or reject them, and act accordingly."

ADVERTISEMENT

The offices of Carr and Ferguson did not respond to requests for comment.

Antitrust experts also are skeptical of Ferguson's suggestion that NewsGuard has legal exposure when it comes to antitrust law. NewsGuard itself has challenged the notion that Newsmax has been the victim of an ad boycott, pointing to an investor presentation show advertising revenue is projected to grow by 228% since 2020.

Bill Kovacic, professor of law at Georgetown University and director of the Competition Law Center, said that the difficulty in proving a "conspiracy among rivals" antitrust case would be that NewsGuard was "coordinating an effort among the advertisers not to deal with" certain sites, and then to show that those advertisers "are agreeing among each other."

The challenge would be to prove that NewsGuard is "engaging advertisers as a group to take a certain path."

NewsGuard's Brill and Crovitz said that they are doing no such thing.

Brill said, "We're not a licensee of the FCC. They have zero jurisdiction. If they had jurisdiction, what they would be purporting to penalize us for is for doing journalism. It's like saying I am going to penalize Consumer Reports because it's giving people information when they are looking to buy a toaster."

He added that when it comes to brands, "We're not telling them what to do, but to the extent that we are telling anyone what to do, we're telling them to read our journalism so they can learn more about the reliability of news and information websites."

**READ MORE ABOUT:** DONALD TRUMP / ELECTIONLINE / GORDON CROVITZ / NEWSGUARD / NEWSMAX / ONE AMERICA NEWS NETWORK / STEVE BRILL

Comments

## Subscribe to Deadline

Get our Breaking News Alerts and Keep your inbox happy.

Sign Up

ADVERTISEMENT

**No Comments**

DEADLINE

TIP US

ADVERTISEMENT

# Trending on Deadline

Movie From Radio Silence; Pic Hits Theaters Early Summer 2028



2 / James Van Der Beek Dies: 'Dawson's Creek' & 'Varsity Blues' Star Who Battled Cancer Was 48



3 / Sarah Michelle Gellar, Chad Michael Murray, Julie Plec & More Mourn James Van Der Beek: "A Generational Icon"



4 / Jason Momoa To Star In Sony's Feature Take Of 'Helldivers' Video Game From Justin Lin; Fall 2027 Release Set




5 / 'Bridgerton' Star Claudia Jessie Lands Role As Suspicious Detective Investigating Glenn Close's Maud In Channel 4's 'Up To No Good'



6 / Bud Cort Dies: 'Harold And Maude' Actor Was 77



7 / Prime Video Greenlights Adaptation Of Chloe Walsh's BookTok Sensation 'Boys Of Tommen' As Internationals Boss Nicole Clemens Sets Out Stall



8 / 'Lights Out' Series Based On Navessa Allen's Dark Romance Novels In Development At Netflix; Hannah Schneider To Adapt For TV




9 / Remembering James Van Der Beek: A Career In Photos



10 / Universal, Lord & Miller & Maximum Effort's 'Everyday Parenting Tips' Sets Jonathan Krisel As Director; Travis Braun Adapting



ADVERTISEMENT

DEADLINE

TIP US

DEADLINE

Signup for Breaking News Alerts & Newsletters

Your Email email@example.com

SIGN UP

By providing your information, you agree to our **Terms of Use** and our **Privacy Policy**. We use vendors that may also process your information to help provide our services. This site is protected by reCAPTCHA Enterprise and the Google **Privacy Policy** and **Terms of Service** apply.

DEADLINE

TIP US




**Rohan Shah Named President Of Camelback Productions' Board As Kumail Nanjiani & Lata Krishnan Join**



**AMC Networks Posts Mixed Q4 Results As Streaming Overtakes Linear TV As Top U.S. Revenue Source**



**Kelly Marie Tran Signs With Gersh**



**Vir Das, India's Premier Standup Comedian, To Launch U.S. Tour This Month**

## Marketplace

## Newswire

### Deadline

About Us

Advertise

### Legal

Terms of Use

Privacy Policy

Accessibility

AdChoices

### Sitemap

TV

Film

Awards

Box Office

Business

International

DEADLINE

TIP US

*Get our latest storiesin the feed of your favorite networks*

## Have a Tip?

*We want to hear from you! Send us a tip using our annonymous form.*

SEND US A TIP

## Stay in the Know

*Sign up for our breaking news alerts*

Your Email email@example.com

By providing your information, you agree to our **Terms of Use** and our **Privacy Policy**. We use vendors that may also process your information to help provide our services. This site is protected by reCAPTCHA Enterprise and the Google **Privacy Policy** and **Terms of Service** apply.

Deadline is a part of Penske Media Corporation. © 2026 Deadline Hollywood, LLC. All Rights Reserved.
Powered by WordPress.com VIP

OUR SITES

# Exhibit 5

← Post

**Andrew Ferguson**
@AFergusonFTC

Big win for free speech. One of the major organs of the censorship industrial complex goes down.

No government agency should be in the business of policing speech. Nebulous terms like "misinformation," "disinformation," and "malinformation," really mean any speech which goes against the elite consensus in DC and Silicon Valley.

In 2022, the FTC issued a report that praised the Global Engagement Center for "defend[ing] against foreign disinformation and propaganda," and suggested the GEC was best "positioned to advise Congress" on how to counter disinformation. But Congressional investigations revealed the GEC funded the Global Disinformation Index and NewsGuard, which led collusive ad-boycotts—possibly in violation of our antitrust laws—to censor the speech of conservative and independent media in the United States.

**Mike Benz** @MikeBenzCyber · Nov 11, 2024
Oh no anything but that

WSJ

SUBSCRIBE SIGN IN

Censors Domestic Citizens

NATIONAL SECURITY

# State Department Division That ~~Battles Foreign Disinformation~~ Faces Closure

The Global Engagement Center, which has been criticized by Elon Musk, may be shut down as Trump prepares to take power

*By Michael R. Gordon* Follow *and Dustin Volz* Follow

*Nov. 10, 2024 at 10:00 am ET*

8:51 PM · Nov 11, 2024 · **572.5K** Views

47 473 2.4K 95

# Exhibit 6

← **Post**

**Andrew Ferguson**
@AFergusonFTC

@MikeBenzCyber is a tireless defender of free speech. I talked with him about how the FTC can combat censorship and promote innovation.

**Mike Benz** @MikeBenzCyber · Nov 24, 2024

I spoke today with @AFergusonFTC, who laid out a compelling vision for how the FTC can take on advertiser boycott collusion and Big Tech collusion in the Internet censorship space to protect consumers, promote market competition, and save free speech online.




9:33 AM · Nov 27, 2024 · **510** Views

1 3 2

# Exhibit 7

# Bannon’s WarRoom, Show Clip Roundup 11/30/2024 [AM]

Episode 4093: Holding The Newly Elected Accountable and Episode 4094: Democrats Refuse To Accept 2024 Election Results



by **Kari Donovan** (https://warroom.org/author/kdonovan/)

— November 30, 2024 (https://warroom.org/bannons-warroom-show-clip-roundup-11-30-2024-am/)

in **SHOW NOTES** (https://warroom.org/category/shownotes/) Reading Time: 2 mins read

Home (https://warroom.org) › SHOW NOTES (https://warroom.org/category/shownotes/)

## BEST OF BANNON SPEECHES | Steve Bannon Speaks To Council Of National Policy

Steve Bannon opened the Saturday morning WarRoom and played footage from his Nov 2024 Council of National Policy speech. In his opening, Bannon emphasized themes of turbulence, resilience, and historical significance in his commentary. He linked the resistance faced by President Trump and the MAGA movement to broader efforts to reshape the American government and economy. Bannon highlighted the importance of hedging against uncertain times, endorsing Birch Gold as a sponsor while promoting precious metals as a safeguard against instability.

In reflecting on his recent speeches, which he described as some of his best, Bannon shared a particular address delivered to the Council for National Policy (CNP), a prominent conservative

organization influential in policy-making. In this speech, he argued for President Trump's place in the historical context, comparing him to figures like George Washington and Abraham Lincoln. According to Bannon, Trump comprehends his pivotal role in the nation's trajectory and the public's need to process the alleged 2020 election theft.

Bannon reaffirmed his belief that the election was stolen and criticized the left's framing of democracy as the central issue. He conveyed an unwavering commitment to the MAGA agenda and Trump's return to power, positioning these as part of a historical arc of transformative leadership.



## Naomi Wolf Walks Through President Trump's Picks For Health-Freedom Cabinet Picks

Naomi Wolf talked about her support of President Trump and the Cabinet picks he has made so far, focusing on Robert Kennedy Jr.




## Darren Beattie Reveals How The Left's Finally Confronting How Unpopular Their Message Is

Darren Beattie talked about the surprising creation of President Trump's victory from the left. Beattie mentions several people who are very upset about President Trump getting back to the White House. He talked about the apparent internal conflicts these people had from being forced to accept that the American people had rejected their political message and were never as popular as the corporate media had led them to believe.




## Ferguson Discusses How Trump Administration Can End Government-Enforced Censorship On Social Media

Andrew Ferguson, FTC Commissioner, highlighted critical issues around government-contracted NGOs and public-private collusion to suppress speech. He criticized government partnerships with platforms like Facebook and YouTube during COVID-19 and election controversies, where officials pressured platforms to censor “disinformation.” Ferguson called this Orwellian, emphasizing the First Amendment protects free speech from government interference.

He expressed concerns about advertiser cartels where companies collectively refuse to advertise on platforms that allow free speech. Such actions could violate antitrust laws designed to ensure fair competition. Ferguson urged a Trump administration FTC to investigate these practices.

He also discussed the “deep state,” a bureaucratic apparatus resistant to change and often misaligned with voter priorities. Ferguson stressed the need for personnel reform, stating, "Personnel is policy.” He advocated appointing individuals committed to transparency and aligning government actions with American interests.

Ferguson sees Trump’s re-election as an opportunity to redirect the government toward public interest. Ending censorship, investigating antitrust violations, and reforming the administrative state would ensure Americans retain their voice. "This country depends on the free exchange of ideas,” he said, underscoring that suppressing speech undermines democracy and the marketplace of ideas.




Previous Post

The New American Revolution: Bannon's Vision for a Populist Resurgence [SPEECH]

Next Post

Andrew Ferguson's FTC Vision: Breaking Censorship Cartels and Taming the Deep State

(https://warroom.org/the-new-american-revolution-bannons-vision-for-a-populist-resurgence-speech/)

(https://warroom.org/andrew-fergusons-ftc-vision-breaking-censorship-cartels-and-taming-the-deep-state/)

Show Episodes (https://warroom.org/category/warroom-full-episodes/) / Topics (https://warroom.org/category/geopolitics/china/) / Events (https://warroom.org/event-gallery-menu/) / Sponsors (https://warroom.org/sponsors/) / Get Active! (#) / Contact Us (https://warroom.org/contact/) / SIGN UP (https://stevebannonswarroom.com/)

© 2025 WarRoom

# Exhibit 8

FEDERAL COMMUNICATIONS COMMISSION
WASHINGTON, DC 20554

Brendan Carr
Commissioner

November 13, 2024

Mr. Sundar Pichai
Chief Executive Officer
Alphabet Inc.

Mr. Satya Nadella
Chief Executive Officer
Microsoft Corporation

Mr. Mark Zuckerberg
Chief Executive Officer
Meta Platforms, Inc.

Mr. Tim Cook
Chief Executive Officer
Apple Inc.

Dear Messrs. Pichai, Zuckerberg, Nadella, and Cook,

Over the past few years, Americans have lived through an unprecedented surge in censorship. Your companies played significant roles in this improper conduct. Big Tech companies silenced Americans for doing nothing more than exercising their First Amendment rights. They targeted core political, religious, and scientific speech. And they worked—often in concert with so-called "media monitors" and others—to defund, demonetize, and otherwise put out of business news outlets and organizations that dared to deviate from an approved narrative.

Congressional investigations, press reports, and other evidence show that in many cases you did not act alone. Rather, you participated in a censorship cartel that included not only technology and social media companies but advertising, marketing, and so-called "fact-checking" organizations as well as the Biden-Harris Administration itself.[1] The relevant conduct extended from removing or blocking social media posts to labeling whole websites or apps as "untrustworthy" or "high-risk" in an apparent effort to suppress their information and viewpoints, including through efforts to delist them, lower their rankings, or harm their profitability. This censorship cartel is an affront to Americans' constitutional freedoms and must be completely dismantled. Americans must be able to reclaim their right to free speech. Indeed, our democracy depends on freedom of expression.

---

[1] Michael Shellenberger, The Censorship-Industrial Complex, Part 2, Testimony Before the U.S. House Select Subcommittee on the Weaponization of the Federal Government (Nov. 30, 2023), https://judiciary.house.gov/sites/evo-subsites/republicans-judiciary.house.gov/files/evo-media-document/shellenberger_testimony.pdf; *see also* U.S. House Judiciary Committee, Interim Staff Report, *GARM's HARM: How the World's Biggest Brands Seek to Control Online Speech* (July 10, 2024) ("*Judiciary GARM Report*"), https://judiciary.house.gov/media/press-releases/how-worlds-biggest-brands-seek-control-online-speech; *see also* Letter from Mark Zuckerberg to The Hon. Jim Jordan (Aug. 26, 2024), https://x.com/JudiciaryGOP/status/1828201780544504064.

I am confident that once the ongoing transition is complete, the Administration and Congress will take broad ranging actions to restore the First Amendment rights that the Constitution grants to all Americans—and those actions can include both a review of your companies' activities as well as efforts by third-party organizations and groups that have acted to curtail those rights.

For now, I am writing to obtain information from you that can inform the FCC's work to promote free speech and a diversity of viewpoints. As you know, Big Tech's prized liability shield, Section 230, is codified in the Communications Act, which the FCC administers.[2] As relevant here, Section 230 only confers benefits on Big Tech companies when they operate, in the words of the statute, "in good faith."[3]

It is in this context that I am writing to obtain information about your work with one specific organization—the Orwellian named NewsGuard.[4] As exposed by the Twitter Files, NewsGuard is a for-profit company that operates as part of the broader censorship cartel.[5] Indeed, NewsGuard bills itself as the Internet's arbiter of truth or, as its co-founder put it, a "Vaccine Against Misinformation."[6] NewsGuard purports to rate the credibility of news and information outlets and tells readers and advertisers which outlets they can trust.[7] As the U.S. House Committee on Small Business 2024 Staff Report stated, "[t]hese ratings, combined with NewsGuard's vast partnerships in the advertising industry, select winners and losers in the news media space."[8] NewsGuard does so by leveraging its partnerships with advertising agencies to effectively censors targeted outlets.

---

[2] FCC General Counsel, *The FCC's Authority to Interpret Section 230 of the Communications Act* (Oct. 21, 2020), https://www.fcc.gov/news-events/blog/2020/10/21/fccs-authority-interpret-section-230-communications-act.

[3] 47 U.S.C. § 230(c) & (c)(2).

[4] *See, e.g.*, Sandy Fitzgerald, *Rep. Comer to Newsmax: NewsGuard's Methods Must Be Probed*, Newsmax (June 21, 2024), https://www.newsmax.com/newsmax-tv/james-comer-newsmax-newsguard/2024/06/20/id/1169509/; *see also* Letter from Rep. James Comer to NewsGuard, Committee on Oversight and Accountability (June 13, 2024), at 1, https://oversight.house.gov/wp-content/uploads/2024/06/Newsguard-Letter-061324.pdf ("The Committee on Oversight and Accountability is investigating the impact of NewsGuard on protected First Amendment speech and its potential to serve as a non-transparent agent of censorship campaigns").

[5] Michael Shellenberger, The Censorship Industrial Complex, Testimony Before the U.S. House Select Subcommittee on the Weaponization of the Federal Government (Mar. 9, 2023), https://docs.house.gov/meetings/IF/IF16/20230328/115561/HHRG-118-IF16-20230328-SD012.pdf?ref=drishtikone.com.

[6] Lee Fang, *Meet NewsGuard: The Government-Backed Censorship Tool Billed as an Arbiter of Truth*, The Federalist (Nov. 15, 2023), https://thefederalist.com/2023/11/15/meet-newsguard-the-government-backed-censorship-tool-billed-as-an-arbiter-of-truth/.

[7] The U.S. House Committee on Small Business, Interim Staff Report, *Small Business: Instruments and Casualties of the Censorship-Industrial Complex*, Report, at 42 (Sept. 2024) ("*U.S. House Committee on Small Business, CIC Report*"), https://smallbusiness.house.gov/uploadedfiles/house_committee_on_small_business_-_cic_report_september_2024.pdf.

[8] *Id.*

NewsGuard also works with web browsers, including Google's Chrome, Apple's Safari, and Microsoft's Bing. NewsGuard has partnered with social media companies. And it offers products for AI systems and app stores. In other words, your products may use NewsGuard or you may enable your customers to use NewsGuard.

But NewsGuard's own track record raises questions about whether relying on the organization's products would constitute "good faith" actions within the meaning of Section 230. For one, reports indicate that NewsGuard has consistently rated official propaganda from the Communist Party of China as more credible than American publications.[9] For another, NewsGuard aggressively fact checked and penalized websites that reported on the COVID-19 lab leak theory.[10] For still another, the Small Business Committee and multiple Media Research Center studies detail numerous instances where NewsGuard apparently does not apply its own rating system in an even-handed manner.[11] The list goes on.

Indeed, NewsGuard is the subject of an ongoing investigation by the U.S. House Committee on Oversight and Accountability for its impact on protected First Amendment speech.[12] And while NewsGuard claims that its mission is to provide apolitical guidance on "misinformation," NewsGuard undercuts this claim by retaining on its Advisory Board at least one person that signed the now infamous October 2020 letter from former intelligence community officials that flamed the false claim that the Hunter Biden laptop story was Russian disinformation—a letter that itself fueled a wave of censorship.

To help inform FCC action, please provide me with the following:

1. A list of every one of your products or services (if any, including advertising) that use or rely on any NewsGuard product, service, or ranking.

2. A list of every one of your products or services (if any) that enables any of your users or customers to use or rely on any NewsGuard product, service, or ranking.

3. If you offer an advertising service, provide details on the use of any media monitor or fact checking service, including NewsGuard, that you may utilize.

---

[9] *See, e.g.*, Joseph Vazquez, *MRC Exposes NewsGuard for Leftist Bias Third Year in a Row*, Media Research Center (Dec. 12, 2023) ("Media Research Center Analysis"), https://newsbusters.org/blogs/free-speech/joseph-vazquez/2023/12/12/mrc-exposes-newsguard-leftist-bias-third-year-row.

[10] *Judiciary GARM Report* at 26; *see also* Michael Shellenberger, *X Post* (Aug. 3, 2023), https://x.com/shellenberger/status/1687141879014391809.

[11] *U.S. House Committee on Small Business, CIC Report* at 44–48; *see also* Media Research Center Analysis.

[12] U.S. House Committee on Oversight and Accountability, *Comer Demands NewsGuard Disclose All Government Contracts Amid Censorship Concerns* (June 10, 2024), https://oversight.house.gov/release/comer-demands-newsguard-disclose-all-government-contracts-amid-censorship-concerns/.

4. If you use third party advertising or marketing agencies to enable advertising within or with your products, please identify the advertising or marketing agencies you work or partner with.

I appreciate your prompt attention to this initial request. It can help ensure that a true diversity of viewpoints can flourish in this country as envisioned by the First Amendment. Please provide your complete response by **December 10, 2024**.

Sincerely,

Brendan Carr

# Exhibit 9

Office of Commissioner
Andrew N. Ferguson

UNITED STATES OF AMERICA
**Federal Trade Commission**
WASHINGTON, D.C. 20580

**Concurring Statement of Commissioner Andrew N. Ferguson**
**FTC v. 1661, Inc. d/b/a GOAT**
**Matter Number 2223016**

December 2, 2024

I concur fully in the filing of this complaint and stipulated order and write separately only to address an issue raised in Commissioner Holyoak's thoughtful concurrence. My colleague urges the Commission to investigate online platforms for unfair acts or practices relating to their opaque, unpredictable processes for banning users and censoring content. She is right. President Trump himself asked the Commission in 2020 to investigate such practices.[1] When Americans' ability to engage in robust public debate on issues of national importance is at stake, no stone should be left unturned. The Commission should undertake these investigations.

Using Section 5 to enforce the penumbra of contract law is only one of many tools at our disposal. We should use all the tools we have. We should address not just censorious conduct specifically, but also investigate the structural issues that may have given these platforms their power over Americans' lives and speech in the first place. In particular, we must vigorously enforce the antitrust laws against any platforms found to be unlawfully limiting Americans' ability to exchange ideas freely and openly. We must prosecute any unlawful collusion between online platforms, and confront advertiser boycotts which threaten competition among those platforms.

Addressing potential structural problems is necessary even if the Commission successfully enforces the platforms' terms of service. Suppose that, in response to Commission action, the platforms honestly disclose their content policies and comply with them. Consumers could then choose to use platforms that provided free-speech-respecting products rather than those that do not. This would be an improvement over the status quo. But the choice would be real only if there are suitable free-speech-respecting substitutes to the censorious platforms. X right now is such a platform. But that is a recent phenomenon; X was once as censorious as the rest. Its current turn toward free expression is due only to its new owner's unusually firm commitment to free and open debate. Other online platforms remain far more censorious. Moreover, the major social media platforms may not necessarily be suitable substitutes for each other based on their characteristics and uses. They appear to occupy several unique niches, and a creator banned from one platform cannot count on earning a living by posting the same content on another platform.

Even if the various platforms are in some measure substitutes for each other, there is another problem. For years, the major speech platforms seemed to censor in lockstep. They banned dissent on the origins of COVID-19, mask mandates, the efficacy and safety of COVID-19 vaccines, transgenderism, and the integrity of the 2020 election. Every major speech platform—Snapchat, Facebook, Twitter, Instagram, and YouTube—banned President Trump roughly

[1] Exec. Order No. 13925, 85 Fed. Reg. 34079 (May 28, 2020).

contemporaneously in early 2021.[2] And this phenomenon was never more obvious than in 2020, when major Big Tech platforms simultaneously banned reporting on, and discussion of, the Hunter Biden laptop story.[3]

The antitrust laws generally do not forbid competitors from engaging in unilateral, parallel conduct—that is, identical or substantially similar conduct that occurs at about the same time but coincidentally.[4] They do, however, prohibit agreements among competitors not to compete.[5] If the platforms colluded amongst each other to set shared censorship policies, such an agreement would be tantamount to an agreement not to compete on contract terms or product quality.[6] "[A]s far as the Sherman Act … is concerned, concerted agreements on contract terms are as unlawful as boycotts."[7]

The prospect of Big Tech censorship collusion is not merely hypothetical. Litigation has revealed the proclivity of some Big Tech firms to conspire on censorship policies. In *Missouri v. Murthy*,[8] several States sued the United States and alleged that officials of the federal government coerced Big Tech firms to suppress "misinformation" on the platforms in violation of the First Amendment. "Misinformation," of course, being Newspeak for ideas and speech inconsistent with progressive orthodoxy. The censored content "touched on a host of divisive topics like the COVID-19 lab-leak theory, pandemic lockdowns, vaccine side-effects, election fraud, and the Hunter

[2] *Which social media platforms have banned Trump and why? An overview*, FoxNews.com, Aug. 5, 2024, https://www.foxnews.com/politics/trump-remains-permanently-blocked-from-snapchat-after-sequence-blockings-from-top-platforms-2021.

[3] Concurring and Dissenting Statement of Comm'r Andrew N. Ferguson, Regarding the Social Media and Video Streaming Services Report, Matter No. P205402, 9–10 (Sept. 19, 2024).

[4] *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 227 (1993) ("[C]onscious parallelism, describes the process, not in itself unlawful, by which firms in a concentrated market might in effect share monopoly power, setting their prices at a profit-maximizing, supracompetitive level by recognizing their shared economic interests and their interdependence with respect to price and output decisions."); *Theatre Enters, Inc. v. Paramount Film Distrib. Corp.*, 346 U.S. 537, 541 (1954) ("[T]his Court has never held that proof of parallel business behavior conclusively establishes agreement or, phrased differently, that such behavior itself constitutes a Sherman Act offense. …'conscious parallelism' has not yet read conspiracy out of the Sherman Act entirely."); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) (dismissing Sherman Act Section 1 claim for failure to plead more than parallel conduct explaining "prior rulings and considered views of leading commentators," are clear that "lawful parallel conduct fails to bespeak unlawful agreement."). There are, of course, some prohibitions on unilateral conduct carried out by monopolists. See *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 767–68 (1984) ("In part because it is sometimes difficult to distinguish robust competition from conduct with long-run anti-competitive effects, Congress authorized Sherman Act scrutiny of single firms only when they pose a danger of monopolization. Judging unilateral conduct in this manner reduces the risk that the antitrust laws will dampen the competitive zeal of a single aggressive entrepreneur.").

[5] See *Standard Oil Co. of New Jersey v. United States*, 221 U.S. 1, 58 (1911) (Section 1 prohibits agreements that are "unreasonably restrictive of competitive conditions").

[6] Cf. *FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 459 (1986) (agreement between dentists to refuse to submit x-rays to dental insurers for use in benefits determinations limiting consumer choice violated antitrust law because the argument "that an unrestrained market in which consumers are given access to the information they believe to be relevant to their choices will lead them to make unwise and even dangerous choices … amounts to 'nothing less than a frontal assault on the basic policy of the Sherman Act.'" (quoting *Nat'l Soc'y of Pro. Eng'rs.*, 435 U.S. 679, 695 (1978)); *Paramount Famous Lasky Corp. v. United States*, 282 U.S. 30, 36–41 (1930) (agreement between film producers to distribute films only subject to the terms of a standard contract including arbitration provision violated antitrust law).

[7] *Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 803 (1993).

[8] 603 U.S. 43 (2024).

Biden laptop story."[9] The Supreme Court ultimately concluded that the States had failed to demonstrate that their speech was removed because of government coercion, as opposed to decisions made by the platforms of their own volition.[10] But discovery in that case revealed the shocking extent of the collaboration between various organs of the federal government—including the White House, CDC, FBI, CISA, and State Department—and Big Tech firms to suppress dissident speech.[11] The record thus demonstrates that Big Tech firms were happy to work with others to determine their censorship policies—a point driven home by the Supreme Court's conclusion that government coercion did not principally drive Big Tech censorship. If they were coordinating those policies with each other, they may have violated the antitrust laws.

There is another danger to free speech on Big Tech platforms that may fall within our antitrust bailiwick: advertiser boycotts. Shortly after Twitter (now X) was purchased by a free-speech champion, major advertisers raced for the door and refused to advertise on X. Concerted refusals to deal—also known as group boycotts—are illegal under the Sherman Act.[12] According to X, this mass advertiser exodus was concerted, and was facilitated by the World Federation of Advertisers' Global Alliance for Responsible Media (GARM) initiative.[13] GARM described itself as a coalition of "marketers, media agencies, media platforms, industry associations, and advertising technology solutions providers to safeguard the potential of digital media by reducing the availability and monetization of harmful content online."[14] According to the House Judiciary Committee, GARM may have been a conspiracy of major advertisers that facilitated boycotts of conservative and libertarian websites, podcasts, platforms, and political candidates in order to protect "brand safety" from "misinformation."[15] GARM ceased its operations in the face of litigation by X.

GARM's dissolution, however, has not abated the risk of advertiser boycotts that raise Sherman Act problems. NewsGuard, for example, "is a domestic for-profit business that rates the credibility of news and information outlets and tells readers and advertisers which outlets they can trust."[16] Like GARM, NewsGuard claims to promote "brand safety" for advertisers. "NewsGuard leverages 'human intelligence' (journalists on staff) to dictate an outlet's trustworthiness. Those deemed 'untrustworthy' are then compiled into 'exclusion lists,' with 'trustworthy' sites on

---

[9] *Missouri v. Biden*, 83 F.4th 350, 259 (5th Cir. 2023) (per curiam), *rev'd*, 603 U.S. 43 (2024).
[10] *Murthy*, 603 U.S. at 59–60.
[11] See *Missouri v. Biden*, 680 F. Supp. 3d 630, 645–89 (W.D. La. 2023).
[12] See, e.g., *Associated Press v. United States*, 326 U.S. 1, 9, 15–19 (1945) (bylaws of publishing agency violated antitrust law where they prohibited dealings with nonmembers and authorized members to block their competitors from obtaining membership); *FTC v. Superior Ct. Trial Laws. Ass'n*, 493 U.S. 411, 424 (1990) (group boycott violated antitrust law regardless of "[t]he social justifications proffered for [the challenged] restraint of trade").
[13] See Compl., *X Corp. v. World Fed'n of Advertisers*, 7:24-cv-00114 (N.D. Tex. Aug. 6, 2024). Rumble similarly filed suit, alleging such an unlawful conspiracy. Compl., *Rumble Inc. v. World Fed'n of Advertisers*, 7:24-cv-00115 (N.D. Tex. Aug. 6, 2024).
[14] Interim Staff Report of the Comm. on the Judiciary U.S. House of Representatives, GARM's Harm: How the World's Biggest Brands Seek to Control Online Speech, at 1 (July 10, 2024) (quotation marks omitted), https://judiciary.house.gov/sites/evo-subsites/republicans-judiciary.house.gov/files/evo-media-document/2024-07-10%20GARMs%20Harm%20-%20How%20the%20Worlds%20Biggest%20Brands%20Seek%20to%20Control%20Online%20Speech.pdf.
[15] *Id*. at 2–4.
[16] H. Comm. on Small Business, Small Business: Instruments and Casualties of the Censorship-Industrial Complex, Interim Staff Report 2024 at 42, https://smallbusiness.house.gov/uploadedfiles/house_committee_on_small_business_-_cic_report_september_2024.pdf.

'inclusion lists,' which are licensed to advertisers to instruct their ad agencies and ad-tech partners to keep their programmatic ads off/on these sites."[17] If a website gets a poor rating on NewsGuard's "nutrition label," it can choke off the advertising dollars that are the lifeblood for many websites—including platforms on which millions of Americans every day speak their minds.[18] NewsGuard "goes to great lengths to create the appearance of nonpartisanship and objectivity," but it seems to give a free pass to deceptive and biased news coverage by major left-leaning outlets.[19] NewsGuard is, of course, free to rate websites by whatever metric it wants. But the antitrust laws do not permit third parties to facilitate group boycotts among competitors.[20]

***

All of this is to say that Commissioner Holyoak is right to propose reviving President Trump's Executive Order 13925. Doing so could promote transparency and honesty in how Big Tech treats its consumers. But I would not stop there. Censorship, even if carried out transparently and honestly, is inimical to American democracy. The Commission must use the full extent of its authority to protect the free speech of all Americans. That authority includes the power to investigate collusion that may suppress competition and, in doing so, suppress free speech online. We ought to conduct such an investigation. And if our investigation reveals anti-competitive cartels that facilitate or promote censorship, we ought to bust them up.

---

[17] *Id.* at 43.
[18] *Id.* at 43–44.
[19] *Id.* at 43, 44–48.
[20] *Toys "R" Us, Inc. v. FTC*, 221 F.3d 928, 934–35 (7th Cir. 2000); *United States v. Apple, Inc.*, 791 F.3d 290, 319–20 (2d Cir. 2015) ("[I]t is well established that vertical agreements, lawful in the abstract can in context 'be useful evidence for a plaintiff attempting to prove the existence of a horizontal cartel." (quoting *Leegin Creative Leather Products v. PSKS, Inc.*, 551 U.S. 877, 893 (2007)).

# Exhibit 10

# FTC Commissioner Andrew N. Ferguson for FTC Chairman

Commissioner Ferguson is the America First, pro-innovation choice for Chairman of the Federal Trade Commission. Ferguson has impeccable legal credentials, proven loyalty to President Donald Trump, and a track record of standing up to Big Tech Censorship, DEI-wokeism, and the anti-business, anti-innovation agenda of the radical left. President Trump can designate Ferguson as Chairman of the FTC on Day 1 of the Trump Administration – no Senate confirmation is needed for sitting FTC Commissioners to become Chairman, and his term does not expire until 2030.

## Major Accomplishments

- Sued the Biden Administration to halt its lawless environmental, immigration, and gun policies.
- Directed Virginia Attorney General's efforts to bring down the Department of Homeland Security's "Disinformation Board."
- Represented Virginia and numerous other States in a landmark antitrust suit against Google's ad-tech monopoly.
- Successfully fought to end the Biden FTC's anti-business policy of refusing to end merger investigations early and allow firms to close their deals as soon as the FTC finds no competitive harm ("early termination").
- Oversaw the effort to confirm President Trump's judicial nominations in the Senate, transforming the Supreme Court as well as the lower courts. Lead staffer for both the Kavanaugh and Barrett nominations.
- Senate staff architect of President Trump's two impeachment acquittals.

## Agenda for the FTC

### Reverse Lina Khan's Anti-Business Agenda

- Repeal burdensome regulations and provide businesses with the certainty they need. Businesses deserve to know what they can and can't do.
- Support strong American companies that can beat foreign competitors. Foster innovation that improves our quality of life and makes our country greater than ever before.
- Stop Lina Khan's war on mergers. Most mergers benefit Americans and promote the movement of the capital that fuels innovation. Focus FTC resources on the mergers that harm competition and hinder innovation, while permitting mergers that keep capital flowing to innovators.
- End the FTC's attempt to become an AI regulator.
- No more novel and legally dubious consumer protection cases. Demand honesty and fairness to consumers, but businesses should not fear that the FTC will punish them for honest conduct that offends the sensibilities of beltway bureaucrats.
- Stop abusing FTC enforcement authorities as a substitute for comprehensive federal privacy legislation.

### Hold Big Tech Accountable and Stop Censorship

- Focus antitrust enforcement against Big Tech monopolies, especially those companies engaged in unlawful censorship.
- Pursue structural and behavioral legal remedies under the antitrust laws and the FTC Act to make sure large platforms treat all Americans fairly and to prevent them from using their market power to box out new entrants and stymie innovation.

### Protect Freedom of Speech and Fight Wokeness

- Investigate and prosecute collusion on DEI, ESG, advertiser boycotts, etc.
- End Lina Khan's politically motivated investigations.
- Terminate all initiatives investigating so-called "disinformation," "hate speech" or AI "bias."
- End the FTC's attacks on online anonymity.
- Fight back against the trans agenda. Investigate the doctors, therapists, hospitals, and others who deceptively pushed gender confusion, puberty blockers, hormone replacement, and sex-change surgeries on children and adults while failing to disclose strong evidence that such interventions are not helpful and carry enormous risks.
- Stop pursuing cases under lawless disparate impact discrimination theories. Such cases are designed to force companies to adopt de facto quotas and affirmative action policies.

### Fight the Bureaucracy to Implement President Trump's Agenda

- The Constitution requires that all federal employees, even the heads of so-called independent agencies, answer to the President.
- Terminate uncooperative bureaucrats.
- Advance the President's agenda by taking on entrenched left-wing idealogues at the FTC who take their agenda from liberal journalists and activists. Only a strong, Trump-aligned Chairman can resist their influence.

## Biographical Highlights

- Solicitor General of Virginia
- Law Clerk to Supreme Court Justice Clarence Thomas. Also clerked on D.C. Circuit. B.A. & J.D. from the University of Virginia.
- Chief counsel for nominations to the Senate Judiciary Committee.
- Chief Counsel to Senate Majority Leader Mitch McConnell. Ferguson served as a strong voice that supported President Trump's agenda within McConnell's office.

## Excerpts from Ferguson's Statements on FTC Matters

Concurring and Dissenting Statement on the Social Media 6(b) Report (link):

> » The Report says nothing about the **banning of politicians (including Donald Trump while he was serving as President of the United States)**, about the removal and demonetization of users who challenge the Silicon Valley political consensus, nor about one of **the most brazen acts of election interference in recent history: the coordinated suppression by social media companies of the Hunter Biden laptop story in the leadup to the 2020 presidential election.**
>
> » We have seen what happens when social media companies prioritize their views—or the government's view—of "quality" over the preferences of their users. Over the past decade, these companies have enforced a restrictive censorship regime on Americans' online speech. **They have adopted Orwellian policies banning nebulous categories of content like "misinformation," "disinformation," and "hate speech"—categories that in practice mean only any content that challenges the Silicon Valley elite consensus on [any issue] where free thought is inconvenient to those in charge.**
>
> » [Chair Khan's] Report also notes that many social media and video streaming companies have "inhouse experts, such as ethicists, social and political scientists, [and] policy experts" who are responsible for addressing "ethics, bias, inclusion, and fairness" in AI technology. [Khan's] Report suggests that this is a good thing and that the companies need more of them, preferably with binding authority over the rest of the company. **But the truth is that these AI safety groups, as they are often called, have proven to be little more than rebranded versions of the DEI bureaucracies that have infected America's businesses and colleges.**
>
> » **Tacking on threats to the end of a report and calling them "recommendations" is not good government; it is bureaucratic bullying.**

Dissenting Statement In the Matter of Rytr LLC (link):

> » The Commission's aggressive move into AI regulation is premature. … Doomsayers warn that AI will take our jobs, hopelessly blur the distinction between fact and fiction, and maybe even threaten the survival of human civilization. AI companies do not forcefully resist all these claims, given that predictions about the incredible potential for AI may be useful as these companies compete for investment dollars and engineering talent. But the Commission should not succumb to the panic or hype. Generative AI technology is impressive, but it is also nascent. Neither its naysayers nor its cheerleaders really understand its potential, or whether it represents substantial progress toward "artificial general intelligence" (AGI)—machine intelligence matching both the breadth and power of the human mind, the holy grail of AI research. **That ignorance is not a reason to plunge headlong with aggressive regulation. It is a reason to stay our hand.**
>
> » As our country has always done, we should give this industry the space to realize its full potential—whatever that turns out to be. America is the greatest commercial power in the history of the world in no small part because of its tolerant attitude toward innovation and new industry. **There has never been a better place in the world to have a new idea than the United States. We should go to great lengths to ensure that remains the case.**

Dissenting and Concurring Statement In the Matter of H&R Block, Inc. (link):

> » The election of the President is thus the key to constitutional self-government for the executive branch. If the President supervises and directs subordinate officers, then the people control them because the President answers directly to the people. But if the President does not control subordinate officers, then neither do the people. The administrative state would rule the roost, governing in favor of its own interests without regard to the people's needs. … The power to appoint is critical to setting the governing agenda. **The power to remove, and the obedience that the fear of removal instills, ensures the agenda's execution. The removal power is also the key to reforming the administrative state.** The President could hardly reform the government if he were stuck with the officers responsible for the problems he was trying to fix. And the removal power must extend beyond merely officers who openly disobey his orders. Subtle forms of disagreement and bureaucratic mischief can strangle policy reforms in their cradle. The President therefore must have the power to remove not just disobedient officers, but also those whom he concludes do not support his governing agenda.

# Exhibit 11

**NewsGuard Statement**
**November 15, 2024**
**Attributable to Gordon Crovitz, NewsGuard Co-CEO and**
**Former Publisher of The Wall Street Journal**

The letter sent by Brendan Carr makes clear that he was misled by relying on false reports about NewsGuard from outlets like Newsmax that earn low credibility scores from NewsGuard. Newsmax gets a 20/100 score from NewsGuard, putting it in the bottom 15% of the more than 10,000 news websites we have rated.

Commissioner Carr's letter states, citing Newsmax, that NewsGuard favors censorship. This is false. NewsGuard was founded in 2018 explicitly as an alternative to government censorship or to continuing to rely on social media platforms' secret algorithms for rating news sources. We take the opposite approach: We apply nine transparent and apolitical criteria for rating news websites and our ratings are disclosed.

Our work does not involve any censorship or blocking of speech at all. Instead of blocking information, we provide users with apolitical reliability analysis. Instead of censorship, we provide users with more information – reliability ratings of news publishers based on apolitical criteria and a transparent journalistic process – so that each user can make informed decisions about which information to trust.

The key claims in the letter about NewsGuard are false, citing unreliable sources:

- The letter says that NewsGuard partners with ad agencies to "effectively censor" targeted websites, which it implies are conservative-leaning sites. However, ad agencies use our ratings to target *more* advertising toward news, and there are more conservative websites on our advertising target list than liberal sites. Among prominent conservative brands rated as credible by NewsGuard that, as a result, benefit from NewsGuard's products driving more advertising revenue to their sites are: Fox News, The New York Post, Townhall, The Washington Times, The Western Journal, The Daily Caller, The Washington Examiner, The Free Beacon, Hot Air, The National Review, Commentary magazine, the Heritage Foundation's The Daily Signal, and dozens of other conservative brands.

  Indeed, many conservative sites get higher ratings from us than liberal sites get, such as Fox News getting a higher score than MSNBC and The Washington Examiner outscoring The New York Times. Again, Newsmax may not like our rating, but that is no excuse for them to validate their low rating with inaccurate claims about NewsGuard or to mislead Commissioner Carr.

- The letter also says that NewsGuard rates Chinese state media as credible while criticizing domestic outlets and that we have judged the claim that COVID-19 could have leaked from a lab to be misinformation. In fact, we do not rate any Chinese state media outlets as credible and have never rated a website as unreliable for publishing the lab leak theory, which, unlike many other entities, we have always found to be credible and not misinformation.

- The letter falsely suggests that we claim the Hunter Biden laptop was not his or that it was a Russian operation. We never made such assertions. Indeed, the only news sources whose reporting on the laptop we criticized were those that claimed it *was* a Russian operation and *denied* it was Hunter Biden's laptop.

Finally, we note that our journalism is itself speech protected by the First Amendment, and we're concerned to see a government official using the powers of his office, however unwittingly after having been misled by Newsmax, to attempt to prevent a private company (NewsGuard) from producing journalistic content.

There is an alternative to Newsmax misleading government officials in an effort to block independent ratings of Newsmax's editorial practices. Newsmax could instead join the thousands of other news websites that earned higher trust scores from NewsGuard by improving its basic journalistic practices. Indeed, our Newsmax Nutrition Label explaining our criteria and how we applied them provides a roadmap for Newsmax to improve its practices and join the many conservative-oriented and liberal-oriented sites that have increased their NewsGuard ratings by improving their credibility and transparency practices.

# Exhibit 12

**Request for Public Comment Regarding Technology Platform Censorship**

The Federal Trade Commission invites public comment to better understand how technology platforms[1] deny or degrade (such as by "demonetizing" and "shadow banning") users' access to services based on the content of the users' speech or their affiliations, including activities that take place outside the platform.[2] In doing so, technology platforms may employ opaque or unpredictable internal procedures to restrict users' access to services, often without any advance notice, leaving affected users with little ability to mitigate the related harm. Users may also receive little information about the alleged violations that led to their dismissal or downgrading on the platform. Technology platforms may similarly deny their users a meaningful opportunity to challenge or appeal the platforms' decisions. Such actions by technology platforms may violate their terms of service or other policies (collectively, "policies") and flout users' reasonable expectations based on the technology platforms' public representations. Such policies and practices, which may affect competition, may have resulted from a lack of competition or may have been the product of anti-competitive conduct.

FTC staff is interested in understanding how consumers have been harmed—including by potentially unfair or deceptive acts or practices, or potentially unfair methods of competition—by technology platforms that limit users' ability to share their ideas or affiliations freely and openly. FTC staff encourages members of the public, including current and former employees of technology platforms, to comment on any issues or concerns that are relevant to the FTC's consideration of this topic, including, but not limited to, the following questions:

1. Under what circumstances have platforms denied or degraded ("shadow banned," "demonetized," etc.) users' access to services based on the content of the users' speech or affiliations?

    a. What specific adverse actions did the platform take?

    b. Did the platform take such adverse actions in response to its users' speech or actions on the platform?

    c. Did the platform take such adverse actions in response to users' off-platform activities?

    d. How and when, if at all, did the platform notify its users about such adverse actions or explain its decisions?

    e. Did countervailing benefits to consumers or competition justify the platform's decisions to deny or degrade its users' access to services?

[1] Technology platforms may include, among others, companies that provide social media, video sharing, photo sharing, ride sharing, event planning, internal or external communications, or other internet services.
[2] Such potentially unlawful conduct affects not just any given speaker or potential speaker, but also consumers that would have otherwise received or had a higher likelihood of receiving the censored content.

2. At the time of the adverse actions, did the platforms have policies or make other public-facing representations about how they would regulate, censor, or moderate users' conduct on and off the platform?

    a. Did the policies or other public-facing representations describe how, when, or under what circumstances the platform would deny or degrade users' access to its services?

    b. Did the platform adhere to its policies or other public-facing representations?

    c. Has the platform revised, updated, or changed its approach to regulating users' speech or actions or for denying or degrading users' access to services? If so, what, if any, revisions, updates, or changes have been made? How and when did the platform give notice of these revisions, updates, or changes to its users?

    d. Has the platform acted in a consistent manner in response to analogous conduct by different users?

    e. Were the platform's policies consistent with the internal or external statements of its executives and employees?

3. Did the platform represent, implicitly or explicitly, whether users had the ability to challenge or appeal adverse actions that deny or degrade the affected users' access to services?

    a. Did the platform offer a meaningful opportunity to challenge or appeal adverse actions that deny, or degrade users' access, consistent with its users' reasonable expectations based on its representations?

    b. How long did the platform take to adjudicate such challenges or appeals?

    c. Has the platform applied a consistent challenge or appeals process in response to analogous conduct by different users?

4. How did the platforms' adverse actions affect users (including creators of content)?

    a. How were users' ability to earn money or build followings affected?

    b. Did competing technology platforms engage in analogous conduct against the same users?

    c. Were users induced into joining and investing their time and money in a platform under the expectation of one set of moderation policies, only to have the rules changed from under them?

d. Were users targeted by such adverse actions able to find adequate substitutes in other platforms?

e. Were users able to reach similar audiences and achieve similar goals (such as monetization and reach) on competing platforms?

5. What factors motivated platforms' decisions to adopt their policies or to take the adverse actions?

   a. Were they made in response to pressure from advertisers or other businesses?

   b. Were they made in response to the actions of state, local, or federal governments?

   c. Were they made in response to actions of foreign governments or other foreign entities?

   d. Were they made to pursue the private interests of platform employees or executives, rather than the business interests of the platform?

   e. Did platform employees or executives encourage, or collude with, outside parties to pressure the platforms to change their policies or take the adverse actions?

6. Were platforms' adverse actions made possible by a lack of competition? Did the practices and policies affect competition?

   a. Did platforms adopt similar policies to and take similar adverse actions as other platforms?

   b. Did platforms agree or otherwise coordinate (including directly or through trade associations, certification bodies, or other means) with other platforms as to their policies and adverse actions?

   c. To what extent have platforms funded or collaborated with organizations, for-profit or non-profit, that advocated for or enabled censorship? Were such activities, such as advertising boycotts, designed to facilitate collusion on censorship?

   d. Were platforms able to achieve market dominance under permissive content policies, only to change policies after they had achieved market power?

   e. To what extent did platforms use their dominance in other markets, such as search engines and app stores, to prevent competition from platforms with different moderation policies?

Comments must be received no later than **May 21, 2025 by 11:59pm ET**.

**Instructions for submitting:**

1. Go to the docket on regulations.gov
2. Click "Browse Documents"
3. Underneath the document containing the RFI questions, click comment (the blue button)
4. Fill out the form which requires:
    4.1. The comment text itself
    4.2. The comment category
5. You can submit as: an individual, an organization, or anonymous
    5.1. Optional: Attachments to aid your response. You can attach up to 20 files, but each file cannot exceed 10MB. Valid file types include: bmp, docx, gif, jpg, jpeg, pdf, png, pptx, rtf, sgml, tif, tiff, txt, wpd, xlsx, xml.

Please DO NOT include sensitive or confidential information in the comments including:

- social security numbers;
- dates of birth;
- driver's license numbers or other state identification numbers;
- financial account information;
- sensitive health information; or
- competitively sensitive information.

Comments will be posted on the Internet and made available to the public (subject to exceptions such as for personal privacy information). Comments submitted in response to this RFI could inform the FTC's enforcement priorities and future actions.

# Exhibit 13

PROMARKET
Insights shaping the future of capitalism.
CHICAGO BOOTH
Stigler Center for the Study of the Economy and the State

ANTITRUST AND COMPETITION   EVENT NOTES   STIGLER CENTER NEWS   THE INFORMATION ECONOMY

# Transcript: FTC Chairman Andrew Ferguson Keynote Part II

BY PROMARKET WRITERS *April 21, 2025*




*Stigler Center event 2025 Antitrust and Competition Conference - Economic Concentration and the Marketplace of Ideas Dinner Keynote: Andrew Ferguson, Chairman, U.S. Federal Trade Commission April 10, 2025 (Photo by Anne Ryan)*

The following is the second part to the transcript of Federal Trade Commission Chairman Andrew Ferguson's keynote at the 2025 Stigler Center Antitrust and Competition Conference. Part II includes Ferguson's interview with University of Chicago law professor Eric Posner and the subsequent audience Q&A. You can read part I, Ferguson's speech, here.

---

**Eric Posner**

Thank you very much, Chairman Ferguson.

Your thesis is admirable in two ways. One is that it's so responsive to the topic of the conference, so I'm sure people appreciate that. And then the other is that it's extremely clear and crisp.

Let me summarize it like this. First, consumers want a free exchange of ideas. They go onto social media platforms in search of them. Second, the platforms (and I want to ask you about this) don't actually do that, or haven't done that. Instead, they've engaged in what you call censorious conduct, or content moderation, or they limit speech, however you want to put it. And therefore you're arguing that—I guess maybe presumptively, or you're claiming just as a matter of fact—the platforms aren't actually engaged in competition.

So, on the first: Is it true that consumers are actually, or users are actually going onto social media platforms seeking the free exchange of ideas? You mentioned that some go on to, like, have fun, to troll other people, maybe to torment or bully people. It also seems to be the case that people don't often want to actually hear the ideas of people who differ with them a great deal. So, what's the basis of your view? It sounds like an idealized view of how people behave, rather than the reality.

**Federal Trade Commission Chairman Andrew Ferguson**

I do think it's the reality.

Even people who are pretty strictly aligned with one side or the other do derive pretty obvious pleasure from engaging—in good or bad faith, it depends—with ideas from the other side. I mean, I meant what I said: You can't troll unless there are people around that you disagree with. So, even someone who goes on just to, you know, bully, I'm not going to say harass, but even if someone is going on just because they want to pick on people they disagree with, you have to have access to those ideas, number one.

Number two, I think the reaction to the censorship epidemic of 2020, the public reaction, revealed a strong preference in favor of having access to ideas that you agree with, that you disagree with, or that you're not sure about. I think the success of X after it was purchased by someone who had a relatively open commitment to free speech, especially after everyone promised it was going to fail when it was originally purchased, is pretty good evidence that there's a preference for this.

Now, it's also obvious that, I don't think consumers want no-holds-barred access to everything, including categorically illegal stuff. It's definitely true that people like receiving some content more than others.

But I think it's equally true that the average consumer does not want a platform where particular ideas are just categorically excluded. If they did, you would expect there to be platforms where the curation was aimed exclusively and expressly to just one side or the other. I guess Blue Sky is a potential example, which has not exactly taken off.

I also think a lot of consumers began engaging with these social media platforms when they were quite openly touting their commitment to free speech and a free exchange of ideas, and then over time that commitment somewhat eroded. One of the things that the FTC, in this initial phase of the investigation, asked consumers to weigh in on was: What was your understanding of the terms of service for these platforms when you signed up on them; and then, was your being kicked off of these platforms inconsistent with their terms of service? A lot of these platforms had—often very flowery—commitments to free exchange of ideas in their terms of service, and a lot of consumers think that they didn't live up to them. President Trump, in 2020, actually issued an executive order asking the FTC to look into this. The FTC did not, but that's one of the things that we're examining now.

**Eric Posner**

Right, and I do want to ask you about that.

But first, a number of people have complained that Musk has kicked them off X, or deplatformed them or whatever the term is. And then, I'm not on X myself, but I gather that you can't really avoid Musk's, um, tweets or x's or whatever they're called. So, he starts off with, I think you're right, commitment to freedom of expression. He loosens the moderation rules. But what should we think about what's happening now? Is this evidence that there's not competition in this type of social media, the fact that he's deplatforming people?

**Andrew Ferguson**

I don't know, as an empirical matter, whether he's deplatforming people. I simply don't know.

I'm sure some people—as is true of every platform—are removed for violating terms of service. I also think it's very obvious that people are allowed to say and express ideas on X that you are not allowed to on other social media platforms. Facebook, for example, still has a vaccine misinformation policy. In terms of avoiding Musk's tweets, it might just be my algorithm that gives me ready access to them. He's also one of the world's most famous men, and is an important leader in the most important government on earth. I don't think it's terribly surprising that the algorithm would be putting his ideas in front of people. I don't think that suggests a competition problem, nor do I think the removal of any particular user does.

Insofar as the argument is, there wasn't widespread idea-specific censorship especially in 2020 and 2021, you're just asking me not to believe my lying eyes. There quite obviously was.

**Eric Posner**

I want to come back to this point about exchange of information, and something one of the speakers earlier today reminded us: network effects.

You would think that, if people want to exchange ideas, be exposed to new ideas, you'd want as big a platform as possible. And that seems to lead in the direction of monopoly.

How do you reconcile your view that the best use of a platform is exchange of ideas among as many people as possible; but your desire, as well, to have competition in the social media sector?

**Andrew Ferguson**

I do not think that a particular platform's propensity to censorship is categorically an indication of monopoly power, or is categorically an abuse of market power. Honestly, the sort of social media problem that has concerned me more before the purchase of X was the sort of eerie similarity of the censorship policies across all of these platforms, including the almost identically coterminous decision to eject Parler from the online world entirely at the exact same time, to get President Trump off of all the social media platforms within a couple hours of each other. The risk of collusion—which is made easier by an absence of competition—is what concerns me more, and I've written about this.

I don't think you said this, but if you did, just to clarify: The mere fact that a platform conducts censorship is not itself an indication of market power. The thing that concerned, I think, a lot of Americans in 2020 and 2021 was that all these platforms seemed to basically move in lockstep on a variety of social issues. The reality of this became even clearer once we had discovery in Murthy against Missouri. They all were adopting the same policies, often in consultation with the government or with, you know, lists of experts, and they all were using the same experts. That concerns me the most, is the idea of a handful of market participants. They're just going to agree on what contours their product will have. And when your product is the exchange of ideas, that's extremely dangerous.

**Eric Posner**

Right, right, and I did want to ask you about that. But, you quickly went from the… And as an antitrust lawyer, I'm sure you're thinking about this.

You quickly went from the fact that they were all doing the same thing at the same time, to the possibility that they were agreeing with each other to do the same thing at the same time. And, as you know better than anybody else here, or as well as anybody else here, parallelism occurs all the time in markets. It can be prices, it can be quality, it can be all the rest. It can be all kinds of things.

To use the examples you gave, one you mentioned, pushing Trump off the platforms. This was immediately in response to the election controversy.

**Andrew Ferguson**

Maybe.

**Eric Posner**

Well, I just mean as a temporal matter.

**Andrew Ferguson**

Right. It happened after. It does not follow it was a response. It is entirely possible that they talked to each other about kicking off the world's most famous man. And that's the issue I'm concerned about.



If there are only a handful, that sort of collusion is very easy. Or if there's a willing partner in the government to set, communicate amongst the various platforms, what the rules are going to be. It's very easy to do if there's only a small handful of them.

**Eric Posner**

So, you're worried that they might have entered into an agreement, but you don't have any evidence.

**Andrew Ferguson**

No. Nor did I say that. My contention is—same with the ejection of Parler—these decisions being made coterminously could just be conscious or unconscious parallelism. They could also be the result of collusion. Collusion is made easier if there are fewer participants. That is the concern that I'm discussing.

**Eric Posner**

Okay.

You also mentioned just now your concern that the government during the Biden administration pressured the social media platforms to, well, censor (as you would put it) or limit what people were saying about covid. Now, that doesn't sound like an antitrust problem.

Do you think that's an antitrust problem, if the government says to these platforms, Look, you're allowing speech on your platforms that is causing people not to get vaccinated, with the result that this epidemic is going to get much worse?

Is that an antitrust problem? Or is it a different kind of problem? Or is it not a problem at all?

**Andrew Ferguson**

I think it's a problem. It isn't necessarily an antitrust problem.

Murthy itself revealed two things going on. There was pressure applied. The court said it wasn't coercive for First Amendment purposes, but there's definitely pressure, consultation, collusion between the platforms and the government.

There also was repeated references to the record of all the platforms consulting with private outside experts on what the rules should be. That is potentially an antitrust problem, if there's an agreement among them that, "We're going to use these experts to help us set the rules."

Even if the sort of collusion, pressure from the government, isn't an antitrust problem, it is a problem for a civic society. And it is a problem made easier if there are fewer market participants.

If there's a wider smattering of market participants, it's harder for the government to get on the horn with everyone and pressure them equally. It's easier basically to buck the government because there are more people. It's harder for the government to apply pressure across the board. If there's just a handful of these companies that the government has to pressure, it's just easier to pull that off.

Even if that's not an antitrust problem directly—like, that *conduct* isn't an antitrust problem directly because of Noerr-Pennington or Interstate Act or whatever—I don't think it follows that we throw up our hands and say, oh well, antitrust laws can't address this directly.

That is a problem, and it is a problem made easier by concentration in the market.



**Eric Posner**

I read the Murthy opinion, and I guess I just had a different impression, so I'm curious. Maybe I missed… I read Alito's concurrence, which sort of lays out the strongest case.

I got the sense what was going on is, you have a bunch of government officials—probably panicking—talking to Facebook and a bunch of these social media platforms and saying: Look, there's a pandemic going on. People are dying. There's this misinformation being circulated, which we think is causing some people not to get vaccinated, which of course will harm other people, you know, through contagion. So, Facebook, please stop allowing people to share this information. It's causing as much harm or more harm than other types of policies that you have—against bullying or harassment or what have you.

Now, that just sounds to me like the government very strongly trying to encourage people in the private sector to act in a way that would advance the public good. Is that pressure? Is that unacceptable pressure in your view, for the government to say to these independent institutions, "We want you to do that?"

Or is there something else going on?

**Andrew Ferguson**

I think it depends on whose version you believe.

I don't know if you read the District Court opinion. The District Court's view was, this wasn't just, "Hey, do us a solid," or, "Do the country a solid." It was like, "Do it, or else."

**Eric Posner**

Yeah. What is the *or else*? That's what I didn't get. Like, what was the implicit threat, however you saw it?

**Andrew Ferguson**

I think it's the same threat that a government can always potentially inflict on any marketplace participant, which is, "We can make your life difficult." The regulators can show up, they can audit, they can investigate, they can cost you a lot of money, and the path of least resistance is: "Do what we say."

This is not dissimilar to the issue the Supreme Court confronted with the New York financial regulators calling up people and saying, "Quit doing business with the NRA, okay? Or else."

The *or else* is, "We have a tremendous array of investigative tools. Those tools are expensive when applied to you even if we don't win at the end of the day, so knuckle under."

The court's conclusion for state action purposes was, it wasn't sufficient to transform the social media companies into arms of the state. I just don't think it follows from that sort of doctrinal nicety that the problem isn't government officials backed with potential coercive power—formal and informal—calling up social media companies and saying, "The following ideas are to be proscribed. Proscribe them."

Having worked in the government a fair amount, I think that your view is either very charitable, or maybe a little naïve, about what happens on a phone between a private company and its regulator.

**Eric Posner**

So, the government shouldn't call up private institutions and tell them, "Do that, stop saying this, or we're going to punish you?"

**Andrew Ferguson**

I do generally think the government should not threaten private people with punishment because of things they're saying.

**Eric Posner**

Okay.

**Andrew Ferguson**

Unless they are criminal, yeah.

**Eric Posner**

All right, good to know.

[*laughter*]

Let's talk about the advertiser boycott issue, also.

You've said before that you're worried about… You think that advertisers colluded, or might have colluded, to boycott social media platforms that displayed speech that they didn't like. Could you tell us more about that?

**Andrew Ferguson**

I definitely did not say they *did* collude. I said…

**Eric Posner**

They *might* have, yes…

**Andrew Ferguson**

…that this risk is real and needs to be confronted and taken seriously.

Part of the way that people who have ideas get them out is, they make a living by propagating ideas. You are one of them. You get this incredibly protected job at the University of Chicago to, sort of, say whatever you want.

Other people participating in the marketplace of ideas can say what they want, as long as they can get the eyeballs to pay attention to them. And part of the way that you make sure you can keep getting the eyeballs is advertising. This isn't just true of social media platforms. This is true for a huge array of individual speakers who have views, both acceptable to the elites and dissident. Bloggers, YouTubers, people on X. All over the place. Part of the way that they get their ideas out there, and they can afford to keep getting the ideas out there, is if they can attract advertisers.

If advertisers get into a back room and agree, "We aren't going to put our stuff next to this guy or woman or his or her ideas," then that is a form of concerted refusal to deal. The antitrust laws condemn concerted refusals to deal. Now of course, because of the First Amendment, we don't have a categorical antitrust prohibition on boycotts. When a boycott ceases to be economic for purposes of the antitrust laws and becomes purely First Amendment activity, the courts have not been super clear. Sort of a "we know it when we see it" type of thing.

The concern I raised in that concurrence—with which I am deeply concerned—is, if advertisers either get in a room together and say, "We're not going to do advertising next to this idea," or they say, "We're going to agree that this third party decides which

ideas get advertisement and which don't; we're just going to let *them* do it," then we are going to dry up the idea because we are drying up the person who has the idea's ability to make money off of that idea.

Unless those people can get tenure, they need to keep attracting eyeballs because that's how they make a living. Drying up the advertising will dry up the idea. So, the risk of an advertiser boycott is a pretty serious risk to the free exchange of ideas.

**Eric Posner**

Just parenthetically: Having tenure does not guarantee you any eyeballs, I'm afraid. We write for a very small…

[*laughter*]

**Andrew Ferguson**

That's right.

**Eric Posner**

Just a few pairs of eyeballs…

**Andrew Ferguson**

Although, having gone to law school, I know they pay a lot to see and hear you, so…

**Eric Posner**

Yeah, well that's true. Again, though, I just want to press you on this a bit.

We see parallel conduct. We see a bunch of advertisers who are worried about their brand. And, as rational economic actors, they don't want their advertisements to be on a platform that people associate with stuff they abhor, whether on the left or on the right. So, just seeing them pulling their ads from platforms that host offensive speech in whatever way, you know, it could be just speech that the advertiser itself doesn't like. That's not a problem. It's only if they get in the back room.

But when we talk about advertisers, we're talking about thousands of companies around the country. Or around the world. There's no back room that they could all fit in together. Is it plausible at all that they engage in collusion?

You mentioned also that they consulted with third parties. It would seem to me this is just business as usual. There are third parties out there that study brand management and how people react, how the affiliation, association of an advertisement with a particular type of speech might affect business. What's the basis for actually trying to investigate in this kind of setting?

**Andrew Ferguson**

Can they all get into a back room and agree? Having represented trade associations, the answer is yes.

Have they? I don't know. No one's looked at it. At least, no one has publicly looked at it. But is this a possibility? Of course, number one.

Number two, there are lots of advertisers, but they tend to use a small handful of advertising agencies to make a lot of these decisions for them. There also are a lot of advertisers, but there aren't that many *huge* advertisers. And a decision by a bunch of huge advertisers to cut off access could have massive downstream economic effects on speakers who need access to advertising.

Again, you know, I don't think you're saying this. The fact that there is coterminous identical conduct—this is true across all of antitrust law—does not mean there's an antitrust violation. Where there is smoke, there is not always fire. But there might be. And the whole point of having the antitrust enforcement agencies is, when you see smoke, at least take a look.

For example, this could have been for a number of reasons but, one of the most prominent, you can call it brand safety managers if you want, was GARM. They confronted a single antitrust lawsuit from X and dissolved almost immediately. It doesn't follow necessarily that they were committing the antitrust violations that they were accused of. But I do think that this risk is sufficient enough and, if it got really bad, would dry up enough access to ideas that it is incumbent upon the antitrust enforcers to take it seriously and, if they think there's something there, to look at it.

**Eric Posner**

Okay, I have one more question (and then we're going to take questions from the audience, so please get your questions ready).

In your remarks, you mention this kind of ideal of people exchanging ideas on platforms. Basically, you said you don't like censorship, but you've also acknowledged that there needs to be *some* kind of regulation; or am I wrong about that? This strikes me as an important question because of your willingness to infer, from limitations on speech, that there might be a competitive problem.

At what point do we become suspicious of a social media platform? You've said, I think, that they could, like, block illegal behavior, like child pornography or something like that. But if they, you know, genuinely think that their users are offended by holocaust denial or conspiracy theories or what have you, what do you… Are you saying that if they implement *any* kinds of limitations, that's bad for society? It's bad for the marketplace of ideas? And it suggests that they must be driven by anti-competitive goals?

**Andrew Ferguson**

No, I do not think that the imposition of *any* limitations is bad for society.

**Eric Posner**

So, I just want to ask you, what are those limitations?

**Andrew Ferguson**

I think it can vary from platform to platform. And I think, frankly, in a good competitive environment, we would expect some variation from platform to platform. Nor do I think that just the act of content moderation is itself evidence of a competitive problem.

But if any company is doing stuff that quite actively drives huge swaths of its consumers off its platform, and doesn't seem to suffer competitive consequences—ad revenue doesn't come down, what have you—that is at least a suggestion that there might be a competitive problem. The FTC, and the government generally… Actually no, not generally. The entire government is not the censorship police because it would be very difficult for the government to be the censorship police without winding up doing a lot of its own censoring.

But I do think that if there are businesses who are doing stuff that drive either a huge swath of their users or their preferences off of their product, and that nothing seems to happen to them—they don't suffer any competitive consequences, they get bigger, they get more profitable—there's at least evidence that competition is not thriving in the space. But it can't be—and it isn't—that every time a company decides to censor, or content moderate, whatever you want to call it, that the antitrust enforcers need to show up. I just disagree with what seemed to be the long-held position by many, which is that this isn't evidence of a potential antitrust problem at all. I think it is.

**Eric Posner**

And just a quick follow-up. Was it actually the case, when Facebook and other social media platforms increased the limitations on speech, that lots of people left those platforms?

**Andrew Ferguson**

People left. It also got… Use of these platforms became super politicized, which is exactly what a lot of these platforms said they were trying to avoid. Facebook acknowledged in January of this year that it had been downgrading all political content, had been trying to keep it—across the board—suppressed. There's evidence that that isn't actually what was happening, but it's sort of neither here nor there. It became this extremely political product at the same time.

They did not lose many users, even as the public impression and public polling about favorability of these platforms plummeted in 2020 and 2021. That doesn't necessarily demonstrate… That isn't the proof in the pudding. It doesn't make the case. But when you are enforcing antitrust laws, you don't show up at an antitrust problem when the case is fully baked and you just go. You're constantly looking for smoke to see if there's fire. And in my view, this is absolutely smoke, at least in some circumstances.

**Eric Posner**

Okay, questions. Yes, over there.

**Audience Member 1 (Luigi Zingales)**

Thank you, chairman, for your speech.

I'm very fascinated by your approach to collusion, or potential risk of collusion. That seems to be quite novel, and I really endorse it. If there is smoke, take a look! Last year in this conference, I was asking people:, There seems to be a coordination in not publishing information about the famous Hunter Biden laptop; why is there not an antitrust enforcement on this issue? Because that's really a serious issue.

I hope that you apply the same rule across the board. There are a lot of potential risks of collusion, a lot of cases where there is smoke. If you take a look in all those cases, this would be the most interesting four years ahead of us.

Let me give you a suggestion, for example. In a lot of industries, not only are there trade associations, but there are also consultants. They play a role in giving the same suggestion to everybody. A colleague at a different university told me that he was, in a former life, a consultant. He went to a bank and suggested that this regional bank should increase their fees. Then the regional bank, what they did is they actually recommended him to all their other competitors. So he went to all the competitors, and they all increased their fees.

Unlike in the case of newspapers, where we maybe see the evidence, in the case of consultants, we don't—because they don't actually publish who they consult for. So I hope you look at the smoke, ask all the consultants to publish a list of who they consult for, and look into that.

**Andrew Ferguson**

I didn't hear a question, but I can comment nonetheless. Two things.

My view of the antitrust agencies is that they're cops on the beat. You're supposed to walk around the markets, and if you see something that looks like trouble, you take a look. You don't prejudge, but you take a look.

On the collusion thing, obviously, collusion under antitrust laws requires some agreement on something. Trade associations play a valuable role, but there's a pretty long history of trade associations that can act as third-party facilitators of horizontal conspiracies. I think that there is a risk that that can be taking place in the advertising markets. It's definitely not the only market where there's a possibility of that, and I'm always interested in looking for the smoke.

To be clear: Sitting in Washington, or even with our regional offices scattered throughout the country (we've got one here in Chicago that I just came from), we can't see it all. So, part of the role of people like you is to alert the agencies when something's going on. We get complaints—of varying levels of politeness—about things happening in the market, including from some people sitting in the room right now. And they are often very helpful because it won't be obvious to us, as we're all looking where we're looking, about what's going on. So this is helpful.

**Eric Posner**

Yeah, Matt?

**Audience Member 2 (Matt Stoller)**

Thanks for the speech and the questions. I guess I have a question about your broad observation that consolidation can lead to certain forms of coordinated speech restrictions.

One of the things that I've heard a lot of when I go out to LA is, there's a lot of fear of talking about China—particularly because of vertically integrated streaming systems that are highly consolidated.

The government actually put out reports in the mid-2010s, and you hear it all the time. You haven't seen a Chinese villain in movies for a long time. There are a number of reasons for this.

How would you approach looking at a problem of consolidated, vertically integrated speech platforms (for lack of a better word) outside of the sort of partisan approach? Looking at something like Chinese control over Hollywood, which is more of a national security question?

**Andrew Ferguson**

What I said in my confirmation. It is not the role of antitrust law, or of antitrust enforcers, or frankly of government to ensure some particular quantum of competitors in a market. We're going to end up with central planning, which is going to be worse than whatever we have now.

But I do think that we ought to care about consolidation, independent of the particular doctrines of antitrust law, because it is much easier for government to control what you think, believe, and do, and what I think, believe, and do if there are a limited number of suppliers above us. It's just much easier for them to coerce a couple people than it is a bunch of people. It just categorically is, and that's true of any government. I think vigorous antitrust enforcement that protects against consolidation and leaves a variety of suppliers makes it harder for the government to coerce you and me downstream by coercing the people we rely on for stuff.

How I would think about the particular problem of vertically integrated movie studios and streaming services and China? I don't have a particular answer on that, just because I think there are potentially fronts to think about antitrust law and our competitiveness vis-à-vis foreign rivals. That isn't generally how antitrust law has constructed it, although I do think there are interesting antitrust theories about whether a merger that would give a foreign government more control over a particular industry should matter to the merger analysis. I'm open to that prospect. Generally it isn't traditionally what antitrust law has said, but that's at least an interesting line of inquiry.

My view is, antitrust law does not… Its job is not just to be anti-consolidation and make sure there's a certain number of competitors. If you've got vigorous antitrust enforcement, you can resist consolidation and therefore resist the coercion of the individual or of the family downstream from coercing the supplier. That's the thing that makes me very nervous about a limited number of suppliers of anything. I mean, de-banking has become this catastrophic problem in this country, where people are being denied access to retail banking services, on the basis of things they say or believe or affiliations. If you've only got a small number of very large banks, and the government has a particular view on whether someone's idea should be permitted in the marketplace, it's a lot easier to drive that out of the marketplace if all you have to do is have the banking regulator call a couple banks and be like, "We don't like people who have these views banking with you." Which is almost exactly what happened in the NRA against Vullo case, with New York's banking regulator just calling financial institutions and being like, "You do business with

the NRA, I'm coming for you." That is an easier maneuver to pull if there are a fewer number of people involved in the market. It's a lot harder if there are a wide variety of participants.

That is one of the reasons that I think, even for libertarians on my side of the aisle who are focused more or mostly on the relationship between government and the citizen, you ought to care about antitrust law because the government has a hard time directly coercing 350 million people but a lot easier time coercing six or seven suppliers that all 350 million of us have to interact with.

**Eric Posner**

Yes, back there.

**Audience Member 3**

On the topic of speech, I appreciate your remarks.

Other members of your administration have broadly suggested that there hasn't been enough crackdown on speech—particularly at protests on campuses, and other forms of speech at college campuses. Now, obviously, you're an independent agency. You're free to express your own views.

I'm curious whether we can take it that you're with the university leaders, like Princeton's Eisgruber, who think it's important to protect freedom of expression of all points of view—no matter what—at places like college campuses?

**Andrew Ferguson**

I'm not sure exactly what the question was.

**Audience Member 3**

The question is whether you believe the freedom of speech principle extends to the rights of protests on campuses, and therefore you stand *with* universities and *against* other parts of the administration, who have threatened universities and suggested they should crack down on speech.

**Andrew Ferguson**

I am not aware of universities suggesting that there be a crackdown on speech. I am aware of the suggestion that universities should not make it so that students fear for their physical safety when they're crossing campus on the basis of their religion, and I definitely agree with that.

I think that the value of free speech is fundamental to this society, but the right to speak does not include the right to intimidate on the basis of someone's religion, to harass, whatever you want to call it.

I am quite firmly of the view that I'm a member of the most free speech administration of my lifetime. And I'm extremely proud of that fact.

**Eric Posner**

Yes, right over here.

**Audience Member 4 (Barry Lynn)**

Hi, this is Barry Lynn. I agree with a lot of what you said. Our organization a few years back, just as a for instance, we condemned Facebook for knocking Alex Jones off the platform, may he burn in hell. We condemned AWS for knocking Parler off. But I have a

couple quick questions.



So, amplification by the platforms. Because all amplification means is that other people's voices are being obviously put down, in the order at which they're being presented to an individual. Is amplification a problem? Is it a form of censorship?

And then the second thing is, you mentioned the Biden administration during the pandemic for putting pressure on the platforms. Last August, at that point former president Trump threatened—in writing—Mark Zuckerberg with life in prison unless he did the right thing. Was that a wrong thing for Donald Trump to do when he was running for office?

**Andrew Ferguson**

Is amplification a form of censorship? No. I think throwing someone off of a platform because of the view they express is a form of censorship. Also, you know, not the greatest example of civic discourse, to just shout out someone burning in hell. I don't love that. I agree with you that they shouldn't be throwing off people just on the basis of the views that they articulate.

**Audience Member 4 (Barry Lynn)**

The second thing, about President Trump?

**Andrew Ferguson**

I don't remember him saying that, so I don't have any comment on that.

**Eric Posner**

Over here?

**Audience Member 5 (Maciej Bernatt)**

I have a question.

When the agency is considering entering into new areas—and I think free speech would be one in the US—then potentially the institutional guarantees matter.

So I wanted to ask you about your view on the independence of competition agencies in a context of actions such as the one you discussed, that potentially there might be smoke.

**Andrew Ferguson**

Sure. I've made my view on this extremely clear, a lot.

I think that the idea of independent organs of executive power is very difficult to square with democracy. When we vote for the president, we're voting for the person who's going to be in charge of the entire executive branch. I guarantee that almost no one in this room would want me to be able to wield executive power free of political accountability. I guarantee no one in this room would want that. And I don't think, in a democratic society, any of us should want very powerful agencies like the FTC to be insulated from political accountability.

My view is that any agency that wields substantial executive power in the name of the American people has to be answerable to the American people. And the way that the executive branch in this country, under our form of government, is answerable to the American people is through the election of the president.

And so my view, which I've said over and over, is that the president has the constitutional authority to remove commissioners of the FTC, including me. And I am extremely confident that when this gets to the Supreme Court—which it is, I guess, there right

now—that the president's decisions will be vindicated as a question of constitutional law.



**Eric Posner**

I think we have time for one more question. Yes, right over there.

**Audience Member 6**

Thank you. Andrew, can I ask you a question?

**Andrew Ferguson**

Sure.

**Audience Member 6**

As FTC commissioner responsible for protecting consumers—and especially vulnerable populations like children—from unfair practices, do you believe that it's in the public interest or in the interest of children themselves for our kids to be on social media platforms designed to capture their attention and monetize their data?

**Andrew Ferguson**

That is a good question. This is the subject of a roaring debate. The commission is going to host a full-day workshop on this question, where we're going to bring in scholars and advocates in a series of panels and speeches and debates to address this question.

I think it has become very obvious that the relationship between children and social media is not a healthy one. It's not healthy for them; it's not healthy for the country. There are very good arguments that advertising targeted toward children is bad in every circumstance. Congress is going to have to make decisions on this. But I do think that we are headed towards a reckoning on the relationship between children and social media, and the effect that social media has on forming brains, with a product that is designed to get a dopamine drip going over and over and over again.

States are starting to address this. Congress has started to address this. Even under current laws, there are parts of this that government can address. The laws that I enforce were written in 1914 and 1938. The problem we're confronting is quite new, so we need to be very careful about how we apply these old laws to new circumstances and not just blunder in, sight unseen, to address what is a real problem. But I do think it's a real problem. Clare Morell wrote *The Tech Exit*. I think it is phenomenal; it's also terrifying. She'll be one of the participants in our workshop. But this is an issue that keeps me up at night. The relationship between children and social media. The difficulty that every parent in America has, regulating their child's interactions with social media.

My own view—stated at a relatively high level of abstraction—is that the most important thing the government can do is interpose parents back between children and social media. That's the healthiest response, rather than government interposing itself directly between children and social media. But parents need help. Children get to interact with social media outside of their parents' presence almost constantly. Screens are everywhere in our schools, whether you like it or not. Even if you are a family who has cut off access to screens to your kids, their friends parents probably have not, and they'll have access to it there.

Government needs to do something about this. I think the main thing it needs to do is put parents back in charge of their kids and make it easier for parents to interpose themselves between their children and social media.

**Eric Posner**

Thank you. Well, I'm afraid we're out of time, sorry. But please join me in thanking Chairman Ferguson for joining us.

[*applause*]

*Articles represent the opinions of their writers, not necessarily those of the University of Chicago, the Booth School of Business, or its faculty.*

Related Posts:

1. **Pluralism in Media Markets Is About Democracy, Not Economics**
2. **Transcript: FTC Chairman Andrew Ferguson Keynote**
3. **Concentration in Social Media Undermines Product Design Quality and User Experience**
4. **Would Content Collusion Among Social Media Companies Be Such a Bad thing?**

# Exhibit 14



**Brendan Carr**
@BrendanCarrFCC

Whether it's the government shutting down speech (a 1A issue) or a private platform doing it (not 1A), these decisions aren't made by an oracle of truth.

It's always a person in power (merely fallible or with a political agenda) that censors speech.

More speech > Less speech

9:47 PM · Apr 15, 2020

11 76 335 3

# Exhibit 15

United States of America
Federal Trade Commission

# *Civil Investigative Demand*

| 1. TO | 1a. MATTER NUMBER |
|---|---|
| NewsGuard Technologies, Inc.<br>25 W. 52nd Street, 15th Floor<br>New York, NY 10019 | FTC File No. 251-0061 |

This demand is issued pursuant to Section 20 of the Federal Trade Commission Act, 15 U.S.C. § 57b-1, in the course of an investigation to determine whether there is, has been, or may be a violation of any laws administered by the Federal Trade Commission by conduct, activities or proposed action as described in Item 3.

2. ACTION REQUIRED

☐ You are required to appear and testify.

| LOCATION OF HEARING | YOUR APPEARANCE WILL BE BEFORE |
|---|---|
| | No appearance required. |
| | DATE AND TIME OF HEARING OR DEPOSITION |

☒ You are required to produce all documents described in the attached schedule that are in your possession, custody, or control, and to make them available at your address indicated above for inspection and copying or reproduction at the date and time specified below.

☒ You are required to answer the interrogatories or provide the written report described on the attached schedule. Answer each interrogatory or report separately and fully in writing. Submit your answers or report to the Records Custodian named in Item 4 on or before the date specified below.

☐ You are required to produce the tangible things described on the attached schedule. Produce such things to the Records Custodian named in Item 4 on or before the date specified below.

DATE AND TIME THE DOCUMENTS, ANSWERS TO INTERROGATORIES, REPORTS, AND/OR TANGIBLE THINGS MUST BE AVAILABLE

30 days from the Issued date below - June 19, 2025 by 5:00 pm ET

3. SUBJECT OF INVESTIGATION

See attached.

| 4. RECORDS CUSTODIAN/DEPUTY RECORDS CUSTODIAN | 5. COMMISSION COUNSEL |
|---|---|
| Helder Agostinho, Deputy Assistant Director | Justin Epner, Attorney |

| DATE ISSUED | COMMISSIONER'S SIGNATURE |
|---|---|
| 5/20/2025 | [signature] |

**INSTRUCTIONS AND NOTICES**

The delivery of this demand to you by any method prescribed by the Commission's Rules of Practice is legal service and may subject you to a penalty imposed by law for failure to comply. The production of documents or the submission of answers and report in response to this demand must be made under a sworn certificate, in the form printed on the second page of this demand, by the person to whom this demand is directed or, if not a natural person, by a person or persons having knowledge of the facts and circumstances of such production or responsible for answering each interrogatory or report question. This demand does not require approval by OMB under the Paperwork Reduction Act of 1980.

**PETITION TO LIMIT OR QUASH**

The Commission's Rules of Practice require that any petition to limit or quash this demand be filed within 20 days after service, or, if the return date is less than 20 days after service, prior to the return date. The original and twelve copies of the petition must be filed with the Secretary of the Federal Trade Commission, and one copy should be sent to the Commission Counsel named in Item 5.

**YOUR RIGHTS TO REGULATORY ENFORCEMENT FAIRNESS**

The FTC has a longstanding commitment to a fair regulatory enforcement environment. If you are a small business (under Small Business Administration standards), you have a right to contact the Small Business Administration's National Ombudsman at 1-888-REGFAIR (1-888-734-3247) or www.sba.gov/ombudsman regarding the fairness of the compliance and enforcement activities of the agency. You should understand, however, that the National Ombudsman cannot change, stop, or delay a federal agency enforcement action.

The FTC strictly forbids retaliatory acts by its employees, and you will not be penalized for expressing a concern about these activities.

**TRAVEL EXPENSES**

Use the enclosed travel voucher to claim compensation to which you are entitled as a witness for the Commission. The completed travel voucher and this demand should be presented to Commission Counsel for payment. If you are permanently or temporarily living somewhere other than the address on this demand and it would require excessive travel for you to appear, you must get prior approval from Commission Counsel.

A copy of the Commission's Rules of Practice is available online at http://bit.ly/FTCSRulesofPractice. Paper copies are available upon request.

FTC Form **144** (rev 01/2024)

**CIVIL INVESTIGATIVE DEMAND**
**ISSUED TO NEWSGUARD TECHNOLOGIES, INC.**
**FTC FILE NO. 251-0061**

Unless modified by agreement with the staff of the Federal Trade Commission (the "Commission" or the "FTC"), each Specification of this Civil Investigative Demand ("CID") requires a complete search of NewsGuard Technologies, Inc. ("NewsGuard") as defined in the Definitions, which appear after the following Specifications. Pursuant to the Commission's Rules of Practice, 16 C.F.R. § 2.7(k), NewsGuard representatives must confer with the Commission representative identified in the final instruction of this CID within fourteen days after receipt of this CID. If NewsGuard believes that the required search or any other part of this CID can be narrowed in any way that is consistent with the Commission's need for information, you are encouraged to discuss such questions and possible modifications with the Commission representative. All modifications to this CID must be agreed to in writing pursuant to the Commission's Rules of Practice, 16 C.F.R. § 2.7(l).

1. State where NewsGuard is incorporated and registered and provide a copy of NewsGuard's articles of incorporation and statutes.

2. State the location and full physical address of each of NewsGuard's offices in the United States and worldwide.

3. Provide NewsGuard organizational charts from 2018 through the present or other documents sufficient to show all NewsGuard personnel over the same time period with responsibility for the following: News Reliability Ratings and any other rating, label, or categorization maintained by NewsGuard, including "nutrition labels"; Misinformation Fingerprints; FAILSafe for AI; AI Safety Suite; NewsGuard for Advertising; Media Intelligence Dashboard; TV/CTV Reliability Ratings; Podcast Reliability Ratings; HealthGuard; and any other product, program, project, work, or special report relating to data, analysis, or journalism that helps companies or consumers distinguish between sources of information online.

4. Describe each product and service that NewsGuard currently offers or has offered from 2018 through the present.

5. Provide all documents relating to NewsGuard's News Reliability Ratings and any other rating, label, or categorization maintained by NewsGuard; Misinformation Fingerprints; AI Safety Suite; NewsGuard for Advertising; Intelligence Dashboard; Nutrition Labels; or any other product, program, project, work, or special report relating to data, analysis, or journalism that helps companies or consumers distinguish between sources of information online.

6. Provide all communications between NewsGuard and any other party regarding any request for NewsGuard to apply a particular reliability rating to any news or information outlet, regardless of whether the request was fulfilled.

7. Provide all documents relating to any complaints that NewsGuard received related to its activities, programs, or policies, including but not limited to complaints regarding NewsGuard's decision to apply a reliability rating to any content.

8. Provide all communications between NewsGuard and any advertiser, advertising agency, or any person acting as an agent of an advertiser, including but not limited to demand side platforms and supply side platforms, related to brand safety or any of the NewsGuard programs identified in Specification 4 and 5.

9. Provide all documents relating to other entities that engage, either directly or indirectly, in tracking, categorizing, monitoring, analyzing, evaluating, or rating news, media, sources, outlets, websites, or other content publisher entities for "brand suitability," "reliability," "misinformation," "hate speech," "false" or "deceptive" content, or similar categories. This request includes but is not limited to communications between NewsGuard and any person connected to these entities. For purposes of this Specification, such entities include but are not limited to:

   a. The World Federation of Advertisers ("WFA");
   b. The Global Alliance for Responsible Media ("GARM");
   c. The Global Disinformation Index ("GDI");
   d. The Interactive Advertising Bureau ("IAB");
   e. Ad Fontes Media, Inc.;
   f. The Check My Ads Institute;
   g. Integral Ad Science ("IAS");
   h. DoubleVerify;
   i. Barometer;
   j. Media Matters for America;
   k. The Center for Countering Digital Hate;
   l. Nelez; or
   m. The Media Roundtable.

10. Provide all documents, including letters, narrative responses, and other materials, produced by NewsGuard to the United States Congress as part of a congressional investigation into media censorship, freedom of speech, or NewsGuard activities, including but not limited to documents in Your possession, custody, or control relating to or cited in:

a. The United States House of Representatives Committee on the Judiciary July 10, 2024 Interim Staff Report entitled "GARM's Harm: How the World's Biggest Brands Seek to Control Online Speech;" and

b. The United States House of Representatives Committee on Small Business, Interim Staff Report entitled "Small Business: Instruments and Casualties of the Censorship-Industrial Complex."

11. Submit one or more Data Sets sufficient to show for any news, media, sources, outlets, websites, or other content publisher entities rated, evaluated, assigned a label, or otherwise scored by NewsGuard:

a. The name of the entity;

b. The address of any website(s) associated with the entity;

c. Any unique identifier(s) used to identify the entity across NewsGuard's databases or data sets; and

d. Any categorization of the entity, including but not limited to whether the entity is associated news, satirical, or platform content.

12. For each entity identified in Specification 11, submit one or more Data Sets sufficient to show, from 2018 through the present:

a. The entity's News Reliability Rating, including any scoring changes and when those changes occurred;

b. The scoring of the component criteria used to calculate the entity's News Reliability Rating, including any scoring changes and when those changes occurred; and

c. Any other rating, label, or categorization of entities maintained by NewsGuard, including any changes and when those changes occurred.

13. Provide any list produced, licensed, sold, or otherwise provided by You to any third party that evaluates or categorizes any news, media, sources, outlets, websites, or other content publisher entities by credibility or any other categorical metric maintained by NewsGuard.

14. Provide documents and data sufficient to show the methodology by which NewsGuard evaluates or categorizes any news, media, sources, outlets, websites, or other content publisher entities, including but not limited to the process NewsGuard uses to select the sample of articles on which to rate the entity.

15. Provide documents and data sufficient to show the methodology by which NewsGuard determines the ratings, labels, or categorizations that it applies to news or information sites.

16. Provide any analysis, evaluation, and/or assessment performed by or provided to NewsGuard of the effect of NewsGuard's News Reliability Rating or any other rating, label, or categorization maintained by NewsGuard, on the profits, revenues, unique visitors, subscribers, or any other business metric of any news, media, sources, outlets, websites, or other content publisher entities rated, evaluated, assigned a label, or otherwise scored by NewsGuard, and all data sets and code that would be necessary to replicate the analysis.

17. Provide all documents reflecting allegations that NewsGuard's reliability ratings are politically biased.

18. Provide all documents reflecting allegations that NewsGuard's reliability ratings or rating criteria are unreliable, subjective, unscientific, or otherwise methodologically unsound.

19. Provide all documents relating to the effect of NewsGuard's reliability rating or any other rating, label, or categorization maintained by NewsGuard, on the profits, revenues, unique visitors, subscribers, or any other business metric of any news, media, sources, outlets, websites, or other content publisher entities rated, evaluated, assigned a label, or otherwise scored by NewsGuard.

20. Provide all documents relating to any benefits to advertisers or to advertising brands that come from using any of NewsGuard products,

21. Provide all documents relating to NewsGuard's claim that "Advertising with NewsGuard unlocks: Premium inventory at lower CPMs, driving significant cost efficiencies; Highly engaged news audiences across the political spectrum; Quality environments that boost campaign performance and generate results; [and] Brand integrity and content alignment that creates opportunities rather than restrictions." (https://www.newsguardtech.com/solutions/newsguard-for-advertising/).

22. Provide all documents relating to the purpose of NewsGuard's News Reliability Rating or any other rating, label, or categorization maintained by NewsGuard, including but not limited to promotional and advertising materials created and/or disseminated by NewsGuard.

23. Provide all documents relating to NewsGuard's use of AI technology to provide any of its services.

24. Provide all documents relating to NewsGuard working with ad tech, technology, or developer companies to develop and advance any of NewsGuard's programs, policies, and objectives, including but not limited to any agreements between NewsGuard and these companies.

25. Provide all analyses or studies NewsGuard conducted, sponsored, or commissioned relating to advertising on social media or digital advertising platforms, and all data sets and code that would be necessary to replicate the analysis.

26. Submit one or more Data Sets sufficient to show, for each customer of NewsGuard services (excluding subscribers to the Reality Check newsletter or the NewsGuard browser extension):

    a. The name of the customer;

    b. Any unique identifier(s) used to identify the customer across NewsGuard's databases or data sets; and

    c. Any categorization of the customer type, including but not limited to whether the customer is educational, not-for-profit, governmental, and/or a business.

27. Provide each financial statement, budget, profit and loss statement, cost center report, profitability report, and any other financial report regularly prepared by or for NewsGuard on any periodic basis. For each such statement, budget, or report, state how often it is prepared, and identify the employees responsible for its preparation; provide all such statements and reports on both a quarterly basis and a yearly basis.

28. Submit one or more Data Sets sufficient to show, for each year from 2018 through present:

    a. In total and by each product or service offered by NewsGuard:

        i) Revenues;

        ii) Revenue deductions or adjustments, including but not limited to discounts;

        iii) Costs of goods sold;

        iv) Operating expenses;

        v) Gross margin, including specifying the formula for calculating gross margin;

        vi) Net margin, including specifying the formula for calculating net margin;

        vii) EBITDA;

        viii) EBITDA margin;

        ix) Total number of licenses; and

        x) Total number of customers, including by customer type.

    b. By customers for each customer of NewsGuard identified in Specification 26, in total and by each product or service offered by NewsGuard:

        i) Gross payments received from the customer;

        ii) Payment deductions or adjustments, including but not limited to discounts;

iii) Cost of goods sold; and

iv) Total number of licenses.

29. For each Data Set provided in response to any Specification in this Civil Investigative Demand, provide a data dictionary that includes:

    a. A list of field names and a definition for each field contained in the Data Set;

    b. The meaning of each code that appears as a field value in the Data Set; and

    c. The primary key in the Data Set or table that defines a unique observation.

30. Identify and describe the steps NewsGuard took to preserve documents related to this CID. Submit documents sufficient to show all NewsGuard document retention policies in effect during any portion of the relevant period.

31. Identify the person(s) responsible for preparing the responses to this CID and submit a copy of all instructions prepared by NewsGuard relating to the steps taken to respond. Where oral instructions were given, identify the person who gave the instructions and describe the content of the instructions and the person(s) to whom the instructions were given. For each Specification, identify the individual(s) who assisted in the preparation of the response, with a listing of the persons (identified by name and title or job description) whose files were searched by each. For each Specification requiring a narrative response or data, identify all individuals who provided any information considered or used in drafting the response.

## DEFINITIONS

For purposes of this CID, the following Definitions apply:

1. "NewsGuard Technologies Inc.," "You," "Your," and "NewsGuard" mean NewsGuard, together with its successors, predecessors, divisions, wholly- or partially-owned subsidiaries, committees, working groups, alliances, affiliates, and partnerships, whether domestic or foreign; and all the directors, officers, employees, consultants, agents, and representatives of the foregoing. Identify by name, address, and phone number, each agent or consultant.

2. "Agreement" means any oral or written contract, arrangement, or understanding, whether formal or informal, between two or more Persons, together with all modifications or amendments thereto.

3. "Communication" means any exchange, transfer, or dissemination of information, regardless of the means by which it is accomplished.

4. "Data Set" means all or a subset of data held by, or accessible to, NewsGuard in the normal course of business.

5. "Document" and "documents" mean any information, on paper or in electronic format, including written, recorded, and graphic materials of every kind, in the possession, custody, or control of NewsGuard. The term "documents" includes, without limitation: computer files; email messages; text messages; instant messages and chat logs; other Messaging Applications; group chats; voicemails and other audio files; calendar entries; schedulers; drafts of documents; metadata and other bibliographic or historical data describing or relating to documents created, revised, or distributed electronically; copies of documents that are not identical duplicates of the originals in that Person's files; notes of meetings or telephone calls; and copies of documents the originals of which are not in the possession, custody, or control of NewsGuard.

   a. The term "computer files" includes information stored in, or accessible through, computers or other information retrieval systems. Thus, NewsGuard should produce documents that exist in machine-readable form, including documents stored in personal computers, portable computers, workstations, minicomputers, mainframes, servers, backup disks and tapes, archive disks and tapes, and other forms of offline storage, whether on or off NewsGuard premises. If NewsGuard believes that the required search of backup disks and tapes and archive disks and tapes can be narrowed in any way that is consistent with the Commission's need for documents and information, you are encouraged to discuss a possible modification to this Definition with the Commission representative identified on the last page of this Request. The Commission representative will consider modifying this Definition to:

      i) exclude the search and production of files from backup disks and tapes and archive disks and tapes unless it appears that files are missing from those that exist in personal computers, portable computers, workstations, minicomputers, mainframes, and servers searched by the NewsGuard;

      ii) limit the portion of backup disks and tapes and archive disks and tapes that needs to be searched and produced to certain key individuals, certain time periods, or certain Specifications identified by the Commission representative; or

      iii) include other proposals consistent with Commission policy and the facts of the case.

6. "Each," "any," and "all" mean "each and every." The terms "and" and "or" have both conjunctive and disjunctive meanings as necessary to bring within the scope of this CID anything that might otherwise be outside its scope. The singular form of a noun or pronoun includes its plural form, and vice versa; and the present tense of any word includes the past tense, and vice versa.

7. "Identify" or "specify," when used in reference to a natural person, means to state the person's (1) full name; (2) present or last-known residence and telephone number and present or last-known business address and telephone number; and (3) present or last-known employer and job title. For any person identified, if any of the above information was different during the time period relevant to the CID, supply both the current

information and such different information as applies to the time period relevant to the CID. Once a natural person has been identified properly, it shall be sufficient thereafter when identifying that same person to state the name only.

"Identify" or "specify," when used in reference to a corporation or other non-natural person, means (1) to state that entity's name; (2) to describe its nature (e.g., corporation, partnership, etc.); (3) to state the location of its principal place of business; and (4) to identify the natural person or persons employed by such entity whose actions on behalf of the entity are responsive to the CID. Once such an entity has been identified properly, it shall be sufficient thereafter when identifying that same entity to state the name only.

"Identify" or "specify," when used in reference to facts, acts, events, occurrences, meetings, or communications, means to describe, with particularity, the fact, act, event, occurrence, meeting, or communication in question, including but not limited to (1) identifying the participants and witnesses of the fact, act, event, occurrence, meeting, or communication; (2) stating the date or dates on which the fact, act, event, occurrence, meeting, or communication took place; (3) stating the location(s) at which the fact, act, event, occurrence, meeting, or communication took place; and (4) providing a description of the substance of the fact, act, event, occurrence, meeting, or communication.

8. "Include" and "including" mean "including but not limited to." The use of the term "include" in any request shall not be used to limit the generality or scope of any request. Nor shall the generality of any request be limited by the fact that another request touches on the same topic with a greater or lesser degree of specificity.

9. "Person" or "persons" includes NewsGuard and means any natural person, corporate entity, sole proprietorship, partnership, association, governmental or non-governmental entity, or trust.

10. "Relate," "related to," and "relating to" mean, in whole or in part, addressing, analyzing, concerning, constituting, containing, commenting on, discussing, describing, identifying, referring to, reflecting, reporting on, stating, or dealing with.

11. The term "Messaging Application" refers to any electronic method that has ever been used by NewsGuard and its employees to communicate with each other or entities outside NewsGuard for any business purposes. "Messaging Application" includes platforms, whether for ephemeral or non-ephemeral messaging, for email, chats, instant messages, text messages, and other methods of group and individual communication (e.g., Microsoft Teams, Slack, GroupMe, WhatsApp, Signal, Skype). "Messaging Application" may overlap with "Collaborative Work Environment."

## INSTRUCTIONS

For the purposes of this CID, the following Instructions apply:

I 1. All references to year refer to calendar year. Unless otherwise specified, each of the Specifications calls for: (1) documents for each of the years from January 1, 2018 to the present; and (2) information for each of the years from January 1, 2018 to the present.

Where information, rather than documents, is requested, provide it separately for each year; where yearly data is not yet available, provide data for the calendar year to date. If calendar year information is not available, supply NewsGuard's fiscal year data indicating the 12-month period covered, and provide the NewsGuard's best estimate of calendar year data.

I 2. Do not produce any Sensitive Personally Identifiable Information ("Sensitive PII") or Sensitive Health Information ("SHI") prior to discussing the information with a Commission representative. If any document responsive to a particular Specification contains unresponsive Sensitive PII or SHI, redact the unresponsive Sensitive PII or SHI prior to producing the document. The term "Sensitive Personally Identifiable Information" means an individual's Social Security Number alone; or an individual's name, address, or phone number in combination with one or more of the following:

- Date of birth
- Driver's license number or other state identification number, or a foreign country equivalent
- Passport number
- Financial account number
- Credit or debit care number

The term "Sensitive Health Information" includes medical records and other individually identifiable health information, whether on paper, in electronic form, or communicated orally. Sensitive Health Information relates to the past, present, or future physical or mental health or condition of an individual, the provision of health care to an individual, or the past, present, or future payment for the provision of health care to an individual.

I 3. Except for privileged material, NewsGuard will produce each responsive document in its entirety by including all attachments and all pages, regardless of whether they directly relate to the specified subject matter. NewsGuard should submit any appendix, table, or other attachment by either attaching it to the responsive document or clearly marking it to indicate the responsive document to which it corresponds. Attachments must be produced along with the document to which they are attached, regardless of whether they have been produced separately. Except for privileged material, NewsGuard will not redact, mask, cut, expunge, edit, or delete any responsive document or portion thereof in any manner.

I 4. Compliance with this CID requires a search of all documents in the possession, custody, or control of NewsGuard, including, without limitation, those documents held by any of NewsGuard's officers, directors, employees, agents, representatives, or legal counsel, whether or not such documents are on the premises of NewsGuard. If any person is unwilling to have his or her files searched, or is unwilling to produce responsive documents, NewsGuard must provide the Commission with the following information as

to each such person: his or her name, address, telephone number, and relationship to NewsGuard.

I 5. Form of Production: NewsGuard shall submit documents as instructed below absent written consent from the Commission representative.

a. Documents stored in electronic or hard copy formats in the ordinary course of business shall be submitted in the following electronic format provided that such copies are true, correct, and complete copies of the original documents:

i) Submit Microsoft Excel, Access, and PowerPoint files in native format with extracted text and metadata.

ii) Submit emails in TIFF (Group IV) format with extracted text and the following metadata and information:

| Metadata/Document Information | Description |
|---|---|
| Spec No. | Subpoena/request paragraph number to which the document is responsive. |
| Alternative Custodian | List of custodians where the document has been removed as a duplicate. |
| Bates Begin | Beginning Bates number of the email. |
| Bates End | Bates number of the last page of the email. |
| Beg Attach | First Bates number of attachment range. |
| End Attach | Ending Bates number of attachment range. |
| Custodian | Name of the person from whom the email was obtained. |
| Email BCC | Names of person(s) blind copied on the email. |
| Email CC | Names of person(s) copied on the email. |
| Email Date Received | Date the email was received. [MM/DD/YYYY] |
| Email Date Sent | Date the email was sent. [MM/DD/YYYY] |
| Email From | Names of the person who authored the email. |
| Email Message ID | Microsoft Outlook Message ID or similar |

| Metadata/Document Information | Description |
|---|---|
| | value in other message systems. |
| Email Subject | Subject line of the email. |
| Email Time Received | Time email was received. [HH:MM:SS AM/PM] |
| Email To | Recipients(s) of the email. |
| Email Time Sent | Time email was sent. [HH:MM:SS AM/PM] |
| Page count | Number of pages in record |
| File size | Size of document in KB |
| File Extension | File extension type (e.g., docx, xlsx) |
| Record Type | Indicates form of record: E-Doc, E-Doc Attachment, Email, Email Attachment, HardCopy, Calendar Appt, Text Message, Chat Message, etc. |
| Folder | File path/folder location of email. |
| Filename with extension | Name of the original native file with file extension. |
| Hash | Identifying value used for deduplication – typically SHA1 or MD5. |
| Redaction | Indicates Yes or No status regarding document redactions. |
| Text Link | Relative path to submitted text file. Example: \TEXT\001\FTC0003090.txt |

iii) Submit email attachments other than those described in subpart (a)(i) in TIFF (Group IV) format. For all email attachments, provide extracted text and the following metadata and information as applicable:

| Metadata/Document Information | Description |
|---|---|
| Spec No. | Subpoena/request paragraph number to which the document is responsive. |
| Alternative Custodian | List of custodians where the document has been removed as a duplicate. |
| Bates Begin | Beginning Bates number of the document. |
| Bates End | Last Bates number of the document. |
| Beg Attach | First Bates number of attachment range. |
| End Attach | Ending Bates number of attachment range. |
| Custodian | Name of person from whom the file was obtained. |
| Date Created | Date the file was created. [MM/DD/YYY] |
| Date Modified | Date the file was last changed and saved. [MM/DD/YYYY] |
| Page count | Number of pages in record |
| File size | Size of document in KB |
| File Extension | File extension type (e.g., docx, xlsx) |

| Metadata/Document Information | Description |
|---|---|
| Filename with extension | Name of the original native file with file extension. |
| Record Type | Indicates form of record: E-Doc, E-Doc Attachment, Email, Email Attachment, HardCopy, Calendar Appt, Text Message, Chat Message, etc. |
| Hash | Identifying value used for deduplication – typically SHA1 or MD5. |
| Author | Author field value extracted from the metadata of a native file. |
| Last Author | Last Saved By field value extracted from metadata of a native file. |
| Redaction | Indicates Yes or No status regarding document redactions. |
| Native Link | Relative file path to submitted native or near native files.<br>Example: \NATIVES\001\FTC0003090.xls |
| Parent ID | Document ID or beginning Bates number of the parent email. |
| Text Link | Relative path to submitted text file.<br><br>Example: \TEXT\001\FTC0003090.txt |
| Time Created | Time file was created. [HH:MM:SS AM/PM] |
| Time Modified | Time file was saved. [HH:MM:SS AM/PM] |

iv) Submit all other electronic documents, other than those described in subpart (a)(i), in TIFF (Group IV) format accompanied by extracted text and the following metadata and information:

| Metadata/Document Information | Description |
|---|---|
| Spec No. | Subpoena/request paragraph number to which the document is responsive. |
| Alternative Custodian | List of custodians where the document has been removed as a duplicate. |
| Bates Begin | Beginning Bates number of the document |
| Bates End | Last Bates number of the document. |
| Beg Attach | First Bates number of attachment range. |
| End Attach | Ending Bates number of attachment range. |
| Custodian | Name of the original custodian of the file. |
| Date Created | Date the file was created. [MM/DD/YYY] |
| Date Modified | Date the file was last changed and saved. [MM/DD/YYYY HH:MM:SS AM/PM] |
| Record Type | Indicates form of record: E-Doc, E-Doc Attachment, Email, Email Attachment, HardCopy, Calendar Appt, Text Message, Chat Message, etc. |
| Author | Author field value extracted from the metadata of a native file. |
| Last Author | Last Saved By field value extracted from metadata of a native file. |
| Redaction | Indicates Yes or No status regarding document redactions. |
| Page count | Number of pages in record |
| File size | Size of document in KB |
| File Extension | File extension type (e.g., docx, xlsx) |
| Filename with extension | Name of the original native file with file extension. |

| Metadata/Document Information | Description |
|---|---|
| Hash | Identifying value used for deduplication – typically SHA1 or MD5. |
| Originating Path | File path of the file as it resided in its original environment. |
| Production Link | Relative path to submitted native or near native files. Example: \NATIVES\001\FTC0003090.xls |
| Native Link | Relative path to submitted native or near native files.<br><br>Example: \NATIVES\001\FTC0003090.xls |
| Text Link | Relative path to submitted text file. Example: \TEXT\001\FTC-0003090.txt |
| Time Created | Time file was created. [HH:MM:SS AM/PM] |
| Time Modified | Time file was saved. [HH:MM:SS AM/PM] |

v) Submit documents stored in hard copy in TIFF (Group IV) format accomplished by OCR with the following information:

| Metadata/Document Information | Description |
|---|---|
| Spec No. | Subpoena/request paragraph number to which the document is responsive. |
| Bates Begin | Beginning Bates number of the document. |
| Bates End | Bates number of the last page of the document. |
| Record Type | Indicates form of record: E-Doc, E-Doc Attachment, Email, Email Attachment, HardCopy, Calendar Appt, Text Message, Chat Message, etc. |
| Page count | Number of pages in record. |

| | |
|---|---|
| Redaction | Indicates Yes or No status regarding document redactions. |
| Custodian | Name of person from whom the file was obtained. |

vi) Submit redacted documents in TIFF (Group IV) format accompanied by OCR with the metadata and information required by relevant document type in subparts (a)(i) through (a)(v) above. For example, if the redacted file was originally an attachment to an email, provide the metadata and information specified in subpart (a)(iii) above. Additionally, please provide a basis for each privilege claim as detailed in Instruction 9.

b. Submit data compilations in electronic format, specifically Microsoft Excel spreadsheets or delimited text formats, with all underlying data un-redacted and all underlying formulas and algorithms intact. Submit data separately from document productions.

c. Produce electronic file and ESI processed submissions as follows:

i) For productions over 20 gigabytes, use an External Hard Disc Drive (stand-alone portable or hard drive enclosure) or USB Flash Drive in Microsoft Windows-compatible, uncompressed data format.

ii) For productions under 20 gigabytes, submissions may be transmitted electronically via FTP. The FTC uses Kiteworks Secure File Transfer. To request a Kiteworks upload invitation, contact the FTC representative identified in the request you received. Use of other File Transfer methods is permitted. Please discuss this option with the FTC representative identified in the CID to determine the viability.

iii) CD-ROM (CD-R, CD-RW) optical disks and DVD-ROM (DVD+R, DVD+RW) optical disks for Windows-compatible personal computers, and USB 2.0 Flash Drives are acceptable storage formats.

iv) <u>All documents produced in electronic format shall be scanned for and free of viruses prior to submission. The Commission will return any infected media for replacement, which may affect the timing of NewsGuard's compliance with this CID.</u>

v) Encryption of productions using NIST FIPS-Compliant cryptographic hardware or software modules, with passwords sent under separate cover, is strongly encouraged.

d. Each production shall be submitted with a transmittal letter that includes the FTC matter number; production volume name; encryption method/software used; list of

custodians and document identification number range for each; total number of documents; and a list of load file fields in the order in which they are organized in the load file.

e. If NewsGuard intends to utilize any de-duplication or email threading software or services when collecting or reviewing information that is stored in NewsGuard's computer systems or electronic storage media, or if NewsGuard's computer systems contain or utilize such software, NewsGuard must contact the Commission representative to determine, with the assistance of the appropriate government technical officials, whether and in what manner NewsGuard may use such software or services when producing materials in response to this CID.

I 6. Before using software or technology (including search terms, email threading, Technology Assisted Review, deduplication, or similar technologies) to identify or eliminate documents, data, or information potentially responsive to this CID, NewsGuard must submit a written description of the method(s) used to conduct any part of its search. In addition, for any process that relies on search terms to identify or eliminate documents, NewsGuard must submit: (a) a list of proposed terms; (b) a tally of all the terms that appear in the collection and the frequency of each term; (c) a list of stop words and operators for the platform being used; and (d) a glossary of industry and NewsGuard terminology. For any process that relies on a form of Technology Assisted Review to identify or eliminate documents, NewsGuard must include (a) confirmation that subject-matter experts will be reviewing the seed set and training rounds; (b) recall, precision, and confidence-level statistics (or an equivalent); and (c) a validation process that allows Commission representatives to review statistically-significant samples of documents categorized as non-responsive documents by the algorithm.

I 7. All documents responsive to this CID:

a. shall be produced in complete form (e.g., including all family members, including Modern Attachments), un-redacted unless privileged, and in the order in which they appear in NewsGuard's files;

b. shall be marked on each page with corporate identification and consecutive document control numbers when produced in TIFF format (e.g., ABC-00000001);

c. if written in a language other than English, shall be translated into English, with the English translation attached to the foreign language document;

d. shall be produced in color where necessary to interpret the document (if the coloring of any document communicates any substantive information, or if black-and-white photocopying or conversion to TIFF format of any document (e.g., a chart or graph), makes any substantive information contained in the document unintelligible, NewsGuard must submit the original document, a like-colored photocopy, or a JPEG-format TIFF);

e. shall be accompanied by an index that identifies: (i) the name of each person from whom responsive documents are submitted; and (ii) the corresponding consecutive

document control number(s) used to identify that person's documents, and if submitted in paper form, the box number containing such documents. If the index exists as a computer file(s), provide the index both as a printed hard copy and in machine-readable form (provided that the Commission representative determines prior to submission that the machine-readable form would be in a format that allows the agency to use the computer files). The Commission representative will provide a sample index upon request; and

f. shall be accompanied by an affidavit of an officer of NewsGuard stating that the copies are true, correct, and complete copies of the original documents.

I 8. If any documents or parts of documents are withheld from production based on a claim of privilege, provide a statement of the claim of privilege and all facts relied upon in support thereof, in the form of a log that includes, in separate fields, a privilege identification number; beginning and ending document control numbers; parent document control numbers; attachments document control numbers; family range; number of pages; all authors; all addressees; all blind copy recipients; all other recipients; all custodians; date of the document; the title or subject line; an indication of whether it is redacted; the basis for the privilege claim (e.g., attorney-client privilege), including the underlying privilege claim if subject to a joint-defense or common-interest agreement; and a description of the document's subject matter. Attachments to a document should be identified as such and entered separately on the log. For each author, addressee, and recipient, state the Person's full name, title, and employer or firm, and denote all attorneys with an asterisk. The description of the subject matter shall describe the nature of each document in a manner that, though not revealing information itself privileged, provides sufficiently detailed information to enable Commission staff, the Commission, or a court to assess the applicability of the privilege claimed. For each document or part of a document withheld under a claim that it constitutes or contains attorney work product, also state whether NewsGuard asserts that the document was prepared in anticipation of litigation or for trial and, if so, identify the anticipated litigation or trial upon which the assertion is based. Submit all non-privileged portions of any responsive document (including non-privileged or redactable attachments) for which a claim of privilege is asserted (except where the only non-privileged information has already been produced in response to this Instruction), noting where redactions in the document have been made. Documents authored by outside lawyers representing NewsGuard that were not directly or indirectly furnished to NewsGuard or any third party, such as internal law firm memoranda, may be omitted from the log. Provide the log in Microsoft Excel readable format.

I 9. If NewsGuard is unable to answer any question fully, supply such information and data as are available. Explain why the answer is incomplete, the efforts made by NewsGuard to obtain the information and data, and the source from which the complete answer may be obtained. If books and records that provide accurate answers are not available, enter best estimates and describe how the estimates were derived, including the sources or bases of such estimates. Estimated data should be followed by the notation "est." If there is no reasonable way for NewsGuard to make an estimate, provide an explanation.

I 10. If documents responsive to a particular Specification no longer exist for reasons other than the ordinary course of business or the implementation of NewsGuard's document retention policy, but NewsGuard has reason to believe have been in existence, state the circumstances under which they were lost or destroyed, describe the documents to the fullest extent possible, state the Specification(s) to which they are responsive, and identify the persons having knowledge of the content of such documents.

I 11. Do not destroy or dispose of documents responsive to this CID, or any other documents relating to the subject matter of this CID. The destruction or disposal of such documents during the pendency of this investigation might constitute a felony in violation of 18 U.S.C. § 1505 and 18 U.S.C. § 1512.

I 12. In order for NewsGuard's response to this CID to be complete, the attached certification form must be executed by the NewsGuard official supervising compliance with this CID, notarized, and submitted along with the responsive materials.

I 13. Any questions you have relating to the scope or meaning of anything in this CID or suggestions for possible modifications thereto should be directed to Justin Epner at (202) 326-2942 or jepner@ftc.gov. The response to the CID shall be delivered per the instruction of Mr. Epner during the course of normal business (8:30 a.m. to 5:30 p.m., Monday through Friday). Mr. Epner will provide specific mail delivery instructions should that method of transmittal be required.

**CERTIFICATION OF COMPLIANCE**

**Pursuant to 28 U.S.C. § 1746**

I, __________________________, certify the following with respect to the Federal Trade Commission's ("FTC") Civil Investigative Demand directed to NewsGuard Technologies, Inc. ("NewsGuard") (FTC File No. 251-0061) (the "CID"):

1. NewsGuard has identified all documents, information, and/or tangible things ("responsive information") in NewsGuard's possession, custody, or control responsive to the CID and either:
    a. provided such responsive information to the FTC; or
    b. for any responsive information not provided, given the FTC written objections setting forth the basis for withholding the responsive information.
2. I verify that the responses to the CID are complete and true and correct to my knowledge.

I certify under penalty of perjury that the foregoing is true and correct.

Date: _________________________

______________________________
Signature

______________________________
Printed Name

______________________________
Title

**UNITED STATES OF AMERICA**
**BEFORE THE FEDERAL TRADE COMMISSION**

**COMMISSIONERS:** **Lina M. Khan, Chair**
**Noah Joshua Phillips**
**Rebecca Kelly Slaughter**
**Christine S. Wilson**
**Alvaro M. Bedoya**

**RESOLUTION DIRECTING USE OF COMPULSORY PROCESS IN NONPUBLIC INVESTIGATIONS OF COLLUSIVE PRACTICES**

**File No. P859910**

Nature and Scope of Investigation:

To investigate whether any persons, partnerships, corporations, or others have engaged or are engaging in inviting, initiating, participating in, or facilitating collusion or coordination in any way with any other market participant, whether through private communications, public statements, sharing information, or other actions, in violation of Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, as amended, or any other statutes or rules enforced by the Commission; and to determine the appropriate action or remedy, including whether injunctive and monetary relief would be in the public interest.

The Federal Trade Commission hereby resolves and directs that any and all compulsory processes available to it be used in connection with any inquiry within the nature and scope of this resolution for a period not to exceed ten years. The expiration of this ten-year period shall not limit or terminate the investigation or the legal effect of any compulsory process issued during the ten-year period. The Federal Trade Commission specifically authorizes the filing or continuation of actions to enforce any such compulsory process after the expiration of the ten-year period.

Authority to Conduct Investigation:

Sections 6, 9, 10, and 20 of the Federal Trade Commission Act, 15 U.S.C. §§ 46, 49, 50, and 57b- 1, as amended; and FTC Procedures and Rules of Practice, 16 C.F.R. § 1.1 *et seq*., and supplements thereto.

By direction of the Commission.

**Issued: July 1, 2022**
**Expires: July 1, 2032**

April J. Tabor
Secretary

# Exhibit 16

UNITED STATES OF AMERICA
Federal Trade Commission
WASHINGTON, D.C. 20580

January 15, 2026

**VIA EMAIL**

NewsGuard Technologies, Inc.
c/o Sophia A. Hansell, Esq.
Gibson Dunn & Crutcher LLP
1700 M Street, NW
Washington, DC 20036
SHansell@gibsondunn.com

**Re: FTC File No. 251-0061**

Dear Ms. Hansell:

This letter responds to your request for clarification in our January 13, 2025 teleconference as to NewsGuard Technologies, Inc.'s ("NewsGuard") obligations under the May 20, 2025 Civil Investigative Demand ("CID") issued by the Commission. As staff have said consistently during multiple meet-and-confer teleconferences with NewsGuard,[1] this investigation seeks information regarding potential anticompetitive behavior by companies operating in the online digital advertising ecosystem, including whether certain companies may have colluded to deny advertising revenue to American political commentary publishers. While we appreciate the materials NewsGuard has produced to date, we require a discrete set of additional information before we can accept a certification of compliance with the CID.

Therefore, consistent with staff's good-faith effort to reduce NewsGuard's burden consistent with the Commission's need for information, this letter modifies the CID pursuant to FTC Rule 2.7(*l*) as follows:

> **Specification 8**. Modified to limit the Specification to communications between NewsGuard and any advertiser, advertising agency, or any person acting as an agent of an advertiser, including but not limited to demand side platforms and supply side platforms, with whom NewsGuard had a commercial relationship relating to NewsGuard News Reliability Ratings.
>
> **Specification 11**. Modified to limit the Specification to entities to whom NewsGuard has assigned a News Reliability Rating.

[1] May 28, 2025, June 4, 2025, June 18, 2025, July 10, 2025, July 18, 2025, July 31, 2025, August 21, 2025, September 8, 2025, November 17, 2025, and January 13, 2026.

**Specification 12**. Specification 12 remains outstanding.

**Specification 15**. Modified to limit the Specification to documents sufficient to show the methodology by which NewsGuard determines NewsGuard's News Reliability Ratings, including internal correspondence about the process of developing the methodology.

**Specification 26**. Modified to limit the Specification to Data Sets sufficient to show, for each customer (other than natural persons) of NewsGuard News Reliability Ratings: the name of the customer; any unique identifier(s) used to identify the customer across NewsGuard's databases or data sets; and any categorization of the customer type, including but not limited to whether the customer is educational, not-for-profit, governmental, and/or a business.

As to the Specifications not specifically addressed in this modification letter, based on its prior productions NewsGuard has satisfied its CID obligations, except for Specification 12, for which NewsGuard owes a response.

As you are aware, the modifications granted in this letter are substantial. In letters dated June 27, July 17, and August 15, 2025, as well as in meet-and-confer teleconferences, you objected to the CID as unduly burdensome. While we disagree, these modifications should serve to address any burden concerns that NewsGuard may have.

If you have any questions concerning the CID or this letter, please contact Justin Epner at (202) 326-2942 or jepner@ftc.gov. As you know, modifications may only be made in writing and by a Commission representative.

*/s/ Patricia Galvan*
Patricia Galvan
Assistant Director
Technology Enforcement Division
Bureau of Competition

cc:
Justin Epner
Ted Zang
Attorneys, Bureau of Competition

# Exhibit 17

FEDERAL TRADE COMMISSION
PROTECTING AMERICA'S CONSUMERS

For Release

# FTC Prevents Anticompetitive Coordination in Global Advertising Merger

June 23, 2025

**Tags:** Competition | Bureau of Competition | Merger | coordinated interaction

Today, the Federal Trade Commission took action to resolve antitrust concerns related to Omnicom Group Inc.'s $13.5 billion acquisition of The Interpublic Group of Companies, Inc. (IPG).

The FTC accepted a proposed consent order that will prevent potential anticompetitive coordination by Omnicom, a global advertising agency that facilitates media buying by representing advertisers in negotiations with media publishers over conditions such as pricing, ad placement, and sponsorships, as well as helping execute advertisers' ad campaigns.

Omnicom and IPG are the third- and fourth-largest media buying advertising agencies in the U.S. Combined, they will be the world's largest media buying advertising agency. The proposed order imposes restrictions that prevent Omnicom from engaging in collusion or coordination to direct advertising away from media publishers based on the publishers' political or ideological viewpoints.

"Websites and other publications that rely on advertising are critical to the flow of our nation's commerce and communication," said Daniel Guarnera, Director of the FTC's Bureau of Competition. "Coordination among advertising agencies to suppress advertising spending on publications with disfavored political or ideological viewpoints threatens to distort not only competition between ad agencies, but also public discussion and debate. The FTC's action today prevents unlawful coordination that targets specific political or ideological viewpoints while preserving individual advertisers' ability to choose where their ads are placed. I thank the FTC staff for their thorough investigation of this merger."

The proposed consent order resolves an FTC complaint alleging that Omnicom's acquisition of IPG threatens to further consolidate the U.S. media buying services market. Further consolidation risks eroding competition by increasing the risk of media buying coordination among the remaining advertising agencies, which have a history of engaging in coordination.

The FTC's complaint alleges that advertising agencies have coordinated—including through industry associations—on decisions not to advertise on certain websites and applications. Coordination among advertising firms may reduce ad revenues for particular media publishers, forcing those publishers to reduce the amount of content they can offer to their own consumers and their investment in their sites.

The terms of the FTC's proposed consent order include a series of provisions that would eliminate Omnicom's ability to deny advertising dollars to media publishers based on their political or ideological viewpoint, except at the express and individualized direction of Omnicom's advertiser customers.

The Commission vote to issue the complaint and accept the consent agreement for public comment was 2-0-1, with Commissioner Mark R. Meador recused. Chairman Andrew N. Ferguson issued a statement.

The public will have 30 days to submit comments on the proposed consent agreement package. Instructions for filing comments appear on the docket. Once processed, they will be posted on Regulations.gov.

**NOTE:** The Commission issues an administrative complaint when it has "reason to believe" that the law has been or is being violated, and it appears to the Commission that a proceeding is in the public interest. When the Commission issues a consent order on a final basis, it carries the force of law with respect to future actions.

The Federal Trade Commission works to promote competition, and to protect and educate consumers. The FTC will never demand money, make threats, tell you to transfer money, or promise you a prize. You can learn more about how competition benefits consumers, file an antitrust complaint, or comment on a proposed merger. For the latest news and resources, follow the FTC on social media, subscribe to press releases, and read our blog.

# Contact Information

## Media Contact

Office of Public Affairs
Office of Public Affairs
202-326-2180

# Exhibit 18

UNITED STATES OF AMERICA
**Federal Trade Commission**
WASHINGTON, D.C. 20580

Office of the Chairman

**Statement of Chairman Andrew N. Ferguson**
**In the Matter of Omnicom Group / The Interpublic Group of Cos.**
**Matter Number 2510049**

June 23, 2025

The Commission today authorizes the filing of an administrative complaint and proposed decision and order requiring Omnicom Group Inc. ("Omnicom") and The Interpublic Group of Companies, Inc. ("IPG") to refrain from practices that damage competition in the media-buying services market post-merger. Omnicom is the third-largest provider of media buying services by revenue, and IPG is the fourth-largest.[1] The merger would increase concentration in this market and risk competitive harm.[2] Without the commitments obtained by the Commission, I have reason to believe that the effect of Omnicom's proposed acquisition of IPG "may be substantially to lessen competition."[3]

I

Omnicom and IPG are two of the six major global advertising holding companies ("holdcos").[4] These advertising holdcos are conglomerates of various advertising agencies acquired over time.[5] Advertising agencies play an essential role in linking advertisers with media publishers, including television networks, print publications, websites, and social media platforms.[6] Advertisers understandably do not necessarily possess the in-house expertise to determine where their advertisements should be placed. They therefore hire advertising agencies not only to make many of these decisions for them, but also to represent advertisers in negotiations with media publishers on key terms such as pricing, ad placement, sponsorships, and exclusives.[7] In serving this role, the advertising agencies hold great influence over where advertisers market their products and spend their advertising dollars. The advertising agencies' decisions then are critical to the success and failure of publishers: most publishers would not be economically viable without sufficient advertising revenue. This impact is not limited to behemoth publishers like television networks, social-media platforms, and major websites. It also includes thousands of small, independent publishers who serve important, unique consumer needs, and are vital to the free exchange of ideas.

---

[1] Complaint ¶ 11, *In the Matter of Omnicom Group and The Interpublic Group of Cos.*, Matter No. 2510049 ("Complaint").
[2] *Id.* ¶ 13; see also Omnicom to Acquire Interpublic in Deal that Will Reshape Advertising Industry, Wall St. J. (Dec. 9, 2024), https://www.wsj.com/business/media/omnicom-to-acquire-interpublic-group-in-deal-that-will-reshape-advertising-industry-eed6f1b3.
[3] 15 U.S.C. § 18.
[4] Complaint ¶¶ 6, 12.
[5] *Id.* ¶ 6.
[6] *Id.* ¶ 7.
[7] *Ibid*.

Advertising agencies compete on many dimensions, including in the market no broader than media-buying services.[8] "Media-buying services" refers to the purchase of advertising space from publishers for or on behalf of advertisers.[9] Historically agencies needed scale to achieve favorable results in negotiations with publishers, encouraging consolidation in the market to today's so-called "Big Six."[10]

Omnicom's proposed acquisition of IPG would consolidate the media-buying services market even further. It would bring together the third- and fourth-largest companies in this market to form a new number one, while reducing the number of significant competitors from six to five.[11] As a result, concentration in this market would increase. One of the great dangers of mergers such as this one is that they increase the risk of collusion among the remaining firms, which can lead to higher prices, reduced output, and other actions that harm consumers such as degraded quality.[12] This risk is what is often referred to as "coordinated effects"—a merger leads to reduced competition not because of a single firm's unilateral actions, but because a group of firms coordinate their behavior in anticompetitive ways.[13]

The rationale for this longstanding concern about the increased risk of coordinated effects from higher concentration is straightforward. The ease of coordination is inversely related to the number of firms in a market. Collusion and coordination are easier in concentrated markets with few participants than in unconcentrated markets with many participants. Collusion, of course, is "the supreme evil of antitrust."[14] Section 7 of the Clayton Act therefore prohibits mergers that "create an appreciable danger of collusive practices in the future."[15] Decades-old precedent establishes that a merger that reduces the number of competitors from six to five, like this one, can, in some circumstances, suffice to establish a Section 7 violation.[16] That is not to say that a six-to-five merger always violates Section 7. This precedent merely establishes that increased consolidation raises antitrust concerns, and the reduction of a market from six to five competitors increases the risk of collusion in that market. Leading antitrust scholars across the spectrum have similarly identified mergers that increased the risks of coordinated effects as suspect.[17] And the

---

[8] *Id*. ¶ 9.
[9] *Ibid*.
[10] *Id*. ¶¶ 8, 12.
[11] *Id*. ¶¶ 11, 13.
[12] Phillip Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application ¶ 916 (rev. ed. 2024) ("Areeda & Hovenkamp") ("Today the most orthodox and probably the commonly asserted rationale for challenging mergers is that under appropriate circumstances they can facilitate express collusion or oligopoly interaction among the various firms in the post-merger market, including both those that participated in the merger and those that did not."); see also *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.,* 509 U.S. 209, 229–30 (1993) ("In the § 7 context, it has long been settled that excessive concentration, and the oligopolistic price coordination it portends, may be the injury to competition the Act prohibits.").
[13] Complaint ¶ 15.
[14] *Verizon Commc'ns v. Law Offs. of Curtis V. Trinko*, 540 U.S. 398, 408 (2004).
[15] *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 719 (D.C. Cir. 2001) (cleaned up).
[16] *FTC v. Elders Grain, Inc.*, 868 F.2d 901, 905 (7th Cir. 1989) (Posner, J.) (affirming preliminary injunction and explaining that "[t]he supply of industrial dry corn was already highly concentrated before the acquisition, with only six firms of any significance. The acquisition has reduced that number to five. This will make it easier for leading members of the industry to collude on price and output….").
[17] See *Hosp. Corp. of Am. v. FTC*, 807 F.2d 1381, 1386 (7th Cir. 1986) (Posner, J.) ("When an economic approach is taken in a section 7 case, the ultimate issue is whether the challenged acquisition is likely to facilitate collusion."); D. Daniel Sokol & Sean P. Sullivan, The Decline of Coordinated Effects Enforcement and How to Reverse It, 76 Fla. L.

antitrust agencies' joint merger guidelines dating back to 1992 have uniformly declared that a merger which increases the risk of coordination can violate Section 7.[18] The 2023 Merger Guidelines' similar declaration that "[m]ergers can violate the law when they increase the risk of coordination," then reiterates what decades of precedent, scholarship, and previous guidelines have long pronounced.[19]

One factor that courts, scholars, and the antitrust agencies have long considered in evaluating the risk of coordinated effects resulting from a merger is whether there is a history of actual or attempted collusion in the industry at issue.[20] A history of collusion, explicit or tacit, demonstrates that firms have been willing and able to coordinate their actions in the past, making it more likely that they will do so again after a merger, particularly if the merger changes market structure in a way that favors further coordination. The Commission must "investigate whether facts suggest a greater risk of coordination than market structure alone would suggest."[21]

Here, the Complaint alleges such a history of market participants coordinating their conduct. In recent years, the advertising industry has been plagued by deliberate, coordinated efforts to steer ad revenue away from certain news organizations, media outlets, and social media networks.[22] This type of coordination risks America's largest companies' economic weight

---

Rev. 265, 268 & 271 (2024) ("The greatest threat today is … *oligopoly* power: the ability of a few competitors to do by coordinated conduct the same things a monopolist would do."; "The need for vigilance against coordinated effects in merger review is a point upon which opposing philosophies have found common ground.") (emphasis in original); Herbert Hovenkamp, Prophylactic Merger Policy, 70 Hastings L.J. 45, 51–55 (2018).

[18] Dep't of Justice & Fed. Trade Comm'n, Horizontal Merger Guidelines § 2.1 (April 2, 1992) ("It is likely that market conditions are conducive to coordinated interaction when the firms in the market previously have engaged in express collusion and when the salient characteristics of the market have not changed appreciably since the most recent such incident.") ("1992 Merger Guidelines"); Dep't of Justice & Fed. Trade Comm'n, Horizontal Merger Guidelines § 2.1 (Apr. 8, 1997) (same); Dep't of Justice & Fed. Trade Comm'n, Horizontal Merger Guidelines § 7.2 (Aug. 19, 2010) ("The Agencies presume that market conditions are conducive to coordinated interaction if firms representing a substantial share in the relevant market appear to have previously engaged in express collusion affecting the relevant market, unless competitive conditions in the market have since changed significantly. … Previous collusion or attempted collusion in another product market may also be given substantial weight if the salient characteristics of that other market at the time of the collusion are closely comparable to those in the relevant market."). The Department of Justice's 1982 Merger Guidelines likewise already declared that "Where only a few firms account for most of the sales of a product, those firms can in some circumstances coordinate, explicitly or implicitly, their actions in order to approximate the performance of a monopolist." Dep't of Justice, Merger Guidelines Part I (June 14, 1982) ("1982 DOJ Merger Guidelines").

[19] Dep't. of Justice & Fed. Trade Comm'n, Merger Guidelines § 2.3 (Dec. 18, 2023) ("2023 Merger Guidelines").

[20] *FTC v. RAG-Stiftung*, 436 F. Supp. 3d 278, 313 (D.D.C. 2020) (citing and quoting discussion of past collusion in an industry from § 7.1 of the antitrust agencies' 2010 Horizontal Merger Guidelines in addressing market vulnerability to coordination); *New York v. Deutsche Telekom AG*, 439 F. Supp. 3d 179, 234 (S.D.N.Y. 2020) (similar); 2023 Merger Guidelines § 2.3A (outlining three "primary factors" for assessing the increased risk of coordination—(1) the existence of a highly concentrated market, (2) prior actual or attempted attempts to coordinate, and (3) elimination of a maverick.); 1992 Merger Guidelines § 2.1 (recognizing that past collusion in an industry can be one of the factors giving rise to concerns that following a merger, the remaining firms may coordinate activities); 1982 DOJ Merger Guidelines Part III ("The Department is more likely to challenge a merger in the following circumstances: [] Firms in the market previously have been found to have engaged in horizontal collusion regarding price, territories, or customers, and the characteristics of the market have not changed appreciably since the most recent finding").

[21] 2023 Merger Guidelines at 3.

[22] Complaint ¶¶ 17–18, 20; see also The mysterious group that's picking Breitbart apart, one tweet at a time, Wash. Post (Sept. 22, 2017), https://www.washingtonpost.com/lifestyle/style/the-mysterious-group-thats-picking-breitbart-apart-one-tweet-at-a-time/2017/09/22/df1ee0c0-9d5c-11e7-9083-fbfddf6804c2_story.html; 20-Plus Brands Have

unwittingly being enlisted for the political and ideological aims of certain advertising industry groups and political activists who in turn avoid the costs they would incur if they merely refused to deal on their own.[23] Indeed, a Congressional investigation[24] concluded that the World Federation of Advertisers' Global Alliance for Responsible Media ("GARM") banded together the most powerful firms in their industry to choke off the vital advertising revenue of those who disagreed with them, disseminated information they believed untrue, or refused to deplatform those who did.[25] The World Federation of Advertisers' members, which include Omnicom and IPG, account for roughly 90 percent of global advertising spending.[26] Both Omnicom and IPG also are founding members of GARM.[27]

GARM has disbanded under a cloud of litigation and congressional investigation.[28] The Commission has not been a party to those actions, and I take no position on any possible violation of the antitrust laws by GARM. The factual allegations, however, if true, paint a troubling picture of a history of coordination—that the group sought to marshal its members into collective boycotts to destroy publishers of content of which they disapproved.[29]

Pre-closing merger analysis is necessarily a prediction of the likelihood that the risks posed by a merger will come to pass.[30] When participants in the industry of a proposed merger have a history of actual or attempted collusion, like alleged for the instant transaction, the Commission must be particularly vigilant.[31] In a market like advertising, where we are presented not only with increasing concentration in the relevant market, but also a troubling history of collusion to the detriment of consumers and the free conduct of American political discourse and elections, that duty is especially pressing.[32]

---

Stopped Advertising on Tucker Carlson Tonight After Immigration Comments, Ad Week (Dec. 20, 2018), https://www.adweek.com/convergent-tv/20-plus-brands-have-stopped-advertising-on-tucker-carlson-tonight-after-immigration-comments/; Snapchat And Pinterest Benefited From The Facebook Boycott – But Can They Keep It Going?, Ad Exchanger (Feb. 9, 2021), https://www.adexchanger.com/social-media/snapchat-and-pinterest-benefited-from-the-facebook-boycott-but-can-they-keep-it-going/; Advertisers continue to flee Twitter as civil rights groups call for a boycott, Engadget (Nov. 4, 2022), https://www.engadget.com/twitter-losing-advertisers-boycott-193748977.html.

[23] Complaint ¶ 21.

[24] Interim Staff Report of the Comm. on the Judiciary U.S. House of Representatives, GARM's Harm: How the World's Biggest Brands Seek to Control Online Speech (July 10, 2024) ("Interim Staff Report").

[25] Complaint ¶ 18.

[26] *Ibid*.

[27] Global Alliance for Responsible Media Launches to Address Digital Safety, World Federation of Advertisers (June 18, 2019), https://wfanet.org/knowledge/item/2019/06/18/Global-Alliance-for-Responsible-Media-launches-to-address-digital-safety.

[28] Complaint ¶ 19; see also Statement on the Global Alliance for Responsible Media (GARM), World Federation of Advertisers (Aug. 9, 2024), https://wfanet.org/leadership/garm/about-garm ("[R]ecent allegations that unfortunately misconstrue [GARM's] purpose and activities have caused a distraction and significantly drained its resources and finances. WFA therefore is making the difficult decision to discontinue GARM activities.").

[29] See, e.g., Interim Staff Report at 17, 25, 33 (alleging efforts by GARM to drive advertisers away from popular media personalities like Joe Rogan, harm news outlets that reported stories GARM leaders felt were untrue, and coordinate with government agencies to decide which information should be excised from public discourse).

[30] *Brown Shoe Co. v. United States*, 370 U.S. 294, 332–33 (1962) (a court must "predict the probable future consequences of this merger.").

[31] Complaint ¶ 16.

[32] *Id.* ¶¶ 19–22.

GARM was neither the beginning nor the end of harmful and potentially unlawful collusion in this industry.[33] Numerous other industry groups and private organizations have publicly sought to use the chokepoint of the advertising industry to effect political or ideological goals.[34] Clandestine pressure campaigns and private dealings among these parties are less well documented but pose the serious risk of harm and illegality. The evidence in this case gives me sufficient "reason to believe"[35] that, in the absence of any intervention, the proposed acquisition is likely to substantially reduce competition and may enhance the vulnerability to coordinated effects that already exists in this particular industry. The history relayed above convinces me that likelihood is of serious concern to the American public.

II

As already highlighted, the Commission, in reviewing a merger that effects an increase in concentration, is always duty-bound to address the risk of collusion.[36] As a leading antitrust treatise makes clear, "evidence of historical attempts at collusion or evidence that collusion is actually occurring in the present could be considered as 'exacerbating' factors sufficient to warrant a merger challenge under circumstances where structural evidence alone would be insufficient."[37] Evidence of past collusion or attempted collusion has played a key role in judicial decisions enjoining mergers under Section 7 for many years before the Commission adopted the 2023 Guidelines.[38] And in negotiating settlements, the Commission may impose stringent remedies based on past collusion in the industry.[39]

In this case, to resolve the Commission's concerns, the parties have proposed a remedy in the form of conduct restrictions that will mitigate this merger's anticompetitive effects. The history of collusion in the market for media-buying services, and the increased potential for collusion post-merger, make this a rare instance where the imposition of a behavioral remedy is appropriate.

Specifically, the proposed decision and order prohibits Omnicom and IPG from entering into or maintaining any agreement or practice that would steer advertising dollars away from publishers based on their political or ideological viewpoints. To be sure, coordinated action by advertising agencies against politically disfavored publishers is tantamount to an agreement not to compete on quality—but obtaining such a ruling in litigation could take years. Today's decision and order eliminates the potential for costly litigation while ensuring that Omnicom and IPG abide by the antitrust laws post-merger.

---

[33] *Id.* ¶ 19.

[34] See Interim Staff Report of the H. Comm. on Small Business, Small Business: Instruments and Casualties of the Censorship-Industrial Complex 42 (Sept. 10, 2024), https://smallbusiness.house.gov/uploadedfiles/house_committee_on_small_business_-_cic_report_september_2024.pdf (describing NewsGuard and other organizations' steering of advertising revenue with "an unavoidable partisan lens.").

[35] 15 U.S.C. § 45(b); see also *FTC v. Standard Oil Co. of Cal.*, 449 U.S. 232, 241 (1980); *Boise Cascade Corp. v. FTC*, 498 F. Supp. 772, 779 (D. Del. 1980).

[36] Antitrust Law Developments 375 (9th ed. 2022) ("a major goal of the merger laws is to prevent markets from consolidating sufficiently to create or enhance the conditions that permit firms to engage in coordinated interaction"); Complaint ¶ 15.

[37] Areeda & Hovenkamp ¶ 917.

[38] See, e.g., *FTC v. Cardinal Health, Inc.*, 12 F. Supp. 2d 34, 65 (D.D.C. 1998) ("Although the Court is not convinced from the record that the Defendants actually engaged in wrongdoing, it is persuaded that in the event of a merger, the Defendants would likely have an increased ability to coordinate their pricing practices.").

[39] See Opinion of the Commission, *In re Coca-Cola Co.*, 117 F.T.C. 903, 946 (June 13, 1994).

Unlike many conduct remedies, the Commission is well prepared to monitor the ones imposed here. As I pointed out last month, one flaw of conduct remedies is that they can sometimes be difficult to monitor or enforce.[40] Here, however, the Commission can monitor Omnicom's and IPG's compliance. Collusion in the advertising industry remains the subject of active investigations.[41] Any future attempts at collusion by Omnicom and IPG are unlikely to remain hidden. Compliance reporting provisions will give the Commission insight into the merged firm's activities. Likewise, advertisement publishers have a powerful incentive to alert the Commission if they believe that they are the object of unlawful collusion. Moreover, this Agreement requires Omnicom and IPG to cooperate with the Commission in any investigation relating to media-buying services[42]—and I have already noted that investigating and policing censorship practices that run afoul of the antitrust laws is a top priority of the Trump-Vance FTC.[43]

Today's settlement does not limit either advertisers' or marketing companies' constitutionally protected right to free speech—the same freedom that the head of GARM, the organization that Omnicom and IPG founded, once described as an "extreme global interpretation of the US Constitution" and "'principles for governance' … from 230 years ago (made by white men exclusively)."[44] The decree goes to great lengths to avoid interfering with the free, regular course of business between marketing firms and their customers. Omnicom-IPG may choose with whom it does business and follow any lawful instruction from its customers as to where and how to advertise.[45] No one will be forced to have their brand or their ads appear in venues and among content they do not wish. The prohibited behavior is limited to "the supreme evil of antitrust"—collusion with other firms and the creation of pre-made "exclusion lists" to encourage advertisers to join *de facto* boycotts coordinated by advertising firms and other third parties.[46]

***

Today, Omnicom and IPG have committed themselves to help stop that sort of coordination in their industry. This consent agreement will help mitigate the dangers inherent in a consolidated national advertising market. I hope the conditions imposed on this merger will encourage all advertising firms to adopt similar practices and thereby reduce the temptation to collude to the detriment of their customers, independent journalists, small and independent media companies, consumers, and the American public square.

[40] Statement of Chairman Andrew N. Ferguson, Joined by Comm'r Melissa Holyoak and Comm'r Mark R. Meador, *In the Matter of Synopsys, Inc./Ansys, Inc.*, Matter No. 2410059, at 7 (May 28, 2025).
[41] See, e.g., Press Release, Attorney General Ken Paxton Opens Investigation Into Possible Conspiracy by Advertising Companies to Boycott Certain Social Media Platforms (Nov. 21, 2024), https://www.texasattorneygeneral.gov/news/releases/attorney-general-ken-paxton-opens-investigation-possible-conspiracy-advertising-companies-boycott.
[42] Decision and Order, *In the Matter of Omnicom Group, Inc. and The Interpublic Group of Companies, Inc.*, Matter No. 2510049, Part VI ("Decision and Order").
[43] Testimony of Chairman Andrew N. Ferguson before the H. Comm. on Appropriations, Subcomm. on Financial Services and General Government, at 26 (May 15, 2025).
[44] Interim Staff Report at 2.
[45] Decision and Order, Part II.
[46] *Ibid*.

# Exhibit 19

WATCH TV LIVE

NEWSMAX TV HEALTH MONEY WORLD

Menu

Wednesday, February 11, 2026

NMAX LISTED NYSE

Home | Platinum | Podcast | Newsfront | Politics | Opinion | Wire | Books | Best Lists | Social | Investors |

Breaking News Sens Reaffirm 39% Cap at Hearing on FCC Broadcast Rule, See More Here

Home | America

Tags: news bias | FTC | Omnicom | IPG | censorship

# Megamerger Omnicom, IPG Mum About NewsGuard Bias




(Dreamstime)

By Paul Bond | Thursday, 26 June 2025 05:35 PM EDT

Add Us On Google

Comment | Print | A A

Listen to this Article

Instaread

00:00 / 00:00

With the Federal Trade Commission approving the $13.5 billion merger between advertising giants Omnicom Group and The Interpublic Group of Companies with a consent decree stipulating they refrain from discriminating against conservative outlets, a key question remains: Will they still rely on NewsGuard?

The FTC decree — released last week with a 30 day public comment period — aims to prevent the merged entity from engaging in anticompetitive practices, particularly those related to Big Censorship (sometimes labeled the Censorship Industrial Complex).

The FTC's order indicated that Omnicom and IPG had violated the law, specifically the Clayton and Federal Trade Commission Acts, by illegally colluding to boycott targeted groups and other violations.

Rather than charging the agencies, the FTC allowed the ad companies to agree to the Consent Order and stipulate to stop doing anti-competitive acts after the merger is approved.

The FTC decree prohibits the merged company from directing advertisers' spending away from publishers due to their political or ideological stance and from using "exclusion lists" that differentiate publishers by political views.

In the past several ad agencies, Omnicom and IPG included, have signed on to DEI-backed initiatives that targeted "disinformation" media outlets.

The disinformation term became a code word for largely preventing conservative media outlets from getting advertising from large ad agencies.

Legal exper

scheme use

censorship

To enforce such advertising bans, agencies used so-called media monitors, many with a left-wing bent, including NewsGuard, Media Matters for America, GDI, the Center for Countering Digital Hate, and the Trusted News Initiative.

Perhaps the most influential is NewsGuard which has been used by both Omincom, IPG or their subsidiaries.

NewsGuard has been accused of anticonservative bias by the FTC, FCC, and House committees.

For example, NewsGuard rates the Washington Post a perfect 100 even after the outlet's faulty reporting on the origins of COVID-19 and Hunter Biden's laptop, and its false assertions that President Donald Trump was some sort of agent working for Russia.

While the merger will create the world's largest media buying agency with an estimated $25 billion in annual revenue, it is still unclear if Omnicom or IPG will stop using NewsGuard or other media monitors.

Newsmax contacted Omnicom and IPG to ask of NewsGuard's status or their use of other media monitors. Neither company responded for comment.

"We are deeply concerned about the FTC's order because it says nothing about media monitors, politicized ratings from NewsGuard and other who have turned disinformation into a censorship racket," Christine Czernejewski, spokesperson for The Independent Media Council (IMC), told Newsmax.

The IMC represents a coalition of conservative and independent media groups opposed to censorship practices, including Newsmax.

"The FTC s

they only g

$13 billion merger," Czernejewski said, "It doesn't add up."

The FTC's consent decree does not explicitly mention NewsGuard or ban ad agencies from using media monitors like NewsGuard.

NewsGuard claims it does not create boycott or exclusion lists and does not rate media outlets based on political views. Their claims have been disputed by multiple critics.

NewsGuard was founded in 2018 by longtime Democratic Party activist and businessman Steve Brill.

Its rating services have long been criticized as highly political. In three separate annual studies the Media Research Center found that NewsGuard ranked liberal media outlets with significantly higher ratings than conservative outlets.

Ad agencies like Omnicom and IPG have used such ratings to deny conservative media advertising placements and revenue.

To ensure FTC compliance, Omnicom must submit annual reports for five years, detailing measures taken to adhere to the decree, including any client-directed exclusion lists based on political ideology.

The FTC declined to respond to Newsmax's questions related to NewsGuard and the IPG-Omnicom merger, which is expected to become effective before the end of the year.

***Paul Bond** has been a journalist for three decades covering media, entertainment, and politics. His work has primarily appeared in Newsweek, USA Today, Reuters, and The Hollywood Reporter.*

**Related Stories:**

- **Rubio: We Closed GEC, Funds for Pro-censorship NewsGuard, GDI**
- **Microsoft Disavows Left-Wing NewsGuard After Cruz Letter**

© 2026 Newsmax. All rights reserved.

Sign up for Newsmax's Daily Newsletter

Rec
righ

# Exhibit 20

NEWSMAX

**Filed Electronically**

Andrew N. Ferguson, Chairman
Federal Trade Commission
600 Pennsylvania Ave N.W.
Washington, DC 20580

**RE: Omnicom Group Inc. and The Interpublic Group of Companies, Inc.**

Dear Mr. Ferguson,

We write in response to the Commission's recent proposed order granting conditional approval of the proposed merger between two of the "Big Six" advertising agencies: Omnicom Group Inc. ("Omnicom") and The Interpublic Group of Companies, Inc. ("IPG"). We believe that this proposed merger will substantially lessen competition in the media buying industry by consolidating two of the six major global ad holding companies. The reduction in competition is so severe that it suggests that the merger should be denied outright. But even if the Commission were to conclude that the merger may move forward, the diminished competition would create the need for more restrictive conditions and more vigilant monitoring than the current proposed order contemplates.

Newsmax is the fourth-highest rated cable news channel today, and we reach over 40 million Americans through our news platforms. Last year the Reuters Institute global survey found that Newsmax was one of the top 12 news brands in the U.S. Similarly, Pew Research reported we were one of the major news sources for Americans during the 2024 election, ranking with NBC News, CBS News, and AP, among others. Newsmax is acutely interested in the proposed merger because it relies significantly on advertising revenue, and Respondents—along with the rest of the Big Six—already exercise concentrated power over the availability of such revenue. Moreover, as discussed below, the Big Six—including Respondents—have a demonstrated history of using that concentrated power for ideologically motivated ends. Through cooperation with third parties, such as the news-outlet "reliability" rating organization NewsGuard, the ad agencies work together to squelch the speech of disfavored—and predominantly right-of-center—outlets, including Newsmax. In order to mitigate the risk that the ad agencies will collude to suppress ideological diversity in the media market, any order approving Respondents' proposed merger should come with strict conditions, including a bar on the use of third-party "reliability" ratings such as those published by NewsGuard and a ten-year-minimum requirement of ongoing compliance reporting and review by an independent monitor.

750 Park of Commerce Drive, Suite 100, Boca Raton, Florida 33487
Phone 561.686.1165 • Fax 561.686.8640

## I. The Proposed Merger Ignores and Condones Omnicom's and IPG's Illegal DEI Programs—Putting the Merger Approval in Violation of the President's Executive Order.

The Commission's approval of the merger between Omnicom and IPG is in direct violation of Executive Order 14173, signed by President Donald J. Trump in January 2025, titled *"Ending Illegal Discrimination and Restoring Merit-Based Opportunity."* This Executive Order expressly prohibits federal support or endorsement of Diversity, Equity, and Inclusion (DEI) programs that use race, sex, or other protected characteristics as factors in decision-making, hiring, advancement, or financial allocation.

Despite the clear direction of Executive Order 14173 and additional memoranda issued by the Department of Justice (DOJ) and the Office of Personnel Management (OPM), the Consent Order issued in connection with the Omnicom-IPG merger fails to address—let alone restrict—their prolific and well-documented engagement in DEI-based policies, practices, and initiatives. This omission effectively grants regulatory approval to potentially unlawful behavior.

The merger's approval stands in stark contrast to other recent merger decisions under the Trump Administration. For example, in the proposed merger of Skydance Media with Paramount Global (CBS), the FCC imposed express conditions requiring the elimination of DEI programs and the appointment of an ombudsman to oversee potential "bias" in editorial operations. No such safeguards have been implemented here, even though Omnicom and IPG exercise significantly greater influence over the media and information landscape through their control of over $240 billion annually in advertising spend—an amount that far exceeds their reported revenues.

Executive Order 14173 characterizes DEI/DEIA initiatives as "dangerous, demeaning, and immoral race- and sex-based preferences" and asserts that such policies violate federal civil rights laws, including Title VII of the Civil Rights Act. Federal agencies, including the DOJ and OPM, were directed to initiate civil and criminal enforcement actions against DEI practitioners, particularly large institutions and federal contractors.[1]

---

Lara Flath, *et al.*, *DEI Under Siege: A Guide to the Trump Executive Orders*, SKADDEN (2025), https://www.skadden.com/insights/publications/2025/02/the-informed-board/dei-under-siege. The Trump Administration has clarified that activities such as the following may constitute illegal discrimination under federal law:

- Affinity groups,

Omnicom publicly embraces DEI at every level of its organization. The company:

- Appointed a Chief Equity & Impact Officer reporting directly to the CEO;[2]
- Employs over 50 full-time DEI professionals across its agency networks;[3]
- Operates the *Omnicom People Engagement Network (OPEN)*, supporting identity-based affinity groups (e.g., "Black Together," "OPEN Pride," "AccentO");[4]
- Ties executive compensation to DEI-linked Key Performance Indicators (KPIs);[5]
- Implements mandatory bias training across business units, and
- Created *OPEN 2.0*, a formal DEI roadmap prioritizing race- and gender-based recruitment, mentorship, and client engagement.[6]

Omnicom also established over 150 private advertising marketplaces in partnership with Colossus SSP and others to funnel media budgets to "diverse publishers," a practice that may constitute racial preference in contracting and distribution of commercial speech.[7]

Similarly, IPG's DEI commitments are similarly expansive:

---

- "Diverse slate" hiring requirements,
- Targeted DEI outreach, and
- Allocation of contracts or advertising dollars based on racial or identity-based criteria.

[2] *Intersectional ERG Collaboration at Omnicom*, WE CREATE SPACE (June 3, 2024), https://www.wecreatespace.co/post/intersectional-collaboration-ergs-at-omnicom.

[3] *Omnicom Group 2023 Proxy Statement*, SEC (2023), U.S.sec.gov/Archives/edgar/data/29989/000121390023022354/def14a2023_omnicom.htm.

[4] *Id.*

[5] *Id.*

[6] *Id.*

[7] Chris Kelly, *How Omnicom is Taking Inclusivity Beyond the Mood Board to the Boardroom*, MARKETING DIVE (Oct. 25, 201), https://www.marketingdive.com/news/how-omnicom-is-taking-inclusivity-beyond-the-mood-board-to-the-boardroom/608687/.

- In 2022, appointed a Global Chief Diversity & Social Impact Officer reporting to the CEO;[8]
- Was the first holding company to tie CEO compensation to diversity metrics;[9]
- Publicly releases EEO-1 data and maintains a formal board diversity policy;[10]
- Aligns human resources and hiring practices with DEI standards;[11] and
- Participates in external programs including CEO Action for Diversity & Inclusion™, the Day of Understanding, and the UN Women's Unstereotype Alliance;[12]

IPG actively uses its media planning to promote DEI, including initiatives such as Equity Upfront (through IPG Mediabrands and MAGNA), which directs media dollars to Black-owned and diverse-owned outlets.[13] Recruiting programs such as BIPOC externships and "momternships" are identity-specific and appear to violate the principles of race- and sex-neutral hiring required by federal law.

Finally, as discussed further below. both Omnicom and IPG have aligned themselves with media-monitoring services rooted in the DEI movement, including NewsGuard, Global Disinformation Index (GDI), Global Alliance for Responsible Media (GARM). These services act as de facto DEI enforcers by rating and categorizing media outlets based on political, cultural, and identity-based content. For instance, NewsGuard offers an "Inclusion List" of approved outlets targeting specific racial and sexual identity communities; advertiser filters that enable clients to

---

[8] Press Release, IPG, Interpublic Names Channing Martin Global Chief Diversity and Social Impact Officer (May 19, 2022), https://investors.interpublic.com/news-releases/news-release-details/interpublic-names-channing-martin-global-chief-diversity-and.

[9] *Id.*

[10] *Interpublic Named Most Awarded Holding Company at ANA Multicultural Excellence Awards*, IPG, https://www.interpublic.com/our-values/diversity-inclusion/.

[11] *An Evolution of our Long-Standing Commitment to Equity, Diversity and Inclusion*, IPG HEALTH, https://ipghealth.com/about/equity-diversity-inclusion.

[12] *Interpublic's Business Resource Groups,* CEO ACTION, https://www.ceoaction.com/actions/interpublic-s-business-resource-groups/.

[13] *How Mediabrands is Recruiting DE&I Talent Through Social Media*, IPG MEDIABRANDS (July 13, 2022), https://www.ipgmediabrands.com/category/our-values/diversity-equity-inclusion/.

exclude or include content based on minority ownership, and segmented ad-targeting tools focused on "community-centered" attributes (e.g., Black, LGBTQ+).[14]

These tools have been used by advertising agencies—including Omnicom and IPG—to redirect advertising dollars away from non-compliant media outlets or to penalize content not aligned with progressive DEI narratives, including coverage of topics such as abortion, transgender ideology, or traditional family values.

The FTC's failure to address or restrict Omnicom and IPG's extensive DEI practices—despite clear federal policy outlawing such programs—represents a material omission and regulatory failure. The merger approval should be revoked on this basis or strongly modified unless it imposes stringent conditions consistent with Executive Order 14173 and ensures compliance with existing federal civil rights law.

## II. The Proposed Merger Would Unacceptably Enhance Omnicom's Market Power and Harm Competition.

The U.S. advertising industry is already highly consolidated by any reasonable benchmark. As the Commission's complaint in this matter recognized, "the Big Six holdcos may form a submarket for a distinct set of customers with global media buying needs and higher advertising budgets."[15] And based on COMvergence estimates for U.S media spending in 2024, the Big Six advertising industry[16] even prior to the proposed merger had an HHI[17] of 2116. [18] As the Commission has recognized, markets with an HHI of 1800 points or higher are generally

---

[14] *Use this Form to Configure your Custom NewsGuard Inclusion List,* NEWSGUARD, https://www.newsguardtech.com/newsguard-inclusion-list-configuration/.

[15] Compl., *In the Matter of Omnicom Grp. Inc., & The Interpublic Grp. of Cos., Inc.*, at 3 (F.T.C.), https://www.ftc.gov/system/files/ftc_gov/pdf/2510049omnicomcomplaint.pdf.

[16] Comprised of the "Big Six" firms Omnicom, IPG, Publicis, WPP, Dentsu, and Havas.

[17] "The term "HHI" means the Herfindahl–Hirschman Index, a commonly accepted measure of market concentration. "The HHI is calculated by squaring the market share of each firm competing in the market and then summing the resulting numbers." *Herfindahl-Hirschman Index*, U.S. DEP'T OF JUST. (last updated Jan. 17, 2024), https://www.justice.gov/atr/herfindahl-hirschman-index.

[18] Gideon Spanier, *Will the 'Big Six' Become the 'Big Three'?*, MM+M (Mar. 20, 2025), https://www.mmm-online.com/news/will-the-big-six-become-the-big-three/.

considered "highly concentrated."[19] Moreover, likely near-term developments—apart from the proposed merger at issue—are only likely to increase the concentration of market power among the Big Six. In particular, the advent of generative AI promises to reshape the landscape for media buying and creative services, leaving large, established firms better positioned to invest in AI tools and form partnerships with established AI providers.[20]

Omnicom's proposed acquisition of IPG threatens to dramatically increase market consolidation and harm competition. That is again apparent from the most important measure of market concentration, the HHI index. According to public estimates, the merger will increase the industry HHI by more than 650 points, to 2775.[21] "Transactions that increase the HHI by more than 100 points in highly concentrated markets are presumed likely to enhance market power under the *Horizontal Merger Guidelines* issued by the Department of Justice and the Federal Trade Commission."[22] And the new HHI of 2775 is far in excess of Commission's 1800 threshold.

Indeed, the $13.25 billion Omnicom-IPG merger will create both the U.S. largest advertising agency and the "world's largest advertising agency.[23] It is also the largest merger in industry history.[24] The combined group, which will retain the Omnicom name under the proposal, will have net revenues of well over $25.60 billion (based on 2023 figures) and a combined market

---

[19] *Herfindahl-Hirschman Index*, U.S. DEP'T OF JUST. (last updated Jan. 17, 2024), https://www.justice.gov/atr/herfindahl-hirschman-index.

[20] Marty Swant, *Omnicom and IPG Acquisition Could Lead to Bigger AI Investments – and Maybe Rewards,* DIGIDAY (Dec. 10, 2024), https://digiday.com/media-buying/omnicom-and-ipg-merger-could-lead-to-bigger-ai-investments-and-maybe-rewards/; *see. e.g.*, Megan Graham, *Omnicom Group to Debut Tool Using Gnerative AI for Advertising Employees*, WALL ST. J. (June 19, 2023), https://www.wsj.com/articles/omnicom-group-to-debut-tool-using-generative-ai-for-advertising-employees-4976424.

[21] Gideon Spanier, *Will the 'Big Six' Become the 'Big Three'?*, MM+M (Mar. 20, 2025), https://www.mmm-online.com/news/will-the-big-six-become-the-big-three/.

[22] *Herfindahl-Hirschman Index*, U.S. DEP'T OF JUST. (last updated Jan. 17, 2024), https://www.justice.gov/atr/herfindahl-hirschman-index.

[23] Jody Godoy, *FTC, Greenlights Omnicom-Interpublic Deal, Bars Coordination Over Political Content*, REUTERS (June 23, 2025), https://www.reuters.com/sustainability/boards-policy-regulation/us-ftc-accepts-consent-order-omnicom-interpublic-merger-2025-06-23/.

[24] Suzanne Vranica, *Omnicom to Acquire Interpublic in Deal That Will Reshape Advertising Industry,* WALL ST. J. (Dec. 9, 2024), https://www.wsj.com/business/media/omnicom-to-acquire-interpublic-group-in-deal-that-will-reshape-advertising-industry-eed6f1b3.

capitalization of over $30 billion.[25] It is estimated that the enlarged group will have almost 37% market share in the U.S.[26]

The reported revenues of Omnicom and IPG significantly understate the true financial influence these firms wield in the advertising market. Although neither company discloses the total advertising spend they manage for clients, industry estimates suggest agencies of their scale typically control media budgets up to ten times their annual revenues—placing their combined buying power and influence over media platforms at up to an approximate $250 billion per year.

The new, combined entity—which will become the largest of the Big Six—will be able to leverage its newfound market power to increase its profits at the expense of employees, clients, and consumers. The combined group aims for $750 million annually in cost synergies,[27] achievable because the new behemoth will be able to reduce headcount.[28] Omnicom and IPG have already reduced US headcount by thousands ahead of the merger.[29] Investors also report that the enlarged Omnicom intends to "function as a cohesive whole" rather than according to the previous holding-company model of loosely connected firms.[30] A conscious effort to take advantage of the enlarged group's size will amplify the effect of consolidation on the firm's behavior.

---

[25] Marketing & Sales Leader for a New Era, OMNICOM + INTERPUBLIC, at 11 (Dec. 9, 2024), https://s201.q4cdn.com/282904488/files/doc_downloads/2024/12/OMC-Investor-Presentation-12-09-24-FINAL.pdf.

[26] Gideon Spanier, *Will the 'Big Six' Become the 'Big Three'?*, MM+M (Mar. 20, 2025), https://www.mmm-online.com/news/will-the-big-six-become-the-big-three/.

[27] Marketing & Sales Leader for a New Era, OMNICOM + INTERPUBLIC, at 4 (Dec. 9, 2024), https://s201.q4cdn.com/282904488/files/doc_downloads/2024/12/OMC-Investor-Presentation-12-09-24-FINAL.pdf.

[28] Suzanne Vranica, *Sorry Mad Men. The Ad Revolution is Here.*, WALL ST. J. (Dec. 13, 2024), https://www.wsj.com/business/media/advertising-revolution-artificial-intelligence-data-mad-men-omnicom-interpublic-3c0c056b; Lara O'Reilly, *The $13 Billion Omnicom-IPG Megamerger Reflects a New Era as Big Tech and AI Upend the Ad Industry*, BUSINESS INSIDER (Dec. 9, 2024) https://www.businessinsider.com/omnicom-ipg-deal-signals-major-shift-ad-agency-market-2024-12.

[29] Gideon Spanier, *Will the 'Big Six' Become the 'Big Three'?*, MM+M (Mar. 20, 2025), https://www.mmm-online.com/news/will-the-big-six-become-the-big-three/.

[30] Seb Joseph, *Bold Call: The Holdco Era is Over. The Operating Company Age is Here – For Real this Time*, DIGIDAY (Mar. 3, 2025), https://digiday.com/marketing/the-holdco-era-is-over-the-operating-company-age-is-here-for-real-this-time/.

Moreover, the proposed merger will likely create even further, downstream anticompetitive effects in the market by incentivizing the other four members of the remaining Big Five to act anticompetitively. With one fewer major player, the remaining firms face reduced competitive pressure to win business by lowering fees, improving quality, or innovating. Advertisers (the agencies' clients) will face a "substantial reduction in options,"[31] which can weaken the market discipline that normally constrains pricing and conduct. The merger also heightens the risk of coordinated interaction among the few remaining advertising holdcos. When markets concentrate, it becomes easier for dominant firms to collude, tacitly or implicitly, rather than to compete.

Further still, the unprecedented scale of the enlarged Omnicom Group may encourage other participants in the remaining Big Five to pursue defensive mergers to maintain their market share. Scale is essential for media buying companies, allowing more leverage in negotiations with media owners.[32] WPP, the third-largest member of the Big Five after the merger, is already reported to be a target for further consolidation,[33] and preliminary discussions are reportedly ongoing with Accenture.[34] There is precedent for this type of downstream, further consolidation in both the media and entertainment and healthcare industries. Disney's 2019 acquisition of 21st Century Fox prompted the Viacom-CBS and Warner-Discovery mergers[35]; and CVS's 2018 acquisition of Aetna prompted Cigna to acquire Express Scripts and UnitedHealth to expand

---

[31] Megan Graham, *Marketers Prepare to Navigate 'Huge Distraction' of Omnicom's IPG Acquisition*, WALL ST. J. (Dec. 11, 2024), https://www.wsj.com/articles/marketers-prepare-to-navigate-huge-distraction-of-omnicoms-ipg-acquisition-b41c1932.

[32] Lara O'Reilly, *The $13 Billion Omnicom-IPG Megamerger Reflects a New Era as Big Tech and AI Upend the Ad Industry*, BUSINESS INSIDER (Dec. 9, 2024) https://www.businessinsider.com/omnicom-ipg-deal-signals-major-shift-ad-agency-market-2024-12.

[33] *Blockbuster Ad Deal: Omnicom's Takeover of IPG to Reset Global Order*, STORYBOARD 18 (Dec. 10, 2024), https://www.storyboard18.com/brand-makers/blockbuster-ad-deal-omnicoms-takeover-of-ipg-to-reset-global-order-49865.htm.

[34] Gideon Spanier & Bärbel Egli-Unckrich, *Accenture and WPP Have Discussed Potential M&A Deal,* MM+M (July 15, 2025), https://www.mmm-online.com/news/accenture-and-wpp-have-discussed-potential-ma-deal/.

[35] Alex Sherman, *Here are the Next Media Mergers that Make the Most Sense*, CNBC (May 29, 2021), https://www.cnbc.com/2021/05/29/media-mergers-whos-next-.html.

Optum through acquisitions.[36] And even Even if no defensive mergers occur, the scale of the enlarged Omnicom Group may push smaller market participants Dentsu and Havas into near-irrelevance, shifting towards a "big three" model.[37]

This wealth of evidence overwhelmingly suggests that the Commission would have had ample justification to deny Respondents' proposed merger as violative of the Clayton and FTC Acts.

## III. The Proposed Merger's Anticompitative Effects Would Be Compounded by Respondents' Demonstrated Propensity Towards Politically-Motivated Censorship.

The degree of market concentration that the proposed merger will yield—and the amount of anticompetitive power the new Omnicom entity will wield—provide reason enough for concern. But even more troubling is the danger that Omnicom will use this newfound concentrated power to silence the voices of media outlets it disagrees with for ideological reasons, thereby reducing the ideological diversity and product variety available to consumers in the media market.

The proposed order acknowledges that the Omnicom-IPG merger "increase[s] the likelihood of coordination among competitors in the Media Buying Services industry relating to the placement of advertisements based on political or ideological viewpoints."[38] But the order does not meaningfully address the serious issues of DEI-based news ratings, reliability monitors and so called fact checkers. While the order singles out "exclusion lists," many media monitors do not claim they employ those lists.

---

[36] *PBM Mergers – Acquisitions – Contracts Timeline*, NATIONAL COMMUNITY PHARMACISTS ASSOCIATION, https://ncpa.org/sites/default/files/2023-02/PBM%20MergerTimeline_2023.pdf.

[37] Gideon Spanier, *Will the 'Big Six' Become the 'Big Three'?*, MM+M (Mar. 20, 2025), https://www.mmm-online.com/news/will-the-big-six-become-the-big-three/.

[38] Proposed Order, *In the Matter of Omnicom Grp. Inc., & The Interpublic Grp. of Cos., Inc.*, at 6 (F.T.C.).

Both Omnicom and IPG, for example, currently use the services of NewsGuard,[39] an organization that publishes what it calls "reliability ratings" of news outlets.[40] Omnicom purports to use NewsGuard's rankings to "[keep] ads off misinformation sites,"[41] and IPG likewise has stated that it will not "fund partners or content that spread misinformation."[42] But NewsGuard has been widely criticized for political bias against conservative news sources.

In three separate studies, the Media Research Center ("MRC") has found that NewsGuard ranks left-leaning media outlets significantly higher than conservative ones on its "reliability" scale. The MRC found that "[l]iberal outlets were rated 27 points higher on average than news organizations on the right. . . . The average NewsGuard score for the 'left' and 'lean left' outlets—which included leftist outlets like Jacobin and The Nation—was 93/100. While the average rating for 'right' and 'lean right' outlets—which included Fox News, *Washington Times* and *New York Post*—was a low 66/100."[43] Indeed, the socialist outlet Jacobin received a 92.5 ranking by NewsGuard, while it gave the right-leaning outlet The Federalist a score of 12.5.[44]

Others have echoed these concerns. George Washington University Law School Professor Jonathan Turley has criticized NewsGuard "as one of the most sophisticated operations being

---

[39] *IPG Mediabrands Strikes Exclusive Deal with Newsguard to Go Beyond Website Ratings to Rate Individual Cable and Boradcast TV News Show*, IPG MEDIABANDS, (Dec. 2, 2021), https://www.ipgmediabrands.com/ipg-mediabrands-strikes-exclusive-deal-with-newsguard-to-go-beyond-website-ratings-to-rate-individual-cable-and-broadcast-tv-news-shows/; Image posted by OMD USA (@omd_usa), INSTAGRAM, (Apr. 5, 2021), https://www.instagram.com/p/CNS9XmtBanO/?utm_source=chatgpt.com.

[40] *Website Rating Process and Criteria*, NEWSGUARD (last updated Feb. 3, 2023), https://www.newsguardtech.com/ratings/rating-process-criteria/.

[41] Tanya Dua, *IPG and Omnicom are Touting a New Tool to Help Advertisers Avoid Misinformation without Hurting Publishers*, BUSINESS INSIDER (Mar. 30, 2021), https://www.businessinsider.com/ipg-and-omnicom-are-using-newsguard-tools-that-protect-publishers-2021-3.

[42] *Mediabrands Introduce Media Responsibility Principles*, IPG MEDIABANDS, (July 13, 2020), https://www.ipgmediabrands.com/mediabrands-introduces-media-responsibility-principles/.

[43] Joseph Vazquez, *STUDY: NewsGuard Ratings System Heavily Skews in Favor of Left-Wing Outlets*, MRCNEWSBUSTERS (Dec. 13, 2021), https://www.newsbusters.org/blogs/free-speech/joseph-vazquez/2021/12/13/study-newsguard-ratings-system-heavily-skews-favor-left.

[44] *Id.*

used to 'white list' and 'black list' sites" and as part of "a massive censorship system."[45] Texas Attorney General Ken Paxton and news outlets the Daily Wire, and the Federalist sued the State Department in 2023 in part over its promotion of NewsGuard's rankings, which the lawsuit alleged were nothing more than "blacklists of ostensibly risky or unreliable American news outlets [published] for the purpose of discrediting and publish favored viewpoints."[46] Federal Communications Commission Chairman Brendan Carr has stated that NewsGuard "leverage[es] its partnerships with advertising agencies to effectively censor[ ] targeted outlets," and has raised questions about whether it employs its rankings in a "good faith" and "even-handed manner."[47] For example, Chairman Carr noted that NewsGuard "has consistently rated official propaganda from the Communist Party of China as more credible than American publications," and that it "aggressively fact checked and penalized websites that reported on the COVID-19 lab leak theory."[48]

According to its critics, NewsGuard derives its biased results by basing its rankings on amorphous and manipulable criteria. One of its nine criteria, for example, asks whether a site "repeatedly publish[es] false or egregiously misleading content" such as "conspiracy theories."[49] But the line between an "egregiously false" "conspiracy theory" and a simple mistake is self-evidently subjective. Another criterion asks whether the site "egregiously distorts or misrepresents facts."[50] What counts as an "egregious[] distort[ion]" is, again, clearly a subjective measure subject to manipulation. Yet another of the criteria asks whether the site uses "opinionated language" or "advances a particular point of view through clearly one-sided story selection."[51] The fact that NewsGuard gives outlets such as Jacobin, BuzzFeed News, and Mother

---

[45] Jonathan Turley, *The Most Chilling Words Today: I'm From NewsGuard and I am Here to Rate You*, THE HILL (July 27, 2024), https://thehill.com/opinion/civil-rights/4795501-newsguard-censorship-conservative-speech/.

[46] Complaint at ¶ 3, *The Daily Wire, LLC, v. Dep't of State*, No. 23-cv-609 (E.D. Tex. Dec. 6, 2023).

[47] Letter from Brendan Carr, Commissioner, FTC, to Sundar Pichai, *et al.* (Nov. 13, 2024), https://www.fcc.gov/sites/default/files/DOC-407732A1.pdf.

[48] *Id.*

[49] *Website Rating Process and Criteria*, NEWSGUARD (last updated Feb. 3, 2023), https://www.newsguardtech.com/ratings/rating-process-criteria/.

[50] *Id.*

[51] *Id.*

Jones high reliability scores itself conclusively demonstrates how easily this measure may be manipulated.

Omnicom and IPG have manifested their anti-conservative bias in other ways as well. Both use third-party "fact-checkers" that purport to publish neutral evaluations of salient factual claims but, in reality, are frequently themselves subject to severe political—predominately leftist—bias.[52] And as the Commission's Complaint in this matter recounts, Omnicom, IPG, and the other major add agencies appear to have also used the World Federation of Advertisers' Global Alliance for Responsible Media as a way to stifle speech. "Major advertisers have discussed and ultimately declined to advertise on certain websites and applications. These decisions appear to have been coordinated through one or more associations of advertising industry players, including ad agencies," such as the "World Federation of Advertisers' Global Alliance for Responsible Media ("GARM") initiative."[53] GARM has worked to "reduc[e] the availability and monetization of harmful content online"—with "[t]he supposedly harmful content typically" comprised of "websites and outlets that, in GARM's view, promoted 'misinformation'—a nebulous term that was ultimately used to sweep in many types of legitimate political speech."[54]

Ideologically-motivated collusion by the biggest ad agencies like Respondents to direct ad revenue away from media outlets they disfavor has a devastating censorial effect that not only harms competition in the media markets but diminishes the richness of the nation's civic discourse. Advertising revenue is the lifeblood of many news outlets, particularly outlets that operate online. And when the largest ad agencies have the ability to act collusively to deny this revenue, the effect can be fatal. As the Commission's complaint notes, "[w]hen a Media Buying Services firm *unilaterally* refuses to buy advertising inventory from certain publishers, that firm must confront the risk that its rivals will gain a competitive advantage by continuing to buy advertising inventory from those publishers. On the other hand, a *concerted* (or otherwise coordinated) refusal to deal among Media Buying Services firms provides a direct economic benefit to the firms by ensuring that they are not competitively disadvantaged relative to their

---

[52] Thomas A. Colicchio, *et al.*, *Bias in Fact Checking?: An Analysis of Partisan Trends Using PolitiFact Data*, DUKE UNIV. (2023), https://dukespace.lib.duke.edu/server/api/core/bitstreams/95100bba-7bfd-4fce-83e8-eb6b5b508bf4/content.

[53] Compl., *In the Matter of Omnicom Grp. Inc., & The Interpublic Grp. of Cos., Inc.*, at 4 (F.T.C.), https://www.ftc.gov/system/files/ftc_gov/pdf/2510049omnicomcomplaint.pdf.

[54] *Id.*

rivals, which are likewise foregoing the opportunity to reach potential audiences on the boycotted publishers' platforms."[55]

Respondents' demonstrated history of employing their already-significant market power to achieve apparently ideologically-motivated ends significantly heightens the concerns over the immense concentration of market power that the new, combined Omnicom will wield if the proposed merger is approved.

## IV. If the Commission Allows the Proposed Acquisition, it Should Impose More Stringent Conditions to Guard Against these Harmful Effects.

As noted, we believe the anticompetitive risks of Respondents' proposed merger are of such magnitude that the Commission would be warranted in denying it outright. If the Commission does allow the merger to go forward, however, it should impose stringent conditions to guard against those risks—conditions far more stringent than the ones contained in the current proposed order.

Most importantly, the Commission should impose conditions that ensure that the new Omnicom entity can no longer use biased rating organizations, fact checkers, and other third-parties to engage in censorship of disfavored news outlets. It should do so through a condition providing that Omnicom must itself internally conduct any assessment, in consultation with advertsiers, of the reliability of an outlet, or of its publications, rather than relying on the assessment of any third party media monitoring organization or entity. The condition should also require Respondents to acknowledge that they have previously worked with third-party entities such as NewsGuard to engage in politically-motivated censorship. Astonishingly, neither Omnicom nor IPG has acknowledged their responsibility for such past conduct. They cannot be trusted to act fairly and responsibly in the future—with the greater market power they will now wield—until they do so.

The Commission should also extend the requirement of annual compliance reports for the full ten-year term of the decree rather than the existing five years. Because the merger may prompt further consolidation or shakeups in the media buying space, competitive dynamics may continue to shift over the short- to medium-term. Further consolidation could make anticompetitive misbehavior easier. As such, the Commission should extend its timeline for monitoring.

Third, the Commission should require Omnicom and IPG to formally acknowledge that they have engaged in conduct inconsistent with federal law through the implementation and enforcement of Diversity, Equity, and Inclusion (DEI) programs and related advertising practices, as referenced in the Consent Order. These actions include, but are not limited to, the use of

---

[55] *Id.*

identity-based criteria—such as race, gender, or political viewpoint—in the allocation of advertising expenditures and the exclusion of certain media outlets from commercial consideration based on viewpoint or ownership demographics. Both companies must ban such programs and practices and agree not to re-start such programs.

Such DEI practices constitute unlawful discrimination under Title VII of the Civil Rights Act of 1964 and are in direct contravention of Executive Order 14173. Moreover, they have caused significant and quantifiable financial harm to affected media organizations, particularly those excluded from advertising campaigns or blacklisted by the Companies' DEI-related media filters and third-party scoring mechanisms.

Accordingly, the Commission should pursue monetary relief in the form of restitution. A minimum of two hundred fifty million dollars ($250,000,000) should be sought from the Companies to be distributed equitably among media outlets that were improperly denied access to advertising revenues as a result of these discriminatory practices.

Finally, the Commission should appoint an independent monitor to review Respondents' conduct, compliance, and annual compliance reports. Appointing an independent third-party monitor in addition to Commission review is preferable, because agency review of compliance often depends on whistleblowers, which may not be forthcoming. An independent, third-party monitor will ensure continued compliance with the Commission's conditions for their full, ten-year duration. The monitor should also be empowered to create a committee to oversee the aforementioned restitution fund and the distribution of funds to aggrieved parties.

Respectfully Submitted,

Christopher Ruddy
Chief Executive Officer
Newsmax Media, Inc.
Newsmax Broadcasting LLC

# Exhibit 21

WATCH TV LIVE

NEWSMAX TV HEALTH MONEY WORLD

Menu

Wednesday, February 11, 2026

NMAX LISTED NYSE

Home | Platinum | Podcast | Newsfront | Politics | Opinion | Wire | Books | Best Lists | Social | Investors

Breaking News Sens Reaffirm 39% Cap at Hearing on FCC Broadcast Rule, See More Here

Home | Newsfront

Tags: tabacco | ftc | omnicorn | merger

# Newsmax's Tabacco Slams FTC Approval of Omnicom–IPG Merger

Ad 1 of 1

00:28

By Newsmax Wires | Sunday, 03 August 2025 07:23 AM EDT

Add Us On Google

Comment | Print | A A

Listen to this Article

Instaread

00:00 / 00:00

Newsmax analyst John Tabacco has sharply criticized the Federal Trade Commission's (FTC) approval of a $13.25 billion merger between advertising giants Omnicom Group and Interpublic Group, saying the decision "stinks at all levels."

The merger, approved in June, creates what is now considered the world's largest advertising agency with control over roughly $240 billion in U.S. ad spending.

Newsmax Media, Inc. on Monday formally filed comments with the FTC opposing the deal, joining other conservative groups that say it threatens free speech and will deepen alleged censorship of right-leaning media.

Tabacco, host of Newsmax's "Wise Guys," voiced his concerns during an appearance Friday on the "Chris Salcedo Show," arguing the approval will allow advertising firms to continue using ratings services that target conservative outlets.

"It says nothing at all in the [Consent] Order about stopping these agencies from using third-party ratings services like NewsGuard to block media like Newsmax and other conservative companies," Tabacco said.

Under the FTC's Consent Order, Omnicom and IPG agreed not to collude with other firms to steer advertising away from outlets based on political or ideological viewpoints.

However, critics say the order fails to address practices involving ratings organizations such as NewsGuard and the Global Disinformation Index (GDI), which have been accused of labeling conservative media as unreliable.

Tabacco cited multiple studies by the Media Research Center claiming conservative outlets receive consistently low reliability scores, while left-leaning and even foreign state media, including Chinese Communist Party publications, score higher.

"The New York Times can get the story about Hunter Biden's laptop wrong, push the Russia hoax, falsely accuse Israel of bombing hospitals in Gaza — and they get 100% or nearly 100% ratings," Tabacco said. "It makes no sense unless this was political."

Newsmax's filing with the FTC was joined by the Conservative Political Action Conference (CPAC) Foundation and the Independent Media Council (IMC), organizations that collectively represent more than 100 million Americans.

Their submissions argue that the FTC's approval and the Consent Order violate federal law and recent executive orders, particularly for failing to address the companies' vast diversity, equity and inclusion (DEI) initiatives.

Tabacco noted that FTC Chair Andrew Ferguson was appointed by President Trump but previously was chief counsel to Sen. Mitch McConnell, R-Ky., from 2019 until 2021.

In 2023, with McConnell's support, Ferguson was nominated for the FTC under President Joe Biden.

Ferguson's decision to approve the merge has not only stunned conservative leaders, but also FTC insiders who were surprised he expedited the merger's approval before the Commission's investigation had been completed.

Newsmax, CPAC and the IMC have urged the Trump administration to reconsider the merger approval or reconstitute the Consent Order to include more protections against censorship and provide restitution to conservative media for the damages they incurred by the advertising agencies actions.

**Related Stories:**

- **CPAC, IMC Want FTC to Stop Omnicom-IPG Merger**

# Exhibit 22


NEWSMAX
@NEWSMAX
Re-read FTC Consent Order, makes no mention of 'censorship' or 'targeting conservatives.' Fully allows Omnicom to use left-wing NewsGuard, GDI.
Consent Order violates Trump EO on stopping DEI at Omnicom.
Newsmax, CPAC oppose FTC sellout.
9:58 PM · Jul 31, 2025 · 2,225 Views
5
12

# Exhibit 23

**UNITED STATES OF AMERICA**
**BEFORE THE FEDERAL TRADE COMMISSION**

**COMMISSIONERS:** **Andrew N. Ferguson, Chairman**
**Melissa Holyoak**
**Mark R. Meador**

| | | |
|---|---|---|
| **In the Matter of**<br><br>**Omnicom Group Inc.,**<br>**a corporation,**<br><br>**and**<br><br>**The Interpublic Group of Companies, Inc.,**<br>**a corporation.** | ) | **DECISION AND ORDER**<br>**DOCKET NO. C-4823** |

**DECISION**

The Federal Trade Commission ("Commission") initiated an investigation of the proposed acquisition by Omnicom Group Inc. ("Omnicom") of The Interpublic Group of Companies, Inc. ("IPG", and collectively "Respondents"). The Commission's Bureau of Competition prepared and furnished to Respondents a draft of the Complaint, which it proposed to present to the Commission for its consideration. If issued by the Commission, the draft Complaint would charge Respondents with violations of Section 7 of the Clayton Act, 15 U.S.C. § 18, and Section 5 of the Federal Trade Commission Act, as amended, 15 U.S.C. § 45 (collectively "Acts").

Respondents and the Bureau of Competition executed an Agreement Containing Consent Order ("Consent Agreement") containing (1) an admission by Respondents of all of the jurisdictional facts set forth in the Complaint, (2) a statement that the signing of said Consent Agreement is for settlement purposes only and does not constitute an admission by Respondents that the law has been violated as alleged in the Complaint, or that the facts as alleged in the Complaint, other than jurisdictional facts, are true, (3) waivers and other provisions as required by the Commission's Rules, and (4) a proposed Decision and Order.

The Commission considered the matter and determined that it had reason to believe that Respondents have violated the said Act, and that a complaint should issue stating its charges in that respect. The Commission accepted the Consent Agreement and placed it on the public record for a period of 30 days for the receipt and consideration of public comments. The Commission duly considered any comments received from interested persons pursuant to Commission Rule 2.34, 16 C.F.R. § 2.34. Now, in further conformity with the procedure described in Rule 2.34, the Commission makes the following jurisdictional findings and issues the following Decision and Order ("Order"):

1. Respondent Omnicom Group Inc. is a corporation organized, existing, and doing business under and by virtue of the laws of the State of New York, with its principal executive offices located at 280 Park Avenue, New York, New York 10017.

2. Respondent The Interpublic Group of Companies, Inc. is a corporation organized, existing, and doing business under and by virtue of the laws of the State of Delaware, with its principal executive offices located at 909 Third Avenue, New York, New York 10022.

3. The Commission has jurisdiction over the subject matter of this proceeding and over the Respondents, and the proceeding is in the public interest.

## ORDER

### I. Definitions

**IT IS ORDERED** that, as used in this Order, the following definitions shall apply:

A. "Omnicom" means Omnicom Group Inc., its directors, officers, employees, agents, representatives, successors, and assigns; and the joint ventures, subsidiaries, partnerships, divisions, groups, and affiliates controlled by Omnicom Group Inc., including Omnicom Media Group, and the respective directors, officers, employees, agents, representatives, successors, and assigns of each. After the Effective Date Omnicom will include IPG.

B. "IPG" means The Interpublic Group of Companies, Inc., its directors, officers, employees, agents, representatives, successors, and assigns; and the joint ventures, subsidiaries, partnerships, divisions, groups, and affiliates controlled by The Interpublic Group of Companies, Inc., including Mediabrands, and the respective directors, officers, employees, agents, representatives, successors, and assigns of each.

C. "Advertiser" means any customer or potential customer of Media Buying Services from Omnicom or IPG.

D. "Covered Bases" means (1) Political or ideological viewpoints (including viewpoints as to the veracity of news reporting or other politically or ideologically contested facts, such as their characterization as "misinformation," "disinformation," "bias," or similar terms); (2) adherence to journalistic standards or ethics established or set by a Third Party; and/or (3) commitment or adherence to diversity, equity or inclusion (DEI), such as diverse ownership or casting. Covered Bases shall not include fraudulent content.

E. "Effective Date" means the date on which the acquisition of IPG by Omnicom is consummated, and the date on which the obligations described in Sections II, III, IV, and V will enter into force.

F. "Mediabrands" means the network within IPG responsible for Media Buying Services.

G. "Media Buying Services" means purchases of advertising inventory across any type of media and types of purchases on behalf of, or for later resale to, Advertisers, but does not include other media services sold or billed separately, such as media planning or campaign management.

H. "Media Publisher" means any seller of advertising inventory, including a website, application, broadcaster, or publisher to Omnicom or IPG.

I. "Omnicom Media Group" means the network within Omnicom responsible for Media Buying Services.

J. "Political or ideological viewpoints" includes the Media Publisher's political or ideological viewpoints, the political or ideological viewpoints expressed in content that the Media Publisher sells advertising to run alongside of, or the political or ideological viewpoints expressed in any content or by any person.

K. "Relevant Area" means the United States.

L. "Other means of differentiating between Media Publishers" shall include, among other things, rating, ranking, or evaluating Media Publishers according to Covered Bases, and "Third Parties" shall include, among other things, individuals and entities that engage in such practices.

**II. Prohibited Conduct**

**IT IS FURTHER ORDERED** that, after the Effective Date:

A. Respondent Omnicom, in connection with its activities in or affecting commerce, as "commerce" is defined in Section 4 of the Federal Trade Commission Act, 15 U.S.C. § 44, shall cease and desist from, directly or indirectly, continuing, entering or attempting to enter into, maintaining or attempting to maintain, enforcing or attempting to enforce, or threatening to enforce any agreement, understanding, rule or practice, with any Third Party with respect to Media Buying Services in the Relevant Area that:

1. Directs Advertisers' advertising spend based on Covered Bases (other than as required by applicable laws);

2. Refuses Advertisers' requests to direct advertising spend to a Media Publisher based on Covered Bases (other than as required by applicable laws); or

3. Declines to deal with Advertisers based on Covered Bases (other than as required by applicable laws);

*PROVIDED, HOWEVER*, that this Paragraph II.A shall not apply to any agreement or discussion between Omnicom and an Advertiser (or vendors, subcontractors, or similar service providers on behalf of the Advertiser) relating to how to direct that Advertiser's advertising spend.

B. Respondent Omnicom shall cause Omnicom Media Group, the entities that operate as part of Omnicom Media Group, Mediabrands, and the entities that operate as part of Mediabrands, not to rely on exclusion lists, inclusion lists, or Other means of differentiating between Media Publishers in the Relevant Area on the basis of Covered Bases to determine or direct Advertisers' advertising placements. Omnicom shall not knowingly encourage or solicit Third Parties to create such means of differentiation on Omnicom's behalf that it itself would be prohibited from creating under this Order.

C. Notwithstanding the foregoing, exclusion lists, inclusion lists, or Other means of differentiating between Media Publishers developed at the express direction of a particular client, including those developed on the basis of Covered Bases, are expressly permitted; provided, however, that Omnicom will not offer any client's exclusion list or inclusion list to another client or Third Party, nor will it knowingly encourage or solicit Third Parties to do so.

D. To the extent such prohibited practices currently exist upon the Effective Date, Omnicom must promptly abolish them.

Nothing in this Order shall prohibit or prevent Omnicom or IPG from making day-to-day unilateral business decisions in the ordinary course, consistent with past practice, including but not limited to decisions on whether to pursue particular client business, so long as Omnicom and IPG do not violate the provisions of this Order.

## III. Compliance Reports

**IT IS FURTHER ORDERED** that:

A. Respondent Omnicom shall notify Commission staff via email at bccompliance@ftc.gov of the Effective Date no later than 5 days after its occurrence; and

B. Respondent Omnicom shall file verified written reports ("Compliance Reports") in accordance with the following:

1. Respondent Omnicom shall submit:

   a. an annual Compliance Report one year after the date this Order is issued, and annually for the next 4 years on the anniversary of that date; and

   b. additional Compliance Reports as the Commission or its staff may request.

2. Each compliance report shall contain sufficient information and documentation to enable the Commission to determine independently whether Respondent Omnicom is in compliance with this Order. Conclusory statements that Respondent Omnicom has complied with its obligations under this Order are insufficient. Respondent Omnicom shall include in its Compliance Reports, among other information or documentation that may be necessary to demonstrate compliance, a full description of the measures Respondent

Omnicom has implemented or plans to implement to ensure that it has complied or will comply with each Section of this Order, including a list setting forth the number of times a publisher appears on "exclusion lists" developed or applied by Omnicom Media Group at the express direction of a particular client based on political ideology (as permitted by Section II of this Order).

a. For a period of 5 years after filing a Compliance Report, Respondent Omnicom shall retain all final versions of material written communications with each party identified in each Compliance Report and all non-privileged internal memoranda, reports, and recommendations concerning fulfilling Respondent Omnicom's obligations under this Order during the period covered by such Compliance Report. Respondent Omnicom shall provide copies of these documents to Commission staff upon request.

b. Respondent Omnicom shall verify each Compliance Report in the manner set forth in 28 U.S.C. § 1746 by the Chief Executive Officer or another officer or employee specifically authorized to perform this function. Respondent Omnicom shall file its Compliance Reports with the Secretary of the Commission at ElectronicFilings@ftc.gov and the Compliance Division at bccompliance@ftc.gov, as required by Commission Rule 2.41(a), 16 C.F.R. § 2.41(a). In addition, Respondent Omnicom shall provide a copy of each Compliance Report to the Monitor if the Commission has appointed one in this matter.

## IV. Monitor

**IT IS FURTHER ORDERED** that:

A. Omnicom shall appoint, with the consent of Commission staff, which consent shall not be unreasonably withheld, a Monitor to observe and report on Respondent Omnicom's compliance with its obligations as set forth in this Order. Within 30 days of the date this Order is issued, Omnicom shall notify the Commission staff via email at bccompliance@ftc.gov of the identity of the proposed Monitor. Commission staff will have 30 days to give or deny consent to the appointment of that monitor. Upon a denial, Omnicom shall have 15 days to propose a new monitor, at which point Commission staff will have another 30 days to give or deny consent. This process will repeat until a monitor is appointed. If after three months Commission staff and Omnicom cannot agree on the appointment of a monitor, the roles will reverse, with the Commission proposing and Omnicom consenting, and Omnicom will not unreasonably withhold consent. Omnicom and the Monitor may enter into an agreement relating to the Monitor's services. Any such agreement:

1. Shall not limit, and the signatories shall not construe it to limit, the terms of this Section IV, and to the extent any provision in the agreement varies from or conflicts with any provision in this Section IV, Omnicom and the Monitor shall comply with the provisions of this Section IV; and

2. Shall include a provision stating that the agreement does not limit, and the signatories shall not construe it to limit, the terms of this Order, and to the extent any provision in the agreement varies from or conflicts with any provision in this Order, Omnicom and the Monitor shall comply with this Order.

B. The Monitor shall:

1. Have the authority to monitor Omnicom's compliance with the obligations set forth in this Order by reviewing the compliance reports submitted pursuant to Section III and requiring Omnicom to respond to inquiries regarding the information contained therein;

2. Receive complaints from nonparties regarding Omnicom's compliance with this Order;

3. Act in consultation with the Commission or its staff;

4. Serve without bond or other security;

5. Notify staff of the Commission, in writing, no later than 5 days in advance of entering into any arrangement that creates a conflict of interest, or the appearance of a conflict of interest, including a financial, professional or personal conflict; provided, however, that the Parties agree that the fact that the Monitor is employed by Omnicom does not alone trigger this provision. If the Monitor becomes aware of such a conflict only after it has arisen, the Monitor shall notify staff of the Commission as soon as the Monitor becomes aware of the conflict; and

6. Report in writing to the Commission concerning Omnicom's compliance with this Order annually on a date determined by Commission staff.

C. The Monitor shall serve for a period of 5 years after the date this Order is issued, provided however, that the Chairman of the Commission may at any time terminate the requirement to have a Monitor if he concludes that a Monitor is no longer necessary to accomplish the purposes of the Order.

D. The Monitor shall report to the Chief Executive Officer of Omnicom. If the Monitor raises a concern about Omnicom's compliance with this Order to the Chief Executive Officer and the Monitor is not satisfied with the Chief Executive Officer's response, the Monitor shall notify the Board of Directors.

E. Respondent Omnicom shall:

1. Cooperate with and assist the Monitor in performing his or her duties for the purpose of reviewing Omnicom's compliance with its obligations under this Order, including as requested by the Monitor, providing the Monitor full and complete access to personnel, information and facilities;

2. Not interfere with the ability of the Monitor to perform his or her duties pursuant to this Order;

3. Pay the Monitor an annual salary for the duration of the Monitor's employment on the same regular cadence as other Omnicom employees in the United States;

4. Indemnify and hold the Monitor harmless against any loss, claim, damage, liability, and expense (including attorneys' fees and out of pocket costs) that arises out of, or is connected with, a claim concerning the performance of the Monitor's duties under this Order, except to the extent the loss, claim, damage, liability, or expense results from gross negligence or willful misconduct by the Monitor; and

5. Not terminate the Monitor's employment or status as Monitor, except (a) with the consent of Commission staff or (b) for serious misconduct, such as the disclosure of confidential information to external parties other than the Commission. Upon such termination, or the departure of the Monitor for another reason, Omnicom will have 30 days to propose a replacement monitor, restarting the process detailed in IV.A.

F. Omnicom may require the Monitor to enter into a customary confidentiality agreement, so long as the agreement does not restrict the Monitor's ability to access personnel, information, and facilities or provide information to the Commission, or otherwise observe and report on Omnicom's compliance with this Order.

## V. Change in Respondent

**IT IS FURTHER ORDERED** that Omnicom shall notify the Commission at least 30 days prior to:

A. The proposed dissolution of Omnicom Group Inc.;

B. The proposed acquisition, merger, or consolidation of Omnicom Group Inc.; or

C. Any other organizational change in Omnicom, including the transfer, sale, or dissolution of subsidiaries, if such change may materially affect compliance obligations arising out of this Order.

## VI. Access

**IT IS FURTHER ORDERED** that, for the purpose of determining or securing compliance with this Order, and subject to any legally recognized privilege, and upon written request and upon 5 days' notice to Respondent Omnicom, Respondent Omnicom shall, without restraint or interference, permit any duly authorized representative of the Commission:

A. Access, during business office hours of Omnicom and in the presence of counsel, to all facilities and access to inspect and copy all books, ledgers, accounts, correspondence, memoranda, and all other records and documents in the possession, or under the control, of Omnicom related to compliance with this Order, which copying services shall be provided by Omnicom at its expense; and

B. To interview officers, directors, or employees of Omnicom, who may have counsel present, regarding matters related to compliance with this Order.

## VII. Cooperation Agreement

**IT IS FURTHER ORDERED** that Omnicom agrees to cooperate with the Commission in any investigation into (a) Omnicom's compliance with the Order and (b) any investigation or litigation relating to Media Buying Services, advertising, or similar matters, including by making employees available for interviews or testimony, facilitating interviews with former employees, accepting service of any compulsory process, not unreasonably objecting to or seeking to quash any such compulsory process, and voluntarily providing and authenticating documents and data reasonably sought by the Commission.

## VIII. Purpose of Order

**IT IS FURTHER ORDERED** that the purpose of this Order is, among other things, to address the theories of harm to competition alleged by the Commission in its Complaint including that the acquisition of IPG by Omnicom increased the likelihood of coordination among competitors in the Media Buying Services industry relating to the placement of advertisements based on Political or ideological viewpoints.

## IX. Term

**IT IS FURTHER ORDERED** that this Order shall terminate 10 years from the date it is issued.

By the Commission, Commissioner Meador recused.

April J. Tabor
Secretary

SEAL:
ISSUED: September 26, 2025

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NEWSGUARD TECHNOLOGIES, INC.,<br><br>*Plaintiff*,<br><br>v.<br><br>FEDERAL TRADE COMMISSION and ANDREW FERGUSON, in his official capacity as Chairman of the Federal Trade Commission,<br><br>*Defendants*. | Civil Action No.: 1:26-cv-00353-DLF |

**[PROPOSED] ORDER GRANTING PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

Having fully considered Plaintiff's Motion for a Preliminary Injunction, it is hereby **ORDERED** that the Motion is **GRANTED**.

The Court finds that Plaintiff has shown a substantial likelihood of success on the merits and that it will suffer immediate and irreparable harm from Defendants' conduct absent immediate and preliminary injunctive relief. The Court also finds that the balance of equities and the public interest tip in Plaintiff's favor.

Accordingly, it is hereby **ORDERED** that:

1. The FTC, Chairman Ferguson, his officers, agents, servants, and employees, during the course of this matter and until otherwise ordered by this Court or the case reaches finality, are **ENJOINED** from initiating any action to enforce the CID.

2. The FTC, Chairman Ferguson, his officers, agents, servants, and employees, during the course of this matter and until otherwise ordered by this Court or the case reaches finality, are **ENJOINED** from initiating any action to enforce the Omnicom-IPG merger condition.
3. Pursuant to Federal Rule of Civil Procedure 65(c), Plaintiff is not required to post a bond for this injunction.

**SO ORDERED.**

Dated: ______________

_________________________
DABNEY L. FRIEDRICH
United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NEWSGUARD TECHNOLOGIES, INC.,<br>*Plaintiff*,<br>v.<br>FEDERAL TRADE COMMISSION and ANDREW FERGUSON, in his official capacity as Chairman of the Federal Trade Commission,<br>*Defendants*. | No. 1:26-cv-0353 (DLF) |

**DEFENDANTS' OPPOSITION**
**TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

**INTRODUCTION** ... 1

**BACKGROUND** ... 2

I. Statutory and Regulatory Framework ... 2

II. The Commission's Efforts to Address Anticompetitive Advertising Boycotts ... 7

A. Advertising Boycott Investigation ... 8

B. The Omnicom-IPG Complaint and Consent Order. ... 12

III. NewsGuard's Complaint and Motion for Preliminary Injunction ... 14

**LEGAL STANDARDS** ... 14

**ARGUMENT** ... 14

I. NewsGuard is Not Entitled to a Preliminary Injunction Against Enforcement of the CID. ... 14

A. NewsGuard Cannot Show That It is Likely to Prevail on the Merits. ... 14

1. This Court Lacks Authority to Hear NewsGuard's Pre-Enforcement Challenge to the CID. ... 15

i. The Court lacks jurisdiction because Congress channeled NewsGuard's claims in the FTC Act's exclusive review scheme. ... 16

ii. NewsGuard lacks a cause of action. ... 18

2. NewsGuard's Retaliation Claim Fails on the Merits. ... 20

i. NewsGuard cannot show its speech prompted the CID. ... 20

a. The FTC acted for nonretaliatory reasons. ... 21

b. NewsGuard's purported evidence of retaliation fails. ... 22

ii. NewsGuard cannot show that the CID has a sufficient chilling effect. ... 27

iii. NewsGuard's reliance on Media Matters is misplaced. ... 29

3. NewsGuard's First and Fourth Amendment Claim Fails on the Merits. ... 30

B. The Equitable Factors Weigh Heavily Against a Preliminary Injunction. ... 32

II. Newsguard is Not Entitled to a Preliminary Injunction Against Any Part of the Omnicom-IPG Consent Order. ..... 34

A. NewsGuard Cannot Show That It is Likely to Prevail on the Merits. ..... 34

1. This Court Lacks Authority to Hear NewsGuard's Unprecedented Challenge to the Consent Order. ..... 34

i. The courts of appeals have exclusive jurisdiction to review FTC orders. ..... 34

ii. NewsGuard has no right to review of an FTC adjudicatory order that does not govern it. ..... 35

iii. NewsGuard failed to exhaust its claim. ..... 37

2. NewsGuard Has Not Established Standing to Challenge the Consent Order. ..... 38

3. NewsGuard's Retaliation Challenge to the Consent Order Fails on the Merits. ..... 40

i. There is no cognizable claim for "retaliatory settlement of litigation." ..... 40

ii. NewsGuard fails to show that the consent order was retaliatory. ..... 40

a. NewsGuard cannot show that its speech prompted the consent order. ..... 40

b. NewsGuard cannot show that the consent order chilled its speech. ..... 42

4. NewsGuard's "Jawboning" Claim Likewise Fails. ..... 42

i. NewsGuard has not come close to demonstrating that Omnicom and IPG were coerced. ..... 43

ii. NewsGuard fails to show a nexus between the consent order and its speech. ..... 44

B. The Equitable Factors Weigh Heavily Against a Preliminary Injunction. ..... 45

**CONCLUSION** ..... 45

## TABLE OF AUTHORITIES

### CASES

*Alexander v. Sandoval*,
532 U.S. 275 (2001) ..... 19

*Amato v. Elicker*,
534 F. Supp. 3d 196 (D. Conn. 2021) ..... 31

*Anheuser-Busch, Inc. v. FTC*,
359 F.2d 487 (8th Cir. 1966) ..... 15

*Archer v. Chisholm*,
870 F.3d 603 (7th Cir. 2017) ..... 27

*Aref v. Lynch*,
833 F.3d 242 (D.C. Cir. 2016) ..... 20, 27, 40, 42

*Armstrong v. Exceptional Child Ctr., Inc.*,
575 U.S. 320 (2015) ..... 19

*Arrington v. Santander Consumer USA Inc.*,
2025 WL 4083338 (D.D.C. Nov. 24, 2025) ..... 33, 45

*Ass'n of Irritated Residents v. EPA*,
494 F.3d 1027 (D.C. Cir. 2007) ..... 37

*Atl. Richfield Co. v. FTC*,
546 F.2d 646 (5th Cir. 1977) ..... 15

*Axon Enter., Inc. v. FTC*,
598 U.S. 175 (2023) ..... 17, 18

*Backpage.com, LLC v. Dart*,
807 F.3d 229 (7th Cir. 2015) ..... 44

*Baltimore Gas & Elec. Co. v. FERC*,
252 F.3d 456 (D.C. Cir. 2001) ..... 37, 45

*Bantam Books, Inc. v. Sullivan*,
372 U.S. 58 (1963) ..... 44

*Belle Fourche Pipeline Co. v. United States*,
751 F.2d 332 (10th Cir. 1984) ..... 15

*Block v. Cmty. Nutrition Inst.*,
467 U.S. 340 (1984) ..... 36, 37

*Blue Ribbon Quality Meats, Inc. v. FTC*,
560 F.2d 874 (8th Cir. 1977) ..... 5, 15

*Breaux v. City of Garland*,
205 F.3d 150 (5th Cir. 2000) ..... 27

*Camreta v. Greene*,
563 U.S. 692 (2011) ... 19

*Carr v. Saul*,
593 U.S. 83 (2021) ... 38

*Chaplaincy of Full Gospel Churches v. England*,
454 F.3d 290 (D.C. Cir. 2006) ... 45

*Citizens for Resp. & Ethics in Wash. v. FEC*,
971 F.3d 340 (D.C. Cir. 2020) ... 19

*City of Rancho Palos Verdes v. Abrams*,
544 U.S. 113 (2005) ... 19

*Constantine v. Rectors & Visitors of George Mason Univ.*,
411 F.3d 474 (4th Cir. 2005) ... 28

*Consumer Fed'n of Am. v. FTC*,
515 F.2d 367 (D.C. Cir. 1975) ... 36

*Consumer Fed'n of Am.*,
515 F.2d 367 (D.C. Cir. 1975) ... 37

*Consumers for Auto Reliability and Safety v. FTC*,
No. 17-1038, 2017 U.S. App. LEXIS 12921 (D.C. Cir. July 14, 2017) ... 37

*Cort v. Ash*,
422 U.S. 66 (1975) ... 18

*DeVillier v. Texas*,
601 U.S. 285 (2024) ... 18

*Elgin v. Dep't of Treasury*,
567 U.S. 1 (2012) ... 35

*Five Flags Pipe Line Co. v. Dep't of Transp.*,
854 F.2d 1438 (D.C. Cir. 1988) ... 35

*FTC v. Boehringer Ingelheim Pharm., Inc.*,
778 F.3d 142 (D.C. Cir. 2015) ... 4

*FTC v. Church & Dwight Co.*,
665 F.3d 1312 (D.C. Cir. 2011) ... 4

*FTC v. Claire Furnace Co.*,
274 U.S. 160 (1927) ... 1, 5, 15, 19

*FTC v. Invention Submission Corp.*,
965 F.2d 1086 (D.C. Cir. 1992) ... 3, 4

*FTC v. Ken Roberts Co.*,
276 F.3d 583 (D.C. Cir. 2001) ... 4, 5

*FTC v. Match Grp., Inc.*,
2023 WL 3181351 (D.D.C. May 1, 2023) .......... 4

*FTC v. Mt. Olympus Fin., LLC*,
211 F.3d 1278 (Table),
2000 WL 419825 (10th Cir. 2000) .......... 4

*FTC v. O'Connell Assocs., Inc.*,
828 F. Supp. 165 (E.D.N.Y. 1993) .......... 27

*FTC v. Owens-Corning Fiberglas Corp.*,
626 F.2d 966 (D.C. Cir. 1980) .......... 4

*FTC v. Standard Oil of Cal.*,
449 U.S. 232 (1980) .......... 34

*FTC v. Texaco*,
555 F.2d 862 (D.C. Cir. 1977) .......... 6, 31, 32

*Fund for Animals v. Frizzell*,
530 F.2d 982 (D.C. Cir. 1975) .......... 33

*Gen Fin. Corp. v. FTC*,
700 F.2d 366 (7th Cir. 1983) .......... 1, 5, 15, 17, 32

*Gonzalez v. Trevino*,
602 U.S. 653 (2024) .......... 20

*Gonzalez v. Walgreen Co.*,
140 F.4th 663 (5th Cir. 2025) .......... 25

*Green v. U.S. Dep't of Justice*,
54 F.4th 738 (D.C. Cir. 2022) .......... 14

*Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc.*,
527 U.S. 308 (1999) .......... 19

*Gustave-Schmidt v. Chao*,
360 F. Supp. 2d 105 (D.D.C. 2004) .......... 25

*Hamilton v. Geithner*,
666 F.3d 1344 (D.C. Cir. 2012) .......... 25

*Harris v. Wackenhut Servs., Inc.*,
648 F. Supp. 2d 53 (D.D.C. 2009) .......... 24

*Hartman v. Moore*,
547 U.S. 250 (2006) .......... 20, 21, 27, 28

*Heckler v. Chaney*,
470 U.S. 821 (1985) .......... 37

*Huisha-Huisha v. Mayorkas*,
27 F.4th 718 (D.C. Cir. 2022) .... 14

*In re Architect of Capitol Emp. Disp.*,
2024 WL 3359515 (D.D.C. July 10, 2024) .... 24

*In re Grand Jury Procs.*,
220 F.3d 568 (7th Cir. 2000) .... 30

*In re Grand Jury Procs.*,
486 F.2d 85 (3d Cir. 1973) .... 30

*In re Grand Jury Subpoena, Judith Miller*,
438 F.3d 1141 (D.C. Cir. 2006) .... 30

*J.T.H. v. Mo. Dep't of Soc. Servs. Child.'s Div.*,
39 F.4th 489 (8th Cir. 2022) .... 27

*Johnson v. Interstate Mgmt. Co.*,
849 F.3d 1093 (D.C. Cir. 2017) .... 18

*Kohls v. Ellison*,
__ F.4th __, 2026 WL 350923 (8th Cir. 2026) .... 33

*L.W. ex rel. Williams v. Skrmetti*,
83 F.4th 460 (6th Cir. 2023) .... 28, 40

*Lakkis v. Lahovski*,
994 F. Supp. 2d 624 (M.D. Pa. 2014) .... 25

*Lewis v. Becerra*,
2022 WL 123909 (D.D.C. Jan. 13, 2022) .... 33

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) .... 38, 39

*Maldonado v. D.C.*,
2019 WL 6877913 (D.D.C. Dec. 16, 2019) .... 33

*Media Matters for Am. v. Bailey*,
2024 WL 3924573 (D.D.C. Aug. 23, 2024) .... 20, 29

*Media Matters for Am. v. FTC*,
2025 WL 2988966 (D.C. Cir. Oct. 23, 2025) .... 10, 23, 29

*Media Matters for Am. v. FTC*,
805 F. Supp. 3d 105 (D.D.C. 2025) .... 10, 29

*Media Matters for Am. v. Paxton*,
138 F.4th 563 (D.C. Cir. 2025) .... 27

*Media Matters for Am. v. Paxton*,
732 F. Supp. 3d 1 (D.D.C. 2024) .... 29

*Minter v. District of Columbia*,
809 F.3d 66 (D.C. Cir. 2015) ........................................ 25, 26

*Mistretta v. United States*,
488 U.S. 361 (1989)........................................ 22

*Moore v. Garnand*,
83 F.4th 743 (9th Cir. 2023)........................................ 28

*Mylan Pharms., Inc. v. Shalala*,
81 F. Supp. 2d 30 (D.D.C. 2000) ........................................ 33

*N.Y. Rehab. Care Mgmt., LLC v. NLRB*,
506 F.3d 1070 (D.C. Cir. 2007) ........................................ 22

*N.Y. State Dep't of Law v. FCC*,
984 F.2d 1209 (D.C. Cir. 1993) ........................................ 45

*Nat'l Lifeline Ass'n v. FCC*,
983 F.3d 498 (D.C. Cir. 2020)........................................ 38

*Nat'l Rifle Ass'n of Am. v. Vullo*,
602 U.S. 175 (2024)........................................ 24, 43, 44

*Newdow v. Bush*,
355 F. Supp. 2d 265 (D.D.C. 2005) ........................................ 33

*Nieves v. Bartlett*,
587 U.S. 391 (2019)........................................ 20

*NRDC v. Pena*,
147 F.3d 1012 (D.C. Cir. 1998) ........................................ 32

*NTEU v. Vought*,
149 F.4th 762 (D.C. Cir. 2025) ........................................ 16, 20

*Open Top Sightseeing USA v. Mr. Sightseeing, LLC*,
48 F. Supp. 3d 87 (D.D.C. 2014) ........................................ 1, 33

*Perry v. Schwarzenegger*,
591 F.3d 1147 (9th Cir. 2010) ........................................ 32

*Rehberg v. Paulk*,
611 F.3d 828 (11th Cir. 2010) ........................................ 27

*Reisman v. Caplin*,
375 U.S. 440 (1964)........................................ 15, 19

*Sanitation & Recycling Indus., Inc. v. City of N.Y.*,
107 F.3d 985 (2d Cir. 1997)........................................ 31

*Schering Corp. v. Heckler*,
779 F.2d 683 (D.C. Cir. 1985)........................................ 37

*SEC v. McGoff*,
647 F.2d 185 (D.C. Cir. 1981) ........ 30

*Seila Law LLC v. CFPB*,
591 U.S. 197 (2020) ........ 4

*Sierra Club v. EPA*,
793 F. Supp. 3d 158 (D.D.C. 2025) ........ 33

*Singh v. Berger*,
56 F.4th 88 (D.C. Cir. 2022) ........ 14

*Starbucks Corp. v. McKinney*,
602 U.S. 339 (2024) ........ 14

*Telecomm. Rsch. & Action Ctr. v. FCC*,
750 F.2d 70 (D.C. Cir. 1984) ........ 35

*Thompson v. Hall*,
426 F. App'x 855 (11th Cir. 2011) ........ 27

*Thunder Basin Coal Co. v. Reich*,
510 U.S. 200 (1994) ........ 16

*Trump v. CASA, Inc.*,
606 U.S. 83 (2025) ........ 33

*Trump v. Hawaii*,
585 U.S. 667 (2018) ........ 21

*Ukiah Adventist Hosp. v. FTC*,
981 F.2d 543 (D.C. Cir. 1992) ........ 6, 35

*United States v. Bell*,
414 F.3d 474 (3d Cir. 2005) ........ 31

*United States v. Benson*,
561 F.3d 718 (7th Cir. 2009) ........ 31

*United States v. Fokker Servs. B.V.*,
818 F.3d 733 (D.C. Cir. 2016) ........ 21

*United States v. Johnson*,
2021 WL 3737681 (D.D.C. Aug. 24, 2021) ........ 22

*United States v. Morton Salt Co.*,
338 U.S. 632 (1950) ........ 3, 5, 22

*United States v. Rundo*,
108 F.4th 792 (9th Cir. 2024) ........ 25

*Wearly v. FTC*,
616 F.2d 662 (3d Cir. 1980) ........ 5, 15, 19

*Wisconsin Gas Co. v. FERC*,
758 F.2d 669 (D.C. Cir. 1985) .......... 45

*Ziglar v. Abbasi*,
582 U.S. 120 (2017) .......... 18

**STATUTES**

15 U.S.C. § 21 .......... 6

15 U.S.C. § 45 .......... 2, 6, 34, 35

15 U.S.C. § 46 .......... 2

15 U.S.C. § 57b-1 .......... 3, 4, 5, 11, 16, 17

**REGULATIONS**

16 C.F.R. § 2.1 .......... 2

16 C.F.R §§ 2.31–2.34 .......... 7

16 C.F.R. § 2.4 .......... 2, 3, 16

16 C.F.R. § 2.7 .......... 3, 16

16 C.F.R. § 2.10 .......... 3, 4, 12

16 C.F.R. Part 3, §§ 3.1–3.31A .......... 6

16 C.F.R. § 4.14 .......... 42

**REGULATORY MATERIALS**

90 Fed. Reg. 27304 (June 26, 2025) .......... 12, 13, 41

Complaint, *In re Omnicom Grp., Inc. and Interpublic Grp. of Cos., Inc.*,
FTC Dkt. No. 251-0049 (June 23, 2025) .......... 12

Concurring Statement of Commissioner Andrew N. Ferguson,
*FTC v. 1661, Inc. d/b/a GOAT*, FTC Dkt. No. 2223016 (Dec. 2, 2024) .......... 7

Decision and Order, *Aaron's, Inc.*, 169 F.T.C. 380 (May 11, 2020) .......... 36

Decision and Order, *Mars, Inc.*, 164 F.T.C. 821 (Nov. 30, 2017) .......... 36

Decision and Order, *In re Omnicom Grp., Inc. and Interpublic Grp. of Cos., Inc.*,
FTC Dkt. No. 251-0049 (September 26, 2025) .......... 13, 35, 41

Order Denying Petition to Quash Civil Investigative Demand, *In re Civil Investigative Demand to Global Disinformation Index Dated May 20, 2025*,
FTC Dkt. No. 251-0061 (Dec. 10, 2025) .......... 8

Order Denying Petition to Quash Civil Investigative Demand, *In re Civil Investigative Demand to Media Matters for Am. Dated May 20, 2025*,
FTC Dkt. No. 251-0061 (July 25, 2025) .......... 8, 9, 26

Petition to Quash Civil Investigative Demand,
FTC Dkt. No. 251-0061 (Jan. 16, 2026) ........ 11, 27

Proposed Order, *In re Valvoline Inc.*,
FTC Dkt. No. C-4824 (Nov. 14, 2025) ........ 36

Statement of Chairman Andrew N. Ferguson, *In re Omnicom Grp. / The Interpublic Grp. Of Cos.*, FTC Dkt. No 2510049 ........ 31

**OTHER AUTHORITIES**

*FTC v. Cigna Grp.*, No. 1:25-mc-00004, Dkt.1–2 (D.D.C. Jan. 15, 2025) ........ 26

*FTC v. IT Media, Inc.*, No. 2:16-cv-09483, Dkt.1–2 (C.D. Cal. Dec. 22, 2016) ........ 26

FTC, *Federal Trade Commission Launches Inquiry on Tech Censorship* (Feb. 20, 2025) ........ 8

FTC, *Request for Public Comment Regarding Technology Platform Censorship* ........ 8

NewsGuard, *NewsGuard Offers Targeted Services* (June 30, 2022) ........ 9

Regulations.gov, *Comment from CPAC & Independent Media Council* (July 29, 2025) ........ 41

Regulations.gov, *Comment from GB News Limited* (July 29, 2025) ........ 41

Regulations.gov, *Comment from Newsmax Media Inc.* (July 28, 2025) ........ 41

Transcript of Motion Hearing, *Media Matters for Am. v. FTC*,
No. 1:25-cv-1959 (Aug. 13, 2025) ........ 32

U.S. House Judiciary Comm., 2024 Interim Staff Report ........ 9, 22

U.S. House Small Bus. Comm., 2024 Interim Staff Report ........ 9, 21, 22

## INTRODUCTION

Plaintiff NewsGuard Technologies, Inc. seeks a preliminary injunction against the enforcement of (1) a Civil Investigative Demand ("CID") that was issued by the FTC pursuant to an investigation into unlawful collusion in the digital advertising industry and (2) a condition in a consent order regarding the merger of two large advertising agencies. The preliminary injunction can straightforwardly be denied for lack of irreparable harm based on NewsGuard's extraordinary delay in seeking this relief. The CID in question was issued *over eight months ago*, and the consent order at issue was entered *over four months ago*. "Such dilatory action … stands in stark contrast to the high bar [NewsGuard] must clear to show irreparable harm." *Open Top Sightseeing USA v. Mr. Sightseeing, LLC*, 48 F. Supp. 3d 87, 90 (D.D.C. 2014). At any rate, both of NewsGuard's challenges are entirely meritless.

**CID challenge.** To begin, NewsGuard misunderstands the proper forum for challenging a CID. It has long been established that FTC CIDs can be reviewed only in an enforcement action brought by the Commission. There is an unbroken, nearly century-long line of appellate decisions denying pre-enforcement review of FTC subpoenas and CIDs. *FTC v. Claire Furnace Co.*, 274 U.S. 160, 174 (1927); *Gen Fin. Corp. v. FTC*, 700 F.2d 366, 368 (7th Cir. 1983). NewsGuard's challenge should similarly be rejected.

NewsGuard fares no better on the merits. Its central claim is retaliation, but its purported evidence of retaliation fails as a matter of law. NewsGuard ignores undisputed indications of the CID's proper purpose, while itself relying on evidence that either does not support its position or actively undercuts it (for example, NewsGuard misleadingly characterizes Chairman Ferguson's *criticism* of heavy-handed government tactics as an *endorsement* of those tactics, *see infra* Part I.A.2.i). NewsGuard's First and Fourth Amendment privilege claim also lacks merit, including because NewsGuard does not identify a single specific document that is in dispute.

**Consent order challenge.** Once again, NewsGuard's claims fail at the threshold. Under the Federal Trade Commission Act, challenges to agency orders must be brought (1) in a court of appeals (2) by a party subject to the order (3) within 60 days. This case was brought (1) in district court (2) by a third party (3) over four months later. In addition, NewsGuard has failed to demonstrate standing to challenge the consent order and, at any rate, the order is unreviewable because decisions to settle litigation are committed to agency discretion by law. Finally, NewsGuard failed to exhaust its claims because it did not submit a comment on the proposed order during the public comment period.

The claims also fail on the merits. The consent order retaliation claim is at least as flawed as the CID retaliation claim. And NewsGuard's jawboning claim entirely lacks both of the fundamental elements of a jawboning claim: coercion by a public official or any nexus to disfavored speech.

In sum, NewsGuard's aggressive theories are untethered from both law and fact. If successful, they threaten to severely impede the effectiveness of federal agency investigations and the finality of agency orders. In addition, the equities—most prominently, NewsGuard's significant delay—categorically preclude relief. The preliminary injunction should be denied.

## BACKGROUND

### I. Statutory and Regulatory Framework

**A.** Section 5 of the FTC Act prohibits "persons, partnerships, or corporations" from engaging in "unfair methods of competition in or affecting commerce." 15 U.S.C. § 45(a). Congress "empowered and directed" the FTC "to prevent" these anticompetitive practices, *id.* § 45(a)(2), and thus authorized the agency "to investigate … any person, partnership, or corporation engaged in or whose business affects commerce," *id.* § 46(a); *see* 16 C.F.R. § 2.1 (describing how Commission investigations are initiated), *id.* § 2.4 (the Commission "encourages

the just and speedy resolution of investigations," and "will … employ compulsory process when in the public interest"). To fulfill this "continuing duty," the Commission "can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not." *United States v. Morton Salt Co.*, 338 U.S. 632, 639, 642–43 (1950).

To aid the agency in conducting its investigations, the FTC Act authorizes the Commission to issue civil investigative demands (CIDs)—a type of agency subpoena—to "any person" who may have "any information" relevant to potential violations of the laws enforced by the Commission. 15 U.S.C. § 57b-1. The issuance of a CID is not final agency action. *See FTC v. Invention Submission Corp.*, 965 F.2d 1086, 1089 (D.C. Cir. 1992). Instead, it is simply one step in an ongoing investigation, which initiates a process of discussion and negotiation. This process is "cooperative[]": the Commission expects CID recipients "to engage in meaningful discussions with staff to prevent confusion or misunderstandings regarding the nature and scope of the information and material being sought." 16 C.F.R. § 2.4.

That cooperative process includes negotiations between a CID recipient and FTC staff "to discuss compliance and to address and attempt to resolve all issues," including legal objections to a CID. *Id.* § 2.7(k). The Commission's regulations authorize FTC staff to modify a CID's terms following those meet-and-confer negotiations. *Id.* § 2.7(*l*). That meet-and-confer process is required before a recipient may file a petition to quash the CID. *Id.* § 2.7(k).

The petition-to-quash process following those negotiations offers the Commission an opportunity to address any remaining objections to a CID. *Id.* § 2.10; *see* 15 U.S.C. § 57b-1(f)(1). The petition process builds on the meet-and-confer negotiations. 16 C.F.R. § 2.7(k) ("absent extraordinary circumstances," the Commission "will consider only issues raised during the meet and confer process"); *id.* § 2.10(a)(2) (requiring "a signed separate statement representing that counsel for the petitioner has conferred with Commission staff … in good faith to resolve by

agreement the issues raised by the petition and has been unable to reach such an agreement"). FTC staff may reply to the petition to quash, and the Commission generally has 40 days to rule on any such petition; the deadline to comply with the CID is suspended during the pendency of a petition to quash, and the Commission sets a new compliance deadline if it denies the petition in whole or in part. *Id.* § 2.10(a)(4), (b), (c); *see* 15 U.S.C. § 57b-1(f)(2). Together, these administrative procedures allow the parties to identify and narrow or resolve disputed issues before judicial review of any remaining objections in an enforcement action.

If that administrative process fails to resolve any differences between the CID recipient and Commission staff, the Commission may file a petition for enforcement in a federal district court pursuant to 15 U.S.C. § 57b–1(e). *See Invention Submission Corp.*, 965 F.2d at 1088–91. The court hearing a CID enforcement action (and an appellate court following the district court's decision) can address a wide range of issues, from routine discovery disputes, *see, e.g.*, *FTC v. Match Grp., Inc.*, 2023 WL 3181351 (D.D.C. May 1, 2023) (motions to seal and for discovery), to claims of trade secrets and attorney-client privilege or work-product protection, *see, e.g.*, *FTC v. Boehringer Ingelheim Pharm., Inc.*, 778 F.3d 142 (D.C. Cir. 2015); *FTC v. Owens-Corning Fiberglas Corp.*, 626 F.2d 966 (D.C. Cir. 1980), to issues of statutory construction, *see, e.g.*, *FTC v. Ken Roberts Co.*, 276 F.3d 583 (D.C. Cir. 2001), and assertions that the scope of the investigation prompting the CID was not properly authorized by a Commission resolution, *see FTC v. Church & Dwight Co.*, 665 F.3d 1312 (D.C. Cir. 2011). Likewise, constitutional challenges to an agency CID may be (and often are) adjudicated in an enforcement action. *E.g.*, *Seila Law LLC v. CFPB*, 591 U.S. 197, 208–09 (2020); *FTC v. Mt. Olympus Fin., LLC*, 211 F.3d 1278 (Table), 2000 WL 419825, at *1–2 (10th Cir. 2000).

A CID is not self-executing, and a recipient incurs no penalty or other legal detriment for failing to comply with a CID before a court orders enforcement. "[T]here are no sanctions for

failing to comply with a subpoena of this type unless and until a district court enters an order under section 20(e) of the Act, 15 U.S.C. § 57b-1(e), directing compliance." *Gen. Fin. Corp. v. FTC*, 700 F.2d 366, 368 (7th Cir. 1983); *see also*, *e.g.*, *FTC v. Claire Furnace Co.*, 274 U.S. 160, 174 (1927) ("the defendants cannot suffer" until the government brings an enforcement action); *Wearly v. FTC*, 616 F.2d 662, 668 (3d Cir. 1980) ("a subpoena from the FTC is not self-enforcing").

The scope of the Commission's authority to investigate and to issue CIDs is broader than its enforcement authority under Section 5 of the FTC Act. The FTC Act gives the Commission broad authority to seek information from "any person" by issuing a CID if the Commission "has reason to believe" that the recipient "may be in possession, custody, or control of any documentary material or tangible things, or may have any information, relevant to unfair or deceptive acts or practices in or affecting commerce … or to antitrust violations." 15 U.S.C. § 57b-1(c). Thus, the Commission is entitled to seek information from entities that are themselves not suspected of any wrongdoing. Courts have consistently held that administrative agencies are accorded "wide latitude in asserting their power to investigate by subpoena," and that "an individual may not normally resist an administrative subpoena on the ground that an agency lacks regulatory jurisdiction if the subpoena is issued at the investigative stage." *Ken Roberts Co.*, 276 F.3d at 586; *see also*, *e.g.*, *Blue Ribbon Quality Meats, Inc. v. FTC*, 560 F.2d 874, 876 (8th Cir. 1977) ("the investigatory power granted the FTC … reaches further than [its] regulatory power").

Moreover, the Commission need not be certain that a CID recipient possesses relevant information: the statutory standard requires only a "reason to believe" that the recipient "may have" relevant information. 15 U.S.C. § 57b-1(c). That undemanding standard accords with the FTC's broad investigative power. The Supreme Court has emphasized the Commission's "power to get information" is analogous to that of a grand jury in a criminal investigation. *Morton Salt*, 338 U.S. at 642. And the D.C. Circuit has noted "the important governmental interest in the

expeditious investigation of possible unlawful activity." *FTC v. Texaco*, 555 F.2d 862, 872 (D.C. Cir. 1977) (en banc) (the "very backbone of an administrative agency's effectiveness in carrying out the congressionally mandated duties of industry regulation is the rapid exercise of the power to investigate").

**B.** In addition to its investigative power, when the Commission has "reason to believe" that there has been a violation of the laws it enforces, it has the statutory authority to enforce the FTC Act and the antitrust laws by bringing administrative proceedings against any "person, partnership, or corporation [that] has been or is using any unfair method of competition or unfair or deceptive act or practice in or affecting commerce." 15 U.S.C. § 45(b); *see also* 15 U.S.C. § 21 (Clayton Act Section 11). It initiates such an enforcement proceeding by issuing and serving "a complaint stating its charges in that respect and containing a notice of a hearing" before the Commission. 15 U.S.C. § 45(b). A complaint may allege for instance that a company's conduct, or its merger with another company or acquisition of another company's assets, constitutes an unfair method of competition (prohibited by the FTC Act) or would substantially lessen competition or tend to create a monopoly (prohibited by the Clayton Act).

The named respondents may dispute the allegations and litigate the charges in an adjudicative proceeding before an Administrative Law Judge and ultimately before the Commission. *See generally* 16 C.F.R. Part 3, §§ 3.1–3.31A. Any final order issued by the Commission directing the respondent to cease and desist is subject to judicial review in a court of appeals. The respondent named in the order must file a petition for review within 60 days in a circuit within which the respondent resides or carries on business or where the challenged practice was used. 15 U.S.C. § 45(c). The court of appeals has exclusive jurisdiction to review the Commission's order. *Id.* "It is undisputed that review of FTC cease and desist orders is committed to the courts of appeals." *Ukiah Adventist Hosp. v. FTC*, 981 F.2d 543, 549 (D.C. Cir. 1992).

Alternatively, if the Commission staff and respondents negotiate a consent agreement, the respondents may consent to the entry of a final Commission order (without admitting liability) and waive judicial review. Pursuant to its procedural rules, the Commission publishes the complaint and the proposed consent agreement and order in the Federal Register and provides an opportunity for public comment before determining whether to accept the agreement and enter the consent order. *See* 16 C.F.R §§ 2.31–2.34. If, after review of any public comments, the Commission decides to amend the complaint and modify the order, the respondent may choose to agree to any modifications, or it may decide to litigate the complaint in an adjudicative proceeding, as described above. If agreed, the Commission enters the consent order specifying the terms the Commission determines are appropriate to address the violations of law specified in the complaint.

## II. **The Commission's Efforts to Address Anticompetitive Advertising Boycotts**

Chairman Ferguson and the FTC have expressed concern about, and taken action to prevent, anticompetitive collusion in the digital advertising industry that withholds advertising from certain disfavored media.[1] This issue is a high priority for the Commission because such concerted action would likely violate the federal antitrust laws and harm the public. Unlawful collusion could reduce competition in markets for advertising purchasing and other advertising-related products or services, which could in turn reduce consumer choice in content, degrade the quality of advertisements, and ultimately stifle debate on matters of public importance.

Accordingly, the Commission has taken several steps to investigate online censorship from advertiser boycotts. In February 2025, for example, the Commission launched a public inquiry into tech censorship, seeking comment on whether tech platforms have "funded or collaborated with organizations, for-profit or non-profit, that advocated for or enabled censorship, and whether "such

[1] *See, e.g.*, Concurring Statement of Commissioner Andrew N. Ferguson, *FTC v. 1661, Inc. d/b/a GOAT*, FTC Dkt. No. 2223016 (Dec. 2, 2024), https://tinyurl.com/32tzaf4a.

activities, *such as advertising boycotts*, [were] designed to facilitate collusion or censorship." FTC, *Federal Trade Commission Launches Inquiry on Tech Censorship* (Feb. 20, 2025), https://tinyurl.com/373z74he (emphasis added); FTC, *Request for Public Comment Regarding Technology Platform Censorship*, https://tinyurl.com/2s4kuy7m. This litigation pertains to certain other steps the Commission has taken to address possible advertiser boycotts.

**A. Advertising Boycott Investigation.**

**1.** To further address the concern about potentially anticompetitive advertising boycotts, the Commission opened a broad investigation into potential boycotts in digital advertising against certain media (that is, concerted refusals to deal with those media) on the basis of lists or ratings using agreed-upon definitions of subjective terms such as "misinformation" or "brand safety." The Commission has explained the purpose and scope of that investigation in its decisions denying petitions to quash CIDs issued to two other entities in the course of the investigation. *See* Order Denying Petition to Quash Civil Investigative Demand, *In re Civil Investigative Demand to Global Disinformation Index Dated May 20, 2025*, FTC Dkt. No. 251-0061 (Dec. 10, 2025), https://tinyurl.com/3jz23jcy (*GDI* PTQ Order); Order Denying Petition to Quash Civil Investigative Demand, *In re Civil Investigative Demand to Media Matters for Am. Dated May 20, 2025*, FTC Dkt. No. 251-0061 (July 25, 2025), https://tinyurl.com/48pc74bz (*Media Matters* PTQ Order).

In furtherance of this investigation, the Commission issued seventeen currently outstanding CIDs to entities "that the Commission has reason to believe possess information relating to the use of such lists to coordinate ad placement." *GDI* PTQ Order at 2. Those entities include ad agencies, advertising trade associations, brand safety and suitability rating organizations, and policy and advocacy groups focused on digital advertising. *Id.*

**2.** One of those CID recipients was plaintiff NewsGuard, which received a CID on May 20, 2025. Dkt.11-17. NewsGuard provides "assessments of the reliability of [internet] news sources," Dkt.11-2 ¶ 4, including through ratings and "Exclusion Lists," NewsGuard, *NewsGuard Offers Targeted Services* (June 30, 2022), https://tinyurl.com/23dma8f4. "Advertisers and ad agencies" use these subscription services to determine "where (on which websites) ads should and should not be placed." Dkt.11-2 ¶ 15. NewsGuard describes "[b]rand safety for online advertisers" as "a multi-billion-dollar industry." *Id.* ¶ 17. Congressional investigations have connected NewsGuard's services to "coordinated action to demonetize" disfavored media entities. U.S. House Judiciary Comm., 2024 Interim Staff Report at 1, 3, 25–26, https://tinyurl.com/2v7ej2wj (Judiciary Committee Report); *see* U.S. House Small Bus. Comm., 2024 Interim Staff Report at 43, 49, https://tinyurl.com/ymevubkd (Small Business Committee Report).

The CID to NewsGuard seeks several categories of documents and information, including: information pertaining to NewsGuard's organizational structure; documents and data relating to NewsGuard's ratings of content publisher entities; communications with other entities related to the subject of the investigation; the methodology by which NewsGuard determines the ratings, labels, or categorizations that it applies to news or information sites; lists that NewsGuard has provided to third parties that evaluate or categorize content publisher entities; identification of NewsGuard's customers and its communications with those customers; and NewsGuard's financial information, among other subjects. Dkt.11-17 at 3–8 (CID specifications).

**3.** One of the other CID recipients in the ad boycott investigation was Media Matters, a policy and advocacy group. On June 18, 2025, it filed a petition to quash the CID, which the Commission denied. *Media Matters* PTQ Order at 13. Media Matters also filed a federal lawsuit, asserting a First Amendment retaliation claim and a First and Fourth Amendment privilege claim.

Media Matters sought a preliminary injunction against enforcement and implementation of the CID. Its briefing focused principally on the retaliation claim. Media Matters relied on a range of facts that are specific to Media Matters and do not apply to NewsGuard, such as (1) the fact that Media Matters is a policy and advocacy entity (rather than a brand safety organization like NewsGuard); and (2) the fact that it has previously prevailed in litigation where it asserted that certain subpoenas from state attorneys general were issued in retaliation for a specific 2023 article regarding Elon Musk and X.com. *See Media Matters for Am. v. FTC*, 805 F. Supp. 3d 105, 113–15 (D.D.C. 2025).

Judge Sooknanan granted a preliminary injunction, *see id.* at 138, and a divided motions panel declined to issue a stay pending appeal, *Media Matters for Am. v. FTC*, 2025 WL 2988966, at *1 (D.C. Cir. Oct. 23, 2025) (per curiam). The majority emphasized the "unique fact pattern" of *Media Matters* and noted that there was no reason to believe that any other CID recipient "could plausibly … seek similar relief." *Id.* at *2, *11. Judge Walker would have granted the stay because "the FTC is (very) likely to prevail on the merits." *Id.* at *12 (Walker, J., dissenting).

The Commission's appeal is ongoing. The Commission contends that the court lacked the authority to consider Media Matters' pre-enforcement challenge to the CID and that, at any rate, it erred in crediting Media Matters' purported evidence of retaliation.

Another CID recipient, Global Disinformation Index (GDI), has also sued and sought a preliminary injunction against enforcement of the CID it received. GDI's suit was filed on November 25, 2025. No. 1:25-cv-4137-CJN (D.D.C.). GDI filed an amended motion for a preliminary injunction on February 2, 2026. Pursuant to the parties' stipulation, the FTC's response to that motion is due March 20, and GDI's reply is due April 3.

**4.** NewsGuard explains that it "participated in ten meet-and-confer discussions [with Commission staff] over the course of eight months and produced over 40,000 pages of documents

in multiple rounds" in response to the CID. Dkt.11-2 ¶ 43. That meet-and-confer process served to substantially narrow the disputes between the Commission staff and NewsGuard. Following the most recent meet-and-confer, Commission staff sent NewsGuard a letter on January 15, 2026, significantly modifying the scope of the CID and confirming the narrow demands that remain outstanding. The letter modified four of the five specifications that NewsGuard disputed, limiting the scope of the requested information in response to NewsGuard's concerns and focusing on the most important information relevant to the FTC's investigation. Dkt.11-18 at 2–3.[2] The letter explicitly stated that NewsGuard's previous productions had "satisfied its CID obligations" as to the remaining specifications. *Id.* at 3.[3]

Shortly after receiving that letter, NewsGuard filed a petition to quash. *See* Petition to Quash Civil Investigative Demand, FTC Dkt. No. 251-0061 (Jan. 16, 2026), https://tinyurl.com/4xx3d3p6 (Petition). The petition raised two grounds to quash the CID. First, NewsGuard argued, citing the district court's preliminary injunction decision in *Media Matters*, that the CID "represents unconstitutional retaliation against NewsGuard based on its protected First Amendment activities." *Id.* at 6. Second, the petition argued that "the CID's overbroad demands and impermissible requests for sensitive subscriber information, customer communications, and internal deliberative materials violate the First and Fourth Amendments' restrictions on administrative subpoenas." *Id.* at 6–7.

NewsGuard's compliance period is stayed while the petition to quash remains pending. 15 U.S.C. § 57b-1(f)(2). If the Commission denies the petition in whole or in part, it will "specify

---

[2] The remaining unmodified specification was one that NewsGuard had not yet responded to.

[3] NewsGuard oddly describes this letter as "insist[ing] [that] NewsGuard remains obligated to provide all documents and information called for by the *original* CID." Dkt.11-1 at 28. As discussed in the main text, that is patently false. The letter expressly provides "modifications" that substantially narrow NewsGuard's obligations under the CID. Dkt.11-18 at 3.

new terms for compliance, including a new return date." 16 C.F.R. § 2.10(b). Under the Commission's rules, a decision on the petition is due by March 6, 2026. *See id.* § 2.10(c).

**B. The Omnicom-IPG Complaint and Consent Order.**

In June 2025, the Commission filed an administrative complaint addressing antitrust concerns associated with a proposed transaction that would merge two of the six largest advertising agency holding companies, creating the largest media buying advertising agency in the United States. The Commission's June 2025 complaint alleged that the merger of these two major players in the industry—Omnicom Group, Inc. and The Interpublic Group of Companies (IPG)—would result in a significantly "more concentrated" market. Complaint ¶ 13, *In re Omnicom Grp., Inc. and Interpublic Grp. of Cos., Inc.*, FTC Dkt. No. 251-0049 (June 23, 2025), https://tinyurl.com/2kt5y2bp. Increased concentration, in turn, would "meaningfully increase[] the risk" of collusion among the remaining market participants. *Id.* ¶ 15. And the risk of "anticompetitive coordination" was particularly significant in this instance due to a "history of coordination" among major advertisers. *Id.* ¶¶ 16–17. As the complaint detailed, "[m]ajor advertisers have discussed and ultimately declined to advertise on certain websites" and those "decisions appear to have been coordinated through one or more associations of advertising industry players, including ad agencies." *Id.* ¶ 17. Accordingly, due to the increased risk of "anticompetitive coordination" from the acquisition, the complaint charged that it would violate both the FTC Act and the Clayton Act. *Id.* ¶¶ 23–24.

To address these concerns, the Commission also issued a proposed consent agreement. The Commission published an analysis of the proposed agreement in the Federal Register and solicited public comment. 90 Fed. Reg. 27304 (June 26, 2025). The analysis explained that the agreement would prohibit Omnicom from certain conduct that the FTC identified as likely to facilitate

anticompetitive coordination. *See id.* at 27306 (identifying terms of consent agreement). The FTC received several comments over the course of the following 30 days.

After considering the comments, the Commission issued a decision and entered a consent order directing Omnicom to cease and desist from certain conduct. Decision and Order, *In re Omnicom Grp., Inc. and Interpublic Grp. of Cos., Inc.*, FTC Dkt. No. 251-0049 (September 26, 2025), https://tinyurl.com/mrjtt8sr (*Omnicom* Decision). The consent order eliminates Omnicom's ability to deny advertising dollars to media publishers based on their political or ideological viewpoint, except at the express and individualized direction of Omnicom's advertiser customers.

The final consent order's wording was altered in response to comments. Among the prohibitions in the order, Omnicom must not enter into, enforce, or maintain any agreement with a third party that directs or restricts advertising based on certain grounds, such as political or ideological viewpoints, including "viewpoints as to the veracity of news reporting or other politically or ideologically contested facts," and "adherence to journalistic standards or ethics established" by a third party. *Id.* at 2–3. The order also prohibits Omnicom and its subsidiaries from relying on "exclusion lists" or "inclusion lists" to differentiate among media outlets on prohibited grounds; such lists are permitted at the request of a particular client but Omnicom must not offer to share them with other clients. *Id.* at 4. The order does not mention NewsGuard or its products.

The Commission determined that the restrictions in the consent order were necessary to address "harm to competition," including the risk that the acquisition "increased the likelihood of coordination among competitors in the Media Buying Services industry relating to the placement of advertisements based on [p]olitical or ideological viewpoints." *Id.* at 8.

**III. <u>NewsGuard's Complaint and Motion for Preliminary Injunction</u>**

NewsGuard filed this action on February 6, 2026. The complaint and preliminary injunction motion, both invoking *Media Matters*, assert that the CID and the Omnicom order violate NewsGuard's First and Fourth Amendment rights. *See* Dkt.1; Dkt.11.

## LEGAL STANDARDS

"A preliminary injunction is an 'extraordinary' equitable remedy that is 'never awarded as of right.'" *Starbucks Corp. v. McKinney*, 602 U.S. 339, 345 (2024). Thus, "a plaintiff seeking a preliminary injunction must make a clear showing that 'he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'" *Id*. at 346. "The balance of the equities and the public interest 'merge when, as here, the Government is the opposing party.'" *Singh v. Berger*, 56 F.4th 88, 107 (D.C. Cir. 2022). Thus, "[w]hen a private party seeks injunctive relief against the government," the Court must "weigh[] the benefits to the private party from obtaining an injunction against the harms to the government and the public from being enjoined." *Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 734 (D.C. Cir. 2022).

## ARGUMENT

**I. NEWSGUARD IS NOT ENTITLED TO A PRELIMINARY INJUNCTION AGAINST ENFORCEMENT OF THE CID.**

**A. NewsGuard Cannot Show That It is Likely to Prevail on the Merits.**

NewsGuard cannot satisfy the first and most important factor in the preliminary injunction analysis: that it is likely to succeed on the merits. *See Green v. U.S. Dep't of Justice*, 54 F.4th 738, 745 (D.C. Cir. 2022). NewsGuard's pre-enforcement claims regarding the CID are not reviewable for several independent reasons. They also fail on their own terms.

**1. This Court Lacks Authority to Hear NewsGuard's Pre-Enforcement Challenge to the CID.**

For nearly a century, the Supreme Court and lower courts have consistently held that disputes about federal CIDs or subpoenas should be resolved in an enforcement action. *See FTC v. Claire Furnace Co.*, 274 U.S. 160, 174 (1927); *see also Reisman v. Caplin*, 375 U.S. 440, 443 (1964) (upholding dismissal of pre-enforcement challenge to IRS summons). Relying on *Claire Furnace* and *Reisman*, courts of appeals have unanimously rejected pre-enforcement challenges to FTC and other federal agency CIDs and subpoenas. *See Gen. Fin. Corp. v. FTC*, 700 F.2d 366, 368 (7th Cir. 1983) (a plaintiff "must wait till the government sues … since that is the method of judicial review of FTC investigations that Congress has prescribed"); *Belle Fourche Pipeline Co. v. United States*, 751 F.2d 332, 334–35 (10th Cir. 1984); *Wearly v. FTC*, 616 F.2d 662, 668 (3d Cir. 1980); *Am. Motors Corp. v. FTC*, 601 F.2d 1329, 1335–37 (6th Cir. 1979); *Blue Ribbon Quality Meats, Inc. v. FTC*, 560 F.2d 874, 876–77 (8th Cir. 1977); *Atl. Richfield Co. v. FTC*, 546 F.2d 646, 651 (5th Cir. 1977); *Anheuser-Busch, Inc. v. FTC*, 359 F.2d 487, 490–91 (8th Cir. 1966) (Blackmun, J.).

These cases have a common thread. Recipients of agency CIDs or subpoenas are not entitled to equitable relief in a pre-enforcement posture because they have an adequate remedy at law: challenging the CID or subpoena in an enforcement action. *E.g.*, *Atl. Richfield*, 546 F.2d at 649. And this doctrine serves important purposes. On the one hand, it protects CID and subpoena recipients by ensuring that they face no legal penalty until they have an opportunity to raise their objections in an enforcement action in federal court. On the other, it ensures that agencies are able to conduct investigations as directed by Congress, allows the parties to narrow and potentially resolve any disputes prior to litigation, and prevents litigants from dragging courts into abstract disagreements without the specific factual context presented in an enforcement action. This case illustrates the problem, as NewsGuard has insisted on forcing this Court to consider these issues

before the Commission has had an opportunity to weigh in on them (and while the CID's compliance date is stayed by the pendency of NewsGuard's petition to quash). Adhering to the traditional prohibition on pre-enforcement review of CIDs would avoid this sort of wasteful dual-track decisionmaking.

A preliminary injunction here would depart from these well-established precedents. As discussed below, this would be error for two reasons. First, Congress has precluded pre-enforcement review of CIDs under the claim-channeling doctrine of *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994). And second, NewsGuard lacks a cause of action.

***i. The Court lacks jurisdiction because Congress channeled NewsGuard's claims in the FTC Act's exclusive review scheme.***

*Claire Furnace*, *Reisman*, and their progeny confirm that district courts should not entertain pre-enforcement challenges to CIDs. And this is precisely the outcome dictated by the FTC Act.

*Thunder Basin* explains that Congress may establish a statutory scheme that channels judicial review to an exclusive jurisdictional mechanism, divesting district courts of their ordinary federal-question jurisdiction. 510 U.S. at 218. A statute channels review when "a preclusive intent is 'fairly discernible in the statutory scheme,'" and "the claims at issue 'are of the type Congress intended to be reviewed within' the special scheme." *NTEU v. Vought*, 149 F.4th 762, 774 (D.C. Cir. 2025). This framework effectuates Congress's objective of directing certain challenges to agency actions "to a single review process," streamlining investigations and enforcement proceedings. *Thunder Basin*, 510 U.S. at 211. Both *Thunder Basin* prongs are satisfied here.

**a.** Congress's preclusive intent is "fairly discernible" in the FTC Act. The FTC Act and its implementing regulations create an interdependent scheme to protect CID recipients. The scheme allows recipients to discuss and negotiate the CID with FTC staff to resolve or narrow disputes, 16 C.F.R. §§ 2.4, 2.7(k); petition the Commission to quash the CID, 15 U.S.C. § 57b-1(f); and obtain judicial review of the CID, including any objections, when the FTC seeks to enforce it, *id.*

§ 57b-1(h). CIDs are not self-executing, and recipients face no penalties for noncompliance until the court rules in an enforcement action. *See Gen. Fin. Corp.*, 700 F.2d at 368–69. This process allows the parties to narrow disputed issues without unnecessarily embroiling district courts in broad legal disputes that lack a well-developed factual record.

**b.** NewsGuard's claims are squarely "of the type" Congress intended to be reviewed through the exclusive statutory mechanism.

*Thunder Basin* identified three factors that must be considered in evaluating whether a litigant's claims are of the type that Congress intended to be reviewed within the statutory structure: (1) whether precluding district court jurisdiction would "foreclose all meaningful judicial review"; (2) whether the claim is "wholly collateral to [the] statute's review provisions"; and (3) whether the claim is "outside the agency's expertise." *Axon Enter., Inc. v. FTC*, 598 U.S. 175, 186 (2023). Here, the answer to each question is no. Unlike *Axon*'s "structural constitutional claims" that contest an agency's "power to proceed at all," *id.* at 191–92, NewsGuard's claims challenge a discrete agency action and implicate issues about which the FTC has considerable expertise.

*First*, precluding this pre-enforcement challenge would not foreclose meaningful judicial review because all objections, including constitutional claims, can be raised in a CID-enforcement action in federal court. *See* 15 U.S.C. § 57b-1(h). Indeed, this is how federal agency CIDs and subpoenas have always been reviewed, and it is not credible to suggest that this traditional mechanism—endorsed by numerous courts—does not amount to meaningful judicial review.

*Second*, there is nothing "wholly collateral" about NewsGuard's claims. Unlike in *Axon*, NewsGuard challenges something "particular about how [the FTC's] power was wielded"—namely, the issuance of the CID—not the Commission's "power generally." *Axon*, 598 U.S. at 193. NewsGuard's motion implicates "procedural or evidentiary matters," *id.*, such as the adequacy of

the breadth of the CID. *E.g.*, Dkt.11-1 at 41–42, 48. NewsGuard's challenge, thus, directly "relate[s] to the subject of [an] enforcement action[]." *Axon*, 598 U.S. at 193.

*Third*, questions about the propriety of CIDs fall directly within the FTC's expertise; thus, the agency should be permitted to decide whether to narrow its CID before commencing an enforcement action. Disputes about whether CIDs have been properly issued, or whether they are overbroad, raise "considerations of agency policy" in which the FTC has "competence and expertise." *Id.* at 194 (cleaned up). The FTC routinely issues CIDs and has considerable experience negotiating with recipients over CIDs' scope and breadth and in evaluating petitions to quash. And NewsGuard's constitutional claims are "intertwined with or embedded in" the FTC's areas of expertise, *id.* at 195, since, as detailed above, the Commission has authority to consider any objections, including constitutional arguments, in a petition to quash.

***ii. NewsGuard lacks a cause of action.***

NewsGuard also has no cause of action. NewsGuard does not allege that there is a cause of action under the Administrative Procedure Act and instead relies on an implied equitable cause of action "arising under the First and Fourth Amendments." Dkt.1 ¶ 8. But "[c]onstitutional rights do not typically come with a built-in cause of action." *DeVillier v. Texas*, 601 U.S. 285, 291 (2024). And the Supreme Court has warned federal courts to hesitate before implying constitutional causes of action. *E.g.*, *Ziglar v. Abbasi*, 582 U.S. 120, 134–35 (2017) ("separation-of-powers principles are or should be central to the analysis"); Likewise, "since *Cort v. Ash*, [422 U.S. 66 (1975),] the Supreme Court has been very hostile to implied [statutory] causes of action." *Johnson v. Interstate Mgmt. Co.*, 849 F.3d 1093, 1097 (D.C. Cir. 2017).

That hostility to implied causes of action is related to the inherent limitations on the "traditional equitable powers" of federal courts. *Ziglar*, 582 U.S. at 133. Those powers are limited to relief that was "traditionally accorded by courts of equity," *Grupo Mexicano de Desarrollo, S.A.*

*v. All. Bond Fund, Inc.*, 527 U.S. 308, 319 (1999), and pre-enforcement injunctions against agency CIDs and subpoenas were not available at equity, *e.g.*, *Claire Furnace*, 274 U.S. at 174.

In addition, the equitable power to "enjoin unlawful executive action is subject to express and implied statutory limitations." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015). In *Exceptional Child Center*, the Court relied on the Medicaid Act's implicit preclusion of private enforcement in declining to employ federal courts' equitable powers. *Id.* at 327–29. Likewise here, the FTC Act provides no express cause of action, and Congress's choice of an administrative process, followed by an enforcement action, as the sole remedy for CID recipients impliedly restricts equitable collateral attacks. *See City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 121 (2005) ("The provision of an express, private means of redress in the statute itself is ordinarily an indication that Congress did not intend to leave open a more expansive remedy."); *Alexander v. Sandoval*, 532 U.S. 275, 290 (2001) (same). Unsurprisingly, the Supreme Court and lower courts have frequently grounded their dismissals of pre-enforcement CID challenges in the want of equity and an adequate remedy at law. *See Reisman*, 375 U.S. at 443; *Claire Furnace*, 274 U.S. at 174; *Wearly*, 616 F.2d at 665.[4]

* * * *

Although NewsGuard (and other CID recipients) would prefer immediate review, Congress weighed the policy factors and channeled such disputes to enforcement actions. And the scheme Congress adopted takes the interests of CID recipients into account, including through the petition-

[4] The district court's preliminary injunction ruling in *Media Matters* disagreeing with these threshold barriers to a pre-enforcement challenge is "is not binding," *Camreta v. Greene*, 563 U.S. 692, 709 n.7 (2011), and the same is true of the divided D.C. Circuit panel's unpublished order declining to issue a stay pending appeal, *Citizens for Resp. & Ethics in Wash. v. FEC*, 971 F.3d 340, 351 (D.C. Cir. 2020). Moreover, as the FTC explained in its pending appeal, the *Media Matters* ruling is mistaken in numerous respects. Appellants' Br. 19–36, *Media Matters*, No. 25-5302 (D.C. Cir. Jan. 5, 2026)

.

to-quash process where CID recipients present their challenges to the agency. While NewsGuard awaits judicial review, it faces no penalties and is not required to "engage in, or to refrain from, any conduct." *Vought*, 149 F.4th at 786. By contrast, permitting pre-enforcement challenges would have drastic and unwelcome consequences, potentially allowing any recipient of process to bring law enforcement investigations to a halt simply by claiming retaliation. That is not the law.

**2. NewsGuard's Retaliation Claim Fails on the Merits.**

NewsGuard claims the CID retaliates against NewsGuard for its "journalistic judgments." Dkt.11-1 at 35. To prevail on this claim, NewsGuard must show that (1) it "engaged in conduct protected under the First Amendment," (2) the FTC took an action "sufficient to deter a person of ordinary firmness in [NewsGuard's] position from speaking," and (3) there is "a causal link" between the protected conduct and "the adverse action." *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016). While the Commission does not dispute that NewsGuard engages in some protected speech, NewsGuard fails the other two prongs: it cannot show the necessary causal link between its speech and the CID, and it cannot show that the CID caused a cognizable chilling effect.

***i. NewsGuard cannot show its speech prompted the CID.***

To show causation, NewsGuard must demonstrate at a *minimum* that the CID "would not have been [issued] absent the retaliatory motive." *Nieves v. Bartlett*, 587 U.S. 391, 399 (2019).[5] In making that but-for showing, NewsGuard must overcome the "presumption of regularity" that attaches to government action. *Hartman v. Moore*, 547 U.S. 250, 263 (2006). That presumption is

[5] In fact, the requisite showing is more robust: NewsGuard must demonstrate that there was no reasonable basis for the CID. For example, in the similar context of retaliatory arrests, the Supreme Court has held that plaintiffs must show that the government lacked probable cause. *See Nieves*, 587 U.S. at 399–400. The logic applies here too. *See Gonzalez v. Trevino*, 602 U.S. 653, 663 (2024) (Alito, J., concurring); *cf. Media Matters for Am. v. Bailey*, 2024 WL 3924573, at *12–13 (D.D.C. Aug. 23, 2024) (considering the issue and ultimately declining to impose an objective basis standard, at least in part for case-specific reasons). However, the Court need not reach that issue because NewsGuard cannot satisfy even the basic but-for standard.

at its apex in the context of law-enforcement investigations, an area of "executive discretion of such high order" that "judicial intrusion … should be minimal." *Id.* Excessive judicial interference "could 'chill law enforcement,' cause delay, and 'impair the performance of a core executive constitutional function.'" *United States v. Fokker Servs. B.V.*, 818 F.3d 733, 741 (D.C. Cir. 2016); *see Trump v. Hawaii*, 585 U.S. 667, 702 (2018). Accordingly, NewsGuard must put forward enough evidence to displace the presumption and show that the but-for cause of the CID was retaliation for its First Amendment speech. NewsGuard has not come close to carrying that burden.

**a. The FTC acted for nonretaliatory reasons.**

The CID issued to NewsGuard is part of a broad investigation into a high priority issue—advertising boycotts that violate the antitrust laws. In particular, the FTC is investigating whether certain entities unlawfully agreed to withhold the placement of ads using lists of disfavored publishers. *E.g.*, Dkt.11-18 at 2. The FTC has issued seventeen currently outstanding CIDs to a variety of entities, including advertising trade associations, policy/advocacy groups, and brand safety/suitability rating organizations like NewsGuard.

The investigation's breadth refutes NewsGuard's theory that the CID was issued in retaliation for NewsGuard's speech. Needless to say, the other entities that received a CID did not engage in the same speech. The fact that they received CIDs anyway demonstrates that the NewsGuard CID would have been issued regardless of any purported retaliatory motive.

Moreover, NewsGuard's own allegations reflect ample *nonretaliatory* reasons for issuing a CID to NewsGuard. For example, NewsGuard acknowledges that it has been the subject of relevant congressional investigations. Dkt.11-1 at 17–18. One congressional committee report concluded that NewsGuard's "aim" is to "systematically defund" outlets it deems "untrustworthy" by creating "exclusion lists," which operate as "blacklists" for advertisers. Small Business Committee Report at 43, 49. The report also found that "advertising organizations" pressured their

members to use these lists, including through "agreements" that "may have antitrust implications." *Id.* at 59. Another congressional report similarly concluded that certain advertising entities may have "participated in boycotts and other coordinated action to demonetize" disfavored entities and that this "anticompetitive behavior" included "push[ing] [advertisers] to use [entities] like … NewsGuard." Judiciary Committee Report at 1, 3, 25–26, 38.

As Chairman Ferguson explained in reaction to these reports, "[c]ongressional investigations revealed [that] … NewsGuard … led collusive ad-boycotts—possibly in violation of our antitrust laws." Dkt.11-7 at 2. These congressional reports furnished an ample basis for the Commission to investigate whether NewsGuard has information relevant to violations of the antitrust laws. Indeed, that is how the system is supposed to work: "Our principle of separation of powers anticipates that the coordinate Branches will converse with each other on matters of vital common interest." *Mistretta v. United States*, 488 U.S. 361, 408 (1989). NewsGuard may object to these reports, but the Commission may investigate "merely on suspicion that the law is being violated, or even just because it wants assurance that it is not." *Morton Salt*, 338 U.S. at 642–43. In sum, far from demonstrating causation, the undisputed evidence disproves it.

**b. NewsGuard's purported evidence of retaliation fails.**

NewsGuard points to three categories of evidence to show retaliation: (1) statements from Chairman Ferguson, (2) the timing of the CID, and (3) the scope of the CID. All of this evidence fails as a matter of law.

***Statements by Chairman Ferguson.*** NewsGuard points to three statements from Chairman Ferguson as evidence of a retaliatory motive. Dkt.11-1 at 40–41.[6] In reality, two of these statements

[6] NewsGuard mentions other statements from Chairman Ferguson elsewhere, but it does not apply them in its retaliation analysis and has thus forfeited reliance on them. *See N.Y. Rehab. Care Mgmt., LLC v. NLRB*, 506 F.3d 1070, 1076 (D.C. Cir. 2007); *United States v. Johnson*, 2021 WL 3737681, at *4 (D.D.C.), *aff'd*, 2021 WL 5537704 (D.C. Cir. Nov. 17, 2021).

simply reflect a concern with potential antitrust violations, while the third is a firm *rejection* of coercive and retaliatory tactics by the government.

*First*, NewsGuard identifies what it sees as Chairman Ferguson's rationale for issuing the CID, Dkt.11-1 at 40: "Congressional investigations revealed [that] … NewsGuard … led collusive ad-boycotts—possibly in violation of our antitrust laws." Dkt.11-7 at 2. This offers no help to their position: Chairman Ferguson was simply making the accurate observation that, per congressional investigations, antitrust violations may have occurred. These sorts of statements are commonplace for federal enforcement officials and cannot possibly serve as a basis for derailing federal investigations. *Cf. Media Matters*, 2025 WL 2988966, at *14 (Walker, J., dissenting) ("Ferguson's sequence of conduct—saying what he would do in office, and then doing it—is what we expect of public servants tasked with enforcing the law.").

*Second*, NewsGuard points to Chairman Ferguson's statement that the FTC "ought to conduct an investigation" of "collusion that may suppress competition [in the advertising context]." Dkt.11-11 at 5. Because that is simply another unremarkable expression of a legitimate antitrust concern, NewsGuard focuses on Chairman Ferguson's further observation that, per congressional investigations, NewsGuard's ratings "seem[] to give a free pass to deceptive and biased news coverage by major left-leaning outlets." *Id.* at 5 & n.19. But that is merely another accurate characterization of the outcome of congressional investigations. And NewsGuard tellingly omits the next two sentences: "NewsGuard is, of course, free to rate websites by whatever metric it wants. But the antitrust laws do not permit third parties to facilitate group boycotts among competitors." *Id.* at 5. This further demonstrates that Chairman Ferguson carefully distinguished protected speech from collusion that violates the antitrust laws.

*Finally*, NewsGuard offers a demonstrably misleading characterization of Chairman Ferguson's remarks in an April 2025 interview, falsely attributing to him views that he

categorically rejected. In that portion of the interview, Chairman Ferguson described (and strongly criticized) the aggressive state government tactics at issue in *National Rifle Association of America v. Vullo*, 602 U.S. 175 (2024). Dkt.11-15 at 5–7. The Chairman said that New York regulators had warned regulated entities against working with the NRA, and characterized the nature of their threat as follows: "We [i.e., the New York regulators] have a tremendous array of investigative tools. Those tools are expensive when applied to you even if we don't win at the end of the day, so knuckle under." *Id.* at 6. As Ferguson explained, "The regulators can show up, they can audit, they can investigate, they can cost you a lot of money, and the path of least resistance is: 'Do what we say.'" *Id.*

Chairman Ferguson could not have been clearer that he categorically rejected such coercive tactics. *Id.* at 5–7. And yet NewsGuard brazenly describes these remarks *as the Chairman's own plan*—an "expla[nation of] how the FTC could use" its investigative tools and coercive power "to demand compliance to its views." Dkt.11-1 at 22; *id.* at 36 (relying on the same misunderstanding to claim that the FTC's actions were "designed to chill NewsGuard's First Amendment-protected speech"); *see also* Dkt.1 ¶ 6 (referring to Chairman Ferguson's purported "public statements that the Commission would use its 'tremendous array of investigative tools [and] coercive power' to force online publishers to 'Do what we say.'"). In short, NewsGuard places crucial reliance on a statement that means the exact opposite of what NewsGuard suggests. This is a telling reflection of the fundamental weakness of its position.[7]

[7] NewsGuard also repeatedly quotes FCC Chairman Brendan Carr. *E.g.*, Dkt.11-1 at 20–21, 22–23, 28. But those statements are irrelevant because NewsGuard does not allege that Chairman Carr had *any* involvement in the issuance of the CID. *See, e.g.*, *In re Architect of Capitol Emp. Disp.*, 2024 WL 3359515, at *3 (D.D.C. July 10, 2024) (disregarding comments by "non-decisionmakers" who "did not work for the [relevant entity]" and who plaintiffs "never link[ed] to [their] termination"); *Harris v. Wackenhut Servs., Inc.*, 648 F. Supp. 2d 53, 62 (D.D.C. 2009), *aff'd*, 419 F. App'x 1 (D.C. Cir. 2011) (concluding that "comments made by … non-decisionmakers[]

***Timing.*** NewsGuard also argues that the "timing" of the CID "support[s] a finding of retaliatory purpose." Dkt.11-1 at 41. But a causal inference arises from timing only where an adverse action closely follows protected conduct. *See Hamilton v. Geithner*, 666 F.3d 1344, 1357 (D.C. Cir. 2012). And NewsGuard's analysis of "timing" does not include a single date, so it cannot possibly show proximity between any two events. More fundamentally, NewsGuard's timing argument is a nonstarter because it does not identify *any* specific speech for which the CID purportedly retaliates. It is impossible to find a temporal connection to an unknown event. *See Lakkis v. Lahovski*, 994 F. Supp. 2d 624, 634 (M.D. Pa. 2014) (allegations "not anchored in time" cannot "enable a fact-finder to infer a causal link").

NewsGuard cannot rehabilitate its timing argument by asserting that the CID was issued promptly after Mr. Ferguson became Chairman. In fact, the CID was issued *four months* later, which is beyond the typical "outer limit" for causation. *Gustave-Schmidt v. Chao*, 360 F. Supp. 2d 105, 118–19 (D.D.C. 2004). At any rate, launching the investigation quickly would not constitute evidence of retaliation because it is equally consistent with what actually occurred: an effort to prioritize an important inquiry into advertising boycotts. *See, e.g.*, *Gonzalez v. Walgreen Co.*, 140 F.4th 663, 674 (5th Cir. 2025) (a fact that is equally consistent with both sides' positions does not constitute evidence in favor of either).

Besides, even if the timing supported NewsGuard's retaliation theory, "temporal proximity" alone is insufficient. *Minter v. District of Columbia*, 809 F.3d 66, 71 (D.C. Cir. 2015); *United States v. Rundo*, 108 F.4th 792, 805 (9th Cir. 2024) ("[T]iming" does not demonstrate "improper motive" because it "can merely be the sign of the government's change in enforcement priorities."). A plaintiff must identify "positive evidence [of retaliation] beyond mere proximity,"

---

are inadmissible" where "plaintiff [had] failed to proffer evidence … that the speakers had any influence … on the [relevant] decision").

*Minter*, 809 F.3d at 71–72, which—as discussed throughout this section—NewsGuard has not done.

***The Scope of the CID.*** Finally, NewsGuard asserts that "the sweeping scope of the CID" serves to "confirm the causal link to NewsGuard's protected speech." Dkt.11-1 at 41–42. But each of the CID's specifications follows naturally from the Commission's goal to investigate potential advertising boycotts. Tellingly, NewsGuard does not argue otherwise. Instead, it raises general objections to the CID's breadth. But it never contends that the CID is *unusually* broad for an FTC CID (nor could it, as in fact the CID is wholly typical).[8] Without even an argument that the CID's specifications are irrelevant or abnormally broad, there is no conceivable basis to treat its scope as evidence of retaliation.

NewsGuard also insists that the CID must be retaliatory because it "gave no explanation" of the subject of the investigation, supposedly in violation of the FTC Act. Dkt.11-1 at 42. But that's incorrect. The explanation provided in the CID was legally sufficient, *see* Dkt.11-17 at 23, as the Commission explained in ruling on a petition to quash a CID with an identical description of the investigation:

> [The statement] identifies the nature of the conduct ("persons … facilitating collusion or coordination in any way with any other market participants"), the methods of law violations ("private communications, public statements, sharing information, or other actions"), the relevant law that may have been violated (Section 5 of the FTC Act), and the investigation's purpose ("to determine the appropriate action or remedy, including whether injunctive and monetary relief would be in the public interest").

*Media Matters* PTQ Order at 5. At any rate, even if there were some technical deficiency in the CID's description, it would at most be a regulatory or statutory concern that would have no bearing on NewsGuard's constitutional claim. And the record reflects that NewsGuard was fully aware of

---

[8] *E.g.*, *FTC v. Cigna Grp.*, No. 1:25-mc-00004, Dkt.1–2 (D.D.C. Jan. 15, 2025) (43 specifications); *FTC v. IT Media, Inc.*, No. 2:16-cv-09483, Dkt.1–2 (C.D. Cal. Dec. 22, 2016).

the nature of the investigation. *See* Dkt.11-18 at 2 ("As [FTC] staff have said consistently … this investigation seeks information regarding potential anticompetitive behavior … including whether certain companies may have colluded to deny advertising revenue to" certain entities.). Indeed, so unimportant was this issue that NewsGuard did not even raise it in its petition to quash or purport to have raised it in the meet-and-confer process, *see* Petition at 6–18 & Exhibit 2—which means that, in addition to everything else, this argument fails for lack of exhaustion. *E.g.*, *FTC v. O'Connell Assocs., Inc.*, 828 F. Supp. 165, 168, 170 (E.D.N.Y. 1993).

***ii. NewsGuard cannot show that the CID has a sufficient chilling effect.***

NewsGuard must also demonstrate that the CID is "sufficient to deter a person of ordinary firmness in plaintiff's position from speaking." *Aref*, 833 F.3d at 258. It has not made this showing.

As an initial matter, it appears unlikely that a retaliatory investigation claim, such as the one being asserted here, is even cognizable. The Supreme Court and the D.C. Circuit have declined to resolve the question. *See Hartman*, 547 U.S. at 262 n.9; *Media Matters for Am. v. Paxton*, 138 F.4th 563, 584–85 (D.C. Cir. 2025). And several courts of appeals have suggested that such claims should *not* be recognized. *See, e.g.*, *Archer v. Chisholm*, 870 F.3d 603, 620 (7th Cir. 2017); *Breaux v. City of Garland*, 205 F.3d 150, 157–61 (5th Cir. 2000); *see also J.T.H. v. Mo. Dep't of Soc. Servs. Child.'s Div.*, 39 F.4th 489, 493 (8th Cir. 2022) ("[W]e have never recognized a retaliatory-investigation claim of this kind. Nor have other courts around the country."). And the Eleventh Circuit has squarely held that "a retaliatory investigation" "does not implicate a federal constitutional right." *Rehberg v. Paulk*, 611 F.3d 828, 850 & n.24 (11th Cir. 2010), *aff'd*, 566 U.S. 356 (2012); *accord Thompson v. Hall*, 426 F. App'x 855, 858 (11th Cir. 2011) (per curiam).

This caselaw suffices to deny a preliminary injunction. After all, the claim here is either not cognizable or at a minimum is unprecedented. The novelty of the claim itself "suggest[s] that the key premise of a preliminary injunction—a showing of a likelihood of success on the merits—

is missing." *L.W. ex rel. Williams v. Skrmetti*, 83 F.4th 460, 471 (6th Cir. 2023), *aff'd*, 605 U.S. 495 (2025). At any rate, the uncertainty about whether the "adverse consequences of a retaliatory investigation would *ever* justify recognizing such an investigation as a distinct constitutional violation," *Hartman*, 547 U.S. at 262 n.9 (emphasis added), counsels skepticism that the adverse consequences of any particular investigation would chill a person of ordinary firmness.

To put it another way, even if a retaliatory investigation claim is theoretically cognizable—which only one federal court of appeals appears to have assumed—it could arise only in extraordinary circumstances that are absent here. *See Moore v. Garnand*, 83 F.4th 743, 752 (9th Cir. 2023) (while no case had "held that a retaliatory investigation by itself was unconstitutional," it was possible that the entire "scope and manner" of a given investigation could violate the First Amendment (emphasis omitted)). For similar reasons, an investigation could have a sufficient chilling effect only under extraordinary circumstances. But NewsGuard has raised an entirely generic retaliatory investigation claim. The scope of the CID is standard for FTC investigations, and NewsGuard has not alleged any unusual injury resulting from the CID. Indeed, NewsGuard does not allege *any* change in its speech. While subjective responses are not "dispositive" and a plaintiff need not show that it "altogether" ceased speaking, it is telling that the CID has apparently had *zero* impact on NewsGuard's speech over the nine months it has been pending. *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 500 (4th Cir. 2005).

Meanwhile, the injuries NewsGuard *does* identify are plainly insufficient. It alleges that complying with the CID would be "costly" in time and resources and "intrusive" in that it would require the production of documents. Dkt.11-1 at 36–37. But if such consequences were enough, then *any* CID or investigation would chill speech.

NewsGuard argues that three nonbinding decisions involving Media Matters have reached just that conclusion. *Id.* at 38. But those cases do not support such an expansive position, which

would make this prong of a retaliation claim meaningless. In two of them, the defendants forfeited the argument that the CID would objectively chill a person of ordinary firmness, *see Media Matters for Am. v. Paxton*, 732 F. Supp. 3d 1, 27 (D.D.C. 2024), *aff'd*, 138 F.4th 563 (D.C. Cir. 2025); *Bailey*, 2024 WL 3924573, at *11, and in all three Matter Matters alleged that the relevant CID actually changed its behavior, *e.g.*, *Media Matters*, 805 F. Supp. 3d at 131—something NewsGuard has not tried to show here.

#### *iii. NewsGuard's reliance on* **Media Matters** *is misplaced.*

NewsGuard's retaliation analysis repeatedly relies on the *Media Matters* litigation. That reliance is misplaced. As noted above, *see supra* pg. 19 n.4, neither the district court ruling nor the stay panel ruling in *Media Matters* are binding. The reasoning of *Media Matters* is also inapplicable here because the determinative facts are entirely different.

As Judge Sooknanan concluded in her order rejecting another CID recipient's related-case designation, each element of the retaliation ruling in *Media Matters* "turned on facts unique to Media Matters." Docket Order, *Disinformation Index, Inc. v. FTC*, No. 1:25-cv-4137 (D.D.C. Dec. 16, 2025). The stay panel majority, too, described *Media Matters* as involving "unique factual circumstances" and expressed skepticism that other CID recipients in the investigation "could plausibly … seek similar relief." *Media Matters*, 2025 WL 2988966, at *11. For example, those rulings placed significant reliance on the fact that Media Matters had previously prevailed in litigation where it asserted that certain state subpoenas were issued in retaliation for a specific 2023 article. *Media Matters*, 805 F. Supp. 3d at 113–15. Nothing similar occurred here. Thus, any ruling regarding Media Matters cannot help NewsGuard show that the FTC retaliated against NewsGuard or that it suffered a cognizable chilling effect.

At any rate, as the Commission has explained on appeal, *Media Matters*' analysis was wrong even on its own terms, radically lowering the bar for retaliation claims. *See* Appellants' Br.

36–54, *Media Matters*, No. 25-5302 (D.C. Cir. Jan. 5, 2026). For example, the court imputed to the FTC Chairman the views of an individual who is not even in government and who is not alleged to have played any role in the CID's issuance. NewsGuard asks this Court not only to repeat the *Media Matters* court's errors, but to exacerbate them by finding retaliation in a case where the purported evidence of a retaliatory motive is even more sparse.

**3. NewsGuard's First and Fourth Amendment Claim Fails on the Merits.**

NewsGuard invokes a smattering of First and Fourth Amendment principles to argue that the CID is somehow unlawful, but all of those arguments are misconceived.

The core of NewsGuard's argument is that it possesses a First Amendment privilege not to disclose some documents implicated by the CID, either as a function of a journalistic privilege or of the freedom of association. Dkt.11-1 at 47–48. *First*, it is axiomatic that any such assertion of privilege must proceed on a "document-by-document basis," *In re Grand Jury Procs.*, 220 F.3d 568, 571 (7th Cir. 2000), and NewsGuard has not identified even a single privileged document that is in dispute. That's fatal to a claim of privilege.

*Second*, at any rate, neither privilege applies.[9] A journalistic privilege is inapplicable because the D.C. Circuit has held that any such privilege does not apply in grand jury proceedings, *In re Grand Jury Subpoena, Judith Miller*, 438 F.3d 1141, 1145–49 (D.C. Cir. 2006), and an FTC investigation is "analogous to the Grand Jury," *Morton Salt*, 338 U.S. at 642–43; *see In re Grand Jury Procs.*, 486 F.2d 85, 90 (3d Cir. 1973) ("Grand jury subpoenas … are exactly analogous to subpoenas issued by a federal administrative agency."); *SEC v. McGoff*, 647 F.2d 185, 192 (D.C. Cir. 1981) (same). No associational interests are implicated either. As a for-profit entity with a

[9] Moreover, the CID includes a procedure for NewsGuard to invoke privilege claims. Dkt.11-17 at 20. The motion makes no mention of this procedure, which is routinely used to protect any privileged information pending enforcement litigation in federal court, where those claims could be presented and resolved.

commercial relationship with customers who pay for its products, NewsGuard's customer lists are not shielded from disclosure. *See, e.g.*, *United States v. Bell*, 414 F.3d 474, 485 (3d Cir. 2005) ("Producing a customer list does not offend the First Amendment."); *United States v. Benson*, 561 F.3d 718, 727 (7th Cir. 2009) (same). The same is true for NewsGuard's communications with those customers. *See Sanitation & Recycling Indus., Inc. v. City of N.Y.*, 107 F.3d 985, 996 (2d Cir. 1997) (right of association "generally will not apply … to business relationships"); *Amato v. Elicker*, 534 F. Supp. 3d 196, 209 (D. Conn. 2021) (association with customers "falls outside First Amendment associational protection").

NewsGuard also claims that, due to its asserted First Amendment interests, the CID violates the Fourth Amendment as overbroad. Dkt.11-1 at 47–48. But even if those First Amendment interests applied (and they do not), the argument fails. To prevail on such a claim, NewsGuard must show more than "[b]roadness" or a "burden"; it must show that the CID is "*unduly* burdensome or *unreasonably* broad." *FTC v. Texaco*, 555 F.2d 862, 882 (D.C. Cir. 1977) (en banc). That standard is particularly demanding here because "the agency's inquiry is pursuant to a lawful purpose"—investigating collusive agreements in violation of the antitrust laws—and NewsGuard does not contest that "the requested documents are relevant" to that investigation. *Id.*; *see* Statement of Chairman Andrew N. Ferguson at 5–6, *In re Omnicom Grp. / The Interpublic Grp. Of Cos.*, FTC Dkt. No 2510049 (explaining that "coordinated action by advertising agencies against politically disfavored publishers is tantamount to an agreement not to compete on quality"—"the supreme evil of antitrust") (cited at Dkt.11-20). NewsGuard has not met that standard, failing even to allege (let alone show) that complying with the CID would "unduly disrupt or seriously hinder normal [business] operations." *Texaco*, 555 F.2d at 882. And the undisputed evidence shows otherwise: FTC staff determined that NewsGuard has complied with

26 of the CID's 31 specifications, and staff "substantial[ly]" narrowed four of the five remaining specifications in a "good-faith effort to reduce NewsGuard's burden." Dkt.11-18 at 2–3.

In sum, NewsGuard's contentions are meritless. More broadly, they are also premature.[10] Each argument hinges on the risk of *compelled disclosure*, but NewsGuard faces no legal penalty until a federal court orders production in an enforcement action. *Gen. Fin. Corp.*, 700 F.2d at 368. Similarly, NewsGuard's claims are premature because they call for highly factual determinations that cannot be adjudicated in a pre-enforcement setting. In an enforcement proceeding, by contrast, CID recipients like NewsGuard have ample opportunity to assert that a certain document is privileged or that complying with a certain specification poses an undue burden. Likewise, any relevant associational interests can be protected at that time "by entry of a protective order," *Perry v. Schwarzenegger*, 591 F.3d 1147, 1160 n.6, 1165 (9th Cir. 2010); *Texaco*, 555 F.2d at 884 & n.62 (describing protective orders for FTC subpoenas).

**B. The Equitable Factors Weigh Heavily Against a Preliminary Injunction.**

The equitable prongs of the preliminary injunction analysis also preclude relief. To begin, NewsGuard has not come close to showing irreparable harm. That much is evident from its own extraordinary delay in seeking relief.

To reiterate, NewsGuard filed its complaint *over eight months* after the CID was issued. But it is well-established that a "district court should be reluctant to award relief" when a plaintiff fails to "promptly" request injunctive relief, *NRDC v. Pena*, 147 F.3d 1012, 1026 (D.C. Cir. 1998), because "such delay implies a lack of urgency and irreparable harm," *Newdow v. Bush*, 355 F.

[10] At oral argument, the *Media Matters* district court expressed skepticism regarding a similar claim, observing that it would be "odd" "to apply privilege in the abstract at this stage" and that any privilege argument could be raised "in a more concrete way" in an enforcement action, where it would be clear if the FTC is "going to take issue with [the] assertions of privilege." Transcript of Motion Hearing 14–15, *Media Matters for Am. v. FTC*, No. 1:25-cv-1959, Dkt.43 (D.D.C. Aug. 13, 2025). The court did not rely on the privilege claim in its preliminary injunction decision.

Supp. 2d 265, 292 (D.D.C. 2005); *see also, e.g.*, *Fund for Animals v. Frizzell*, 530 F.2d 982, 987 (D.C. Cir. 1975) (44-day delay in seeking injunction was "inexcusable" and "bolstered" the court's "conclusion that an injunction should not issue"); *Open Top Sightseeing USA v. Mr. Sightseeing, LLC*, 48 F. Supp. 3d 87, 90 (D.D.C. 2014) (36-day delay cut against preliminary injunction); *Mylan Pharms., Inc. v. Shalala*, 81 F. Supp. 2d 30, 44 (D.D.C. 2000) (two-month delay "militates against a finding of irreparable harm"); *Sierra Club v. EPA*, 793 F. Supp. 3d 158, 165 (D.D.C. 2025) (three-month delay was "in tension with the high bar [plaintiffs] must clear to establish irreparable harm."); *Arrington v. Santander Consumer USA Inc.*, 2025 WL 4083338, at *1 (D.D.C. Nov. 24, 2025) (holding that delay demonstrated lack of irreparable harm, and citing *Open Top Sightseeing*, *Fund for Animals*, and *Mylan Pharms.*). The same principle applies "where First Amendment rights are allegedly at stake." *Kohls v. Ellison*, __ F.4th __, 2026 WL 350923, at *4 (8th Cir. 2026).

NewsGuard avers that it spent those eight months "attempt[ing] to work in good faith with the FTC concerning the CID," Dkt.14 at 6, but that merely reinforces that the CID did not cause any irreparable harm. *Maldonado v. D.C.*, 2019 WL 6877913, at *3–4 (D.D.C. Dec. 16, 2019) (plaintiffs' "litigation strategy," including engaging in lengthy "settlement discussions," "strongly discredit[ed their] claim that they [were] suffering irreparable harm"); *Lewis v. Becerra*, 2022 WL 123909, at *9 (D.D.C. Jan. 13, 2022) (delay suggested a lack of irreparable harm even if litigation tactics were adopted for "valid strategic reasons"). At any rate, the only potentially irreparable harm NewsGuard identifies is First Amendment harm, which it has not suffered because (as shown above) there has been no First Amendment violation.

The balance of equities and the public interest also weigh against an injunction. "[T]he Government is likely to suffer irreparable harm from the District Courts' entry of injunctions that likely exceed the [courts'] authority." *Trump v. CASA, Inc.*, 606 U.S. 831, 860 (2025); *see Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, J., in chambers) ("[A]ny time a State is

enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury."). An injunction would also harm the public, which benefits from the robust enforcement of the antitrust laws. *See FTC v. Standard Oil of Cal.*, 449 U.S. 232, 242 (1980). On the other hand, NewsGuard has suffered no irreparable harm and any other alleged injury cannot outweigh the grievous harms to the public and to the FTC, which are exacerbated by the likelihood that an injunction here will further encourage a barrage of copycat pre-enforcement challenges to federal CIDs and subpoenas.

## II. NEWSGUARD IS NOT ENTITLED TO A PRELIMINARY INJUNCTION AGAINST ANY PART OF THE OMNICOM-IPG CONSENT ORDER.

### A. NewsGuard Cannot Show That It is Likely to Prevail on the Merits.

As with its CID challenge, NewsGuard's challenge to a condition in the consent order is not likely to prevail on the merits both because its claims are not reviewable and because they are entirely meritless in any event.

#### 1. This Court Lacks Authority to Hear NewsGuard's Unprecedented Challenge to the Consent Order.

This Court cannot hear NewsGuard's claims relating to the consent order because (1) the FTC Act vests jurisdiction over challenges to FTC orders exclusively in the courts of appeals and requires petitions to be filed within sixty days; (2) Congress limited the ability to obtain review of an FTC order to only those entities that are bound by the order; and (3) NewsGuard failed to exhaust its claims.

##### *i. The courts of appeals have exclusive jurisdiction to review FTC orders.*

Congress has provided for judicial review of FTC adjudicatory orders, but only in the courts of appeals. Section 5(c) of the FTC Act allows "[a]ny person … required by an order of the Commission to cease and desist … [to] obtain a review of such order in the court of appeals of the United States." 15 U.S.C. § 45(c). Once a petition for review is filed, the court of appeals "shall

have jurisdiction of the proceeding and of the question determined therein concurrently with the Commission," *id.*, but once the record is filed, "the jurisdiction of the court of appeals … shall be exclusive." *Id.* § 45(d).

Congress is free to "choose the court in which judicial review of agency decisions may occur." *Five Flags Pipe Line Co. v. Dep't of Transp.*, 854 F.2d 1438, 1439 (D.C. Cir. 1988) (cleaned up). When Congress "vests jurisdiction in a particular court," it "manifest[s] an intent that the appellate court exercise sole jurisdiction over the class of claims covered by the statutory grant of review power," and thereby "cuts off original jurisdiction in other courts in all cases covered by that statute." *Telecomm. Rsch. & Action Ctr. v. FCC*, 750 F.2d 70, 77 (D.C. Cir. 1984) (*TRAC*); *see Elgin v. Dep't of Treasury*, 567 U.S. 1, 10–11 (2012).

Here, Congress through the FTC Act precluded jurisdiction in this Court over FTC cease-and-desist orders of the type under challenge. "It is undisputed that review of FTC cease and desist orders is committed to the courts of appeals." *Ukiah Adventist Hosp. v. FTC*, 981 F.2d 543, 549 (D.C. Cir. 1992). Any other tribunals—including this one—lack jurisdiction to hear appeals of such orders, and this dooms NewsGuard's claim.

Moreover, the FTC Act provides that any petition for review of a Commission order must be filed in the court of appeals "within sixty days from the date of the service of such order." 15 U.S.C. § 45(c). Here, the consent order was issued on September 26, 2025, *Omnicom* Decision at 8, and NewsGuard sought review over four months later. Thus, NewsGuard's challenge would be untimely in any event.

***ii. NewsGuard has no right to review of an FTC adjudicatory order that does not govern it.***

The Court also lacks jurisdiction to hear NewsGuard's challenge to the consent order because Congress limited the right of judicial review to the parties governed by the Commission's order. *See* 15 U.S.C. § 45(c) (specifying that judicial review is available to "[a]ny person,

partnership, or corporation required by an order of the Commission to cease and desist from using any … act or practice"). The "any person" provision "only allows judicial review for parties subject to an FTC cease and desist order." *Consumer Fed'n of Am. v. FTC*, 515 F.2d 367, 369 (D.C. Cir. 1975). Thus, by the plain terms of the FTC Act, third parties such as NewsGuard that are not named parties subject to an FTC order may not challenge it.

As the Supreme Court observed in *Block v. Community Nutrition Institute*, 467 U.S. 340 (1984), Congress may—and sometimes does—limit access to judicial review to the class of plaintiffs who are actually bound by an agency order. In *Block*, the Court interpreted the relevant statute to provide for judicial review of certain Department of Agriculture orders when challenged by dairy handlers, who were subject to the orders, but not in cases by consumers who were not parties to the orders. *Id.* at 346–47. Because the statute conferred no explicit right to review on consumers, and because allowing them to sue "would severely disrupt this complex and delicate administrative scheme," the court declined to recognize an implied right of action. *Id.* at 347–48. The same reasoning applies to the FTC Act. Congress designed a comprehensive process that entrusted the Commission with the investigation and adjudication of putative violations of the antitrust laws, and provided for judicial review only when sought by a party to that process.

This was a sensible decision. FTC consent orders routinely affect third parties. For example, recent orders have prohibited the covered parties from entering into certain types of contracts with third parties, *see* Decision and Order, *Aaron's, Inc.*, 169 F.T.C. 380, 386 (May 11, 2020), from signing new leases with certain landlords, *see* Proposed Order, *In re Valvoline Inc.*, FTC Dkt. No. C-4824 (§ XI) (Nov. 14, 2025), https://tinyurl.com/2vmy8ekz, or from hiring certain specified employees, *see* Decision and Order, *Mars, Inc.*, 164 F.T.C. 821, 843 (Nov. 30, 2017). As in *Block*, allowing affected third parties to undermine litigation settlements would "severely disrupt" the FTC's adjudicatory process and hinder the agency's ability to enforce the law. 467

U.S. at 348. Allowing third-party challenges could also permit gamesmanship by enabling the parties to purport to agree to a settlement in the knowledge or expectation that portions of it will be attacked by like-minded third parties. *See Block*, 467 U.S. at 348 (noting that recognizing a third-party right of action would enable gamesmanship of this kind).

It is unsurprising, then, that when a group of third-party petitioners previously sought to challenge an FTC consent order, the D.C. Circuit dismissed the case for lack of jurisdiction. Order, *Consumers for Auto Reliability and Safety v. FTC*, No. 17-1038, 2017 U.S. App. LEXIS 12921, *1 (D.C. Cir. July 14, 2017) (per curiam) ("Petitioners are not subject to the requirements of the consent orders at issue and therefore may not challenge those orders in this court under 15 U.S.C. § 45(c)." (citing *Consumer Fed'n of Am.*, 515 F.2d 367 (D.C. Cir. 1975)). To our knowledge, no court has ever allowed such a challenge to proceed, and this Court should not be the first.

Third-party collateral attacks are also barred for the independent reason that consent orders reflect a decision by the Commission to settle enforcement litigation. An agency's decision to settle a case, and the terms of the settlement, amount to "an exercise of its 'complete discretion … to decide how and when to enforce'" its statute. *Schering Corp. v. Heckler*, 779 F.2d 683, 687 (D.C. Cir. 1985); *Baltimore Gas & Elec. Co. v. FERC*, 252 F.3d 456, 457 (D.C. Cir. 2001) (agency's "decision to settle [enforcement action] is committed to the agency's nonreviewable discretion"); *accord Ass'n of Irritated Residents v. EPA*, 494 F.3d 1027, 1031–32 (D.C. Cir. 2007). Such decisions are committed to agency discretion, and therefore not subject to judicial review, because "a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Heckler v. Chaney*, 470 U.S. 821, 830 (1985).

***iii. NewsGuard failed to exhaust its claim.***

NewsGuard's attempt to challenge the consent order would also fail for lack of exhaustion. Even where a statute does not expressly impose an exhaustion requirement, courts often find an

implied requirement "based on an analogy to the rule that appellate courts will not consider arguments not raised before trial courts." *Carr v. Saul*, 593 U.S. 83, 88 (2021) (cleaned up).

Here, NewsGuard did not submit a comment during the public comment period, even though by its own account "the proposed order was intended to target and debilitate if not eliminate new rating services" and "NewsGuard was at the top of the FTC's and Ferguson's hit list." Dkt.11-1 at 30. Accordingly, even if NewsGuard otherwise had a right to judicial review, failure to exhaust would defeat its case. *See, e.g., Nat'l Lifeline Ass'n v. FCC*, 983 F.3d 498, 509 (D.C. Cir. 2020) ("[W]e will not review arguments that have not first been presented to the Commission.").

**2. NewsGuard Has Not Established Standing to Challenge the Consent Order.**

In addition, NewsGuard lacks Article III standing. NewsGuard identifies only two purported injuries from the consent order, neither of which suffices to establish standing. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).

*First*, NewsGuard asserts that "it is questionable (or doubtful) that [IPG] will be able to continue with the [NewsGuard] contract now that it has been absorbed by Omnicom and is subject to the Consent Order." Dkt.11-1 at 34; Dkt.11-2 ¶ 67. As illustrated by the hedging words "questionable" and "doubtful," this suggestion is entirely speculative. This is presumably because—even though over four months have elapsed—NewsGuard cannot point to any actual harm it has suffered as a result of IPG's actions. In particular, NewsGuard pointedly does *not* claim that Omnicom will stop making payments on the IPG contract, or take any other action that will cause actual harm to NewsGuard. Nor does NewsGuard allege that, a result of the consent order, the contract will not be renewed in the future—presumably because the prospect of any such renewal would be speculative even in the absence of the order. This is particularly true in light of IPG's acquisition by Omnicom (which apparently was not a NewsGuard customer), as well as NewsGuard's self-acknowledged status as an extremely minor player in the advertiser brand safety

space. *See* Dkt.11-2 ¶ 20; *see also Lujan*, 504 U.S. at 560–61 (Plaintiff's injury must be "(a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." (cleaned up)).

*Second*, NewsGuard alleges that one other client indicated it would not renew its contract because of "[r]ecent developments that require [the client] to take a more cautious approach to this area of [its] business.'" Dkt.11-1 at 34; *see* Dkt.1 ¶ 134; Dkt.11-2 ¶ 66. But there is absolutely nothing in the record to suggest that the vague phrase "recent developments" refers to the consent order, which does not even mention NewsGuard (rather than, for example, the significant public criticism and multiple congressional investigations NewsGuard has faced).

Presumably it would have been quite easy for NewsGuard to clarify which developments its erstwhile client had in mind, but it pointedly chose not to do so. Thus, it would be wholly speculative to conclude that the loss of business was caused by the challenged portion of the consent order, let alone that the client will return if that portion of the order is enjoined. This purported injury therefore fails both the traceability and the redressability prongs of the standing analysis. *See Lujan*, 504 U.S. at 560–61 (Plaintiff's injury must be "fairly … traceable to the challenged action by the defendant, and not … the result of independent action of some third party not before the court," and "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be redressed by a favorable decision.").[11]

[11] This asserted injury also lacks traceability because it is too remote from the challenged government action. NewsGuard identifies no case finding standing based on a representation by a third party to a fourth party that a government order involving two other parties requires the third party to be more cautious about its business relationships.

### 3. NewsGuard's Retaliation Challenge to the Consent Order Fails on the Merits.

#### *i. There is no cognizable claim for "retaliatory settlement of litigation."*

As discussed above, it is at best questionable whether a retaliatory *investigation* claim is cognizable. *See supra* Part I.A.2.ii. But NewsGuard's novel theory of a "retaliatory settlement of litigation" is even more far-fetched. The FTC knows of no example where a court has even *considered* such a claim by a third party—and NewsGuard has identified none. This is unsurprising because third parties are not bound by such settlements, and allowing them to challenge settlements on retaliation grounds would be highly disruptive of settled expectations. At any rate, NewsGuard certainly cannot show that it is *likely to prevail* on this novel claim, which wholly lacks doctrinal support. *See Skrmetti*, 83 F.4th at 471.

#### *ii. NewsGuard fails to show that the consent order was retaliatory.*

Even if a retaliatory settlement claim were valid, NewsGuard nevertheless fails to demonstrate First Amendment retaliation. As discussed above, to prevail on a retaliation claim NewsGuard must show (1) that it "engaged in conduct protected under the First Amendment," (2) that the FTC "took some retaliatory action sufficient to deter a person of ordinary firmness in [NewsGuard's] position from speaking again," and (3) that there is "a causal link between the exercise of a constitutional right and the adverse action." *Aref*, 833 F.3d at 258 (cleaned up). As with its retaliatory investigation claim, NewsGuard's retaliatory settlement claim fails to establish either a causal link between its speech and the Commission's entry of the consent order, or that the consent order caused a sufficient deterrent effect.

##### a. NewsGuard cannot show that its speech prompted the consent order.

To support its retaliatory settlement claim, NewsGuard relies on the same factual allegations that it uses to support its retaliatory investigation claim. As discussed at length above,

*see supra* Part I.A.2.i., those allegations fail to establish that the Commission took any action relating to NewsGuard because of the company's speech. Chairman Ferguson's statements about his concerns involving collusive boycotts in the advertising industry, and NewsGuard's potential role in them, demonstrate not retaliatory intent but rather his strong interest in enforcing the antitrust laws. And NewsGuard fails to identify dates on which it engaged in expressive conduct that could give rise to an inference of retaliation based on timing.

Far from showing retaliation against NewsGuard, the evidence reflects the Commission's nonretaliatory reasons for adopting the final consent order. As the FTC's analysis of the proposed order explained, Omnicom's acquisition of IPG would significantly increase market concentration in the advertising industry, making it far easier for market participants to engage in anticompetitive, collusive boycotts of disfavored media publishers, just as the Commission found they had done in the recent past. *See* 90 Fed. Reg. 27304, 27305–06 (June 26, 2025). The proposed order sought to remedy this problem by "eliminating Omnicom's ability to participate in [such] ongoing or future coordination." *Id.* at 27304. During the public comment period, however, several commenters expressed concern that the initial order as written might not achieve that goal. *See* Regulations.gov, *Comment from CPAC & Independent Media Council* (July 29, 2025), https://tinyurl.com/yf5nw8p2; *Comment from GB News Limited* (July 29, 2025), https://tinyurl.com/4jcumwyp; *Comment from Newsmax Media Inc.* (July 28, 2025), https://tinyurl.com/3ruxx5vp.[12] After considering the submitted comments, the Commission

[12] Contrary to NewsGuard's suggestion, *see* Dkt.11-1 at 31–32, 42–43, Newsmax's comment did not propose the final consent order's prohibition on the use of third-party services that evaluate "the veracity of news reporting" and "adherence to journalistic standards," *Omnicom* Decision at 2. Instead, Newsmax's comment suggested several significant changes to the proposed order that the Commission did *not* adopt, including blocking the Omnicom/IPG transaction outright, requiring Omnicom to develop its own in-house news vetting functions, requiring Omnicom and IPG to admit to various violations of the law, and imposing a monetary penalty of $250 million.

entered a final consent order with revised language designed to more effectively preclude Omnicom from engaging in the collusive conduct that the Commission had identified previously. NewsGuard is not named in the consent order, the challenged condition in the order applies to Omnicom's agreements with *any* brand safety organization (not just NewsGuard), and, by NewsGuard's own admission, it is only a tiny player in that space with "*de minimis*" market share. Dkt.1 ¶ 97; Dkt.11-2 ¶ 44 (same). This chain of events demonstrates that the Commission acted appropriately to address antitrust concerns.

Finally, NewsGuard completely ignores the fact that the Commission as a whole, not Chairman Ferguson, authorized the administrative complaint and entered the consent order. NewsGuard's complaint and affidavit make no mention at all of then-Commissioner Holyoak, who also voted in favor of the complaint and the final consent order. Dkt.11-25 at 2, 9. *See* 16 C.F.R. § 4.14 (Commission action "may be taken only with the affirmative concurrence of a majority of the participating Commissioners."). This is yet another reason to reject NewsGuard's claim.

**b. NewsGuard cannot show that the consent order chilled its speech.**

As with its CID claim, NewsGuard fails to allege that the condition in the consent order was "sufficient to deter a person of ordinary firmness in plaintiff's position from speaking." *Aref*, 833 F.3d at 258. Once again, NewsGuard does not claim to have tempered its speech in any way—or indeed, to have done anything differently at all—as a result of the consent order. And as explained above, its paltry allegations of injury are not even sufficient to make out standing, let alone a sufficiently grievous injury to deter a person of reasonable firmness.

**4. NewsGuard's "Jawboning" Claim Likewise Fails.**

Finally, NewsGuard asserts an "unconstitutional jawboning" claim, suggesting that the Commission coerced Omnicom and IPG into agreeing to a consent order that bars the merged entity from doing business with NewsGuard, thus punishing NewsGuard indirectly for its speech.

As the Supreme Court recently explained in *National Rifle Association of America v. Vullo*, a jawboning claim has two elements: "[a] government official [1] cannot coerce a private party to [2] punish or suppress disfavored speech on her behalf." 602 U.S. at 190. NewsGuard entirely fails to establish either element.

#### *i. NewsGuard has not come close to demonstrating that Omnicom and IPG were coerced.*

A plaintiff advancing a jawboning claim must show that the third party's action against the plaintiff was *coerced* by the government. This means that "the coerced party 'reasonably understood' the [government] to threaten adverse action" if the directive were not followed, "and thus its 'compliance with the [government's] directives was not voluntary.'" *Vullo*, 602 U.S. at 176–77. Courts apply several "factors to determine whether a challenged communication is reasonably understood to be a coercive threat," such as "word choice and tone," "whether the speech was perceived as a threat; and, perhaps most importantly … whether the speech refers to adverse consequences." *Id.* at 189.

NewsGuard does not discuss any of these factors. And this is no surprise, because NewsGuard does not even allege the existence of *any threatening communication*. Specifically, it fails to allege any communication at all from the Commission to Omnicom or IPG inviting them to agree to the objected-to provision in the consent order, or making any threats in the event they did not agree. Remarkably, NewsGuard cannot even allege that the provision was added at the Commission's suggestion and not at the suggestion of Omnicom or IPG. NewsGuard can do no more than surmise that "it would be unusual ... for an ad agency and marketing company to seek restrictions on use of services designed to protect advertisers' reputations and brand safety." Dkt.1 ¶ 127. Whether or not one agrees that this is reasonable speculation, it is indisputably just speculation. In other words, NewsGuard cannot even establish that the FTC *asked* for this provision, let alone that it did so coercively.

By contrast, the cases on which NewsGuard relies—*Vullo*, *Bantam Books*, and *Backpage*—all involved explicit threats by government actors demanding that the target intermediaries cease dealing with a disfavored speaker or suffer significant legal consequences, as well as an immediate reaction by the intermediary to those threats. *See Vullo*, 602 U.S. at 183–85 (state financial services regulator offered to ignore legal violations by insurance companies "so long as [they] aided [the regulator's] campaign against gun groups," leading the companies to discontinue underwriting insurance policies for the National Rifle Association); *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 60–63 (1963) (bookseller ceased selling certain disfavored books in response to notices from state "[m]orality" commission and visits by police); *Backpage.com, LLC v. Dart*, 807 F.3d 229, 230 (7th Cir. 2015) (local sheriff threatened Visa and MasterCard with prosecution for processing payments for a disfavored website, which discontinued doing so as a direct result of the threats). In each of those cases the threatening nature of the government's communications, and their effect on the targeted intermediaries, made clear that the communications were coercive. NewsGuard points to nothing similar here, and it has therefore failed to demonstrate a *sine qua non* of a jawboning claim: coercion by the government.

***ii. NewsGuard fails to show a nexus between the consent order and its speech.***

NewsGuard also must show that the Commission used the consent order to induce a third party to "punish or suppress disfavored speech on [its] behalf." *Vullo*, 602 U.S. at 190. In other words, coercion by itself does not make out a jawboning claim; instead, a jawboning claim arises only if the governmental coercion "indirectly worked a violation of [NewsGuard's] First Amendment rights." *Id.* at 201 (Jackson, J., concurring). NewsGuard is quite wrong, then, to suggest that the jawboning claim allows it to prevail regardless of whether the Commission's actions were retaliatory. *See* Dkt.11-1 at 43. To the contrary, NewsGuard must demonstrate that

the Commission acted *in order to suppress* its purportedly disfavored speech. As discussed above, *see supra* Part I.A.2.i., NewsGuard has entirely failed to make that showing.

**B. The Equitable Factors Weigh Heavily Against a Preliminary Injunction.**

Here too the equitable prongs of the preliminary injunction analysis preclude relief. Once again, NewsGuard's own delay—over four months this time—is sufficient to demonstrate the lack of irreparable harm. *See Arrington*, 2025 WL 4083338, at *1. And even setting that aside, NewsGuard once again fails to identify any irreparable harm—indeed, as discussed in the standing section above, it has failed to demonstrate *any* non-speculative injury at all. *See Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 298 (D.C. Cir. 2006) ("speculative" injuries do not "warrant preliminary injunctive relief"). Moreover, the only concrete harms NewsGuard purports to identify involve possible loss of business, but "economic loss does not, in and of itself, constitute irreparable harm." *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985).

Once again, an overbroad injunction would harm the government (this time by invading the core executive function of settling enforcement actions) as well as the public's interest in effective antitrust enforcement (this time by disrupting a provision designed to alleviate the acute collusion risks of a large merger in an important industry). *See Baltimore Gas & Elec. Co.*, 252 F.3d at 457 (agency's "decision to settle [enforcement action] is committed to the agency's nonreviewable discretion"); *N.Y. State Dep't of Law v. FCC*, 984 F.2d 1209, 1214 (D.C. Cir. 1993) (same). And once again, the public's interest is only further harmed by the prospect that NewsGuard's expansive theories will open any number of other final orders by the FTC and other agencies to second-guessing, sowing chaos and upsetting well-settled expectations. The equitable calculus overwhelmingly favors Defendants.

**CONCLUSION**

For the reasons set forth above, the motion for preliminary injunction should be denied.

Dated: February 23, 2026
Washington, D.C.

Respectfully submitted,

<u>OF COUNSEL:</u>

DANIEL GUARNERA
*Director*

KELSE MOEN
*Deputy Director*

BUREAU OF COMPETITION

LUCAS CROSLOW (D.C. Bar #1048342)
*General Counsel*

H. THOMAS BYRON III (D.C. Bar #442856)
*Deputy General Counsel*

ALEX POTAPOV (D.C. Bar #998355)
*Deputy General Counsel*

ROBERT E. ZUVER, JR. (D.C. Bar #987216)
*Attorney*

/s/ Ethan D. Beck
ETHAN D. BECK (D.C. Bar #90024619)
*Counsel to the General Counsel*

FEDERAL TRADE COMMISSION
600 Pennsylvania Ave., N.W.
Washington, DC 20580
(202) 326-2110
ebeck@ftc.gov

*Attorneys for the Defendants*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

NEWSGUARD TECHNOLOGIES, INC.,

*Plaintiff,*

v.

FEDERAL TRADE COMMISSION and ANDREW FERGUSON, in his official capacit as Chairman of the Federal Trade Commissio

*Defendants.*

Case No.: 1:26-cv-00353-DLF

Hon. Dabney L. Friedrich

**PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**


TABLE OF AUTHORITIES ........................................................................................................ iii

INTRODUCTION ........................................................................................................................ 1

ARGUMENT ................................................................................................................................ 2

I. This Court Has Jurisdiction to Grant Relief for NewsGuard's Constitutional Claims. ...... 2

A. Section 1331 Confers Jurisdiction Over NewsGuard's Constitutional Claims. ..... 2

B. This Court has Jurisdiction over Retaliatory CIDs. ............................................... 3

*The FTC Act Does Not Channel Review to the Courts of Appeals.* .........3

Thunder Basin *Does Not Foreclose Review*............................................. 3

Claire Furnace *Does Not Bar Review*....................................................... 5

*NewsGuard Possesses a Cause of Action* ..............................................6

C. This Court has Jurisdiction Over NewsGuard's Challenge to Consent Order .......8

*15 U.S.C. § 45(c) Does Not Apply* .......................................................8

*Agency Discretion Does Not Include Discretion to Violate the Constitution* ..................................................................................8

*NewsGuard Has Standing to Challenge the Consent Order* .................9

II. NewsGuard is Likely to Prevail in its Challenge to the CID. .......................................... 10

A. NewsGuard's Journalism Is Protected Under the First Amendment. ................... 10

B. The CID Substantially Burdens Speech. ............................................................. 10

C. Ferguson and the FTC Targeted NewsGuard Based on Viewpoint. ..................... 12

D. The *Media Matters Cases* Are Not "Unique" Outliers. ....................................... 16

III. NewsGuard is Likely to Prevail in its Challenge to the Omnicom Consent Order. .......... 17

A. The Consent Order Imposed a Blacklist on NewsGuard. .................................... 17

B. The Merger Condition Substantially Burdens NewsGuard's Speech. .................. 19

C. The FTC is Censoring NewsGuard Using Intermediaries. .................................. 21

IV. Equitable Factors Favor Injunctive Relief. ...................................................................... 23

A. NewsGuard Did Not Delay Seeking Relief. ........................................................ 23

B. Injunctive Relief Should be Granted. .................................................................... 25

CONCLUSION ............................................................................................................................ 25

CERTIFICATE OF SERVICE ....................................................................................................... 27

## TABLE OF AUTHORITIES

**Cases**

*Ams. for Prosperity Found. v. Bonta*
594 U.S. 595 (2021) .......... 11

*Armstrong v. Exceptional Child Ctr., Inc.*
575 U.S. 320 (2015) .......... 7

*Ashcroft v. Am. Civil Liberties Union,*
542 U.S. 656 (2004) .......... 1

*Axon Enterprise, Inc. v. FTC*
598 U.S. 175 (2023) .......... 2, 3, 4, 5, 22

*Backpage.com, LLC v. Dart*
807 F.3d 229 (7th Cir. 2015) .......... 10, 20, 21

*Bell v. Hood*
327 U.S. 678 (1946) .......... 7

*Belle Fourche Pipeline Co. v. United States*
751 F.2d 332 (10th Cir. 1984) .......... 6

*Carr v. Saul*
593 U.S. 83 (2021) .......... 10

*Colorado River Water Conservation Dist. v. United States*
424 U.S. 800 (1976) .......... 2

*Constantine v. Rectors & Visitors of George Mason Univ.*
411 F.3d 474 (4th Cir. 2005) .......... 12

*Consumer Fed'n of Am. v. FTC*
515 F.2d 367 (D.C. Cir. 1975) .......... 8

*Elgin v. Dep't of Treasury*
567 U.S. 1 (2012) .......... 3

*Elrod v. Burns*
427 U.S. 347 (1976) .......... 21, 25

*Fed. Educ. Ass'n. v. Trump*
795 F. Supp. 3d 74 (D.D.C. 2025) .......... 1

*Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*
561 U.S. 477 (2010) .......... 2, 5

*FTC v. Claire Furnace Co.*
274 U.S. 160 (1927) .......... 5, 6

*Fund for Animals v. Frizzell*
530 F.2d 982 (D.C. Cir. 1975) .......... 24

*Gonzales v. Trevino*
60 F.4th 906 (5th Cir. 2023) .......... 13

*Hartman v. Moore*
547 U.S. 250 (2006) .......... 6, 13

*Heckler v. Chaney*
470 U.S. 821 (1985) .......... 9

*Hubbard v. U.S. Env't Prot. Agency*
809 F.2d 1 (D.C. Cir. 1986) .......... 2, 7

*Kohls v. Ellison*
2026 WL 350923 (8th Cir. 2026) .......... 24

*Lujan v. Defenders of Wildlife*
504 U.S. 555 (1992) .......... 9

*Make The Road New York v. Wolf*
962 F.3d 612 (D.C. Cir. 2020) .......... 9

*Maldonado v. D.C.*
2019 WL 6877913 (D.D.C. Dec. 16, 2019) .......... 24

*Manhattan Cmty. Access Corp. v. Halleck*
587 U.S. 802 (2019) .......... 19, 21

*Marbury v. Madison*
5 U.S. (1 Cranch) 137 (1803) .......... 2, 7

*Mata v. Lynch*
576 U.S. 143 (2015) .......... 2

*Media Matters for Am. v. Bailey*
2024 WL 3924573 (D.D.C. Aug. 23, 2024) .......... 1, 13, 14, 16

*Media Matters for Am. v. FTC*
2025 WL 2988966 (D.C. Cir. Oct. 23, 2025) .......... 3, 4, 5, 6, 16, 17

*Media Matters for Am. v. FTC*
805 F. Supp. 3d 105 (D.D.C. 2025) .......... 7, 9, 14

*Media Matters for Am. v. Paxton*
138 F.4th 563 (D.C. Cir. 2025) .......... 2, 4, 5, 6, 7, 10, 12, 16, 25

*Moody v. NetChoice, LLC*
603 U.S. 707 (2024) .......... 19, 21

*Mylan Pharms., Inc. v. Shalala*
81 F. Supp. 2d 30 (D.D.C. 2000) .......... 24

*Nat'l Rifle Ass'n of Am. v. Vullo*
602 U.S. 175 (2024) .......... 10, 21, 22, 23

*Nebraska Press Ass'n v. Stuart*
427 U.S. 539 (1976) .......... 20

*Newdow v. Bush*
355 F. Supp. 2d 265 (D.D.C. 2005) .......... 24

*News America Pub., Inc. v. FCC*
844 F.2d 800 (D.C. Cir. 1988) .......... 17

*Nieves v. Bartlett*
587 U.S. 391 (2019) .......... 13

*NRDC v. Pena*
147 F.3d 1012 (D.C. Cir. 1998) .......... 24

*Open Top Sightseeing USA v. Mr. Sightseeing, LLC*
48 F. Supp. 3d 87 (D.D.C. 2014) .......... 24

*Padula v. Webster*
822 F.2d 97 (D.C. Cir. 1987) .......... 9

*Perry Ed. Ass'n v. Perry Local Educators' Ass'n*
460 U.S. 37 (1983) .......... 15

*Perry v. Schwarzenegger*
591 F.3d 1147 (9th Cir. 2009) .......... 11

*Reisman v. Caplin*
375 U.S. 440 (1964) .......... 6

*Rosenberger v. Rector & Visitors of Univ. of Virginia*
515 U.S. 819 (1995) .......... 14, 15

*Schering Corp. v. Heckler*
779 F.2d 683 (D.C. Cir. 1985) .......... 9

*SEC v. Jarkesy*,
603 U.S 109 (2024) .......... 5

*Sierra Club v. EPA*,
793 F. Supp. 3d 158 (D.D.C. 2025) .......... 24

*Swift v. United States*,
649 F. Supp. 596 (D.D.C. 1986) .......... 9

*Thunder Basin Coal Co. v. Reich*,
510 U.S. 200 (1994) .......... 2, 3, 4, 8

*Trudeau v. FTC*,
456 F.3d 178 (D.C. Cir. 2006) .......... 2

*United States v. Alvarez*,
567 U.S. 709 (2012) .......... 1

*United States v. Playboy Ent. Grp., Inc.*,
529 U.S. 803 (2000) .......... 21, 25

*Wearly v. FTC*,
616 F.2d 662 (3d Cir. 1980) .......... 6

*White v. Lee*,
227 F.3d 1214 (9th Cir. 2000) .......... 7

*Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of the President*,
774 F. Supp. 3d 86 (D.D.C. 2025) .......... 1

*Wisconsin Gas Co. v. FERC*,
758 F.2d 669 (D.C. Cir. 1985) .......... 21

*WWHT, Inc. v. FCC*,
656 F.2d 807 (D.C. Cir. 1981) .......... 9

*Ziglar v. Abbasi*,
582 U.S. 120 (2017) .......... 6

*Zurcher v. Stanford Daily*,
436 U.S. 547 (1978) .......... 11

**Statutes**

15 U.S.C. § 45(c) .......... 8

15 U.S.C. § 57b-1(e) .......... 3

15 U.S.C. § 57b-1(f) .......... 3

28 U.S.C. § 1331 .......................................................................................................... 2, 3, 8

**Other Authorities**

Interim Staff Report of the H. Comm. on Small Business: Instruments and Casualties of the Censorship-Industrial Complex 59 (Sept. 10, 2024) ................................................................ 14

Proposed Decision & Order, *Omnicom Grp. Inc.*, FTC File No. 251-0049, 2025 WL 2355514 (June 23, 2025) .......................................................................................................... 18

**INTRODUCTION**

The FTC opposes NewsGuard's Motion for Preliminary Injunction by employing a heads-I-win-tails-you-lose strategy: It claims NewsGuard's case is premature, Defendant's Opposition to Preliminary Injunction Motion (ECF 20, "Opp.") at 32, yet asserts NewsGuard waited too long to bring it. *Id.* at 1, 2, 32–33, 45. The Commission describes its CID process as "cooperative," *id.* at 3, yet claims NewsGuard was engaging in "litigation tactics" by its good faith participation. *Id.* at 33. It asserts NewsGuard lacks standing and has no judicial remedy, *id.* at 35–40, *and* that NewsGuard should be out of court for failing to exhaust its remedies before filing suit. *Id.* at 2, 27, 34, 37–38. And through it all, Chairman Ferguson claims to be defending "free speech" while manipulating regulatory tools to suppress viewpoints he dislikes and promote news sites he favors.

The FTC asks this Court to presume regularity, Opp. at 20, but nothing about this is normal. The presumption of regularity does not apply to a federal agency's retaliatory acts. As numerous judges have recently pointed out, "courts have seen instance after instance of departures from this tradition" of assuming that executive or administrative authority is in service of a good faith application of law. *Fed. Educ. Ass'n. v. Trump*, 795 F. Supp. 3d 74, 88–92 (D.D.C. 2025) (collecting numerous cases), *stay pending appeal denied*, 2025 WL 2738626, at *8 (D.C. Cir. Sept. 25, 2025); *Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of the President*, 774 F. Supp. 3d 86, 88 (D.D.C. 2025) ("The retaliatory nature of the Executive Order at issue … is clear from its face"). In a case like this, regularity cannot be presumed. *Media Matters for Am. v. Bailey*, 2024 WL 3924573, at *18 (D.D.C. Aug. 23, 2024). Quite the contrary, "the Constitution 'demands that content-based restrictions on speech be presumed invalid ... and that the Government bear the burden of showing their constitutionality.'" *United States v. Alvarez*, 567 U.S. 709, 716–17 (2012) (quoting *Ashcroft v. Am. Civil Liberties Union*, 542 U.S. 656, 660 (2004)).

## ARGUMENT

### I. This Court Has Jurisdiction to Grant Relief for NewsGuard's Constitutional Claims.

#### A. Section 1331 Confers Jurisdiction Over NewsGuard's Constitutional Claims.

Under 28 U.S.C. § 1331, district courts "shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." As Justice Gorsuch emphasized in *Axon Enterprise, Inc. v. FTC*, that text "is as clear as statutes get": "Not *may* have jurisdiction, but *shall*. Not *some* civil actions arising under federal law, but *all*." 598 U.S. 175, 205 (2023) (Gorsuch, J., concurring). And when a federal court has jurisdiction, it has a "virtually unflagging obligation" to exercise it. *Mata v. Lynch*, 576 U.S. 143, 150 (2015) (quoting *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976)).

Accordingly, this Court has jurisdiction over actions arising under the Constitution, including challenges to unconstitutional action by federal agencies that violate the First Amendment. *Trudeau v. FTC*, 456 F.3d 178, 185–86 (D.C. Cir. 2006). That includes claims for unconstitutional retaliation, *id.* at 190 & n.22 (collecting cases), and challenges to overly broad investigations that intrude on First and Fourth Amendment rights. *See Media Matters for Am. v. Paxton*, 138 F.4th 563, 579 (D.C. Cir. 2025). As the D.C. Circuit has recognized, "[t]he court's power to enjoin unconstitutional acts by the government … is inherent in the Constitution itself." *Hubbard v. U.S. Env't Prot. Agency*, 809 F.2d 1, 11 n.15 (D.C. Cir. 1986) (citing *Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803)).

Statutory review schemes do not displace that jurisdiction unless Congress's intent to do so is "fairly discernible" and the claims are "of the type Congress intended to be reviewed within th[e] statutory structure." *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 489 (2010) (quoting *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207, 212 (1994)). Because

NewsGuard's challenge arises under the Constitution and its claims are not "of the type" Congress sought to exclusively channel for agency review, this Court retains authority under Section 1331 to issue injunctive relief. And because NewsGuard is suffering present and concrete harm caused by Defendants' conduct, *see infra* Sections II, III, NewsGuard has standing to bring its claims.

**B. This Court has Jurisdiction over Retaliatory CIDs.**

***The FTC Act Does Not Channel Review to the Courts of Appeals.*** The Supreme Court has found a "fairly discernible" intent to strip district court jurisdiction where a statutory scheme provides "review in a court of appeals following the agency's own review process," so that "[t]he agency effectively fills in for the district court, with the court of appeals providing judicial review." *Axon*, 598 U.S. at 185 (citing *Thunder Basin*, 510 U.S. at 207–12; *Elgin v. Dep't of Treasury*, 567 U.S. 1, 10–15 (2012)). That does not describe the CID enforcement scheme. Under the FTC Act, enforcement of a CID proceeds in district court.[1] *See* 15 U.S.C. § 57b-1(e). As the D.C. Circuit has explained, the question in this context is not one of forum, but of timing. Namely, whether the CID target may "seek relief at this time for the 'here-and-now' First Amendment harms," or whether it must await an enforcement action—"a step that might never happen." *Media Matters for Am. v. FTC*, 2025 WL 2988966, at *5 (D.C. Cir. Oct. 23, 2025) (per curiam) ("*Media Matters* Stay Op.") (quoting *Axon*, 598 U.S. at 191–92, 195).

**Thunder Basin** ***Does Not Foreclose Review.*** The *Thunder Basin* framework applies where Congress has provided an "alternative" path to judicial review. *Axon*, 598 U.S. at 185. It does not authorize agencies to foreclose judicial review altogether—which, as *Thunder Basin* itself emphasized, would raise serious constitutional concerns. *See Thunder Basin*, 510 U.S. at 215 n.20. Allowing the FTC "to issue sweeping demands that inflict concrete and 'ongoing injuries' that

[1] To be sure, the FTC may consider a CID recipient's petition to quash, *see* 15 U.S.C. § 57b-1(f), but the agency's decision is not directly appealable by the recipient to a court of appeals.

suppress speech and journalism," while at the same time controlling "when, if ever, judicial review can commence" would risk precisely that result. *Media Matters* Stay Op. at *4–5 (citing *Paxton*, 138 F.4th at 583, 585).

Even if the *Thunder Basin* framework applies, this Court has jurisdiction. Under *Thunder Basin*, courts consider whether: (1) precluding district court jurisdiction would foreclose all meaningful judicial review, (2) the claim is wholly collateral to the statute's review provisions, and (3) the claim is outside the agency's expertise. *Axon*, 598 U.S. at 186.

*First, meaningful review*. If NewsGuard cannot bring this case now, it may never obtain meaningful judicial review for the "here-and-now injury" caused by the CID. *See Axon*, 598 U.S. at 191; Skibinski Decl. ¶ 40–49, ECF 11-2. The FTC contends that NewsGuard must wait for the agency to bring an enforcement action. But under that theory, First Amendment rights could be "effectively lost." *See Axon*, 598 U.S. at 192. Authorizing the issuer of a CID to dictate "when, if ever, judicial review can commence" would empower agencies to lock the courthouse doors "as long as the agency chooses not to take additional enforcement steps." *Media Matters* Stay Op. at *4–5, contravening the principle that "Congress rarely allows claims about agency action to escape effective judicial review." *Axon*, 598 U.S. at 186; *see also Paxton*, 138 F.4th at 583 (noting that Media Matters would have no "meaningful redress" for "ongoing injuries due to the campaign of retaliation" absent the ability to challenge the CID in district court).

*Second, collateralism*. NewsGuard's First Amendment claims do not depend on whatever antitrust theory the FTC may pursue regarding "anticompetitive collusion." Opp. at 7. The collateral inquiry turns on "the nature of the claim." *Axon*, 598 U.S. at 194. Claims that "do not relate to the subject of the enforcement action[]"—whether or not such an action is pending—are collateral. *Id.* at 193–94. NewsGuard's claims do not concern matters the FTC "regularly

adjudicate[s]" and have "nothing to do with" any antitrust charges. *Id.* at 193. Instead, NewsGuard advances "discrete" constitutional claims wholly separate from the subject of any enforcement action. *Id.* at 192–94.

*Third, agency expertise*: NewsGuard's claims turn on First Amendment limits on government action—questions "outside the Commission's competence and expertise," *Free Enter. Fund*, 561 U.S. at 491, and "detached from 'considerations of agency policy,'" *Axon*, 598 U.S. at 194 (quoting *Free Enter. Fund*, 561 U.S. at 491). Even if the FTC had expertise in this area, there is no benefit to delay, as the FTC has already been "afforded an opportunity to consider the constitutional harms caused by its demand." *Media Matters* Stay Op. at *5; *see* ECF 11-2 ¶ 42. The FTC is not well positioned to adjudicate whether its own actions constitute unlawful retaliation.[2] *Axon*, 598 U.S. at 195–96.

**Claire Furnace *Does Not Bar Review*.** Defendants invoke *FTC v. Claire Furnace Co.*, 274 U.S. 160 (1927), to argue that district courts categorically lack jurisdiction over pre-enforcement CID challenges. Opp. at 15. But the D.C. Circuit has squarely rejected that contention where a CID inflicts First Amendment injury. In *Media Matters*, for instance, the stay panel held that "when a company challenges a 'sweeping' demand on First Amendment grounds and demonstrates actual and ongoing harm to its constitutional rights, the case is no longer 'simply about a pre-enforcement challenge to a non-self-executing [demand.]'" *Media Matters* Stay Op. at *3 (quoting *Paxton*, 138 F.4th at 569, 579). Where a plaintiff shows "present, concrete, and objective harms" to "newsgathering activities and media business operations" that persist absent further enforcement action, "the demand's lawfulness can be challenged and remedied in district court." *Id.* (quoting

---

[2] The Supreme Court's decision in *SEC v. Jarkesy* reinforces this court's jurisdiction. The Court cautioned against allowing "Congress to concentrate the roles of prosecutor, judge, and jury in the hands of the Executive Branch." 603 U.S. 109, 140 (2024); *see Media Matters* Stay Op. at *5.

*Paxton*, 138 F.4th at 579). Those features distinguish this case from *Claire Furnace*, "which did not involve a First Amendment claim or any already-accruing harm." *Id.*[3] NewsGuard alleges and submits evidence of such harm here.[4] ECF 11-2 ¶¶ 40–49.

***NewsGuard Possesses a Cause of Action.*** Defendants contend NewsGuard lacks a cause of action, relying on *Ziglar v. Abbasi*, 582 U.S. 120 (2017), which declined to extend the *Bivens* remedy. *See* Opp. at 18. But *Bivens* actions are suits for *money* damages. NewsGuard seeks prospective injunctive relief, and *Ziglar* itself confirms that federal courts retain "traditional equitable powers" to enjoin unconstitutional conduct. *Ziglar*, 582 U.S. at 133–34. The availability of injunctive relief as an alternative remedy was one reason the Court declined to authorize a *Bivens* action. *See id.* at 142–43, 148.

The same distinction defeats Defendants' reliance on *Hartman v. Moore*, 547 U.S. 250 (2006), for the proposition that a retaliatory investigation claim is not cognizable. Opp. at 27. Like *Ziglar*, *Hartman* involved an individual capacity suit for damages. Its holding—that a plaintiff in a retaliatory prosecution action must plead and prove the absence of probable cause—does not foreclose a litigant from seeking prospective injunctive relief, and *Paxton* confirms such claims are cognizable. The D.C. Circuit held that where a litigant suffers harm as the "specific target[] of

---

[3] For similar reasons, *Reisman v. Caplin*, 375 U.S. 440 (1964), does not render NewsGuard's claims nonjusticiable. As the D.C. Circuit has explained, *Reisman* "did not concern First Amendment retaliation" and "does not govern" where a plaintiff is "suffering ongoing injuries due to the campaign of retaliation against them." *Paxton*, 138 F.4th at 583.

[4] Defendants also cite *Claire Furnace* for the proposition that "pre-enforcement injunctions against agency CIDs" were unavailable at equity. Opp. at 19. But that general rule does not control where a CID target faces ongoing injury from a retaliatory investigation. *See Paxton*, 138 F.4th at 583; *Media Matters* Stay Op. at *3. Defendants' own authorities recognize that pre-enforcement relief may be available where a CID target is "exposed to … immediate, irreparable injury." *Belle Fourche Pipeline Co. v. United States*, 751 F.2d 332, 335 (10th Cir. 1984); *see also Wearly v. FTC*, 616 F.2d 662, 666 (3d Cir. 1980) (observing that "preenforcement review" may be "necessary" and that "the FTC Act [does] not proscribe preenforcement suits").

a retaliatory government investigation" and is "not challenging a general government policy," those harms constitute cognizable injuries sufficient to support a claim.[5] *Paxton*, 138 F.4th at 582.

At bottom, "[t]he ability to sue to enjoin unconstitutional actions by … federal officers … reflects a long history of judicial review of illegal executive action, tracing back to England." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015); *see also Bell v. Hood*, 327 U.S. 678, 684 (1946) ("[I]t is established practice for this Court to sustain the jurisdiction of federal courts to issue injunctions to protect rights safeguarded by the Constitution.").

Finally, Defendants invoke *Armstrong*, 575 U.S. at 327–29, to argue that the FTC Act "impliedly restricts" CID targets from bringing "equitable collateral attacks." Opp. at 19. But *Armstrong* addressed private enforcement of a statutory right under the Medicaid Act, not suits to enjoin unconstitutional government action. 575 U.S. at 328. With respect to constitutional violations, this Court's "power to enjoin unconstitutional acts by the government … is inherent in the Constitution itself." *Hubbard*, 809 F.2d at 11 n.15 (citing *Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803)). Nothing in the FTC Act can be fairly read to displace that principle.

[5] Defendants cite various cases they say "suggest" retaliatory investigation claims should not be recognized. Opp. at 27. But many of the cases address a different question entirely: whether in suits for damages the law was clearly established so as to overcome qualified immunity. Defendants' argument conflates distinct doctrines. Whether a damages remedy lies under *Bivens* or Section 1983 is a separate question from whether a court has power to grant prospective injunctive relief to prevent ongoing retaliatory conduct. And whether a plaintiff can defeat qualified immunity is yet another inquiry, one that often imposes a higher burden on the plaintiff. Bottom line, "the standard for qualified immunity is higher than what is required for preliminary injunctive relief." *Media Matters for Am. v. FTC*, 805 F. Supp. 3d 105, 132 (D.D.C. 2025); *see id.* (noting that "the Ninth Circuit simultaneously held that it is not 'clearly established that a retaliatory investigation per se violates the First Amendment' *and* that 'the scope and manner of the investigation' in *White v. Lee*, 227 F.3d 1214 (9th Cir. 2000), 'violated plaintiffs' First Amendment rights.'") (cleaned up).

**C. This Court has Jurisdiction Over NewsGuard's Challenge to Consent Order.**

This Court has jurisdiction over NewsGuard's challenge to the Omnicom merger condition for many of the same reasons it has jurisdiction over the retaliatory CID.[6]

***15 U.S.C. § 45(c) Does Not Apply.*** Defendants first contend that 15 U.S.C. § 45(c) channels judicial review exclusively to the courts of appeals. *See* Opp. at 16–18. But that provision provides appellate review only to "[a]ny person, partnership, or corporation required by an order of the Commission to cease and desist." NewsGuard is not a party to the Consent Order; it instead brings suit to vindicate its First Amendment right to be free from censorship through intermediaries. Section 45(c) therefore does not apply.

The government relies on *Consumer Fed'n of Am. v. FTC*, 515 F.2d 367 (D.C. Cir. 1975), for the proposition that only parties subject to cease and desist orders may seek judicial review. *See* Opp. at 36. But that case held that the nonparties were "not entitled to review *under the APA*." *Consumer Fed'n of Am.*, 515 F.2d at 369 (emphasis added). It did not address whether a nonparty may bring a constitutional claim under Section 1331.

***Agency Discretion Does Not Include Discretion to Violate the Constitution.*** Defendants also argue that consent orders reflect discretionary settlement decisions that are not subject to judicial review. *See* Opp. at 37. But an agency's discretion to settle enforcement litigation does not include discretion to violate the Constitution. The D.C. Circuit has repeatedly recognized that "even where agency action is 'committed to agency discretion by law,' review is still available to

[6] Although Defendants do not invoke *Thunder Basin* with respect to the merger condition, its factors again confirm district court jurisdiction. *First*, the FTC's position that nonparties may never challenge consent orders would foreclose any judicial remedy for NewsGuard's constitutional claims. *Second*, NewsGuard's First Amendment claim is independent of the FTC Act's review provisions and is wholly collateral to the Act's statutory scheme. *Third*, adjudicating constitutional retaliation and jawboning claims falls outside the FTC's expertise, and the agency is not well positioned to determine whether its own actions violate the First Amendment.

determine if the Constitution has been violated.” *Padula v. Webster*, 822 F.2d 97, 101 (D.C. Cir. 1987); *see also Make The Road New York v. Wolf*, 962 F.3d 612, 632 (D.C. Cir. 2020).

Courts have likewise held that nonreviewability under the APA does not bar judicial review of alleged constitutional violations: “In no event would a finding of nonreviewability on the ground that an action is committed to agency discretion preclude judicial review when constitutional violations have been alleged.” *WWHT, Inc. v. FCC*, 656 F.2d 807, 815 n.15 (D.C. Cir. 1981); *see also Swift v. United States*, 649 F. Supp. 596, 601 n.4 (D.D.C. 1986) (“Regardless of whether a given agency action is reviewable under the Administrative Procedure Act or is instead committed to agency discretion, no agency has the discretionary authority to violate constitutional rights.”); *Media Matters of Am. v. FTC*, 805 F. Supp. 3d, 105. 127 (2025) (“Courts in this District routinely allow constitutional claims in equity to proceed where relief under the APA is foreclosed.”).

Defendants cite *Heckler v. Chaney*, 470 U.S. 821 (1985), and *Schering Corp. v. Heckler*, 779 F.2d 683 (D.C. Cir. 1985), which recognize a presumption of nonreviewability for certain enforcement or nonenforcement decisions under the APA. But that presumption does not extend to constitutional claims. Indeed, *Chaney* itself stressed that “[n]o colorable claim [was] made … that the agency’s refusal to institute proceedings violated any constitutional rights of respondents.” 470 U.S. at 838. The *Schering* court likewise observed that “[n]o claim has been made that the agency’s failure to initiate enforcement action violates any constitutional rights.” 779 F.2d at 687.

***NewsGuard Has Standing to Challenge the Consent Order.*** Contrary to Defendants’ assertion, Opp. at 38–39, NewsGuard has standing. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). NewsGuard alleges concrete and ongoing constitutional and economic injury resulting from the merger conditions. *See infra* Sections II, III. The Consent Order operates as a government-imposed blacklist prohibiting Omnicom and its affiliates from using NewsGuard’s

services, and NewsGuard has already lost customers as a result. *See* ECF 11-2 ¶ 66. That injury is directly traceable to the merger condition and would be redressed by injunctive relief. *See Paxton*, 138 F.4th at 579–80. NewsGuard has standing here for the same reason the NRA had standing to challenge the consent decrees in *Vullo* even though it was not a party to them, Backpage had standing to challenge Sheriff Dart's ultimatums, *see Backpage.com, LLC v. Dart*, 807 F.3d 229 (7th Cir. 2015), and booksellers had standing to challenge the blacklist in *Bantam Books*.[7]

## II. NewsGuard is Likely to Prevail in its Challenge to the CID.

### A. NewsGuard's Journalism Is Protected Under the First Amendment.

The FTC grudgingly "does not dispute that NewsGuard engages in some protected speech," Opp. at 20, but conceding the obvious is no real concession. NewsGuard's reviews and ratings of news sources for reliability and accuracy is "quintessential First Amendment activit[y]." *Paxton*, 138 F.4th at 584. At bottom, the FTC does not dispute it targeted NewsGuard because, in Chairman Ferguson's view, NewsGuard's reliability ratings reflect bias against conservative news sources. Retaliation on this basis is especially egregious: "At the heart of the First Amendment's Free Speech Clause is the recognition that viewpoint discrimination is uniquely harmful to a free and democratic society." *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 187 (2024).

### B. The CID Substantially Burdens Speech.

The FTC contends that the sweeping scope of the CID is no indication of retaliatory motive because, it claims, the CID is "wholly typical" and "NewsGuard does not argue otherwise." Opp. at 26. If the FTC's demands for every document ever created or received by NewsGuard for its

[7] Defendants also suggest that NewsGuard failed to exhaust administrative remedies. *See* Opp. at 37–38. But NewsGuard was not a party to an adversarial proceeding regarding the Consent Order that could warrant imposition of an issue-exhaustion requirement. *See Carr v. Saul*, 593 U.S. 83, 89 (2021). Moreover, where Defendants maintain that consent orders are categorically immune from third-party challenge, exhaustion would serve no purpose.

eight-year existence is "typical," it is alarming the FTC believes it has such a free pass to pressure and intimidate entities it targets. And the FTC's continual demands to know the identities of all NewsGuard's customers and to obtain all communications with customers is more alarming still, because the FTC's actions have demonstrated their aim is to find every ad agency or advertiser associated with NewsGuard to target them as well.

NewsGuard objected to the extraordinary scope of the CID, its intrusiveness and infringement of First Amendment rights from day one, but to no avail. The FTC mischaracterizes its CID demands and the outcome of the parties' negotiations. It says now that NewsGuard had complied with 26 of the 31 CID specifications and only a few things remained when NewsGuard filed its petition to quash. *See* Opp. at 11 (January 15 letter "confirm[ed] the narrow demands that remained outstanding"). In fact, the FTC insisted on January 15, 2026 that NewsGuard remained obligated to provide (1) identities of all entities for which NewsGuard ever assigned a reliability rating; (2) all ratings; (3) all methodologies and analyses for each rating; (4) identities of all customers; and (5) all communications with customers.[8] The FTC also added a *new* demand for "internal correspondence" among NewsGuard journalists about how it developed its methodology.

[8] In an irrelevant diversion, the FTC asserts NewsGuard has no grounds to assert claims under the First or Fourth Amendments because the company has not asserted claims of a First Amendment or reporter's privilege on a "document-by-document basis." Opp. at 30. The issue here is not about procedures for making privilege claims as to specific documents in a production to a federal agency. Rather, the issue is that the FTC's pursuit of NewsGuard—its burdensome CID and intrusive investigation—violates fundamental First and Fourth Amendment principles. When government demands for information would chill speech rights of the targeted party, the First Amendment provides protection. *Perry v. Schwarzenegger*, 591 F.3d 1147, 1160 (9th Cir. 2009). When the government uses compulsory process (*e.g.*, a subpoena, CID, or warrant) to demand materials that could fall under First Amendment protection, Fourth Amendment requirements must also be met, with "scrupulous exactitude." *Zurcher v. Stanford Daily*, 436 U.S. 547, 564 (1978). And, when the government seeks to compel information about associational interests, its actions must satisfy exacting scrutiny. *See Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 609-10 (2021).

The FTC asserts its actions have had no chilling effect because NewsGuard has not ceased providing its review and ratings services. *See* Opp. at 28 (claiming "the CID has apparently had *zero* impact on NewsGuard's speech"). But that misunderstands the law. The inquiry is whether the government's retaliatory actions would chill a *person of ordinary firmness* to refrain from or limit speech, not whether the government's coercive actions were successful to block the person from speaking entirely. As the Fourth Circuit said in the case the FTC cites: "We have never held that a plaintiff must prove that the allegedly retaliatory conduct caused her to cease First Amendment activity altogether. The cause of action targets conduct that tends to *chill* such activity, not just conduct that *freezes* it completely." *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 500 (4th Cir. 2005). That NewsGuard is resilient and has stood up for First Amendment rights does not mean the FTC's actions have had no chilling effect.

Defendants claim NewsGuard has shown no injuries for having to respond to the CID except that it "would be 'costly' in time and resources and 'intrusive' in that it would require the production of documents." Opp. at 28. But the FTC ignores the facts and NewsGuard's actual arguments, not to mention the applicable legal standard—whether burdens of this magnitude would deter a person of reasonable firmness. Just as in the *Media Matters* cases, it clearly would. NewsGuard has expended over 30% of the revenues from advertising clients just to cover the cost of the CID compliance process and there is no end in sight. ECF 11-2 ¶ 49. Here, the process is the punishment, and the FTC's investigation—dragging NewsGuard through the gauntlet is expensive and intrusive—but more importantly it has infringed First Amendment rights. *Paxton*, 138 F.4th at 585 (burdens of campaign against First Amendment activity impose irreparable harm).

**C. Ferguson and the FTC Targeted NewsGuard Based on Viewpoint.**

The FTC misstates the law in an effort to frame a lenient standard for the government's retaliatory actions. The FTC claims "NewsGuard must demonstrate at a *minimum* that the CID

'would not have been [issued] absent the retaliatory motive,'" and that the government is entitled to a "presumption of regularity" for any actions it takes. Opp. at 20. For the first point the FTC relies on *Nieves v. Bartlett*, 587 U.S. 391 (2019), which concerned probable cause standards for claims of retaliatory arrests, *id.* at 402, that courts have held are inapplicable in the context of civil cases. *See Bailey*, 2024 WL 3924573, at *12–13. As for affording some "presumption of regularity" to government prosecutorial actions, *see* Opp. at 20 (relying on *Hartman*, 547 U.S. at 263 (concerning criminal charging decisions)), that likewise does not override First Amendment protections, because "'it falls on the judiciary to ensure the First Amendment is not reduced to a parchment promise.'" *Bailey*, 2024 WL 3924573, at *18 (quoting *Gonzales v. Trevino*, 60 F.4th 906, 907 (5th Cir. 2023) (Ho, J., dissenting from denial of rehearing *en banc*)).

The FTC contends it targeted NewsGuard for "nonretaliatory reasons," but its arguments are unconvincing and frankly implausible. Opp. at 41. The FTC argues, first, that it must have had a "nonretaliatory" motive because it issued so many CIDs to so many entities (apparently 17 in all) in connection with Chairman Ferguson's accusations about a supposed "censorship industrial complex." Opp. at 21; *see* ECF 11-2 ¶ 32–33 & ECF 11-9. Two other organizations (Media Matters and Disinformation Index) have already sued the FTC, and the complaints in those cases reveal the Commission's strategy of burdensome and intrusive CID demands is the same as here. That the FTC has pursued a dragnet approach against numerous organizations that review and report about online news sources does not dispel the FTC's retaliatory purpose—it confirms it.

The FTC urges that congressional investigations and statements about NewsGuard and other journalistic organizations which address online disinformation confirm the "ample *nonretaliatory* reasons for … issuing a CID to NewsGuard." Opp. at 21. But the congressional committees that examined the issue did not find any evidence there had ever been any collusion or

advertiser boycotts, saying only that this “may have antitrust implications.”[9] Opp. at 22. Ferguson’s public assertion that “[c]ongressional investigations revealed … NewsGuard … led collusive ad-boycotts,” ECF 11-7 at 2, was simply piling his political accusations on top of the unfounded accusations of the committees. But that does not make the FTC’s retaliatory actions innocent.

More generally, the FTC contends Chairman Ferguson’s many public attacks on NewsGuard were just “unremarkable expression[s] of a legitimate antitrust concern.” Opp. at 23. The FTC’s characterizations ignore what Ferguson actually said. His comments rang with an ideologically-motivated political slant, *i.e.*, he was going after the “radical left,” “progressives,” and “Silicon Valley,” “everyone who is fighting ‘disinformation’”—this is Ferguson’s so-called “censorship industrial complex.” ECF 11-9; 11-12. And Ferguson went after NewsGuard specifically because of his mistaken view that NewsGuard “seems to give a free pass to … major left-leaning outlets,” ECF 11-11, and his constitutionally bankrupt position that the FTC should target “purely private censorship,” ECF 11-9, *i.e.*, editorial and journalistic judgments of publishers like NewsGuard. As in *Media Matters v. FTC*, 2025 WL 2378009, at *19, and *Bailey*, 2024 WL 3924573, at *14, the comments of Chairman Ferguson have described the FTC’s investigative push and NewsGuard “in ideological terms.”

Ferguson’s statements and the FTC’s actions do not reflect some “unremarkable” neutral investigation for “legitimate antitrust concern[s].” Opp. at 23. They are, rather, a quite remarkable viewpoint-based attack on free speech. When the government targets “particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant.” *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 829 (1995). The government may not restrict

[9] Interim Staff Report of the H. Comm. on Small Business: Instruments and Casualties of the Censorship-Industrial Complex 59 (Sept. 10, 2024), https://smallbusiness.house.gov/uploadedfiles/house_committee_on_small_business_-_cic_report_september_2024.pdf.

or regulate speech "when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Id.*; *see also Perry Ed. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46 (1983). Yet that is what the FTC set out to do and has done here.

The FTC takes particular umbrage at NewsGuard's references to Chairman Ferguson's comments during an April 2025 interview in which he explained that government agencies always have the threat that they "potentially can inflict on any marketplace participant, which is, 'We can make your life difficult.' The regulators can show up, they can audit, they can investigate, they can cost you a lot of money, and the path of least resistance is: 'Do what we say.'" ECF 11-15; Opp. at 24. The FTC contends the description of Ferguson's comments in NewsGuard's PI memorandum is "demonstrably misleading" because Ferguson "categorically rejected such coercive tactics." Opp. at 24. But *that* is not what Ferguson said. He was describing what he viewed as the reality of government regulators' powers: "The or else is, 'We have a tremendous array of investigative tools. Those tools are expensive when applied to you even if we don't win at the end of the day, so knuckle under.'" ECF 11-15. And he described it as "naïve" to fail to appreciate the government's powers (or "what happens on a phone between a private company and its regulator"). *Id.*

NewsGuard's point in the PI memorandum was that Ferguson's explanation of tactics and the FTC's powers (formal and informal) turned out to be a playbook for the CID to NewsGuard and the blacklist provision of the Consent Order. However much the government might want to distance itself from Ferguson's statements now, the roadmap he described is in fact what happened.

The FTC claims the timing does not support any inference of retaliatory intent, but cites to a portion of NewsGuard's PI memorandum that doesn't mention timing except to say that the harms from the FTC's actions are current and ongoing. Opp. at 25 (citing ECF 11-1 at 41). The FTC makes largely nonsensical arguments based on irrelevant cases mentioning "'temporal

proximity'" or the "'outer limit" for causation. *Id.* But how the timing of Chairman Ferguson's statements and the FTC's actions reflect viewpoint-based animus and retaliatory motive is clear from the record. In late 2024, before he was named chairman, Ferguson said he would pursue an investigation of media companies—and NewsGuard specifically—to go after the "radical left" and pursue his novel theory of some sort of advertising boycott. ECF 11-2 ¶ 35; ECF 11-12. The FTC did just that, launching its investigation and dragnet CIDs to 17 organizations (NewsGuard among them) in May 2025. While the FTC has not pointed to anything from this effort showing or even suggesting any evidence of any boycott or collusion, it has not given up the cause. And when the proposed Omnicom-IPG merger gave the FTC opportunity to target NewsGuard more directly, that is exactly what it did.

**D. The *Media Matters Cases* Are Not "Unique" Outliers.**

This Court and the D.C. Circuit have now held in three cases brought by Media Matters across five rulings in those cases that (1) Media Matters stated cognizable First Amendment retaliation claims for intrusive and coercive "investigations" brought by the FTC and two state attorneys general; and (2) Media Matters was entitled to preliminary injunctions to block the investigations; because (3) it is likely to succeed in showing that the governments' acts were retaliatory and designed to chill speech. *See Media Matters v. FTC*, *Media Matters* Stay Op., 2025 WL 2988966 (denying stay of preliminary injunction pending appeal); *Bailey*, 2024 WL 3924573 (granting preliminary injunction); *Paxton*, 732 F. Supp. 3d at 1 (same); *Paxton*, 138 F.4th at 585 (affirming grant of preliminary injunction).

The FTC contends reliance on the *Media Matters* decisions "is misplaced," claiming "the determinative facts are entirely different." Opp. at 29. It offers no support for this except to note that the D.C. Circuit used the phrase "unique factual circumstances" in its decision denying a stay. *Id.* But this came in the context of the Circuit Court's explanation that the FTC had failed to offer

any evidence that the preliminary injunction against the Media Matters CID could affect any other CID or its overall investigation. 2025 WL 2988966, at *11. The court was not saying that it found the Media Matters CID to be unique, and the FTC conveniently failed to mention its CIDs to other targets in its investigation—such as NewsGuard—were largely carbon copies. The FTC's strained effort to avoid the *Media Matters* cases underscores their applicability and relevance here.

## III. NewsGuard is Likely to Prevail in its Challenge to the Omnicom Consent Order.

### A. The Consent Order Imposed a Blacklist on NewsGuard.

The FTC's assertion that NewsGuard failed to show its speech prompted the Consent Order condition barring Omnicom's use of services that assess news sites based on "'adherence to journalistic standards or ethics'" is absurd.[10] Opp. at 13. Its statement that "NewsGuard is not named in the consent order" means nothing. *Id.* at 42. The D.C. Circuit flatly rejected such a dodge when it invalidated generic language in a congressional budget resolution barring an extension of any "current" waivers of the FCC's newspaper-broadcast cross-ownership rules. *News America Pub., Inc. v. FCC*, 844 F.2d 800, 814 (D.C. Cir. 1988). The 18-word condition on FCC funding was buried in a 471-page continuing resolution at the end of a 379-word paragraph, but the court found the budget amendment "strikes at [Rupert] Murdoch with the precision of a laser beam." *Id.* To reach that conclusion the court reviewed the context as well as statements of legislators and found the record "reveals but a single focus: whether Rupert Murdoch and News America should be denied the opportunity to seek an extension of his temporary waivers." *Id.* at 810.

The same conclusion applies here. The FTC proposed the merger condition after Commissioner (then Chairman) Ferguson had been railing about "private censorship" for months,

[10] Likewise, NewsGuard did not "ignore[]" that "the Commission as a whole," and not just Chairman Ferguson, was responsible for the merger condition. Opp. at 42. That's why the Commission is named as a Defendant.

calling out NewsGuard specifically, and just one month after the FTC served NewsGuard with the CID. *See* Compl. ¶¶ 83, 111–116; ECF 11-2 ¶¶ 40, 53–55. As Chairman Ferguson announced at the time, "investigating and policing censorship practices that run afoul of the antitrust laws is a top priority of the Trump-Vance FTC" and warned it would "monitor Omnicom's and IPG's compliance," including by imposing "reporting provisions." ECF 11-20 at 6. But even though NewsGuard was a clear target, *see id* at 5 & n.34, the FTC's original shot missed the mark and the Consent Order had to be adjusted to make sure NewsGuard was hit. ECF 11-2 ¶¶ 54, 63.

Specifically, in line with Ferguson's ongoing narrative that he sought to use his agency to prevent "censorship" of conservative news sites, the draft order would have precluded Omnicom or its agencies from doing business with any news rating service or entity that directs advertising spending "based on the Media Publisher's political or ideological viewpoints, or the political or ideological viewpoints expressed in content that the Media Publisher sells advertising to run alongside of." Proposed Decision & Order, *Omnicom Grp. Inc.*, FTC File No. 251-0049, 2025 WL 2355514 (June 23, 2025). But there was a problem. As NewsGuard had previously demonstrated to congressional committees, its news ratings were based entirely on fully disclosed journalistic criteria, not on "political or ideological viewpoints." *See* Compl. ¶¶ 48–54; ECF 11-2 ¶¶ 27–30. So as originally proposed, the Omnicom consent order would not reach NewsGuard.

Well aware of this, Newsmax and its allies lobbied the FTC to alter the merger conditions specifically so they would apply to NewsGuard. *See* Compl. ¶¶ 83, 111–116; ECF 11-2 ¶¶ 58–63; ECF 11-22; ECF 11-24. They repeatedly named NewsGuard in their communications with the FTC and urged it to add a condition (with compliance monitoring) to prohibit Omnicom from using "any third party media monitoring organization or entity" to "conduct any assessment" of "the reliability of an outlet, or of its publications." *Id.* ECF 11-22 at 1. In response, the FTC modified

its consent order to prohibit the merged companies from entering any agreement with any third-party service used in connection with advertising purchases based on "adherence to journalistic standards or ethics." ECF 11-25 at 2–3. As *everybody* understood, that meant NewsGuard.[11]

Although the FTC characterizes the focus on NewsGuard as a product of Chairman Ferguson's "strong interest in enforcing the antitrust laws" and his concern about what he called "collusive boycotts of disfavored media publishers," Opp. at 41, Defendants' brief demonstrates precisely the *opposite*. The Commission undermines any plausible claim it "acted appropriately to address antitrust concerns" by asserting NewsGuard could not have been the target of the Omnicom merger condition because "it is only a tiny player in that space with '*de minimis*' market share." *Id.* at 42 (quoting Compl. ¶ 97; ECF 11-2 ¶ 44). This is a stark admission of pretext, just as Ferguson's many statements alleging "censorship" of "conservative voices" confess his viewpoint-based motivation. And this is deeply at odds with the basic First Amendment principles that the Free Speech Clause protects private actors against the government, not the other way around, *Manhattan Cmty. Access Corp. v. Halleck*, 587 U.S. 802, 804 (2019), and the government has no legitimate role deciding "what counts as the right balance of private expression" or to "'un-bias' what it thinks [is] biased." *Moody v. NetChoice, LLC*, 603 U.S. 707, 719 (2024).

**B. The Merger Condition Substantially Burdens NewsGuard's Speech.**

The FTC's scattershot arguments that any alleged harms are "speculative" because NewsGuard "does *not* claim that Omnicom will stop making payments on the IPG contract," Opp. at 38, that NewsGuard has not shown the consent order has "chilled speech," *id.* at 42, and that

[11] The FTC asserts that "Newsmax's comment did not propose the final consent order's prohibition on the use of third-party services that evaluate 'the veracity of news reporting' and 'adherence to journalistic standards.'" Opp. at 41 n.12. But whether or not the FTC adopted Newsmax's exact language, it cannot dispute it modified the Order at Newsmax's behest so that it would blacklist NewsGuard. The FTC also points to other Newsmax suggestions "the Commission did *not* adopt," *id.*, but for purposes of this case, what matters are the ones it *did*.

economic loss is not “irreparable harm,” *id.* at 45, ignore the record, defy logic, and misunderstand basic First Amendment law.

First, a blacklist is a direct prohibition on speech—the Omnicom merger condition imposes a *freeze* not just a chill. *See Nebraska Press Ass’n v. Stuart*, 427 U.S. 539, 559 (1976). The FTC’s assertion that NewsGuard did not show IPG will “stop making payments” ignores that the merger condition the Commission imposed *forbids* IPG from “continuing … maintaining, or attempting to maintain … any agreement” that uses a third-party service that evaluates “adherence to journalistic standards or ethics.” ECF 11-25 at 2–3. The order prohibits what is now the world’s largest advertising agency and media buying company from doing business with NewsGuard. And, as Chairman Ferguson warned, the FTC will be watching to ensure compliance. ECF 11-20 at 6.

Second, the record amply shows NewsGuard has lost customers because of the Omnicom Consent Order, and imminently stands to lose more if the consent order condition is not enjoined. *See* ECF 11-2 ¶¶ 65–69. The FTC claims NewsGuard failed to disclose sufficient details about its business relationships, but this is just an oblique way for the government to continue prying loose information about NewsGuard’s customers—a process that began with the CID.[12]

Third, the FTC’s position defies its own logic used in attempting to justify both the CID and merger condition. Chairman Ferguson and others base their entire campaign against news ratings services on the premise that unfavorable ratings may discourage advertising agencies and their clients from placing ads on news sites the government favors, thus causing a loss of business. They call this loss of earning potential intolerable “censorship.” Yet, ironically, they see no First

[12] The FTC’s claim that NewsGuard cannot show traceability and redressability unless it shows “the client will return if that portion of the order is enjoined,” Opp. at 39, simply misunderstands the law. The court rejected this identical argument in *Dart*, 807 F.3d at 238 (Backpage’s “only remedy is an injunction against the sheriff’s violating its First Amendment rights”).

Amendment problem with imposing a government *order* directly prohibiting the world's largest ad agency from doing business with NewsGuard because of its editorial policies. This not only misconstrues the nature of censorship, *Halleck*, 587 U.S. at 804, it turns the First Amendment's commands upside down. *Moody*, 603 U.S. at 719.

Fourth, the FTC's claim that "economic loss does not, in and of itself, constitute irreparable harm" has no application in First Amendment cases. Opp. at 45 (quoting *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)). *Wisconsin Gas* involved natural gas regulations that threatened to make contracts more expensive; it had nothing to do with free expression. But loss of First Amendment freedoms is inherently irreparable, *Elrod v. Burns*, 427 U.S. 347, 373 (1976), and the Supreme Court has held that government regulations that impede a media company's business constitutes irreparable harm. The Court permanently enjoined a law that targeted Playboy Television, because it "limited Playboy's market as a penalty for its programming choice." *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 812 (2000). In the First Amendment context, the "distinction between laws burdening and laws banning speech is but a matter of degree." *Id.* This is precisely the type of penalty the FTC is imposing on NewsGuard.

**C. The FTC is Censoring NewsGuard Using Intermediaries.**

The FTC has no serious answer to the claim that its intermediary strategy of using the Omnicom Consent Order to suppress NewsGuard's speech violates the holdings of *Vullo*, *Bantam Books*, and *Dart*. It claims *Vullo* depends on alleging specific elements and asserts "NewsGuard does not even allege the existence of *any threatening communication*." Opp. at 43. This is simply wrong—it not only ignores the record in this case, it misunderstands the import of those cases.

As the Court stressed in *Vullo*, "the critical takeaway is that the First Amendment prohibits government officials from wielding their power selectively to punish or suppress speech, directly or (as alleged here) through private intermediaries." 602 U.S. at 198. That is precisely what

happened here. Defendants' claim there is no cause of action because NewsGuard did not allege a "threat" misses the point entirely. *Vullo* explained that the various "multifactor test[s]" used by circuit courts are a "useful, though nonexhaustive guide" but are "just helpful guideposts." *Id.* at 191; *see also id* at 199 ("Whatever value these 'guideposts serve, they remain 'just' that and nothing more.") (Gorsuch, J., concurring, citing *Axon*, 598 U.S. at 205–07). As the Court concluded, "[u]ltimately, *Bantam Books* stands for the principle that a government official cannot do indirectly what she is barred from doing directly: A government official cannot coerce a private party to punish or suppress disfavored speech on her behalf." *Id.* at 190; *see also id* at 193 ("whether analyzed as a threat or as an inducement, the conclusion is the same").

Defendants overlook the direct parallels between *Vullo* and this case. In *Vullo*, New York regulators began investigating whether the NRA insurance programs violated state law and made it clear the state opposed the NRA's pro-gun advocacy. Regulators used various means to deliver their message, including in private meetings, press releases, and "guidance letters" that "encouraged" insurance companies to manage risks "that may arise from their dealings with the NRA or similar gun promotion organizations." *Id.* at 184. After issuing the guidance letter and press release, the state entered consent decrees with various insurers in which they "agreed not to provide any NRA-endorsed insurance programs (even if lawful)." *Id.* at 185.

So too here: Chairman Ferguson made statements asserting the FTC "ought to conduct … an investigation," claiming NewsGuard "seems to give a free pass to … left-leaning outlets," and pledging to "[i]nvestigate advertiser boycotts" as well as "'progressives who are targeting disinformation.'" ECF 11-2 ¶¶ 35–36; ECF 11-11; ECF 11-12. The FTC subsequently launched an inquiry asserting social media providers and other "tech platforms" are engaged in "censorship" that is "potentially illegal." *Id.* ¶ 37 & ECF 11-14. And when Omnicom sought merger approval,

the FTC simultaneously unveiled a complaint along with a proposed consent order, while Ferguson issued a statement calling NewsGuard an organization that "ha[s] publicly sought to use the chokepoint of the advertising industry to effect political or ideological goals" and alleging NewsGuard steers "advertising revenue with 'an unavoidable partisan lens.'" *Id.* ¶ 55 & ECF 11-20. Ultimately, the FTC issued a revised consent order permitting the merger *only* on the condition the merged entity would do no business with NewsGuard. *Vullo* fits this scenario like a glove.

## IV. Equitable Factors Favor Injunctive Relief.

### A. NewsGuard Did Not Delay Seeking Relief.

The FTC misrepresents the sequence of events to suggest incorrectly that NewsGuard engaged in "extraordinary delay in seeking this relief." Opp. at 1. In truth, NewsGuard filed suit less than three weeks after its negotiations with the FTC over the CID broke down despite its good faith efforts to comply. ECF 11-2 ¶ 48 & ECF 11-18. The FTC now seeks to penalize NewsGuard for engaging in those negotiations, designed not to *prolong* litigation but to avoid it altogether.

Despite the FTC holding out its negotiations with NewsGuard as a "cooperative" process, Opp. at 3, the agency did not participate in good faith. In mid-January, it walked back earlier statements confirming NewsGuard's compliance and, despite NewsGuard's efforts to cooperate, FTC staff simply repeated several of the most intrusive, infringing demands the FTC had made from the outset, including identification of all NewsGuard subscribers and communications with its customers. ECF 11-2 ¶ 46.

This persistent, repeated demand that NewsGuard disclose all its customers was particularly troubling. Given Chairman Ferguson's statements that tech and media companies constituted a "censorship cartel," NewsGuard reasonably feared the FTC intended to similarly pressure or coerce its customers as well. So, when FTC staff reasserted this demand and walked back concessions made over the prior seven months of negotiations—combined with the FTC's

issuance of the Consent Order targeting NewsGuard—the magnitude of the FTC's retaliatory campaign became apparent. NewsGuard immediately filed a petition to quash the CID and, just a few weeks later, filed its Complaint in this action and sought preliminary injunctive relief.

This is not, as the FTC contends, an "extraordinary delay" that "preclude[s]" equitable relief. Opp. at 32. Every one of the FTC's cited cases fails to support, and indeed actively undermines, this assertion. *See* Opp. at 32–33 (collecting cases). As these cases confirm, it is only "unreasonable" and "unexcused" delay that, while "not dispositive of the [preliminary injunction] issue," weighs against relief.[13] In *Maldonado*, for instance, this Court denied plaintiffs' motion for injunctive relief where they waited "*nine years* after initiating th[eir] lawsuit" to request relief. 2019 WL 6877913, at *3–4 (emphasis added).

The FTC's assertion that NewsGuard's good faith cooperation regarding the CID somehow cuts against injunctive relief now that the full scale of the FTC's retaliatory campaign is apparent is likewise unsupported. Those eight months of cooperation were not, as the FTC claims, part of any "litigation strategy" of NewsGuard, Opp. at 33, but instead an attempt to *avoid* litigation altogether. It was only when negotiations broke down, it became apparent that trying to work with FTC cooperatively was a futile effort, and the full extent of the government's retaliatory campaign became clear that litigation—and injunctive relief—became necessary.

The FTC's argument that NewsGuard cannot challenge the consent order because it "did not submit a comment during the public comment period" also misrepresents the facts and the

---

[13] *Mylan Pharms., Inc. v. Shalala*, 81 F. Supp. 2d 30, 44 (D.D.C. 2000); *see also Kohls v. Ellison*, 2026 WL 350923, at *4 (8th Cir. 2026); *NRDC v. Pena*, 147 F.3d 1012, 1026 (D.C. Cir. 1998); *Fund for Animals v. Frizzell*, 530 F.2d 982, 987 (D.C. Cir. 1975); *Sierra Club v. EPA*, 793 F. Supp. 3d 158, 165 (D.D.C. 2025); *Maldonado v. D.C.*, 2019 WL 6877913, at *3–4 (D.D.C. Dec. 16, 2019); *Open Top Sightseeing USA v. Mr. Sightseeing, LLC*, 48 F. Supp. 3d 87, 90 (D.D.C. 2014); *Newdow v. Bush*, 355 F. Supp. 2d 265, 292 (D.D.C. 2005).

FTC's own actions. As set forth in the Complaint, the only version of the consent order ever subject to public comment *would not have applied to NewsGuard*. ECF 11-2 ¶ 54. Only after *Newsmax* flagged this did the FTC revise the language to directly target NewsGuard. *Id.* ¶¶ 58–63 & ECF 11-22; 11-23; 11-24; 11-25. The FTC then adopted the final Consent Order on September 26, 2025, (for the first time including the terms barring Omnicom from using services that rate news sources based on "veracity of reporting" or "adherence to journalistic standards") with no opportunity for NewsGuard (or anyone else) to comment on the revised language. *Id.* ¶ 63 & ECF 11-25. The FTC cannot reasonably fault NewsGuard for failing to comment on a consent order the FTC itself withheld from public comment.

### B. Injunctive Relief Should be Granted.

For all the reasons described above, NewsGuard has more than demonstrated that preliminary injunctive relief is proper. Loss of First Amendment freedoms are inherently irreparable. *Elrod*, 427 U.S. at 373. This specifically includes instances where government regulations impede a media company's business. *Playboy Ent. Grp.*, 529 U.S. at 812. Where such First Amendment violations occur, the balance of equities and public interest always favor an injunction. *Paxton*, 138 F.4th at 585. Nor would enjoining the FTC from enforcing its retaliatory CID, or its Consent Order targeting NewsGuard, harm the FTC in any way. And the government does not contend otherwise.

## CONCLUSION

For all these reasons, Plaintiff asks that the Court grant its motion for a preliminary injunction.

Dated: February 27, 2026

Respectfully Submitted,

/s/ Robert Corn-Revere
Robert Corn-Revere
(D.C. Bar No. 375415)
James C. Grant*
(WA Bar No. 14358)
Sara E. Berinhout*
(MA Bar No. 703217)
Samuel Rudovsky**
(PA Bar No. 335724)
Not Admitted to the D.C. Bar. D.C. Practice limited to U.S. federal courts and related matters under D.C. Ct. App. R. 49(c)(3).
FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION
700 Pennsylvania Ave. SE, Ste. 340
Washington, DC 20003
(215) 717-3473
bob.corn-revere@fire.org
jim.grant@fire.org
sara.berinhout@fire.org
sam.rudovsky@fire.org

*Pro hac vice forthcoming
**Pro hac vice pending

*Counsel for Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that on February 27, 2026, a true and correct copy of the foregoing document was transmitted via using the CM/ECF system, which automatically sends notice and a copy of the filing to all counsel of record.

/s/ Robert Corn-Revere
Robert Corn-Revere

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NEWSGUARD TECHNOLOGIES, INC.,<br>*Plaintiff*,<br>v.<br>FEDERAL TRADE COMMISSION and ANDREW FERGUSON, in his official capacity as Chairman of the Federal Trade Commission,<br>*Defendants*. | No. 1:26-cv-0353 (DLF) |

**DEFENDANTS' NOTICE OF THE COMMISSION'S ORDER REGARDING NEWSGUARD'S PETITION TO QUASH**

Today, March 6, 2026, the Commission issued a ruling denying NewsGuard's petition to quash the Civil Investigative Demand. The Commission's order is attached as **Exhibit A**. NewsGuard's petition to quash is attached as **Exhibit B**. Both documents also will be available through the Commission's website. *See* FTC, *Legal Library: Petitions to Quash*, https://tinyurl.com/2tudb3wz.

Dated: March 6, 2026
Washington, D.C.

Respectfully submitted,

OF COUNSEL:

DANIEL GUARNERA
*Director*

KELSE MOEN
*Deputy Director*

BUREAU OF COMPETITION

LUCAS CROSLOW (D.C. Bar #1048342)
*General Counsel*

H. THOMAS BYRON III (D.C. Bar #442856)
*Deputy General Counsel*

ALEX POTAPOV (D.C. Bar #998355)
*Deputy General Counsel*

/s/ Ethan D. Beck
ETHAN D. BECK (D.C. Bar #90024619)
*Counsel to the General Counsel*

FEDERAL TRADE COMMISSION
600 Pennsylvania Ave., N.W.
Washington, DC 20580
(202) 326-2110
ebeck@ftc.gov

*Attorneys for the Defendants*

# EXHIBIT A

**UNITED STATES OF AMERICA**
**BEFORE THE FEDERAL TRADE COMMISSION**

**COMMISSIONERS: Andrew N. Ferguson, Chairman**
**Mark R. Meador**

| | | |
|---|---|---|
| **In the Matter of** | ) | |
| | ) | **File No. 2 -** |
| **CIVIL INVESTIGATIVE DEMAND TO** | ) | **PUBLIC** |
| **NE SGUARD TECHNOLOGIES, INC.** | ) | |
| **DATED MA 2 , 2 2** | ) | |

**ORDER DEN ING PETITION TO UASH**
**CIVIL INVESTIGATIVE DEMAND**

**By FERGUSON, Chairman:**

NewsGuard Technologies, Inc. (NewsGuard) petitions the Commission to quash in its entirety a Civil Investigative Demand (CID) issued on May 20, 2025, in connection with the Commission's investigation into whether any natural persons, partnerships, corporations, associations, or other legal entities have engaged in unfair methods of competition, including boycotts or other forms of collusion or coordination, with respect to withholding, degrading, increasing the cost of, or otherwise diminishing the quantity of advertising placed on news outlets, media platforms, or other publishers in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, or Section 5 of the FTC Act, 15 U.S.C. § 45.

NewsGuard requests that the Commission quash the CID because (1) the CID constitutes retaliation against NewsGuard for its First Amendment-protected activities, and (2) the CID is overbroad and requests sensitive information in violation of the First and Fourth Amendments. *Petition*, at 6 7. For the reasons set forth below, we deny NewsGuard's petition.

## I. BACKGROUND

NewsGuard is a New York City-based company that "rate s and review s the reliability of news sources across the open web, social media, and content platforms" including television and podcasts.[1] NewsGuard assigns reliability scores and ratings to over 35,000 content publishers,[2] then "makes money by selling subscriptions to its browser extension and Reality Check newsletter, and by licensing access to its databases of ratings and false claim fingerprints to companies."[3] According to NewsGuard, its ratings "enable brands to advertise safely on

[1] NewsGuard, *News Reliability Ratings*, https://www.newsguardtech.com/solutions/news-reliability-ratings/.
[2] *Id.*
[3] NewsGuard, *NewsGuard FAQ: How does NewsGuard make money?*, https://www.newsguardtech.com/newsguard-faq/.

reliable news sources while avoiding brand-safety risk."[4] In addition to providing ratings, NewsGuard produces reports and research related to online misinformation and disinformation, and engages in outreach to industry participants and policymakers.[5] NewsGuard asserts that it has become "a leading source of journalism about information reliability." *Petition*, at 2. Its work addresses a range of topics, including what it views as foreign and domestic disinformation campaigns and online propaganda. *See id.*

On May 20, 2025, under the authority of a Commission resolution authorizing the use of compulsory process, the Commission issued a CID to NewsGuard pursuant to Section 20 of the FTC Act, 15 U.S.C. § 57b-1. The NewsGuard CID was one of seventeen still-outstanding CIDs issued as part of the Commission's investigation into whether entities have conspired to withhold, degrade, increase the cost of, or otherwise diminish the quantity of advertising placed on news outlets, media platforms, or other publishers in violation of Section 1 of the Sherman Act and Section 5 of the FTC Act, under the guise of promoting "brand suitability" and "brand safety" against "misinformation." Specifically, the Commission is investigating whether online advertisers and/or advertising agencies have unlawfully agreed to use certain lists promulgated by other industry participants that categorize or rate content publishers as not "brand suitable" or not "brand safe," to coordinate the placement of ads. As such, CID recipients to date include multiple advertising agencies as well as entities that the Commission has reason to believe possess information relating to the use of such lists to coordinate ad placement. These entities include several advertising trade associations, several brand safety/suitability rating organizations such as NewsGuard, and several policy/advocacy groups.

The CID to NewsGuard seeks information pertaining to NewsGuard's organizational structure; documents and data relating to NewsGuard's ratings of content publisher entities; communications with other entities related to the subject of the investigation; the methodology by which NewsGuard determines the ratings, labels, or categorizations that it applies to news or information sites; lists that NewsGuard has provided to third parties that evaluate or categorize content publisher entities; identification of NewsGuard's customers and its communications with those customers; and NewsGuard's financial information, among other subjects. *See generally Petition* Ex. 1, at 1  6. The CID contains 31 specifications. *Id.* The relevant time period for NewsGuard's responses is from January 1, 2018 to the present. *Id.* at 8.

NewsGuard appears to have had at least ten substantive meet-and-confer sessions with Commission staff. *See Petition* Ex. 2, at 1  6 (Statement of Counsel Pursuant to 16 C.F.R. § 2.10(a)(2)). During those sessions, NewsGuard raised concerns about the CID based on the First Amendment and unreasonable burden. *See, e.g.*, *id.*   3. Despite its concerns, NewsGuard has responded to a substantial portion of the CID: it has produced 41,183 pages of documents and provided other information sought by the CID through letters, emails, and phone calls. *See id.*   26.

On January 15, 2026, staff sent NewsGuard a letter that substantially modified the scope of the original CID. *Petition* Ex. 3. The letter modified Specifications 8, 11, 15, and 26 to address NewsGuard's burden concerns by limiting the scope of the information requested in each

[4] NewsGuard, *NewsGuard: Global Leader in Information Reliability*, https://www.newsguardtech.com/about-newsguard/.
[5] NewsGuard, *NewsGuard: The leading datasets for studying misinformation, disinformation, and online information reliability*, https://www.newsguardtech.com/industries/researchers/.

Specification. For example, the letter narrowed Specification 26 to cover only customers that use NewsGuard's news reliability ratings and to exclude all customers who are natural persons. *Id.* at 3. The letter also provided that, except for those four Specifications (as modified) and Specification 12, staff deemed NewsGuard to have satisfied its CID obligations through its prior productions. *Id.*

The following day, January 16, 2026, NewsGuard timely filed its petition to quash the CID.[6]

## II. ANAL SIS

### A. The CID Does Not Constitute Retaliation in Violation of the First Amendment.

NewsGuard first argues that the CID should be quashed because it is part of an unconstitutional retaliation campaign targeting NewsGuard's protected First Amendment activities. *Petition*, at 7. To prevail on this claim, NewsGuard must show that (1) it "engaged in conduct protected under the First Amendment," (2) the FTC "took some retaliatory action sufficient to deter a person of ordinary firmness in NewsGuard's position from speaking again," and (3) there is "a causal link between the exercise of a constitutional right and the adverse action." *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016) (cleaned up). For purposes of this Order, the Commission assumes without deciding that NewsGuard engages in some protected First Amendment activities. But its claim fails at each of the other two prongs: it has not shown that the CID has caused a sufficient chilling effect, and it has not shown a causal link between the CID and its First Amendment-protected activities.

#### . Chilling Effect

NewsGuard argues that the "draconian" CID, which it claims the Commission issued " to punish or suppress its disfavored expression,'" is "plainly sufficient to chill" its First Amendment-protected speech. *Petition*, at 8 (quoting *NRA v. Vullo*, 602 U.S. 175, 188 (2024)). NewsGuard identifies four "adverse consequences" resulting from the Commission's investigation that allegedly chill its expression: (1) the fact that it incurs costs to review its internal documents to identify responsive materials; (2) the fact that its internal resources are diverted to respond to the CID; (3) the possibility that the CID will result in the disclosure of NewsGuard's customer lists; and (4) the fact that the CID is enforceable in federal court. *Petition*, at 8 9.

To the extent that NewsGuard is alleging that the Commission initiated a retaliatory investigation it appears unlikely that such a claim is even cognizable. The Supreme Court and the U.S. Court of Appeals for the District of Columbia Circuit have declined to resolve the question. *See Hartman v. Moore*, 547 U.S. 250, 262 n.9 (2006); *Media Matters for Am. v. Paxton*, 138 F.4th 563, 584 85 (D.C. Cir. 2025). Several courts of appeals have suggested that such claims

---

[6] Commission staff granted several extensions to the deadline for NewsGuard to file a petition to limit or quash the CID. Under the latest extension, NewsGuard's deadline was January 16, 2026. Under Commission Rule 2.10(c), 16 C.F.R. § 2.10(c), the Commission had 40 days, or until March 2, 2026, to issue an order ruling on NewsGuard's petition. Due to the lapse in federal government appropriations from January 31 through February 3, 2026, this date has been extended until March 6, 2026.

should not be recognized. *See Archer v. Chisholm*, 870 F.3d 603, 620 (7th Cir. 2017); *Breaux v. City of Garland*, 205 F.3d 150, 157 61 (5th Cir. 2000); *see also J.T.H. v. Mo. Dep't of Soc. Servs. Child.'s Div.*, 39 F.4th 489, 493 (8th Cir. 2022) (" W e have never recognized a retaliatory-investigation claim of this kind. Nor have other courts around the country. . . ."); *Sivella v. Twp. of Lyndhurst*, No. 20-2342, 2021 WL 3356934, at 3 (3d Cir. Aug. 3, 2011) ("Since *Hartman*, no Supreme Court case has addressed the issue of whether the initiation of a retaliatory investigation can constitute a First Amendment violation an absence of relevant Supreme Court precedent strongly supports a finding that a particular right is not clearly established."). And the U.S. Court of Appeals for the Eleventh Circuit has squarely held that "a retaliatory investigation" "does not implicate a federal constitutional right." *Rehberg v. Paulk*, 611 F.3d 828, 850 n.24 (11th Cir. 2010), *aff'd*, 566 U.S. 356 (2012); *Thompson v. Hall*, 426 F. App'x 855, 858 (11th Cir. 2011) (per curiam) (same).

Even if a retaliatory investigation claim were theoretically cognizable which only one federal court of appeals appears to have assumed it could arise only in extraordinary circumstances. *See Moore v. Garnand*, 83 F.4th 743, 752 (9th Cir. 2023) (recognizing that while no case had "held that a retaliatory investigation by itself was unconstitutional," it was possible that the entire "scope and manner" of a given investigation could violate the First Amendment). Such extraordinary circumstances might include "campaigns of harassment and humiliation," *Coszalter v. City of Salem*, 320 F.3d 968, 975 (9th Cir. 2003), threats of arrest, *Lacey v. Maricopa Cnty.*, 693 F.3d 896, 909 10, 917 (9th Cir. 2012), or "other means of coercion, persuasion, and intimidation" such as a substantial fine, *White v. Lee*, 227 F.3d 1214, 1228 n.8 (9th Cir. 2000) (citing *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963)).

None of these is true of the Commission's investigation. NewsGuard is one of numerous CID recipients in a matter indisputably of public concern and high priority for the Commission. The scope of the CID is standard for FTC investigations. *See infra* Part II.A.2.c. NewsGuard faces no threat of fines or arrest. CIDs are not self-executing, and NewsGuard will incur no penalty or other legal detriment for failing to comply unless the Commission first files a petition for enforcement in a federal court and the court, after considering NewsGuard's arguments, rules for the Commission and orders NewsGuard to respond. *See, e.g.*, *Gen. Fin. Corp. v. FTC*, 700 F.2d 366, 368 (7th Cir. 1983); 15 U.S.C. § 57b-1(e) (CID enforcement provision). And NewsGuard's statement of counsel acknowledges that, far from harassing or coercing NewsGuard, Commission staff has met-and-conferred numerous times to address NewsGuard's concerns and substantially modified the CID to reduce its scope. *See Petition* Ex. 2, at 1 6; *see also id.* Ex. 3. Indeed, NewsGuard does not allege *any* change in its speech resulting from the CID. While subjective responses are not "dispositive" and a plaintiff need not show that it "altogether" ceased speaking, *see Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 500 (4th Cir. 2005), it is telling that the CID has apparently had no impact on NewsGuard's speech over the nine months it has been pending. Overall, the record demonstrates that the Commission's approach to its investigation of NewsGuard is miles away from the circumstances that could give rise to a retaliatory investigation claim, assuming one is even cognizable. *Cf. Moore*, 83 F.4th at 752 53 (even "unjustifiably pursuing a criminal investigation" and "attempting to induce the IRS to open an investigation" were insufficient for a retaliatory investigation claim). For the same reasons, these circumstances also do not give rise to a sufficient chilling effect.

Moreover, the four generalized harms that NewsGuard points to as evidence of a chilling effect prove both too much and too little. They prove too much because *all* CIDs require their recipients to incur costs and divert internal resources to respond, and *all* CIDs are enforceable in federal court. *See FTC v. Standard Oil Co. of Cal.*, 449 U.S. 232, 244 (1980) (" T he expense and annoyance of litigation is part of the social burden of living under government.") (cleaned up); *FTC v. Texaco, Inc.*, 555 F.2d 862, 882 (D.C. Cir. 1977) ("Some burden on subpoenaed parties is to be expected and is necessary in furtherance of the agency's legitimate inquiry and the public interest."); 15 U.S.C. § 57b-1(e). And the Commission frequently requests the identification of customers as part of its compulsory process, particularly in antitrust investigations where the Commission must understand market dynamics to make an informed enforcement decision. *See, e.g.*, Attach. to Global Disinformation Index's Pet. to uash CID, FTC File No. 251-0061, at 4 (Sept. 17, 2025), https://tinyurl.com/v9mhhm8c/; FTC, Model Request for Additional Information and Documentary Material, at 5 (Jan. 2024); *FTC v. Take-Two Interactive Software, Inc.*, No. 1:08-mc-00360-HHK, Dkt. 1-3, at 2 (D.D.C. June 5, 2008). If these consequences amount to a chilling effect, then virtually every CID the Commission issues would impermissibly chill speech.

At the same time, these generic harms prove too little because, as explained above, NewsGuard would have to demonstrate extraordinary circumstances to make out a claim that the Commission's investigation is retaliatory (assuming such a claim is cognizable). NewsGuard has not even alleged, much less documented, that it has suffered any unusual or specific injuries because of the CID. At most, NewsGuard has alleged that the legal expense it has incurred to comply with the CID "has exceeded 28 of the revenue NewsGuard has derived from the advertising brand-safety services" that are the subject of the CID. *Petition*, at 9. But, as stated above, legal expenses incurred in responding to a CID are part and parcel of all Commission investigations; this claimed injury is plainly insufficient. Nor does NewsGuard claim to have changed its behavior in response to the CID. The absence of any allegations of actual injury renders NewsGuard's claim that the CID chilled its speech untenable.

#### 2. Causal Link

NewsGuard also fails to demonstrate a causal link between its speech and the CID. *Aref*, 833 F.3d at 258. To show causation, NewsGuard must demonstrate at a minimum that the CID "would not have been issued absent the retaliatory motive." *Nieves v. Bartlett*, 587 U.S. 391, 399 (2019).[7] In making that but-for showing, NewsGuard must overcome the "longstanding presumption of regularity" that attaches to government action. *Hartman*, 547 U.S. at 263. That presumption is at its apex in the context of law-enforcement investigations, an area of "executive discretion of such high order." *Id.* As such, to meet this prong, NewsGuard must put forward sufficient evidence to displace the presumption of regularity and demonstrate that the but-for cause of the CID was NewsGuard's protected activity specifically, its "reports regarding the reliability of news and information websites" and its "journalism about foreign governments'

[7] In fact, the requisite showing is more robust: NewsGuard must demonstrate that there was no reasonable basis for the CID. For example, in the similar context of retaliatory arrests, the Supreme Court has held that plaintiffs must show that the government lacked probable cause. *Nieves*, 587 U.S. at 399 400. The same logic applies here too. *See Gonzalez v. Trevino*, 602 U.S. 653, 663 (2024) (Alito, J., concurring); *cf. Media Matters for Am. v. Bailey*, No. 24-cv-147, 2024 WL 3924573, at 12 13 (D.D.C. Aug. 23, 2024) (considering the issue and ultimately declining to impose an objective basis standard, at least in part for case-specific reasons). However, as discussed in the accompanying text, NewsGuard has not satisfied even the basic but-for standard.

disinformation campaigns and other issues of information reliability." *See Petition*, at 7 8. For two reasons, NewsGuard has not met this burden.

*First*, there are ample nonretaliatory explanations for the Commission's investigation. The CID is part of a broad investigation into a high-priority issue advertising boycotts that may violate the antitrust laws. In particular, the Commission is investigating whether various entities unlawfully agreed to withhold the placement of ads using lists that categorize content publishers as not "brand suitable" or "brand safe." NewsGuard has hardly been singled out, as numerous other entities have also received CIDs.[8] The investigation's breadth refutes NewsGuard's theory that the CID was issued in retaliation for NewsGuard's speech. In addition, the other entities that received a CID did not engage in the same speech as NewsGuard. The fact that they received CIDs anyway demonstrates that the NewsGuard CID would have been issued regardless of any purported retaliatory motive against NewsGuard's news-rating activities. These reasons alone vitiate any conclusion that retaliation was the but-for cause of the CID to NewsGuard.

*Second*, NewsGuard's circumstantial evidence of retaliation fails to establish a causal relationship between its speech and the CID. In attempting to show such a connection, NewsGuard points to four categories of evidence: (1) certain statements by Chairman Ferguson,[9] (2) the timing of the CID, (3) the scope of the CID, and (4) the Decision and Order in *In re Omnicom Group Inc.*, No. C-4823 I.D, II.A (Sept. 26, 2025) (Omnicom Consent Order).[10] *Petition*, at 10 14.

### a. Statements by Chairman Ferguson

NewsGuard points to three statements by Chairman Ferguson that identified NewsGuard by name:

> A November 2024 post on in which then-Commissioner Ferguson commented on the impending closure of the Department of State's Global Engagement Center (GEC), observing that "Congressional investigations revealed the GEC funded the Global Disinformation Index and NewsGuard, which led collusive ad-boycotts possibly in

---

[8] *See* CID to The Global Disinformation Index, Attach. to Pet. to uash, FTC File No. 251-0061 (Sept. 17, 2025) https://tinyurl.com/v9mhhm8c/; CID to Media Matters for Am., Ex. 1 to Pet. to uash, FTC File No. 251-0061 (June 18, 2025), https://www.ftc.gov/system/files/ftc_gov/pdf/2510064mediamattersptqredactedpublic.pdf.

[9] NewsGuard also identifies statements by the Chairman of the Federal Communications Commission (FCC), *Petition*, at 4, 11 12, but these are a red herring. Remarks from "non-decisionmakers are not generally direct evidence of retaliation," *e.g.*, *Waggel v. George Wash. Univ.*, 957 F.3d 1364, 1374 (D.C. Cir. 2020), and could only conceivably be relevant if the non-decisionmaker was involved in the decisionmaking process, *see, e.g.*, *Harris v. Wackenhut Servs., Inc.*, 648 F. Supp. 2d 53, 62 (D.D.C. 2009). The FCC Chairman was not involved in any decisionmaking regarding the FTC's advertising boycott investigation or the CID issued to NewsGuard, and NewsGuard does not even allege as much. *See, e.g.*, *In re Architect of Capitol Emp. Disp.*, No. 24-mc-32 (TNM), 2024 WL 3359515, at 3 (D.D.C. July 10, 2024) (disregarding comments by "non-decisionmakers" who "did not work for the relevant entity " and whom plaintiffs "never link ed " to their termination); *United States v. Biden*, 729 F. Supp. 3d 410, 422 (D. Del. 2024) (any "pressure campaign from Congressional Republicans" to charge defendant was irrelevant without "credible allegations to suggest that the conduct of those lawmakers (or anyone else) had any impact whatsoever on the Special Counsel").

[10] https://www.ftc.gov/system/files/ftc_gov/pdf/OmnicomOrder.pdf.

> violation of our antitrust laws to censor the speech of conservative and independent media in the United States."[11] *Petition*, at 3.
>
> A December 2024 statement in then-Commissioner Ferguson's concurrence in *FTC v. 1661, Inc. d/b/a GOAT* that identified NewsGuard as one example of a news-rating and brand-safety organization whose activities may contribute to a "risk of advertiser boycotts that raise Sherman Act problems." The statement observed that "the antitrust laws do not permit third parties to facilitate group boycotts among competitors" and called on the Commission to "use the full extent of its authority to protect the free speech of all Americans," including by "investigat ing collusion that may suppress competition and, in doing so, suppress free speech online."[12] *Petition*, at 3.
>
> A June 2025 statement by Chairman Ferguson in connection with the administrative complaint and other filings in *In re Omnicom Group / The Interpublic Group of Cos.*, FTC File No. 251-0049. NewsGuard excerpts part of the following sentence in the statement: "Numerous other industry groups and private organizations have publicly sought to use the chokepoint of the advertising industry to effect political or ideological goals." In a parenthetical to a footnote accompanying this sentence, the statement summarized a U.S. House of Representatives committee staff report as "describing NewsGuard and other organizations' steering of advertising revenue with an unavoidable partisan lens.'"[13] *Petition*, at 11.

Rather than suggesting retaliation, these statements reflect the Chairman's views and understanding of entities in the advertising industry that may have engaged in censorship and highlight that investigating possible antitrust violations in that industry was a priority for the incoming Chairman. The Chairman simply observed, consistent with the findings of congressional investigations, that antitrust violations may have occurred and deserved the Commission's attention. Such statements about enforcement priorities are commonplace for enforcement officials; indeed, it "is what we expect of public servants tasked with enforcing the law." *Media Matters for Am. v. FTC*, No. 25-5302, 2025 WL 2988966, at 14 (D.C. Cir. Oct. 23, 2025) (Walker, J., dissenting). If anything, the statements underscore First Amendment values by reflecting the Chairman's belief that censorship is pernicious and may violate the antitrust laws if done pursuant to an agreement. *See id.* at 18 (explaining that Chairman "Ferguson's (far-from-incriminating) comments" reveal a "campaign *against* censorship"); *see also United States v. Rundo*, 108 F.4th 792, 807 (9th Cir. 2024) (statement that prosecution "was initiated to address violent attempts to squelch free speech'" was "not suspect" and instead "put the *non*-discriminatory motive of the prosecutors' office on display"); *United States v. Wilson*, 123 F.4th 1021, 1032 (9th Cir. 2024) (Bumatay, J., concurring) (the "mere fact that government officials" used labels such as " radical left' . . . to identify violent wrongdoers" "doesn't suggest that they targeted the violent rioters because of their political beliefs" instead of "based on their violence alone"); *United States v. Penagaricano-Soler*, 911 F.2d 833, 838 (1st Cir. 1990) (rejecting selective prosecution claim based on public statements by high-ranking officials where "the government presented sufficient countervailing reasons of a non-discriminatory nature").

---

[11] https://x.com/AFergusonFTC/status/1856152760850243905.

[12] https://www.ftc.gov/system/files/ftc_gov/pdf/ferguson-goat-concurrence.pdf.

[13] https://www.ftc.gov/system/files/ftc_gov/pdf/omnicom-ipg-ferguson-statement_0.pdf.

NewsGuard also points to two other statements by Chairman Ferguson: a written statement that he had a "track record of standing up to . . . the radical left" and would " i nvestigate . . . advertiser boycotts," and a statement on a podcast that " progressives' who are fighting disinformation' were not going to give up just because of the election,' so it's really important that the FTC take investigative steps in the new administration under President Trump.'" *Petition*, at 10 11 (quoting *Media Matters for Am. v. FTC*, 805 F. Supp. 3d 105, 134 (D.D.C. 2025)). NewsGuard contends that these statements "characterize similar investigations in ideological terms'" and " indicate at a minimum that Chairman Ferguson saw the FTC's investigation as having a partisan bent.'" *Id.* at 10 (quoting *Media Matters*, 805 F. Supp. 3d at 134). Neither statement mentions NewsGuard, and far from suggesting retaliation, they reflect a legitimate concern about potential antitrust violations. Nor do these general statements connect the CID to NewsGuard's First Amendment-protected activities; they do not reflect any matter-specific direction toward NewsGuard or suggest that the CID was prompted by commentary rather than by the Commission's independent investigative interests. And framing these statements as partisan or ideological is irrelevant to NewsGuard's retaliation claim because they do nothing to connect the CID to a particular protected activity by NewsGuard.

**b. Timing of the CID**

NewsGuard next argues that the timeline of this "fast-moving investigation" into advertising boycotts supports an inference of retaliation. Specifically, NewsGuard points to the following sequence of events: then-Commissioner Ferguson was chosen by President-elect Donald Trump to be Chairman in December 2024; he became Chairman in January 2025; he announced an investigation into " tech platform censorship'" in February 2025; and the Commission issued a CID to NewsGuard (and other entities) in May 2025. *Petition*, at 12 13 (quoting *Media Matters*, 805 F. Supp. 3d at 136; other alterations omitted). NewsGuard argues this sequence of events "further demonstrat es the but-for' causation between the FTC's retaliatory motive and the NewsGuard CID." *Id.* at 12.

NewsGuard misconstrues the timing inquiry. The relevant question is not the interval between the CID's issuance and the FTC's "retaliatory motive" as exemplified by Chairman Ferguson becoming Chairman though even if it were, that four-month gap would be beyond the typical "outer limit" for establishing causation. *See Gustave-Schmidt v. Chao*, 360 F. Supp. 2d 105, 118 19 (D.D.C. 2004); *see also Hamilton v. Geithner*, 666 F.3d 1344, 1357 (D.C. Cir. 2012) (temporal proximity can support causation "only where the two events are very close in time" and even "a three-month period" may "be too lengthy") (cleaned up). Nor is it the interval between the CID's issuance and then-Commissioner Ferguson's November December 2024 comments mentioning NewsGuard (an even longer temporal gap). Instead, the causal link that NewsGuard must demonstrate is between (1) an adverse action (here, the issuance of the CID), and (2) *its own* exercise of a constitutional right. *See Aref*, 833 F.3d at 258. But NewsGuard does not identify any specific speech, on a single date, for which the CID was purportedly issued in retaliation.[14] In other words, to draw an inference of retaliation from timing, an adverse Event B must closely follow a protected Event A. Here, NewsGuard does not allege an identifiable Event

---

[14] NewsGuard argues that the Commission's investigation "has followed the exact same timeline that the district court found troubling in *Media Matters*." *Petition*, at 12 (citing *Media Matters*, 805 F. Supp. 3d at 136). While the Commission respectfully disagrees with the district court's decision in that case and is currently appealing it, the plaintiff there at least identified a specific article that it claimed led to the issuance of a retaliatory CID (albeit 18 months later). *Media Matters*, 805 F. Supp. 3d at 113, 116.

A at all, much less one that was closely followed by adverse Event B. It is impossible to find a temporal connection to an unknown event. *See Lakkis v. Lahovski*, 994 F. Supp. 2d 624, 634 (M.D. Pa. 2014) (suggesting that allegations that are "not anchored in time" are insufficient to support a First Amendment retaliation claim because they do not imply "temporal proximity to enable a fact-finder to infer a causal link").[15]

At any rate, the assertion that the investigation was launched promptly does not support NewsGuard's version of events because it is equally consistent with what actually occurred: namely, a robust effort by the Commission to pursue a high-priority investigation into advertising boycotts. A fact that is equally consistent with both sides' positions does not constitute evidence in favor of either. *See, e.g.*, *Gonzalez v. Walgreen Co.*, 140 F.4th 663, 674 (5th Cir. 2025). And timing alone does not suggest "improper motive" because it "can merely be the sign of the government's change in enforcement priorities." *Rundo*, 108 F.4th at 805. Here, if the Commission acted promptly to issue a CID to NewsGuard, that action only establishes (if anything) a causal connection between the CID and the Commission's substantive enforcement priorities. It is not evidence of retaliation.

#### c. Scope of the CID

Next, NewsGuard argues that the " scope of the CID suggests pretext on the part of the FTC,'" which bolsters its contention that the CID is retaliatory. *Petition*, at 13 (quoting *Media Matters*, 805 F. Supp. 3d at 137). NewsGuard asserts that the CID's " demands . . . go well beyond the investigation's purported scope'" and, as an example, points to two CID specifications that request NewsGuard's financial information. *Id.* (quoting *Media Matters*, 805 F. Supp. 3d at 137).

The CID's scope, consisting of 31 specifications, is far from unusual. For example, another CID from the same investigation, which became public after the recipient filed a petition to quash, contains 29 specifications (only two fewer than the CID to NewsGuard) and covers the same relevant time period.[16] The scope of the NewsGuard CID is also in line with the typical CID issued in Commission investigations. *See Texaco*, 555 F.2d at 882 ("There is no doubt that these subpoenas are broad in scope, but the FTC's inquiry is a comprehensive one and must be so to serve its purposes.").[17] And all of the CID's specifications follow naturally from the Commission's objective of investigating potential advertising boycotts. As to NewsGuard's financial information specifically, it could shed light on whether NewsGuard expended funds on (or received funds for) coordinating activities. *See FTC v. Invention Submission Corp.*, 965 F.2d 1086, 1089 90 (D.C. Cir. 1992) (recognizing that "financial information can be relevant to a pre-complaint *investigation*"). More fundamentally, it is the Commission's prerogative to define the scope of the investigation, subject to the requirement that "the inquiry is within the authority of the agency, the demand is not too indefinite and the information sought is reasonably relevant." *United States v. Morton Salt Co.*, 338 U.S. 632, 652 (1950). As explained further below, the

[15] To the extent NewsGuard may argue that it regularly issues ratings and is therefore continually speaking, that argument proves too much: *any* adverse regulatory action taken during NewsGuard's existence would be transformed into something temporally proximate and indicative of retaliation.

[16] *See* CID to The Global Disinformation Index, Attach. to Pet. to uash, FTC File No. 251-0061 (Sept. 17, 2025), https://tinyurl.com/v9mhhm8c/.

[17] *E.g.*, *FTC v. Cigna Grp.*, No. 1:25-mc-00004, Dkt. 1-2 (D.D.C. Jan. 15, 2025) (43 specifications); *FTC v. IT Media, Inc.*, No. 2:15-cv-09483, Dkt. 1-2 (C.D. Cal. Dec. 12, 2016) (30 specifications).

NewsGuard CID easily satisfies this requirement, and NewsGuard does not argue that the CID fails to provide adequate notice of the scope of the Commission's investigation.

NewsGuard's argument regarding the CID's scope is further undercut by the January 15 letter from staff, which granted "substantial" "modifications" to the CID. *Petition* Ex. 3, at 3. As NewsGuard acknowledges, the letter deemed NewsGuard to have " satisfied its CID obligations, except for' Specifications 8, 11, 12, 15, and 26." *Petition* Ex. 2 26; *see Petition*, at 13 n.14 (recognizing that the modified CID no longer seeks NewsGuard's financial information). And as to the five outstanding Specifications, the letter modified all but one "to limit" their scope. *Petition* Ex. 3, at 2 3. These modifications to the CID's scope demonstrate the Commission's "good-faith effort to reduce NewsGuard's burden" to the extent "consistent with the Commission's need for information" to further the investigation. *Id.*; *see Texaco*, 555 F.2d at 882 83 (recognizing that concerns over burdensomeness of an FTC subpoena were " substantially mitigated' during the course of extensive negotiations with Commission attorneys").

### d. Omnicom Consent Order

Finally, NewsGuard argues that the Omnicom Consent Order provides further evidence of a "retaliatory nexus" between the CID and NewsGuard's First Amendment-protected activity because it prohibits the merged entity in that case from using services, "such as NewsGuard's," that "evaluate viewpoints as to the veracity of news reporting' and adherence to journalistic standards or ethics.'" *Petition*, at 13 14 (quoting Omnicom Consent Order).

On June 23, 2025, the Commission approved the acquisition of one large advertising agency (IPG) by another (Omnicom), subject to a consent order. Together with the consent order, the Commission issued an administrative complaint that alleged, in part: "Major advertisers have discussed and ultimately declined to advertise on certain websites and applications. These decisions appear to have been coordinated through one or more associations of advertising industry players, including ad agencies."[18] To address this allegation, the June 2025 consent order contained a provision prohibiting the merged entity from entering into agreements with any third party that affect advertising spend based on the political or ideological viewpoints of sellers of advertising inventory. *See* Decision Order, *In re Omnicom Grp. Inc.*, No. 251-0049 II.A (June 23, 2025), https://www.ftc.gov/system/files/ftc_gov/pdf/Omnicom-DandO.pdf.

In September 2025, in response to public comments, the Commission modified the consent order to more specifically define "political or ideological viewpoints" to include "viewpoints as to the veracity of news reporting or other politically or ideologically contested facts, such as their characterization as misinformation,' disinformation,' bias,' or similar terms" and "adherence to journalistic standards or ethics." *See* Omnicom Consent Order I.D. NewsGuard now complains that these prohibitions " coerce a private party to punish or suppress disfavored speech on the government's behalf,'" including speech by NewsGuard. *Petition*, at 13 14 (quoting *Vullo*, 602 U.S. at 190).

[18] Complaint, *In re Omnicom Grp. Inc.*, No. 251-0049 17, https://www.ftc.gov/system/files/ftc_gov/pdf/Omnicom-Complaint.pdf.

The Commission disagrees that the Omnicom Consent Order shows retaliation against NewsGuard. Instead, the evidence reflects the Commission's nonretaliatory reasons for adopting the Omnicom Consent Order. As the administrative complaint alluded to, and the Commission's analysis of the proposed order explained, Omnicom's acquisition of IPG would increase market concentration in the advertising industry, making it far easier for market participants to engage in anticompetitive, collusive boycotts of disfavored media publishers, just as the Commission found they had done in the recent past. *See* 90 Fed. Reg. 27304, 27305 06 (June 26, 2025). The proposed order sought to remedy this problem by "eliminating Omnicom's ability to participate in such ongoing or future coordination." *Id.* at 27304. During the public comment period, however, several commenters expressed concern that the initial order as written might not achieve that goal. *See* Regulations.gov, *Comment from CPAC & Independent Media Council* (July 29, 2025), https://tinyurl.com/yf5nw8p2; *Comment from GB News Limited* (July 29, 2025), https://tinyurl.com/4jcumwyp; *Comment from Newsmax Media Inc.* (July 28, 2025), https://tinyurl.com/3ruxx5vp. After considering the submitted comments, the Commission entered a final consent order with revised language designed to more effectively preclude Omnicom from engaging in the collusive conduct that the Commission had identified previously. NewsGuard is not named in the Omnicom Consent Order, and the challenged condition in the Order applies to Omnicom's agreements with any brand safety organization i.e., organizations that offer services "such as NewsGuard's," not just NewsGuard itself.[19] This is evidence of the Commission acting to address antitrust concerns about concentration in the advertising industry that were raised by public commenters, not retaliating against NewsGuard.[20]

### B. The CID Does Not Otherwise Violate the First or Fourth Amendments.

NewsGuard's second argument is that the CID is overly broad and unnecessarily intrusive in violation of the First and Fourth Amendments. *Petition*, at 14. While NewsGuard's theories somewhat overlap, it essentially makes three points in support of this argument: (1) the CID improperly seeks information protected by a First Amendment journalist's privilege; (2) the CID violates NewsGuard's associational rights under the First Amendment; and (3) the CID is an unreasonable search under the Fourth Amendment. None of these arguments is persuasive.

#### . First Amendment ournalist s Pri ilege

NewsGuard argues that it is an organization that engages in "journalistic activities," and therefore, information regarding its "deliberative process and procedures for formulating ratings"

[19] Indeed, it appears that there are several other entities in this space. *See* U.S. House Judiciary Comm., Interim Staff Report at 3 (July 10, 2024), https://tinyurl.com/2v7ej2wj (describing "the Global Disinformation Index (GDI)" as a "news ranking organization " like NewsGuard); *id.* at 26 ("Documents show that an advertising entity recommend ed that its members work with organizations *such as* GDI and NewsGuard" and "promote ed GDI and NewsGuard ... *over other* independent fact checkers'" (emphasis added)); *id.* (quoting evidence indicating that "GDI is one of *many*" "independent fact checkers to weed out mis-and-disinfo from supply chain and ad buys," including "NewsGuard, IFCN, etc." (emphasis added)); *see also id.* at 33 (listing eleven "ad-tech service providers" that are engaged in "content detection and classification for the purposes of content moderation and/or monetization").

[20] In addition, the Omnicom Consent Order was issued over one month *after* the NewsGuard CID, and was modified in the manner NewsGuard complains of over three months after that. Obviously, events that postdate an adverse action cannot have caused that action. *See, e.g.*, *Hankins v. Wheeler*, 760 F. Supp. 3d 467, 482 (E.D. La. 2024) (holding " t here is simply no correlation, much less causation, between" alleged constitutional violations and deficiencies in an investigation "that occurred *afterward*," since " t o find otherwise defies logic").

is immune from production in response to the CID. *Petition*, at 16; *see also id.* at 15 (" T he First Amendment affords NewsGuard a privilege that protects it from having to disclose information."). Here, NewsGuard appears to be invoking a journalist's privilege under the First Amendment. We are unpersuaded that such a privilege shields NewsGuard from responding for two reasons: the public interest in effective law enforcement outweighs any qualified First Amendment privilege in withholding information that NewsGuard may hold (assuming such a privilege exists), and NewsGuard has not met its burden of showing that the information sought by the CID falls within that privilege.

Some courts have held that the First Amendment "provides journalists with a qualified privilege against compelled disclosure of information obtained through their news gathering activities." *Hutira v. Islamic Republic of Iran*, 211 F. Supp. 2d 115, 118 (D.D.C. 2002); *see also Zerilli v. Smith*, 656 F.2d 705, 712 14 (D.C. Cir. 1981). In those courts that have recognized the privilege, the reporter invoking the privilege bears the burden of demonstrating its applicability. *See Hutira*, 211 F. Supp. 2d at 119 nn.4 5. " T he critical question for deciding whether a person may invoke the journalist's privilege is whether she is gathering news for dissemination to the public." *Shoen v. Shoen*, 5 F.3d 1289, 1293 (9th Cir. 1993). In other words, assuming the existence of the privilege,[21] the person seeking to invoke the privilege "must demonstrate, through competent evidence, the intent to use material sought, gathered or received to disseminate information to the public and that such intent existed at the inception of the newsgathering process." *von Bulow v. von Bulow*, 811 F.2d 136, 144 (2d Cir. 1987).

**a. The Public Interest**

The Supreme Court has held that only in limited circumstances will the First Amendment bar the government from gathering information during a law enforcement investigation. In *Branzburg v. Hayes*, 408 U.S. 665 (1972), the Court considered whether the First Amendment protected journalists from revealing confidential information and sources in response to a grand jury subpoena. The Court ruled in favor of the government, noting that it could "perceive no basis for holding that the public interest in law enforcement and in ensuring effective grand jury proceedings is insufficient to override the consequential, but uncertain, burden on news gathering that is said to result from insisting that reporters, like other citizens, respond to relevant questions put to them in the course of a valid grand jury investigation or criminal trial." *Id.* at 690 91; *see also Zerilli*, 656 F.2d at 711 ("The Court justified this decision by pointing to the traditional importance of grand juries and the strong public interest in effective criminal investigation.").

The Commission exercises investigative law enforcement powers akin to those of a criminal grand jury. Indeed, the Supreme Court has noted that the Commission "has a power of inquisition . . . . that is more analogous to the Grand Jury, which does not depend on a case or controversy for power to get evidence but can investigate merely on suspicion that the law is being violated." *Morton Salt*, 338 U.S. at 642 43; *see also In re Grand Jury Proceedings*, 486 F.2d 85, 90 (3d Cir. 1973) ("Grand jury subpoenas then, when they are brought before the

[21] *See In re Request from U.K. Pursuant to Treaty Between Gov't of U.S. and Gov't of U.K. on Mutual Assistance in Criminal Matters in the Matter of Dolours Price*, 685 F.3d 1, 17 n.23 (1st Cir. 2012) (" T here is a circuit split on whether under *Branzburg v. Hayes*, 408 U.S. 665 (1972) there can ever be a reporter's privilege of constitutional or common law dimensions."); *In re Grand Jury Subpoena, Judith Miller*, 438 F.3d 1141, 1145 49 (D.C. Cir. 2006) (rejecting existence of constitutional reporter's privilege in grand jury proceedings); *cf. Chen v. FBI*, 153 F.4th 1289, 1295 (D.C. Cir. 2025) (declining to recognize a federal common law newsgathering privilege).

federal courts for enforcement, for all practical purposes are exactly analogous to subpoenas issued by a federal administrative agency on the authority of a statute, without any prior judicial control."). As such, when the Commission acts in its law enforcement capacity, as it does here, the public interest in the ability to thoroughly gather evidence outweighs any qualified First Amendment privilege.

### b. NewsGuard s Burden

NewsGuard also fails to meet its burden to show that the material sought by the CID qualifies for the journalist's privilege as recognized by some courts. *First*, NewsGuard broadly claims that the CID's "requests regarding NewsGuard's deliberative process and procedures for formulating ratings" are "intrusive" and reflect a " fishing expedition.'" *Petition*, at 16 17 (quoting *Media Matters*, 805 F. Supp. 3d at 130). But these general, unsupported statements do not provide "competent evidence" demonstrating where NewsGuard obtained the information in question and whether the organization intended to disseminate the information to the public at the time it received it. *von Bulow*, 811 F.2d at 144. Such "blanket assertions" of privilege, *id.* at 147, are insufficient under both *von Bulow* and the Commission's Rules of Practice. To properly assert a "claim of protected status" in response to the CID, NewsGuard needed to "include a detailed log of the items withheld . . . of sufficient detail to enable the Commission staff to assess the validity of the claim for each document . . . . The failure to provide information sufficient to support a claim of protected status may result in a denial of the claim." 16 C.F.R. § 2.11(a)(1). NewsGuard submitted no such privilege log here, nor did it otherwise identify any purportedly privileged documents. Its privilege claim can be denied on that basis alone.

*Second*, NewsGuard's argument conflates its commercial and journalistic activities. To the extent a First Amendment newsgathering privilege exists, it applies only where there is an intent to disseminate information to the public, which is at the heart of the "paramount public interest in . . . an independent press capable of participating in robust, unfettered debate." *von Bulow*, 811 F.2d at 144 (cleaned up). By contrast, NewsGuard appears to have licensed its ratings products only to "advertisers" and "individual NewsGuard subscribers" (not the public), for a fee, via terms spelled out in private licensing agreements. *See supra* Part I; *Petition*, at 2. Those clients and subscribers were under no obligation to disseminate the materials they received from NewsGuard to the general public or otherwise put them to public use. These circumstances describe garden-variety commercial-intelligence or consulting arrangements, not journalism. Licensing a commercial product for a fee to select commercial purchasers via private contract is not "disseminat ing information to the public," *von Bulow*, 811 F.2d at 147, which is required for First Amendment protection. *See also Am. Sav. Bank, FSB v. USB PaineWebber, Inc.*, No. M8-85, 2002 WL 31833223, at 2 3 (S.D.N.Y. Dec. 16, 2002) (denying motion to quash subpoena to credit rating agency that performed fee-based ratings subject to private contractual agreements, since circulating information only to private counterparties was not newsgathering and did not qualify for First Amendment privilege). If it were, business consultants who gather information about a market or firm and give that information to a client in exchange for a fee could claim the putative journalist's privilege to avoid investigation into their business practices. No matter the status of the claims journalist's privilege, it would never extend to such ordinary business activities.

Accordingly, assuming the First Amendment journalist's privilege exists, we reject its application to this CID.

### 2. First Amendment Associational Rights

NewsGuard next argues that the CID violates its First Amendment associational rights by demanding that it identify its customers and produce communications with those customers. *Petition*, at 17.

NewsGuard cites *Americans for Prosperity Foundation v. Bonta*, 594 U.S. 595, 609 (2021), for the proposition that "before requiring that organizations reveal sensitive information about their members and supporters," the government must satisfy "exacting scrutiny." *Petition*, at 17. But that case is inapposite. There is a difference between a non-profit group's members or the donors at issue in *Bonta* who take part in, or donate to, a group without expecting a commercial return and the customers of a for-profit commercial enterprise with whom the enterprise has a commercial, transactional relationship. This distinction is crucial for purposes of the First Amendment, under which commercial speech generally receives less protection than political or expressive speech. *Cent. Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of N.Y.*, 447 U.S. 557, 563 (1980). In accordance with this principle, courts hold that " p roducing a customer list does not offend the First Amendment because commercial transactions do not entail the same rights of association as political meetings." *United States v. Bell*, 414 F.3d 474, 485 (3d Cir. 2005); *see also United States v. Benson*, 561 F.3d 718, 727 (7th Cir. 2009) (holding compelled disclosure of customer list did not violate the First Amendment because defendant operated a commercial enterprise, "not a membership organization"); *Edmondson v. RCI Hosp. Holdings, Inc*., No. 16-CV-2242 (VEC), 2018 WL 2768643, at 2 (S.D.N.Y. June 8, 2018) (holding disclosure of customer identities unprotected by First Amendment associational privilege). Here, NewsGuard makes money by selling subscriptions and licensing access to its ratings databases to customers a classic commercial exchange that places its customer lists outside of First Amendment protection.

NewsGuard further asserts that it is "a journalistic organization with a First Amendment right to associate with its customers to engage in the free exchange of ideas protected by the Constitution." *Petition*, at 18 (citing *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 460 (1958)). Yet courts reject the existence of any such right between an organization and its customers. A First Amendment right of association "generally will not apply, for example, to business relationships." *Sanitation & Recycling Indus., Inc. v. City of N.Y.*, 107 F.3d 985, 996 (2d Cir. 1997) (citing *Roberts v. U.S. Jaycees*, 468 U.S. 609, 620 (1984)); *see also Calm Ventures LLC v. Newsom*, 548 F. Supp. 3d 966, 975 (C.D. Cal. 2021) ("Plaintiff and its customers do not associate for the purpose of engaging in those activities protected by the First Amendment.") (quotation omitted); *Amato v. Elicker*, 534 F. Supp. 3d 196, 209 (D. Conn. 2021) (claim of infringement on right to associate with customers "falls outside First Amendment associational protection"). Here, again, NewsGuard has a commercial relationship with the subscribers who pay for access to its products. Thus, the associational interests at issue in *NAACP* which reversed the compelled disclosure of a political advocacy group's membership lists, 357 U.S. at 460, 462 do not apply.

### 3. Fourth Amendment Search

Lastly, NewsGuard argues that the CID violates the Fourth Amendment because it is impermissibly "expansive" and an unreasonable intrusion into NewsGuard's business affairs,

especially given the alleged First Amendment issues discussed above. *Petition*, at 14. This argument also lacks merit.

We begin with NewsGuard's assertion that " t he Fourth Amendment imposes substantial restrictions on the reach of administrative subpoenas," which it attributes to the Supreme Court's decision in *Oklahoma Press Publishing Co. v. Walling*, 327 U.S. 186 (1946). *Petition*, at 14. NewsGuard misinterprets the Supreme Court's holding. The Court concluded that the Fourth Amendment permits administrative agencies to make broad demands for information so long as (1) the agency is authorized by law to conduct the investigation, and (2) the materials sought are relevant to the investigation. *Okla. Press*, 327 U.S. at 208 09 (holding that agency process does not violate the Fourth Amendment where "the investigation is authorized by Congress, is for a purpose Congress can order, and the documents sought are relevant to the inquiry"). The Court noted that any information request should not be "unreasonable," by which it meant "too much indefiniteness or breadth." *Id.* at 208; *see also In re Grand Jury Subpoena*, 829 F.2d 1291, 1298 (4th Cir. 1987) ("The critical inquiry, assuming that the hurdle of relevancy has been cleared, is whether there is too much indefiniteness or breadth in the things required to be produced by the subpoena."). The Court reiterated this conclusion in *Morton Salt* as to the Commission specifically, noting that Commission process is appropriate so long as "the inquiry is within the authority of the agency, the demand is not too indefinite and the information sought is reasonably relevant." 338 U.S. at 652.[22]

Lower courts have applied these principles to evaluate the burden posed by Commission-issued process. In *Texaco*, the U.S. Court of Appeals for the District of Columbia Circuit considered a challenge to the scope of a Commission subpoena. The court found that a Commission information request is too "indefinite" only where it is "*unduly* burdensome or *unreasonably* broad," as " s ome burden on subpoenaed parties is to be expected and is necessary in furtherance of the agency's legitimate inquiry and the public interest." 555 F.2d at 882 (emphasis added); *see also Genuine Parts Co. v. FTC*, 445 F.2d 1382, 1391 (5th Cir. 1971) ("extreme breadth . . . must be accorded the Commission in conducting such an investigation"); *Adams v. FTC*, 296 F.2d 861, 867 (8th Cir. 1961) (" B roadness alone is not sufficient justification to refuse enforcement of a subpoena so long as the material sought is relevant."). Thus, courts will only modify CIDs if the recipient has demonstrated that compliance "threatens to unduly disrupt or seriously hinder normal operations of a business." *Texaco*, 555 F.2d at 882.

A Commission CID therefore does not violate the Fourth Amendment where (1) the Commission's inquiry is in furtherance of its statutorily authorized function, (2) the materials sought are relevant to that inquiry, and (3) the request is not unduly burdensome or unreasonably broad. NewsGuard has not demonstrated that the CID here fails in any of these respects. *First*, the Commission issued the CID pursuant to its statutory authority to obtain information relating to an antitrust investigation. *See* 15 U.S.C. § 57b-1(c)(1). NewsGuard's petition does not argue (nor could it) that the Commission lacks antitrust investigative authority or the ability to issue CIDs as part of an antitrust investigation. *Second*, the information sought by the CID is relevant

[22] The Court further noted that Fourth Amendment considerations weigh less heavily for businesses than for individuals, as " t he Federal Government allows businesses the privilege of engaging in interstate commerce" and " f avors from the government often carry with them an enhanced measure of regulation." 338 U.S. at 652. "Even if one were to regard the request for information in this case as caused by nothing more than official curiosity, nevertheless law-enforcing agencies have a legitimate right to satisfy themselves that corporate behavior is consistent with the law and the public interest." *Id.*

to the Commission's antitrust investigation. Indeed, NewsGuard's petition identifies only two specifications (relating to NewsGuard's financial information) that it claims are beyond the scope of the investigation. *Petition*, at 13. Yet even these specifications are clearly relevant, as they would show any payments that NewsGuard received as part of an agreement that may have violated the antitrust laws. In any event, as NewsGuard's petition admits, staff has already confirmed that NewsGuard has satisfied its obligations as to these specifications. *See id.* at 13 n.14. *Third*, the request is not unduly burdensome or unreasonably broad, as NewsGuard has not provided any evidence that complying with the CID would "unduly disrupt or seriously hinder normal business operations." NewsGuard's argument that the CID is broad or that the information sought is "sensitive" does not establish a basis to quash the CID, let alone demonstrate a Fourth Amendment violation, especially given staff's extensive, good faith efforts to narrow the CID.[23]

## III. CONCLUSION

For the foregoing reasons, NewsGuard's petition to quash is denied.

**IT IS HEREB ORDERED THAT** NewsGuard's Petition to uash the May 20, 2025, Civil Investigative Demand be, and hereby is, **DENIED.**

**IT IS FURTHER ORDERED THAT** NewsGuard shall comply in full with the Commission's Civil Investigative Demand no later than **April , 2 2** , or at such other date, time, and location as the Commission staff may determine.

By the Commission, Commissioner Meador recused.

April J. Tabor
Secretary

SEAL:
ISSUED: March 6, 2026

[23] This analysis remains unchanged even assuming that NewsGuard has First Amendment interests implicated by the CID. While NewsGuard is correct that the Supreme Court has noted that Fourth Amendment requirements should be applied with "exactitude" when First Amendment interests are involved, *Petition*, at 15, the Court clarified that this does not require "special showings" by the government so long as the information request is reasonable and issued pursuant to appropriate process and authority. *See Zurcher v. Stanford Daily*, 436 U.S. 547, 565 (1978). Thus, contrary to NewsGuard's implication, any First Amendment considerations here do not create a heightened standard under the Fourth Amendment.

# EXHIBIT B

GIBSON DUNN

January 16, 2026

VIA EMAIL

April J. Tabor
Secretary
Office of the Secretary
Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, D.C. 20580
atabor@ftc.gov

Re: FTC File No. 251-0061

Dear Madam Secretary:

Pursuant to 16 C.F.R. § 2.10, enclosed please find NewsGuard Technologies, Inc.'s Petition to Quash the United States Federal Trade Commission's Civil Investigative Demand dated May 20, 2025, in the above-referenced matter.

Sincerely,

GIBSON, DUNN & CRUTCHER LLP

*/s/ Sophia A. Hansell*

Sophia A. Hansell

Enclosures

CC via email service: Office of the Secretary (electronicfilings@ftc.gov)
Geoffrey Green (ggreen@ftc.gov)
Justin Epner (jepner@ftc.gov)
Theodore Zang (tzang@ftc.gov)

**BEFORE THE UNITED STATES**
**FEDERAL TRADE COMMISSION**

| | |
|---|---|
| In the Matter of<br><br>The Civil Investigative Demand dated May 20, 2025, to NewsGuard Technologies, Inc. | **PUBLIC**<br><br>FTC File No. 251-0061 |

**PETITION TO QUASH CIVIL INVESTIGATIVE DEMAND**

Pursuant to 16 C.F.R. § 2.10(a), Petitioner NewsGuard Technologies, Inc. ("NewsGuard") hereby respectfully requests that the United States Federal Trade Commission ("FTC" or "Commission") quash the Civil Investigative Demand to NewsGuard dated May 20, 2025 (the "CID," attached as Exhibit 1). The CID should be quashed in its entirety because it constitutes unconstitutional retaliation against NewsGuard for its protected First Amendment activities and because the CID's unconstitutionally broad and intrusive demands impermissibly chill NewsGuard's speech and associational rights.

**BACKGROUND AND PROCEDURAL HISTORY**

NewsGuard was founded in 2018 with the mission of providing internet users the context they need to make informed decisions about whether they can rely on online sources of news they encounter every day.[1] It is a nonpartisan media organization that uses "apolitical journalistic criteria" to rate the reliability of online news sources. *Consortium for Indep. Journalism, Inc. v. United States*, 2025 WL 919504, at *18 n.11 (S.D.N.Y. Mar. 26, 2025). From the beginning, NewsGuard's guiding principle has been that no government entity should be in the business of deciding what news people consume, but neither should those decisions be left to secret, unaccountable Silicon Valley-generated algorithms or to partisan advocacy groups. Instead,

[1] https://www.newsguardtech.com/press/announcing-newsguard/.

people should be offered information based on transparent, apolitical criteria so that they have the information to make their own decisions.

NewsGuard's reliability ratings are used by advertisers to make informed decisions about the websites on which to place their ads and by individual NewsGuard subscribers to evaluate the accuracy of the information they encounter online. NewsGuard's ratings are generated by a team of journalistically trained analysts. Each rating is accompanied by a thorough analysis explaining exactly how NewsGuard's nine apolitical criteria were applied to determine each site's score, with the publisher's comments included so that readers can see both sides of the story and decide for themselves how much to trust a publication. The average programmatic advertising campaign runs on 44,000 websites, *see* ANA, *ANA Provides "First Look" at In-Depth Programmatic Transparency Study*, https://tinyurl.com/3fw6h7du, which is why agencies and brands value information about the nature of these websites so that they can avoid websites they consider what the industry terms "brand unsafe." For example, NewsGuard reported that one year Warren Buffett through his investment in Geico was unintentionally the largest advertiser on the Russian government propaganda website Sputnik News. *See* L. Gordon Crovitz, Opinion, *How Amazon, Geico and Walmart Fund Propaganda*, N.Y. Times (Jan. 21, 2020), https://tinyurl.com/5d555bd5. Beyond its ratings of news outlets, NewsGuard has become a leading source of journalism about information reliability—from informing citizens about Russian, Chinese, and Iranian disinformation campaigns targeting Americans to exposing how violent Hamas propaganda videos were promoted to American teens on platforms such as TikTok, Facebook, and X during the war in Gaza.

For years, NewsGuard has faced baseless criticism from websites that get low reliability ratings, such as Newsmax, that it holds a bias against conservatives and "censors" conservative speech. It has also faced false bias claims from some on the opposite side of the aisle, resulting, in one case, in a defamation suit brought by the left-wing Consortium News website, which was dismissed with prejudice by the U.S. District Court for the Southern District of New York. *See Consortium for Indep. Journalism, Inc.*, 2025 WL 919504, at *20.

The misconception related to bias against conservatives has manifested in congressional investigations and hearings, and more recently a CID from the FTC, whose Chairman Andrew Ferguson has long been a vocal critic of NewsGuard. Even before becoming Chairman of the FTC, Chairman Ferguson promoted an ideologically motivated effort to censor and otherwise discriminate against NewsGuard based on the content of its journalism. In November 2024, then-Commissioner Ferguson responded to a post on X about the closure of the U.S. Department of State's Global Engagement Center by referring to NewsGuard by name and declaring that NewsGuard had supposedly "led collusive ad-boycotts—possibly in violation of our antitrust laws—to censor the speech of conservative and independent media in the United States."[2] The following month, then-Commissioner Ferguson stated that the FTC "ought to conduct . . . an investigation" into NewsGuard, incorrectly claiming that NewsGuard "seems to give a free pass to . . . major left-leaning outlets."[3] Although biased ratings would still be protected by the First Amendment, then-Commissioner Ferguson's statement was factually incorrect: Many major left-leaning outlets receive *lower* scores from NewsGuard than comparable right-leaning outlets. For

[2] https://x.com/AFergusonFTC/status/1856152760850243905.
[3] https://www.ftc.gov/system/files/ftc_gov/pdf/ferguson-goat-concurrence.pdf.

example, Fox News scores higher than MSNBC, the conservative Washington Examiner outscores the liberal Daily Beast, and the conservative Daily Caller outscores the liberal Daily Kos.

NewsGuard has also been the subject of criticism from Federal Communications Commission Chairman Brendan Carr, who described NewsGuard as "Orwellian."[4] In a November 2024 letter, then-Commissioner Carr alleged that NewsGuard was part of a "censorship cartel" alongside major technology companies and that NewsGuard "leverag[es] its partnerships with advertising agencies to effectively censor[] targeted outlets."[5] Then-Commissioner Carr wrote that the incoming Trump Administration would investigate and take action against NewsGuard, prematurely and publicly declaring that the so-called "cartel" must be "completely dismantled."[6]

Following these statements, President Trump named Ferguson the Chairman of the FTC and Carr the Chairman of the FCC.

True to their threats, the Trump Administration has targeted NewsGuard for oppressive and unfounded regulatory action in retaliation for the company's First Amendment activities. In particular, on May 20, 2025, the FTC issued a sweeping CID—comprising 31 Specifications and dozens more sub-Specifications—to NewsGuard demanding vast numbers of confidential, highly sensitive documents, including "all documents relating to NewsGuard's News Reliability Ratings and any other rating[s]"—a request that effectively encompassed virtually all of the company's emails, reporters' notes and drafts, texts, and other documents created since its founding in 2018—as well as communications with, and the identities of, NewsGuard's subscribers. CID Specifications 5, 8, and 26. Despite NewsGuard's serious concerns about the CID's intrusion into

---

[4] https://www.fcc.gov/sites/default/files/DOC-407732A1.pdf.
[5] *Id.*
[6] *Id.*

its First Amendment rights, NewsGuard has worked constructively with staff, in good faith, to provide information responsive to staff's priority Specifications while maintaining certain objections to the scope and nature of the CID. As detailed in the attached statement under 16 C.F.R. § 2.10(a)(2), over the past seven months, NewsGuard has met and conferred with staff on ten occasions and has produced more than 40,000 pages of responsive documents as well as detailed written responses to a number of staff's inquiries. *See* Statement of Matthew C. Parrott (attached as Exhibit 2). Nevertheless, staff has refused to provide assurance that NewsGuard has fully complied with the CID. To the contrary, staff continues to insist on additional document productions. Staff's letter of January 15, 2026—which purports to be a "good-faith effort to reduce NewsGuard's burden"—is, in reality, a doubling down on its unconstitutional demands that ignores NewsGuard's meaningful compliance efforts and reiterates several of the CID's most burdensome requests, including for productions encompassing (1) the identities of NewsGuard's customers, (2) NewsGuard's communications with its customers, (3) the identity of all entities to which NewsGuard has ever assigned a News Reliability Rating, (4) the ratings assigned to those entities over time, and (5) "documents sufficient to show the methodology by which NewsGuard determines" reliability ratings, including "internal correspondence about the process of developing the methodology". Exhibit 3 at 1-2; *see also id.* at 1 (staff letter of January 15, 2026, requesting "additional information" as to Specifications 8, 11, 12, 15, and 26 "before we can accept a certification of compliance with the CID"). Staff's January 15 letter makes clear that only total capitulation by NewsGuard will assuage the FTC's demands.

The FTC's retaliatory campaign against NewsGuard has not stopped with the CID. On September 26, 2025, the FTC entered into a Consent Order with Omnicom Group Inc.

("Omnicom") and The Interpublic Group of Companies, Inc. ("IPG") that prohibits their merged company from using third-party services that evaluate "viewpoints as to the veracity of news reporting" and "adherence to journalistic standards or ethics." *In re Omnicom Group Inc.* ¶¶ 1.D, 2.A, No. C-4823 (Sept. 26, 2025). The Consent Order—revised and finalized after the submission of a comment letter by the conservative news outlet Newsmax objecting to the proposed order on the ground that it did not reach NewsGuard[7]—effectively prohibits Omnicom from using NewsGuard's services. Newsmax has a significantly lower reliability rating from NewsGuard than many rival conservative websites, including Fox News, the Washington Examiner, and National Review, that, unlike Newsmax, are on NewsGuard's default "inclusion list" for advertisers.

Although NewsGuard has sought, for months, to cooperate with the FTC, it is now clear that the FTC will only end its multifront campaign against NewsGuard when it has succeeded in silencing NewsGuard entirely by driving the company out of business. NewsGuard therefore has no choice but to move to quash the FTC's onerous and unconstitutional CID.[8]

## ARGUMENT

The CID should be quashed because it "presents a straightforward First Amendment violation." *Media Matters for Am. v. FTC*, __ F. Supp. 3d __, 2025 WL 2378009, at *1 (D.D.C. Aug. 15, 2025) ("*Media Matters*"). The unjustified and punitive CID represents unconstitutional retaliation against NewsGuard based on its protected First Amendment activities. And, even beyond the FTC's unconstitutional campaign of retaliation against NewsGuard, the CID's overbroad demands and impermissible requests for sensitive subscriber information, customer

[7] https://www.regulations.gov/comment/FTC-2025-0066-0008.
[8] The petition to quash is timely because staff granted NewsGuard an extension of time until January 16, 2026, to file its petition. *See* Exhibit 4.

communications, and internal deliberative materials violate the First and Fourth Amendments' restrictions on administrative subpoenas.

## I. The FTC's Retaliatory CID Unconstitutionally Chills NewsGuard's First Amendment Rights And Must Be Quashed.

The CID must be quashed because it is part of the FTC's unconstitutional retaliation campaign targeting NewsGuard's protected First Amendment activities. To prevail on a First Amendment retaliation claim, NewsGuard must show: "(1) [it] engaged in conduct protected under the First Amendment; (2) the [FTC] took some retaliatory action sufficient to deter a person of ordinary firmness in [NewsGuard's] position from speaking again; and (3) a causal link between the exercise of [NewsGuard's] constitutional right and the adverse action taken [by the FTC]." *Media Matters*, 2025 WL 2378009, at *15. As in the *Media Matters* case preliminarily enjoining an equally unconstitutional CID, each of these factors is clearly met here.

### A. NewsGuard Engages In Activities Protected Under The First Amendment.

NewsGuard's activities—including its reliability ratings and its other journalistic endeavors—rest at the core of the First Amendment.

NewsGuard provides its customers with transparent, nonpartisan, and apolitical reports regarding the reliability of news and information websites. NewsGuard's "report[s] on public issues are quintessential First Amendment activities." *Media Matters for Am. v. Paxton*, 138 F.4th 563, 584 (D.C. Cir. 2025); *see N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 269 (1964) ("The general proposition that freedom of expression upon public questions is secured by the First Amendment has long been settled by our decisions.").

NewsGuard is also a prominent source of journalism about foreign governments' disinformation campaigns and other issues of information reliability.[9] It is beyond question that such "speech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection." *Snyder v. Phelps*, 562 U.S. 443, 452 (2011) (citation omitted).

Without a doubt, NewsGuard is "engaged in conduct protected under the First Amendment." *Paxton*, 138 F.4th at 584.

**B. The FTC Engaged In Retaliatory Action Sufficient To Deter A Person Of Ordinary Firmness In NewsGuard's Position From Speaking Again.**

The FTC's draconian CID—which has already imposed substantial compliance costs on NewsGuard and exposed NewsGuard to the threat of an enforcement action for noncompliance—is plainly sufficient to chill NewsGuard's First Amendment expression by deterring it from continuing to provide honest, nonpartisan, and apolitical assessments of news outlets and to report on online sources of disinformation.

As a unanimous Supreme Court recently held, the government "cannot . . . use the power of the State to punish or suppress disfavored expression." *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 188 (2024). But that is precisely what the FTC did when it issued its vindictive, unwarranted, and needlessly burdensome CID to NewsGuard. The FTC's CID "cross[es] the line" established by the First Amendment because the investigation "come[s] with particularly adverse consequences," including the significant costs of reviewing NewsGuard's internal documents to

---

[9] *See, e.g.*, https://www.newsweek.com/russia-ukraine-disinformation-newsguard-2034104; https://www.newsguardtech.com/special-reports/violent-celebratory-hamas-videos-garner-millions-of-views-despite-bans-by-tech-platforms/.

identify material responsive to the FTC's 31 sweeping Specifications, the diversion of internal resources away from NewsGuard's core mission in order to respond to the CID, and the possibility that the CID will result in the disclosure of NewsGuard's customer lists, thereby deterring current and prospective customers from doing business with NewsGuard. *Media Matters*, 2025 WL 2378009, at *18. It was precisely these types of burdens that led the court to find that the FTC's CID to Media Matters had an impermissible chilling effect. *See id*. (preliminarily enjoining a CID that "has had plenty of knock-on effects," including "driving additional costs," causing "retention challenges," and resulting in Media Matters' "remov[al] from coalition communications about FTC actions") (internal quotation marks omitted). Indeed, as in the *Media Matters* case, "[i]t is hard to imagine any media company *not* being chilled by this sweeping and sensitive CID." *Id.* (emphasis in original).

Moreover, as in *Media Matters*, "the fact that the CID is enforceable in federal court . . . bolsters the conclusion that someone of ordinary firmness would be deterred from speaking." 2025 WL 2378009, at *16 (citing 15 U.S.C. § 49); *see also Media Matters for Am. v. Paxton*, 732 F. Supp. 3d 1, 28 (D.D.C. 2024) ("[P]ossible judicial intervention to enforce the CID[] make[s] Plaintiffs' claim of chilled expression objectively reasonable."). Although NewsGuard is confident in the strength of its First Amendment position, the mere possibility that the FTC will seek to enforce the CID in federal court raises the specter of additional legal expenses and resource diversions that NewsGuard can ill afford. Indeed, since the FTC issued the CID, the legal expense NewsGuard has incurred to comply with the FTC's relentless demands has exceeded 28% of the revenue NewsGuard has derived from the advertising brand-safety services that are the subject of the FTC's retaliatory harassment, with no end in sight. Parrott Statement ¶ 28. Exposing

NewsGuard to those litigation-related burdens is constitutionally impermissible because "the First Amendment prohibits government officials from relying on the 'threat of invoking legal sanctions and other means of coercion . . . to achieve the suppression' of disfavored speech." *Vullo*, 602 U.S. at 189 (quoting *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963)).

### C. There Is A Causal Link Between NewsGuard's First Amendment Activity And The FTC's Adverse Actions.

Finally, NewsGuard has established unconstitutional retaliation because there is an undeniable "causal link" between the FTC's CID and NewsGuard's protected First Amendment activity, which makes clear that the FTC's "'adverse action against [NewsGuard] would not have been taken absent the retaliatory motive.'" *Paxton*, 732 F. Supp. 3d at 28 (quoting *Nieves v. Bartlett*, 587 U.S. 391 (2019)). Specifically, "given the comments by Chairman Ferguson" and other administration officials about NewsGuard, "the timing of the CID," and the further "evidence of pretext" provided by the Omnicom Consent Order targeting NewsGuard, it is clear that "retaliatory animus was the but-for cause of the FTC's CID." *Media Matters*, 2025 WL 2378009, at *2.

*First*, as the district court found in *Media Matters*, Chairman Ferguson has made repeated comments that characterize similar investigations "in ideological terms" and that "indicate at a minimum that Chairman Ferguson saw the FTC's investigation as having a partisan bent." 2025 WL 2378009, at *19. "[B]efore he was chosen as the FTC Chairman, [then-Commissioner] Ferguson bolstered his candidacy by arguing that he had a 'track record of standing up to . . . the radical left' and insisting that he would '[i]nvestigate . . . advertiser boycotts'" of the type that the CID to NewsGuard purports to investigate. *See id*. (quoting *FTC Commissioner Andrew N. Ferguson for FTC Chairman*, Punchbowl News, https://perma.cc/A56K-Q4YM) (alterations in original). Additionally, the *Media Matters* district court highlighted a podcast appearance in

November 2024 where then-Commissioner Ferguson stated that "'progressives' who are 'fighting "disinformation"' were 'not going to give up just because of the election,' so 'it's really important that the FTC take investigative steps in the new administration under President Trump.'" *Id*. (quoting Andrew Ferguson, Bannon's WarRoom, Show Clip Roundup 11/30/2-24 [AM], Bannon's War Room (Nov. 30, 2024), https://perma.cc/ASE8-RZNJ). This evidence lays bare that Chairman Ferguson has been engaged in a long-running crusade against companies, such as NewsGuard, that supply advertisers with the tools to make informed online placement decisions and that provide members of the public with the tools to identify online misinformation.

Even more probative are Chairman Ferguson's statements expressly singling out NewsGuard as a potential target for FTC investigation. Chairman Ferguson has alleged that NewsGuard "led collusive ad-boycotts—possibly in violation of our antitrust laws—to censor the speech of conservative and independent media in the United States,"[10] and incorrectly claimed that NewsGuard "seems to give a free pass to . . . major left-leaning outlets."[11] Moreover, when the Omnicom Consent Order was first proposed in June 2025, Chairman Ferguson released a statement explicitly calling out NewsGuard as an organization that "ha[s] publicly sought to use the chokepoint of the advertising industry to effect political or ideological goals" and alleging that NewsGuard steers "advertising revenue with 'an unavoidable partisan lens.'"[12]

Chairman Ferguson is not the only Trump Administration official to air such false views about NewsGuard: FCC Chairman Carr alleged that NewsGuard "leverag[es] its partnerships with

---

[10] https://x.com/AFergusonFTC/status/1856152760850243905.
[11] https://www.ftc.gov/system/files/ftc_gov/pdf/ferguson-goat-concurrence.pdf.
[12] https://www.ftc.gov/system/files/ftc_gov/pdf/omnicom-ipg-ferguson-statement_0.pdf.

advertising agencies to effectively censor[] targeted outlets."[13] And both Chairman Ferguson and Chairman Carr publicly declared that the Trump Administration should investigate NewsGuard. *See supra* at 3-4. "These are precisely the sorts of comments that courts . . . have considered as evidence of retaliatory intent." *Media Matters*, 2025 WL 2378009, at *20; *see also Paxton*, 732 F. Supp. 3d at 28 (finding that the Texas Attorney General's "description of Media Matters as a 'radical anti-free speech' and 'radical left-wing organization' and his encouraging of other Attorneys General to look into Media Matters' reporting is evidence of retaliatory intent").

*Second*, as the district court found as to Media Matters, "Chairman Ferguson wasted no time after taking office to initiate this investigation," further demonstrating the "but-for" causation between the FTC's retaliatory motive and the NewsGuard CID. *Media Matters*, 2025 WL 2378009, at *20. In fact, the FTC's investigation into NewsGuard has followed the exact same timeline that the district court found troubling in *Media Matters*: "President-elect Trump announced on December 10, 2024, that he had chosen Mr. Ferguson to be the Chairman of the FTC. He became the Chairman in January 2025. And he announced an investigation into 'tech [platform] censorship' the very next month, in February 2025, and issued the CID to [NewsGuard] by May 2025." *Id.* (first alteration in original; citations omitted). As the district court held, "[t]his fast-moving investigation—when combined with the above statements from Chairman Ferguson . . .—suggests that he was chomping at the bit to 'take investigative steps in the new administration under President Trump' to make [supposed] 'progressives' like [NewsGuard] 'give up.'" *Id.* (quoting Andrew Ferguson, Bannon's WarRoom, Show Clip Roundup 11/30/2-24 [AM], Bannon's War Room (Nov. 30, 2024), https://perma.cc/ASE8-RZNJ). To further underscore this point,

[13] https://www.fcc.gov/sites/default/files/DOC-407732A1.pdf.

"Chairman Ferguson only gained the reins to the FTC in January 2025. And counting from *that* date, it becomes clear that he acted with expedition in issuing a CID to [NewsGuard]" four months later. *Id*. (citation omitted; emphasis in original).

*Third*, "the scope of the CID suggests pretext on the part of the FTC, which is fatal" to any counterarguments regarding causation the FTC may offer. *Media Matters*, 2025 WL 2378009, at *21. The CID's "demands . . . go well beyond the investigation's purported scope," which, as with the Media Matters CID, is apparently an effort by the FTC to determine whether NewsGuard "has information about the use of 'brand suitable' or 'brand safe' lists to 'coordinate ad placement.'" *Id*. For example, the CID asked NewsGuard to "[p]rovide each financial statement, budget, profit and loss statement, cost center report, profitability report, and any other financial report regularly prepared by or for NewsGuard on any periodic basis," and, "[f]or each such statement, budget, or report, [to] state how often it is prepared, and identify the employees responsible for its preparation." CID Specification 27. The CID also sought granular financial information broken down by specific NewsGuard products and services. *See* CID Specification 28.[14] As these far-reaching requests show, "the sweeping scope of the FTC's CID [does not] square with the proffered reason" behind the investigation. *Media Matters*, 2025 WL 2378009, at *21.

Any conceivable doubt about the retaliatory nexus between the CID and NewsGuard's protected First Amendment activity is eliminated by the Omnicom Consent Order. It is well-settled that the government "cannot coerce a private party to punish or suppress disfavored speech on [the

[14] According to staff's letter of January 15, 2026, NewsGuard "has satisfied its CID obligations" as to Specifications 27 and 28. Exhibit 3 at 2. But NewsGuard's compelled compliance with these demands does nothing to cure their constitutional shortcomings, and they remain probative of the FTC's retaliatory motive.

government's] behalf." *Vullo*, 602 U.S. at 190. But that is exactly what the FTC has done with the Omnicom Consent Order, which, as a condition of permitting the Omnicom-IPG merger to move forward, bars the merged entity from using services—such as NewsGuard's—that evaluate "viewpoints as to the veracity of news reporting" and "adherence to journalistic standards or ethics." *In re Omnicom Group Inc.* ¶¶ 1.D, 2.A, No. C-4823 (Sept. 26, 2025). The FTC's use of its coercive powers to prevent Omnicom from doing business with NewsGuard as a means of punishing NewsGuard for its First Amendment activity is unconstitutional on its own terms, *see Vullo*, 602 U.S. at 190, and when viewed together with the FTC's CID, leaves no doubt that the FTC has embarked on an unconstitutional campaign of retaliation against NewsGuard.

In sum, the evidence of unconstitutional retaliation is at least as strong here as in *Media Matters*, if not stronger. As the D.C. Circuit has recognized, "there can be no doubt that, as a general proposition," the issuance of subpoenas or CIDs "in order to harass [private parties] in their journalistic information-gathering activities" "would constitute an abridgement of a journalist's First Amendment rights." *Reps. Comm. for Freedom of the Press v. AT&T*, 593 F.2d 1030, 1064 (D.C. Cir. 1978). Because the FTC issued its CID to NewsGuard for precisely that unconstitutional purpose, the CID must be quashed.

## II. The Overly Broad And Unnecessarily Intrusive CID Has An Unconstitutional Chilling Effect On NewsGuard's Speech And Associational Rights.

Even setting aside the FTC's retaliatory animus, the CID must be quashed because its expansive terms and requests for sensitive customer information impose unconstitutional burdens on NewsGuard's speech and associational rights.

The Fourth Amendment imposes substantial restrictions on the reach of administrative subpoenas. *See Okla. Press Publ'g Co. v. Walling*, 327 U.S. 186, 208-11 (1946) ("The gist of the

protection is in the requirement . . . that the disclosure sought shall not be unreasonable."). In addition, the First Amendment affords NewsGuard a privilege that protects it from having to disclose information if doing so would chill its constitutional rights of free speech and free association. *See Perry v. Schwarzenegger*, 591 F.3d 1147, 1160 (9th Cir. 2009). These constitutional protections are interrelated; when an administrative subpoena seeks materials that could fall under First Amendment protection, courts require that the Fourth Amendment's standards be met with "scrupulous exactitude." *Zurcher v. Stanford Daily*, 436 U.S. 547, 564 (1978) (citing *Stanford v. Texas*, 379 U.S. 476, 485 (1965)); *see also In re Grand Jury Subpoena: Subpoena Duces Tecum*, 829 F.2d 1291, 1297 (4th Cir. 1987) (the Supreme Court "has made clear that the context of the [F]irst [A]mendment intensifies the [F]ourth [A]mendment concerns that may be present in a sweeping subpoena duces tecum") (citing *Branzburg v. Hayes*, 408 U.S. 665, 708 (1972)).

Where, as here, an administrative subpoena "implicates [F]irst [A]mendment concerns . . . the usual deference to the administration agency is not appropriate." *Fed. Election Comm'n v. Larouche Campaign*, 817 F.2d 233, 234 (2d Cir. 1987). Instead, "protection of constitutional liberties of the target of the subpoena calls for a more exacting scrutiny of the justification offered by the agency." *Id*. As longstanding First Amendment case law "makes clear," "before a state or federal body can compel disclosure of information which would trespass upon [F]irst [A]mendment freedoms, a 'subordinating interest of the State' must be proffered, and it must be 'compelling.'" *Fed. Election Comm'n v. Machinists Non-Partisan Pol. League*, 655 F.2d 380, 389 (D.C. Cir. 1981) (quoting *NAACP v. Alabama*, 357 U.S. 449, 463 (1958)).

No such subordinating interest is present here. The current administration's own statements demonstrate that it lacks any legitimate basis for intruding on NewsGuard's First Amendment freedoms and that it is instead targeting NewsGuard based on a misperceived left-wing bias in NewsGuard's ratings and other journalistic activities. *See supra* at 3-4. But even if such a bias were substantiated, it would *still* be a constitutionally insufficient justification for the CID. As the Supreme Court has warned, "[i]t is particularly important that the exercise of the power of compulsory process be carefully circumscribed when the investigative process tends to impinge upon such highly sensitive areas as freedom of speech or press." *Sweezy v. State of N.H. by Wyman*, 354 U.S. 234, 245 (1957).

The FTC's expansive CID to NewsGuard is the polar opposite of "carefully circumscribed." Indeed, Specification 8, even as modified by staff in their January 15 letter, is sufficiently broad to sweep in all of NewsGuard's communications with its customers subscribing to its reliability ratings. *See* CID Specification 8 ("Provide all communications between NewsGuard and any advertiser, advertising agency, or any person acting as an agent of an advertiser, including but not limited to demand side platforms and supply side platforms, with whom NewsGuard had a commercial relationship relating to NewsGuard News Reliability Ratings.") (as modified by Exhibit 3). The FTC's requests regarding NewsGuard's deliberative process and procedures for formulating ratings are equally intrusive. *See* CID Specifications 11, 12, 15 (requesting the identity of all entities to which NewsGuard has ever assigned a News Reliability Rating, the ratings assigned to those entities over time, and "documents sufficient to show the methodology by which NewsGuard determines" reliability ratings, including "internal correspondence about the process of developing the methodology")) (as modified by Exhibit 3). As the district court found in

preliminarily enjoining the Media Matters CID, "[a] reporter of ordinary firmness would be wary of speaking again if she had to reveal the materials requested by this fishing expedition of a CID." *Media Matters*, 2025 WL 2378009, at *16; *see also Dow Chem. Co. v. Allen*, 672 F.2d 1262, 1276 (7th Cir. 1982) (affirming decision not to enforce administrative subpoenas where "enforcement of the subpoenas carries the potential for chilling the exercise of First Amendment rights" because disclosure of the information sought "might well be both unnerving and discouraging").

The CID also targets information protected by NewsGuard's First Amendment associational rights through its requests for information identifying NewsGuard's customers. *See* CID Specification 8 ("Provide all communications between NewsGuard and any advertiser, advertising agency, or any person acting as an agent of an advertiser . . . with whom NewsGuard had a commercial relationship relating to NewsGuard News Reliability Ratings") (as modified by Exhibit 3); CID Specification 26 ("Submit one or more Data Sets sufficient to show, for each customer (other than natural persons) of NewsGuard News Reliability Ratings . . . [t]he name of the customer") (as modified by Exhibit 3). As courts have repeatedly emphasized when evaluating administrative subpoenas, "'[i]mplicit in the right to engage in activities protected by the First Amendment [is] a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends.'" *Brock v. Loc. 375, Plumbers Int'l Union of Am., AFL-CIO*, 860 F.2d 346, 349 (9th Cir. 1988) (quoting *Roberts v. United States Jaycees*, 468 U.S. 609, 622 (1984)). Accordingly, "before requiring that organizations reveal sensitive information about their members and supporters," the government must satisfy "exacting scrutiny." *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 609 (2021).

The FTC cannot possibly meet the demanding constitutional requirements for compelling disclosure of NewsGuard's customer lists. NewsGuard is a journalistic organization with a First Amendment right to associate with its customers to engage in the free exchange of ideas protected by the Constitution. *See NAACP*, 357 U.S. at 460 ("It is beyond debate that freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the 'liberty' assured by the Due Process Clause of the Fourteenth Amendment, which embraces freedom of speech."). Because "compulsory disclosure of organizational ties can constitute a significant encroachment on freedom of association," *Familias Unidas v. Briscoe*, 619 F.2d 391, 399 (5th Cir. 1980), it can only be justified if it is narrowly tailored to further a sufficiently important government interest, *Ams. for Prosperity*, 594 U.S. at 609-10. The FTC's open-ended demand for customer identities untethered to any legitimate investigatory interest is the antithesis of a constitutionally tailored information request.

**RESERVATION OF RIGHTS**

By submitting this Petition to Quash, NewsGuard does not intend to—and does not—waive any rights to make additional arguments against the Commission's investigation of NewsGuard, the CID, or both, including under the U.S. Constitution, the FTC Act, or any other statute or rule.

**CONCLUSION**

For all these reasons, the public interest does not support enforcement of the CID issued to NewsGuard because "enforcement of an unconstitutional [action] is always contrary to the public interest." *Karem v. Trump*, 960 F.3d 656, 668 (D.C. Cir. 2020) (internal quotation marks omitted). The FTC should therefore quash the CID in its entirety.

By: */s/ Theodore J. Boutrous Jr.*

Theodore J. Boutrous Jr.
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
Tel: (213) 229-7000
TBoutrous@gibsondunn.com

Amir C. Tayrani
Sophia A. Hansell
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036
Tel: (202) 955-8500
ATayrani@gibsondunn.com
SHansell@gibsondunn.com

Matthew C. Parrott
GIBSON, DUNN & CRUTCHER LLP
3161 Michelson Drive Suite 1200
Irvine, CA 92612
Tel: (949) 451-3823
MParrott@gibsondunn.com

*Counsel for Petitioner NewsGuard Technologies, Inc.*

January 16, 2026

**CERTIFICATE OF SERVICE**

I hereby certify that, on January 16, 2026, the foregoing Petition to Quash Civil Investigative Demand was served by electronic mail on the following:

Office of the Secretary
Federal Trade Commission
600 Pennsylvania Avenue, N.W.
Washington D.C. 20580
electronicfilings@ftc.gov

April Tabor, Secretary of the Commission
600 Pennsylvania Ave. NW
Washington D.C. 20580
atabor@ftc.gov

Geoffrey Green
600 Pennsylvania Ave. NW
Washington D.C. 20580
ggreen@ftc.gov

Justin Epner
600 Pennsylvania Ave. NW
Washington D.C. 20580
jepner@ftc.gov

Theodore Zang
600 Pennsylvania Ave. NW
Washington D.C. 20580
tzang@ftc.gov

By: *<u>/s/ Theodore J. Boutrous Jr.</u>*

Theodore J. Boutrous Jr.
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
Tel: (213) 229-7000

*Counsel for Petitioner NewsGuard Technologies, Inc.*

# EXHIBIT 1

United States of America
Federal Trade Commission

PUBLIC

# Civil Investigative Demand

1. TO

NewsGuard Technologies, Inc.
25 W. 52nd Street, 15th Floor
New York, NY 10019

1a. MATTER NUMBER

FTC File No. 251-0061

This demand is issued pursuant to Section 20 of the Federal Trade Commission Act, 15 U.S.C. § 57b-1, in the course of an investigation to determine whether there is, has been, or may be a violation of any laws administered by the Federal Trade Commission by conduct, activities or proposed action as described in Item 3.

2. ACTION REQUIRED

☐ You are required to appear and testify.

LOCATION OF HEARING

YOUR APPEARANCE WILL BE BEFORE

No appearance required.

DATE AND TIME OF HEARING OR DEPOSITION

☒ You are required to produce all documents described in the attached schedule that are in your possession, custody, or control, and to make them available at your address indicated above for inspection and copying or reproduction at the date and time specified below.

☒ You are required to answer the interrogatories or provide the written report described on the attached schedule. Answer each interrogatory or report separately and fully in writing. Submit your answers or report to the Records Custodian named in Item 4 on or before the date specified below.

☐ You are required to produce the tangible things described on the attached schedule. Produce such things to the Records Custodian named in Item 4 on or before the date specified below.

DATE AND TIME THE DOCUMENTS, ANSWERS TO INTERROGATORIES, REPORTS, AND/OR TANGIBLE THINGS MUST BE AVAILABLE

30 days from the Issued date below - June 19, 2025 by 5:00 pm ET

3. SUBJECT OF INVESTIGATION

See attached.

4. RECORDS CUSTODIAN/DEPUTY RECORDS CUSTODIAN

Helder Agostinho, Deputy Assistant Director

5. COMMISSION COUNSEL

Justin Epner, Attorney

DATE ISSUED

5/20/2025

COMMISSIONER'S SIGNATURE

[signature]

## INSTRUCTIONS AND NOTICES

The delivery of this demand to you by any method prescribed by the Commission's Rules of Practice is legal service and may subject you to a penalty imposed by law for failure to comply. The production of documents or the submission of answers and report in response to this demand must be made under a sworn certificate, in the form printed on the second page of this demand, by the person to whom this demand is directed or, if not a natural person, by a person or persons having knowledge of the facts and circumstances of such production or responsible for answering each interrogatory or report question. This demand does not require approval by OMB under the Paperwork Reduction Act of 1980.

## PETITION TO LIMIT OR QUASH

The Commission's Rules of Practice require that any petition to limit or quash this demand be filed within 20 days after service, or, if the return date is less than 20 days after service, prior to the return date. The original and twelve copies of the petition must be filed with the Secretary of the Federal Trade Commission, and one copy should be sent to the Commission Counsel named in Item 5.

## YOUR RIGHTS TO REGULATORY ENFORCEMENT FAIRNESS

The FTC has a longstanding commitment to a fair regulatory enforcement environment. If you are a small business (under Small Business Administration standards), you have a right to contact the Small Business Administration's National Ombudsman at 1-888-REGFAIR (1-888-734-3247) or www.sba.gov/ombudsman regarding the fairness of the compliance and enforcement activities of the agency. You should understand, however, that the National Ombudsman cannot change, stop, or delay a federal agency enforcement action.

The FTC strictly forbids retaliatory acts by its employees, and you will not be penalized for expressing a concern about these activities.

## TRAVEL EXPENSES

Use the enclosed travel voucher to claim compensation to which you are entitled as a witness for the Commission. The completed travel voucher and this demand should be presented to Commission Counsel for payment. If you are permanently or temporarily living somewhere other than the address on this demand and it would require excessive travel for you to appear, you must get prior approval from Commission Counsel.

A copy of the Commission's Rules of Practice is available online at http://bit.ly/FTCSRulesofPractice. Paper copies are available upon request.

FTC Form **144** (rev 01/2024)

**CIVIL INVESTIGATIVE DEMAND
ISSUED TO NEWSGUARD TECHNOLOGIES, INC.
FTC FILE NO. 251-0061**

Unless modified by agreement with the staff of the Federal Trade Commission (the "Commission" or the "FTC"), each Specification of this Civil Investigative Demand ("CID") requires a complete search of NewsGuard Technologies, Inc. ("NewsGuard") as defined in the Definitions, which appear after the following Specifications. Pursuant to the Commission's Rules of Practice, 16 C.F.R. § 2.7(k), NewsGuard representatives must confer with the Commission representative identified in the final instruction of this CID within fourteen days after receipt of this CID. If NewsGuard believes that the required search or any other part of this CID can be narrowed in any way that is consistent with the Commission's need for information, you are encouraged to discuss such questions and possible modifications with the Commission representative. All modifications to this CID must be agreed to in writing pursuant to the Commission's Rules of Practice, 16 C.F.R. § 2.7(l).

1. State where NewsGuard is incorporated and registered and provide a copy of NewsGuard's articles of incorporation and statutes.

2. State the location and full physical address of each of NewsGuard's offices in the United States and worldwide.

3. Provide NewsGuard organizational charts from 2018 through the present or other documents sufficient to show all NewsGuard personnel over the same time period with responsibility for the following: News Reliability Ratings and any other rating, label, or categorization maintained by NewsGuard, including "nutrition labels"; Misinformation Fingerprints; FAILSafe for AI; AI Safety Suite; NewsGuard for Advertising; Media Intelligence Dashboard; TV/CTV Reliability Ratings; Podcast Reliability Ratings; HealthGuard; and any other product, program, project, work, or special report relating to data, analysis, or journalism that helps companies or consumers distinguish between sources of information online.

4. Describe each product and service that NewsGuard currently offers or has offered from 2018 through the present.

5. Provide all documents relating to NewsGuard's News Reliability Ratings and any other rating, label, or categorization maintained by NewsGuard; Misinformation Fingerprints; AI Safety Suite; NewsGuard for Advertising; Intelligence Dashboard; Nutrition Labels; or any other product, program, project, work, or special report relating to data, analysis, or journalism that helps companies or consumers distinguish between sources of information online.

6. Provide all communications between NewsGuard and any other party regarding any request for NewsGuard to apply a particular reliability rating to any news or information outlet, regardless of whether the request was fulfilled.

7. Provide all documents relating to any complaints that NewsGuard received related to its activities, programs, or policies, including but not limited to complaints regarding NewsGuard's decision to apply a reliability rating to any content.

8. Provide all communications between NewsGuard and any advertiser, advertising agency, or any person acting as an agent of an advertiser, including but not limited to demand side platforms and supply side platforms, related to brand safety or any of the NewsGuard programs identified in Specification 4 and 5.

9. Provide all documents relating to other entities that engage, either directly or indirectly, in tracking, categorizing, monitoring, analyzing, evaluating, or rating news, media, sources, outlets, websites, or other content publisher entities for "brand suitability," "reliability," "misinformation," "hate speech," "false" or "deceptive" content, or similar categories. This request includes but is not limited to communications between NewsGuard and any person connected to these entities. For purposes of this Specification, such entities include but are not limited to:

   a. The World Federation of Advertisers ("WFA");

   b. The Global Alliance for Responsible Media ("GARM");

   c. The Global Disinformation Index ("GDI");

   d. The Interactive Advertising Bureau ("IAB");

   e. Ad Fontes Media, Inc.;

   f. The Check My Ads Institute;

   g. Integral Ad Science ("IAS");

   h. DoubleVerify;

   i. Barometer;

   j. Media Matters for America;

   k. The Center for Countering Digital Hate;

   l. Nelez; or

   m. The Media Roundtable.

10. Provide all documents, including letters, narrative responses, and other materials, produced by NewsGuard to the United States Congress as part of a congressional investigation into media censorship, freedom of speech, or NewsGuard activities, including but not limited to documents in Your possession, custody, or control relating to or cited in:

a. The United States House of Representatives Committee on the Judiciary July 10, 2024 Interim Staff Report entitled "GARM's Harm: How the World's Biggest Brands Seek to Control Online Speech;" and

b. The United States House of Representatives Committee on Small Business, Interim Staff Report entitled "Small Business: Instruments and Casualties of the Censorship-Industrial Complex."

11. Submit one or more Data Sets sufficient to show for any news, media, sources, outlets, websites, or other content publisher entities rated, evaluated, assigned a label, or otherwise scored by NewsGuard:

a. The name of the entity;

b. The address of any website(s) associated with the entity;

c. Any unique identifier(s) used to identify the entity across NewsGuard's databases or data sets; and

d. Any categorization of the entity, including but not limited to whether the entity is associated news, satirical, or platform content.

12. For each entity identified in Specification 11, submit one or more Data Sets sufficient to show, from 2018 through the present:

a. The entity's News Reliability Rating, including any scoring changes and when those changes occurred;

b. The scoring of the component criteria used to calculate the entity's News Reliability Rating, including any scoring changes and when those changes occurred; and

c. Any other rating, label, or categorization of entities maintained by NewsGuard, including any changes and when those changes occurred.

13. Provide any list produced, licensed, sold, or otherwise provided by You to any third party that evaluates or categorizes any news, media, sources, outlets, websites, or other content publisher entities by credibility or any other categorical metric maintained by NewsGuard.

14. Provide documents and data sufficient to show the methodology by which NewsGuard evaluates or categorizes any news, media, sources, outlets, websites, or other content publisher entities, including but not limited to the process NewsGuard uses to select the sample of articles on which to rate the entity.

15. Provide documents and data sufficient to show the methodology by which NewsGuard determines the ratings, labels, or categorizations that it applies to news or information sites.

16. Provide any analysis, evaluation, and/or assessment performed by or provided to NewsGuard of the effect of NewsGuard's News Reliability Rating or any other rating, label, or categorization maintained by NewsGuard, on the profits, revenues, unique visitors, subscribers, or any other business metric of any news, media, sources, outlets, websites, or other content publisher entities rated, evaluated, assigned a label, or otherwise scored by NewsGuard, and all data sets and code that would be necessary to replicate the analysis.

17. Provide all documents reflecting allegations that NewsGuard's reliability ratings are politically biased.

18. Provide all documents reflecting allegations that NewsGuard's reliability ratings or rating criteria are unreliable, subjective, unscientific, or otherwise methodologically unsound.

19. Provide all documents relating to the effect of NewsGuard's reliability rating or any other rating, label, or categorization maintained by NewsGuard, on the profits, revenues, unique visitors, subscribers, or any other business metric of any news, media, sources, outlets, websites, or other content publisher entities rated, evaluated, assigned a label, or otherwise scored by NewsGuard.

20. Provide all documents relating to any benefits to advertisers or to advertising brands that come from using any of NewsGuard products,

21. Provide all documents relating to NewsGuard's claim that "Advertising with NewsGuard unlocks: Premium inventory at lower CPMs, driving significant cost efficiencies; Highly engaged news audiences across the political spectrum; Quality environments that boost campaign performance and generate results; [and] Brand integrity and content alignment that creates opportunities rather than restrictions." (https://www.newsguardtech.com/solutions/newsguard-for-advertising/).

22. Provide all documents relating to the purpose of NewsGuard's News Reliability Rating or any other rating, label, or categorization maintained by NewsGuard, including but not limited to promotional and advertising materials created and/or disseminated by NewsGuard.

23. Provide all documents relating to NewsGuard's use of AI technology to provide any of its services.

24. Provide all documents relating to NewsGuard working with ad tech, technology, or developer companies to develop and advance any of NewsGuard's programs, policies, and objectives, including but not limited to any agreements between NewsGuard and these companies.

25. Provide all analyses or studies NewsGuard conducted, sponsored, or commissioned relating to advertising on social media or digital advertising platforms, and all data sets and code that would be necessary to replicate the analysis.

26. Submit one or more Data Sets sufficient to show, for each customer of NewsGuard services (excluding subscribers to the Reality Check newsletter or the NewsGuard browser extension):

    a. The name of the customer;

    b. Any unique identifier(s) used to identify the customer across NewsGuard's databases or data sets; and

    c. Any categorization of the customer type, including but not limited to whether the customer is educational, not-for-profit, governmental, and/or a business.

27. Provide each financial statement, budget, profit and loss statement, cost center report, profitability report, and any other financial report regularly prepared by or for NewsGuard on any periodic basis. For each such statement, budget, or report, state how often it is prepared, and identify the employees responsible for its preparation; provide all such statements and reports on both a quarterly basis and a yearly basis.

28. Submit one or more Data Sets sufficient to show, for each year from 2018 through present:

    a. In total and by each product or service offered by NewsGuard:

        i) Revenues;

        ii) Revenue deductions or adjustments, including but not limited to discounts;

        iii) Costs of goods sold;

        iv) Operating expenses;

        v) Gross margin, including specifying the formula for calculating gross margin;

        vi) Net margin, including specifying the formula for calculating net margin;

        vii) EBITDA;

        viii) EBITDA margin;

        ix) Total number of licenses; and

        x) Total number of customers, including by customer type.

    b. By customers for each customer of NewsGuard identified in Specification 26, in total and by each product or service offered by NewsGuard:

        i) Gross payments received from the customer;

        ii) Payment deductions or adjustments, including but not limited to discounts;

iii) Cost of goods sold; and

iv) Total number of licenses.

29. For each Data Set provided in response to any Specification in this Civil Investigative Demand, provide a data dictionary that includes:

    a. A list of field names and a definition for each field contained in the Data Set;

    b. The meaning of each code that appears as a field value in the Data Set; and

    c. The primary key in the Data Set or table that defines a unique observation.

30. Identify and describe the steps NewsGuard took to preserve documents related to this CID. Submit documents sufficient to show all NewsGuard document retention policies in effect during any portion of the relevant period.

31. Identify the person(s) responsible for preparing the responses to this CID and submit a copy of all instructions prepared by NewsGuard relating to the steps taken to respond. Where oral instructions were given, identify the person who gave the instructions and describe the content of the instructions and the person(s) to whom the instructions were given. For each Specification, identify the individual(s) who assisted in the preparation of the response, with a listing of the persons (identified by name and title or job description) whose files were searched by each. For each Specification requiring a narrative response or data, identify all individuals who provided any information considered or used in drafting the response.

## DEFINITIONS

For purposes of this CID, the following Definitions apply:

1. "NewsGuard Technologies Inc.," "You," "Your," and "NewsGuard" mean NewsGuard, together with its successors, predecessors, divisions, wholly- or partially-owned subsidiaries, committees, working groups, alliances, affiliates, and partnerships, whether domestic or foreign; and all the directors, officers, employees, consultants, agents, and representatives of the foregoing. Identify by name, address, and phone number, each agent or consultant.

2. "Agreement" means any oral or written contract, arrangement, or understanding, whether formal or informal, between two or more Persons, together with all modifications or amendments thereto.

3. "Communication" means any exchange, transfer, or dissemination of information, regardless of the means by which it is accomplished.

4. "Data Set" means all or a subset of data held by, or accessible to, NewsGuard in the normal course of business.

5. “Document” and “documents” mean any information, on paper or in electronic format, including written, recorded, and graphic materials of every kind, in the possession, custody, or control of NewsGuard. The term “documents” includes, without limitation: computer files; email messages; text messages; instant messages and chat logs; other Messaging Applications; group chats; voicemails and other audio files; calendar entries; schedulers; drafts of documents; metadata and other bibliographic or historical data describing or relating to documents created, revised, or distributed electronically; copies of documents that are not identical duplicates of the originals in that Person’s files; notes of meetings or telephone calls; and copies of documents the originals of which are not in the possession, custody, or control of NewsGuard.

   a. The term “computer files” includes information stored in, or accessible through, computers or other information retrieval systems. Thus, NewsGuard should produce documents that exist in machine-readable form, including documents stored in personal computers, portable computers, workstations, minicomputers, mainframes, servers, backup disks and tapes, archive disks and tapes, and other forms of offline storage, whether on or off NewsGuard premises. If NewsGuard believes that the required search of backup disks and tapes and archive disks and tapes can be narrowed in any way that is consistent with the Commission’s need for documents and information, you are encouraged to discuss a possible modification to this Definition with the Commission representative identified on the last page of this Request. The Commission representative will consider modifying this Definition to:

      i) exclude the search and production of files from backup disks and tapes and archive disks and tapes unless it appears that files are missing from those that exist in personal computers, portable computers, workstations, minicomputers, mainframes, and servers searched by the NewsGuard;

      ii) limit the portion of backup disks and tapes and archive disks and tapes that needs to be searched and produced to certain key individuals, certain time periods, or certain Specifications identified by the Commission representative; or

      iii) include other proposals consistent with Commission policy and the facts of the case.

6. “Each,” “any,” and “all” mean “each and every.” The terms “and” and “or” have both conjunctive and disjunctive meanings as necessary to bring within the scope of this CID anything that might otherwise be outside its scope. The singular form of a noun or pronoun includes its plural form, and vice versa; and the present tense of any word includes the past tense, and vice versa.

7. “Identify” or “specify,” when used in reference to a natural person, means to state the person’s (1) full name; (2) present or last-known residence and telephone number and present or last-known business address and telephone number; and (3) present or last-known employer and job title. For any person identified, if any of the above information was different during the time period relevant to the CID, supply both the current

information and such different information as applies to the time period relevant to the CID. Once a natural person has been identified properly, it shall be sufficient thereafter when identifying that same person to state the name only.

"Identify" or "specify," when used in reference to a corporation or other non-natural person, means (1) to state that entity's name; (2) to describe its nature (e.g., corporation, partnership, etc.); (3) to state the location of its principal place of business; and (4) to identify the natural person or persons employed by such entity whose actions on behalf of the entity are responsive to the CID. Once such an entity has been identified properly, it shall be sufficient thereafter when identifying that same entity to state the name only.

"Identify" or "specify," when used in reference to facts, acts, events, occurrences, meetings, or communications, means to describe, with particularity, the fact, act, event, occurrence, meeting, or communication in question, including but not limited to (1) identifying the participants and witnesses of the fact, act, event, occurrence, meeting, or communication; (2) stating the date or dates on which the fact, act, event, occurrence, meeting, or communication took place; (3) stating the location(s) at which the fact, act, event, occurrence, meeting, or communication took place; and (4) providing a description of the substance of the fact, act, event, occurrence, meeting, or communication.

8. "Include" and "including" mean "including but not limited to." The use of the term "include" in any request shall not be used to limit the generality or scope of any request. Nor shall the generality of any request be limited by the fact that another request touches on the same topic with a greater or lesser degree of specificity.

9. "Person" or "persons" includes NewsGuard and means any natural person, corporate entity, sole proprietorship, partnership, association, governmental or non-governmental entity, or trust.

10. "Relate," "related to," and "relating to" mean, in whole or in part, addressing, analyzing, concerning, constituting, containing, commenting on, discussing, describing, identifying, referring to, reflecting, reporting on, stating, or dealing with.

11. The term "Messaging Application" refers to any electronic method that has ever been used by NewsGuard and its employees to communicate with each other or entities outside NewsGuard for any business purposes. "Messaging Application" includes platforms, whether for ephemeral or non-ephemeral messaging, for email, chats, instant messages, text messages, and other methods of group and individual communication (e.g., Microsoft Teams, Slack, GroupMe, WhatsApp, Signal, Skype). "Messaging Application" may overlap with "Collaborative Work Environment."

## INSTRUCTIONS

For the purposes of this CID, the following Instructions apply:

I 1. All references to year refer to calendar year. Unless otherwise specified, each of the Specifications calls for: (1) documents for each of the years from January 1, 2018 to the present; and (2) information for each of the years from January 1, 2018 to the present.

Where information, rather than documents, is requested, provide it separately for each year; where yearly data is not yet available, provide data for the calendar year to date. If calendar year information is not available, supply NewsGuard's fiscal year data indicating the 12-month period covered, and provide the NewsGuard's best estimate of calendar year data.

I 2. Do not produce any Sensitive Personally Identifiable Information ("Sensitive PII") or Sensitive Health Information ("SHI") prior to discussing the information with a Commission representative. If any document responsive to a particular Specification contains unresponsive Sensitive PII or SHI, redact the unresponsive Sensitive PII or SHI prior to producing the document. The term "Sensitive Personally Identifiable Information" means an individual's Social Security Number alone; or an individual's name, address, or phone number in combination with one or more of the following:

- Date of birth
- Driver's license number or other state identification number, or a foreign country equivalent
- Passport number
- Financial account number
- Credit or debit care number

The term "Sensitive Health Information" includes medical records and other individually identifiable health information, whether on paper, in electronic form, or communicated orally. Sensitive Health Information relates to the past, present, or future physical or mental health or condition of an individual, the provision of health care to an individual, or the past, present, or future payment for the provision of health care to an individual.

I 3. Except for privileged material, NewsGuard will produce each responsive document in its entirety by including all attachments and all pages, regardless of whether they directly relate to the specified subject matter. NewsGuard should submit any appendix, table, or other attachment by either attaching it to the responsive document or clearly marking it to indicate the responsive document to which it corresponds. Attachments must be produced along with the document to which they are attached, regardless of whether they have been produced separately. Except for privileged material, NewsGuard will not redact, mask, cut, expunge, edit, or delete any responsive document or portion thereof in any manner.

I 4. Compliance with this CID requires a search of all documents in the possession, custody, or control of NewsGuard, including, without limitation, those documents held by any of NewsGuard's officers, directors, employees, agents, representatives, or legal counsel, whether or not such documents are on the premises of NewsGuard. If any person is unwilling to have his or her files searched, or is unwilling to produce responsive documents, NewsGuard must provide the Commission with the following information as

to each such person: his or her name, address, telephone number, and relationship to NewsGuard.

I 5. Form of Production: NewsGuard shall submit documents as instructed below absent written consent from the Commission representative.

a. Documents stored in electronic or hard copy formats in the ordinary course of business shall be submitted in the following electronic format provided that such copies are true, correct, and complete copies of the original documents:

i) Submit Microsoft Excel, Access, and PowerPoint files in native format with extracted text and metadata.

ii) Submit emails in TIFF (Group IV) format with extracted text and the following metadata and information:

| **Metadata/Document Information** | **Description** |
|---|---|
| Spec No. | Subpoena/request paragraph number to which the document is responsive. |
| Alternative Custodian | List of custodians where the document has been removed as a duplicate. |
| Bates Begin | Beginning Bates number of the email. |
| Bates End | Bates number of the last page of the email. |
| Beg Attach | First Bates number of attachment range. |
| End Attach | Ending Bates number of attachment range. |
| Custodian | Name of the person from whom the email was obtained. |
| Email BCC | Names of person(s) blind copied on the email. |
| Email CC | Names of person(s) copied on the email. |
| Email Date Received | Date the email was received. [MM/DD/YYYY] |
| Email Date Sent | Date the email was sent. [MM/DD/YYYY] |
| Email From | Names of the person who authored the email. |
| Email Message ID | Microsoft Outlook Message ID or similar |

| Metadata/Document Information | Description |
|---|---|
| | value in other message systems. |
| Email Subject | Subject line of the email. |
| Email Time Received | Time email was received. [HH:MM:SS AM/PM] |
| Email To | Recipients(s) of the email. |
| Email Time Sent | Time email was sent. [HH:MM:SS AM/PM] |
| Page count | Number of pages in record |
| File size | Size of document in KB |
| File Extension | File extension type (e.g., docx, xlsx) |
| Record Type | Indicates form of record: E-Doc, E-Doc Attachment, Email, Email Attachment, HardCopy, Calendar Appt, Text Message, Chat Message, etc. |
| Folder | File path/folder location of email. |
| Filename with extension | Name of the original native file with file extension. |
| Hash | Identifying value used for deduplication – typically SHA1 or MD5. |
| Redaction | Indicates Yes or No status regarding document redactions. |
| Text Link | Relative path to submitted text file. Example: \TEXT\001\FTC0003090.txt |

iii) Submit email attachments other than those described in subpart (a)(i) in TIFF (Group IV) format. For all email attachments, provide extracted text and the following metadata and information as applicable:

| **Metadata/Document Information** | **Description** |
|---|---|
| Spec No. | Subpoena/request paragraph number to which the document is responsive. |
| Alternative Custodian | List of custodians where the document has been removed as a duplicate. |
| Bates Begin | Beginning Bates number of the document. |
| Bates End | Last Bates number of the document. |
| Beg Attach | First Bates number of attachment range. |
| End Attach | Ending Bates number of attachment range. |
| Custodian | Name of person from whom the file was obtained. |
| Date Created | Date the file was created. [MM/DD/YYY] |
| Date Modified | Date the file was last changed and saved. [MM/DD/YYYY] |
| Page count | Number of pages in record |
| File size | Size of document in KB |
| File Extension | File extension type (e.g., docx, xlsx) |

| Metadata/Document Information | Description |
|---|---|
| Filename with extension | Name of the original native file with file extension. |
| Record Type | Indicates form of record: E-Doc, E-Doc Attachment, Email, Email Attachment, HardCopy, Calendar Appt, Text Message, Chat Message, etc. |
| Hash | Identifying value used for deduplication – typically SHA1 or MD5. |
| Author | Author field value extracted from the metadata of a native file. |
| Last Author | Last Saved By field value extracted from metadata of a native file. |
| Redaction | Indicates Yes or No status regarding document redactions. |
| Native Link | Relative file path to submitted native or near native files.<br>Example: \NATIVES\001\FTC0003090.xls |
| Parent ID | Document ID or beginning Bates number of the parent email. |
| Text Link | Relative path to submitted text file.<br><br>Example: \TEXT\001\FTC0003090.txt |
| Time Created | Time file was created. [HH:MM:SS AM/PM] |
| Time Modified | Time file was saved. [HH:MM:SS AM/PM] |

iv) Submit all other electronic documents, other than those described in subpart (a)(i), in TIFF (Group IV) format accompanied by extracted text and the following metadata and information:

| Metadata/Document Information | Description |
|---|---|
| Spec No. | Subpoena/request paragraph number to which the document is responsive. |
| Alternative Custodian | List of custodians where the document has been removed as a duplicate. |
| Bates Begin | Beginning Bates number of the document |
| Bates End | Last Bates number of the document. |
| Beg Attach | First Bates number of attachment range. |
| End Attach | Ending Bates number of attachment range. |
| Custodian | Name of the original custodian of the file. |
| Date Created | Date the file was created. [MM/DD/YYY] |
| Date Modified | Date the file was last changed and saved.<br>[MM/DD/YYYY HH:MM:SS AM/PM] |
| Record Type | Indicates form of record: E-Doc, E-Doc Attachment, Email, Email Attachment, HardCopy, Calendar Appt, Text Message, Chat Message, etc. |
| Author | Author field value extracted from the metadata of a native file. |
| Last Author | Last Saved By field value extracted from metadata of a native file. |
| Redaction | Indicates Yes or No status regarding document redactions. |
| Page count | Number of pages in record |
| File size | Size of document in KB |
| File Extension | File extension type (e.g., docx, xlsx) |
| Filename with extension | Name of the original native file with file extension. |

| **Metadata/Document Information** | **Description** |
|---|---|
| Hash | Identifying value used for deduplication – typically SHA1 or MD5. |
| Originating Path | File path of the file as it resided in its original environment. |
| Production Link | Relative path to submitted native or near native files. Example: \NATIVES\001\FTC0003090.xls |
| Native Link | Relative path to submitted native or near native files.<br><br>Example: \NATIVES\001\FTC0003090.xls |
| Text Link | Relative path to submitted text file. Example: \TEXT\001\FTC-0003090.txt |
| Time Created | Time file was created. [HH:MM:SS AM/PM] |
| Time Modified | Time file was saved. [HH:MM:SS AM/PM] |

v) Submit documents stored in hard copy in TIFF (Group IV) format accomplished by OCR with the following information:

| **Metadata/Document Information** | **Description** |
|---|---|
| Spec No. | Subpoena/request paragraph number to which the document is responsive. |
| Bates Begin | Beginning Bates number of the document. |
| Bates End | Bates number of the last page of the document. |
| Record Type | Indicates form of record: E-Doc, E-Doc Attachment, Email, Email Attachment, HardCopy, Calendar Appt, Text Message, Chat Message, etc. |
| Page count | Number of pages in record. |

| | |
|---|---|
| Redaction | Indicates Yes or No status regarding document redactions. |
| Custodian | Name of person from whom the file was obtained. |

vi) Submit redacted documents in TIFF (Group IV) format accompanied by OCR with the metadata and information required by relevant document type in subparts (a)(i) through (a)(v) above. For example, if the redacted file was originally an attachment to an email, provide the metadata and information specified in subpart (a)(iii) above. Additionally, please provide a basis for each privilege claim as detailed in Instruction 9.

b. Submit data compilations in electronic format, specifically Microsoft Excel spreadsheets or delimited text formats, with all underlying data un-redacted and all underlying formulas and algorithms intact. Submit data separately from document productions.

c. Produce electronic file and ESI processed submissions as follows:

i) For productions over 20 gigabytes, use an External Hard Disc Drive (stand-alone portable or hard drive enclosure) or USB Flash Drive in Microsoft Windows-compatible, uncompressed data format.

ii) For productions under 20 gigabytes, submissions may be transmitted electronically via FTP. The FTC uses Kiteworks Secure File Transfer. To request a Kiteworks upload invitation, contact the FTC representative identified in the request you received. Use of other File Transfer methods is permitted. Please discuss this option with the FTC representative identified in the CID to determine the viability.

iii) CD-ROM (CD-R, CD-RW) optical disks and DVD-ROM (DVD+R, DVD+RW) optical disks for Windows-compatible personal computers, and USB 2.0 Flash Drives are acceptable storage formats.

iv) All documents produced in electronic format shall be scanned for and free of viruses prior to submission. The Commission will return any infected media for replacement, which may affect the timing of NewsGuard's compliance with this CID.

v) Encryption of productions using NIST FIPS-Compliant cryptographic hardware or software modules, with passwords sent under separate cover, is strongly encouraged.

d. Each production shall be submitted with a transmittal letter that includes the FTC matter number; production volume name; encryption method/software used; list of

custodians and document identification number range for each; total number of documents; and a list of load file fields in the order in which they are organized in the load file.

e. If NewsGuard intends to utilize any de-duplication or email threading software or services when collecting or reviewing information that is stored in NewsGuard's computer systems or electronic storage media, or if NewsGuard's computer systems contain or utilize such software, NewsGuard must contact the Commission representative to determine, with the assistance of the appropriate government technical officials, whether and in what manner NewsGuard may use such software or services when producing materials in response to this CID.

I 6. Before using software or technology (including search terms, email threading, Technology Assisted Review, deduplication, or similar technologies) to identify or eliminate documents, data, or information potentially responsive to this CID, NewsGuard must submit a written description of the method(s) used to conduct any part of its search. In addition, for any process that relies on search terms to identify or eliminate documents, NewsGuard must submit: (a) a list of proposed terms; (b) a tally of all the terms that appear in the collection and the frequency of each term; (c) a list of stop words and operators for the platform being used; and (d) a glossary of industry and NewsGuard terminology. For any process that relies on a form of Technology Assisted Review to identify or eliminate documents, NewsGuard must include (a) confirmation that subject-matter experts will be reviewing the seed set and training rounds; (b) recall, precision, and confidence-level statistics (or an equivalent); and (c) a validation process that allows Commission representatives to review statistically-significant samples of documents categorized as non-responsive documents by the algorithm.

I 7. All documents responsive to this CID:

a. shall be produced in complete form (e.g., including all family members, including Modern Attachments), un-redacted unless privileged, and in the order in which they appear in NewsGuard's files;

b. shall be marked on each page with corporate identification and consecutive document control numbers when produced in TIFF format (e.g., ABC-00000001);

c. if written in a language other than English, shall be translated into English, with the English translation attached to the foreign language document;

d. shall be produced in color where necessary to interpret the document (if the coloring of any document communicates any substantive information, or if black-and-white photocopying or conversion to TIFF format of any document (e.g., a chart or graph), makes any substantive information contained in the document unintelligible, NewsGuard must submit the original document, a like-colored photocopy, or a JPEG-format TIFF);

e. shall be accompanied by an index that identifies: (i) the name of each person from whom responsive documents are submitted; and (ii) the corresponding consecutive

document control number(s) used to identify that person's documents, and if submitted in paper form, the box number containing such documents. If the index exists as a computer file(s), provide the index both as a printed hard copy and in machine-readable form (provided that the Commission representative determines prior to submission that the machine-readable form would be in a format that allows the agency to use the computer files). The Commission representative will provide a sample index upon request; and

f. shall be accompanied by an affidavit of an officer of NewsGuard stating that the copies are true, correct, and complete copies of the original documents.

I 8. If any documents or parts of documents are withheld from production based on a claim of privilege, provide a statement of the claim of privilege and all facts relied upon in support thereof, in the form of a log that includes, in separate fields, a privilege identification number; beginning and ending document control numbers; parent document control numbers; attachments document control numbers; family range; number of pages; all authors; all addressees; all blind copy recipients; all other recipients; all custodians; date of the document; the title or subject line; an indication of whether it is redacted; the basis for the privilege claim (e.g., attorney-client privilege), including the underlying privilege claim if subject to a joint-defense or common-interest agreement; and a description of the document's subject matter. Attachments to a document should be identified as such and entered separately on the log. For each author, addressee, and recipient, state the Person's full name, title, and employer or firm, and denote all attorneys with an asterisk. The description of the subject matter shall describe the nature of each document in a manner that, though not revealing information itself privileged, provides sufficiently detailed information to enable Commission staff, the Commission, or a court to assess the applicability of the privilege claimed. For each document or part of a document withheld under a claim that it constitutes or contains attorney work product, also state whether NewsGuard asserts that the document was prepared in anticipation of litigation or for trial and, if so, identify the anticipated litigation or trial upon which the assertion is based. Submit all non-privileged portions of any responsive document (including non-privileged or redactable attachments) for which a claim of privilege is asserted (except where the only non-privileged information has already been produced in response to this Instruction), noting where redactions in the document have been made. Documents authored by outside lawyers representing NewsGuard that were not directly or indirectly furnished to NewsGuard or any third party, such as internal law firm memoranda, may be omitted from the log. Provide the log in Microsoft Excel readable format.

I 9. If NewsGuard is unable to answer any question fully, supply such information and data as are available. Explain why the answer is incomplete, the efforts made by NewsGuard to obtain the information and data, and the source from which the complete answer may be obtained. If books and records that provide accurate answers are not available, enter best estimates and describe how the estimates were derived, including the sources or bases of such estimates. Estimated data should be followed by the notation "est." If there is no reasonable way for NewsGuard to make an estimate, provide an explanation.

I 10. If documents responsive to a particular Specification no longer exist for reasons other than the ordinary course of business or the implementation of NewsGuard's document retention policy, but NewsGuard has reason to believe have been in existence, state the circumstances under which they were lost or destroyed, describe the documents to the fullest extent possible, state the Specification(s) to which they are responsive, and identify the persons having knowledge of the content of such documents.

I 11. Do not destroy or dispose of documents responsive to this CID, or any other documents relating to the subject matter of this CID. The destruction or disposal of such documents during the pendency of this investigation might constitute a felony in violation of 18 U.S.C. § 1505 and 18 U.S.C. § 1512.

I 12. In order for NewsGuard's response to this CID to be complete, the attached certification form must be executed by the NewsGuard official supervising compliance with this CID, notarized, and submitted along with the responsive materials.

I 13. Any questions you have relating to the scope or meaning of anything in this CID or suggestions for possible modifications thereto should be directed to Justin Epner at (202) 326-2942 or jepner@ftc.gov. The response to the CID shall be delivered per the instruction of Mr. Epner during the course of normal business (8:30 a.m. to 5:30 p.m., Monday through Friday). Mr. Epner will provide specific mail delivery instructions should that method of transmittal be required.

**CERTIFICATION OF COMPLIANCE**

**Pursuant to 28 U.S.C. § 1746**

I, __________________________, certify the following with respect to the Federal Trade Commission's ("FTC") Civil Investigative Demand directed to NewsGuard Technologies, Inc. ("NewsGuard") (FTC File No. 251-0061) (the "CID"):

1. NewsGuard has identified all documents, information, and/or tangible things ("responsive information") in NewsGuard's possession, custody, or control responsive to the CID and either:
   a. provided such responsive information to the FTC; or
   b. for any responsive information not provided, given the FTC written objections setting forth the basis for withholding the responsive information.
2. I verify that the responses to the CID are complete and true and correct to my knowledge.

I certify under penalty of perjury that the foregoing is true and correct.

Date: __________________________

______________________________
Signature

______________________________
Printed Name

______________________________
Title

**UNITED STATES OF AMERICA**
**BEFORE THE FEDERAL TRADE COMMISSION**

**COMMISSIONERS:** **Lina M. Khan, Chair**
**Noah Joshua Phillips**
**Rebecca Kelly Slaughter**
**Christine S. Wilson**
**Alvaro M. Bedoya**

**RESOLUTION DIRECTING USE OF COMPULSORY PROCESS**
**IN NONPUBLIC INVESTIGATIONS OF COLLUSIVE PRACTICES**

**File No. P859910**

Nature and Scope of Investigation:

To investigate whether any persons, partnerships, corporations, or others have engaged or are engaging in inviting, initiating, participating in, or facilitating collusion or coordination in any way with any other market participant, whether through private communications, public statements, sharing information, or other actions, in violation of Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, as amended, or any other statutes or rules enforced by the Commission; and to determine the appropriate action or remedy, including whether injunctive and monetary relief would be in the public interest.

The Federal Trade Commission hereby resolves and directs that any and all compulsory processes available to it be used in connection with any inquiry within the nature and scope of this resolution for a period not to exceed ten years. The expiration of this ten-year period shall not limit or terminate the investigation or the legal effect of any compulsory process issued during the ten-year period. The Federal Trade Commission specifically authorizes the filing or continuation of actions to enforce any such compulsory process after the expiration of the ten-year period.

Authority to Conduct Investigation:

Sections 6, 9, 10, and 20 of the Federal Trade Commission Act, 15 U.S.C. §§ 46, 49, 50, and 57b- 1, as amended; and FTC Procedures and Rules of Practice, 16 C.F.R. § 1.1 *et seq*., and supplements thereto.

By direction of the Commission.

**Issued: July 1, 2022**
**Expires: July 1, 2032**

April J. Tabor
Secretary

# EXHIBIT 2

**BEFORE THE UNITED STATES**
**FEDERAL TRADE COMMISSION**

| | |
|---|---|
| In the Matter of<br><br>The Civil Investigative Demand dated May 20, 2025, to NewsGuard Technologies, Inc. | **PUBLIC**<br><br>FTC File No. 251-0061 |

**STATEMENT OF COUNSEL PURSUANT TO 16 C.F.R. § 2.10(a)(2) IN SUPPORT OF PETITION TO QUASH CIVIL INVESTIGATIVE DEMAND**

1. Counsel for Petitioner NewsGuard Technologies, Inc. ("NewsGuard") respectfully submits this Statement of Counsel pursuant to 16 C.F.R. § 2.10(a)(2) in support of the Petition to Quash the Civil Investigative Demand ("CID") filed by NewsGuard on January 16, 2026 in this matter.

**Chronology of Cooperation**

2. On May 20, 2025, the FTC issued a Civil Investigative Demand ("CID") to NewsGuard containing 31 Specifications.

3. On May 28, 2025, NewsGuard's counsel Sophia A. Hansell and Matthew C. Parrott and FTC staff attorneys Justin Epner and Theodore Zang ("Staff") held a meet-and-confer to discuss the CID.[1] NewsGuard described its objections to the CID, including that the CID would chill NewsGuard's First Amendment rights and that, as written, it would impose unreasonable burdens on NewsGuard. NewsGuard explained that it would attempt to respond to the CID in good faith in an effort to rectify any misperceptions about NewsGuard's business and conduct, but that if Staff could not reasonably address NewsGuard's objections, NewsGuard may need to move to quash the CID. NewsGuard and Staff agreed to discuss ways in which NewsGuard could

[1] Unless otherwise mentioned, a combination of those attorneys participated in each meet-and-confer conference referenced in this Statement of Counsel.

reasonably respond to the CID while balancing NewsGuard's objections. And Staff assured NewsGuard that it would extend the deadline to move to quash the CID as long as NewsGuard made progress complying with the CID. During that conversation, Staff identified Specifications 9, 13, and 23 as its highest priority specifications.

4. On June 3, 2025, NewsGuard made its first production of documents responsive to the CID. This production contained 11,039 pages of documents and included NewsGuard's Articles of Incorporation in response to Specification 1 and, in response to Specification 10, a complete reproduction of all documents and correspondence previously produced to the United States House of Representatives.

5. On June 4, 2025, NewsGuard and Staff held a meet-and-confer addressing the scope and priorities of the remaining Specifications in the CID. During that conversation, NewsGuard provided an update on Staff's high-priority Specifications by informing Staff that NewsGuard was compiling documents responsive to Specification 9 and developing a modification proposal for responding to Specification 13. NewsGuard further informed Staff that it had no documents responsive to Specification 23 in its possession.

6. On June 12, 2025, NewsGuard sent a letter to Staff providing contextual information relevant to several Specifications and describing NewsGuard's mission, methodology, and products. In particular, the letter described NewsGuard's apolitical, criterion-based ratings methodology, the distinction between its Misinformation Fingerprints and site ratings, and the transparency and accountability features of its process (e.g., contacting publishers for comment, publishing "Nutrition Labels," and disclosing rating criteria and staff authorship). The letter also explained that NewsGuard rates a diverse collection of news outlets across the perceived political spectrum. In addition, the letter included sample materials for Staff's review.

7. On June 18, 2025, NewsGuard and Staff held a meet-and-confer during which NewsGuard answered Staff's questions regarding NewsGuard's previous submissions.

8. On June 27, 2025, NewsGuard sent a letter to Staff responding to various open questions from the June 18 meet-and-confer, as well as providing additional context relevant to several of the Specifications.

9. On July 10, 2025, NewsGuard and Staff held a meet-and-confer to discuss NewsGuard's June 27, 2025 letter. Also at that time, Staff asked NewsGuard to prioritize Specification 12.

10. On July 17, 2025, NewsGuard made a second production of documents. The production contained 28,905 pages of documents responsive to Specification 9.

11. Also on July 17, NewsGuard sent a letter seeking modification of Specifications 11, 12, and 13. This letter explained that, as written, those Specifications were unreasonably broad and burdensome, effectively calling for nearly all of NewsGuard's work product and journalistic materials. NewsGuard proposed a sampling methodology spanning approximately 40 publishers across categories and across the perceived political spectrum, with historical data from 2020 forward.

12. On July 18 and 31, 2025, NewsGuard and Staff held meet-and-confers to discuss NewsGuard's July 17 letter. Staff asked questions about the proposed sampling methodology, and NewsGuard described its First Amendment concerns with producing more data, including the identity of clients.

13. On August 4, 2025, following a telephone conversation with NewsGuard, Staff sent NewsGuard an email claiming that NewsGuard had produced information responsive only to

Specifications 1, 9, and 10. Staff also requested that NewsGuard henceforth treat Specifications 8 and 21 as priorities.

14. On August 15, 2025, NewsGuard sent Staff a letter explaining that the information contained in NewsGuard's prior productions and letters substantially complied with at least 16 of the Specifications. The letter also enumerated NewsGuard's continuing objections to the CID.

15. On August 21, 2025, NewsGuard and Staff held a meet-and-confer to discuss NewsGuard's August 15 letter. During that call, Staff acknowledged that NewsGuard had responded to more than three of the CID's Specifications. Staff also requested that for Specification 9, NewsGuard produce communications with six additional entities not previously identified in Specification 9.

16. On September 8, 2025, NewsGuard and Staff held a meet-and-confer to discuss Staff's additional request related to Specification 9. NewsGuard and Staff also discussed NewsGuard's modification request related to Specifications 11 through 13 and a potential compromise related to disclosing NewsGuard's customers.

17. On September 11, 2025, NewsGuard made its third production with nine pages of documents collected in response to Specifications 19 through 21.

18. On November 17, 2025—shortly after the Federal Government reopened after a 43-day shutdown—NewsGuard and Staff held a meet-and-confer to discuss the status of NewsGuard's CID compliance. At that time, NewsGuard informed Staff that NewsGuard was prepared to make a further production with data related to Specifications 11 through 13 as well as anonymized customer information. NewsGuard also informed Staff that, in the spirit of cooperation, it was collecting and reviewing documents related to Staff's expanded Specification 9 request.

19. The next day, on November 18, 2025, NewsGuard made its fourth production with an additional 40 pages of documents and a spreadsheet containing a large sampling of NewsGuard's news ratings data spanning multiple years.

20. On December 3, 2025, NewsGuard sent a letter to Staff providing additional information and data responsive to questions posed by Staff during the November 17 meet-and-confer regarding the programmatic advertising ecosystem and NewsGuard's business.

21. On December 8, 2025, NewsGuard made its fifth production of documents, which contained 1,187 pages of communications between NewsGuard and the Specification 9 entities identified by Staff on August 21.

22. On January 13, 2026, NewsGuard and Staff held a meet-and-confer. NewsGuard reiterated its objections to the CID, asked Staff for assurances that Staff would not request additional information or materials from NewsGuard, and stated that it was prepared to move to quash the CID as an ongoing unconstitutional retaliation against NewsGuard for its protected First Amendment activities and because the CID's unconstitutionally broad and intrusive demands impermissibly chill NewsGuard's speech and associational rights. Staff did not provide those assurances and, instead, asked for additional information related to NewsGuard's December 3 letter.

23. On January 15, 2026, NewsGuard sent an email to Staff responding to the questions posed by Staff during the January 13 meet-and-confer. Later that day, Staff sent NewsGuard a letter purporting to "clarif[y]" NewsGuard's "obligations under the" CID and offering various modifications. However, the proposed modifications abandoned the sampling approach the parties had been discussing for Specifications 11 and 12, and instead demanded all of NewsGuard's reliability ratings. Staff also continued to request the identities of and communications with

NewsGuard's customers, as well as documents reflecting NewsGuard's journalistic methodologies.

24. On January 16, 2026, NewsGuard sent Staff an email explaining that the proposed modifications did not resolve NewsGuard's constitutional objections to the CID and that NewsGuard would petition to quash the CID based on NewsGuard's continuing objections.

25. Over the course of these months, Staff extended NewsGuard's deadline to move to quash the CID several times. Staff provided the latest extension on November 26, 2025, thereby extending the petition to limit or quash deadline relating to the CID to January 16, 2026.

**Summary of CID Compliance**

26. Having engaged in a good-faith effort to comply with the CID and cooperate with the FTC's investigation, to date, NewsGuard has made productions totaling 41,180 pages of documents, submitted numerous substantive letters answering Staff's questions, provided other information sought by the CID and Staff in emails and during phone calls, and engaged in at least ten substantive meet-and-confers regarding NewsGuard's objections and compliance with the CID. As a result of NewsGuard's good-faith effort, in the letter from Staff dated January 15, 2026, Staff confirmed that NewsGuard "has satisfied its CID obligations, except for" Specifications 8, 11, 12, 15, and 26.

27. NewsGuard has engaged with Staff on every one of the 31 Specifications in the CID and has substantially complied with most of them, as explained below.

a. Specification 1 – Requesting Articles of Incorporation. NewsGuard provided the requested information.

b. Specification 2 – Requesting NewsGuard's office location. NewsGuard provided the requested information.

c. Specification 3 – Requesting organizational charts. NewsGuard informed Staff that it does not maintain historical organizational charts and that the current, complete list of NewsGuard employees appears on NewsGuard's public website to which NewsGuard directed Staff. NewsGuard has responded to all follow-up questions from Staff regarding its historical staffing.

d. Specification 4 – Requesting descriptions of NewsGuard's products and services. NewsGuard described its products and services in correspondence, including letters dated June 12, 2025 and June 27, 2025.

e. Specification 5 – Requesting all documents relating to NewsGuard's news reliability ratings and any other ratings. NewsGuard explained to Staff that this Specification essentially requests every piece of work product ever generated by NewsGuard and NewsGuard's journalistic materials, including reporting and gathering of information from sources. NewsGuard has continuously maintained that this Specification violates its First Amendment rights.

f. Specifications 6, 7, 17, and 18 – Requesting communications regarding particular reliability ratings. NewsGuard explained to Staff that any feedback from publishers on the ratings NewsGuard assigns to them is published on publishers' rating pages, and NewsGuard offered to provide a sample of such rating pages beyond what was included in the documents produced in the first production. NewsGuard also informed Staff that it does not keep a centralized record of communications from third parties about a particular publisher's rating, and that searching for and producing all such communications would be

unreasonably burdensome. NewsGuard informed Staff that examples of such communications were included in its document productions.

g. Specifications 8 and 26 – Requesting identification of and all communications with NewsGuard's customers. NewsGuard informed Staff that it objects to providing information about its customers because doing so would be a violation of its First Amendment rights. NewsGuard has refused to comply with the demand that it disclose customer information, including the names of its subscribers. In an effort to protect its First Amendment rights relating to NewsGuard subscribers, NewsGuard was willing only to provide sample anonymized contracts and anonymized descriptions of customers, but has consistently remained unwilling to comply with the demand that it disclose its subscribers.

h. Specification 9 – Requesting documents related to enumerated third parties. NewsGuard produced approximately 30,000 pages of communications responsive to this request.

i. Specification 10 – Requesting all documents produced to the United States Congress. NewsGuard produced all requested documents.

j. Specifications 11 through 13 – Requesting documents and data relating to NewsGuard's ratings. After multiple conversations with Staff seeking to narrow these Specifications to information that would be most useful to Staff, NewsGuard produced a sampling of multiple years' worth of ratings data.

k. Specifications 14 and 15 – Requesting documents related to NewsGuard's rating methodology. NewsGuard responded to these Specifications in its

substantive letters. Documents in its productions also provided further explanation of NewsGuard's ratings and methodologies.

l. Specifications 16, and 19 through 21 – Requesting analysis of the effect of NewsGuard's reliability ratings. NewsGuard pointed Staff to public statements it has made relevant to these Specifications and provided further explanation in its letters and in documents produced.

m. Specification 22 – Requesting all documents related to the purpose of NewsGuard's ratings. NewsGuard provided detailed narrative descriptions of the mission and purpose of its ratings. And NewsGuard produced marketing materials explaining its mission and purpose.

n. Specification 23 – Requesting all documents related to NewsGuard's use of AI technology. NewsGuard explained to Staff that it has no documents in its possession responsive to this Specification because it does not use AI to generate ratings.

o. Specification 24 – Requesting documents related to NewsGuard's development of technology with third parties. NewsGuard explained to Staff that NewsGuard has not engaged any technology development company to develop any unique technology to further its purpose. Accordingly, no documents exist responsive to this Specification.

p. Specification 25 – Requesting all studies related to social media or digital advertising. NewsGuard explained to Staff that it regularly publishes reports on topics of public interest, including on its website and in its Reality Check

newsletter. These reports cover a wide range of topics in the news. NewsGuard provided Staff URLs to all such reports, which are publicly available.

q. Specifications 27 and 28 – Requesting NewsGuard's financial information. While objecting to these requests as overbroad, in the spirit of cooperation, NewsGuard produced its P&L statement.

r. Specification 29 – Requesting information related to data sets produced in response to the CID. NewsGuard provided detailed information about the data sets it has produced.

s. Specification 30 – Requesting information regarding NewsGuard's document preservation efforts. NewsGuard confirmed for Staff that shortly after receiving the CID, it issued a document retention notice to ensure that potentially relevant materials are preserved and otherwise implemented appropriate document preservation measures on centralized systems.

t. Specification 31 – Requesting information on the source of information provided in response to the CID. NewsGuard informed Staff that the Specification responses in its substantive letters were drafted by or with the assistance of legal counsel at Gibson Dunn, at the direction of NewsGuard leadership, including its General Counsel. Because communications about the drafting of these letters are protected by privileges, NewsGuard did not disclose the substance of the communications.

28. Since the FTC issued the CID, the legal expense NewsGuard has incurred to comply with the CID and Staff's requests has exceeded 28% of the revenue NewsGuard has derived from the advertising brand-safety services it offers clients.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 16, 2026, in Irvine, California.

*/s/ Matthew C. Parrott*

Matthew C. Parrott
GIBSON, DUNN & CRUTCHER LLP
3161 Michelson Drive Suite 1200
Irvine, CA 92612
Tel: (949) 451-3823
MParrott@gibsondunn.com

# EXHIBIT 3

UNITED STATES OF AMERICA
Federal Trade Commission
WASHINGTON, D.C. 20580

January 15, 2026

**VIA EMAIL**

NewsGuard Technologies, Inc.
c/o Sophia A. Hansell, Esq.
Gibson Dunn & Crutcher LLP
1700 M Street, NW
Washington, DC 20036
SHansell@gibsondunn.com

**Re: FTC File No. 251-0061**

Dear Ms. Hansell:

This letter responds to your request for clarification in our January 13, 2025 teleconference as to NewsGuard Technologies, Inc.'s ("NewsGuard") obligations under the May 20, 2025 Civil Investigative Demand ("CID") issued by the Commission. As staff have said consistently during multiple meet-and-confer teleconferences with NewsGuard,[1] this investigation seeks information regarding potential anticompetitive behavior by companies operating in the online digital advertising ecosystem, including whether certain companies may have colluded to deny advertising revenue to American political commentary publishers. While we appreciate the materials NewsGuard has produced to date, we require a discrete set of additional information before we can accept a certification of compliance with the CID.

Therefore, consistent with staff's good-faith effort to reduce NewsGuard's burden consistent with the Commission's need for information, this letter modifies the CID pursuant to FTC Rule 2.7(*l*) as follows:

**Specification 8**. Modified to limit the Specification to communications between NewsGuard and any advertiser, advertising agency, or any person acting as an agent of an advertiser, including but not limited to demand side platforms and supply side platforms, with whom NewsGuard had a commercial relationship relating to NewsGuard News Reliability Ratings.

**Specification 11**. Modified to limit the Specification to entities to whom NewsGuard has assigned a News Reliability Rating.

[1] May 28, 2025, June 4, 2025, June 18, 2025, July 10, 2025, July 18, 2025, July 31, 2025, August 21, 2025, September 8, 2025, November 17, 2025, and January 13, 2026.

**Specification 12**. Specification 12 remains outstanding.

**Specification 15**. Modified to limit the Specification to documents sufficient to show the methodology by which NewsGuard determines NewsGuard's News Reliability Ratings, including internal correspondence about the process of developing the methodology.

**Specification 26**. Modified to limit the Specification to Data Sets sufficient to show, for each customer (other than natural persons) of NewsGuard News Reliability Ratings: the name of the customer; any unique identifier(s) used to identify the customer across NewsGuard's databases or data sets; and any categorization of the customer type, including but not limited to whether the customer is educational, not-for-profit, governmental, and/or a business.

As to the Specifications not specifically addressed in this modification letter, based on its prior productions NewsGuard has satisfied its CID obligations, except for Specification 12, for which NewsGuard owes a response.

As you are aware, the modifications granted in this letter are substantial. In letters dated June 27, July 17, and August 15, 2025, as well as in meet-and-confer teleconferences, you objected to the CID as unduly burdensome. While we disagree, these modifications should serve to address any burden concerns that NewsGuard may have.

If you have any questions concerning the CID or this letter, please contact Justin Epner at (202) 326-2942 or jepner@ftc.gov. As you know, modifications may only be made in writing and by a Commission representative.

*/s/ Patricia Galvan*
Patricia Galvan
Assistant Director
Technology Enforcement Division
Bureau of Competition

cc:
Justin Epner
Ted Zang
Attorneys, Bureau of Competition

# EXHIBIT 4

PUBLIC

UNITED STATES OF AMERICA
Federal Trade Commission
WASHINGTON, D.C. 20580

November 26, 2025

**VIA EMAIL**

NewsGuard Technologies, Inc.
c/o Sophia A. Hansell, Esq.
Gibson Dunn & Crutcher LLP
1700 M Street, NW
Washington, DC 20036
SHansell@gibsondunn.com

**Re: FTC File No. 251-0061**

Dear Ms. Hansell:

In connection with the May 20, 2025 Civil Investigative Demand issued by the Commission to NewsGuard Technologies, Inc. ("NewsGuard") ("the CID"), you requested an extension of the return date. The current deadline is December 2, 2025. In light of NewsGuard's ongoing engagement, including its recent production of documents responsive to CID Specifications 8, 11-13, and 29, and commitment to produce additional documents responsive to Specification 9, as well as with the expectation of, *e.g.*, continued efforts to meet-and-confer regarding data responsive to Specifications 11-13, and taking into account the upcoming holidays, this letter extends the return date pursuant to FTC Rule 2.7(*l*), 16 C.F.R. § 2.7(*l*), to January 16, 2026. Pursuant to Federal Trade Commission Rule 2.10(a)(5), this letter extends the petition to limit or quash deadline relating to the CID to January 16, 2026.

Sincerely,

*/s/ Justin Epner*
Justin Epner
Attorney, Bureau of Competition

APPROVED:

*/s/ Patricia Galvan*
Patricia Galvan
Assistant Director
Technology Enforcement Division
Bureau of Competition

BEFORE THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NEWSGUARD TECHNOLOGIES,<br>Plaintiff,<br>vs.<br>FEDERAL TRADE COMMISSION, et al.,<br>Defendants. | Case Number 26-cv-353<br><br>Washington, D.C.<br>March 4, 2026<br>2:03 p.m. |

TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE DABNEY L. FRIEDRICH
UNITED STATES DISTRICT JUDGE

APPEARANCES:

| | |
|---|---|
| For the Plaintiff: | ROBERT CORN-REVERE, ESQ.<br>SAMUEL RUDOVSKY, ESQ.<br>JAMES GRANT, ESQ.<br>SARA BERINHOUT, ESQ.<br>Foundation for Individual Rights and Expression<br>700 Pennsylvania Avenue Southeast<br>Suite 340<br>Washington, D.C. 20003 |
| For the Defendants: | ALEX POTAPOV, ESQ.<br>ETHAN BECK, ESQ.<br>THOMAS BYRON, ESQ.<br>ROBERT ZUVER, JR., ESQ.<br>Federal Trade Commission<br>600 Pennsylvania Avenue Northwest<br>Washington, D.C. 20580 |
| Official Court Reporter: | SARA A. WICK, RPR, CRR<br>333 Constitution Avenue Northwest<br>Room 4704-B<br>Washington, D.C. 20001<br>202-354-3284 |

Proceedings recorded by stenotype shorthand.
Transcript produced by computer-aided transcription.

P R O C E E D I N G S

(Call to order of the court.)

COURTROOM DEPUTY: We are on the record in Civil Action 26-353, NewsGuard Technologies versus the Federal Trade Commission, et al.

Starting with plaintiff's counsel, please approach the podium and state your appearance for the record.

MR. CORN-REVERE: Robert Corn-Revere for NewsGuard Technologies. With me at counsel table are James Grant, Sara Berinhout, and Samuel Rudovsky.

THE COURT: All right. Thank you. Will you all be sharing the argument, or will you be arguing?

MR. CORN-REVERE: I will be doing the argument.

THE COURT: Okay. The defendants?

MR. POTAPOV: Alex Potapov from the Federal Trade Commission. I will be doing the argument. And with me at counsel's table are Tom Byron, Bob Zuver, and Ethan Beck.

THE COURT: All right. Welcome, everyone.

We are here on NewsGuard's motion for preliminary injunction. NewsGuard argues that a Civil Investigative Demand that the FTC issued to NewsGuard in May 2025 and a condition that the FTC imposed in September 2025 on the merger of Omnicom Group, Inc., and the Interpublic Group of Companies, Inc., violate NewsGuard's First and Fourth Amendment rights.

NewsGuard alleges that the CID and the merger conditions

are causing the company ongoing irreparable constitutional injury, economic loss, and associational harm.

All right. I do have a number of questions for each side.

Mr. Corn-Revere, I will start with you. I will have you come up. Let me start initially with a few jurisdictional questions.

In a typical case, a challenge to an FTC demand would generally wait for an enforcement action, but the D.C. Circuit made clear in *Paxton* that this rule gives way when a company challenges a sweeping CID on First Amendment grounds and demonstrates actual and ongoing harm to its constitutional rights.

So, based on *Paxton*, you must show that you have a present, a concrete, and an ongoing harm that needs to be addressed now as opposed to some future date.

So can you walk me through what these First Amendment harms are.

MR. CORN-REVERE: Yes, Your Honor.

First of all, I want to place the CID in context, because it was issued after a months-long campaign in which NewsGuard was constantly vilified. The government's seeking its list of customers; other federal agencies, the FCC, for example, writing to major tech companies and demanding information on who NewsGuard does business with; and then that was followed by the CID, which asked for all kinds of information, basically all of

NewsGuard's information from the time that it was --

THE COURT: And I will get to the scope of the CID. I know it's very broad. I agree with you.

But for now, can you focus on what your alleged harms are that are ongoing and need to be addressed now as opposed to a future date when the Court could reach the merits.

MR. CORN-REVERE: The substantial burdens that have been placed on NewsGuard so far, in that it has tried to work with the FTC. It produced 40,000 documents. It has spent over 30 percent of its profits for its news reliability ratings business trying to comply with the CID.

And the fact that it is an ongoing request for information focused on the customers as well, which tends to scare them off, means that the harm of the investigation itself is imposing substantial burdens on NewsGuard as a business, a publishing business.

THE COURT: Principally, you're asserting business harms?

MR. CORN-REVERE: Well, we're asserting harms to a publishing company based -- that are focused on it specifically because of its viewpoints and because of its constitutional rights. That was what the D.C. Circuit looked at in *Paxton* and said that there is a separate harm from, say, a chilling effect --

THE COURT: But are you asserting that you are

chilled?

MR. CORN-REVERE: I think the -- well, the answer to that question is yes, and we can provide more information on what changes NewsGuard has been required to make under the circumstances.

THE COURT: I thought that you weren't saying that you were chilled.

MR. CORN-REVERE: Excuse me?

THE COURT: I thought that you were not saying that you are chilled currently.

And if you are, can you point me to those assertions?

MR. CORN-REVERE: We haven't made those allegations specifically on the record so far.

THE COURT: Okay. But now is the time. So right now, what is the chill that's in the record?

MR. CORN-REVERE: What I can tell you is that since the CID has been issued and NewsGuard has been trying to comply, that it has stopped publishing reports on advertiser reliability. It has tempered which of the subjects that it focuses on, focusing more on foreign sources of misinformation.

It stopped using the term "misinformation" altogether in its reports, because that's one thing that the investigators and its political critics have focused on. And as a consequence, that is having a marked effect on its business.

And the test for whether or not there is an ongoing injury

is whether or not this would deter a publisher of reasonable firmness. And I think that this kind of investigative colonoscopy is precisely the kind of thing that would chill any publisher.

But as I was saying earlier --

THE COURT: Well, let me stop you there.

I get that that is sufficient to show retaliation. But separate and apart from that, don't you also have to show for irreparable harm ongoing current injury that the Court needs to address now?

MR. CORN-REVERE: Well, yes, and I think the harms that I mentioned are the ones that --

THE COURT: Okay. So I want to make sure I've got them straight. So you say you've stopped publishing reports on certain advertising?

MR. CORN-REVERE: Exactly, that the reports have focused on foreign sources of disinformation as opposed to --

THE COURT: Foreign sources. So NewsGuard is no longer focused on domestic advertising?

MR. CORN-REVERE: It still reports on domestic news issues but has stopped publishing reports specifically on advertising.

THE COURT: And that is because why?

MR. CORN-REVERE: Because of the ongoing investigation. It's where the process is the punishment.

THE COURT: What about the ongoing investigation prevents NewsGuard from publishing in those spaces?

MR. CORN-REVERE: That's what the chilling effect is. Because so much of the focus has been on the very term "misinformation," saying that is a code word for left-leaning, that NewsGuard has shied away from characterizing reports in that way that draw more attention from regulators. It has spent substantial sums trying to comply with this. And this has affected the associations with other businesses.

THE COURT: But is that a business choice NewsGuard is making, or is it really chilled by the investigation, prevented from publishing in that space?

MR. CORN-REVERE: Well, there is not -- other than in the Omnicom consent order, which imposes a specific black list on the merged companies using NewsGuard, these other effects are the effects of NewsGuard's reaction. It wouldn't have made these independently of the government pressure being implied through this expansive CID, but they are effects on what it has been publishing.

That's the definition of a chilling effect.

THE COURT: And on the black list that you say is created by the merger condition, as a result of that condition, the two companies cannot -- can no longer use NewsGuard's services?

MR. CORN-REVERE: That's right. Certainly, the

companies affected by the -- that are subject to the merger conditions can't use NewsGuard. We've had -- actually, since the declaration was filed, NewsGuard has heard from additional clients that they are going to stop using NewsGuard.

And that doesn't even speak to those businesses that will be deterred by the fact that this is an area that is already receiving substantial government attention and pressure from government agencies, saying that they shouldn't be using this kind of service.

THE COURT: And I guess I have the same question.

To what extent is that a business versus a First Amendment harm?

MR. CORN-REVERE: Well, when the government is targeting a company because of its viewpoints and that causes that company both to change what it is doing from an editorial standpoint and from those who would consume that product, then that is a legally cognizable chilling effect.

THE COURT: And the language in the condition, in your view, does it apply exclusively to NewsGuard, or does it apply to other entities as well?

MR. CORN-REVERE: It can apply to others, but it was adopted specifically at Newsmax's request so that it would apply to NewsGuard. As originally drafted, the consent order condition would have applied only to ratings based on political or ideological standpoints. When Newsmax objected to that and

said that it wouldn't cover NewsGuard and cited NewsGuard extensively in its comments to the FTC, then it was altered to say that anyone who provides third-party ratings based on journalistic standards and ethics also is covered.

Now, it didn't say NewsGuard specifically. But as we pointed out in our reply brief, it didn't have to, because it was specifically adopted so that it would apply to NewsGuard, and the terms of the condition then fit NewsGuard like a glove.

THE COURT: Okay. And how, if at all, should the Court distinguish between the asserted First Amendment harms and the business harms?

MR. CORN-REVERE: Well, I don't think there really is a difference. And that was the point of the *Playboy* case, which cited whether or not someone is being penalized from a business standpoint because of their editorial choices. And the Court in that case held that the loss of business -- in this case, a certain percentage of the business -- because of the reaction to the government regulations was First Amendment harm.

And as the Court put it, the difference between a ban and a First Amendment violation is just a matter of degree.

THE COURT: All right. But is a loss of business really a First Amendment chilling?

MR. CORN-REVERE: Well, it is when you're having government-applied pressure specifically because of the viewpoints and editorial position of a business, and then as a

result of that, the business suffers as a result.

That was also the point in *Backpage v. Dart*, where -- what Judge Posner called was a campaign of suffocation, saying that if you don't like the business's output, you can apply pressure, and as a result of that, the lost business is a First Amendment harm.

THE COURT: And the viewpoint-specific restriction in the merger condition -- at least on its face, it's not viewpoint-specific, but you're saying because of what Newsmax said, that was targeted to NewsGuard?

MR. CORN-REVERE: Well, there are two parts to that, Your Honor. In terms of the Omnicom merger condition, that was targeted on anyone who rates news sites based on journalistic standards and journalistic ethics.

That, by the way, is a viewpoint-based restriction, and that was targeted specifically at NewsGuard at Newsmax's request.

The other part of it, too, is the investigation, which has sought every bit of information of NewsGuard about how and why it rates sites. And this was done -- when you pull back and look at the full context in which these cases came about, is that it was done after months of complaining about NewsGuard claiming that its viewpoints and editorial position were, in the viewpoint of the current government, wrong.

So as a result, they said, "We are going to investigate,

and we are going to go after them because we perceive them to be left-leaning," which is incorrect. But nonetheless, that was the stated reason for going after them.

And that's where, similar to *Media Matters v. Paxton*, where the D.C. Circuit looked at that, and Judge Edwards wrote that that was really a distinct harm. There was the chilling effect that Media Matters had alleged, but in addition to that, being the subject of government retaliation because of a viewpoint is an independent harm.

And that's certainly what we have here.

THE COURT: All right. Well, could any business facing a CID construe their operations as First Amendment and claim irreparable injury from the loss of customers?

MR. CORN-REVERE: Not if they're not a publisher of First Amendment-related business.

THE COURT: But any publisher?

MR. CORN-REVERE: It would depend on the focus of the investigation. As I say, here, both in terms of the conception, the reasons stated for why an investigation was going to take place, and by the breadth and terms of the CID itself, it is focused on NewsGuard's editorial positions, and on that basis, you would have to make the case in every instance whether or not --

THE COURT: We will get more to that in a minute when we're looking at retaliation on the merits. But there were

certainly grounds that were antitrust related, at least that were asserted.

MR. CORN-REVERE: Well, they were asserted, but, Your Honor, we think they are pretextual, and I think that's clear from a variety of things. One is the fact that the investigation was framed in ideological terms, which all of the cases involving *Media Matters* found to be the case, found that first by framing the investigation by talking about the ideology or the perceived editorial viewpoint makes that -- describes the context in which the investigation takes place and lends itself to a conclusion that the government's claim that this is antitrust harm is pretextual.

The second part of that -- and this is something that we address in our reply brief as well -- is the admission in the government's brief that we shouldn't assume that the Omnicom consent decree condition was meant to apply to NewsGuard because it only, after all, represents 1/10 of 1 percent of the brand reliability market.

If that's the case, then it is an admission that concerning antitrust harms, this investigation is --

THE COURT: All right. We will get there.

Let me go back to the injury, and let me ask you: What is your best case to support your position that NewsGuard's loss of business constitutes irreparable harm?

MR. CORN-REVERE: Well, again, I think the Supreme

Court settled that in *Playboy Entertainment Group* when it said that the loss of profits to a First Amendment business, when it's been targeted because of its editorial viewpoint, is First Amendment injury.

And we have alleged that just the response to the CID alone has cost more than a third of the revenue of NewsGuard, has placed incredible burdens on the business. It faces an existential threat.

THE COURT: And you're asking me to conclude that the investigation was targeted to NewsGuard's viewpoint based on the statements that the chairman made? What specifically are you relying on for that assertion?

MR. CORN-REVERE: Well, it's a combination of things. I think the -- you can look at this in sort of three phases.

In the run-up to Chairman Ferguson becoming chairman, he made a number of statements in public -- social media posts and interviews --

THE COURT: But basically, you're relying on his statements? I just want to know the categories. His statements --

MR. CORN-REVERE: I think that set the tone, where he explains exactly why he plans --

THE COURT: And what else beyond his statements?

MR. CORN-REVERE: Beyond his statements? Well, there was also -- this was another statement of Chairman Ferguson when

he was still commissioner. At the end of --

THE COURT: I know. I've looked at all those statements. I'm just trying to get the different categories. You've got statements by the chairman before and after he became chair.

MR. CORN-REVERE: The background there set the context for why the investigation is taking place.

THE COURT: And what else?

MR. CORN-REVERE: And after that, the investigations that he foreshadowed materialized.

THE COURT: Wait. "The investigations." You mean of NewsGuard or other entities?

MR. CORN-REVERE: There were other entities as well, that's right.

THE COURT: I'm just trying to understand how you're framing it. It's congressional investigations involving NewsGuard, or investigations of other entities like Media Matters? What are you --

MR. CORN-REVERE: Well, at this point, I'm talking about FTC investigations. There was, in February of 2025, the general inquiry on tech censorship that had been foreshadowed by the earlier statements of Commissioner, then Chairman Ferguson.

THE COURT: And did NewsGuard's name come up in those investigations?

MR. CORN-REVERE: I'm not sure. I haven't read all of

the comments that were filed with the FTC.

THE COURT: So you're just talking about the overall context?

MR. CORN-REVERE: That's right; that's right. And then on May 20, the NewsGuard CID was issued. And as I say, the breadth and the subjects of that inquiry both show that it is, I think, pretextual and focused on the editorial viewpoints of NewsGuard.

THE COURT: So chairman statements and scope of the demand?

MR. CORN-REVERE: Yes.

THE COURT: As well as the overall context in the news generally?

MR. CORN-REVERE: Right. It is the product of a campaign that began before Chairman Ferguson became chairman, and then it came into fruition after he became chairman.

And then when the Omnicom original consent order was released before it was modified on June 23rd, Chairman Ferguson issued a statement at that time and mentioned NewsGuard specifically, saying that he thought it was necessary to investigate and make sure that -- let's see if I can find it.

Yeah, he described -- even though this is not related to the subject of the merger, he says -- called NewsGuard "an organization that has publicly sought to use the choke point of the advertising industry to effect political and ideological

goals" and alleging that "NewsGuard steers advertising revenue with an unavoidable partisan lens."

Now, at the time, as we mentioned in our papers, that was based on the misconception and, we think, the distortion that NewsGuard made political ideological judgments.

When it was brought to the FTC's attention that it doesn't, that its judgments are based on news-related, transparent, journalistic standards, then the consent order was modified to include any kind of third-party ratings of news or essays.

THE COURT: With regard to the *Playboy* case that you mentioned earlier, am I correct that involved a permanent injunction rather than a preliminary injunction?

MR. CORN-REVERE: It was a permanent injunction, but a preliminary -- well, actually, to trace the history of the case, originally, there was a TRO issued, and then preliminary injunctive relief was denied based on the fact that at the time the Court was waiting to see how the record would develop.

And then after summary judgment, the Supreme Court upheld it, saying that the loss of business was sufficient to show --

THE COURT: All right. And while the standards for a permanent injunction and preliminary injunction are similar, there's still a distinction, is there not, for a preliminary injunction, in that you have to show you need relief now?

MR. CORN-REVERE: Well, that's right, and I think the fact --

THE COURT: In the moment, before I can reach the merits.

MR. CORN-REVERE: For the same reasons that this Court and the D.C. Circuit found there were grounds for preliminary injunction in the *Media Matters* cases, I think that the impact on NewsGuard certainly justifies preliminary injunctive relief here.

In those cases, there have been five decisions -- three from in court and two from the D.C. Circuit -- that imposed preliminary injunctive relief.

THE COURT: Right. But isn't it fair that in the *Media Matters* string of cases, there was a more fulsome record than there is here? After all, the D.C. Circuit did state there was a pattern of litigation and information demands targeted at Media Matters that had spanned virtually every day for two years.

Here, you point to the statements of Chairman Ferguson and the scope of the CID, which may be enough, but you must concede that it is different in degree than the record that existed in *Media Matters*.

And one, do you disagree with that? Two, do you think the Court should be looking into what happened in Media Matters in assessing this case?

MR. CORN-REVERE: I think the record in *Media Matters* is sufficient, partly because -- well, for two reasons.

One is, the Court did rely on those various statements that provided the contextual background for why the FTC was focusing on Media Matters.

THE COURT: But they also leaned heavily on the AG actions as well; the Attorney General actions.

MR. CORN-REVERE: Yes, it did, but those were simply repeating the same kinds of requests for information. And if you look at the scope of the CIDs, they're almost carbon copies, looking for every bit of information --

THE COURT: The scope of the CIDs, they're all exceedingly broad.

MR. CORN-REVERE: That's right. They were --

THE COURT: I'm just saying, there's more in the record, is there not, in *Media Matters*?

MR. CORN-REVERE: Well, that's true, but when it comes to the FTC specifically, the fact that it had been preceded by two cases from state AGs doesn't affect the reasons why the FTC investigation wouldn't -- any reason why it should have been allowed to proceed. It was enjoined on its own merits.

Even though there were other investigations that had preceded it, the injunction against the FTC CID was based on the fact that it was in this context of announced -- going after Media Matters because of its viewpoint, because of its breadth, and because the Court found that the antitrust justifications that were advanced were essentially pretextual.

THE COURT: All right. And in terms of the consent order, do you have a case in which a nonparty has challenged a merger?

MR. CORN-REVERE: No, Your Honor, I don't, but that's because there are very few mergers that impose conditions that target a third party because of its viewpoints. We do have in the *Vullo* case precise parallel, where you have state consent orders that target a third-party speech, and as a consequence of that, the case was allowed to go forward.

And the Supreme Court held that that was a violation -- assumed it would be a violation of the First Amendment. So it used those conditions on the --

THE COURT: What evidence do you have here that the two companies were coerced into accepting the condition?

MR. CORN-REVERE: It's not a matter of coercion; it's a matter of inducement. They were allowed to merge if they accepted this condition. And as the Supreme Court said in *Vullo*, that there's no difference between coercion and inducement when you're using that to use intermediaries.

THE COURT: So but for this condition, there would have been no merger? That's your position?

MR. CORN-REVERE: Our position is that this merger -- this condition was added specifically at the behest of a competitor, a target of ratings, someone who is a news source that is rated by NewsGuard, so that it would cover NewsGuard and

so that it would not be able to do business.

THE COURT: Okay. In terms of the congressional investigations, you acknowledge that the committees, at least a committee, found that NewsGuard's business activity may have antitrust implications.

Why isn't the fact -- that fact enough to find a reasonable basis for the demand?

MR. CORN-REVERE: Well, that was an interim staff report and one throw-away line in an interim staff report. The actual inquiries that were undertaken, NewsGuard was asked to come in and explain its ratings. It came in, explained to the committees, and then the investigations didn't go forward.

For then to have the FTC take that germ of an idea and have it blossom into this full-blown investigation and conditions imposed, that is going far beyond what that one mention would justify.

THE COURT: All right. But given the presumption of regularity that applies -- perhaps you believe, based on the record, it should not apply, but in light of the presumption.

MR. CORN-REVERE: Well, I think the point of the *Media Matters* cases is that where you have retaliation, the presumption of regularity does not apply. The very fact that an agency is using power to restrict speech that it acknowledges is protected under the First Amendment, that that isn't normal. That isn't how agencies should operate.

And so I think the presumption of regularity is misplaced in a case like this.

THE COURT: Okay. Do you take the position that all the CIDs are retaliatory in this investigation?

MR. CORN-REVERE: I don't know about all of them. I can tell you about the *Media Matters* CIDs and this one. I think that it gives some reason to ask questions in other cases. But in this case, there's no question but that Chairman Ferguson targeted and complained about NewsGuard and because of what he perceived to be its editorial positions, and that followed regulatory action that targeted those positions.

The fact that in the merger condition originally it went after the stated justifications about ideological bias and then had to be shifted to cover any kind of news rating shows how NewsGuard was specifically targeted.

THE COURT: All right. I just didn't read your briefs to be asserting that you were chilled from the start, which you seem to be arguing here now.

MR. CORN-REVERE: I think the standard and the reason these were framed that way is because the standard is that you look at whether or not the conditions being imposed or the regulations or threats being imposed would chill a person of ordinary firmness.

And as I said earlier, I think any kind of investigation of this magnitude, focused on viewpoints, would do that.

Now, I mentioned today, in response to your question, that there has been a chilling effect. And if Your Honor believes that it would be necessary to supplement the record with that --

THE COURT: Well, the record is what it is before me now. If you want to withdraw your PI and come back, we can do that, but right now, I'm considering the motion based on the record that's before me.

MR. CORN-REVERE: No, I understand that, and I think that what we have presented in the papers is sufficient for that, particularly the declaration of Matt Skibinski, who is the chief operating officer at NewsGuard, who is with us here in the courtroom today. If you would like him to talk more about chilling effect, we could ask him to do that.

But as I say, under the existing standards and as Judge Edwards wrote in the *Paxton* case, if you have a retaliatory investigation, that by itself is independent harm from any chilling effect. And in terms of chilling effect, whether or not a publisher has given in isn't the standard that you apply.

The question is whether or not a publisher of reasonable firmness would be affected, and that's, I think, the standard --

THE COURT: No, I get that. The challenge is for irreparable harm.

MR. CORN-REVERE: And I think any kind of restriction on First Amendment activities is, by definition, irreparable harm.

THE COURT: And again, that assertion that's broader than just business harm is based on the fact that you're in the publishing industry?

MR. CORN-REVERE: Well, in the publishing industry and being targeted specifically because of editorial viewpoints, yes.

THE COURT: Because you say the investigation -- I shouldn't give the presumption that the antitrust investigation is a valid investigation? I should not accord that presumption and find that it's a pretext for viewpoint discrimination?

MR. CORN-REVERE: Pretextual on when it's shown that there is a retaliatory motive that would undermine any presumption of regularity, and that, as Judge Edwards held, is itself First Amendment injury.

THE COURT: How do I get there, given that the condition that was added, at least to the merger, that doesn't refer to NewsGuard by name, and you're telling me it covers more than just NewsGuard?

MR. CORN-REVERE: That's right.

THE COURT: Those other entities that are covered by it, do they have the same viewpoints? Is there anything in the record that addresses that? And if not, how can I draw that inference?

MR. CORN-REVERE: I don't know of other entities that fall within that. I direct your attention, as we did in the

papers, to the *News America* case where you had a similar generic description that was found by Congress to target in that case Rupert Murdoch with the precision --

THE COURT: I understand. But I thought you said earlier here that it is broader and it does cover more than just NewsGuard.

MR. CORN-REVERE: It uses generic terms.

THE COURT: But you don't know whether it actually hits any other entity?

MR. CORN-REVERE: I don't know -- I can't stand here today and list other companies that meet those criteria. I'm sure my clients would be able to name some.

But the point is, the change in the consent order was made specifically because the original formulation of targeting ideological --

THE COURT: And I saw the Newsmax writing. But if it is capturing more than just NewsGuard, can I necessarily conclude that the sole purpose of that is to target NewsGuard's viewpoint?

MR. CORN-REVERE: I think you can, and there's a direct link between Chairman Ferguson's statement on January -- or June 23 when the first consent order was issued, and he talked about the need to go after NewsGuard, named NewsGuard specifically. And then the Newsmax comments came in, and then the consent order was changed to focus on specifically what

NewsGuard does.

And that chain of events, as the D.C. Circuit had said in the *Murdoch* case, targets NewsGuard with the precision of a laser beam.

THE COURT: And you say that NewsGuard has such a small marketplace, less than 0.1 percent?

MR. CORN-REVERE: 0.1 percent of the market, which means the antitrust justifications are pretextual.

THE COURT: Should the Court necessarily infer that NewsGuard itself is a target of the antitrust investigation or that it may have information related to the antitrust investigation?

MR. CORN-REVERE: Well, if that's the focus, that there could be information that would be relevant, I don't know why there would be an investigation of every part of NewsGuard's business structure, every communication with clients, every bit of internal information on how it does ratings.

That has nothing to do with the professed interest of the FTC in what they claim to be an antitrust enforcement. It has everything to do with the repeated and frequent statements by Chairman Ferguson -- repeated again and again -- saying that we need to go after NewsGuard because he perceived it as being left-leaning.

THE COURT: All right. Anything else you would like to add?

MR. CORN-REVERE: I'm sure I will think of something later, Your Honor.

THE COURT: Take a moment.

MR. CORN-REVERE: Well, let me ask: At this point, will there be an opportunity to speak after the government?

THE COURT: Of course.

MR. CORN-REVERE: Okay.

THE COURT: All right. Let me hear from the FTC.

Mr. Potapov?

MR. POTAPOV: Potapov.

THE COURT: Potapov. Sorry.

All right. Let me start with jurisdiction. I want to focus on the merger condition. I really do have a hard time accepting your argument that NewsGuard failed to exhaust its merger condition claims because it failed to comment on the proposed order during the public comment period.

Correct me if I'm wrong, but at the outset, when the comment period opened, the draft order didn't refer in any way to NewsGuard. So why would they be expected to comment?

MR. POTAPOV: Sure, Your Honor. Well, the final order also does not refer to NewsGuard in any way.

THE COURT: No, understood. But clearly, clearly, there's an attempt to include it. It may be just NewsGuard; it may be broader than that. I'm interested in your perspective on that. But I think we can all agree that part of the intent in

adding that language was to capture NewsGuard.

MR. POTAPOV: So certainly, the final order certainly is broader than just NewsGuard. And in that respect, it's very different from the *News America* case that they rely on where there is a statutory provision that applied and only could apply to a single entity.

THE COURT: So what other entities are covered by this broad language?

MR. POTAPOV: So I'm not sure that's currently in the record. I mean, at a minimum, another entity that has sued the FTC regarding this investigation, GDI, would count. That's publicly known.

But again, a key difference between this and *News America* is that this category is open. New entities could enter into it, and existing entities could enter out of it. It's just a question of whether you provide a certain kind of service.

But to return to your original question, Your Honor, I would just note that I think NewsGuard themselves are a little bit inconsistent on this point. Because if you look at their brief at page 30, they say, "The proposed order was intended to target and debilitate, if not eliminate, news rating services, and NewsGuard was at the top of the FTC's and Ferguson's hit list."

So I think it's odd for them to now say that they were unaware that the proposed order could have applied to them.

Obviously, there's some level of debate as to whether they would have been captured by the original language. They say they wouldn't be; a lot of other people would believe that they would be. But they certainly were on notice that this was of relevance to them.

THE COURT: And therefore, if they didn't comment, then they've failed to exhaust?

MR. POTAPOV: The much more fundamental problem here is, as you've noted, Your Honor, there has never been a successful third-party challenge to one of these orders. And their challenge is precluded in three different ways by Section 45(c), because it was not brought in a Court of Appeals; it was not brought within 60 days or even close to 60 days; and it was not brought by one of the parties that were regulated by the order.

But if, for some reason, they are allowed to bring this case, then I'm not sure why they should not be expected to participate in the comment process.

THE COURT: All right. Well, is it your view that the Court would lack jurisdiction simply because it's not a party to the merger?

MR. POTAPOV: Yes; yes.

THE COURT: And does that apply across the board? Is there never a situation in which an entity that's not a party to the order would nonetheless be able to challenge?

MR. POTAPOV: So there has never been one yet.

THE COURT: I understand there has never been one, but can't you envision one?

MR. POTAPOV: So the binding language from the D.C. Circuit is that the relevant statutory provision, quote, only allows judicial review for parties subject to an FTC cease and desist order. That's Consumer Federation of America, 515 F.2d at 369.

Recently -- not that recently, but a few years ago, there was a challenge to an FTC order, consent order by third parties, which we cite. And again, the D.C. Circuit dismissed it with categorical language. It just said, "Petitioners are not subject to the requirements of the consent orders at issue and, therefore, may not challenge those orders in this court."

So, you know, I can understand that there can be difficult hypotheticals in extreme situations. And even if we assume that in some cases third parties are allowed to challenge these orders, and even if we assume that NewsGuard is one of those parties, there still is no explanation as to why they shouldn't have to bring it in the Court of Appeals or why they shouldn't abide by the 60-day limit.

THE COURT: All right. Well, what -- under the merger condition, can Omnicom continue to make payments on the existing contract to NewsGuard?

MR. POTAPOV: Yes, it can, and this is very notable,

because NewsGuard does not allege that any payments have stopped. In fact, it doesn't allege that it has been harmed in any way, in any concrete way.

And that goes to yet another jurisdictional defect with this entire set of claims, which is that they haven't demonstrated standing in a nonspeculative way. They say, "It is questionable or doubtful that IPG will be able to continue with the contract now that it has been absorbed by Omnicom and is subject to the consent order."

That's, obviously, very speculative language, and presumably, that's because even though it has been over four months since the order was entered -- which of course is another problem because it illustrates that they don't have irreparable harm. But even though over four months have passed since the order has been entered, they can't actually point to any concrete consequences.

And if they attempted to point to future consequences with respect to Omnicom, that would be completely speculative because, of course, Omnicom acquired IPG. Omnicom was not apparently doing business with NewsGuard before. NewsGuard themselves talks about what a small part they are of the relevant market.

So therefore, there's really no reason to think that Omnicom would renew their contract in the future.

THE COURT: Say that again.

MR. POTAPOV: So they had a contract with IPG.

THE COURT: NewsGuard?

MR. POTAPOV: NewsGuard, yes. NewsGuard had a contract with IPG. IPG has been acquired by Omnicom. So Omnicom did not previously have a contract with NewsGuard, or at least they don't allege that Omnicom did.

So therefore, if they were to say, Well, we're worried that Omnicom will not renew our contract in the future, that would be speculative, because there's no reason to think that Omnicom would want to do so in the first place, particularly in light of the fact that again NewsGuard says they're such a small part of the relevant marketplace.

THE COURT: So you think prospectively, they can engage with NewsGuard?

MR. POTAPOV: No; no. They're prohibited from doing so. But what I'm saying, Your Honor, is that but for this condition, it would be speculative to say that they would do so. So they can't establish standing by saying in the future Omnicom would have renewed the contract but for this condition.

THE COURT: And does the merger contract affirmatively allow the entities to pay NewsGuard?

MR. POTAPOV: No, it doesn't, but it just doesn't speak to that question at all. It simply says that they cannot use those services.

THE COURT: So what would the FTC do if they were to

pay -- if the FTC knew that they were paying them?

MR. POTAPOV: We wouldn't do anything. It really has nothing to do with what we're concerned about, which is not payments from Omnicom to NewsGuard but, rather, the use of NewsGuard's services to facilitate collusion on the part of Omnicom.

Another point that I would like to make, Your Honor, is it really -- they insist in their briefs and they insisted again here that somehow the fact that they are a small player in the market indicates that our antitrust concerns are pretextual. But that really makes no sense once you take into account what the antitrust concern actually is.

So the antitrust concern is that -- and this is explained very clearly in the Omnicom complaint and in the accompanying analysis. The concern is that you previously had a total of six major advertising companies that completely controlled the market, or effectively did, among the six of them. And that makes collusion much easier.

And so a merger between the two of them brings the number from six to five and makes collusion easier still. And that concern is heightened when there is a history of collusion in the market, which there is in this market. There's a history of collusion among these advertising companies to direct advertising dollars away from publishers with disfavored viewpoints.

And so the concern about the role of NewsGuard in all of this is that their ratings were used to facilitate this collusion. And of course, in order for that to happen, NewsGuard itself does not have to be big at all. It is the advertising companies that have to be big, and they are.

So that response from NewsGuard really does not support their position.

THE COURT: All right. What more can you share with me about the scope of the overall investigation?

MR. POTAPOV: Well, so the scope of the overall investigation --

THE COURT: How many other demands are there?

MR. POTAPOV: So it's public that there are 17 outstanding CIDs in the investigation.

THE COURT: One of which is NewsGuard?

MR. POTAPOV: One of which is NewsGuard; one of which is Media Matters; one of which is GDI. But it's also public that there's a variety of groups that received CIDs, including advertising agencies, including brand safety organizations like NewsGuard, and including advocacy groups like Media Matters.

THE COURT: All right. And are all of these demands as broad as the one in this case and the *Media Matters* case; incredibly broad?

MR. POTAPOV: I can't speak to the ones that are nonpublic. So the *Media Matters* and *GDI* ones are of similar

breadth. And there's a few things that I want to say about that.

The first is that they really did not contest in their reply brief either that this is a standard breadth for an FTC subpoena, or that all of the provisions in it are directly related to the purpose of the investigation.

So I think --

THE COURT: But it's so hard to understand why the government needs seven years, basically since its inception, NewsGuard's inception, seven years of detailed financial information regarding each of NewsGuard's products and services for your antitrust investigation.

MR. POTAPOV: Well, I think this gets to the next point that I was going to make, which is that you should really look not at the original CID but at the January 15th letter, because that reflects the willingness of the FTC staff to compromise on the scope of the investigation and to make it reasonable.

And what's very significant -- one of the things that's very significant about the January 15th letter is that we deem the financial request to have been satisfied. We're no longer asking for financial --

THE COURT: Hold up; hold up. At least according to the declaration of Mr. Skibinski, in that latest demand, the FTC is seeking identification of all of NewsGuard's subscribers;

communications with customers; identifications of all entities to which NewsGuard had ever signed a news reliability rating; the particulars of each rating assigned to each entity over time; and documents to show how NewsGuard has developed methodologies for ratings, including internal correspondence.

Which I understand those methodologies are public, are they not?

MR. POTAPOV: I'm not certain about that. I'm not certain why they would object to that one, to the extent that they are public.

But I really appreciate that question, Your Honor. I hope that -- I hope that you look at the January 15th letter, because on its face it completely refutes a lot of the things they said about it, including --

THE COURT: It refutes what I just read from the declaration?

MR. POTAPOV: So I think that's largely accurate. But -- so here's what the January 15th letter did: The January 15th letter, out of the 31 specifications within the original CID, it insisted on the original terms of only one. For four, it significantly limited their scope, and for the other 26, it deemed them satisfied. And that includes the one about the financial records.

So regardless of whether in fact they had been fully satisfied, we released them from 26 of the 31 specifications.

And the one that -- of the ones that were limited, I would point you to specification 26 to really illustrate the way that we were narrowing the CID, because it narrows the original specification in two key respects: The first of which is that it ensures that it only asks for information about customers of their news reliability ratings, which is the product at issue; and second, it expressly excludes all natural persons from the list of customers for which NewsGuard has to provide the information.

And so, you know, that is exactly what the meet-and-confer process is supposed to be about, which is when the -- the reason that these CIDs are so broad to begin with -- and again, they don't contest this is standard for an FTC CID.

The reason they're so broad to begin with is, of course, we don't know what information the recipient has or how it is stored. So we have the meet and confers with the recipient, and then we try to work with them proactively to narrow it in a way that is reasonable for them --

THE COURT: But it seems backwards: An incredibly invasive demand with lots of productions coming over a series of months, and then there's an effort to narrow.

MR. POTAPOV: Well, the effort to narrow was there from the beginning. And by the way, I believe my colleague meant to say 40,000 pages, something like 6,000 documents. That's not a particularly important distinction. It's a lot of

documents, and we appreciate that they have produced them.

But the other thing to remember is the CID itself is non -- it's non-self-executing. So they're not -- NewsGuard is not currently under any risk of legal penalty for failing to produce the document.

THE COURT: And there will be a ruling on the motion to quash on the 6th?

MR. POTAPOV: Yes, there will be.

THE COURT: Can I get an update on that?

MR. POTAPOV: I'm sure both parties will provide one. We certainly will.

But the other thing to remember is that there's a significant disciplining effect -- other than just the good faith of the FTC staff -- and we do work hard to narrow the CIDs in a reasonable way. But in order to actually require the recipient to produce any documents, we have to go to federal court, and we have to satisfy the federal court that it's reasonable to enforce the subpoena.

So if we were marching in there with unreasonable demands, we would not have any success. And so it's --

THE COURT: It's just hard to understand why they're made up front.

MR. POTAPOV: Well, again, we do our best -- and again, they do not challenge that every single one of these specifications is relevant to the purposes of the investigation.

And while they attempt to characterize the January 15th letter as -- I mean, according to them, that's the moment when their irreparable harm became apparent. That's their explanation for why they waited over eight months to bring this case where they are purportedly suffering irreparable harm, is that it was the January 15th letter that made it apparent how much they were suffering.

But given that, as we've discussed, the January 15th letter was actually a substantial compromise and a show of good faith from the FTC, that position really doesn't make any sense.

THE COURT: All right. One of the arguments you rely on is the breadth of the investigation to show it's not targeted at anyone. I mean, that argument can cut both ways if the investigation is broad and looking at a lot of entities for their particular viewpoints. So it's kind of an argument that can benefit both sides.

MR. POTAPOV: I appreciate that, and this is a very important point.

First, again, so there is a broad investigation, and the question is, you know, is this all just designed to sort of sweep in NewsGuard because of a purported hostility to NewsGuard, or is there a reason --

THE COURT: Or not just NewsGuard, but other similarly situated entities that have certain viewpoints.

MR. POTAPOV: Well, for NewsGuard specifically, I

think my colleague said that there was one throw-away line in a congressional report. But actually -- this is quoted in our brief -- both of these reports contain extensive findings, and I hope that this Court takes a look at them, that strongly suggest that NewsGuard was implicated in precisely the kinds of advertising boycotts that the investigation is concerned with and that Chairman Ferguson has consistently been concerned about.

So one of them found that NewsGuard's aim is to systematically defund outlets it deems untrustworthy by creating exclusion lists which operate as black lists for advertisers. And that report also found that advertising organizations pressured their members to use these lists, including through agreements that may have antitrust implications.

And the other report concluded that certain advertising entities participated in boycotts and other coordinated action to demonetize disfavored entities, and this anticompetitive behavior including pushing advertisers to use entities like NewsGuard.

So it would have been extremely strange not to include NewsGuard in this investigation. The notion that the inclusion of NewsGuard speaks to some sort of bias is completely unfounded.

And in terms of the relationship to Media Matters, I think this is a very important point, and I'm glad that Your Honor

brought up the similarity of the breadth. Because as we point out, the state panel, the state majority in *Media Matters* emphasized the unique facts of Media Matters and expressed skepticism that other recipients in the same investigation, such as NewsGuard, could even plausibly make out similar claims.

And the reason for that is because, as you pointed out, there was this much -- we vehemently disagree with the decision -- the Court's decision in *Media Matters*. But for whatever it's worth, it focused on the 2023 article about Elon Musk and the purported response to it by the state AGs, and then sort of our investigation was lumped in with that.

And here, you do not have anything like that.

THE COURT: So the specific facts that the D.C. Circuit focused on and Judge Sooknanan as well that you think distinguish that case from this case are what exactly? The scope of the number of statements and the number of investigations?

MR. POTAPOV: So this is -- one of the very odd things about NewsGuard's retaliation claim is that they don't actually identify any specific First Amendment conduct that we are purportedly retaliating for. Whereas, for better or worse, Media Matters has a theory, which is that the FTC, as well as the state AGs, are, you know, retaliating at the behest of Elon Musk for a specific article in 2023 that criticized Elon Musk and X.

And so that was the central fact in the *Media Matters* litigation, and it's entirely absent here.

What I would add, Your Honor -- and this is kind of an important and subtle point. So in response to this, in the reply brief, NewsGuard says, "Well, that's because the state panel wasn't aware that all of these CIDs were of a similar scope to each other."

But if you look at what the -- it's actually completely backwards. What the state majority says at page 9 --

THE COURT: No, I've read it. I agree with you that it is focusing on other specific facts aside from that.

MR. POTAPOV: They say that if we were able to show they are in fact carbon copies of each other, that would defeat Media Matters's claim. It wouldn't bolster NewsGuard's claim; it would defeat Media Matters's claim, because it would show that Media Matters is not actually unique.

THE COURT: Are you saying NewsGuard needs to focus on specific instances of First Amendment behavior or just generally?

MR. POTAPOV: Yes.

THE COURT: You think they do have to --

MR. POTAPOV: Yes; absolutely.

THE COURT: -- identify something particular?

MR. POTAPOV: Absolutely. But all of the examples that they focus on are completely inadequate. Every specific

mention of NewsGuard by Chairman Ferguson is Chairman Ferguson saying things like, you know, "We ought to investigate, because it seems from congressional reports that NewsGuard may have participated in these unlawful ad boycotts."

And that's just a completely standard thing to say for an antitrust enforcer, you know. That's what they do. They identify areas for potential investigation, and of course, you know, two detailed congressional reports are an increasingly sound basis for doing so.

So if courts went around taking all of these statements and using them as evidence of retaliation, you know, it would be very difficult to conduct any investigation.

THE COURT: All right. So the FTC Act requires the agency to state the nature of the conduct and the provisions of law applicable. In this case, it seems that the explanation the FTC has given is identical to the one in *Media Matters*, and it's back from July 2022.

Has it really complied with that provision? And specifically, I'm talking about 15 U.S.C. Section 57(b)(1)(C)(ii).

MR. POTAPOV: Absolutely. A number of responses to that, Your Honor.

So first of all, a couple of the other CID recipients, both Media Matters and GDI, they received, as you pointed out, a similar explanation, and then they asked -- they said, "Oh, this

is not detailed enough." They complained. And the FTC did provide a more detailed explanation. We were happy to do so in a cooperative spirit.

But at any rate, I agree that the explanation that was provided is fairly general, but if you look at the Commission's PTQ decision on the *Media Matters* case, it concludes that even that initial explanation did satisfy the statutory standard.

But again, regardless of whether it satisfies the statutory standard, that really doesn't go to NewsGuard's constitutional claim, and I think primarily because, as we point out in our brief and they don't respond, they knew all along what the nature of the investigation was, and that's, presumably, why they didn't complain. That's, presumably, why they didn't complain during the meet-and-confer process and why they didn't complain in the petition to quash.

THE COURT: But I thought the circuit did say there was a problem with the explanation in *Media Matters*?

MR. POTAPOV: Well, no. What they said there was that -- so when we did provide the more detailed explanation, that represented sort of a belated attempt to sort of backfill an explanation in response to the constitutional challenge, which was suspicious.

And again, we strongly disagree with that, but the fact that we --

THE COURT: But I don't read the opinion to say the

initial inadequate one complied with the law.

MR. POTAPOV: Yeah, no, that's right, Your Honor. I apologize. They do say, I think incorrectly, that we don't claim that it was adequate, and they don't -- they don't wrestle, certainly, with the PTQ decision explaining that it is adequate.

THE COURT: So this is the norm, like your super-broad subpoenas? This is what the FTC does? They don't give more detail than what they --

MR. POTAPOV: Certainly, this case illustrates that was our initial approach with respect to these three different entities.

THE COURT: But to what extent is that an aberration that suggests this is a different kind of investigation? Is this the norm, for the FTC to give these kinds of boilerplate explanations to comply with the act?

MR. POTAPOV: I'm not -- I haven't reviewed -- I don't believe that it is anomalous, and I also don't believe that NewsGuard has asserted that it is anomalous in that respect.

THE COURT: All right. I'm just curious, is the FTC investigating any organizations accused of suppressing liberal-oriented news organizations?

MR. POTAPOV: I can't speak to nonpublic investigations. I don't believe there are any public ones.

THE COURT: All right. It seems like that could be a

factor in assessing the legitimacy and whether the investigation is pretextual.

MR. POTAPOV: And I do think NewsGuard makes that type of argument when they accuse -- so another category of statements that they point to is ones that they characterize as ideological. And I think that is an attempt to smuggle in a viewpoint discrimination claim to a retaliation context.

So you have these general statements where Chairman Ferguson lays out his enforcement policies, and that really doesn't do anything to tie it to any specific speech or any specific action of NewsGuard.

And if they want to make out a viewpoint discrimination claim, they would have to satisfy the difficult standards of that type of claim.

THE COURT: Okay.

MR. POTAPOV: In particular, they would have to show that there are similarly situated entities. They would have to show that there are news-rating entities out there that are right wing in nature and that are not being investigated. Of course, they don't even have allegations of that here.

THE COURT: So it's like retaliation claims in other contexts? You have to have a specific instance. Whereas, for viewpoint discrimination, you can say, "I don't like the way *The New York Times* reports.

MR. POTAPOV: That's right; that's right.

And I guess just a few other points that I think are relevant. And we would be happy to do supplemental briefing on any issue.

THE COURT: No, I don't want that. I do want the update on the demand, though, the motion to quash.

MR. POTAPOV: Sure. We have a limited ability to brief, for example, the *Thunder Basin* issue because --

THE COURT: I think the Circuit has taken care of that.

MR. POTAPOV: Right; right. But just a quick thing to bring to your attention is that we don't believe that the *Paxton* case actually does control here. The reason being that that involved state subpoenas and, therefore, didn't apply the *Thunder Basin* framework. And the *Thunder Basin* framework, it is not enough to show that there is ongoing harm. It's not even enough to show there's irreparable harm.

THE COURT: But we've got the stay, and you're saying that's not binding, right, the stay decision?

MR. POTAPOV: That's right.

THE COURT: I understand. I hear you. To the extent you want to make more points on that, make them now.

MR. POTAPOV: Well, I will just point you at a minimum to *National Association of Immigration Judges v. Owen*, which is 139 F.4th at 312, where the Fourth Circuit expressly said, "Plaintiffs cannot avoid claim channeling under *Thunder Basin* by

merely alleging irreparable injury."

Of course, here -- and I would like to address this as well. Here, they have not alleged any irreparable injuries. As you've pointed out, they're now saying our speech has been chilled, but that's not in the record in front of you, and that's not anything that they can possibly rely on.

And also, I don't think they have any answer to our points that as to both of their challenges, they have no conceivable irreparable harm because of their extraordinary delay in bringing the case.

I mean, with respect to the order, they literally have no response in their brief as to why they have irreparable harm, even though they waited over four months after purportedly being put on a government black list to sue.

THE COURT: But given First Amendment injuries, you don't think they have sort of a special class of injury, that they could sit on them for a while and then assert them?

MR. POTAPOV: No; no. In fact, when you have a First Amendment injury, that's all the more reason to try to get it remedied more quickly.

THE COURT: Well, it may be, but you're saying you waive it if you don't do it within days? Four months is fairly quick.

MR. POTAPOV: We cite a case about that, the *Kohls* case from the Eighth Circuit, where they expressly say that even

when you have First Amendment harm, nevertheless, you're not entitled to just sit around.

And the basic logic of that, Your Honor, is that -- I mean, why does delay, generally speaking, defeat irreparable harm? Because it serves as proof that you're not really suffering irreparable harm. Because if you are really suffering irreparable harm, you run to court and try to get a preliminary injunction.

THE COURT: Can you give me authority in this circuit that supports that proposition, that delay in the First Amendment context is grounds to deny a preliminary injunction?

MR. POTAPOV: No, but we cited a number of cases in general on the delay principle, and they certainly didn't cite any that suggests that there's a First Amendment exemption to these delay principles.

THE COURT: All right. Back to the merger condition, you're saying it covers companies besides NewsGuard; right?

MR. POTAPOV: Yes.

THE COURT: And you can publicly speak to some of that?

MR. POTAPOV: Well, again, by its terms, it's generic. It just talks about providing news ratings. And again, it would appear to -- it's public. GDI has also sued us, and it would appear to cover them as well at a minimum. And as my colleague acknowledged, I'm sure there are any number of others.

And with respect to the points they're making about Newsmax, I do think it's important to note that the Newsmax comment, which they claim, you know, was the motivating force behind the final order, it makes a bunch of proposals that were not adopted.

In the reply brief, they sort of quote selectively from it to make it seem as though it suggested something similar to what was actually implemented in the final order. But actually, here's the quote from the Newsmax comment. It said -- it suggested that "the final order should include a condition providing that Omnicom must itself internally conduct any assessment of the reliability of an outlet."

So basically, they suggested that Omnicom should be required to do the news ratings itself. And not only is that not in the final order; that's actually prohibited by the final order.

And also, Newsmax suggested a bunch of other stuff, like not allowing the merger to proceed at all, or requiring Omnicom and IPG to admit wrongdoing and imposing an enormous penalty.

So this assertion that this was done, you know, based on the Newsmax comment and specifically to target Newsmax, it's really entirely unsupported in the record, and the comment tends to undercut it.

THE COURT: All right. With respect to the jawboning claim, did Omnicom or IPG push back on this particular

condition?

MR. POTAPOV: So that -- we haven't made allegations about that, and it's nonpublic. So I think the question is whether NewsGuard has made the appropriate showing in order to get relief.

THE COURT: Is inducement, which is what they're arguing, is that sufficient?

MR. POTAPOV: So absolutely not. So a jawboning claim must include jawboning. It must include a threatening communication from an official that demands something from the intermediary and a response from the intermediary. That's all of these cases. That's *Backpage*. That's *Vullo*.

So I think what we heard my colleague start to say was well, you know, this process is sort of inherently coercive. But that would mean that the coercion prong of a jawboning claim was satisfied in every -- with respect to every consent order, by us or any other agency. And that just can't be. There's no authority for that, particularly since they seem to think that coercion is all there is to it, you know; that once they show coercion, that's it, they have a First Amendment claim.

In fact, though, jawboning claims have two elements. The first is the coercion, which they haven't shown, and the other is that they have to show that the coercion is actually aimed to punish or suppress a disfavored speech.

And I think Justice Jackson's concurrence in *Vullo* lays

this out very well.  So actually, they do still have to -- the whole reason they're asserting a jawboning claim -- and they pretty much state this explicitly -- is to avoid having to show retaliation.  They say, "Well, we can win on jawboning regardless of whether the FTC's actions were retaliatory."  And that's incorrect.  It's not enough for them to plead just to show coercion.  They have to show actual connection between the coercion and the disfavored speech; in other words, retaliation.

So really, the jawboning claim is parasitic on the retaliation claim and fails for the same reason.

THE COURT:  All right.  Anything else you would like to address before I turn back to the plaintiff?

MR. POTAPOV:  Just one other thing I would like to say is that, you know, with respect -- so first, you know, with respect to threshold issues for Omnicom, I cited the *Consumer Federation of America* case, but I would also like to point to the *Ukiah Adventist Hospital* case, which again is a binding categorical statement from the D.C. Circuit that -- where the D.C. Circuit said it is undisputed that review of FTC cease and desist orders is committed to the Courts of Appeals.

So it's like this challenge simply should not be in this court, and I don't believe they have any contrary authority whatsoever.

And also, with respect to the Omnicom retaliation claim, we pointed out -- again, to no response -- that there is no

cognizable claim for retaliatory settlement of litigation. We're not aware of a single claim of this form, and they have not cited one.

THE COURT: All right. Thank you.

Mr. Corn-Revere, I want to give you a chance to make any points you would like to make, but first, I would like to hear your response to the points the FTC has made regarding the payments.

MR. CORN-REVERE: Yes.

THE COURT: And also the scope of the CID, and also the need for specific instances of retaliation against speech as opposed to just a general claim, viewpoint claim, to support your retaliation claim.

So those three.

MR. CORN-REVERE: I may have to ask you to repeat those.

THE COURT: Of course.

The payments, are you getting paid now?

MR. CORN-REVERE: My understanding is that the contract has been terminated, but I would have to confirm that with my client.

THE COURT: Does that mean you aren't -- you didn't get any payments since the merger went into effect?

MR. CORN-REVERE: I'm not sure of the timing. But the face of the merger -- or the consent order basically prohibits

anyone covered by the order from -- cease and desist from directly or indirectly continuing, entering, or attempting to enter into, maintaining or attempting to maintain, enforcing or attempting to enforce, threatening to enforce any agreement, understanding, rule, or practice. So --

THE COURT: Right. But you read that to bar payments on the contract?

MR. CORN-REVERE: I read that to bar any association with the business.

THE COURT: But you're still not answering my question on whether you're getting payments.

MR. CORN-REVERE: Not that I'm aware of, Your Honor. My understanding is that the IPG contract is being terminated or has been terminated.

THE COURT: As of the date of the merger and the condition, payment stopped?

MR. CORN-REVERE: That, I don't know.

THE COURT: Okay. That would be useful to know.

MR. CORN-REVERE: Your Honor, would you like us to supplement the record with that point?

THE COURT: It seems like it's a simple yes or no. You are or you're not. I don't think you need to supplement the record. If you have the answer, I would like to know it.

MR. CORN-REVERE: Well, standing here today, I don't know the answer to that question.

THE COURT: Well, your client's here, aren't they?

MR. CORN-REVERE: Do you want me to confer with them?

THE COURT: Yes.

MR. CORN-REVERE: Okay.

(Pause.)

MR. CORN-REVERE: My understanding is that the IPG contract, one payment was made after the date of the consent order -- I'm sorry, the merger order, but no payments have been made since, and it has been terminated after that.

THE COURT: Okay. Thank you.

MR. CORN-REVERE: In addition to that, there was another client who terminated its business arrangement with NewsGuard following the developments. And since the last filing, the reply brief was filed and the declaration of Matt Skibinski, additional business has been lost.

So it is -- maybe things haven't happened immediately, but on a rolling basis, business is being lost because of that.

But also, the expenses that have been imposed on NewsGuard as a result of the investigation have been crushing.

THE COURT: You say 30 percent of its net worth or revenues?

MR. CORN-REVERE: Yes, from the news reliability part of the business.

Let me try and address -- I'm sorry, Your Honor.

THE COURT: No, that's all right. Go ahead. Go

ahead.

MR. CORN-REVERE: I was going to try and address some of the points that my friend has made.

First, this citation to *Consumer Federation*, saying that there is no jurisdiction to challenge a merger, he neglected to read that part of the opinion that said there's no jurisdiction if you're bringing an appeal under 45(c).

As you know, Your Honor, we're bringing this under 1331 because there isn't the ability to -- as a nonparty to the merger, there wasn't the ability to challenge a final order.

So under the principles laid out in *Axon Enterprises* and *Thunder Basin*, the initial condition is that there's no effective judicial remedy, which means if you're not a party and you couldn't appeal it to the Court of Appeals, then if there is a constitutional injury, your only recourse is to bring it in district court. It is entirely collateral to the proceeding and had nothing to do with the merger itself, and the constitutional issue is not the focus of the FTC's expertise.

All of those conditions are met.

Let's see. Next point I believe my friend made was that the CID is not onerous and that the January 15th letter narrowed the categories that the FTC was looking for.

First of all, I think Your Honor picked up on the difficulty of having these large, expansive CIDs being issued. That's a point that Judge Sooknanan pointed out in the *Media*

*Matters* case, that it is not a reason to put a lot of faith in the agency if it throws out these dragnet investigations.

THE COURT: Right. I'm just curious why NewsGuard and others don't immediately move to quash rather than engage in the back and forth.

MR. CORN-REVERE: Well, Media Matters did sue sooner than NewsGuard did. NewsGuard tried to work with the agency, and at this point, my friend is trying to penalize NewsGuard for having to engage in what he describes as a cooperative process. That went on for some time, and NewsGuard tried to comply, and then it culminated in the January 15th letter, which my friend claims narrowed the investigation or narrowed the demands.

But as we pointed out in our papers, it really didn't have much of an impact in that way. For example, it still demanded all of NewsGuard's customers, all of its communications with them, the identification of all entities which NewsGuard had even assigned a news reliability rating, all internal communications related to doing those ratings, and then documents to show how they developed their internal ratings.

And then the January 15th letter went on to increase the demands that were placed on NewsGuard. It expanded to include all of the internal journalistic deliberations.

So at that point, that's when it became clear to NewsGuard that continuing to engage in that process, which the FTC had encouraged, was futile. And in particular, the demand for

customers' names was --

THE COURT: Are all of these demands, including the January demands, a part of the motion to quash, or is that just a subset that will be addressed on Friday?

MR. CORN-REVERE: The motion to quash did include --

THE COURT: Everything, including the January demands?

MR. CORN-REVERE: Yes, it did. But for the same reason that NewsGuard didn't wait for an answer from the FTC, NewsGuard decided that the only way to get relief from the here-and-now injury was to proceed in district court.

THE COURT: I understand.

MR. CORN-REVERE: Let's see. I addressed the question about whether or not there are still payments under the Omnicom condition.

The next point that I would like to address is the allegation or representation made that there are very different facts between here and the *Media Matters* cases and, particularly, the justification set forth in the CID in this case.

I think it's telling that, in trying to say that the FTC had provided adequate explanation of the focus of the investigation, it refers to in block quotes the denial of the motion to quash in the *Media Matters* case. It, at essentially page 26 of its brief, is treating these two cases as essentially identical.

It then tries to distinguish the two cases, saying that Media Matters was a policy and advocacy entity; whereas, NewsGuard is a brand safety organization.

I'm not sure how that makes a difference other than the fact --

THE COURT: Well, it can make a difference in terms of irreparable harm under the First Amendment.

MR. CORN-REVERE: Well, yes. It shows that NewsGuard is suffering more irreparable harm --

THE COURT: More than Media Matters, who actually does reporting and articles?

MR. CORN-REVERE: I'm sorry. I didn't understand your question.

THE COURT: More than Media Matters that does more journalistic-type reporting?

MR. CORN-REVERE: Well, yes, because that's NewsGuard's focus, to apply journalistic criteria, and that is quintessential First Amendment activity.

THE COURT: And you're saying that has been chilled?

MR. CORN-REVERE: It has been, yes, and as I mentioned earlier when we were talking about that with your initial question.

The other attempts to distinguish Media Matters really don't speak to the difference, although he says that the stay order talks about the unique facts of NewsGuard -- I'm sorry,

the unique facts of *Media Matters*. But that reference was only saying that the FTC had not demonstrated how a preliminary injunction in the *Media Matters* case would necessarily undo other investigations.

THE COURT: I didn't read that language in the way that NewsGuard is reading it. I read it to point out unique circumstances and the factual record in *Media Matters*, which was extensive. It may have been both, but repeatedly, the circuit talked about the specific circumstances and the exceptional and unusual circumstances.

It certainly referenced the lack of knowledge about the larger investigation, but I think that it also highlighted a number of unique circumstances that justified the relief in *Media Matters* that aren't present here.

MR. CORN-REVERE: It did talk about the fact that there were the state investigations. But the language that I was thinking of was where, in the majority, it says, "While the starting presumption is that agency actions are taken in good faith, the Commission has not shown that the unique and seemingly quite unprecedented constellation of undisputed facts and circumstances compiled in this still-preliminary record would render erroneous the district court's tentative finding that Media Matters' protected speech likely caused issuance of the demand."

The common factors between the two are, of course, the

months-long campaign talking about these kinds of news ratings organizations. It was framed in ideological terms. And the real difference between *Media Matters* and here is that in this case, both Chairman Ferguson and the FTC constantly referred to NewsGuard specifically by name.

Whereas, as Judge Walker pointed out in his dissent in the stay order, that he thought that Media Matters wasn't even specifically named.

Here, what we know is that the FTC and Chairman Ferguson were specifically targeting and certainly going after NewsGuard.

And we know that from the Omnicom order as well. In the initial release of the tentative order, Chairman Ferguson talked about how specifically it was designed to go after -- or related to investigating and going after entities like NewsGuard, and then later, after the Newsmax comments, that was added.

Now, my friend suggests that the fact that the FTC didn't adopt everything that the Newsmax comments suggested is a reason not to think that the addition of NewsGuard was not relevant here.

To begin with, NewsGuard -- Newsmax was obsessed with NewsGuard. It mentioned it over a dozen times in a 14-page pleading. And of the other conditions that it talked about, it wanted to have a monitor for compliance, which was added, and it wanted the FTC to add conditions on DEI, which it did.

But the important fact for this case is that the

modification was made specifically to go after rating services that focused on news reliability and news ethics, journalistic ethics, and that's what was added.

Finally, unless you have other questions, let me say a couple words.

THE COURT: At some point, I wanted to hear your response to the argument that Mr. Potapov made regarding the specific instances required for a retaliation claim.

Do you disagree with that?

MR. CORN-REVERE: I disagree with the idea that this constellation of factors is insufficient. I think that a retaliation claim, if you show that -- as a matter of fact, the cases that we cite in our briefs say that you don't have to find a smoking gun; you look at the circumstances from which you can infer retaliation.

THE COURT: But what instances should the Court focus on?

MR. CORN-REVERE: The repeated statements, both when Chairman Ferguson was running for office as chair --

THE COURT: Were in retaliation to what?

MR. CORN-REVERE: The editorial positions that NewsGuard --

THE COURT: Any particular story, or just in general?

MR. CORN-REVERE: I think the fact that it was rating on journalistic standards, period, and the fact that some sites

rated lower than others -- Newsmax, in particular -- and that was a constant source of its complaints.

THE COURT: And you think that still can constitute a retaliation claim, that broader viewpoint?

MR. CORN-REVERE: I think it describes the context in which these actions were taken, culminating in a CID that specifically focused on the editorial policies and standards of NewsGuard.

THE COURT: But you think the policies and standards are sufficiently specific for retaliation?

MR. CORN-REVERE: I think when connected to all of the factors, that it is, yes.

THE COURT: All right. What about with respect to the jawboning claim, and whether inducement rather than actual collusion is sufficient to --

MR. CORN-REVERE: I think my friend is not quite capturing the import of the jawboning cases. If you look at *Backpage v. Dart*, for example, it talks about not just threats, but also government actions that target intermediaries to affect a third-party speech, which is exactly what's going on here. It doesn't have to be a threat if you have government actions that then impose conditions on the third party that violate their rights, which is exactly what happened in *Vullo*.

THE COURT: So you think this is true strongarming?

MR. CORN-REVERE: Well, yes, it is. When you make it

known to the target of a regulatory act that you want to see certain viewpoints suppressed, and then you grant a regulatory concession based on a condition that it will suppress them, that they won't do business with a certain entity, that that is sufficient to make out a jawboning claim.

That, by the way, is again precisely what happened in *Vullo*, where the State of New York entered consent decrees with insurance companies on the condition that they no longer do business with the NRA, whether or not the insurance policies they were talking about were legal.

THE COURT: All right. Sorry. Go ahead.

MR. CORN-REVERE: That's okay.

I think that's all I had, Your Honor, unless you have any further questions.

THE COURT: Nothing more from me.

I will take this under advisement. Thank you for your briefing and your argument. I appreciate it. I hope to issue a decision fairly soon. There's a lot on the docket right now. So I will do my best.

Thank you.

(Proceedings adjourned at 3:31 p.m.)

CERTIFICATE OF OFFICIAL COURT REPORTER

I, Sara A. Wick, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

/s/ Sara A. Wick                    March 5, 2026

SIGNATURE OF COURT REPORTER          DATE

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NEWSGUARD TECHNOLOGIES, INC.,<br><br>*Plaintiff*,<br><br>v.<br><br>FEDERAL TRADE COMMISSION and ANDREW FERGUSON, in his official capacity as Chairman of the Federal Trade Commission,<br><br>*Defendants*. | Case No.: 1:26-cv-00353-DLF |

**NOTICE OF SUPPLEMENTAL AUTHORITY**

Plaintiff NewsGuard, by and through undersigned counsel, respectfully submits the attached opinion from the U.S. District Court for the Northern District of Texas in *X Corp. v. World Federation of Advertisers et al.*, No. 7:24-CV-0114-B, 2026 WL 833900 (N.D. Tex. Mar. 26, 2026), as supplemental authority in support of Plaintiff's Motion for Preliminary Injunction (ECF No. 11).

Defendants Chairman Ferguson and the Federal Trade Commission justify the FTC's expansive Civil Investigative Demand as

"part of a broad investigation into a high priority issue—advertising boycotts that violate the antitrust laws." ECF No. 20 at 21. The opinion in *World Federation of Advertisers* underscores why, in addition to the reasons described in Plaintiff's briefing (ECF No. 11, 21), Defendants' argument fails: Even if NewsGuard were indeed facilitating an advertising boycott of certain media sources (it is not), it still would not implicate antitrust law.

Advertising boycotts, including even those which constitute "*per se* illegal collusion," do not state an "antitrust injury" unless they involve "'joint efforts by a firm or firms to disadvantage competitors' either directly or by pressuring others." 2026 WL 833900 at *25 (finding X, formerly Twitter, failed to state an antitrust claim because the alleged boycott between advertisers did not involve harm to their competitors). Where, as here, "the claim does not directly or indirectly involve the plaintiff's *competitor*, it does not state an antitrust injury." *Id.* (emphasis added).

Dated: March 31, 2026

Respectfully Submitted,

/s/ Robert Corn-Revere
Robert Corn-Revere
(D.C. Bar No. 375415)
James C. Grant*
(WA Bar No. 14358)
Sara E. Berinhout**
(MA Bar No. 703217)
Samuel Rudovsky*
(PA Bar No. 335724)
Not Admitted to the D.C. Bar.
D.C. Practice limited to U.S.
federal courts and related matters
under D.C. Ct. App. R. 49(c)(3).
FOUNDATION FOR INDIVIDUAL
RIGHTS AND EXPRESSION
700 Pennsylvania Ave. SE, Ste. 340
Washington, DC 20003
(215) 717-3473
bob.corn-revere@fire.org
jim.grant@fire.org
sara.berinhout@fire.org
sam.rudovsky@fire.org

*Admitted pro hac vice
**Pro hac vice forthcoming

*Counsel for Plaintiff*

2026 WL 833900
Only the Westlaw citation is currently available.
United States District Court, N.D.
Texas, Wichita Falls Division.

X CORP., Plaintiff,
v.
WORLD FEDERATION OF ADVERTISERS; MARS, INCORPORATED; CVS HEALTH CORPORATION; ØRSTED A/S; TWITCH INTERACTIVE, INC.; NESTLÉ S.A.; NESTLE USA, INC.; ABBOTT LABORATORIES; COLGATE-PALMOLIVE COMPANY; LEGO A/S; LEGO BRAND RETAIL, INC.; PINTEREST, INC.; TYSON FOODS, INC.; SHELL PLC; SHELL USA, INC.; and SHELL BRANDS INTERNATIONAL AG, Defendants.

CIVIL ACTION NO. 7:24-CV-0114-B
|
Filed 03/26/2026

## MEMORANDUM OPINION AND ORDER

JANE J. BOYLE SENIOR UNITED STATES DISTRICT JUDGE

***1** Three categories of motions are before the Court. First are five motions to dismiss for lack of personal jurisdiction and/or venue filed by the World Federation of Advertisers ("WFA") (Doc. 132), Shell Brands International AG ("Shell International") (Doc. 142), Lego A/S (Doc. 145), Nestlé S.A. (Doc. 163), and Ørsted Services A/S (Doc. 210). Plaintiff X Corp. filed a consolidated response to most of these motions (Doc. 194) and a separate response to Ørsted Services's motion (Doc. 215). The movants have each filed separate replies (Docs. 216, 217, 218, 224, and 230). Relevant to these motions is X's contingent motion for jurisdictional discovery (Doc. 200) and a response (Doc. 214) and reply (Doc. 226) thereto. The Court **DENIES** the motion to dismiss filed by WFA (Doc. 132). The Court **GRANTS** the motions to dismiss filed by Shell International (Doc. 142), Lego A/S (Doc. 145), Nestlé S.A. (Doc. 163), and Ørsted Services (Doc. 210). The Court **DISMISSES** the case as to Shell International, Lego A/S, Nestlé S.A., and Ørsted Services without prejudice. The Court **DENIES** X's contingent motion for jurisdictional discovery (Doc. 200).

The second category of motions includes a motion to transfer (Doc. 178) and a conditional motion to sever some of the defendants prior to transfer (Doc. 190). The motion to transfer was filed by Abbott Laboratories ("Abott"), CVS Health Corporation ("CVS"), Colgate-Palmolive Company ("Colgate"), Lego Brand Retail, Inc. ("Lego Brand"), Mars, Inc., Nestle USA, Inc., and Pinterest, Inc. X has filed a response (Doc. 197), and the movants have filed a reply (Doc. 221). X has also filed a sur-reply (Doc. 241), to which the movants responded (Doc. 247). Related to the motion to transfer, X also sought leave to file additional supplemental evidence (Doc. 244). The motion to sever (Doc. 190) was filed by Lego A/S, Nestlé S.A., and Shell International. The motion to transfer (Doc. 178) is **DENIED**. The motion to sever (Doc. 190) and the motion for leave to file supplemental evidence (Doc. 244) are **DENIED AS MOOT**.

The final category is just one motion: a motion to dismiss for failure to state a claim filed by all Defendants (Doc. 160). X has responded (Doc. 196), and Defendants have replied (Doc. 223). Defendants also submitted supplemental authority (Doc. 242), to which X has responded (Doc. 243). The Court **GRANTS** the motion to dismiss for failure to state a claim (Doc. 160) as to all defendants not already dismissed for lack of jurisdiction. X's case as to those remaining defendants is **DISMISSED WITH PREJUDICE**. A final judgment will follow.

## I.

## BACKGROUND

X operates the social media platform formerly known as Twitter. Defendants include foreign and domestic companies that advertise their products online, as well as a global non-profit organization through which marketers pursue their collective interests. This case is about Defendants' alleged conspiracy to boycott advertising on X's platform through an initiative called the Global Alliance for Responsible Media ("GARM").

### *A. The Parties*

***2** X is a Nevada corporation with its principal place of business in Bastrop, Texas. Doc. 77, Second Am. Compl. ¶ 10. X merged with Twitter, Inc. in April 2023 and is Twitter's successor in interest. *Id.* After some additions

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

and subtractions, the case now involves the below fourteen defendants—five are foreign, and nine are domestic.

1. The Five Foreign Defendants

The first foreign defendant is WFA, which is an international non-profit organization "representing the common interests of marketers" worldwide. *See id.* ¶¶ 11–12. WFA is "dominated and controlled by competing advertisers and is dedicated to promoting their collective economic interests." *Id.* ¶ 12. WFA is organized under the Belgian Companies Code and has its headquarters in Belgium. *Id.* ¶ 11. It also has an office in New York City. *Id.* GARM was a WFA initiative that reported to WFA's Executive Committee. *Id.* The senior WFA executive who co-founded and led GARM (Rob Rakowitz), WFA's President, and its Deputy President all live and work in the United States. *Id.*

Second, Shell International is "responsible for development and licensing of the Shell trademark and is incorporated and headquartered in Switzerland." *Id.* ¶ 23. Shell International is a wholly owned subsidiary of parent company Shell plc, which is an English oil and gas company. *Id.* Shell plc (but not Shell International) was a founding member of GARM. *See id.* Shell International is a WFA member and pays its annual subscription fee to WFA's Belgian bank account. *See* Doc. 144, App. Shell PLC's Mot. Dismiss, Ex. B, Aragon Decl. ¶ 3. In 2020, Shell International paid one invoice for GARM's operating budget to WFA's Belgian bank account. *See id.* ¶ 4. Shell International was also a leader on the Association of National Advertisers Global CMO Growth Council (the "ANA Council"), which co-founded GARM with WFA. *See* Doc. 77, Second Am. Compl. ¶ 37. Shell International has no employment contracts with anyone in the United States, has no offices in the United States, has no bank accounts in the United States, and owns no tangible assets in the United States. *See* Doc. 143, Shell Int'l's Br. Mot. Dismiss, 2–3 (citing declarations provided in appendix).

Third, Lego A/S is a toy and game manufacturer that is incorporated and headquartered in Denmark. Doc. 77, Second Am. Compl. ¶ 20. Lego A/S allegedly directed the anticompetitive conduct of its co-defendant and "indirect, wholly owned subsidiary" Lego Brand. *Id.* An unknown Lego entity became a GARM member no later than June 2022. *Id.* (identifying Lego A/S as GARM member); *see* Doc. 194, Consol. Resp., 5 (citing appendix) (presenting evidence that unknown Lego entity was GARM member); Doc. 147, App. Lego A/S's Mot. Dismiss, Ex. 2, Soriano Decl. ¶ 3 (denying Lego A/S's involvement in WFA or GARM). An unknown Lego entity was also a leader on the ANA Council. Doc. 77, Second Am. Compl. ¶ 37. Lego A/S does not conduct business or have offices, employees, or any physical presence in the United States. *See* Doc. 146, Lego A/S's Br. Mot. Dismiss, 2 (citing declaration in appendix).

Fourth, Nestlé S.A. manufactures consumer products and is incorporated and headquartered in Switzerland. Doc. 77, Second Am. Compl. ¶ 17. Nestlé S.A. allegedly directed the anticompetitive conduct of its co-defendant and "indirect, wholly owned subsidiary" Nestle USA. *Id.* An unknown Nestle entity was a founding member of GARM, and an employee for an unknown Nestle entity sat on WFA's Executive Board. *See id.*; Doc. 195, App. Consol. Resp., Ex. A, Renner Decl. ¶¶ 5–6. Nestle USA (but not Nestlé S.A.) had an employee on the ANA Council. Doc. 195, App. Consol. Resp., Ex. A, Renner Decl. ¶ 8. An unknown global Nestle entity recommended to its corporate affiliates (including Nestle USA) that X, as a "high-risk platform," was "presumptively unsuitable for the purchase of advertising." *See* Doc. 77, Second Am. Compl. ¶ 141 (alleging Nestlé S.A. was the responsible entity); Doc. 195, App. Consol. Resp., Ex. I, Tenreiro-Braschi Decl. ¶¶ 3–4 (describing meeting with unknown Nestle entity's employee who oversees "global brand safety efforts"); Doc. 225, Jampen Decl. ¶¶ 3, 5 (denying that employee who met with X was officer or employee of Nestlé S.A.). Nestlé S.A. does not have offices or employees in the United States and does not directly advertise, market, contract, manufacture, or sell anything in the United States. *See* Doc. 164, Nestlé S.A.'s Br. Mot. Dismiss, 2 (first citing declaration provided in appendix; then citing *Nespresso USA, Inc. v. Ethical Coffee Co. SA*, 263 F. Supp. 3d 498, 502 (D. Del. 2017)).

***3** Fifth, Ørsted Services is a Danish corporation with its principal place of business in Denmark. Doc. 211, Ørsted Servs.'s Br. Mot. Dismiss, 2.[1] Ørsted Services does not transact any business in Texas. *See id.* at 3. Ørsted Services has conceded that it is subject to the personal jurisdiction of New York state courts because its employees sent emails to WFA employees there. *See id.* at 11–12.

1 The Second Amended Complaint originally named Ørsted Services's parent company, Ørsted A/S, as a defendant. *See* Doc. 77, Second Am. Compl. ¶ 13. While briefing for the motions to dismiss was underway, X and the Ørsted entities jointly moved to substitute Ørsted A/S with Ørsted Services. *See* Doc. 193, Joint Mot. The Court granted the motion

and gave Ørsted Services its own briefing schedule for Rule 12 motions. *See* Doc. 203, Order, 1.

Unlike Ørsted Services, the other four foreign defendants have not identified any U.S. state in which they would be subject to personal jurisdiction.

2. The Nine Domestic Defendants

The first domestic defendant is Abbott, which "manufactures and sells pharmaceutical and other health care products." Doc. 77, Second Am. Compl. ¶ 18. Abbott is incorporated and headquartered in Illinois and became a GARM member no later than June 2022. *Id.*

Second, CVS "provides health services, including health insurance, pharmacy, and clinical services." *Id.* ¶ 15. CVS is incorporated in Delaware and headquartered in Rhode Island, and it became a GARM member no later than June 2022. *Id.*

Third, Colgate "manufactures and sells consumer products including toothpaste and soap." *Id.* ¶ 19. Colgate is incorporated in Delaware and headquartered in New York, and it became a GARM member no later than June 2022. *Id.*

Fourth, Lego Brand—co-defendant Lego A/S's indirect, wholly owned subsidiary—is incorporated and headquartered in Connecticut. *Id.* ¶ 20.

Fifth, Mars sells consumer products and services, and it is incorporated in Delaware and headquartered in Virginia. *Id.* ¶ 14. Mars was a founding member of GARM, sat on GARM's "Steer Team," and is represented on WFA's Executive Board. *Id.*

Sixth, Nestle USA—co-defendant Nestlé S.A.'s indirect, wholly owned subsidiary—is incorporated in Delaware and headquartered in Virginia. *Id.* ¶ 17.

Seventh, Pinterest operates its own social media platform whereon it sells advertising space. *Id.* ¶ 21. Pinterest also advertises its platform on other social media platforms. *Id.* Pinterest is headquartered in California and incorporated in Delaware, and it became a GARM member in October 2020. *Id.*

The above seven domestic defendants have moved to transfer the case. The last two domestic defendants, Shell USA, Inc. and Tyson Foods, Inc. ("Tyson"), have not moved for transfer but do not oppose it. *See* Doc. 179, Br. Mot. Transfer, 1 n.1. Shell USA—an affiliate and co-defendant of Shell International—is incorporated in Delaware and headquartered in Houston, Texas. Doc. 77, Second Am. Compl. ¶ 23. Tyson "produces and sells food products"; is headquartered in Arkansas and incorporated in Delaware; and became a GARM member no later than June 2022. *Id.* ¶ 22.

*B. Social Media, Advertising, and GARM*

Like many social media platforms, X's platform is free to use for consumers. *See id.* ¶ 91. Consumers use X's platform to publish posts containing text, photos, and videos and/or to view and interact with others' posts. *Id.* ¶ 33. X distinguishes itself from its competitors "in the degree to which consumers use its platform to keep up to date with news, live events, issues of public policy, and other current affairs." *Id.* ¶ 34.

***4** Though they might log into X for updates on current events, X's consumers also occasionally see paid advertisements in their feed of sequential posts. *Id.* ¶ 33. Those advertisements are how social media companies like X generate substantial portions of their revenue. *See id.* ¶ 91. X sells digital display advertising space directly to advertisers and also to agencies that purchase advertising space for clients. *Id.* ¶ 35. Like other social media companies, X auctions its advertising inventory to advertisers, who compete to be able to display their ads to particular users. *Id.* ¶ 151.

Online advertisers, because their advertisements appear sequentially with other content, care about the standards used by social media companies to moderate content. *See id.* ¶ 63. At first, an advertiser would negotiate individually with each social media company to "customize the reach of its ads and to avoid unwanted content." *Id.* But "[s]ome ... advertisers found these individualized negotiations to be unsatisfying and costly." *Id.* "[A]cting unilaterally and in uncoordinated rivalry with one another," the advertisers were unable to force social media platforms to adopt their desired outcomes for advertisement-adjacent content. *Id.* ¶ 44.

Confronting this collective action problem, WFA (along with some of its members and the ANA Council) founded the GARM initiative. *Id.* ¶¶ 36–37. GARM's purpose was "to leverage the collective market power of its advertiser members to advance their economic interests by forcing changes to the business operations of digital media and social media platforms that sell advertising inventory to GARM members or to their clients." *Id.* ¶ 43. To further advertisers' economic interests, GARM's central aim was "to remove harmful content from advertiser-supported media." *Id.* ¶ 45.

Although GARM included social media platforms, it was "dominated and controlled by advertisers, who used it to advance their collective economic interests." *Id.* ¶ 41. GARM was governed by its Steer Team, which "included and represented the world's largest advertisers." *Id.* ¶ 39. To "avoid conflicts of interest," social media platforms were excluded from the Steer Team. *Id.* ¶ 41.

Rob Rakowitz, who co-founded GARM, works in WFA's New York office. *Id.* ¶ 38. As GARM's "Initiative Lead," Rakowitz "was part of every significant decision made by GARM." *Id.* Rakowitz was supervised by the Steer Team and would consult the Steer Team before " 'hav[ing] a conversation around policy and enforcement and consistency' with a GARM member." *Id.* ¶ 39.

*C. GARM's Brand Safety Standards and Enforcement*

As part of its work, GARM promulgated "brand safety standards" that would provide a common framework for all social media platforms to follow. *See id.* ¶¶ 48–65. Developed by GARM-member working groups, the standards categorized objectionable social media content as either completely unsuitable for appearing next to advertisements or as suitable for appearing next to advertisements only with advertiser consent. *See id.* ¶¶ 50, 53. GARM also established a system for monitoring social media platforms' adherence to its standards and reporting noncompliance. *See id.* ¶ 54.

The ANA Council and its members endorsed the brand safety standards and promoted their wide adoption and enforcement. *Id.* ¶¶ 58–61. GARM and the ANA Council would exchange information with each other regarding their efforts to "forc[e] social media platforms to adopt, implement, and adhere to" the brand safety standards. *Id.* ¶ 61. Forcing these changes shifted costs from advertisers—which previously had to individually negotiate where their advertisements would be placed on social media—to social media platforms in a way that was not necessarily in the platforms' or their users' best interests. *Id.* ¶¶ 63–64.

***5** Adopting and enforcing the standards was stated as a requirement of GARM membership. *Id.* ¶ 66. In its published response to the "frequently asked question" "Who can join GARM?," GARM conveyed that "[a]ny advertiser, media agency, and media platform" could join so long as it was "willing to align with our charter" and "agree to adopt GARM solutions to improve business operations." *Id.* ¶ 68. GARM membership applications explained that members "must 'agree to work with industry partners and category peers in a collaborative, non-competitive way, actively support GARM's charter, and agreement [*sic*] to make commensurate changes to business operations in pursuit of GARM's goals.' " *Id.* ¶ 73. Once advertisers became members, GARM instructed them to consider a platform's compliance with the brand safety standards and urged them to purchase more advertising from compliant platforms. *Id.* ¶ 76.

The GARM advertiser members that signaled their agreement to follow these exhortations did so in different ways. CVS publicly announced that it would only pay to place advertisements on platforms that comply with the brand safety standards. *Id.* ¶ 80. Pinterest allowed GARM to tell its members that the standards had received Pinterest's "Executive Endorsement." *See id.* ¶ 81. Mars, an unidentified Nestle entity, Ørsted Services, and other GARM members told X that compliance with the brand safety standards and GARM's internal processes "are conditions precedent to [their] purchase of advertising from X." *Id.* ¶ 83.

GARM members also "would, from time to time, bring suspected deviations" by advertising platforms to GARM's attention for it to investigate. *Id.* ¶ 84. In some conversations with platforms, GARM would "threaten to communicate to its advertiser and advertising agency members that the media platform is not complying with the Brand Safety Standards." *Id.* ¶ 87. Advertiser members commonly looked to GARM's determinations of compliance to decide whether to reduce or discontinue purchasing from a platform. *Id.* ¶ 86.

X's Second Amended Complaint provides three examples of GARM's pressure on platforms. First, when Meta (another social media company) announced changes to its manner of reporting to advertisers where on the platform advertisements were appearing, Rakowitz celebrated the "significant win we forced." *Id.* ¶¶ 46–47.

Second, GARM members including CVS and Mars boycotted Meta and Twitter until the two social media companies "agreed in discussions with the GARM Steer Team to adhere to the Brand Safety Standards." *Id.* ¶ 85. "WFA facilitated this boycott by surveying WFA members about their willingness to boycott these social media platforms and disseminating the results of this survey to its members." *Id.*

Third, Coca-Cola contacted GARM to ask its views on "a possible boycott of Spotify" (an audio streaming service that sells advertising space) due to Spotify publishing a podcast

promoting supposed misinformation. *Id.* ¶ 88; *see* Doc. 77-2, Second Am. Compl. Ex. B, at App. 83. In a back-and-forth email chain with Spotify, Rakowitz wrote that GARM was "gravely concerned about the lack of fundamental policies and decision making at your platform," that GARM had "held back on press commentary on this incident out of deference," but that GARM would eventually "comment with what we're able to glean." Doc. 77, Second Am. Compl. ¶ 90; *see* Doc. 77-3, Second Am. Compl. Ex. C, at App. 39–40.

*D. The Alleged Conspiracy to Boycott X*

After Elon Musk acquired Twitter in 2022, WFA—concerned that the platform would no longer follow the brand safety standards—issued a public letter to Musk. Doc. 77, Second Am. Compl. ¶¶ 93, 96. In the letter, WFA wrote that it expected Twitter to "uphold its previous commitments to GARM and continue to engage with GARM." *Id.* ¶ 96. The letter also said:

> We are monitoring Twitter's actions, such as setting up a content moderation review panel, and assessing their design, governance, and potential to improve implementation of digital media safety best practice. We will share these views with members, as we have with previous events.
>
> ***6** GARM members will continue to leverage such insights as part of their own independent assessments and decision-making processes.

*Id.* The same day, Rakowitz posted on Twitter, addressing Musk with a similar message made "on behalf of" GARM. *Id.* ¶ 97. According to X, WFA's letter and Rakowitz's post were implicit signals to begin the boycott. *See id.* ¶¶ 99–103.

WFA's and Rakowitz's public statements touched off a flurry of GARM-member advertising agencies recommending that their clients suspend paid advertising on Twitter. *Id.* ¶ 104. Abbott, Colgate, Mars, Nestle USA, at least one Shell entity, and Tyson received one such recommendation from their GARM-member advertising agency and refrained from purchasing advertising on Twitter. *Id.* ¶ 106.

Shortly after the public statements, Rakowitz and GARM started investigating Twitter and advertisers' willingness to advertise on it. Rakowitz emailed Twitter questions about brand safety from GARM's Steer Team and hinted at "calls for boycotts and counter-boycott." *Id.* ¶ 108. GARM's Steer Team developed an assessment of Twitter that noted concerns with adherence to the brand safety standards. *Id.* ¶ 109. GARM's Steer Team also surveyed WFA-and GARM-member advertisers and advertising agencies to assess their plans to purchase advertising from Twitter. *Id.* ¶ 110. Rakowitz shared the survey results with WFA Executive Committee members and widely among GARM members. *Id.*

While the investigation was ongoing, Ørsted Services employees reached out to GARM for its views on boycotting Twitter and signaled readiness to act according to GARM's recommendation, so long as other advertisers would be doing the same. *See id.* ¶¶ 111–20. A WFA employee assisted in fielding Ørsted Services's request for information. *See id.* ¶ 119.

Twitter, GARM, and WFA met in December 2022 to attempt to reconcile their differences at a meeting that was also attended by representatives from Mars and a Nestle entity. *Id.* ¶ 123. Before the meeting, WFA "prepared to expel Twitter from GARM if its demands were not met in a timeframe acceptable to GARM." *Id.* ¶ 122. Those demands included responding to requests within three days, demonstrably supporting the brand safety standards, and regularly participating in working groups. *Id.* After the meeting, WFA issued a public statement signaling cooperation between GARM's Steer Team and Twitter, followed by another public statement summarizing the steps Twitter had agreed to take to implement the brand safety standards. *Id.* ¶ 124, 126.

But that seemingly positive meeting did not end the boycott. *See id.* ¶ 124. Rather, the boycott exists to this day because "GARM never rescinded its recommendation to GARM-member advertisers and advertising agencies to refrain from purchasing advertising on Twitter, now X." *Id.* ¶ 141.

Since the boycott began, Abbott, Mars, Tyson, Colgate, Pinterest, and CVS substantially decreased or eliminated their advertising purchases from Twitter/X. *Id.* ¶ 138. The Shell entities, Nestle entities, and Lego entities purchased little or no advertising from X's platform after the boycott began. *Id.* Ørsted Services was interested in continuing advertising on Twitter; reached out to GARM for its latest recommendation, noting GARM's prior "recommendations" not to advertise on Twitter; and ultimately cited concerns with adherence to GARM's brand safety standards when it decided not to resume advertising. *See id.* ¶¶ 131–35.

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

***7** Instead of buying from X, "GARM-member advertisers and advertising agencies are paying above competitive levels for advertising inventory purchased from social media platforms deemed by GARM to be adhering to the GARM Brand Safety Standards, including from Defendant Pinterest." *Id.* ¶ 143.

As a result of the boycott, X's existing customers "ceased or curtailed their purchases of advertising from X, and new customers were deterred or restrained from purchasing from X, leading to lost revenue and profit for X and diminishing its equity value and goodwill." *Id.* ¶ 154. The price remaining customers (who are unaffiliated with GARM) are willing to pay for advertisements has also declined. *Id.* X "has become a less effective competitor to other social media companies in the sale of digital advertising and in competing for user engagement on its platform." *Id.* ¶ 155. Because it has less revenue, X also is unable to "invest in new or improved functionality, thus harming the consumers who use X's platform." *Id.*

To remedy this harm, X filed this case asserting two claims for group boycott of its platform and information exchange to further the boycott conspiracy, both in violation of the Sherman Act, 15 U.S.C. § 1. *See id.* ¶¶ 156–65.

## II.

## LEGAL STANDARDS

*A. Personal Jurisdiction and Venue*

Under Federal Rule of Civil Procedure 12(b)(2), a defendant may move to dismiss an action for lack of personal jurisdiction. In the face of a Rule 12(b)(2) challenge, the plaintiff bears the burden to establish that personal jurisdiction is proper. *Monkton Ins. Servs., Ltd. v. Ritter*, 768 F.3d 429, 431 (5th Cir. 2014) (citation omitted). When a court rules on a 12(b)(2) motion without an evidentiary hearing, the party invoking the court's jurisdiction can satisfy its burden with "sufficient facts as to make out only a *prima facie* case supporting jurisdiction." *Nunes v. NBCUniversal Media, LLC*, 582 F. Supp. 3d 387, 394 (E.D. Tex. 2022) (quoting *Alpine View Co. v. Atlas Copco AB*, 205 F.3d 208, 215 (5th Cir. 2000)). The Court considers "affidavits, interrogatories, depositions, oral testimony, or any combination of the recognized methods of discovery" and resolves any factual conflict contained in the parties' submissions in the plaintiff's favor. *Stuart v. Spademan*, 772 F.2d 1185, 1192 (5th Cir. 1985) (citation omitted); *Cent. Freight Lines, Inc. v. APA Transp. Corp.*, 322 F.3d 376, 380 (5th Cir. 2003).

Under Federal Rule of Civil Procedure 12(b)(3), a defendant may move to dismiss an action for improper venue. As with a 12(b)(2) motion, the plaintiff bears the burden to prove that the chosen venue is proper and "may carry its burden by presenting facts that, taken as true, would establish venue." *See TGM Wind Servs., LLC v. Bartusek*, No. 3:16-CV-01007-N, 2016 WL 9527980, at *1 (N.D. Tex. Sept. 22, 2016) (Godbey, J.) (citation omitted).

*B. Transfer*

"For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented." 28 U.S.C. § 1404(a). To transfer a case, the movant must show "good cause," which includes that it "satisfy the statutory requirements" and "clearly demonstrate" that transfer promotes convenience and justice. *In re Volkswagen of Am., Inc.*, 545 F.3d 304, 315 (5th Cir. 2008). Before comparing forums, the threshold statutory requirement is that the lawsuit "might have been brought" in the proposed transferee forum. *Maxell, Ltd. v. Coretronic Corp.*, No. 5:24-CV-00088-RWS-JBB, 2025 WL 1674398, at *1 (E.D. Tex. Mar. 26, 2025) (citation omitted). Because it is a statutory requirement, "[t]he burden to prove that a case could have been brought in the transferee forum falls on the party seeking transfer." *Id.* (citing *Volkswagen*, 545 F.3d at 315); *accord Ill. Union Ins. Co. v. Tri Core Inc.*, 191 F. Supp. 2d 794, 797 (N.D. Tex. 2002) (Lynn, J.) (citation omitted).

*C. Stating a Claim*

***8** Under Federal Rule of Civil Procedure 8(a)(2), a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Federal Rule of Civil Procedure 12(b)(6) authorizes motions to dismiss a plaintiff's complaint for "failure to state a claim upon which relief can be granted." In considering a Rule 12(b)(6) motion to dismiss, a "court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (internal quotation marks and citation omitted).

To survive a motion to dismiss, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell*

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

*Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citation omitted). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556). When well-pleaded facts fail to meet this standard, "the complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Id.* at 679 (citing FED. R. CIV. P. 8(a)(2)) (citation modified).

**III.**

**ANALYSIS**

The Court first addresses the motions to dismiss for lack of personal jurisdiction and/or improper venue, then the motion to transfer, and finally the motion to dismiss for failure to state a claim. In the first section, the Court holds that it has personal jurisdiction over WFA under Federal Rule of Civil Procedure 4(k)(2) and venue is proper under 28 U.S.C. § 1391(c)(3) but that it lacks personal jurisdiction over Shell International, Lego A/S, Nestlé S.A., and Ørsted Services. In the second section, the Court denies the motion to transfer. Finally, for the defendants that were not dismissed for lack of jurisdiction, the Court rules that X failed to state a claim under 15 U.S.C. § 1.

*A. Personal Jurisdiction Exists and Venue is Proper for WFA, but Personal Jurisdiction Does Not Exist for Shell International, Lego A/S, Nestlé S.A., and Ørsted Services.*

"A 'court must have ... power over the parties before it (personal jurisdiction) before it can resolve a case.' " *Fuld v. Pal. Liberation Org.*, 606 U.S. 1, 11 (2025) (quoting *Lightfoot v. Cendant Mortg. Corp.*, 580 U.S. 82, 95 (2017)). The only constitutional limit on a federal court's exercise of personal jurisdiction flows from the Fifth Amendment's Due Process Clause. *Ins. Corp. of Ir. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982). Limits on a federal court's personal jurisdictional reach may otherwise be imposed by Congress, incidental to Congress's constitutional power to create lower federal courts. *See Palmore v. United States*, 411 U.S. 389, 401 (1973). Congress delegated to the Supreme Court the role of writing uniform procedural rules for the federal courts. *See Berk v. Choy*, 607 U.S. ___ ___, ___ ___, 146 S. Ct. 546, 552 (2026) (citing 28 U.S.C. § 2072(a)) (other citation omitted). Pursuant to this delegated authority, the Supreme Court adopted Federal Rule of Civil Procedure 4(k), which governs lower courts' exercise of personal jurisdiction. *See id.*; *Hardy v. Scandinavian Airlines Sys.*, 117 F.4th 252, 263 (5th Cir. 2024).

***9** Three methods of establishing personal jurisdiction under Rule 4(k) are relevant to this case. First is Rule 4(k)(1)(A), which authorizes personal jurisdiction to the extent consistent with the reach of the state in which the federal court sits. A state's jurisdictional reach is limited by the Fourteenth Amendment's Due Process Clause, which is the subject of most case law on personal jurisdiction. *See, e.g., Daimler AG v. Bauman*, 571 U.S. 117, 125 (2014) ("Federal courts ordinarily follow state law in determining the bounds of their jurisdiction over persons." (citing Rule 4(k)(1)(A)). That case law involves the familiar categories of "general jurisdiction" and "specific jurisdiction," whereby a state can exercise jurisdiction over a defendant only if it is domiciled there or has sufficient "minimum contacts" to have "purposefully availed" itself of the state's legal protections. *See Fuld*, 606 U.S. at 12–13. Those Fourteenth Amendment standards derive from interstate federalism concerns to "ensure that the States, through their courts, do not reach out beyond the limits imposed on them by their status as coequal sovereigns in a federal system." *Id.* at 14–15 (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292 (1980)).

The second relevant Rule 4(k) provision is Rule 4(k)(1)(C), which allows personal jurisdiction when authorized by a jurisdiction-granting federal statute. The statute invoked for personal jurisdiction here is the Clayton Act, 15 U.S.C. § 22. If that statute's requirements are satisfied and if consistent with the Fifth Amendment's Due Process Clause, the Court can exercise jurisdiction. *See Fuld*, 606 U.S. at 25.

The final relevant Rule 4(k) provision is Rule 4(k)(2), which states:

> For a claim that arises under federal law, serving a summons or filing a waiver of service establishes personal jurisdiction over a defendant if: (A) the defendant is not subject to jurisdiction in any state's courts

> of general jurisdiction; and (B) exercising jurisdiction is consistent with the United States Constitution and laws.

In cases where Rule 4(k)(2)'s requirements are met, a federal court can exercise personal jurisdiction to the fullest extent allowed by the Fifth Amendment's Due Process Clause. *See Hardy*, 117 F.4th at 264–65 (citation omitted).

Turning now to X's assertion of personal jurisdiction, its lead jurisdictional theory is Rule 4(k)(2) for WFA, Shell International, Lego A/S, and Nestlé S.A. The Court rules that it has jurisdiction over WFA under Rule 4(k)(2) but lacks jurisdiction over Shell International, Lego A/S, and Nestlé S.A. The latter conclusion, because it hinges on Fifth Amendment due process considerations, obviates the need to separately analyze jurisdiction under any other theory. The Court therefore denies WFA's motion to dismiss and grants the motions to dismiss filed by Shell International, Lego A/S, and Nestlé S.A. Concomitantly with granting those three motions to dismiss, the Court denies X's request for jurisdictional discovery related to Shell International, Lego A/S, and Nestlé S.A.

Finally, for Ørsted Services, X invokes only Rule 4(k)(1)(C) and the Clayton Act's jurisdiction-granting provision. X has failed to establish jurisdiction under this route, so the Court grants Ørsted Services's motion to dismiss.

1. The Court Has Personal Jurisdiction Over WFA Under Rule 4(k)(2) But Not Over Shell International, Lego A/S, or Nestlé S.A.

Rule 4(k)(2) authorizes personal jurisdiction over foreign defendants if (1) the claims arise under federal law, (2) the defendant is not subject to personal jurisdiction in any State, and (3) exercising jurisdiction does not violate the Fifth Amendment Due Process Clause. The first requirement is easily satisfied: X's two claims arise under a federal statute, the Sherman Act. On the second requirement, "so long as a defendant does not concede to jurisdiction in another state, a court may use 4(k)(2) to confer jurisdiction." *Adams v. Unione Mediterranea Di Sicurta*, 364 F.3d 646, 651 (5th Cir. 2004) (citation omitted). WFA, Shell International, Lego A/S, and Nestlé S.A. have not conceded that they are subject to any State's personal jurisdiction, so the second requirement is satisfied. That leaves the third requirement: whether exercising personal jurisdiction comports with Fifth Amendment Due Process.

***10** In the following five subsections, the Court first lays out the Fifth Amendment due process standard for personal jurisdiction then assesses whether exercising personal jurisdiction comports with that standard for WFA, for Shell International, for Lego A/S, and finally for Nestlé S.A.

*i. The Fifth Amendment does not impose strict geographical limitations on a federal court's exercise of personal jurisdiction but nevertheless requires establishing that a defendant engaged in jurisdiction-triggering conduct.*

What exact limits, if any, are imposed by the Fifth Amendment's Due Process Clause is an open question. Before the Supreme Court decided *Fuld* last year, the Fifth Circuit employed the exact same "minimum contacts" analysis under the Fifth Amendment as is used under the Fourteenth Amendment—the only difference being that the Fifth Amendment analysis looked at contacts with the United States as a whole, rather than any individual State. *See Hardy*, 117 F.4th at 265 & n.27. But *Fuld* held that the Fifth Amendment's Due Process Clause "necessarily permits a more flexible jurisdictional inquiry commensurate with the Federal Government's broader sovereign authority." 606 U.S. at 16. Although it held the two standards are different, the Supreme Court did not "delineate the outer bounds of the Federal Government's power, consistent with due process, to hale foreign defendants into U.S. courts." *Id.* at 18.

Parts of the *Fuld* opinion suggest the Fifth Amendment imposes no limit on federal courts' exercise of extraterritorial authority: The "interstate federalism concerns" that drive the Fourteenth Amendment analysis "do not apply to limitations under the Fifth Amendment upon the power of the Federal Government and the corollary authority of the federal courts." *Id.* at 15. In other words, the Fifth Amendment contains no geography-based limitations:

> While "the limitations of the Constitution are barriers bordering the States and preventing them from transcending the limits of their authority," there is no equivalent "ground for constructing an imaginary constitutional barrier around the exterior confines of the United States for the purpose of shutting that government off from the exertion of powers which inherently belong to it by virtue of its sovereignty."

*Id.* (quoting *United States v. Bennett*, 232 U.S. 299, 306 (1914)).[2]

2 Justice Thomas (joined by Justice Gorsuch) was more explicit: "The Fifth Amendment's Due Process Clause imposes no limits on the Federal Government's power to extend federal jurisdiction beyond the Nation's borders." *Id.* at 44 (Thomas, J., concurring in the judgment).

Nevertheless, the Supreme Court engaged in a basic test to check that the exercise of personal jurisdiction under a jurisdiction-granting statute was "tie[d] ... to conduct closely related to the United States" even if the conduct occurred abroad. *See id.* at 18. *Fuld* involved a federal statute deeming two specific organizations as having consented to personal jurisdiction if they engaged in specified conduct supporting terrorism anywhere in the world and if they had any presence in the United States. *See id.* at 8–9. The Supreme Court found the jurisdiction-granting statute suitably limited to Congress's goal of combating terrorism because it did not put the defendants "at broad risk of being haled into U.S. courts for myriad civil liability actions." *Id.* at 20. Jurisdiction was tied to "specific and narrow conduct that directly implicates issues of sensitive and ongoing concern in respondents' relationships with the United States." *Id.* at 21. The statute targeted only two specific foreign entities with "decades of meaningful contacts, ties, and relations with the United States." *Id.* at 22 (citation modified).

***11** The Supreme Court also suggested that the Fifth Amendment analysis "might entail a similar 'inquiry into the reasonableness of the assertion of jurisdiction in the particular case' " as exists under a Fourteenth Amendment "minimum contacts" analysis. *Id.* at 23 (quoting *Asahi Metal Indus. Co. v. Super. Ct.*, 480 U.S. 102, 115 (1987)). The possible factors included in such a reasonableness inquiry are "the burden on the defendant, the interests of the forum State, and the plaintiff's interest in obtaining relief." *Id.* at 24 (quoting *Asahi*, 480 U.S. at 113).

As to burden on the defendant, the Supreme Court was attentive to the fact that the international defendants were " 'sophisticated international organizations' that operate 'billion dollar-budgets' " and had long maintained their presence worldwide and in the United States. *Id.* (citations omitted). The Supreme Court also noted that being haled into U.S. courts could not "have come as much of a surprise" to the defendants who had litigated in the United States for decades and were given clear notice of potential lawsuits through the jurisdiction-granting statute. *Id.* at 24–25.

For the latter two parts of the reasonableness inquiry, the Supreme Court applied similar reasoning to assess the interests of the United States as the forum and a U.S. plaintiff's interest in obtaining relief in federal court. *See id.* at 24. Exercising jurisdiction was reasonable under the Fifth Amendment because of the United States's "exceedingly compelling interest, as part of its comprehensive efforts to deter international terrorism, in providing a forum for American victims to hold the perpetrators of such acts accountable." *Id.* at 24.

Ultimately, the reasonableness test boils down to whether exercising personal jurisdiction could be deemed so "gravely difficult and inconvenient ... as to render the exercise of personal jurisdiction unreasonable and unfair." *Id.* at 25 (first quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 478 (1985); then quoting *Asahi*, 480 U.S. at 116) (internal quotation marks omitted). Even Justice Thomas, despite concluding that the Fifth Amendment imposes "no limits," suggested that due process entails "notice and an opportunity to be heard," which includes proper service and that it is feasible for the defendant to defend itself in American courts. *Id.* at 44 & n.4 (Thomas, J., concurring in the judgment).

Although the Fourteenth Amendment's "minimum contacts" test no longer applies to the Fifth Amendment, the old test's principle of analyzing each defendant individually remains intact. Under the "minimum contacts" test, "plaintiffs may not aggregate defendants' forum contacts and may not establish personal jurisdiction without specifying who did what." *Pearson v. Shriners Hosps. for Child., Inc.*, 133 F.4th 433, 442 (5th Cir. 2025). The Supreme Court in *Fuld* excised from the Fifth Amendment analysis any limitation that would require assessing only contacts with the geographic territory of the United States, but it did not abrogate the principle that the plaintiff must demonstrate personal jurisdiction over each defendant individually. If using a jurisdiction-granting statute as in *Fuld*, that means establishing that the defendant performed the jurisdiction-triggering conduct that Congress specified. *See* 606 U.S. at 9–10 (describing how plaintiffs alleged and district courts found that defendants had engaged in jurisdiction-triggering conduct).

The jurisdiction-triggering conduct when using Rule 4(k)(2) is the conduct leading to the plaintiff's injury. Under the old "minimum contacts" test, a court would assess whether

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

the case before it "arises out of or results from" geographic contacts with the United States. *See Hardy*, 117 F.4th at 266–67. The essential difference between that analysis and the analysis employed in *Fuld* is that geographic contacts, while still relevant, are not all that is relevant. To determine whether the exercise of personal jurisdiction under Rule 4(k)(2) comports with Fifth Amendment due process, courts should now ask a more general question: Is the conduct giving rise to this case or controversy closely connected with the United States? Exercising jurisdiction over conduct closely connected to the United States can comport with the Fifth Amendment regardless of whether the conduct occurred here, in another country, on the open sea, in outer space, or completely on the internet.

*ii. WFA is subject to personal jurisdiction under Rule 4(k)(2).*

***12** Under *Fuld*'s basic test for conduct closely connected to the United States, the Court has personal jurisdiction over WFA under Rule 4(k)(2). To support jurisdiction, X points to its allegations that GARM was WFA's initiative that operated out of U.S. offices and that the WFA executive Rakowitz held meetings, sent emails, and published statements as part of his work for GARM from within the United States. *See* Doc. 194, Consol. Resp., 11. Moreover, as part of the alleged boycott of Twitter/X, WFA signaled that it would monitor the practices of an American company (*see* Doc. 77, Second Am. Compl. ¶ 96), which led to American advertisers refraining from purchasing from the American company (*see id.* ¶ 106). WFA also helped GARM survey advertisers' willingness to join a boycott of Twitter (*see id.* ¶ 110) and met with Twitter to negotiate terms regulating Twitter's business practices (*see id.* ¶ 123). Even if these activities occurred entirely on the internet and not physically on U.S. territory, the conduct is closely connected with the United States and has an impact on U.S. commerce. Requiring WFA to respond to this lawsuit does not risk haling it into U.S. courts for "myriad civil liability reasons." *See Fuld*, 606 U.S. at 20.[3]

3 This analysis depends squarely on WFA's—not any other entity's—conduct that is part of the alleged boycott against X. Thus, the analysis is unaffected by WFA's argument that its members' or GARM's activities cannot be imputed to WFA. *See* Doc. 217, WFA's Reply Mot. Dismiss, 3.

Exercising personal jurisdiction over WFA also satisfies the reasonableness inquiry. On the inquiry's first part, the burden placed on WFA to litigate in this country is minimal because it is a sophisticated organization with international and U.S. presence, as opposed to an entity or individual that only operates outside of this country with localized impact. As WFA points out, it indeed differs from the defendants in *Fuld* due to its general lack of involvement in U.S. litigation. *Contrast* Doc. 217, WFA's Reply Mot. Dismiss, 1 & n.1 (indicating WFA has never been sued in the United States apart from this case and one related case), *with Fuld*, 606 U.S. at 24–25 (noting that litigating in United States "could not have come as much of a surprise" in part due to decades of involvement in U.S. litigation). Also unlike the defendants in *Fuld*, WFA did not receive "clear notice" through a congressional enactment targeting its activities. *See* 606 U.S. at 25. But those differences are not so great as to make it surprising that WFA's continued involvement and activity in U.S. commerce could open it up to personal jurisdiction. Nor do they make it—under the reasonableness inquiry's ultimate distillation—"gravely difficult and inconvenient" for the internationally present WFA to appear in federal court. *Id.* at 25 (citation omitted).

The other two parts of the reasonableness inquiry—the forum's and plaintiff's interests—also support exercising jurisdiction. Like the statute addressing U.S. antiterrorism interests in *Fuld*, antitrust law is designed to address foreign conduct causing domestic antitrust injury: "[O]ur courts have long held that application of our antitrust laws to foreign anticompetitive conduct is nonetheless reasonable, and hence consistent with principles of prescriptive comity, insofar as they reflect a legislative effort to redress *domestic* antitrust injury that foreign anticompetitive conduct has caused." *F. Hoffman-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 165 (2004) (citations omitted). Although *F. Hoffman-La Roche* dealt with the scope of conduct covered by the statute rather than personal jurisdiction, it elucidates why a U.S. antitrust plaintiff can expect to obtain relief in its home country and the United States's interest in providing that relief. WFA protests that the plaintiff and forum should not be grouped together when assessing the interests of each. *See* Doc. 217, WFA's Reply Mot. Dismiss, 8. But *Fuld* essentially grouped the two together when it said both forum and plaintiff had strong interests for "similar reasons." 606 U.S. at 24. The Court sees no reason to decouple X's interest in obtaining relief and the United States's interest in providing a forum to seek it. Considering the backdrop of U.S. antitrust law, both forum and plaintiff have strong interests supporting the exercise of personal jurisdiction here.

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

***13** WFA finally advances two procedural arguments, both of which are unavailing. First, WFA argues that X must establish all elements of Rule 4(k)(2), including Rule 4(k)(2)(A)'s requirement that WFA is not subject to personal jurisdiction in any state. *See* Doc. 217, WFA's Reply Mot. Dismiss, 7. But the Fifth Circuit has advised that, to invoke Rule 4(k)(2), a plaintiff need not engage in a piecemeal analysis of all fifty states to disconfirm jurisdiction everywhere. *See Adams*, 364 F.3d at 651. "If ... the defendant contends that he cannot be sued in the forum state and refuses to identify any other where suit is possible, then the federal court is entitled to use Rule 4(k)(2)." *Id.* (quoting *ISI Int'l, Inc. v. Borden Ladner Gervais LLP*, 256 F.3d 548, 552 (7th Cir. 2001)).

WFA then asserts that X needed to have specifically referenced Rule 4(k)(2) in its complaint for WFA to address that jurisdictional theory, but WFA cites no authority in support of such a requirement. *See* Doc. 217, WFA's Reply Mot. Dismiss, 8 & n.10. Although a plaintiff must plead the facts necessary to support jurisdiction, the Court is not aware of authority stating that a plaintiff must specify the jurisdictional theory in its complaint. In any event, WFA did not concede that it is subject to personal jurisdiction elsewhere, even after X explained its jurisdictional theory. *See id.* Thus, the Court finds that X has established personal jurisdiction over WFA under Rule 4(k)(2).

WFA has also moved to dismiss for improper venue but acknowledges that if personal jurisdiction exists over WFA, venue is proper under 28 U.S.C. § 1391(c)(3). *See id.* at 10. The Court therefore denies the entirety of WFA's motion to dismiss for lack of personal jurisdiction and improper venue.

*iii. Shell International is not subject to personal jurisdiction.*

X has not demonstrated a prima facie case for exercising personal jurisdiction over Shell International under Rule 4(k)(2) because X has not adequately alleged that Shell International engaged in conduct closely connected with the United States. To begin, the factual allegations specific to Shell International relate generally to its affiliations with WFA and the ANA Council. *See* Doc. 77, Second Am. Compl. ¶¶ 23, 37. But Shell International's conduct with respect to those affiliations occurred entirely abroad with no tangible U.S. impact. *See* Doc. 144, App. Shell PLC's Mot. Dismiss, Ex. B, Aragon Decl. ¶¶ 3–4 (describing Shell International's payments to WFA's Belgian bank account). Moreover, the evidence before the Court shows that Shell International does not perform any conduct in the United States. *See* Doc. 143, Shell Int'l's Br. Mot. Dismiss, 2–3 (citing declarations provided in appendix).

Shell International's affiliation with WFA and the ANA Council is also steps removed from the controversy presented in this case. Alleging that Shell International paid dues to WFA, was a leader of the ANA Council, or paid a GARM invoice does not tell the Court what Shell International did to monitor X's activities, answer surveys about willingness to stop advertising on X, or boycott X. Involvement in GARM could mean a wide range of things: besides the alleged X boycott, GARM's activities included consulting the industry to establish agreeable standards and pursuing collective action against other digital media companies.

GARM membership or affiliation does not equate to boycotting X, despite GARM's stated requirement of adherence to and enforcement of the brand safety standards. *See* Doc. 77, Second Am. Compl. ¶¶ 66, 68, 73, 76. The Second Amended Complaint contains several examples where fewer than all GARM members joined in boycotting other platforms (*e.g., id.* ¶ 85), where Rakowitz threatened a boycott prior to consulting GARM members (*e.g., id.* ¶¶ 108, 110), and where advertisers boycotted in response to an intervening communication from their advertising agency (*e.g., id.* ¶ 106). Based on those allegations, the Court cannot equate those that boycotted X with anyone who affiliated with the boycotters.

***14** Because boycotting X was not GARM's raison d'être, X does not have standing to challenge GARM's existence but only to seek relief for injuries inflicted upon X. As a result, a connection to GARM, even a less attenuated one than Shell International's, does not sweep a defendant into X's lawsuit. To exercise personal jurisdiction under Rule 4(k)(2), X must allege that Shell International engaged in jurisdiction-triggering conduct. Here, the jurisdiction-triggering conduct is the boycott and information-sharing conspiracy leading to X's injury.

Under that rubric, X alleges that "Shell"—a collective reference to Shell plc, Shell International, and Shell USA—refrained from purchasing advertising on X after the boycott began. *See* Doc. 77, Second Am. Compl. ¶¶ 106, 138. X also asserts that Shell International "acted in a unity of purpose with Shell USA regarding the conduct of Shell USA." Doc. 194, Consol. Resp., 5. According to X, the Court should impute the actions of other Shell entities to Shell International

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

under a single-enterprise theory recognized in other circuits. *See id.* at 6 n.2.

X's single-enterprise theory fails to establish personal jurisdiction for two reasons. First, even if it applies to this case, the theory concerns antitrust liability, not personal jurisdiction. *See* *Chandler v. Phx. Servs.*, No. 7:19-cv-00014-O, 2020 WL 1848047, at *14–15 (N.D. Tex. Apr. 13, 2020) (O'Connor, J.) (explaining theory as method for parent company "[t]o be liable for its subsidiary's conduct"). "Liability and personal jurisdiction are two separate questions in law, and the former does not establish the latter." *Robert Yaquinto Print'g Co. v. Fleer Skybox Int'l, L.P.*, No. 3:05-CV-1412-N, 2005 WL 8158550, at *2 (N.D. Tex. Dec. 20, 2005) (Godbey, J.). Second, "courts do not lightly or routinely pierce the corporate veil." *USHealth Grp., Inc. v. South*, 636 F. App'x 194, 202 (5th Cir. 2015) (per curiam) (citation omitted). To impute a subsidiary's conduct to the parent corporation, "the corporation must have exercised such control over the subsidiary that it is clear the two entities have abandoned their separate corporate identities." *Id.* (citations omitted). X has not articulated facts supporting its assertion that Shell International is answerable for activities by other Shell entities. At bottom, grouping together all Shell entities does not answer the question "who did what." To exercise jurisdiction over Shell International, the Court needs to know what Shell International—not Shell plc or Shell USA—did. Without more, X's allegation that the three acted in "unity of purpose" is a mere conclusion unsupported by alleged facts.

Similar to how X argues that a corporate family should be treated as one, X argues that all defendants can be treated as part of one boycott conspiracy over which jurisdiction exists. In support of this conspiracy jurisdiction theory, X points to several cases from other circuits accepting the theory that one conspirator's minimum contacts with a forum can support jurisdiction over out-of-forum co-conspirators. *See* Doc. 194, Consol. Resp., 18 (collecting cases). X acknowledges that an unpublished Fifth Circuit case rejected conspiracy jurisdiction. *See id.* at 22 (quoting *Delta Brands Inc. v. Danieli Corp.*, 99 F. App'x 1, 6 (5th Cir. 2004)). But X says that an earlier Fifth Circuit case, which is published, endorsed the theory in dicta. *See id.* at 20–22 (discussing *Guidry v. U.S. Tobacco Co.*, 188 F.3d 619 (5th Cir. 1999)). X therefore asks that the Court not propagate the "non-binding error" of the later unpublished Fifth Circuit case. *Id.* at 22–25.

***15** Supposing without deciding that the conspiracy jurisdiction theory is valid, X still has not established jurisdiction because it has not sufficiently tied Shell International to the boycott conspiracy. To successfully invoke conspiracy jurisdiction, a plaintiff must adequately allege that "a conspiracy existed" and that "the defendant participated in the conspiracy." *In re Platinum & Palladium Antitr. Litig.*, 61 F.4th 242, 270 (2d Cir. 2023) (citation omitted); *see* *Guidry*, 188 F.3d at 631–32 (explaining that conspiracy jurisdiction requires adequately pleading a conspiracy exists under Federal Rule of Civil Procedure 8 standards). For instance, in *Platinum & Palladium*, the plaintiffs adequately alleged that the defendants were part of the conspiracy through their participation in "interfirm communications" where co-conspirators discussed price information and coordinated market activity. *See* 61 F.4th at 270–71. In this way, conspiracy jurisdiction does not ease the "who did what" requirement for personal jurisdiction; it instead modifies the "what" to require adequately alleging participation in the conspiracy. A plaintiff cannot allege a worldwide conspiracy, list several organizations as defendants, assert without adequate supporting facts that they were all part of the conspiracy, and thereby force every international defendant to answer a lawsuit in a forum where one conspirator's conduct occurred. Here, as explained above, X has alleged facts connecting Shell International to other organizations but not showing how Shell International participated in the alleged boycott. Therefore, even if conspiracy jurisdiction is operable in this circuit, it fails here.

Finally, as jurisdiction fails under Rule 4(k)(2) for noncompliance with the Fifth Amendment Due Process Clause, jurisdiction necessarily fails under any other possible theory. The Court therefore grants Shell International's motion to dismiss.

*iv. Lego A/S is not subject to personal jurisdiction.*

The attempt to assert personal jurisdiction under Rule 4(k)(2) over Lego A/S fails for essentially the same reasons as applicable to Shell International. As with the Shell entities, X groups the Lego entities together without asserting facts to support its conclusion that Lego A/S broke its formal corporate separateness to direct the conduct of subsidiary Lego Brand. *See* Doc. 77, Second Am. Compl. ¶¶ 20, 37, 138. Even assuming that Lego A/S was a GARM member and leader on the ANA Council, X fails to specify how Lego A/S participated in the boycott against X, rather than GARM at large. With no connection between Lego A/S and the United States germane to the controversy at hand, the Court cannot exercise personal jurisdiction over Lego A/S under Rule 4(k)(2) or any other theory.

*v. Nestlé S.A. is not subject to personal jurisdiction.*

The Court lacks personal jurisdiction over Nestlé S.A. under Rule 4(k)(2) as well. X once again impermissibly groups together Nestle entities without supporting facts. *See id.* ¶ 17. Even if Nestlé S.A. was a founding member of GARM and had an employee on WFA's Executive Board, those facts do not connect Nestlé S.A. to the boycott conspiracy against X. In a conspicuous counterexample to its group pleading, X alleges that Nestle USA—not Nestlé S.A.—received and acted on an advertising agency's "recommendation to refrain from purchasing advertising from Twitter." *Id.* ¶ 106. That allegation connects Nestlé S.A.'s subsidiary to the controversy, but it does not show how Nestlé S.A. directed the conduct, monitored X's activities, or participated in the boycott itself.

X does allege one fact that, if attributable to Nestlé S.A., would connect it to the boycott conspiracy. X alleges in the Second Amended Complaint that "Nestlé S.A. instructs its subsidiaries, including Nestle USA, to presumptively refrain from purchasing advertising from Twitter, now X, as a 'high-risk' platform." *Id.* ¶ 141. X's "Global Lead for Brand Safety" has since clarified that the "high-risk" comment was made by an unknown Nestle entity's employee who "oversees Nestlé's global brand safety efforts." *See* Doc. 195, App. Consol. Resp., Ex. I, Tenreiro-Braschi Decl. ¶¶ 3–4. That individual's LinkedIn page says that she has served since January 2023 as the "Global Programmatic & Brand Safety Lead" at "Nestlé" based in Barcelona, Spain, and that she is personally based in the United Kingdom. *See id.*, Ex. H, at App. 056. X speculates that the context of this employee's comment "is consistent with the entity that did these things being Nestlé S.A." and that Nestlé S.A. is "play[ing] a corporate shell game." Doc. 194, Consol. Resp., 6 n.2.

***16** Nestlé S.A. responded with its corporate general counsel's affidavit that the individual whom X alleges made the "high-risk" comment has never been an officer or employee of Nestlé S.A. *See* Doc. 225, Jampen Decl. ¶¶ 3, 5. Moreover, X has not factually contested Nestlé S.A.'s declaration-supported assertion that, as the ultimate parent of all Nestle entities, it does not "have direct control or managerial responsibilities over the activities of its subsidiaries." Doc. 164, Nestlé S.A.'s Br. Mot. Dismiss, 2 (first citing Doc. 165, App. Nestlé S.A.'s Mot. Dismiss, Jampen Decl. ¶¶ 5–6; then citing *P & L Dev., LLC v. Gerber Prods. Co.*, 715 F. Supp. 3d 435, 454 (E.D.N.Y. 2024)).

Taking all evidence in the light most favorable to X, the Court need not give speculation greater weight than a sworn declaration. Here, the employee does not even work or live in Switzerland where Nestlé S.A. is headquartered. Further, X does not present evidence that Nestlé S.A. has otherwise directed the advertising activities of its subsidiaries. X's challenge to Nestlé S.A.'s sworn declaration, absent countervailing evidence, amounts to mere speculation that Nestlé S.A. is lying. Having no substantive reason to reject the clearly stated facts in Nestlé S.A.'s declarations, the Court accepts them as true and rules that it lacks personal jurisdiction over Nestlé S.A. under Rule 4(k)(2) or any other jurisdictional theory.

Finally, because the Court dismisses Shell International, Lego A/S, and Nestlé S.A. from the lawsuit, their motion to sever is denied as moot.

2. The Court Denies X's Motion for Jurisdictional Discovery.

Jurisdictional discovery motions are committed to a district court's discretion, *see Monkton*, 768 F.3d at 434, and should be granted when a plaintiff "presents factual allegations that suggest with reasonable particularity the possible existence of" facts to support jurisdiction. *Getagadget, L.L.C. v. Jet Creations Inc.*, No. 19-51019, 2022 WL 964204, at *5 (5th Cir. Mar. 30, 2022) (citations omitted). "Discovery on matters of personal jurisdiction need not be permitted unless the motion to dismiss raises issues of fact.... When the lack of personal jurisdiction is clear, discovery would serve no purpose and should not be permitted." *Kelly v. Syria Shell Petrol. Dev. B.V.*, 213 F.3d 841, 855 (5th Cir. 2000) (citation modified). Jurisdictional discovery should be denied if it seeks to understand which entity in a corporate family is responsible, rather than whether the Court has personal jurisdiction over a named defendant. *See DDC Tech., LLC v. Structural Graphics, LLC*, No. 3:22-CV-1263-B, 2022 WL 17813705, at *7 (N.D. Tex. Dec. 19, 2022) (Boyle, J.).

For the reasons explained in Sections III.A.1.iii–v above, X has failed to present "factual allegations that suggest with reasonable particularity" that the Court has personal jurisdiction over Shell International, Lego A/S, and Nestlé S.A. *See Getagadget*, 2022 WL 964204, at *5. X contends that these defendants have not rebutted a series of allegations in its Second Amended Complaint that would meet this required showing. *See* Doc. 226, Reply Mot. Disc., 4–5. Half of these allegations are affiliations with GARM, WFA, or the ANA Council, which as the Court explained above are not

sufficient to suggest that the specific defendant monitored X's activities, refrained from purchasing advertisements, or otherwise participated in the boycott. The other half of the supposedly unrebutted allegations are factually unsupported conclusions that the defendants participated in the boycott or acted in unity of purpose with a subsidiary. The only potential factual discrepancy could have been the Nestle employee who made the "high-risk platform" comment, but X does not present facts (as opposed to speculation) controverting a sworn affidavit that the employee did not work for Nestlé S.A. Accordingly, X has not met its initial burden under *Getagadget.*

***17** X nevertheless advances two arguments for jurisdictional discovery, both of which fail to persuade the Court. First, X argues that it is entitled to test the factual assertions regarding the defendants' corporate structure and relationships with alleged co-conspirators. *See* Doc. 201, Br. Mot. Disc., 4–8. In support, X principally points to *In re Gasoline Spot Litigation*, where the court allowed jurisdictional discovery because the plaintiffs objected to the defendant's declaration as "lacking in foundation and hearsay." No. 20-cv-03131-JSC, 2020 WL 7431843, at *8 (N.D. Cal. Dec. 18, 2020). That court also based its decision to allow jurisdictional discovery on the plaintiff's assertion of facts that the international corporate parent's executives met with its subsidiary's co-conspirator; that the parent hired and managed its subsidiary's senior trading employee; and that the parent supervised, reviewed, and approved its subsidiary's trading activities with the co-conspirator. *Id.* Here, X does not assert that the relevant affiants do not have sufficient knowledge as to the facts in their declarations, nor that they might say something different if deposed. And X has not presented sufficient facts to support its conclusion that Shell International, Lego A/S, and Nestlé S.A. are lying about their non-involvement in their subsidiaries' advertising decisions.

Second, X argues that jurisdictional discovery should be permitted because Shell International, Lego A/S, and Nestlé S.A. "all played key roles in the founding, running, and unlawful activities of GARM and the ANA, whose Global CMO Growth Council proselytized for GARM and adherence to its rules, and which was a member of GARM's Steer Team." Doc. 201, Br. Mot. Disc., 9. Again, however, mere affiliation with GARM and its wide-ranging activities does not support a connection to the boycott against X. These allegations do not, for example, suggest that these defendants (not their corporate affiliates) ever purchased advertising from X or that they participated in GARM's negotiations of advertising practices with X. In contrast, X does not rely on group pleading to allege that other entities (including Nestle USA) changed their advertising habits after receiving a boycott-related communication. *See* Doc. 77, Second Am. Compl. ¶ 106. X has not persuaded the Court that a dispute exists over asserted facts that, if true, would support jurisdiction; X simply has not alleged facts supporting the conclusions it wishes to draw.

At bottom, X's jurisdictional discovery requests are difficult to perceive as anything other than a fishing expedition. X seeks communications between and among the defendants and "any of their subsidiaries" regarding "WFA/GARM or the boycott of X," their "membership and roles in WFA or GARM," and their "business activities ... in the U.S." Doc. 201, Br. Mot. Disc., 10. These requests are aimed at the impermissible inquiry of figuring out who in the corporate family was involved, rather than figuring out specifically whether the Court has jurisdiction over named defendants. *See DDC Tech.*, 2022 WL 17813705, at *7. More troublingly, prior to establishing that the Court has personal jurisdiction, the requests seek sprawling information from international defendants about GARM and their involvement in it generally, rather than specific to the boycott against X. Because X has not satisfied its burden to establish that any discovery—let alone its broad requests—is warranted, the motion for jurisdictional discovery is denied.

3. Ørsted Services is Not Subject to Personal Jurisdiction Under Rule 4(k)(1)(C).

Unlike the other foreign defendants, Ørsted Services concedes that it is subject to personal jurisdiction in New York, which precludes application of Rule 4(k)(2). *See* Doc. 211, Ørsted Servs.'s Br. Mot. Dismiss, 12. Thus, to establish personal jurisdiction over Ørsted Services, X leans entirely on Rule 4(k)(1)(C) and jurisdiction under the Clayton Act, 15 U.S.C. § 22. That statute has two clauses separated by a semi-colon:

> Any suit, action, or proceeding under the antitrust laws against a corporation may be brought not only in the judicial district whereof it is an inhabitant, but also in any district wherein it may be found or transacts business; and all process in such cases may be served in

the district of which it is an inhabitant,
or wherever it may be found.

***18** § 22.

This Court recently analyzed the statute in *Rumble, Inc. v. World Federation of Advertisers*, No. 7:24-CV-0115-B, 2025 WL 2345076 (N.D. Tex. Aug. 13, 2025) (Boyle, J.). The clause preceding the semicolon is a " 'special' venue provision, which provides additional methods for a plaintiff to demonstrate that venue is proper in antitrust cases." *Id.* at *5 (citation omitted). "The second clause is a personal jurisdiction provision authorizing 'worldwide service of process' " and allowing any federal district court in the country to exercise personal jurisdiction over an antitrust defendant. *See id.* (citation omitted).

In *Rumble*, the Court recognized that a circuit split exists as to whether the two clauses are "independent" or "integrated." *See id.* at *6. If they are independent, the personal jurisdiction clause always applies irrespective of whether the special venue clause is satisfied. *Id.* If they are integrated, the personal jurisdiction clause is only activated if the special venue provision is satisfied. *Id.* For Ørsted Services, interpreting the clauses as independent makes it subject to personal jurisdiction in this District regardless of whether it inhabits, is found, or transacts business here. Under the integrated interpretation, Ørsted Services would only be subject to personal jurisdiction under § 22 if it inhabits, is found, or transacts business here.

After discerning that the Fifth Circuit had not taken a side on the matter, the Court in *Rumble* concluded that the two clauses are integrated. *See id.* at *5–9. To reach this conclusion, the Court assessed the text and structure of the statute and surveyed the approaches taken by other circuits. *See id.*

X asks the Court to revisit its previous analysis and hold that the two provisions are independent. In support, X argues that the Alien Venue Statute (28 U.S.C. § 1391(c)(3)) overrides the Clayton Act's special venue provision, parses decisions of the Courts of Appeals that this Court previously scrutinized in *Rumble*, and objects to the Court's previous analysis of the statutory text and structure. *See* Doc. 215, Resp. Ørsted Servs.'s Mot. Dismiss, 5–21. The Court is unconvinced by X's three lines of argument.

*i. The Alien Venue Statute does not impact the operation of § 22's two clauses together.*

First, X argues that "the Alien Venue Statute trumps the Clayton Act's special venue provision and authorizes the Court to exercise jurisdiction over an alien defendant ... without regard to whether the Clayton Act's venue provision is satisfied." *Id.* at 7. X's lead support is *Brunette Machine Works, Ltd. v. Kockum Industries*, where the Supreme Court decided the applicability of the patent venue statute to alien defendants. 406 U.S. 706 (1972). The patent venue statute makes venue proper for patent infringement cases in the district either (a) where a defendant resides or (b) where the infringement occurred and the defendant has a regular and established place of business. *See id.* at 706–07. The Alien Venue Statute at the time said: "an alien may be sued in any judicial district." *Id.* at 706 (citation modified).

***19** The Supreme Court held that, in patent infringement cases against aliens, plaintiffs were not limited to establishing proper venue through the patent venue statute. *See id.* at 714. Instead, plaintiffs could establish proper venue against an alien in any case using the Alien Venue Statute, which codified "the long-established rule that suits against aliens are wholly outside the operation of all the federal venue laws, general and special." *Id.* Four decades later, according to X, Congress "reaffirmed and bolstered the *Brunette* rule" by changing § 1391(c)'s introductory language from "For purposes of venue under this chapter" to "For all venue purposes." *See* Doc. 215, Resp. Ørsted Servs.'s Mot. Dismiss, 7.

The principle that venue is proper over nonresidents anywhere is correct, yet it is uninformative of how § 22's two clauses operate together. Under *Brunette*, a plaintiff can establish proper venue in a patent case using the Alien Venue Statute, notwithstanding the patent statute's special venue provision. *See* 406 U.S. at 714. So too in this antitrust case: X can establish proper venue using § 1391(c)(3).[4] But in neither patent cases nor antitrust cases does establishing venue obviate the need to establish personal jurisdiction. A plaintiff can do so using any of the Rule 4(k) methods, and if using Rule 4(k)(1)(C), the plaintiff must meet the requirements of the chosen jurisdiction-granting statute. The question is whether, to use § 22's jurisdiction-granting provision, a plaintiff needs to have satisfied its special venue provision. The principle that a plaintiff can use other methods to establish venue has no bearing on that question.

4 For an example, see the last paragraph of Section III.A.1.ii above dealing with venue for WFA.

*ii. The Court continues to reject the Third and Ninth Circuits' approach.*

X's second argument asks the Court to take another look at cases it rejected from the Third Circuit and Ninth Circuit interpreting § 22's two clauses as independent only for aliens. *See* Doc. 215, Resp. Ørsted Servs.'s Mot. Dismiss, 10–11. In *Rumble*, the Court disagreed with those courts' holdings because they relied on the purpose of the statute, rather than its text, and because they treated foreign and domestic corporations differently under the same text. *See* 2025 WL 2345076, at *8–9. The Ninth Circuit case, which was decided first, identified § 22's "main contribution to be its expansion of the bounds of venue" and decided in light of that purpose that a lawsuit against an alien corporation should not be restricted by the special venue provision. *See Go-Video, Inc. v. Akai Elec. Co.*, 885 F.2d 1406, 1410–13 (9th Cir. 1989) (citations omitted). The Third Circuit followed *Go-Video*'s logic and added on that "[t]he principle that an alien may be sued in any district is simply too deeply rooted to assume otherwise." *In re Auto. Refinishing Paint Antitr. Litig.*, 358 F.3d 288, 295–97 (3d Cir. 2004) (citations omitted).

These cases are correct that § 22 broadens venue and personal jurisdiction but wrong that it broadens personal jurisdiction in ways untethered to the text and structure of the statute. Without § 22, an antitrust plaintiff (if unable to use Rule 4(k)(2)) would need to sue the defendant under Rule 4(k)(1)(A) where it is at home or in a place where it has minimum contacts out of which the antitrust case arises. With § 22, an antitrust plaintiff can sue corporate defendants anywhere they "transact business," whether or not the case arises out of that business. In that way, § 22 simultaneously broadens venue and personal jurisdiction by allowing both to exist without case-related contacts. But recognizing this broadening aspect does not mean that, when faced with a choice between a broad interpretation and a narrow one, a court should choose the broader one based on the provision's general purpose of broadening. If the statute has the effect of broadening, it is only as a result of its text, not the statute's "purpose" and not "background principles" that are not stated in the text.

*iii. X's textual and structural arguments do not compel an independent interpretation.*

***20** Last in X's entreaty to reassess *Rumble* are two textual and structural arguments. First, X criticizes *Rumble*'s conclusion that "such cases" in § 22's second clause refers to the entire first clause, and X argues instead that "such cases" means "antitrust cases" generally. *See* Doc. 215, Resp. Ørsted Servs.'s Mot. Dismiss, 11–12. At a granular level, X is correct that "such cases" could mean antitrust cases generally because the first clause says where cases "may be brought," rather than adjectivally describing where they "are" brought. *See id.* at 12–13.

But proper textual analysis does not miss the forest for the trees. "It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Chamber of Com. v. U.S. Dep't of Lab.*, 885 F.3d 360, 372 (5th Cir. 2018) (quoting *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989)). A related "cardinal principle of statutory construction" is "that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." *United States v. Lauderdale Cnty.*, 914 F.3d 960, 966 (5th Cir. 2019) (citation modified). In context, reading "such cases" in § 22's second clause as referring to antitrust cases generally renders the venue provision "disposable." *KM Enters., Inc. v. Glob. Traffic Techs., Inc.*, 725 F.3d 718, 729 (7th Cir. 2013) (citations omitted).

The independent interpretation renders the venue provision disposable because § 22—titled "District in which to sue corporation"—applies only to corporations. If personal jurisdiction in an antitrust case is proper against a corporation everywhere, then the corporation is a resident everywhere for purposes of venue in that case under the general venue statute. *See* 28 U.S.C. § 1391(c)(2). A defendant's residence in a district makes venue proper there for that defendant. *See* § 1391(b)(1). As a result, an antitrust plaintiff would never need to use § 22's special venue provision under an independent interpretation of the statute, and Congress would have written the special venue provision to have no effect.

X criticizes this conclusion regarding superfluity as incorrect because an antitrust plaintiff could sue corporations and noncorporations in one lawsuit, but its argument does not explain when § 22's special venue provision would ever need to be used under an independent interpretation. *See* Doc. 215, Resp. Ørsted Servs.'s Mot. Dismiss, 14–15. If suing corporations and non-corporations, the fact that venue is proper for corporations everywhere does not make venue for the case overall proper because § 1391(b)(1) requires that "all defendants are residents of the State in which the district is


© 2026 Thomson Reuters. No claim to original U.S. Government Works.

located." The antitrust plaintiff would then need to figure out a different way to establish that venue is proper for the non-corporate defendants. Its first option for doing so is filing in the forum where the non-corporate defendant resides, which poses no issue for the corporate defendant who—under the independent interpretation of § 22, plus operation of § 1391(c)(2)—resides there too. Its second option is filing where "a substantial part of the events or omissions giving rise to the claim occurred," § 1391(b)(2)—again obviating any need for use of § 22's special venue provision. The fallback option—"if there is no district in which an action may otherwise be brought," § 1391(b)(3)—likewise does not require use of § 22's special venue provision. Thus, X's critique does not elucidate any use of § 22's special venue provision if the statute's clauses are deemed independent.

***21** Second, X argues that the semicolon between § 22's two clauses suggests that they operate independently. *See* Doc. 215, Resp. Ørsted Servs.'s Mot. Dismiss, 13–14. *Contra Rumble*, 2025 WL 2345076, at *7 ("The venue and personal jurisdiction provisions are part of the same sentence and are only separated by a semicolon, which suggests that Congress intended for them to operate together." (citation omitted)). But the case X cites for this proposition, despite stating that clauses separated by semicolons are presumed independent, advises that "punctuation alone is not 'a reliable guide for discovery of a statute's meaning.' " *Elgin Nursing & Rehab. Ctr. v. U.S. Dep't of Health & Hum. Servs.*, 718 F.3d 488, 494–95 (5th Cir. 2013) (citations omitted). Moreover, the regulatory guideline at issue in *Elgin* involved two different criteria for evaluating one outcome of whether eggs were prepared safely. *See id.* at 494. Here, § 22's two clauses do not refer to two different ways to establish venue or two different ways to establish personal jurisdiction that might be seen as alternate options. X's argument about semicolons therefore has little applicability here.

Returning to Ørsted Services, X has made no effort to establish that the Court has jurisdiction under an integrated interpretation of § 22 by showing, for example, that Ørsted Services transacts business in this District. Nor has X made any effort to establish that Ørsted Services had case-related minimum contacts with Texas that would give rise to personal jurisdiction. Thus, the Court dismisses all claims against Ørsted Services without prejudice.

X requests interlocutory appeal if the Court disagrees with X's interpretation of § 22. *See* Doc. 215, Resp. Ørsted Servs.'s Mot. Dismiss, 21. Because this opinion disposes of all claims against all parties, the Court will issue a final judgment that allows X to appeal any purported error leading to that final order. Thus, X's request for certification of interlocutory appeal is denied as moot.

*B. The Court Denies Transfer.*

The first step of the transfer analysis is assessing whether the case "might have been brought" in the proposed transferee forum. *See* 28 U.S.C. § 1404(a). Often, this issue is undisputed and therefore not scrutinized. *See, e.g., Volkswagen*, 545 F.3d at 312 ("All agree that this civil action originally could have been filed in the Dallas Division."); *In re TikTok*, 85 F.4th 352, 357 n.5 (5th Cir. 2023) (similar).

But where, as here, the issue is disputed, the burden falls on the movants to prove that the transferee forum "has subject-matter jurisdiction, personal jurisdiction, and proper venue." *See Maxell*, 2025 WL 1674398, at *2. That burden is not satisfied by a defendant conceding jurisdiction in the transferee forum. *See Blitz USA, Inc. v. Liberty Surplus Ins. Corp.*, No. 3:11–CV–0034–G, 2011 WL 1602718, at *3 (noting that transferee forum must be proper "independently of the wishes of the defendant" (citation omitted)). Instead, meeting the burden requires an affirmative demonstration, just the same as a plaintiff must demonstrate when it opposes a jurisdictional challenge. *Compare Ill. Union*, 191 F. Supp. 2d at 797 (explaining transfer movants' burden to establish personal jurisdiction in transferee forum as to each defendant) (citation omitted), *with Monkton*, 768 F.3d at 431 (explaining plaintiff's burden in face of personal jurisdiction challenge).

As to their proposed transfer to the U.S. District Court for the Southern District of New York ("SDNY"), the movants have failed to meet the threshold burden to show that the defendants would be subject to personal jurisdiction there.[5] On their alternative request for intra-district transfer to Dallas, transferring would have no impact given the Court's conclusion on the merits, so the Court denies intra-district transfer.

5 For this inquiry, the Court need not consider dismissed defendants. *See, e.g., QR Spex, Inc. v. Motorola, Inc.*, 507 F. Supp. 2d 650, 668 (E.D. Tex. 2007) (transferring case as to two defendants after dismissing others). Thus, the parties' arguments regarding personal jurisdiction in SDNY over Shell International, Lego A/S, Nestlé S.A., and Ørsted

X CORP., Plaintiff, v. WORLD FEDERATION OF ADVERTISERS;..., Slip Copy (2026)

Services are mooted by those defendants' dismissal from the lawsuit.

1. The movants do not meet their burden to show SDNY has personal jurisdiction.

***22** The movants cite two parts of the Clayton Act to argue that the action could be transferred to SDNY. *See* Doc. 179, Br. Mot. Transfer, 8. First, they cite 15 U.S.C. § 15(a), which says that private antitrust lawsuits may be brought in "any district court of the United States in the district in which the defendant resides or is found or has an agent." This provision concerns venue only, which means that the movants would need a separate basis for personal jurisdiction. *See* 14D *Wright & Miller's Federal Practice and Procedure* § 3818 (4th ed. 2025).

Second, they cite 15 U.S.C. § 22, which allows personal jurisdiction anywhere only if its special venue clause is satisfied. *See Rumble*, 2025 WL 2345076, at *6 (other citations omitted) (citing *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 422 (2d Cir. 2005)) (explaining that the Second Circuit follows integrated reading of § 22). Thus, SDNY would have personal jurisdiction over a defendant that inhabits, is found, or transacts business in that district. *See Expoconsul Int'l, Inc. v. A/E Sys., Inc.*, 711 F. Supp. 730, 732 (S.D.N.Y. 1989) (citing § 22). "Inhabit" means to be incorporated somewhere, and "found" means to do business there. *Id.* at 732–33 (citation omitted). "Transact business" is a looser standard meant to expand the forums in which antitrust cases can be brought, *see id.* at 733 (citation omitted), and the standard is satisfied if a defendant does "practical, everyday business ... of any substantial character." *Daniel*, 428 F.3d at 428 (citations omitted). Critically, whichever route you take to satisfy § 22's venue clause, contact with the state as a whole is irrelevant. *See id.* at 430. Only a showing of contact with the specific judicial district will satisfy the venue clause. *Id.* (citations omitted).

The evidence provided by the movants is insufficient to show that they do any business in SDNY to satisfy § 22's venue clause and activate its personal jurisdiction clause. For six defendants, the movants provided New York business registrations. *See* Doc. 179, Mot. Transfer, 4. But registrations to do business in the state of New York do not establish that those defendants do business in SDNY specifically. Two defendants—Mars and CVS—provide declarations from their executives stating, "I understand that [Mars/CVS] transacts business in New York, NY." Doc. 179-1, App. Mot. Transfer, Ex. 17, Stephenson Decl. ¶ 14; *id.*, Ex. 18, Vaccarezza Decl. ¶ 5. Those statements do not demonstrate anything, they merely state a conclusion. *Cf. Expoconsul*, 711 F. Supp. at 733–34 (assessing sales figures and breadth of business contacts with district to determine "transacting business" standard was satisfied). Just as it would not work for a plaintiff to beat a jurisdictional challenge with only a conclusory statement in support, a conclusory statement cannot be sufficient when the burden is on the defendant here. Moreover, the statements do not necessarily connect the purported business to SDNY because parts of New York City are in the Eastern District of New York. *See* 28 U.S.C. § 112(c). Only one defendant, Pinterest, says it has an office in New York City. Doc. 179-1, App. Mot. Transfer, Ex. 15, Myvett Decl. ¶ 4. But Pinterest fails to specify in which borough (or in which federal judicial district) its office is located.

The movants may wonder why the Court cannot just presume that the remaining defendants—some of the world's largest corporations—do business in the global commerce hub of Manhattan, which is in SDNY. The answer is that, although § 1404 allows judicial discretion in weighing convenience, the statute does not permit judicial guesswork that the transferee forum could entertain the case. X raised this issue in its response brief, *see* Doc. 197, Resp. Mot. Transfer, 15–16, and the movants in their reply did not provide facts or analysis to meet their burden, *see* Doc. 221, Reply Mot. Transfer, 8. The Court will not research each defendant to figure out the street addresses of its retail locations, where its products are shipped, or the quantity of those business activities in SDNY. That burden rests on the movants, and they have failed to carry it.

***23** Unprompted judicial research into these defendants, while in some instances seemingly simple, opens its own can of worms. A court may, under Federal Rule of Evidence 201, take unprompted judicial notice of adjudicative facts that are "generally known" within its territorial jurisdiction or that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Judicial notice might be appropriate for "jurisdictional facts drawn from public records." *See PNC Bank, N.A. v. 2013 Travis Oak Creek, L.P.*, 136 F.4th 568, 574 (5th Cir. 2025) (collecting examples). A Google search might reveal that Pinterest's New York office is in fact in Manhattan, but is Google—like an official government record—a source "whose accuracy cannot reasonably be questioned"? Suppose the answer is yes, what you see on the internet is unquestionably reliable for such purposes. Now, if the Court uses Google to locate CVS pharmacies and Shell gas stations in Manhattan, how

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

does the Court know that those retail locations are owned or operated by the defendants here, rather than by formally separate corporate subsidiaries? Even if Google can (reliably or not) answer some questions, for other defendants who sell products but do not have public-facing business locations, a Google search might not do the trick at all. And at bottom, doing all this work for big corporate defendants relieves them of a burden that the Court would not relieve if an ordinary individual wished to transfer a case. Due to the inherent complications and unfairness, the Court declines to look outside the record to determine how much business each defendant does in SDNY.

Alternatively, the movants could have attempted to show that SDNY has personal jurisdiction under Rule 4(k)(1)(A) because the defendants are subject to New York state courts' personal jurisdiction. "General jurisdiction" would not exist in New York over most of the defendants because they are not "at home" in New York since their headquarters and places of incorporation are in other states. *See* Doc. 77, Second Am. Compl. ¶¶ 14–15, 17–18, 20–23; *Daimler*, 571 U.S. at 137. The movants have not conducted a "minimum contacts" analysis to show that the defendants are subject to "specific jurisdiction" in New York. Some defendants' declarations state their advertising agencies and GARM contacts are only in New York, but other defendants do not say anything about New York. *Contrast* Doc. 179-1, App. Mot. Transfer, Ex. 17, Stephenson Decl. ¶¶ 7, 11 (advertising agency and GARM contacts in New York), *and id.*, Ex. 18, Vaccarezza Decl. ¶¶ 9, 11 (similar), *with id.*, Ex. 19, Crawford Decl. (no mention of New York). Other defendants did not provide any declaration regarding the location of their case-related contacts. In any event, the Court will not extrapolate facts from the complaint or elsewhere when the movants have not done their work.

SDNY could clearly entertain the case only as to two defendants: WFA and Colgate. Any federal court would have subject-matter jurisdiction since this case arises under federal law. *See* 28 U.S.C. § 1331. WFA is subject to personal jurisdiction anywhere in the United States under Rule 4(k)(2), and venue is proper as to WFA wherever it is subject to personal jurisdiction under 28 U.S.C. § 1391(c)(3). Colgate, which is headquartered in New York, is subject to general personal jurisdiction in New York state courts and therefore subject to SDNY's personal jurisdiction under Rule 4(k)(1)(A). Venue would also be proper as to Colgate because it is deemed to reside for venue purposes in any district where it is subject to personal jurisdiction. *See* § 1391(b)(1), (c)(2).

If only a partial transfer is possible, the movants ask that the Court transfer the defendants that can be transferred and retain the remaining defendants here. *See* Doc. 179, Br. Mot. Transfer, 9 n.12. "[I]n most multidefendant cases ... severance and transfer makes sense only where the administration of justice would be materially advanced and a defendant in one district is not 'so involved' in the transferred controversy that the same issues would have to be litigated twice." *Def. Distributed v. Bruck*, 30 F.4th 414, 429 (5th Cir. 2022) (footnote omitted). Here, it is unclear how transferring only WFA and Colgate would materially advance the administration of justice or how the partial transfer could avoid having to litigate the same issues twice.[6] Thus, the request for partial transfer to SDNY is denied.

6 Even if the Court provided a little boost from *sua sponte* internet searches to determine that additional defendants could be transferred, that help could not be provided to all defendants. That means that any transfer would inevitably be partial, and it is unclear how a transfer that applies to any fewer than all defendants would materially advance the administration of justice or avoid having to litigate the same issues twice.

***24** Because the Court denies transfer to SDNY due to the movants' failure to establish that the case "might have been brought" there, the Court does not opine on the impact of X's terms of service and denies as moot X's motion for leave to file supplemental evidence regarding those terms.

<u>2. The Court declines to transfer to the Dallas Division.</u> The above transfer analysis was necessary because, if the Court were to have transferred the case to SDNY, it would have deferred deciding the merits of this case to the transferee court. *See Tel. Sci. Corp. v. Harris & Harris Ltd.*, No. 3:25-CV-1239-B, 2026 WL 657600, at *1 & n.1 (N.D. Tex. Mar. 9, 2026) (Boyle, S.J.) (citation omitted). In contrast, transferring to the Dallas Division would not change the presiding judge, so the Court can defer deciding the alternate request for intra-district transfer until after it has examined the merits of X's claim. In the next section, the Court explains that X has failed to state a claim and dismisses the case. Therefore, the case will not proceed further in this Court, and no convenience is gained by transfer. If, after an appeal, it becomes necessary to revisit the issue, a renewed motion for intra-district transfer may be filed.

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

X CORP., Plaintiff, v. WORLD FEDERATION OF ADVERTISERS;..., Slip Copy (2026)

*C. X Failed to State a Claim Under 15 U.S.C. § 1 Because X Has Not Suffered Antitrust Injury.*

To state a claim under 15 U.S.C. § 1, a plaintiff must establish that it has suffered antitrust injury. *See Dr.'s Hosp. of Jefferson, Inc. v. Se. Med. All., Inc.*, 123 F.3d 301, 305 (5th Cir. 1997) (citation omitted). This requirement is distinct from the Article III jurisdictional question whether the plaintiff has suffered an injury in fact that is caused by the defendant and redressable by favorable judicial decision. *See Rx Sols., Inc. v. Caremark, L.L.C.*, 164 F.4th 436, 443–44 & n.4 (5th Cir. 2026) (citations omitted). Instead, the "requirement is inferred from section 4 of the Clayton Act, which affords a remedy to any person injured in his business or property 'by reason of' an antitrust violation." *Dr.'s Hosp.*, 123 F.3d at 305 (citing 15 U.S.C. § 15(a)). Antitrust injury, as a component of statutory standing, is a "useful filter at an early stage of litigation" for weeding out faux antitrust lawsuits that merely state ordinary tort or contract claims. *See id.* at 306.

The Fifth Circuit recently summarized antitrust injury in the following way:

> The Supreme Court has distilled antitrust injury as being "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." ... "The antitrust laws ... were enacted for 'the protection of competition not competitors.' " ... "Typical" antitrust injury thus "include[s] increased prices and decreased output." ... "This circuit has narrowly interpreted the meaning of antitrust injury, excluding from it the threat of decreased competition." ... "Loss from competition itself—that is, loss in the form of customers[ ] choosing the competitor's goods and services over the plaintiff's—does not constitute an antitrust injury." ... In short, the question underlying antitrust injury is whether *consumers*—not *competitors*—have been harmed.

*Rx Sols.*, 164 F.4th at 444 (citations omitted).

Illegal group boycotts are "joint efforts by a firm or firms to disadvantage competitors by either directly denying or *persuading or coercing suppliers or customers to deny relationships* the competitors need in the competitive struggle." *Spectators Commc'n Network Inc. v. Colonial Country Club*, 253 F.3d 215, 221 (5th Cir. 2001) (internal quotation marks omitted) (quoting *Nw. Wholesale Stationers, Inc. v. Pac. Stationary & Printing Co.*, 472 U.S. 284, 294 (1985)). Although they often involve conspirators with "no direct motive to restrain trade," illegal group boycotts must involve a competitor at some level who seeks to restrain competition against an outsider to the agreement. *See id.*; *MM Steel, L.P. v. JSW Steel (USA) Inc.*, 806 F.3d 835, 844 (5th Cir. 2015) ("[A] group boycott ... [is] often[ ] a concerted agreement among competitors to refuse to deal with a manufacturer unless the manufacturer refuses to deal with an additional (typically new) competitor." (citation omitted)).

***25** X suggests that it need not satisfy the antitrust injury requirement because the alleged boycott is a "*per se* illegal collusion" that necessarily states antitrust injury. *See* Doc. 243, Resp. Suppl. Auth., 1. But even a boycott claim falling under the *per se* approach must involve "joint efforts by a firm or firms to disadvantage competitors" either directly or by pressuring others. *See Nw. Wholesale*, 472 U.S. at 294 (citations omitted). If the claim does not directly or indirectly involve the plaintiff's competitor, it does not state an antitrust injury.

X has not stated an antitrust injury. To recap, X is in the market of selling space on its social media platform where advertisements will be viewed by X's users. *See* Doc. 77, Second Am. Compl. ¶ 151. As alleged, WFA and its GARM initiative organized an advertiser boycott of X's platform. *See id.* ¶¶ 96, 104, 106, 124, 138, 141. Advertisers continue to buy advertising space from other social media companies and pay higher prices for that space. *See id.* ¶ 143. The harm to X has included reduced revenue and reduced prices that advertisers are willing to pay to advertise on its platform. *See id.* ¶¶ 154–55.

To understand why these allegations do not amount to an antitrust claim, think of X's injury in two ways: First, consider that the conspiracy benefits other social media companies that no longer must compete with X. Second, consider that the conspiracy benefits the advertisers who no longer compete with each other to buy X's advertising space. Either way, no antitrust injury exists.

<u>1. If the conspiracy was meant to benefit competing social media companies, X has not alleged that Defendants' activities allowed those competitors to corner the supply against consumer interests.</u>

A group of competitors who refuse to buy from an upstream supplier can cause antitrust injury if the refusal to deal is meant to allow another upstream supplier to corner the supply market. For example, in *Doctor's Hospital*, a preferred provider network contracted with various hospitals to provide services that the network could package into deals for group

purchasers of healthcare coverage. *See* 123 F.3d at 303. An individual consumer whose healthcare plan participated in the network could go to an in-network hospital for a lower price than an out-of-network hospital. *See id.* In this setup, think of the hospitals as suppliers of healthcare and the network as an intermediary that buys from the hospitals to sell to the ultimate consumer, the patient.

The antitrust conspiracy arose when two hospitals—one large and one small—that were located immediately next door to each other both wanted to join the network. *See id.* The small hospital, rejected from the network, filed an antitrust lawsuit against both the network and the larger hospital that was allowed to join. *See id.* at 304. The large hospital had "condition[ed] its entrance" into the network on the exclusion of the small hospital, and the network obliged so that it could secure the large hospital's larger supply of services. *See id.* As a result, the network's consumers in that area had reduced options and higher costs than they would have had if the small hospital was able to compete freely with the large hospital. *See id.* The Fifth Circuit held that the small hospital's "alleged losses and competitive disadvantage because of its exclusion from [the network] fall easily within the conceptual bounds of antitrust injury." *Id.* at 305.

In contrast to the facts of *Doctor's Hospital*, X has not alleged that the boycott against it allows or is intended to allow a competing social media company to corner the supply market for online advertising space. X alleges that the boycott against it benefits social media companies whom GARM deemed to have complied with the brand safety standards and that those companies are able to charge higher prices than X because they do not have to compete with X. *See* Doc. 77, Second Am. Compl. ¶ 143. Pinterest is one of the favored competitors. *See id.* But X has not alleged that the advertisers chose to do business with Pinterest—or any other social media company—as part of an agreement not to do business with X. Unlike the large hospital in *Doctor's Hospital*, Pinterest is not alleged to be X's competitor that wanted to exclude X from the market so that it could charge higher prices. In turn, unlike the network in *Doctor's Hospital*, the advertisers did not decide to boycott X at Pinterest's—or any other X competitor's—behest to secure the competitor's business. Instead, X alleges a conspiracy driven by advertisers not to further X-competitor social media companies' interests but to pursue their own collective interests as to where they place their advertisements. *See id.* ¶ 41.

***26** Two cases that X cites in its brief as "easily constitut[ing] antitrust injury" likewise describe a combination with upstream competitors. *See* Doc. 196, Resp. Joint Mot. Dismiss, 39. First, in *IQ Dental Supply, Inc. v. Henry Schein, Inc.*, the Second Circuit found antitrust injury where large on-the-ground dental-supply distributors pressured dental practices to not do business with the plaintiff, a competing online distributor. *See* 924 F.3d 57, 60–61, 63–64 (2d Cir. 2019). Second, in *Full Draw Productions v. Easton Sports, Inc.*, the Tenth Circuit found antitrust injury where large manufacturers of archery equipment collectively refused to purchase rental space at the plaintiff's archery trade show because they wanted to force the plaintiff out of business and start their own trade show. *See* 182 F.3d 745, 748, 751 (10th Cir. 1999).

In both *IQ Dental* and *Full Draw*, an upstream supplier —either for dental products or for space at archery trade shows—is involved. The dental practices in *IQ Dental* were participants with "no direct motive to restrain trade" but were pressured into doing so by upstream competitors, and the manufacturers in *Full Draw* restrained trade so that they could occupy the upstream supplier position themselves. *See* *Spectators' Commc'n*, 253 F.3d at 221.

Here, X has not alleged that an advertising space supplier (*i.e.*, one of X's competitors) directed the Defendants' boycott. Nor has X alleged that advertisers, WFA, or GARM sought to become the supplier (a new social media company) themselves. Thus, a construction of X's antitrust claim as one restraining it from competing with fellow social media companies is not "injury of the type the antitrust laws were intended to prevent." *Rx Sols.*, 164 F.4th at 444.

2. If the conspiracy was meant to eliminate competition at the advertiser level, X has not alleged that Defendants' boycott restrained X from selling to its downstream customers.

A group of competitors who refuse to buy from an upstream supplier can also cause antitrust injury if the refusal to deal is meant to cut off the supplier's direct access to other downstream customers. For example, in *Eastern States Retail Lumber Dealers' Ass'n v. United States*, an association of retailers wanted to maintain the system where they bought lumber from regional wholesalers and sold it to local consumers. *See* 234 U.S. 600, 606–07 (1914). To do so, if a wholesaler tried to sell directly to consumers, the wholesaler's name went on a "blacklist" circulated to all retailers. *See id.* at 607–08. When retailers saw a wholesaler's name on the

blacklist, they understood it as a call to "withhold patronage" from that wholesaler. *See id.* at 608–09. Thus, the retailers collectively imposed on the wholesalers a condition to avoid competing for local customers anywhere, on pain of retailers everywhere boycotting the offending wholesaler and putting it out of business. *See id.* at 611. The Supreme Court held that the retailers violated antitrust law by collectively restraining the wholesalers' ability to compete for end consumers. *See id.* at 614. In figurative terms, think of the retailers' collective signal to the wholesalers as saying, "do not dare go around us to access our customers."

The advertisers here imposed no "do not dare go around us" restriction. The key difference between *Eastern States* and this case is what the respective conspirators sought when they combined forces: In *Eastern States*, the retailers sought to restrict the wholesalers from competing for the retailers' customer base. The conspiring advertisers here did not attempt to force X to advertise with only GARM advertisers so that they could control the social media advertising market or any other market. They merely decided that they would not buy from X for their own advertising needs, notwithstanding if X sold advertising space to anyone else.

***27** To be sure, GARM allegedly imposed a "do not dare go around us" restriction by gatekeeping X's access to advertisers. *See* Doc. 77, Second Am. Compl. ¶ 63 (explaining that GARM's collective action shifted the cost of monitoring content from individual advertisers to social media companies). But GARM is not an economic intermediary like the retailers in *Eastern States.* GARM did not buy advertising space from X to sell to advertisers nor did it, in such an arrangement, tell X not to sell directly to GARM's customers. Rather, GARM was organized by advertisers and reflected their "avowed commitment to furthering [their] economic interests ... as a group." Doc. 196, Resp. Joint Mot. Dismiss, 13–14 (citing Doc. 77, Second Am. Compl. ¶¶ 36–47). Thus, if GARM is the obstacle to X reaching its advertiser-customers directly, then it is the equivalent of the advertiser-customers themselves deciding not to deal.

The last of the cases X cited in its brief to support antitrust injury is, like *Eastern States*, a "do not dare go around us" case. *See id.* at 39. That case, *Big Bear Lodging Ass'n v. Snow Summit, Inc.*, involved a group of ski resorts that sold discount ski tickets to lodging referral services and did not want the lodging referral services to refer anyone to competing ski resorts outside of the group. *See* 182 F.3d 1096, 1099–1100 (9th Cir. 1999). With the aim to prevent the group's competitors from competing, a group boycott restricting the referral services from doing business with outsiders was a *per se* antitrust violation. *See id.* at 1103. Unlike the conspiring ski resorts in *Big Bear*, the defendant advertisers here are not telling X to only do business with them and not with other advertisers. The only harm X has asserted is that its customers collectively chose X's competitors over X. That "[l]oss from competition itself ... does not constitute an antitrust injury." *Rx Sols.*, 164 F.4th at 444 (citation omitted). Therefore, although a group boycott is alleged, there is no antitrust violation here.

Because X does not allege that Defendants acted to restrain competition, it has failed to state either of its claims under the Sherman Act. Its claims against the remaining Defendants (all besides Shell International, Lego A/S, Nestlé S.A., and Ørsted Services) are therefore dismissed.

The Court finally denies X's request for an opportunity to replead. *See* Doc. 196, Resp. Joint Mot. Dismiss, 40. "Whether leave to amend should be granted is entrusted to the sound discretion of the district court, and that court's ruling is reversible only for an abuse of discretion." *Young v. U.S. Postal Serv. ex rel. Donahoe*, 620 F. App'x 241, 245 (5th Cir. 2015). "Denial of leave to amend is appropriate where there is no indication that amendment would cure the defects in a complaint." *Id.* The 165-paragraph Second Amended Complaint contains no dearth of detail: if facts existed that GARM operated at an X competitor's behest to put X out of business or that GARM advertisers sought to unfairly exclude competing advertisers from doing business, X would have pleaded those facts. The very nature of the alleged conspiracy does not state an antitrust claim, and the Court therefore has no qualm dismissing with prejudice.

## IV.

## CONCLUSION

For the foregoing reasons, the motions are disposed as follows: The Court **DENIES** the motion to dismiss filed by WFA (Doc. 132). The Court **GRANTS** the motions to dismiss filed by Shell International (Doc. 142), Lego A/S (Doc. 145), Nestlé S.A. (Doc. 163), and Ørsted Services (Doc. 210), and **DISMISSES** all claims as to those defendants **WITHOUT PREJUDICE**. The Court **DENIES** X's contingent motion for jurisdictional discovery (Doc. 200). The motion to transfer (Doc. 178) is **DENIED**. The motion to sever (Doc. 190) and

the motion for leave to file supplemental evidence (Doc. 244) are **DENIED AS MOOT**. The Court **GRANTS** the motion to dismiss for failure to state a claim (Doc. 160) as to all defendants not already dismissed for lack of jurisdiction. X's case as to those remaining defendants is **DISMISSED WITH PREJUDICE**. A final judgment will follow.

***28 SO ORDERED**.

**All Citations**

Slip Copy, 2026 WL 833900

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NEWSGUARD TECHNOLOGIES, INC., *Plaintiff*, v. FEDERAL TRADE COMMISSION and ANDREW FERGUSON, in his official capacity as Chairman of the Federal Trade Commission, *Defendants*. | No. 1:26-cv-0353 (DLF) |

**DEFENDANTS' RESPONSE TO PLAINTIFF'S NOTICE OF SUPPLEMENTAL AUTHORITY**

NewsGuard invokes an out-of-circuit district court decision to argue that the CID is invalid because any advertising boycott that NewsGuard might have facilitated would not cause "antitrust injury" and thus "would not implicate antitrust law." Dkt.30 at 2. This is misguided in several respects.

*First*, NewsGuard forfeited this argument by not raising it in its briefing or at oral argument. And it fails to properly present it even now, merely asserting (without explanation) that there would be no antitrust injury here. *Id.*

*Second*, NewsGuard overlooks that the Commission need not demonstrate an antitrust violation to launch an investigation. Instead, the FTC may investigate "merely on suspicion that the law is being violated, or even just because it wants assurance that it is not." *United States v. Morton Salt Co.*, 338 U.S. 632, 642-43 (1950); *see* Dkt.20 at 14, 33.

*Third*, the non-binding decision NewsGuard invokes is beside the point in any event. It held only that a particular private plaintiff had not satisfied the "antitrust injury" test. *See X Corp. v. World Fed'n of Advertisers*, 2026 WL 833900, at *24-28 (N.D. Tex. Mar. 26, 2026). But

"antitrust injury" is a standing requirement that applies solely to private plaintiffs, not law enforcement agencies like the FTC. *E.g.*, *City of Oakland v. Oakland Raiders*, 20 F.4th 441, 455 n.10 (9th Cir. 2021) (the federal government "is authorized to sue anyone who violates the antitrust laws"). And rightly so: The Commission is investigating whether *anyone* (not just one plaintiff) has been harmed in violation of the antitrust laws. NewsGuard cannot pretermit that inquiry (before any potential complaint has even been filed) simply because a court held that a private litigant's allegations in a different lawsuit did not demonstrate antitrust injury.

Dated: April 1, 2026
Washington, D.C.

Respectfully submitted,

LUCAS CROSLOW (D.C. Bar #1048342)
*General Counsel*

H. THOMAS BYRON III (D.C. Bar #442856)
*Deputy General Counsel*

ALEX POTAPOV (D.C. Bar #998355)
*Deputy General Counsel*

*/s/ Ethan D. Beck*
ETHAN D. BECK (D.C. Bar #90024619)
*Counsel to the General Counsel*

FEDERAL TRADE COMMISSION
600 Pennsylvania Ave., N.W.
Washington, DC 20580
(202) 326-2110
ebeck@ftc.gov

*Attorneys for the Defendants*

OF COUNSEL:

DANIEL GUARNERA
*Director*

KELSE MOEN
*Deputy Director*

BUREAU OF COMPETITION

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NEWSGUARD TECHNOLOGIES, INC.,<br>*Plaintiff*,<br>v.<br>FEDERAL TRADE COMMISSION and ANDREW FERGUSON, in his official capacity as Chairman of the Federal Trade Commission,<br>*Defendants*. | No. 1:26-cv-0353 (DLF) |

**DEFENDANTS' NOTICE OF WITHDRAWAL OF CIVIL INVESTIGATIVE DEMAND AND NOTICE OF RELATED LITIGATION**

Defendants write to inform the Court of significant recent developments in the Federal Trade Commission's investigation into unlawful advertising boycotts that bear on the relief sought by NewsGuard in this case. As the Court is aware, NewsGuard challenges (1) a civil investigative demand (CID) that the Commission issued as part of its investigation into advertising boycotts, and (2) a condition in a 2025 Commission consent order related to the merger of two large advertising companies, Omnicom Group Inc. (Omnicom) and the Interpublic Group of Companies (IPG). On April 16, 2026, the Commission formally withdrew the CID that NewsGuard challenges. It did so because its investigation recently culminated in a landmark settlement with three advertising agencies. That settlement includes terms that are materially identical to those in the Omnicom consent order.

As explained below, these developments have important implications for NewsGuard's claims in this case. Accordingly, Defendants intend to confer with NewsGuard's counsel concerning an appropriate resolution of the claims asserted in NewsGuard's complaint. As an

initial matter, we bring this information to the Court because it is also relevant to the pending motion for preliminary injunction, as explained below.

* * *

As part of the Commission's investigation into potential advertising boycotts, the Commission recently filed a complaint in *FTC v. Dentsu US, Inc.*, No. 26-cv-469 (N.D. Tex. 2026). There, the Commission and eight States sued Dentsu, WPP, and Publicis—three of the largest global advertising holding companies, which are collectively known as the "Big Six."[1] The complaint (attached as Exhibit 1) alleges that Dentsu, WPP, and Publicis colluded through trade associations to set brand-safety standards. *See* Ex. 1 ¶¶ 1-9. The complaint further alleges that these trade associations relied on information from entities such as NewsGuard to develop these shared brand-safety standards. *See id.* ¶¶ 3-4, 80-85. The complaint explains that these anticompetitive agreements prevented the Big Six from competing with each other based on their own, independently developed brand-safety standards, to the detriment of their clients and of American consumers. *See id.* ¶¶ 91-97. The complaint asserts that these collusive acts violated Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 5 of the FTC Act, 15 U.S.C. § 45.

To resolve these claims, Dentsu, WPP, and Publicis each agreed to stipulated final judgments imposing permanent injunctions, which the district court has since approved and entered. *See* Final Orders and Stip. Perm. Injunctions as to Dentsu, WPP, and Publicis, *FTC v. Dentsu US, Inc.*, No. 4:26-cv-469 (N.D. Tex. Apr. 15, 2026), ECF Nos. 8-10 (attached as Exhibits 2-4). These permanent injunctions prohibit Dentsu, WPP, and Publicis from, among other things, enforcing any agreement "with any Third Party with respect to Media Buying Services" that

[1] Two of the "Big Six" companies were Omnicom and IPG. Following the consummation of the merger of Omnicom and IPG on November 25, 2026, there are currently five major advertising holding companies. *See* Compl. (Ex. 1) ¶ 32 & n.12.

"[d]irects Advertisers' advertising spend," "[r]efuses Advertisers' requests to direct advertising spend," or "[d]eclines to deal with Advertisers" based on "Covered Bases" (which are defined to include "viewpoints as to the veracity of news reporting" and "adherence to journalistic standards or ethics"), except at the express direction of their advertiser customers. *See id.* §§ II.C., III.B. The conditions these permanent injunctions impose are materially identical to the conditions imposed by the Omnicom consent order, which are the subject of some of NewsGuard's claims in this action. *See* Decision and Order §§ I.D., 2.A, *In re Omnicom Grp., Inc. & Interpublic Grp. of Cos., Inc.*, FTC Dkt. No. C-4823 (Sept. 26, 2025), https://tinyurl.com/msss6xu5; Dkt.1 ¶ 125 & n.43.

Following the Commission's successful lawsuit against Dentsu, WPP, and Publicis, FTC staff formally withdrew the CID that NewsGuard challenges here. *See* Letter from P. Galvan to S. Hansell (Apr. 16, 2026) (attached as Exhibit 5). The relief obtained in *Dentsu*, which marks the culmination of the Commission's investigation in this area, resolved the issues related to NewsGuard that gave rise to the CID, and the Commission therefore no longer requires compliance with the CID. Accordingly, FTC staff have withdrawn the CID issued to NewsGuard (along with several other CIDs issued in the investigation, which were withdrawn for the same reason). The withdrawal of the CID at issue here moots NewsGuard's request for preliminary injunctive relief regarding enforcement of the CID. *See* Dkt.11 at 3 (requesting that Defendants be "enjoined from initiating any action to enforce the CID"); Dkt.11-26 at 1 (same).

In addition, *Dentsu* further illustrates that the relief obtained by the Commission in the Omnicom consent order, like the similar relief in the *Dentsu* complaint and injunctions, aims to prevent further anticompetitive conduct by major advertising agencies concerning brand-safety standards. Contrary to NewsGuard's contentions about supposed retaliation or viewpoint discrimination, the Commission's latest action also demonstrates that the Omnicom consent order

was part of a comprehensive investigation against unlawful collusion in the digital advertising market.

Dated: April 17, 2026

Respectfully submitted,

OF COUNSEL:

DANIEL GUARNERA
*Director*

KELSE MOEN
*Deputy Director*

BUREAU OF COMPETITION

LUCAS CROSLOW (D.C. Bar #1048342)
*General Counsel*

H. THOMAS BYRON III (D.C. BAR #442856)
*Deputy General Counsel*

ALEX POTAPOV (D.C. Bar #998355)
*Deputy General Counsel*

ETHAN D. BECK (D.C. Bar #90024619)
*Counsel to the General Counsel*

ROBERT E. ZUVER, JR. (D.C. Bar #987216)
*Attorney*

FEDERAL TRADE COMMISSION
600 Pennsylvania Ave., N.W.
Washington, DC 20580

/s/ Alan Bakowski
ALAN BAKOWSKI (D.C. Bar #990312)
*Attorney*

FEDERAL TRADE COMMISSION
401 W. Peachtree Street NW, Suite 1500
Atlanta, GA 30308
(404) 656-1363
abakowski@ftc.gov

*Attorneys for the Defendants*

# Exhibit 1

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | |
|---|---|
| Federal Trade Commission,<br>State of Florida,<br>State of Indiana,<br>State of Iowa,<br>State of Montana,<br>State of Nebraska,<br>State of Texas,<br>State of Utah,<br>State of West Virginia,<br><br>Plaintiffs,<br><br>v.<br><br>Dentsu US, Inc.,<br>GroupM Worldwide LLC (d/b/a WPP Media),<br>Publicis, Inc.,<br><br>Defendants. | Case No.: 4:26-cv-469<br><br>**COMPLAINT** |

**PRELIMINARY STATEMENT**

Plaintiffs, Federal Trade Commission ("FTC" or "the Commission"), by and through its designated attorneys, and the States of Florida, Indiana, Iowa, Montana, Nebraska, Texas, Utah, and West Virginia, by and through their respective Attorneys General (collectively, "the States") (together with the Commission, "Plaintiffs"), petition this Court pursuant to Section 13(b) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 53(b), and Section 16 of the Clayton Act, 15 U.S.C. § 26, to enter a permanent injunction and other equitable relief against Defendants Dentsu US, Inc., GroupM Worldwide LLC (d/b/a WPP Media), and Publicis, Inc., to prevent their continuing course of anticompetitive conduct and unfair methods of competition in

or affecting commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 5 of the FTC Act, as amended, 15 U.S.C. § 45.

## I. NATURE OF THE CASE

1. Freedom of speech and the press are foundational to American liberty. Over the last decade, untold numbers of Americans have been censored online and prevented from taking part in critically important political and social debates. As both individuals' speech and journalism increasingly moved online over the last decade, various digital gatekeepers exercised far-reaching and often unchecked control over Americans' free expression.[1] The result was a warped public discourse in which viewpoints disfavored by powerful corporations were excluded from portions of the digital public square.[2]

2. Much online censorship in recent years resulted from social media firms and other digital platforms that suspended or banned users, algorithmically downranked news articles, demonetized content creators, and imposed "warning labels" on online posts. But there were parallel efforts by various interested parties to demonetize disfavored conservative news and opinion sites by denying them digital advertising revenue.

3. Over the past decade, a number of organizations pursued strategies that involved classifying disfavored opinions as "misinformation" and then lobbying the digital ad-buying

---

[1] *See generally* U.S. House of Representatives, Interim Staff Report Committee on the Judiciary and the Select Subcommittee on the Weaponization of the Federal Government, *The Censorship-Industrial Complex: How Top Biden White House Officials Coerced Big Tech to Censor Americans, True Information, and Critics of the Biden Administration* (May 1, 2024), https://judiciary.house.gov/sites/evo-subsites/republicans-judiciary.house.gov/files/evo-media-document/Biden-WH-Censorship-Report-final.pdf.

[2] *See, e.g.*, U.S. House of Representatives, Interim Staff Report Committee on the Judiciary, *GARM's Harm: How the World's Biggest Brands Seek to Control Online Speech* (July 10, 2024) at 27-32, https://judiciary.house.gov/sites/evo-subsites/republicans-judiciary.house.gov/files/evo-media-document/2024-07-10%20GARMs%20Harm%20-%20How%20the%20Worlds%20Biggest%20Brands%20Seek%20to%20Control%20Online%20Speech.pdf.

ecosystem to demonetize sites that hosted or shared such content. Some of the most prominent groups included NewsGuard (a self-described ratings agency that ranks the reliability of media outlets),[3] the Global Disinformation Index ("GDI") (an activist group that seeks to partner with governments and private corporations to attack "disinformation"),[4] Check My Ads (a media watchdog that is "famous for publicly shaming ad-tech firms and advertisers who may have inadvertently funded disinformation and fake news"[5]), and Media Matters for America (an advocacy group which describes itself as a "progressive research and information center dedicated to comprehensively monitoring, analyzing, and correcting conservative misinformation in the U.S. media"[6]).

4. These groups were relatively small, but they each, in their various ways, sought to elevate concerns within the digital advertising industry about what they viewed as "misinformation," in order to deprive certain sites of the digital ad revenue they needed to survive. For instance, NewsGuard expressly markets itself as a means to disrupt advertising revenue for "misinformation publishers" by licensing "exclusion lists of untrustworthy sites" to advertisers.[7] GDI was created because its founders believed that the results of the 2016 U.S. presidential election and Brexit referendum were caused by media disinformation, which could be solved by targeting the media companies' advertisers.[8] Check My Ads explained, in a 2022

---

[3] *About NewsGuard*, NEWSGUARD, https://www.newsguardtech.com/about-newsguard/.

[4] *Who We Are*, GLOBAL DISINFORMATION INDEX, https://www.disinformationindex.org/about.

[5] Ryan Barwick, *Disinformation and ad-tech activists Check My Ads are starting a nonprofit*, MARKETING BREW (Oct. 27, 2021), https://www.marketingbrew.com/stories/2021/10/27/misinformation-and-ad-tech-activists-check-my-ads-are-starting-a-nonprofit.

[6] *About Us*, MEDIA MATTERS, https://www.mediamatters.org/about-us.

[7] Matt Skibinski, *Special Report: Top brands are sending $2.6 billion to misinformation websites each year*, NEWSGUARD, https://www.newsguardtech.com/special-reports/brands-send-billions-to-misinformation-websites-newsguard-comscore-report/.

[8] Virginia Kirst, *Global Disinformation Index: Cutting off the money supply to disinformation*, UPGRADE DEMOCRACY (Apr. 18, 2024), https://upgradedemocracy.de/en/perspective/highlights/global-disinformation-index-cutting-off-the-money-supply-to-disinformation/.

article titled "Here's our plan to defund the insurrectionists," that it was "launching the first effort to permanently block" prominent conservative media figures such as Charlie Kirk, Glenn Beck, and Steve Bannon "from the ad industry."[9] And Media Matters engaged in a related campaign to pressure advertisers to remove their advertising from Fox News due to its "extremist programming,"[10] as well as targeting Elon Musk's X.[11]

5. It was in this social and political environment that, rather than compete independently, the nation's largest ad agencies—firms that buy digital ad inventory on behalf of their advertiser clients—agreed that they would all use the same "brand safety" standards to avoid buying ads on websites containing "misinformation." "Brand safety" refers to advertisers' desire to avoid buying ads on sites that are categorically inappropriate for any advertising support; for example, brands do not want their ads to appear on pornography websites or sites associated with criminal activity or terrorism. Brand-safety protections are important to advertisers.

6. In a competitive market, the ad agencies would have faced strong economic incentives to capture business from their rivals by developing lower cost, higher quality, better targeted, and more innovative brand-safety tools—all to the benefit of their advertiser clients. Advertisers would also likely benefit from this competition by getting more value for their advertising budgets.

---

[9] *Here's our plan to defund the insurrectionists*, CHECK MY ADS (Jan. 5, 2022), https://checkmyads.org/?p=800.

[10] *Tell Advertisers: Drop Fox*, MEDIA MATTERS FOR AMERICA, https://action.mediamatters.org/secure/drop-fox; *see also* Bobby Lewis, *Fox & Friends is a ticking time bomb for advertisers*, MEDIA MATTERS FOR AMERICA (May 20, 2021), https://www.mediamatters.org/brian-kilmeade/fox-friends-ticking-time-bomb-advertisers.

[11] *Here are the companies pulling ads from X*, MEDIA MATTERS (Nov. 17, 2023), https://www.mediamatters.org/twitter/here-are-companies-pulling-ads-x.

7. Instead of competing, however, the ad agencies agreed to adopt the same brand-safety standards on "misinformation." In 2018, the agencies established the Advertising Protection Bureau ("APB") through their trade association, the American Association of Advertising Agencies (the "4As"). As one ad agency executive summarized the APB's genesis, "the major [ad agency] holding companies came together under the 4As and **agreed that brand safety is so important, that we must combine efforts, become one voice, and stop sending potential mixed signals**." The 4As vice president agreed, declaring, "**When it comes to brand and consumer safety, media agencies have to put competition aside.**"

8. Later, the ad agencies also coordinated through the Global Alliance for Responsible Media ("GARM"), an entity created by the World Federation of Advertisers and which they each joined as members. One ad agency executive described GARM as a forum for agencies to "**check[] their competitive relationships at the door**" while they are "**engaged in the brand safety discussion**." In fact, GARM made clear to the six largest global advertising holding companies (the "Big Six") that discussions between the ad agencies about brand safety were governed by secrecy: "**The first rule of Fight Club is: You do not talk about Fight Club. The second rule of Fight Club is: *You do not talk about Fight Club.***" Elsewhere, GARM leadership itself also wanted "**the agencies [to] speak as a single entity to describe how they're tailoring plans and buys**." During a retrospective on GARM's third anniversary, the question was posed, "How has **collective work in brand safety** and suitability helped brands address tension points in media?" The answer was, "Lots of work done within the agencies historically and coming together to address these as peers in 4As APB – **collaborate not compete on safety which is why *uncommon collaboration* is so natural for us**."

9. Both the APB and GARM established a common "Brand Safety Floor" to target "misinformation." The Brand Safety Floor resulted in reduced ad revenues for many conservative publishers; sites that fell below the Brand Safety Floor were at risk of being passed over as ad agencies looked to spend billions of dollars to buy ad inventory on behalf of their advertiser clients. Today, the largest ad agencies control over $81 billion of ad-buying power.

10. The Sherman Act prohibits "every contract, combination . . . , or conspiracy, in restraint of trade." In other words, the antitrust laws prevent competitors from agreeing to act collectively in ways that harm competition. Here, as one GARM document explained, the agencies' agreement on a brand-safety standard related to "misinformation" allowed "the agencies [to] speak as a single entity." This agreement insulated the ad agencies from the competitive pressures that would otherwise have existed for them to improve and differentiate their brand-safety offerings with the goal of capturing business from each other. It harmed advertisers because they lost the benefits of that competition, including better quality and lower cost brand-safety tools, and the broader reach, better targeting, and cheaper inventory that those tools would have provided in the absence of the agencies' agreement. And, ultimately, by demonetizing certain conservative media outlets, the agreement hampered debate on some of the most consequential and hotly debated subjects of public life.

11. Plaintiffs bring this action to restore competition between ad agencies on brand-safety standards, and to vindicate Americans' interest in a free and open public square unconstrained by unlawful ad agency collusion.

## II. THE PARTIES

12. Plaintiff Federal Trade Commission ("FTC") is an agency of the United States government established, organized, and existing pursuant to the FTC Act, 15 U.S.C. §§ 41 *et*

*seq.*, with its principal offices in Washington, D.C. The FTC is vested with authority and responsibility for enforcing, inter alia, Section 5 of the FTC Act, 15 U.S.C. § 45, and is authorized under Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), to initiate court proceedings to enjoin violations of any law the FTC enforces. This case is proper under Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), because the FTC has reason to believe that Defendants are violating, or are about to violate, Section 5 of the FTC Act, 15 U.S.C. § 45, and Section 1 of the Sherman Act, 15 U.S.C. § 1, making it appropriate, efficient, and suitable to file this action in federal court to seek the requested relief.

13. Plaintiff State of Florida is a sovereign state of the United States. This action is brought by and through its Attorney General, James Uthmeier, who is the chief law enforcement officer of the State, with the authority to bring this action on behalf of the State pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26. The State of Florida brings this action in its sovereign capacity and as *parens patriae* on behalf of and to protect its general economy and the health and welfare of its residents, and to prevent and restrain Defendants from violating Section 1 of the Sherman Act, 15 U.S.C. § 1. The Office of the Attorney General for the State of Florida has its principal offices at The Capitol, PL-01, Tallahassee, FL 32399.

14. Plaintiff State of Indiana is a sovereign state of the United States. This action is brought by and through its Attorney General, Theodore E. Rokita, who is the chief law enforcement officer of the State, with the authority to bring this action on behalf of the State in its sovereign capacity and as *parens patriae* on behalf of and to protect its general economy and the health and welfare of its residents.

15. Plaintiff State of Iowa is a sovereign state of the United States. This action is brought by and through its Attorney General, Brenna Bird, who is the chief law enforcement

officer of the State, with the authority to bring this action on behalf of the State in its sovereign capacity and as *parens patriae* on behalf of and to protect its general economy and the health and welfare of its residents.

16. Plaintiff State of Montana is a sovereign state of the United States. This action is brought by and through its Attorney General, Austin Knudsen. Plaintiff State of Montana has reason to believe that Defendants have engaged in the anticompetitive course of conduct set forth herein, which has caused adverse effects to consumers and harm to economic competition in trade and commerce in this State. Therefore, the Office of the Attorney General of the State of Montana believes and is of the opinion that this matter is in public interest.

17. Plaintiff State of Nebraska is a sovereign state of the United States. Michael T. Hilgers is the Attorney General of Nebraska and authorized to bring legal actions on behalf of the State and its citizens.

18. Plaintiff State of Texas is a sovereign state of the United States. This action is brought by and through its Attorney General, Ken Paxton. Plaintiff State of Texas has reason to believe that Defendants have engaged in the anticompetitive course of conduct set forth herein, which has caused adverse effects to consumers and harm to economic competition in trade and commerce in this State. Therefore, the Antitrust Division of the Office of the Attorney General of the State of Texas believes and is of the opinion that this matter is in public interest.

19. Plaintiff State of Utah is a sovereign state of the United States. This action is brought by and through its Attorney General, Derek Brown, who is the chief law enforcement officer of the State, with the authority to bring this action on behalf of the State in its sovereign capacity and as *parens patriae* on behalf of and to protect its general economy and the health and welfare of its residents.

20. Plaintiff State of West Virginia is a sovereign state of the United States and brings this action by and through its Attorney General, John B. McCuskey. Attorney General McCuskey is authorized to bring this action pursuant to 15 U.S.C.§ 26 to enjoin violations of federal antitrust laws.

21. Defendant Dentsu US, Inc. ("Dentsu") is a corporation organized, existing, and doing business under, and by virtue of, the laws of the State of New Jersey with its executive offices and principal place of business located at 150 East 42nd Street, New York, NY 10017.

22. Defendant GroupM Worldwide LLC (d/b/a WPP Media) ("WPP") is a corporation organized, existing, and doing business under, and by virtue of, the laws of the State of Delaware with its executive offices and principal place of business located at New York at 3 World Trade Center, 175 Greenwich Street, New York, NY 10007.

23. Defendant Publicis, Inc. ("Publicis") is a corporation organized, existing, and doing business under, and by virtue of, the laws of the State of Delaware with its executive offices and principal place of business located at 375 Hudson Street, New York, NY 10014.

24. Except to the extent that competition has been restrained as herein alleged, Defendants Dentsu, WPP, and Publicis have been and are now in competition among themselves and with other advertising agency holding companies, to sell services to advertisers including Media Buying Services, which encompass the purchase of programmatic digital advertising inventory on behalf of or for resale to the advertisers.

25. Each Defendant is, and at all times relevant herein, has been engaged in commerce, as "commerce" is defined in Section 1 of the Clayton Act, as amended, 15 U.S.C. § 12, and engages in business that is in or affects commerce, as "commerce" is defined in Section 4 of the FTC Act, as amended, 15 U.S.C. § 44.

## III. JURISDICTION AND VENUE

26. The FTC brings this action pursuant to Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), to prevent Defendants' violation of Section 5 of the FTC Act, 15 U.S.C. § 45, and Section 1 of the Sherman Act, 15 U.S.C. § 1. The States bring this action under their common law, equitable, or statutory powers, and under Section 16 of the Clayton Act, 15 U.S.C. § 26, as *parens patriae* on behalf of and to protect their general economies and the health and welfare of their residents, and to prevent and restrain Defendants from violating Section 1 of the Sherman Act, 15 U.S.C. § 1.

27. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, and 15 U.S.C. § 53(b).

28. This Court has personal jurisdiction over Dentsu because Dentsu has the requisite constitutional contacts with the State of Texas. Furthermore, Dentsu maintains an office at 5049 Edwards Ranch Road, Fort Worth, TX 76109.

29. This Court has personal jurisdiction over WPP because WPP has the requisite constitutional contacts with the State of Texas. Furthermore, WPP maintains an office at 14841 Dallas Parkway, Dallas, TX 74254.

30. This Court has personal jurisdiction over Publicis because Publicis has the requisite constitutional contacts with the State of Texas. Furthermore, Publicis maintains an office in the state through its affiliated entities Commission Junction LLC, which is registered at 199 Bryan Street, Suite 900, Dallas, TX 75201, and Blue 449, Inc. and Starcom MediaVest Group, Inc., both of which maintain an office at 2021 McKinney Ave, Suite 600, Dallas, TX 75201.

31. Venue is proper in this district under 15 U.S.C. § 53(b) and 28 U.S.C. § 1391 because each of the Defendants transacts business or resides in this district, and a substantial part of the events giving rise to this action occurred in this district.

## IV. MARKET STRUCTURE

### A. The Big Six and Media Buying Services

32. Until on or about November 26, 2025, there were six major global advertising holding companies: co-conspirators The Interpublic Group of Companies, Inc. ("IPG"), Omnicom Group Inc. ("Omnicom"), and Havas North America, Inc. ("Havas"), and Defendants Dentsu, Publicis, and WPP (collectively the "Big Six"). On or about November 26, 2025, Omnicom closed its acquisition of IPG.[12]

33. Advertising agency holding companies are conglomerates of acquired independent agencies. The two primary services that advertising agencies provide are creative advertising (e.g., slogans, branding, visual designs, commercial) and media buying (e.g., preparing a media buying plan, and conducting negotiations or setting parameters for executing the plan).

34. The market for Media Buying Services in the United States is characterized, in part, by the media buying agency's scale, in terms of geographic reach, clientele, the types of media on which the agency buys advertising, and the pool of advertising dollars to spend in media buying negotiations. For large advertisers seeking to reach customers in the United States, the Big Six possess the scale and experience that these advertisers commonly seek to aid their

[12] This Complaint nevertheless refers to the "Big Six" because, at most times relevant herein, IPG was a separate and independent Big Six advertising agency holding company. After Omnicom and IPG consummated their merger on or about November 26, 2025, there were and are now five major advertising agency holding companies.

negotiations with media publishers. An advertiser often contracts with a single Big Six agency to handle its media buying needs in the United States.

35. Collectively, as of 2023, the Big Six accounted for about $81 billion out of a total of $155 billion in U.S. media billings, or a 52% share.

36. The Big Six often compete against each other to serve this distinct set of customers with global media buying needs and higher advertising budgets, trying to offer the best possible Media Buying Services.

**B. Brand Safety and Brand Suitability**

37. Part of this competition involves providing a strategy for excluding "unsafe" or "unsuitable" advertising inventory as a component of any media buying plan. As discussed above, "brand safety" can refer to preventing ads from appearing on websites or next to content that the brand or agency believes would damage the brand's reputation, such as illegal websites that perpetrate scams and other frauds or recruit for terrorist organizations. "Brand suitability" can refer to preventing ads from appearing on websites or next to content that would be inappropriate for that particular brand. For example, an airline might not want its ads to run on webpages with news articles about a plane crash, whereas a clothing brand might be indifferent to advertising on such webpages.

38. In setting the strategy for a media buying plan, advertisers and agencies must decide how to balance the ad campaign's reach or performance against "brand safety" and "brand suitability" while minimizing costs. As the Interactive Advertising Bureau ("IAB"), a trade association for digital advertisers, wrote in 2018, just before the onset of the conspiracy, "Advertising quality is in the eye of the beholder – some value brand safety more, some value viewability more, some simply focus on campaign performance." The IAB therefore

recommended taking "a nuanced approach rather than blocking entire content categories or keywords."

39. Before the onset of the conspiracy in 2018, the large advertising agencies did indeed take a more "nuanced approach." For example, in late 2017, co-conspirator Omnicom wrote that it established a "brand safety scorecard to plot each client's 'risk vs cost' audit."

40. Over time, one standard method of implementing "brand safety" procedures has been to assemble lists of content categories and publishers from whom the media buying agency will or will not purchase inventory. These lists are typically called inclusion or exclusion lists, respectively, and may derive in part from third-party firms that assign ratings to news stories or publishers. Other tools that the media buying agency might use include those from measurement firms that can determine where a client's ads ran and how effective they were—overall and with respect to the client's "brand safety" strategy. These are the types of efforts that the advertising agencies made before they implemented their collusive and one-size-fits-all "floor" approach to news and political commentary under categories such as "Debated Sensitive Social Issues" and "Misinformation."

41. The advertising industry generally recognizes that service providers should be competing against one another's "brand safety" strategies. For example, the IAB, in a May 2025 email recruiting attendees for a webinar aimed at advertising agencies and other industry players, pledged that it could help participants "turn brand safety into your competitive edge."

**C. Digital and Programmatic Advertising**

42. Digital advertising is distinct from other forms of advertising because of its precision, adaptability, and interactivity. Digital ads offer detailed performance metrics including impressions, clicks, conversions, bounce rates, and more. Advertisers can track return on

investment ("ROI") and adjust campaigns based on real-time data. Unlike static print or broadcast ads, users can click, swipe, or otherwise engage with digital ads. Digital ads can also be dynamically personalized based on user behavior, preferences, or location. Other advertising formats—such as print, radio, or outdoor advertising—do not offer these personalization, measurement, and engagement features.

43. Programmatic advertising is a method of buying and selling digital ad inventory using automated technology including real-time bidding ("RTB"). Advertisers bid on individual ad slots, which are locations where digital ads can appear. When a user visits a website, an auction occurs in real time to determine, typically within milliseconds, which ad is shown. An ad "impression" occurs each time that a digital ad is served for display on a particular screen. Buyers such as brands and ad agencies often agree to pay a certain cost per mille ("CPM"), meaning price per thousand ad impressions. Advertisers have numerous options for setting the parameters of an ad campaign, including what types of publishers to include in or exclude from the campaign, and which types of users to target based on factors such as demographics, device type, location, and how much the advertiser is willing to pay for impressions and click-throughs.

44. Direct digital advertising entails manual negotiations between specific buyers and sellers for digital ad inventory. This process is slower and costlier, for both advertisers and publishers, than using RTB platforms to buy and sell digital ads programmatically.

45. Beyond identifying and targeting the right demographic of consumers, advertisers must also consider geographic factors—such as language, cultural preferences, and legal compliance requirements like the General Data Protection Regulation ("GDPR") in Europe—that limit cross-border substitutability.

## V. THE RELEVANT MARKET

46. The relevant line of commerce in which to analyze the anticompetitive conduct is no broader than the provision of "Media Buying Services." The Big Six account for 52% of U.S. media billings in that market. There may also be a distinct submarket of Media Buying Services for a distinct subset of customers with high advertising budgets that require cross-market, multi-channel advertising campaigns. The largest six—now five—advertising agency holding companies dominate this submarket. The programmatic purchase of digital advertising inventory on behalf of large advertising brands may also form a relevant submarket for advertising agencies providing Media Buying Services. The Big Six ad agencies have market power in the Media Buying Services market and all of the above-mentioned submarkets.

47. The relevant geographic market is the United States. The advertisers may come from every corner of the globe and the Big Six advertising agency holding companies have extensive international presence. Advertisers use the Big Six for Media Buying Services to target advertising at individuals within the United States.

## VI. ANTICOMPETITIVE CONDUCT

48. The Big Six colluded with each other, and through organizations established under the auspices of two major trade associations in the advertising industry, on "brand safety" dimensions of their sale of Media Buying Services.

### A. Big Six Membership in Advertiser Protection Bureau ("APB")

49. The American Association for Advertising Agencies, also known as the "4As," is a trade association that represents the interests of advertising agencies.

50. In April 2018, the Big Six formed the APB within the 4As to "create an industry collective with responsibility of achieving 'Advertising Assurance,' to enforce environments

where brands and consumers can coexist with trust." In other words, "the major holding companies came together [in 2018] under the 4As and agreed that brand safety is so important, that we must combine efforts, become one voice, and stop sending potential mixed signals" regarding "brand safety" to platforms and publishers.

51. From the start, the APB made clear that its member agencies would reduce the extent to which they compete when it came to "brand safety" strategies. As a 4As vice president publicly stated when the APB was founded, **"When it comes to brand and consumer safety, media agencies have to put competition aside."**

52. The APB's membership is comprised almost exclusively of the Big Six advertising agency holding companies. During the course of the events described in this Complaint, the APB met weekly or more often.

### B. The "Brand Safety Floor" and "Brand Suitability Framework"

53. The initial forum where the Big Six cooperated and agreed with each other on "brand safety" standards and practices—including with respect to "Debated Sensitive Social Issues" and, later, "Misinformation"—was the APB.

54. In September 2018, pursuant to this cooperation, the APB promulgated the "Brand Safety Floor" and the "Brand Suitability Framework." The Floor and Framework consisted of content categories, such as "Online Piracy" and "Spam or Harmful Content," with the Floor describing types of content within each category that were "not appropriate for any advertising support" by ad agencies and other industry players.

55. The Brand Suitability Framework, using the same categories, assigned risk levels of "low," "medium," and "high" to different descriptions of content within each category, but left it to advertisers to decide what level of risk was acceptable for their respective brands.

56. In announcing the Brand Safety Floor and Brand Suitability Framework, the APB explained that the endeavor sought to "mov[e] brand safety discussions to a more granular content level."

57. The Big Six made no secret of what they intended to achieve by agreeing at this "granular" level. The APB Brand Safety Floor and Brand Suitability Framework announcement quoted the Managing Partner of Brand Safety for the Americas at GroupM (WPP) as declaring: "The foundation of Brand Safety must be built on a concrete, universal understanding of content that is never appropriate under any circumstances." The same announcement also quoted the Executive Vice President of Digital Investment & Standards at Publicis Media Exchange, who asserted: "The APB has been instrumental in taking steps to create a common understanding around the issue, and in providing the necessary framework to cultivate a safe space for industry-wide collaboration" to create "consistent parameters and policies across all partners."

58. However, the Big Six recognized the limitations on the APB's ability to enforce its agreed-to standards in the industry. As one APB participant from GroupM (WPP) noted in July 2019, APB "addresses the symptoms of the problem not the cause," much like "a police force, but with no laws to apply."

59. The solution, the Big Six realized, was to partner with the World Federation of Advertisers' ("WFA") Global Alliance for Responsible Media ("GARM") initiative. The WFA is a trade association that represents the interests of advertisers—i.e., purchasers of advertising inventory—as opposed to the advertising *agencies* who are represented by the 4As. The WFA established GARM in June 2019. Each of the Big Six was a founding member of GARM and maintained its membership until GARM's dissolution in August 2024. GroupM (WPP) was a member of the GARM Steer Team, which acted like a board of directors and plotted the overall

direction of the initiative. Unlike the core of the WFA's operations, GARM was, by design, open to companies other than those who purchase advertising.

60. GARM and the APB formally partnered in July 2019, with a 4As representative declaring that they were "looking to build upon & share the work already begun with the [APB]." Or, as the 4As' CEO explained, "there were no global protocols but the 4A's APB created the floor and framework that the GARM framework was built upon and refined."[13]

61. As Big Six executives understood, enforcing the Brand Safety Floor would require ongoing coordination between the agencies. According to language that a Publicis executive drafted in July 2019, each agency would "identify bad actors across [the] ecosystem through the APB," which would be "made up of global brand safety leads from each [agency] holdco [holding company] that alert the other 'APB' cross-holdco agency members of any sudden known or potential violative content to avoid and blacklist." After the Publicis executive emailed this proposed language to a GroupM (WPP) executive, he in turn emailed it to the GARM leader.

62. The Big Six used GARM as a mechanism to push the joint standards, originally developed by APB, throughout the advertising ecosystem. "This is exactly what GARM is here to address," the GroupM (WPP) executive stated, "and when the platforms have agreed to new rules of engagement, it will accelerate the [APB's] work."

63. That early tight connection between the organizations was also reflected, for example, in an October 2019 email from the CEO of the 4As to the GARM Initiative Lead to

---

[13] On July 31, 2020, the GARM Initiative Lead sent dozens of contacts—including several of the Big Six—a presentation on brand safety, dated July 29, 2020. That presentation explained that creation of the Safety Floor and Suitability Framework "has been driven by the 4A's APB working group," and that "[w]ithin the GARM we are agreeing to implement this . . . ."

thank him for recognizing the contributions of a consultant who "on behalf of the 4A's and the APB" was working "for agencies to lead this change." The 4As' CEO offered to cover the consultant's fees for him to continue representing the 4As. The GARM leader replied that the consultant would be included in GARM "Steer Team meetings + decision making."

64. In November 2019, the APB approached GARM with a list of "brand safety imperatives" that the APB wanted to "tackle . . . in partnership with GARM," including key "Agency asks for platforms." The framing of "Agency asks" made clear that the agencies had reached agreement with one another. The APB's list—called the "Agency Pledge of Advertising Assurance"—included various requirements for "Monetization Guidelines/Content." One of these APB requirements was that GARM demand that platforms and publishers commit to "[a]bsolute protection from content that would fall into the Brand Safety Floor."

65. GARM agreed, with the 4As later boasting that GARM "adapted and evolved" APB's work in this area "into a global approach."

66. Big Six executives also understood that "brand safety" standards and practices constituted a competitively sensitive area in which to differentiate their services from other Big Six agencies, as a late 2019 internal email exchange among executives at Publicis made clear. Publicis "got a taskforce together . . . and put together a plan on content & timing" to produce a "Brand Safety Guidebook" precisely because WPP had published its own. But one of the executives declared that Publicis would create its Brand Safety Guidebook with "a lot more action" than the one published by WPP. She further recommended, with emphasis, "**only distribut[ing] this internally and for clients**," not putting it "publically on our website as GroupM [WPP] did."

67. In February 2020, a GroupM (WPP) executive wrote that GARM was a forum for agencies to "check[] their competitive relationships at the door (GroupM vs Publicis . . .)" while they are "engaged in the brand safety discussion."

68. In particular, the Big Six regularly met with one another under the auspices of the "Advancing Shared Language" working group within GARM. The goals of this working group were, among other things, to "deploy an enhanced version of the APB Brand Safety + Suitability Framework" and "address News + Journalism."

69. In a June 2020 report, WPP acknowledged that there was tension between abiding by the Brand Safety Floor and delivering what clients wanted. The Brand Safety Floor won. "While it is right for the industry to focus on the risk-based approach and enable advertisers to choose the environments that are more or less suitable to their brand, we ought not to forget that contextual brand safety, defined by 4A's Brand Safety Floor, continues to exist . . . [and] must continue to be observed, avoided and acted on."

70. The initial GARM version of the Brand Safety Floor and Brand Suitability Framework, released in September 2020, hewed closely to the categories and descriptions in the APB version, including the category of "Debated Sensitive Social Issues."

## C. The Big Six Agree to a New Category for the Brand Safety Floor: "Misinformation"

71. Early versions of the Brand Safety Floor required adherents to demonetize advertising inventory on content that constituted "[i]nsensitive, irresponsible and harmful treatment of debated social issues and related acts that demean a particular group or incite greater conflict," but the Big Six and GARM decided this approach was not enough.

72. In June 2020, GARM's Initiative Lead informed other GARM leaders, including GroupM (WPP) and the 4As (APB), that the first step in a plan for "[n]avigating news in a

polarized media marketplace" is to "[e]liminate disinformation via exclusion lists." The GroupM (WPP) executive responded: "Count me in!"

73. By the beginning of July 2020, the APB circulated to GARM members a deck that explained proposed modifications to the Brand Safety Floor and Brand Suitability Framework. These "expansions of our Floor and High Risk definitions" sought to prevent or deter the purchase of advertising inventory from online publishers with disfavored viewpoints on issues such as "ProLife/ProChoice, Gun Control, Privacy vs Public safety, Capital Punishment, Immigration reform, Universal healthcare, [and the] Green New Deal."

74. At the same time, GroupM (WPP) was teeing up a discussion for the Big Six (via the APB and including the GARM Initiative Lead) to add "Misinformation" as a new category in the "4A's/GARM Brand Safety Floor & Framework." The process followed the same approval path as the original APB Brand Safety Floor and Brand Suitability Framework, with the APB members (largely made up of the Big Six) first approving the recommendation among themselves, then forwarding the recommendation to the GARM Steering Committee for further approval.

75. On July 2, 2020, a GroupM (WPP) executive, on behalf of the APB, reported to the GARM Initiative Lead "that the category of Misinformation is complicated and important" but that they would "prefer to table Misinformation for now, with a commitment to tackle the definition working with GARM moving forward." On July 15, 2020, the GARM Initiative Lead reached out again to the Big Six and 4As. A Publicis executive wrote back minutes later to convey that the Big Six "met yesterday on misinformation and had a ton of back and forth discussion. We're close, but not 100% there." The GARM leader replied: "Awesome to hear."

76. In September 2020, in furtherance of the conspiracy, Defendants and co-conspirators Havas and Omnicom agreed "to explore expanded guidance to foster commonality in categorization of individual pieces of content."

77. By October 2020, with respect to "Harmful Content Definitions," a GARM deck noted that "[w]e've gained alignment on definitions across platforms, agencies, and marketers" and a plan to "[drive] more consistent + predictable implementation via 3rd parties with increased content category specification."

78. A June 2021 GARM document referring expressly to the participation of at least three of the Big Six agencies made an unambiguous "REQUEST": "[E]nsure that the articles of misinformation and disinformation are removed from monetized content and media plans." GARM's plan was to "[g]ain endorsement and application across the industry by Jul 22."

79. In October 2021, the GARM Initiative Lead emailed the Big Six, the 4As, and select other leaders in the advertising industry to explain: "Requirements are clear from large scale advertising players (Madison Avenue)"—a reference to the big advertising agencies—but "it needs more than 'boycotts' or 'pauses'" for the Big Six to get what they want. Understanding, however, that this coordination could be problematic for those involved, he cautioned everyone including the Big Six: "**The first rule of Fight Club is: You do not talk about Fight Club. The second rule of Fight Club is: *You do not talk about Fight Club.***" An IPG executive responded to the full group that they all "need to huddle and work out what the advertising industry wants."

80. In February and March 2022, GARM leadership organized meetings and email exchanges for "the agencies [to] speak as a single entity to describe how they're tailoring plans and buys." NewsGuard featured prominently in the discussion. IPG told its rivals: "We're

leveraging NewsGuard to avoid . . . anything that scores red (fail) on being a reputable/quality news source." WPP's GroupM also responded to tell its competitors about its plans regarding placing advertisements for its clients. And in the same instance, Publicis told its rivals that it was "[h]appy to participate and share action steps." In so doing, Publicis told other large advertising agencies that it will advise clients to "[c]onsider trusted news sources as areas to help eliminate funding for misinformation: . . . NewsGuard helps identify and exclude misinformation sites & apps and can be activated through [Publicis'] global exclusion list. . . . This is a time to remind advertisers and agency teams of established industry standards like GARM."

81. A June 2022 GARM document setting forth topics and questions for a panel on "GARM [at] 3Y[ears old]" included the following question specifically for GroupM (WPP): "How has collective work in brand safety and suitability helped brands address tension points in media?" The answer: "Lots of work done within the agencies historically and coming together to address these as peers in 4As APB – collaborate not compete on safety which is why *uncommon collaboration* is so natural for us."

82. As GARM admitted, "2021 was about… [a]greeing to act on Misinformation," and by facilitating this sustained "uncommon collaboration" between competitors, GARM was finally ready in June 2022 to add "Misinformation" as a new category of the Brand Safety Floor.

83. GARM did not stop at promulgating neutral rules; it put its hand on the scale. In November 2021, the GARM Initiative Lead had suggested including "willfully misleading" content in the "misinformation" category to ensure that advertising revenue would be denied to the conservative website *Breitbart* specifically. The GARM leader explained to an executive from GroupM (WPP): "The example of how Breitbart may use facts selectively to mislead was an example given" of the need to amend GARM's working definition of "misinformation."

Ultimately, GARM implemented the Initiative Lead's suggestion. Contemporaneously with GARM's formulation and implementation of this additional Brand Safety Floor category, conservative publishers identified as publishing what the Brand Safety Floor defined as "misinformation" suffered dramatic declines in their sales of digital advertising inventory.

84. GARM took a victory lap after implementing this expansion of the Brand Safety Floor. A GARM slide deck prepared for its November 2022 "bootcamp"—which GARM's Initiative Lead praised as "fantastic"—highlighted "Uncommon Collaboration" among entities including the 4As, IPG, and Publicis. Attendees at the related "Masterclass" included the 4As, Dentsu, UM (IPG), Publicis, and GroupM (WPP).

**D. GARM Dissolved in August 2024, but the Conspiracy Could Easily Recur**

85. Beginning in 2023 the U.S. House Judiciary Committee began investigating GARM, NewsGuard, GDI, and related organizations, including for potential violations of the antitrust laws. On July 10, 2024, the Committee issued an interim staff report entitled "GARM's Harm: How the World's Biggest Brands Seek to Control Online Speech." The report was based on document productions from and interviews of GARM and the other entities investigated. The report concluded that "[t]he information uncovered to date of WFA and GARM's collusive conduct to demonetize disfavored content is alarming." And it noted that "[t]he extent to which GARM has organized its trade association and coordinates actions that rob consumers of choices is likely illegal under the antitrust laws and threatens fundamental American freedoms."

86. GARM dissolved shortly thereafter, on August 9, 2024, citing the "recent allegations." The 4As and the APB remain active to the present day, and Defendants remain members.

87. Four days after GARM dissolved, GroupM (WPP) sent a memorandum regarding its "Brand Safety Policy" to a series of business partners. The memorandum explains that GroupM (WPP) will continue to abide by the GARM standards despite GARM's dissolution.

88. After the disbandment of GARM, Dentsu joined a research effort spearheaded by the 614 Group (a research and consulting firm) that was publicly characterized as an effort to continue the work of GARM. After additional scrutiny by the House Judiciary Committee, Dentsu withdrew from the initiative.

89. In an October 17, 2024 email a high-ranking executive at a major trade association wrote: "Heard we are planning to discuss GARM as a hot topic. . . . I would not discuss what happens next as we are still discussing that with [another trade association] and 4A's . . . . We have agreed to wait until the dust settles after the election to see where the political chips fall….we are regrouping at the end of November [2024]."

90. These actions—and the conversations taking place between members of the trade associations—in the months following GARM's dissolution and leading up to the presidential election, demonstrate an ability and willingness to reengage in this anticompetitive conspiracy depending on "where the political chips fall" in the future.

## VII. ANTICOMPETITIVE EFFECTS

91. The Big Six agreement to establish a common Brand Safety Floor for the digital advertising industry stifled competition on brand-safety standards and practices to the detriment of the American public at large. It excluded available advertising inventory, was not in the ad agencies' respective individual economic self-interest, reduced the quality of Media Buying Services to their clients, undermined the freedom of speech, and degraded media options for American consumers.

92. The Supreme Court has explained that the "Sherman Act reflects a legislative judgment that ultimately competition will produce not only lower prices, but also better goods and services. . . . The assumption that competition is the best method of allocating resources in a free market recognizes that all elements of a bargain—quality, service, safety, and durability—and not just the immediate cost, are favorably affected by the free opportunity to select among alternative offers."[14] The Court has further held that advancing a perceived social goal is not an excuse for competitors to collude instead of compete.[15] Likewise, a "refusal to compete with respect to the package of services offered to customers, no less than a refusal to compete with respect to the price term of an agreement," violates the Sherman Act.[16]

93. Prior to their collusive agreement, the Big Six "agencies had separate views and vocabulary on harmful content."

94. Absent their agreement in restraint of trade, each of the Big Six would have developed—independently and in competition with each other—differentiated standards and practices for clients to use in refining their own inclusion and exclusion criteria when buying advertising inventory that balanced safety, performance, and cost in different ways. The Big Six were in fact naturally inclined to compete in this fashion. This tendency was reflected, for example, in the reaction of Publicis to WPP's initial publication of a Brand Safety Guidebook.[17]

95. The Big Six agreed to set a Brand Safety Floor that, in part, demonetized advertising inventory appearing on lawful but disfavored content, including from news and

---

[14] *Nat'l Soc'y of Prof'l Engr's v. United States*, 435 U.S. 679, 695 (1978).
[15] *Id.* at 695-96.
[16] *FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 459 (1986).
[17] *See id.* at 452 ("[A]bsent such a restraint, competition among dentists for patients would have tended to lead dentists to compete with respect to their policies in dealing with patients' insurers . . . ."); *id.* at 465-66 (concluding that the FTC's rationale was supported by substantial evidence).

political commentary publishers. This agreement eliminated an important opportunity for each of the Big Six to differentiate their services from those their competitors offered, and reduced the advertising inventory available to their clients. The Big Six reached, refined, and sought to implement this anticompetitive agreement under the auspices of the APB and GARM.

96. Moreover, but for the conspiracy, it would not have been in the economic self-interest of each Big Six advertising agency to adopt identical standards and practices for the exclusion of advertising inventory from certain news and political commentary publishers. For example, in 2021, the CEO of the 4As wrote, regarding advertisers, that "you narrow your inventory and you're narrowing your REACH and you're hurting publishers and journalists." By agreeing on "brand safety" standards and practices for "Debated Sensitive Social Issues" and "Misinformation," advertising agencies were reducing available advertising inventory and thereby narrowing the reach of their clients' ad campaigns. Likewise, in 2022, in preparing for a panel conversation related to GARM, a Dentsu executive was slated to discuss the following question: "How do you see brands managing the relationship between doing the right thing and profit or business results?" That "doing the right thing" for GARM necessarily would require brands to "manag[e] the relationship" with "profit or business results" reflects the value the Big Six derived from their agreement not to compete on the Brand Safety Floor. In short, each member of the Big Six could rest assured that its competitors would impose the same tradeoffs on their respective customers. By agreeing to a common Brand Safety framework, the Big Six conveyed to themselves economic advantage by avoiding resource-intensive individual research and negotiations without fear of competitive disadvantage.

97. Any business changes that any of the Big Six made in response to criticism of their "brand safety" standards and practices, including through programmatic filters and exclusion lists, could be reversed in the future absent binding remedies.

## VIII. VIOLATIONS CHARGED

### Count 1 – Illegal Agreement in Violation of Section 1 of the Sherman Act and Section 5 of the FTC Act

98. Plaintiffs re-allege and incorporate by reference the allegations contained in paragraphs 1-97 above.

99. Defendants reached an agreement to set a Brand Safety Floor that demonetized advertising inventory on lawful but disfavored content. This agreement eliminated an important opportunity to differentiate their services from those their competitors offered and reduced the advertising inventory available to their clients. Defendants reached, refined, and sought to implement this anticompetitive agreement under the auspices of the APB and GARM. This agreement is a contract, combination, or conspiracy in restraint of trade within the meaning of Section 1 of the Sherman Act, 15 U.S.C. § 1.

100. Defendants' agreement to restrain competition is unlawful.

101. At all times relevant to the anticompetitive conduct alleged in this Complaint, Defendants collectively had, and continue to have, market power in all relevant markets.

102. Defendants' agreement to restrain competition has had and will continue to have anticompetitive effects, including reducing customer choice by depriving Defendants' customers of the option to purchase advertising inventory from publishers with disfavored viewpoints.

103. There are no valid procompetitive justifications for Defendants' collusive conduct. To the extent that there are any valid procompetitive benefits to Defendants' conduct,

such benefits are outweighed by their anticompetitive effects and could have been achieved without the anticompetitive restraint of trade.

104. In the absence of binding relief, Defendants would be able and likely to reconstitute their anticompetitive agreement depending on where "the political chips fall." Defendants continue to meet in the APB, and ad inventory exclusion, under the auspices of "brand safety," which, although "not a topic of focus in the [4As'] *current* planning priorities . . . might become a focus at the Association [again] in the future if the advertisers who are clients of Association member agencies indicate they want increased focus on brand safety from their agencies," according to a February 2026 letter from the 4As (emphasis added).

105. Defendants' unlawful agreement violates Section 1 of the Sherman Act and thus constitutes an unfair method of competition in violation of Section 5 of the FTC Act, 15 U.S.C. § 45.

**Count 2 – Unfair Method of Competition**

106. The FTC re-alleges and incorporates by reference the allegations contained in paragraphs 1-97 above.

107. The agreement is an unfair method of competition that violates Section 5 of the FTC Act, 15 U.S.C. § 45.

108. The agreement constitutes a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

## IX. POWER TO GRANT RELIEF

109. Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to issue a permanent injunction against violations of the FTC Act and, in the exercise of its equitable jurisdiction, to order equitable relief to remedy the injury caused by Defendants' violations.

Section 16 of the Clayton Act, 15 U.S.C. § 26, authorizes this Court to issue a permanent injunction for violations of the Sherman Act.

## X. PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs request that this Court, as authorized by Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), and by Section 16 of the Clayton Act, 15 U.S.C. § 26, and pursuant to its own equitable powers, enter final judgment against Dentsu, WPP, and Publicis declaring, ordering, and adjudging:

A. that Dentsu's course of conduct, as alleged herein, violates Section 1 of the Sherman Act and thus constitutes an unfair method of competition in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a);

B. that Dentsu is permanently enjoined from engaging in its unlawful conduct;

C. that Dentsu is permanently enjoined from engaging in similar and related conduct, or any conduct that is similar in purpose or effect;

D. that WPP's course of conduct, as alleged herein, violates Section 1 of the Sherman Act and thus constitutes an unfair method of competition in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a);

E. that WPP is permanently enjoined from engaging in its unlawful conduct;

F. that WPP is permanently enjoined from engaging in similar and related conduct, or any conduct that is similar in purpose or effect;

G. that Publicis' course of conduct, as alleged herein, violates Section 1 of the Sherman Act and thus constitutes an unfair method of competition in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a);

H. that Publicis is permanently enjoined from engaging in its unlawful conduct;

I. that Publicis is permanently enjoined from engaging in similar and related conduct, or any conduct that is similar in purpose or effect; and

J. any additional relief that the Court finds just and proper.

Dated: April 15, 2026

Respectfully submitted,

*/s/ Justin Epner*
JUSTIN EPNER
Bar Number: DC Bar # 1028431
Ph: (202) 326-2942; jepner@ftc.gov
NICHOLAS BUSH
Bar Number: DC Bar # 1011001
Ph: (202) 326-2848; nbush@ftc.gov
CASSANDRA EHLY
Bar Number: DC Bar # 90034416
Ph: (202) 326-2975; cehly@ftc.gov
LINCOLN MAYER
Bar Number: DC Bar # 992050
Ph: (202) 326-3324; lmayer@ftc.gov
THEODORE ZANG
Bar Number: NY Bar # 2186518
Ph: (212) 607-2816; tzang@ftc.gov

Attorneys
Federal Trade Commission
600 Pennsylvania Avenue, N.W.
Washington, DC 20580
Telephone: (202) 326-2942

PATRICIA GALVAN
Assistant Director

HELDER AGOSTINHO
Deputy Assistant Director

Technology Enforcement Division, Bureau of Competition

*/s/ Anne LeJeune*
ANNE LEJEUNE
Texas Bar No. 24054286
(Local Counsel)
Ph: (214) 979-9371; alejeune@ftc.gov
Federal Trade Commission
1999 Bryan Street, Suite 2150
Dallas, Texas 75201
Facsimile: (214) 953-3079

*Attorneys for Plaintiff Federal Trade Commission*

Of Counsel:

DANIEL GUARNERA
Director

KELSE MOEN
Deputy Director

Federal Trade Commission
Bureau of Competition

FOR PLAINTIFF STATE OF FLORIDA:

JAMES UTHMEIER
Attorney General, State of Florida

JASON HILBORN
Deputy Attorney General for Civil Enforcement

*/s/ Lizabeth Brady*
Lizabeth Brady
Director, Antitrust Division
Florida Bar No. 457991
Colin Fraser
Senior Assistant Attorney General
Florida Bar No. 104741

Office of the Attorney General
The Capitol, PL-01
Tallahassee, Florida 32399-1050
Telephone: (850) 414-3300
Email: Liz.Brady@myfloridalegal.com
Email: Colin.Fraser@myfloridalegal.com

*Counsel for Plaintiff State of Florida*

FOR PLAINTIFF STATE OF INDIANA:

THEODORE E. ROKITA
ATTORNEY GENERAL OF INDIANA
Attorney No. 18857-49

/s/ *Scott L. Barnhart*
Scott L. Barnhart, Atty. No. 25474-82
Chief Counsel and Director of Consumer Protection

OFFICE OF INDIANA ATTORNEY
GENERAL TODD ROKITA
Indiana Government Center South, 5th Floor,
302 W. Washington Street
Indianapolis, IN 46204
Tel.: (317) 232-6309
Email: Scott.Barnhart@atg.in.gov

/s/ *Jesse Moore*
Jesse Moore, Atty. No. 37654-49
Deputy Attorney General

OFFICE OF INDIANA ATTORNEY
GENERAL TODD ROKITA
Indiana Government Center South, 5th Floor,
302 W. Washington Street
Indianapolis, IN 46204
Phone: (317) 232-4956
Fax: (317) 232-7979
Email: Jesse.Moore@atg.in.gov

*Counsel for Plaintiff State of Indiana*

FOR PLAINTIFF STATE OF IOWA:

BRENNA BIRD
Attorney General, State of Iowa

*/s/ Daniel L. Barnes*
Daniel L. Barnes (AT0015826)
Deputy Attorney General for Consumer Protection

Office of Iowa Attorney General Brenna Bird
1305 E. Walnut St. Des Moines, Iowa 50319
Tel.: (515) 281-8772
Email: daniel.barnes@ag.iowa.gov

*Counsel for Plaintiff State of Iowa*

FOR PLAINTIFF STATE OF MONTANA:

AUSTIN KNUDSEN
Attorney General of Montana

*/s/ Brent Mead*
Brent Mead (MT #68035000)
*Deputy Solicitor General*

Montana Department of Justice
215 North Sanders
P.O. Box 200151
Helena, MT 59620-0151
(406) 444-2026
brent.mead2@mt.gov

*Counsel for Plaintiff State of Montana*

FOR PLAINTIFF STATE OF NEBRASKA:

MICHAEL T. HILGERS
Attorney General of Nebraska

*/s/ Cody S. Barnett*
Cody S. Barnett
Solicitor General

Nebraska Department of Justice
1445 K Street, Room 2115
Lincoln, Nebraska 68508
Tel.: (402) 471-2683
Email: cody.barnett@nebraska.gov

*Counsel for Plaintiff State of Nebraska*

FOR PLAINTIFF STATE OF TEXAS:

KEN PAXTON
Attorney General

BRENT WEBSTER
First Assistant Attorney General

RALPH MOLINA
Deputy First Assistant Attorney General

AUSTIN KINGHORN
Deputy Attorney General for Civil Litigation

Office of the Texas Attorney General
P.O. Box 12548
Austin, Texas 78711-2548
Telephone: (512) 936-1162
Fax: (512) 473-8301
thomas.york@oag.texas.gov
amber.fly@oag.texas.gov
kay.dannenmaier@oag.texas.gov

THOMAS D. YORK
Chief, Antitrust Division
Texas State Bar No. 24095531

/s/ *Katherine S. Dannenmaier*
KATHERINE S. DANNENMAIER
Assistant Attorney General, Antitrust Division
Texas State Bar No. 24125093

AMBER L. FLY
Assistant Attorney General,
Antitrust Division
Texas State Bar No. 24101761

*Counsel for Plaintiff State of Texas*

FOR PLAINTIFF STATE OF UTAH:

DEREK BROWN
Attorney General of Utah

*/s/ Marie W.L. Martin*
Douglas Crapo (14620)
Deputy Attorney General
Marie W.L. Martin (18712)
Division Director
160 E. 300 S., 5th Floor
PO Box 140830
Salt Lake City, UT 84114
(801) 366-0310
dcrapo@agutah.gov
mwmartin@agutah.gov

*Counsel for Plaintiff State of Utah*

FOR PLAINTIFF STATE OF WEST VIRGINIA:

JOHN B. MCCUSKEY
Attorney General of West Virginia

*<u>/s/ Douglas L. Davis</u>*
Douglas L. Davis
Senior Assistant Attorney General
West Virginia Attorney General's Office
P.O. Box 1789
Charleston, WV 25326
Phone: (304) 558-8986
Fax: (304) 558-0184
douglas.l.davis@wvago.gov

*Counsel for Plaintiff State of West Virginia*

# Exhibit 2

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | |
|---|---|
| Federal Trade Commission,<br>State of Florida,<br>State of Indiana,<br>State of Iowa,<br>State of Montana,<br>State of Nebraska,<br>State of Texas,<br>State of Utah,<br>State of West Virginia,<br><br>Plaintiffs,<br><br>v.<br><br>Dentsu US, Inc.,<br>GroupM Worldwide LLC (d/b/a WPP Media),<br>Publicis, Inc.,<br><br>Defendants. | Case No.: 4:26-cv-469 |

**FINAL ORDER AND STIPULATED PERMANENT INJUNCTION AS TO DENTSU US, INC.**

**WHEREAS** Plaintiffs, the Federal Trade Commission ("FTC" or "the Commission"), the States of Florida, Indiana, Iowa, Montana, Nebraska, Texas, Utah, and West Virginia (the "States") filed their Complaint on April 15, 2026, pursuant to Section 13(b) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §53(b), and Section 16 of the Clayton Act, 15 U.S.C. § 26, seeking injunctive and other equitable relief for violations of Section 5 of the FTC Act, 15 U.S.C. § 5 and Section 1 of the Sherman Act, 15 U.S.C. § 1.

**AND WHEREAS**, in conjunction with the filing of this Final Order and Stipulated Permanent Injunction ("Final Order"), the Plaintiffs and Defendant Dentsu US, Inc., by their designated attorneys, stipulate and agree to the entry by this Court of this Final Order to resolve all matters in dispute in this action between them without trial or adjudication of any issue of fact or law.

**AND WHEREAS**, this Final Order is entered for settlement purposes only and does not constitute any evidence against, or an admission of wrongdoing, liability or any issue of fact, other than jurisdictional, or law, by Dentsu US, Inc.;

**AND WHEREAS**, Dentsu US, Inc. agrees to be bound by the provisions of this Final Order;

**AND WHEREAS**, Plaintiffs require Dentsu US, Inc. to perform certain injunctive relief in order to prevent violations and help remedy the competition lost as alleged in the Complaint;

**AND WHEREAS**, Dentsu US, Inc. has represented to the Commission that the relief set forth herein can and will be made and that Dentsu US, Inc. will not later raise a claim of hardship or difficulty as grounds for asking the Court to modify any of the relief provisions contained in this Final Order;

**AND WHEREAS**, Dentsu US, Inc. agrees to the appointment of a Monitor to oversee its actions to achieve the remedial purposes of this Final Order;

**AND WHEREAS**, Dentsu US, Inc. agrees to the entry of this Final Order under Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), and Section 16 of the Clayton Act, 15 U.S.C. § 26;

**NOW THEREFORE**, without trial or adjudication of any issue of fact or law, and upon consent of the parties,

**IT IS ORDERED, ADJUDGED, AND DECREED THAT**:

## I. FINDINGS

1. This Court has jurisdiction over the subject matter of, and each of the parties to, this action pursuant to Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), Section 16 of the Clayton Act, 15 U.S.C. § 26, and 28 U.S.C. §§ 1337 and 1345.

2. The Complaint charges that Dentsu US, Inc., co-Defendants, and co-conspirators participated in unfair methods of competition in violation of Section 5 of the FTC Act, 15 U.S.C. § 45, and in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

3. Dentsu US, Inc. transacts business in this district. Venue is proper in this Court under Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), Section 16 of the Clayton Act, 15 U.S.C. § 26, and 28 U.S.C. § 1391.

4. Dentsu US, Inc. neither admits nor denies any of the allegations in the Complaint, except as specifically stated in this Final Order. Only for purposes of this action, Dentsu US, Inc. admits the facts necessary to establish jurisdiction.

5. The parties, by and through their designated counsel, have agreed that entry of this Final Order fully and finally resolves all issues between them arising from the specific events and business practices giving rise to the allegations described in the Complaint and precludes further litigation between the Plaintiffs and Dentsu US, Inc. on the resolved issues except for purposes of enforcing this Final Order.

6. Dentsu US, Inc. waives any claim that it may have under the Equal Access to Justice Act, 28 U.S.C. § 2412, concerning the prosecution of this action through the date of this Final Order, and agrees to bear its own costs and attorney fees.

7. Dentsu US, Inc. and the Plaintiffs waive all rights to appeal or otherwise challenge or contest the validity of this Final Order.

## II. DEFINITIONS

For the purpose of this Final Order, the following definitions apply:

A. **"Advertiser"** means any customer or potential customer of Media Buying Services from Dentsu US, Inc.

B. **"Dentsu US, Inc.**" means Dentsu US, Inc. its directors, officers, employees, agents, representatives, successors, and assigns; and the joint ventures, subsidiaries, partnerships, divisions, groups, and affiliates controlled by Dentsu US, Inc., and the respective directors, officers, employees, agents, representatives, successors, and assigns of each. This definition shall not include any non-US joint ventures, subsidiaries, partnerships, divisions, groups, and affiliates of Dentsu US, Inc.

C. **"Covered Bases"** means (1) Political or ideological viewpoints (including viewpoints as to the veracity of news reporting or other politically or ideologically contested facts, such as their characterization as "misinformation," "disinformation," "bias," or similar terms); (2) adherence to journalistic standards or ethics established or set by a Third Party; and/or (3) commitment or adherence to diversity, equity or inclusion (DEI), such as diverse ownership or casting. Covered Bases shall not include fraudulent content.

D. **"Implementation Vendor"** means a third party, such as a technology platform provider, engaged by Dentsu US, Inc. to carry out or engage in Media Buying Services on behalf of Advertisers.

E. **"Media Buying Services"** means purchases of advertising inventory across any type of media and types of purchases on behalf of, or for later resale to, Advertisers, but does not include other media services sold or billed separately, such as media planning or campaign management. This definition shall not include purchases of advertising inventory made by demand-side platforms.

F. **"Media Publisher"** means any seller of advertising inventory, including a website, application, broadcaster, or publisher to Dentsu US, Inc.

G. **"Political or ideological viewpoints"** includes the Media Publisher's political or ideological viewpoints, the political or ideological viewpoints expressed in content that the Media Publisher sells advertising to run alongside of, or the political or ideological viewpoints expressed in any content or by any person.

H. **"Relevant Area"** means the United States.

I. **"Other means of differentiating between Media Publishers"** shall include rating, ranking, or evaluating Media Publishers according to Covered Bases. **"Third Parties"** shall include, among other things, individuals and entities that engage in such practices.

## III. PROHIBITED CONDUCT

**IT IS HEREBY ORDERED** that:

A. Dentsu US, Inc., in connection with its activities in or affecting commerce, as "commerce" is defined in Section 4 of the Federal Trade Commission Act, 15 U.S.C. § 44, shall not, directly or indirectly, continue, enter or attempt to enter into, maintain or attempt to maintain, enforce or attempt to enforce, or threaten to enforce any agreement, understanding, rule, or practice with any other seller of Media Buying Services to prohibit, restrict, limit, or impede Media Buying Services business conducted with any Media Publisher in the Relevant Area with respect to its news and political or social commentary content.

**PROVIDED, HOWEVER**, that this Paragraph III.A shall not apply to (i) any agreement or discussion between Dentsu US, Inc. and an Advertiser (or vendors, subcontractors, or similar service providers on behalf of the Advertiser) or (ii) any agreement or discussion between Dentsu US, Inc. and an Implementation Vendor and other vendors, subcontractors, and other intermediate buyers of inventory acting at the direction of Dentsu US, Inc. to execute client media campaigns relating to how to direct an Advertiser's advertising spend.

B. Dentsu US, Inc., in connection with its activities in or affecting commerce, as "commerce" is defined in Section 4 of the Federal Trade Commission Act, 15 U.S.C. § 44, shall cease and desist from, directly or indirectly, continuing, entering or attempting to enter into, maintaining or attempting to maintain, enforcing or attempting to enforce, or threatening to enforce any agreement, understanding, rule, or practice with any Third Party with respect to Media Buying Services in the Relevant Area that:

1. Directs Advertisers' advertising spend based on Covered Bases (other than as required by applicable laws);

2. Refuses Advertisers' requests to direct advertising spend to a Media Publisher based on Covered Bases (other than as required by applicable laws); or

3. Declines to deal with Advertisers based on Covered Bases (other than as required by applicable laws);

**PROVIDED, HOWEVER**, that this Paragraph III.B shall not apply to any agreement or discussion between Dentsu US, Inc. and an Advertiser (or vendors, subcontractors, or similar service providers on behalf of the Advertiser) relating to how to direct that Advertiser's advertising spend. Nothing in this Paragraph III.B. shall require Dentsu US, Inc. to take a position with respect to or to cease any business relationship with an Implementation Vendor based on any policies adopted by an Implementation Vendor in the ordinary course of the Implementation Vendor's business outside the direction of Dentsu US, Inc.

C. Dentsu US, Inc. shall not rely on exclusion lists, inclusion lists, or Other means of differentiating between Media Publishers in the Relevant Area on the basis of Covered Bases to determine or direct Advertisers' advertising placements. Dentsu US, Inc. shall not knowingly encourage or solicit Third Parties to create such means of differentiation on Dentsu US, Inc.'s behalf that it itself would be prohibited from creating under this Final Order.

D. Notwithstanding the foregoing, exclusion lists, inclusion lists, or Other means of differentiating between Media Publishers developed, acquired, or adopted at the express direction of an Advertiser or a third party acting on the Advertiser's behalf, including those developed on the basis of Covered Bases, are expressly permitted; provided, however, that Dentsu US, Inc. will not offer any client's exclusion list or inclusion list in either case to the extent developed on the basis of Covered Bases to another client or Third Party, nor will it knowingly encourage or solicit Third Parties to do so.

E. To the extent such prohibited practices currently exist upon entry of this Final Order, Dentsu US, Inc. must promptly abolish them. Nothing in this Final Order shall prohibit or

prevent Dentsu US, Inc. from making day-to-day unilateral business decisions in the ordinary course, consistent with past practice, including but not limited to decisions on whether to pursue particular client business, so long as Dentsu US, Inc. does not violate the provisions of this Final Order.

## IV. COMPLIANCE REPORTS

**IT IS FURTHER ORDERED** that:

A. Dentsu US, Inc. shall file verified written reports ("Compliance Reports") in accordance with the following:

1. Dentsu US, Inc. shall submit:

a. An annual Compliance Report one year after the date this Final Order is entered, and annually for the next 4 years on the anniversary of that date; and

b. Additional Compliance Reports as the Commission or its staff may request.

2. Each compliance report shall contain sufficient information and documentation to enable the Commission to determine independently whether Dentsu US, Inc. is in compliance with this Final Order. Conclusory statements that Dentsu US, Inc. has complied with its obligations under this Final Order are insufficient. Dentsu US, Inc. shall include in its Compliance Reports, among other information or documentation that may be necessary to demonstrate compliance, a full description of the measures Dentsu US, Inc. has implemented or plans to implement to ensure that it has complied or will comply with each Section of this Final Order, including a list setting forth the number of times a publisher appears on "exclusion lists" developed or applied by

Dentsu US, Inc. at the express direction of a particular client based on political ideology (as permitted by Section III of this Final Order)

a. For a period of 5 years after filing a Compliance Report, Dentsu US, Inc. shall retain all final versions of material written communications with each party identified in each Compliance Report and all non-privileged internal memoranda, reports, and recommendations concerning fulfilling Dentsu US, Inc.'s obligations under this Final Order during the period covered by such Compliance Report. Dentsu US, Inc. shall provide copies of these documents to Commission staff upon request.

b. Dentsu US, Inc. shall verify each Compliance Report in the manner set forth in 28 U.S.C. § 1746 by the Chief Executive Officer or another officer or employee specifically authorized to perform this function. Dentsu US, Inc. shall file its Compliance Reports with the Secretary of the Commission at ElectronicFilings@ftc.gov and the Compliance Division at bccompliance@ftc.gov, as required by Commission Rule 2.41(a), 16 C.F.R. § 2.41(a). In addition, Dentsu US, Inc. shall provide a copy of each Compliance Report to the Monitor if one has been appointed in this matter.

## V. MONITOR

**IT IS FURTHER ORDERED** that:

A. Dentsu US, Inc. shall appoint, with the consent of Commission staff, which consent shall not be unreasonably withheld, a Monitor to observe and report on Dentsu US, Inc.'s

compliance with its obligations as set forth in this Order. Within 30 days of the date this Order is issued, Dentsu US, Inc. shall notify the Commission staff via email at bccompliance@ftc.gov of the identity of the proposed Monitor. Commission staff will have 30 days to give or deny consent to the appointment of that monitor. Upon a denial, Dentsu US, Inc. shall have 15 days to propose a new Monitor, at which point Commission staff will have another 30 days to give or deny consent. This process will repeat until a Monitor is appointed. If after three months Commission staff and Dentsu US, Inc. cannot agree on the appointment of a Monitor, the roles will reverse, with the Commission proposing and Dentsu US, Inc. consenting, and Dentsu US, Inc. will not unreasonably withhold consent. Dentsu US, Inc. and the Monitor may enter into an agreement relating to the Monitor's services. Any such agreement:

1. Shall not limit, and the signatories shall not construe it to limit, the terms of this Section V, and to the extent any provision in the agreement varies from or conflicts with any provision in this Section V, Dentsu US, Inc. and the Monitor shall comply with this Section V; and
2. Shall include a provision stating that the agreement does not limit, and the signatories shall not construe it to limit, the terms of this Order, and to the extent any provision in the agreement varies from or conflicts with any provision in this Order, Dentsu US, Inc. and the Monitor shall comply with this Order.

B. The Monitor shall:

1. Have the authority to monitor Dentsu US, Inc.'s compliance with the obligations set forth in this Final Order by reviewing the compliance reports submitted pursuant to

Section IV and requiring Dentsu US, Inc. to respond to inquiries regarding the information contained therein;

2. Receive complaints from nonparties regarding Dentsu US, Inc.'s compliance with this Order;
3. Act in consultation with the Commission or its staff;
4. Serve without bond or other security;
5. Notify staff of the Commission, in writing, no later than 5 days in advance of entering into any arrangement that creates a conflict of interest, or the appearance of a conflict of interest, including a financial, professional or personal conflict; provided, however, that the Parties agree that the fact that the Monitor is employed by Dentsu US, Inc. does not alone trigger this provision. If the Monitor becomes aware of such a conflict only after it has arisen, the Monitor shall notify staff of the Commission as soon as the Monitor becomes aware of the conflict; and
6. Report in writing to the Commission concerning Dentsu US, Inc.'s compliance with this Order annually on a date as determined by Commission staff.

C. The Monitor shall serve for a period of 5 years after the date this Order is issued, provided however, that the Chairman of the Commission may at any time terminate the requirement to have a Monitor if he concludes that a Monitor is no longer necessary to accomplish the purposes of the Order.

D. The Monitor shall report to the Chief Executive Officer of Dentsu US, Inc. If the Monitor raises a concern about Dentsu US, Inc.'s compliance with this Order to the Chief Executive Officer and the Monitor is not satisfied with the Chief Executive Officer's response, the Monitor shall notify the Board of Directors.

E. Dentsu US, Inc. shall:

1. Cooperate with and assist the Monitor in performing his or her duties for the purpose of reviewing Dentsu US, Inc.'s compliance with its obligations under this Order, including as requested by the Monitor, providing the Monitor full and complete access to personnel, information and facilities;
2. Not interfere with the ability of the Monitor to perform his or her duties pursuant to this Order;
3. Pay the Monitor an annual salary for the duration of the Monitor's employment on the same regular cadence as other Dentsu US, Inc. employees in the United States, or other compensation as mutually agreed between the Monitor and Dentsu US, Inc.;
4. Indemnify and hold the Monitor harmless against any loss, claim, damage, liability, and expense (including attorneys' fees and out of pocket costs) that arises out of, or is connected with, a claim concerning the performance of the Monitor's duties under this Order, except to the extent the loss, claim, damage, liability, or expense results from gross negligence or willful misconduct by the Monitor; and
5. Not terminate the Monitor's employment or status as Monitor, except (a) with the consent of Commission staff or (b) for serious misconduct, such as the disclosure of confidential information to external parties other than the Commission. Upon such termination, or the departure of the Monitor for another reason, Dentsu US, Inc. will have 30 days to propose a replacement Monitor, restarting the process detailed in V.A.

F. Dentsu US, Inc. may require the Monitor to enter into a customary confidentiality agreement, so long as the agreement does not restrict the Monitor's ability to access

personnel, information, and facilities or provide information to the Commission, or otherwise observe and report on Dentsu US, Inc.'s compliance with this Order.

## VI. CHANGE IN DEFENDANT

**IT IS FURTHER ORDERED** that Dentsu US, Inc. shall notify the Commission at least 30 days prior to:

A. The proposed dissolution of Dentsu US, Inc.;

B. The proposed acquisition, merger, or consolidation of Dentsu US, Inc.; or

C. Any other organizational change in Dentsu US, Inc., including the transfer, sale, or dissolution of subsidiaries, if such change may materially affect compliance obligations arising out of this Order.

## VII. ACCESS

**IT IS FURTHER ORDERED** that, for the purpose of determining or securing compliance with this Order, and subject to any legally recognized privilege, and upon written request and upon 30 days' notice to Dentsu US, Inc., Dentsu US, Inc. shall, without restraint or interference, permit any duly authorized representative of the Commission:

A. Access, during business office hours of Dentsu US, Inc. and in the presence of counsel, to all facilities and access to inspect, subject to third-party confidentiality obligations, relevant portions of books, ledgers, accounts, correspondence, memoranda, and all other records and documents in the possession or under the control of Dentsu US, Inc. necessary to confirm statements in the operative Compliance Report, which copying services shall be provided by Dentsu US, Inc. at its expense; and

B. To interview, either informally or on the record, officers, directors, or employees of Dentsu US, Inc., in the presence of counsel, regarding matters related to compliance with this Order.

## VIII. COOPERATION AGREEMENT

**IT IS FURTHER ORDERED** that Dentsu US, Inc. agrees to (a) cooperate with the Commission in any investigation into Dentsu US, Inc.'s compliance with the Final Order; (b) cooperate with the Commission in any investigation or litigation relating to the subject matter of the Complaint, including by making employees available for interviews or testimony, facilitating interviews with former employees, accepting service of any compulsory process, not unreasonably objecting to or seeking to quash any such compulsory process, and voluntarily providing and authenticating documents and data reasonably sought by the Commission; and (b) cooperate with any request by the Commission in defending this Final Order against a challenge by a third party, including through litigation and any appeals.

## IX. TERM

**IT IS FURTHER ORDERED** that this Final Order shall terminate 10 years from the date it is issued.

## X. ENFORCEMENT OF FINAL ORDER

A. The Commission retains and reserves all rights to enforce the provisions of this Final Order, including the right to seek an order of contempt from the Court. Dentsu US, Inc. agrees that in any civil contempt action, any motion to show cause, or any similar action brought by the Commission regarding an alleged violation of this Final Order, the Commission may establish a violation of this Final Order and the appropriateness of any remedy therefor by a preponderance

of the evidence, and Dentsu US, Inc. waives any argument that a different standard of proof should apply.

B. The Final Order should be interpreted to give full effect to the procompetitive purposes of the antitrust laws, including Section 1 of the Sherman Act and Section 5 of the Federal Trade Commission Act. Dentsu US, Inc. agrees that it may be held in contempt of, and that the Court may enforce, any provision of this Final Order that, as interpreted by the Court in light of these procompetitive principles and applying ordinary tools of interpretation, is stated specifically and in reasonable detail, whether or not it is clear and unambiguous on its face. In any such interpretation, the terms of this Final Order should not be construed against either party as the drafter.

C. In any enforcement proceeding in which the Court finds that Dentsu US, Inc. has violated this Final Order, the Commission may apply to the Court for an extension of this Final Order, together with such other relief as may be appropriate.

## XI. RETENTION OF JURISDICTION

**IT IS FURTHER ORDERED** that this Court retains jurisdiction of this matter for purposes of construction, modification, and enforcement of this Final Order.

**IT IS SO ORDERED** on this **15th day of April 2026.**

Mark T. Pittman

Mark T. Pittman
UNITED STATES DISTRICT JUDGE

***SO STIPULATED AND AGREED:***

**FOR PLAINTIFF FEDERAL TRADE COMMISSION**

*/s/ Justin Epner*
JUSTIN EPNER
Bar Number: DC Bar # 1028431
Ph: (202) 326-2942; jepner@ftc.gov
NICHOLAS BUSH
Bar Number: DC Bar # 1011001
Ph: (202) 326-2848; nbush@ftc.gov
CASSANDRA EHLY
Bar Number: DC Bar # 90034416
Ph: (202) 326-2975; cehly@ftc.gov
LINCOLN MAYER
Bar Number: DC Bar # 992050
Ph: (202) 326-3324; lmayer@ftc.gov
THEODORE ZANG
Bar Number: NY Bar # 2186518
Ph: (212) 607-2816; tzang@ftc.gov

Attorneys
Federal Trade Commission
600 Pennsylvania Avenue, N.W.
Washington, DC 20580

PATRICIA GALVAN
Assistant Director

HELDER AGOSTINHO
Deputy Assistant Director

Technology Enforcement Division, Bureau of Competition

*/s/ Anne LeJeune*
ANNE LEJEUNE
Texas Bar No. 24054286
(Local Counsel)
Ph: (214) 979-9371; alejeune@ftc.gov
Federal Trade Commission
1999 Bryan Street, Suite 2150
Dallas, Texas 75201

*Attorneys for Plaintiff Federal Trade Commission*

Date: April 15, 2026

Of Counsel:

DANIEL GUARNERA
Director

KELSE MOEN
Deputy Director

Federal Trade Commission
Bureau of Competition

**FOR PLAINTIFF STATE OF FLORIDA**

JAMES UTHMEIER
Attorney General, State of Florida

JASON HILBORN
Deputy Attorney General for Civil Enforcement

/s/ *Lizabeth Brady* Date: April 15, 2026
Lizabeth Brady
Director, Antitrust Division
Florida Bar No. 457991
Colin Fraser
Senior Assistant Attorney General
Florida Bar No. 104741

Office of the Attorney General
The Capitol, PL-01
Tallahassee, Florida 32399-1050
Telephone: (850) 414-3300
Email: Liz.Brady@myfloridalegal.com
Email: Colin.Fraser@myfloridalegal.com

*Counsel for Plaintiff State of Florida*

**FOR PLAINTIFF STATE OF INDIANA**

THEODORE E. ROKITA
ATTORNEY GENERAL OF INDIANA
Attorney No. 18857-49

/s/ *Scott L. Barnhart* Date: April 15, 2026
Scott L. Barnhart, Atty. No. 25474-82
Chief Counsel and Director of Consumer Protection

OFFICE OF INDIANA ATTORNEY
GENERAL TODD ROKITA
Indiana Government Center South, 5th Floor,
302 W. Washington Street
Indianapolis, IN 46204
Tel.: (317) 232-6309
Email: Scott.Barnhart@atg.in.gov

/s/ *Jesse Moore*
Jesse Moore, Atty. No. 37654-49
Deputy Attorney General

OFFICE OF INDIANA ATTORNEY
GENERAL TODD ROKITA
Indiana Government Center South, 5th Floor,
302 W. Washington Street
Indianapolis, IN 46204
Phone: (317) 232-4956
Fax: (317) 232-7979
Email: Jesse.Moore@atg.in.gov

*Counsel for Plaintiff State of Indiana*

**FOR PLAINTIFF STATE OF IOWA**

BRENNA BIRD
Attorney General, State of Iowa

/s/ *Daniel L. Barnes* Date: April 15, 2026
Daniel L. Barnes (AT0015826)
Deputy Attorney General for Consumer Protection

Office of Iowa Attorney General Brenna Bird
1305 E. Walnut St. Des Moines, Iowa 50319
Tel.: (515) 281-8772
Email: daniel.barnes@ag.iowa.gov

*Counsel for Plaintiff State of Iowa*

**FOR PLAINTIFF STATE OF MONTANA**

AUSTIN KNUDSEN
Attorney General of Montana

*/s/ Brent Mead*
Brent Mead (MT #68035000)
*Deputy Solicitor General*

Date: April 15, 2026

Montana Department of Justice
215 North Sanders
P.O. Box 200151
Helena, MT 59620-0151
(406) 444-2026
brent.mead2@mt.gov

*Counsel for Plaintiff State of Montana*

**FOR PLAINTIFF STATE OF NEBRASKA**

MICHAEL T. HILGERS
Attorney General of Nebraska

/s/ *Cody S. Barnett* Date: April 15, 2026
Cody S. Barnett
Solicitor General

Nebraska Department of Justice
1445 K Street, Room 2115
Lincoln, Nebraska 68508
Tel.: (402) 471-2683
Email: cody.barnett@nebraska.gov

*Counsel for Plaintiff State of Nebraska*

**FOR PLAINTIFF STATE OF TEXAS**

KEN PAXTON
Attorney General

BRENT WEBSTER
First Assistant Attorney General

RALPH MOLINA
Deputy First Assistant Attorney General

AUSTIN KINGHORN
Deputy Attorney General for Civil Litigation

Office of the Texas Attorney General
P.O. Box 12548
Austin, Texas 78711-2548
Telephone: (512) 936-1162
Fax: (512) 473-8301
thomas.york@oag.texas.gov
amber.fly@oag.texas.gov
kay.dannenmaier@oag.texas.gov

THOMAS D. YORK
Chief, Antitrust Division
Texas State Bar No. 24095531

/s/ *Katherine S. Dannenmaier*
KATHERINE S. DANNENMAIER
Assistant Attorney General, Antitrust Division
Texas State Bar No. 24125093

AMBER L. FLY
Assistant Attorney General
Antitrust Division
Texas State Bar No. 24101761

*Counsel for Plaintiff State of Texas*

Date: April 15, 2026

**FOR PLAINTIFF STATE OF UTAH:**

DEREK BROWN
Attorney General of Utah

*/s/ Marie W.L. Martin* Date: April 15, 2026
Douglas Crapo (14620)
Deputy Attorney General
Marie W.L. Martin (18712)
Division Director
160 E. 300 S., 5th Floor
PO Box 140830
Salt Lake City, UT 84114
(801) 366-0310
dcrapo@agutah.gov
mwmartin@agutah.gov

*Counsel for Plaintiff State of Utah*

**FOR PLAINTIFF STATE OF WEST VIRGINIA**

JOHN B. MCCUSKEY
Attorney General of West Virginia

*/s/ Douglas L. Davis* Date: April 15, 2026
Douglas L. Davis
Senior Assistant Attorney General
West Virginia Attorney General's Office
P.O. Box 1789
Charleston, WV 25326
Phone: (304) 558-8986
Fax: (304) 558-0184
douglas.l.davis@wvago.gov

*Counsel for Plaintiff State of West Virginia*

**FOR DENTSU US, INC.**

*/s/ Noah Joshua Phillips* Date: April 15, 2026

Noah Joshua Phillips
nphillips@cravath.com
**CRAVATH, SWAINE & MOORE LLP**
1601 K Street NW
Washington, D.C. 20006
Telephone: (202) 869-7700
Facsimile: (202) 869-7600

*Attorney for Dentsu US, Inc.*

*/s/ Susan Zoch* Date: April 15, 2026

Susan Zoch
Secretary, Dentsu US, Inc. and General Counsel, Americas

*Officer of Dentsu US, Inc.*

# Exhibit 3

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | |
|---|---|
| Federal Trade Commission,<br>State of Florida,<br>State of Indiana,<br>State of Iowa,<br>State of Montana,<br>State of Nebraska,<br>State of Texas,<br>State of Utah,<br>State of West Virginia,<br><br>Plaintiffs,<br><br>v.<br><br>Dentsu US, Inc.,<br>GroupM Worldwide LLC (d/b/a WPP Media),<br>Publicis, Inc.,<br><br>Defendants. | Case No.: 4:26-cv-469 |

**FINAL ORDER AND STIPULATED PERMANENT INJUNCTION AS TO GROUPM WORLDWIDE LLC (D/B/A WPP MEDIA)**

**WHEREAS** Plaintiffs, the Federal Trade Commission ("FTC" or "the Commission"), and the States of Florida, Indiana, Iowa, Montana, Nebraska, Texas, Utah, and West Virginia (the "States") filed their Complaint on April 15, 2026, pursuant to Section 13(b) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §53(b), and Section 16 of the Clayton Act, 15 U.S.C. § 26, seeking injunctive and other equitable relief for violations of Section 5 of the FTC Act, 15 U.S.C. § 5 and Section 1 of the Sherman Act, 15 U.S.C. § 1.

**AND WHEREAS**, in conjunction with the filing of this Final Order and Stipulated Permanent Injunction ("Final Order"), the Plaintiffs and Defendant GroupM Worldwide LLC (d/b/a WPP Media) ("WPP"), by their designated attorneys, stipulate and agree to the entry by this Court of this Final Order to resolve all matters in dispute in this action between them without trial or adjudication of any issue of fact or law.

**AND WHEREAS**, this Final Order is entered for settlement purposes only and does not constitute any evidence against, or an admission of wrongdoing, liability or any issue of fact, other than jurisdictional, or law, by WPP;

**AND WHEREAS**, WPP agrees to be bound by the provisions of this Final Order;

**AND WHEREAS**, Plaintiffs require WPP to perform certain injunctive relief in order to prevent violations and help remedy the competition lost as alleged in the Complaint;

**AND WHEREAS**, WPP has represented to the Commission that the relief set forth herein can and will be made and that WPP will not later raise a claim of hardship or difficulty as grounds for asking the Court to modify any of the relief provisions contained in this Final Order;

**AND WHEREAS**, WPP agrees to the appointment of a Monitor to oversee its actions to achieve the remedial purposes of this Final Order;

**AND WHEREAS**, WPP agrees to the entry of this Final Order under Section 13(b) of the FTC Act, 15 U.S.C. § 53(b) and Section 16 of the Clayton Act, 15 U.S.C. § 26;

**NOW THEREFORE**, without trial or adjudication of any issue of fact or law, and upon consent of the parties,

**IT IS ORDERED, ADJUDGED, AND DECREED THAT**:

## I. FINDINGS

1. This Court has jurisdiction over the subject matter of, and each of the parties to, this action pursuant to Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), Section 16 of the Clayton Act, 15 U.S.C. § 26, and 28 U.S.C. §§ 1337 and 1345.

2. The Complaint charges that WPP, co-Defendants, and co-conspirators participated in unfair methods of competition in violation of Section 5 of the FTC Act, 15 U.S.C. § 45, and in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

3. WPP transacts business in this district. Venue is proper in this Court under Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), Section 16 of the Clayton Act, 15 U.S.C. § 26, and 28 U.S.C. § 1391.

4. WPP neither admits nor denies any of the allegations in the Complaint, except as specifically stated in this Final Order. Only for purposes of this action, WPP admits the facts necessary to establish jurisdiction.

5. The parties, by and through their designated counsel, have agreed that entry of this Final Order fully and finally resolves all issues between them arising from the specific events and business practices giving rise to the allegations described in the Complaint and precludes further litigation between the Plaintiffs and WPP on the resolved issues except for purposes of enforcing this Final Order.

6. WPP waives any claim that it may have under the Equal Access to Justice Act, 28 U.S.C. § 2412, concerning the prosecution of this action through the date of this Final Order, and agrees to bear its own costs and attorney fees.

7. WPP and the Plaintiffs waive all rights to appeal or otherwise challenge or contest the validity of this Final Order.

## II. DEFINITIONS

For the purpose of this Final Order, the following definitions apply:

A. **"Advertiser"** means any customer or potential customer of Media Buying Services from WPP.

B. **"WPP"** means GroupM Worldwide LLC (d/b/a WPP Media), its directors, officers, employees, agents, representatives, successors, and assigns; and the joint ventures, subsidiaries, partnerships, divisions, groups, and affiliates controlled by WPP, and the respective directors, officers, employees, agents, representatives, successors, and assigns of each. This definition shall not include any non-US joint ventures, subsidiaries, partnerships, divisions, groups, and affiliates of WPP.

C. **"Covered Bases"** means (1) Political or ideological viewpoints (including viewpoints as to the veracity of news reporting or other politically or ideologically contested facts, such as their characterization as "misinformation," "disinformation," "bias," or similar terms); (2) adherence to journalistic standards or ethics established or set by a Third Party; and/or (3) commitment or adherence to diversity, equity or inclusion (DEI), such as diverse ownership or casting. Covered Bases shall not include fraudulent content.

D. **"Implementation Vendor"** means a third party, such as a technology platform provider, engaged by WPP to carry out or engage in Media Buying Services on behalf of Advertisers.

E. **"Media Buying Services"** means purchases of advertising inventory across any type of media and types of purchases on behalf of, or for later resale to, Advertisers, but does not include other media services sold or billed separately, such as media planning or campaign management. This definition shall not include purchases of advertising inventory made by demand-side platforms.

F. **"Media Publisher"** means any seller of advertising inventory, including a website, application, broadcaster, or publisher to WPP.

G. **"Political or ideological viewpoints"** includes the Media Publisher's political or ideological viewpoints, the political or ideological viewpoints expressed in content that the Media Publisher sells advertising to run alongside of, or the political or ideological viewpoints expressed in any content or by any person.

H. **"Relevant Area"** means the United States.

I. **"Other means of differentiating between Media Publishers"** shall include rating, ranking, or evaluating Media Publishers according to Covered Bases. **"Third Parties"** shall include, among other things, individuals and entities that engage in such practices.

## III. PROHIBITED CONDUCT

**IT IS HEREBY ORDERED** that:

A. WPP, in connection with its activities in or affecting commerce, as "commerce" is defined in Section 4 of the Federal Trade Commission Act, 15 U.S.C. § 44, shall not, directly or indirectly, continue, enter or attempt to enter into, maintain or attempt to maintain, enforce or attempt to enforce, or threaten to enforce any agreement, understanding, rule, or practice with

any other seller of Media Buying Services to prohibit, restrict, limit, or impede Media Buying Services business conducted with any Media Publisher in the Relevant Area with respect to its news and political or social commentary content.

**PROVIDED, HOWEVER**, that this Paragraph III.A shall not apply to (i) any agreement or discussion between WPP and an Advertiser (or vendors, subcontractors, or similar service providers on behalf of the Advertiser) or (ii) any agreement or discussion between WPP and an Implementation Vendor and other vendors, subcontractors, and other intermediate buyers of inventory acting at the direction of WPP to execute client media campaigns relating to how to direct an Advertiser's advertising spend.

B. WPP, in connection with its activities in or affecting commerce, as "commerce" is defined in Section 4 of the Federal Trade Commission Act, 15 U.S.C. § 44, shall cease and desist from, directly or indirectly, continuing, entering or attempting to enter into, maintaining or attempting to maintain, enforcing or attempting to enforce, or threatening to enforce any agreement, understanding, rule, or practice with any Third Party with respect to Media Buying Services in the Relevant Area that:

1. Directs Advertisers' advertising spend based on Covered Bases (other than as required by applicable laws);

2. Refuses Advertisers' requests to direct advertising spend to a Media Publisher based on Covered Bases (other than as required by applicable laws); or

3. Declines to deal with Advertisers based on Covered Bases (other than as required by applicable laws);

**PROVIDED, HOWEVER**, that this Paragraph III.B shall not apply to any agreement or discussion between WPP and an Advertiser (or vendors, subcontractors, or similar service

providers on behalf of the Advertiser) relating to how to direct that Advertiser's advertising spend. Nothing in this Paragraph III.B. shall require WPP to take a position with respect to or to cease any business relationship with an Implementation Vendor based on any policies adopted by an Implementation Vendor in the ordinary course of the Implementation Vendor's business outside the direction of WPP.

C. WPP shall not rely on exclusion lists, inclusion lists, or Other means of differentiating between Media Publishers in the Relevant Area on the basis of Covered Bases to determine or direct Advertisers' advertising placements. WPP shall not knowingly encourage or solicit Third Parties to create such means of differentiation on WPP's behalf that it itself would be prohibited from creating under this Final Order.

D. Notwithstanding the foregoing, exclusion lists, inclusion lists, or Other means of differentiating between Media Publishers developed, acquired, or adopted at the express direction of an Advertiser or a third party acting on the Advertiser's behalf, including those developed on the basis of Covered Bases, are expressly permitted; provided, however, that WPP will not offer any client's exclusion list or inclusion list in either case to the extent developed on the basis of Covered Bases to another client or Third Party, nor will it knowingly encourage or solicit Third Parties to do so.

E. To the extent such prohibited practices currently exist upon entry of this Final Order, WPP must promptly abolish them. Nothing in this Final Order shall prohibit or prevent WPP from making day-to-day unilateral business decisions in the ordinary course, consistent with past practice, including but not limited to decisions on whether to pursue particular client business, so long as WPP does not violate the provisions of this Final Order.

## IV. COMPLIANCE REPORTS

**IT IS FURTHER ORDERED** that:

A. WPP shall file verified written reports ("Compliance Reports") in accordance with the following:

1. WPP shall submit:

a. An annual Compliance Report one year after the date this Final Order is entered, and annually for the next 4 years on the anniversary of that date; and

b. Additional Compliance Reports as the Commission or its staff may request.

2. Each compliance report shall contain sufficient information and documentation to enable the Commission to determine independently whether WPP is in compliance with this Final Order. Conclusory statements that WPP has complied with its obligations under this Final Order are insufficient. WPP shall include in its Compliance Reports, among other information or documentation that may be necessary to demonstrate compliance, a full description of the measures WPP has implemented or plans to implement to ensure that it has complied or will comply with each Section of this Final Order, including a list setting forth the number of times a publisher appears on "exclusion lists" developed or applied by WPP at the express direction of a particular client based on political ideology (as permitted by Section III of this Final Order)

a. For a period of 5 years after filing a Compliance Report, WPP shall retain all final versions of material written communications with each party

identified in each Compliance Report and all non-privileged internal memoranda, reports, and recommendations concerning fulfilling WPP's obligations under this Final Order during the period covered by such Compliance Report. WPP shall provide copies of these documents to Commission staff upon request.

b. WPP shall verify each Compliance Report in the manner set forth in 28 U.S.C. § 1746 by the Chief Executive Officer or another officer or employee specifically authorized to perform this function. WPP shall file its Compliance Reports with the Secretary of the Commission at ElectronicFilings@ftc.gov and the Compliance Division at bccompliance@ftc.gov, as required by Commission Rule 2.41(a), 16 C.F.R. § 2.41(a). In addition, WPP shall provide a copy of each Compliance Report to the Monitor if one has been appointed in this matter.

## V. MONITOR

**IT IS FURTHER ORDERED** that:

A. WPP shall appoint, with the consent of Commission staff, which consent shall not be unreasonably withheld, a Monitor to observe and report on WPP's compliance with its obligations as set forth in this Order. Within 30 days of the date this Order is issued, WPP shall notify the Commission staff via email at bccompliance@ftc.gov of the identity of the proposed Monitor. Commission staff will have 30 days to give or deny consent to the appointment of that monitor. Upon a denial, WPP shall have 15 days to propose a new

Monitor, at which point Commission staff will have another 30 days to give or deny consent. This process will repeat until a Monitor is appointed. If after three months Commission staff and WPP cannot agree on the appointment of a Monitor, the roles will reverse, with the Commission proposing and WPP consenting, and WPP will not unreasonably withhold consent. WPP and the Monitor may enter into an agreement relating to the Monitor's services. Any such agreement:

1. Shall not limit, and the signatories shall not construe it to limit, the terms of this Section V, and to the extent any provision in the agreement varies from or conflicts with any provision in this Section V, WPP and the Monitor shall comply with this Section V; and
2. Shall include a provision stating that the agreement does not limit, and the signatories shall not construe it to limit, the terms of this Order, and to the extent any provision in the agreement varies from or conflicts with any provision in this Order, WPP and the Monitor shall comply with this Order.

B. The Monitor shall:

1. Have the authority to monitor WPP's compliance with the obligations set forth in this Final Order by reviewing the compliance reports submitted pursuant to Section IV and requiring WPP to respond to inquiries regarding the information contained therein;
2. Receive complaints from nonparties regarding WPP's compliance with this Order;
3. Act in consultation with the Commission or its staff;
4. Serve without bond or other security;
5. Notify staff of the Commission, in writing, no later than 5 days in advance of entering into any arrangement that creates a conflict of interest, or the appearance of a conflict

of interest, including a financial, professional or personal conflict; provided, however, that the Parties agree that the fact that the Monitor is employed by WPP does not alone trigger this provision. If the Monitor becomes aware of such a conflict only after it has arisen, the Monitor shall notify staff of the Commission as soon as the Monitor becomes aware of the conflict; and

6. Report in writing to the Commission concerning WPP's compliance with this Order annually on a date as determined by Commission staff.

C. The Monitor shall serve for a period of 5 years after the date this Order is issued, provided however, that the Chairman of the Commission may at any time terminate the requirement to have a Monitor if he concludes that a Monitor is no longer necessary to accomplish the purposes of the Order.

D. The Monitor shall report to the Chief Executive Officer of WPP. If the Monitor raises a concern about WPP's compliance with this Order to the Chief Executive Officer and the Monitor is not satisfied with the Chief Executive Officer's response, the Monitor shall notify the Board of Directors.

E. WPP shall:

1. Cooperate with and assist the Monitor in performing his or her duties for the purpose of reviewing WPP's compliance with its obligations under this Order, including as requested by the Monitor, providing the Monitor full and complete access to personnel, information and facilities;
2. Not interfere with the ability of the Monitor to perform his or her duties pursuant to this Order;

3. Pay the Monitor an annual salary for the duration of the Monitor's employment on the same regular cadence as other WPP employees in the United States, or other compensation as mutually agreed between the Monitor and WPP;
4. Indemnify and hold the Monitor harmless against any loss, claim, damage, liability, and expense (including attorneys' fees and out of pocket costs) that arises out of, or is connected with, a claim concerning the performance of the Monitor's duties under this Order, except to the extent the loss, claim, damage, liability, or expense results from gross negligence or willful misconduct by the Monitor; and
5. Not terminate the Monitor's employment or status as Monitor, except (a) with the consent of Commission staff or (b) for serious misconduct, such as the disclosure of confidential information to external parties other than the Commission. Upon such termination, or the departure of the Monitor for another reason, WPP will have 30 days to propose a replacement Monitor, restarting the process detailed in V.A.

F. WPP may require the Monitor to enter into a customary confidentiality agreement, so long as the agreement does not restrict the Monitor's ability to access personnel, information, and facilities or provide information to the Commission, or otherwise observe and report on WPP's compliance with this Order.

## VI. CHANGE IN DEFENDANT

**IT IS FURTHER ORDERED** that WPP shall notify the Commission at least 30 days prior to:

A. The proposed dissolution of WPP;

B. The proposed acquisition, merger, or consolidation of WPP; or

C. Any other organizational change in WPP, including the transfer, sale, or dissolution of subsidiaries, if such change may materially affect compliance obligations arising out of this Order.

## VII. ACCESS

**IT IS FURTHER ORDERED** that, for the purpose of determining or securing compliance with this Order, and subject to any legally recognized privilege, and upon written request and upon 30 days' notice to WPP, WPP shall, without restraint or interference, permit any duly authorized representative of the Commission:

A. Access, during business office hours of WPP and in the presence of counsel, to all facilities and access to inspect, subject to third-party confidentiality obligations, relevant portions of books, ledgers, accounts, correspondence, memoranda, and all other records and documents in the possession or under the control of WPP necessary to confirm statements in the operative Compliance Report, which copying services shall be provided by WPP at its expense; and

B. To interview, either informally or on the record, officers, directors, or employees of WPP, in the presence of counsel, regarding matters related to compliance with this Order.

## VIII. COOPERATION AGREEMENT

**IT IS FURTHER ORDERED** that WPP agrees to (a) cooperate with the Commission in any investigation into WPP's compliance with the Final Order; (b) cooperate with the Commission in any investigation or litigation relating to the subject matter of the Complaint, including by making employees available for interviews or testimony, facilitating interviews with former employees, accepting service of any compulsory process, not unreasonably objecting to or seeking to quash any such compulsory process, and voluntarily providing and authenticating

documents and data reasonably sought by the Commission; and (b) cooperate with any request by the Commission in defending this Final Order against a challenge by a third party, including through litigation and any appeals.

## IX. TERM

**IT IS FURTHER ORDERED** that this Final Order shall terminate 10 years from the date it is issued.

## X. ENFORCEMENT OF FINAL ORDER

A. The Commission retains and reserves all rights to enforce the provisions of this Final Order, including the right to seek an order of contempt from the Court. WPP agrees that in any civil contempt action, any motion to show cause, or any similar action brought by the Commission regarding an alleged violation of this Final Order, the Commission may establish a violation of this Final Order and the appropriateness of any remedy therefor by a preponderance of the evidence, and WPP waives any argument that a different standard of proof should apply.

B. The Final Order should be interpreted to give full effect to the procompetitive purposes of the antitrust laws, including Section 1 of the Sherman Act and Section 5 of the Federal Trade Commission Act. WPP agrees that it may be held in contempt of, and that the Court may enforce, any provision of this Final Order that, as interpreted by the Court in light of these procompetitive principles and applying ordinary tools of interpretation, is stated specifically and in reasonable detail, whether or not it is clear and unambiguous on its face. In any such interpretation, the terms of this Final Order should not be construed against either party as the drafter.

C. In any enforcement proceeding in which the Court finds that WPP has violated this Final Order, the Commission may apply to the Court for an extension of this Final Order, together with such other relief as may be appropriate.

## XI. RETENTION OF JURISDICTION

**IT IS FURTHER ORDERED** that this Court retains jurisdiction of this matter for purposes of construction, modification, and enforcement of this Final Order.

**IT IS SO ORDERED** on this **15th day of April 2026.**

Mark T. Pittman

Mark T. Pittman
UNITED STATES DISTRICT JUDGE

***SO STIPULATED AND AGREED:***

**FOR PLAINTIFF FEDERAL TRADE COMMISSION**

Of Counsel:

DANIEL GUARNERA
Director

KELSE MOEN
Deputy Director

Federal Trade Commission
Bureau of Competition

*/s/ Justin Epner*
JUSTIN EPNER
Bar Number: DC Bar # 1028431
Ph: (202) 326-2942; jepner@ftc.gov
NICHOLAS BUSH
Bar Number: DC Bar # 1011001
Ph: (202) 326-2848; nbush@ftc.gov
CASSANDRA EHLY
Bar Number: DC Bar # 90034416
Ph: (202) 326-2975; cehly@ftc.gov
LINCOLN MAYER
Bar Number: DC Bar # 992050
Ph: (202) 326-3324; lmayer@ftc.gov
THEODORE ZANG
Bar Number: NY Bar # 2186518
Ph: (212) 607-2816; tzang@ftc.gov

Attorneys
Federal Trade Commission
600 Pennsylvania Avenue, N.W.
Washington, DC 20580

PATRICIA GALVAN
Assistant Director

HELDER AGOSTINHO
Deputy Assistant Director

Technology Enforcement Division, Bureau of Competition

*/s/ Anne LeJeune*
ANNE LEJEUNE
Texas Bar No. 24054286
(Local Counsel)
Ph: (214) 979-9371; alejeune@ftc.gov
Federal Trade Commission
1999 Bryan Street, Suite 2150
Dallas, Texas 75201

*Attorneys for Plaintiff Federal Trade Commission*

Date: April 15, 2026

**FOR PLAINTIFF STATE OF FLORIDA**

JAMES UTHMEIER
Attorney General, State of Florida

JASON HILBORN
Deputy Attorney General for Civil Enforcement

/s/ *Lizabeth Brady* Date: April 15, 2026
Lizabeth Brady
Director, Antitrust Division
Florida Bar No. 457991
Colin Fraser
Senior Assistant Attorney General
Florida Bar No. 104741

Office of the Attorney General
The Capitol, PL-01
Tallahassee, Florida 32399-1050
Telephone: (850) 414-3300
Email: Liz.Brady@myfloridalegal.com
Email: Colin.Fraser@myfloridalegal.com

*Counsel for Plaintiff State of Florida*

**FOR PLAINTIFF STATE OF INDIANA**

THEODORE E. ROKITA
ATTORNEY GENERAL OF INDIANA
Attorney No. 18857-49

/s/ *Scott L. Barnhart* Date: April 15, 2026
Scott L. Barnhart, Atty. No. 25474-82
Chief Counsel and Director of Consumer Protection

OFFICE OF INDIANA ATTORNEY
GENERAL TODD ROKITA
Indiana Government Center South, 5th Floor,
302 W. Washington Street
Indianapolis, IN 46204
Tel.: (317) 232-6309
Email: Scott.Barnhart@atg.in.gov

/s/ *Jesse Moore*
Jesse Moore, Atty. No. 37654-49
Deputy Attorney General

OFFICE OF INDIANA ATTORNEY
GENERAL TODD ROKITA
Indiana Government Center South, 5th Floor,
302 W. Washington Street
Indianapolis, IN 46204
Phone: (317) 232-4956
Fax: (317) 232-7979
Email: Jesse.Moore@atg.in.gov

*Counsel for Plaintiff State of Indiana*

**FOR PLAINTIFF STATE OF IOWA**

BRENNA BIRD
Attorney General, State of Iowa

/s/ *Daniel L. Barnes* Date: April 15, 2026
Daniel L. Barnes (AT0015826)
Deputy Attorney General for Consumer Protection

Office of Iowa Attorney General Brenna Bird
1305 E. Walnut St. Des Moines, Iowa 50319
Tel.: (515) 281-8772
Email: daniel.barnes@ag.iowa.gov

*Counsel for Plaintiff State of Iowa*

**FOR PLAINTIFF STATE OF MONTANA**

AUSTIN KNUDSEN
Attorney General of Montana

*/s/ Brent Mead*
Brent Mead (MT #68035000)
*Deputy Solicitor General*

Date: April 15, 2026

Montana Department of Justice
215 North Sanders
P.O. Box 200151
Helena, MT 59620-0151
(406) 444-2026
brent.mead2@mt.gov

*Counsel for Plaintiff State of Montana*

**FOR PLAINTIFF STATE OF NEBRASKA**

MICHAEL T. HILGERS
Attorney General of Nebraska

/s/ *Cody S. Barnett*
Cody S. Barnett
Solicitor General

Date: April 15, 2026

Nebraska Department of Justice
1445 K Street, Room 2115
Lincoln, Nebraska 68508
Tel.: (402) 471-2683
Email: cody.barnett@nebraska.gov

*Counsel for Plaintiff State of Nebraska*

**FOR PLAINTIFF STATE OF TEXAS**

KEN PAXTON
Attorney General

BRENT WEBSTER
First Assistant Attorney General

RALPH MOLINA
Deputy First Assistant Attorney General

AUSTIN KINGHORN
Deputy Attorney General for Civil Litigation

Office of the Texas Attorney General
P.O. Box 12548
Austin, Texas 78711-2548
Telephone: (512) 936-1162
Fax: (512) 473-8301
thomas.york@oag.texas.gov
amber.fly@oag.texas.gov
kay.dannenmaier@oag.texas.gov

THOMAS D. YORK
Chief, Antitrust Division
Texas State Bar No. 24095531

/s/ *Katherine S. Dannenmaier*
KATHERINE S. DANNENMAIER
Assistant Attorney General, Antitrust Division
Texas State Bar No. 24125093

AMBER L. FLY
Assistant Attorney General
Antitrust Division
Texas State Bar No. 24101761

*Counsel for Plaintiff State of Texas*

Date: April 15, 2026

**FOR PLAINTIFF STATE OF UTAH**

DEREK BROWN
Attorney General of Utah

*/s/ Marie W.L. Martin*
Douglas Crapo (14620)
Deputy Attorney General
Marie W.L. Martin (18712)
Division Director
160 E. 300 S., 5th Floor
PO Box 140830
Salt Lake City, UT 84114
(801) 366-0310
dcrapo@agutah.gov
mwmartin@agutah.gov

*Counsel for Plaintiff State of Utah*

Date: April 15, 2026

**FOR PLAINTIFF STATE OF WEST VIRGINIA**

JOHN B. MCCUSKEY
Attorney General of West Virginia

*/s/ Douglas L. Davis* Date: April 15, 2026
Douglas L. Davis
Senior Assistant Attorney General
West Virginia Attorney General's Office
P.O. Box 1789
Charleston, WV 25326
Phone: (304) 558-8986
Fax: (304) 558-0184
douglas.l.davis@wvago.gov

*Counsel for Plaintiff State of West Virginia*

**FOR GROUPM WORLDWIDE LLC (D/B/A WPP MEDIA)**

*/s/ Dominic Vote* Date: April 15, 2026

Christopher Davies
Dominic Vote
Sarah E. Pugh
Wilmer Cutler Pickering Hale and Dorr LLP
2100 Pennsylvania Avenue, N.W.
Washington, DC 20037
Telephone: (202) 663-6187
Telephone: (202) 663-6045
Telephone: (202) 663-6516
Email: christopher.davies@wilmerhale.com
Email: dominic.vote@wilmerhale.com
Email: sarah.pugh@wilmerhale.com

*Attorneys for GroupM Worldwide LLC (d/b/a WPP Media)*

*/s/ Nicola McCormick* Date: April 15, 2026

Nicola McCormick

*Officer of GroupM Worldwide LLC (d/b/a WPP Media)*

# Exhibit 4

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | |
|---|---|
| Federal Trade Commission,<br>State of Florida,<br>State of Indiana,<br>State of Iowa,<br>State of Montana,<br>State of Nebraska,<br>State of Texas,<br>State of Utah,<br>State of West Virginia,<br><br>Plaintiffs,<br><br>v.<br><br>Dentsu US, Inc.,<br>GroupM Worldwide LLC (d/b/a WPP Media),<br>Publicis, Inc.,<br><br>Defendants. | Case No.: 4:26-cv-469 |

**FINAL ORDER AND STIPULATED PERMANENT INJUNCTION AS TO PUBLICIS, INC.**

**WHEREAS** Plaintiffs, the Federal Trade Commission ("FTC" or "the Commission"), and the States of Florida, Indiana, Iowa, Montana, Nebraska, Texas, Utah, and West Virginia (the "States") filed their Complaint on April 15, 2026, pursuant to Section 13(b) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §53(b), and Section 16 of the Clayton Act, 15 U.S.C. § 26, seeking injunctive and other equitable relief for violations of Section 5 of the FTC Act, 15 U.S.C. § 5 and Section 1 of the Sherman Act, 15 U.S.C. § 1.

**AND WHEREAS**, in conjunction with the filing of this Final Order and Stipulated Permanent Injunction ("Final Order"), the Plaintiffs and Defendant Publicis, Inc., by their designated attorneys, stipulate and agree to the entry by this Court of this Final Order to resolve all matters in dispute in this action between them without trial or adjudication of any issue of fact or law.

**AND WHEREAS**, this Final Order is entered for settlement purposes only and does not constitute any evidence against, or an admission of wrongdoing, liability or any issue of fact, other than jurisdictional, or law, by Publicis, Inc.;

**AND WHEREAS**, Publicis, Inc. agrees to be bound by the provisions of this Final Order;

**AND WHEREAS**, Plaintiffs require Publicis, Inc. to perform certain injunctive relief in order to prevent violations and help remedy the competition lost as alleged in the Complaint;

**AND WHEREAS**, Publicis, Inc. has represented to the Commission that the relief set forth herein can and will be made and that Publicis, Inc. will not later raise a claim of hardship or difficulty as grounds for asking the Court to modify any of the relief provisions contained in this Final Order;

**AND WHEREAS**, Publicis, Inc. agrees to the appointment of a Monitor to oversee its actions to achieve the remedial purposes of this Final Order;

**AND WHEREAS**, Publicis, Inc. agrees to the entry of this Final Order under Section 13(b) of the FTC Act, 15 U.S.C. § 53(b) and Section 16 of the Clayton Act, 15 U.S.C. § 26;

**NOW THEREFORE**, without trial or adjudication of any issue of fact or law, and upon consent of the parties,

**IT IS ORDERED, ADJUDGED, AND DECREED THAT**:

## I. FINDINGS

1. This Court has jurisdiction over the subject matter of, and each of the parties to, this action pursuant to Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), Section 16 of the Clayton Act, 15 U.S.C. § 26, and 28 U.S.C. §§ 1337 and 1345.

2. The Complaint charges that Publicis, Inc., co-Defendants, and co-conspirators participated in unfair methods of competition in violation of Section 5 of the FTC Act, 15 U.S.C. § 45, and in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

3. Publicis, Inc. transacts business in this district. Venue is proper in this Court under Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), Section 16 of the Clayton Act, 15 U.S.C. § 26, and 28 U.S.C. § 1391.

4. Publicis, Inc. neither admits nor denies any of the allegations in the Complaint, except as specifically stated in this Final Order. Only for purposes of this action, Publicis, Inc. admits the facts necessary to establish jurisdiction.

5. The parties, by and through their designated counsel, have agreed that entry of this Final Order fully and finally resolves all issues between them arising from the specific events and business practices giving rise to the allegations described in the Complaint and precludes further litigation between the Plaintiffs and Publicis, Inc. on the resolved issues except for purposes of enforcing this Final Order.

6. Publicis, Inc. waives any claim that it may have under the Equal Access to Justice Act, 28 U.S.C. § 2412, concerning the prosecution of this action through the date of this Final Order, and agrees to bear its own costs and attorney fees.

7. Publicis, Inc. and the Plaintiffs waive all rights to appeal or otherwise challenge or contest the validity of this Final Order.

## II. DEFINITIONS

For the purpose of this Final Order, the following definitions apply:

A. **"Advertiser"** means any customer or potential customer of Media Buying Services from Publicis, Inc.

B. **"Publicis, Inc.**" means Publicis, Inc. its directors, officers, employees, agents, representatives, successors, and assigns; and the joint ventures, subsidiaries, partnerships, divisions, groups, and affiliates controlled by Publicis, Inc., and the respective directors, officers, employees, agents, representatives, successors, and assigns of each. This definition shall not include any non-US joint ventures, subsidiaries, partnerships, divisions, groups, and affiliates of Publicis, Inc.

C. **"Covered Bases"** means (1) Political or ideological viewpoints (including viewpoints as to the veracity of news reporting or other politically or ideologically contested facts, such as their characterization as "misinformation," "disinformation," "bias," or similar terms); (2) adherence to journalistic standards or ethics established or set by a Third Party; and/or (3) commitment or adherence to diversity, equity or inclusion (DEI), such as diverse ownership or casting. Covered Bases shall not include fraudulent content.

D. **"Implementation Vendor"** means a third party, such as a technology platform provider, engaged by Publicis, Inc. to carry out or engage in Media Buying Services on behalf of Advertisers.

E. **"Media Buying Services"** means purchases of advertising inventory across any type of media and types of purchases on behalf of, or for later resale to, Advertisers, but does not include other media services sold or billed separately, such as media planning or campaign management. This definition shall not include purchases of advertising inventory made by demand-side platforms.

F. **"Media Publisher"** means any seller of advertising inventory, including a website, application, broadcaster, or publisher to Publicis, Inc.

G. **"Political or ideological viewpoints"** includes the Media Publisher's political or ideological viewpoints, the political or ideological viewpoints expressed in content that the Media Publisher sells advertising to run alongside of, or the political or ideological viewpoints expressed in any content or by any person.

H. **"Relevant Area"** means the United States.

I. **"Other means of differentiating between Media Publishers"** shall include rating, ranking, or evaluating Media Publishers according to Covered Bases. **"Third Parties"** shall include, among other things, individuals and entities that engage in such practices.

## III. PROHIBITED CONDUCT

**IT IS HEREBY ORDERED** that:

A. Publicis, Inc., in connection with its activities in or affecting commerce, as "commerce" is defined in Section 4 of the Federal Trade Commission Act, 15 U.S.C. § 44, shall not, directly or indirectly, continue, enter or attempt to enter into, maintain or attempt to maintain, enforce or attempt to enforce, or threaten to enforce any agreement, understanding, rule, or practice with any other seller of Media Buying Services to prohibit, restrict, limit, or impede Media Buying Services business conducted with any Media Publisher in the Relevant Area with respect to its news and political or social commentary content.

**PROVIDED, HOWEVER**, that this Paragraph III.A shall not apply to (i) any agreement or discussion between Publicis, Inc. and an Advertiser (or vendors, subcontractors, or similar service providers on behalf of the Advertiser) or (ii) any agreement or discussion between Publicis, Inc. and an Implementation Vendor and other vendors, subcontractors, and other intermediate buyers of inventory acting at the direction of Publicis, Inc. to execute client media campaigns relating to how to direct an Advertiser's advertising spend.

B. Publicis, Inc., in connection with its activities in or affecting commerce, as "commerce" is defined in Section 4 of the Federal Trade Commission Act, 15 U.S.C. § 44, shall cease and desist from, directly or indirectly, continuing, entering or attempting to enter into, maintaining or attempting to maintain, enforcing or attempting to enforce, or threatening to enforce any agreement, understanding, rule, or practice with any Third Party with respect to Media Buying Services in the Relevant Area that:

1. Directs Advertisers' advertising spend based on Covered Bases (other than as required by applicable laws);

2. Refuses Advertisers' requests to direct advertising spend to a Media Publisher based on Covered Bases (other than as required by applicable laws); or

3. Declines to deal with Advertisers based on Covered Bases (other than as required by applicable laws);

**PROVIDED, HOWEVER**, that this Paragraph III.B shall not apply to any agreement or discussion between Publicis, Inc. and an Advertiser (or vendors, subcontractors, or similar service providers on behalf of the Advertiser) relating to how to direct that Advertiser's advertising spend. Nothing in this Paragraph III.B. shall require Publicis, Inc. to take a position with respect to or to cease any business relationship with an Implementation Vendor based on any policies adopted by an Implementation Vendor in the ordinary course of the Implementation Vendor's business outside the direction of Publicis, Inc.

C. Publicis, Inc. shall not rely on exclusion lists, inclusion lists, or Other means of differentiating between Media Publishers in the Relevant Area on the basis of Covered Bases to determine or direct Advertisers' advertising placements. Publicis, Inc. shall not knowingly encourage or solicit Third Parties to create such means of differentiation on Publicis, Inc.'s behalf that it itself would be prohibited from creating under this Final Order.

D. Notwithstanding the foregoing, exclusion lists, inclusion lists, or Other means of differentiating between Media Publishers developed, acquired, or adopted at the express direction of an Advertiser or a third party acting on the Advertiser's behalf, including those developed on the basis of Covered Bases, are expressly permitted; provided, however, that Publicis, Inc. will not offer any client's exclusion list or inclusion list in either case to the extent developed on the basis of Covered Bases to another client or Third Party, nor will it knowingly encourage or solicit Third Parties to do so.

E. To the extent such prohibited practices currently exist upon entry of this Final Order, Publicis, Inc. must promptly abolish them. Nothing in this Final Order shall prohibit or prevent

Publicis, Inc. from making day-to-day unilateral business decisions in the ordinary course, consistent with past practice, including but not limited to decisions on whether to pursue particular client business, so long as Publicis, Inc. does not violate the provisions of this Final Order.

## IV. COMPLIANCE REPORTS

**IT IS FURTHER ORDERED** that:

A. Publicis, Inc. shall file verified written reports ("Compliance Reports") in accordance with the following:

1. Publicis, Inc. shall submit:

   a. An annual Compliance Report one year after the date this Final Order is entered, and annually for the next 4 years on the anniversary of that date; and

   b. Additional Compliance Reports as the Commission or its staff may request.

2. Each compliance report shall contain sufficient information and documentation to enable the Commission to determine independently whether Publicis, Inc. is in compliance with this Final Order. Conclusory statements that Publicis, Inc. has complied with its obligations under this Final Order are insufficient. Publicis, Inc. shall include in its Compliance Reports, among other information or documentation that may be necessary to demonstrate compliance, a full description of the measures Publicis, Inc. has implemented or plans to implement to ensure that it has complied or will comply with each Section of this Final Order, including a list setting forth the number of times a publisher appears on "exclusion lists" developed or applied by Publicis, Inc.

at the express direction of a particular client based on political ideology (as permitted by Section III of this Final Order)

a. For a period of 5 years after filing a Compliance Report, Publicis, Inc. shall retain all final versions of material written communications with each party identified in each Compliance Report and all non-privileged internal memoranda, reports, and recommendations concerning fulfilling Publicis, Inc.'s obligations under this Final Order during the period covered by such Compliance Report. Publicis, Inc. shall provide copies of these documents to Commission staff upon request.

b. Publicis, Inc. shall verify each Compliance Report in the manner set forth in 28 U.S.C. § 1746 by the Chief Executive Officer or another officer or employee specifically authorized to perform this function. Publicis, Inc. shall file its Compliance Reports with the Secretary of the Commission at ElectronicFilings@ftc.gov and the Compliance Division at bccompliance@ftc.gov, as required by Commission Rule 2.41(a), 16 C.F.R. § 2.41(a). In addition, Publicis, Inc. shall provide a copy of each Compliance Report to the Monitor if one has been appointed in this matter.

## V. MONITOR

**IT IS FURTHER ORDERED** that:

A. Publicis, Inc. shall appoint, with the consent of Commission staff, which consent shall not be unreasonably withheld, a Monitor to observe and report on Publicis, Inc.'s

compliance with its obligations as set forth in this Order. Within 30 days of the date this Order is issued, Publicis, Inc. shall notify the Commission staff via email at bccompliance@ftc.gov of the identity of the proposed Monitor. Commission staff will have 30 days to give or deny consent to the appointment of that monitor. Upon a denial, Publicis, Inc. shall have 15 days to propose a new Monitor, at which point Commission staff will have another 30 days to give or deny consent. This process will repeat until a Monitor is appointed. If after three months Commission staff and Publicis, Inc. cannot agree on the appointment of a Monitor, the roles will reverse, with the Commission proposing and Publicis, Inc. consenting, and Publicis, Inc. will not unreasonably withhold consent. Publicis, Inc. and the Monitor may enter into an agreement relating to the Monitor's services. Any such agreement:

1. Shall not limit, and the signatories shall not construe it to limit, the terms of this Section V, and to the extent any provision in the agreement varies from or conflicts with any provision in this Section V, Publicis, Inc. and the Monitor shall comply with this Section V; and
2. Shall include a provision stating that the agreement does not limit, and the signatories shall not construe it to limit, the terms of this Order, and to the extent any provision in the agreement varies from or conflicts with any provision in this Order, Publicis, Inc. and the Monitor shall comply with this Order.

B. The Monitor shall:

1. Have the authority to monitor Publicis, Inc.'s compliance with the obligations set forth in this Final Order by reviewing the compliance reports submitted pursuant to

Section IV and requiring Publicis, Inc. to respond to inquiries regarding the information contained therein;

2. Receive complaints from nonparties regarding Publicis, Inc.'s compliance with this Order;
3. Act in consultation with the Commission or its staff;
4. Serve without bond or other security;
5. Notify staff of the Commission, in writing, no later than 5 days in advance of entering into any arrangement that creates a conflict of interest, or the appearance of a conflict of interest, including a financial, professional or personal conflict; provided, however, that the Parties agree that the fact that the Monitor is employed by Publicis, Inc. does not alone trigger this provision. If the Monitor becomes aware of such a conflict only after it has arisen, the Monitor shall notify staff of the Commission as soon as the Monitor becomes aware of the conflict; and
6. Report in writing to the Commission concerning Publicis, Inc.'s compliance with this Order annually on a date as determined by Commission staff.

C. The Monitor shall serve for a period of 5 years after the date this Order is issued, provided however, that the Chairman of the Commission may at any time terminate the requirement to have a Monitor if he concludes that a Monitor is no longer necessary to accomplish the purposes of the Order.

D. The Monitor shall report to the Chief Executive Officer of Publicis, Inc. If the Monitor raises a concern about Publicis, Inc.'s compliance with this Order to the Chief Executive Officer and the Monitor is not satisfied with the Chief Executive Officer's response, the Monitor shall notify the Board of Directors.

E. Publicis, Inc. shall:

1. Cooperate with and assist the Monitor in performing his or her duties for the purpose of reviewing Publicis, Inc.'s compliance with its obligations under this Order, including as requested by the Monitor, providing the Monitor full and complete access to personnel, information and facilities;
2. Not interfere with the ability of the Monitor to perform his or her duties pursuant to this Order;
3. Pay the Monitor an annual salary for the duration of the Monitor's employment on the same regular cadence as other Publicis, Inc. employees in the United States, or other compensation as mutually agreed between the Monitor and Publicis, Inc.;
4. Indemnify and hold the Monitor harmless against any loss, claim, damage, liability, and expense (including attorneys' fees and out of pocket costs) that arises out of, or is connected with, a claim concerning the performance of the Monitor's duties under this Order, except to the extent the loss, claim, damage, liability, or expense results from gross negligence or willful misconduct by the Monitor; and
5. Not terminate the Monitor's employment or status as Monitor, except (a) with the consent of Commission staff or (b) for serious misconduct, such as the disclosure of confidential information to external parties other than the Commission. Upon such termination, or the departure of the Monitor for another reason, Publicis, Inc. will have 30 days to propose a replacement Monitor, restarting the process detailed in V.A.

F. Publicis, Inc. may require the Monitor to enter into a customary confidentiality agreement, so long as the agreement does not restrict the Monitor's ability to access personnel,

information, and facilities or provide information to the Commission, or otherwise observe and report on Publicis, Inc.'s compliance with this Order.

## VI. CHANGE IN DEFENDANT

**IT IS FURTHER ORDERED** that Publicis, Inc. shall notify the Commission at least 30 days prior to:

A. The proposed dissolution of Publicis, Inc.;

B. The proposed acquisition, merger, or consolidation of Publicis, Inc.; or

C. Any other organizational change in Publicis, Inc., including the transfer, sale, or dissolution of subsidiaries, if such change may materially affect compliance obligations arising out of this Order.

## VII. ACCESS

**IT IS FURTHER ORDERED** that, for the purpose of determining or securing compliance with this Order, and subject to any legally recognized privilege, and upon written request and upon 30 days' notice to Publicis, Inc., Publicis, Inc. shall, without restraint or interference, permit any duly authorized representative of the Commission:

A. Access, during business office hours of Publicis, Inc. and in the presence of counsel, to all facilities and access to inspect, subject to third-party confidentiality obligations, relevant portions of books, ledgers, accounts, correspondence, memoranda, and all other records and documents in the possession or under the control of Publicis, Inc. necessary to confirm statements in the operative Compliance Report, which copying services shall be provided by Publicis, Inc. at its expense; and

B. To interview, either informally or on the record, officers, directors, or employees of Publicis, Inc., in the presence of counsel, regarding matters related to compliance with this Order.

## VIII. COOPERATION AGREEMENT

**IT IS FURTHER ORDERED** that Publicis, Inc. agrees to (a) cooperate with the Commission in any investigation into Publicis, Inc.'s compliance with the Final Order; (b) cooperate with the Commission in any investigation or litigation relating to the subject matter of the Complaint, including by making employees available for interviews or testimony, facilitating interviews with former employees, accepting service of any compulsory process, not unreasonably objecting to or seeking to quash any such compulsory process, and voluntarily providing and authenticating documents and data reasonably sought by the Commission; and (b) cooperate with any request by the Commission in defending this Final Order against a challenge by a third party, including through litigation and any appeals.

## IX. TERM

**IT IS FURTHER ORDERED** that this Final Order shall terminate 10 years from the date it is issued.

## X. ENFORCEMENT OF FINAL ORDER

A. The Commission retains and reserves all rights to enforce the provisions of this Final Order, including the right to seek an order of contempt from the Court. Publicis, Inc. agrees that in any civil contempt action, any motion to show cause, or any similar action brought by the Commission regarding an alleged violation of this Final Order, the Commission may establish a violation of this Final Order and the appropriateness of any remedy therefor by a preponderance

of the evidence, and Publicis, Inc. waives any argument that a different standard of proof should apply.

B. The Final Order should be interpreted to give full effect to the procompetitive purposes of the antitrust laws, including Section 1 of the Sherman Act and Section 5 of the Federal Trade Commission Act. Publicis, Inc. agrees that it may be held in contempt of, and that the Court may enforce, any provision of this Final Order that, as interpreted by the Court in light of these procompetitive principles and applying ordinary tools of interpretation, is stated specifically and in reasonable detail, whether or not it is clear and unambiguous on its face. In any such interpretation, the terms of this Final Order should not be construed against either party as the drafter.

C. In any enforcement proceeding in which the Court finds that Publicis, Inc. has violated this Final Order, the Commission may apply to the Court for an extension of this Final Order, together with such other relief as may be appropriate.

## XI. RETENTION OF JURISDICTION

**IT IS FURTHER ORDERED** that this Court retains jurisdiction of this matter for purposes of construction, modification, and enforcement of this Final Order.

**IT IS SO ORDERED** on this **15th day of April 2026.**

Mark T. Pittman
UNITED STATES DISTRICT JUDGE

***SO STIPULATED AND AGREED:***

**FOR PLAINTIFF FEDERAL TRADE COMMISSION**

*/s/ Justin Epner*
JUSTIN EPNER
Bar Number: DC Bar # 1028431
Ph: (202) 326-2942; jepner@ftc.gov
NICHOLAS BUSH
Bar Number: DC Bar # 1011001
Ph: (202) 326-2848; nbush@ftc.gov
CASSANDRA EHLY
Bar Number: DC Bar # 90034416
Ph: (202) 326-2975; cehly@ftc.gov
LINCOLN MAYER
Bar Number: DC Bar # 992050
Ph: (202) 326-3324; lmayer@ftc.gov
THEODORE ZANG
Bar Number: NY Bar # 2186518
Ph: (212) 607-2816; tzang@ftc.gov

Attorneys
Federal Trade Commission
600 Pennsylvania Avenue, N.W.
Washington, DC 20580

PATRICIA GALVAN
Assistant Director

HELDER AGOSTINHO
Deputy Assistant Director

Technology Enforcement Division, Bureau of Competition

Of Counsel:

DANIEL GUARNERA
Director

KELSE MOEN
Deputy Director

Federal Trade Commission
Bureau of Competition

*/s/ Anne LeJeune*
ANNE LEJEUNE
Texas Bar No. 24054286
(Local Counsel)
Ph: (214) 979-9371; alejeune@ftc.gov
Federal Trade Commission
1999 Bryan Street, Suite 2150
Dallas, Texas 75201

*Attorneys for Plaintiff Federal Trade Commission*

Date: April 15, 2026

**FOR PLAINTIFF STATE OF FLORIDA**

JAMES UTHMEIER
Attorney General, State of Florida

JASON HILBORN
Deputy Attorney General for Civil Enforcement

/s/ *Lizabeth Brady* Date: April 15, 2026
Lizabeth Brady
Director, Antitrust Division
Florida Bar No. 457991
Colin Fraser
Senior Assistant Attorney General
Florida Bar No. 104741

Office of the Attorney General
The Capitol, PL-01
Tallahassee, Florida 32399-1050
Telephone: (850) 414-3300
Email: Liz.Brady@myfloridalegal.com
Email: Colin.Fraser@myfloridalegal.com

*Counsel for Plaintiff State of Florida*

**FOR PLAINTIFF STATE OF INDIANA**

THEODORE E. ROKITA
ATTORNEY GENERAL OF INDIANA
Attorney No. 18857-49

/s/ *Scott L. Barnhart* Date: April 15, 2026
Scott L. Barnhart, Atty. No. 25474-82
Chief Counsel and Director of Consumer Protection

OFFICE OF INDIANA ATTORNEY
GENERAL TODD ROKITA
Indiana Government Center South, 5th Floor,
302 W. Washington Street
Indianapolis, IN 46204
Tel.: (317) 232-6309
Email: Scott.Barnhart@atg.in.gov

/s/ *Jesse Moore*
Jesse Moore, Atty. No. 37654-49
Deputy Attorney General

OFFICE OF INDIANA ATTORNEY
GENERAL TODD ROKITA
Indiana Government Center South, 5th Floor,
302 W. Washington Street
Indianapolis, IN 46204
Phone: (317) 232-4956
Fax: (317) 232-7979
Email: Jesse.Moore@atg.in.gov

*Counsel for Plaintiff State of Indiana*

**FOR PLAINTIFF STATE OF IOWA**

BRENNA BIRD
Attorney General, State of Iowa

/s/ *Daniel L. Barnes* Date: April 15, 2026
Daniel L. Barnes (AT0015826)
Deputy Attorney General for Consumer Protection

Office of Iowa Attorney General Brenna Bird
1305 E. Walnut St. Des Moines, Iowa 50319
Tel.: (515) 281-8772
Email: daniel.barnes@ag.iowa.gov

*Counsel for Plaintiff State of Iowa*

**FOR PLAINTIFF STATE OF MONTANA**

AUSTIN KNUDSEN
Attorney General of Montana

*/s/ Brent Mead*
Brent Mead (MT #68035000)
*Deputy Solicitor General*

Date: April 15, 2026

Montana Department of Justice
215 North Sanders
P.O. Box 200151
Helena, MT 59620-0151
(406) 444-2026
brent.mead2@mt.gov

*Counsel for Plaintiff State of Montana*

**FOR PLAINTIFF STATE OF NEBRASKA**

MICHAEL T. HILGERS
Attorney General of Nebraska

/s/ *Cody S. Barnett*
Cody S. Barnett
Solicitor General

Date: April 15, 2026

Nebraska Department of Justice
1445 K Street, Room 2115
Lincoln, Nebraska 68508
Tel.: (402) 471-2683
Email: cody.barnett@nebraska.gov

*Counsel for Plaintiff State of Nebraska*

**FOR PLAINTIFF STATE OF TEXAS**

KEN PAXTON
Attorney General

BRENT WEBSTER
First Assistant Attorney General

RALPH MOLINA
Deputy First Assistant Attorney General

AUSTIN KINGHORN
Deputy Attorney General for Civil Litigation

Office of the Texas Attorney General
P.O. Box 12548
Austin, Texas 78711-2548
Telephone: (512) 936-1162
Fax: (512) 473-8301
thomas.york@oag.texas.gov
amber.fly@oag.texas.gov
kay.dannenmaier@oag.texas.gov

THOMAS D. YORK
Chief, Antitrust Division
Texas State Bar No. 24095531

/s/ *Katherine S. Dannenmaier*
KATHERINE S. DANNENMAIER
Assistant Attorney General, Antitrust Division
Texas State Bar No. 24125093

AMBER L. FLY
Assistant Attorney General
Antitrust Division
Texas State Bar No. 24101761

*Counsel for Plaintiff State of Texas*

Date: April 15, 2026

**FOR PLAINTIFF STATE OF UTAH**

DEREK BROWN
Attorney General of Utah

*/s/ Marie W.L. Martin*
Douglas Crapo (14620)
Deputy Attorney General
Marie W.L. Martin (18712)
Division Director
160 E. 300 S., 5th Floor
PO Box 140830
Salt Lake City, UT 84114
(801) 366-0310
dcrapo@agutah.gov
mwmartin@agutah.gov

Date: April 15, 2026

*Counsel for Plaintiff State of Utah*

**FOR PLAINTIFF STATE OF WEST VIRGINIA**

JOHN B. MCCUSKEY
Attorney General of West Virginia

*/s/ Douglas L. Davis* Date: April 15, 2026

Douglas L. Davis
Senior Assistant Attorney General
West Virginia Attorney General's Office
P.O. Box 1789
Charleston, WV 25326
Phone: (304) 558-8986
Fax: (304) 558-0184
douglas.l.davis@wvago.gov

*Counsel for Plaintiff State of West Virginia*

**FOR PUBLICIS, INC.**

*<u>/s/ David B. Anders</u>* Date: April 15, 2026

David B. Anders
Wachtell Lipton Rosen & Katz
51 West 52nd Street
New York, NY 10019
Telephone: (212) 403-1307
Email: DBAnders@wlrk.com

*Attorney for Publicis, Inc.*

*<u>/s/ Robert Vyverberg</u>* Date: April 15, 2026

Robert Vyverberg
Vice President & Assistant Secretary, Publicis, Inc.

*Officer of Publicis, Inc.*

# Exhibit 5

United States of America
FEDERAL TRADE COMMISSION
WASHINGTON, DC 20580

Bureau of Competition
Technology Enforcement Division

April 16, 2026

**VIA EMAIL**

NewsGuard Technologies, Inc.
c/o Sophia A. Hansell, Esq.
Gibson, Dunn & Crutcher LLP
1700 M Street, NW
Washington, DC 20036
SHansell@gibsondunn.com

**Re: FTC File No. 251-0061**

Dear Ms. Hansell:

On May 20, 2025, the Federal Trade Commission issued a Civil Investigative Demand ("the CID") to NewsGuard Technologies, Inc. ("NewsGuard"). On April 15, 2026 the Commission entered, and a federal district court approved, a settlement in *Federal Trade Commission, et al., v. Dentsu US, Inc., et al.*, No. 26-cv-469 (N.D. Tex. 2026), that resolved the issues related to NewsGuard that gave rise to the CID. Accordingly, the Commission no longer requires compliance with the CID. Pursuant to FTC Rule 2.7(*l*), this letter withdraws the CID.

*/s/ Patricia Galvan*
Patricia Galvan
Assistant Director
Technology Enforcement Division
Bureau of Competition

cc:
Justin Epner
Attorney, Bureau of Competition

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NEWSGUARD TECHNOLOGIES, INC.,<br><br>*Plaintiff*,<br>v.<br><br>FEDERAL TRADE COMMISSION and ANDREW FERGUSON, in his official capacity as Chairman of the Federal Trade Commission,<br><br>*Defendants*. | Case No.: 1:26-cv-00353-DLF<br><br>Hon. Dabney L. Friedrich |

**PLAINTIFF'S RESPONSE TO DEFENDANTS' NOTICE OF WITHDRAWAL OF CIVIL INVESTIGATIVE DEMAND AND NOTICE OF RELATED LITIGATION**

Plaintiff NewsGuard Technologies, Inc. ("NewsGuard") respectfully submits this Notice to address recent actions taken by the FTC and in response to Defendants' Notice of Withdrawal of Civil Investigative Demand and Notice of Related Litigation ("Defendants' Notice"), ECF 33.

**A. The FTC's Notice of Withdrawal of the CID to NewsGuard.**

On April 16, 2026, the FTC notified NewsGuard that it was withdrawing the CID it had issued on May 20, 2025, which had been the subject of eleven months of dealings and litigation, including this action. *See* Apr. 16, 2026, letter from Patricia Galvin (FTC) to NewsGuard, ECF 33-5. The only explanation given by the FTC was that the Commission had "entered, and a federal district court [had] approved, a settlement in *Federal Trade Commission, et al. v. Dentsu US, Inc., et al.*, No. 26-cv-469 (N.D. Tex)." *Id.* That settlement, the FTC asserted, "resolved the issues related to NewsGuard that gave rise to the CID." *Id.*

**B. The FTC Obtained the *Dentsu* Consent Orders Without Notice or Opportunity to be Heard.**

On April 15, 2026, the FTC filed in the Northern District of Texas a Complaint and Proposed Final Orders and Stipulated Permanent Injunctions as to Dentsu US, Inc. ("Dentsu"), GroupM Worldwide LLC ("WPP"), and Publicis, Inc. ("Publicis"), three of the largest global ad agency holding companies. *See FTC v. Dentsu US, Inc.*, No. 26-cv-469 (N.D. Tex. 2026), Dkt. Nos. 3-1, 4-1, 5-1. As explained further below, the gist of the FTC's "settlement" was that the companies committed to not using third-party services that evaluate or rate "Media Publishers" (*e.g.*, websites or platforms) based on "veracity of news reporting" or "adherence to journalistic standards." *See, e.g.*, *FTC v. Dentsu*, Dkt. No. 3-1 at § II.C. This is the same restriction, stated in nearly verbatim terms, as the Omnicom Consent Order that NewsGuard has challenged in this case.

The FTC submitted its Complaint and stipulated Proposed Final Orders to the District Court in Texas the morning of April 15, 2026. The FTC gave no notice to NewsGuard of the filing (or of the FTC's purported view that entry of the requested consent orders would "resolve[] the issues related to NewsGuard)." *See* ECF 33-5. NewsGuard had no opportunity to be heard, to respond, or to intervene. The District Court accepted the FTC's assertions and proposed restrictions less than four hours after the FTC's filing. *See* ECF 33-2, 33-3, 33-4.

**C. Through the *Dentsu* Consent Orders and the Prior Omnicom Order, the FTC Seeks to Bar Global Ad Agencies From Using NewsGuard's Services.**

Dentsu, WPP, and Publicis are three of the largest global ad agency holding companies, half of what was formerly called the "Big Six." Two of the other Big Six were Omnicom Media and the Interpublic Group of Companies (IPG) until those two companies merged in November

2025 with the FTC's blessing, contingent on their acceptance of the FTC's consent order prohibiting the merged entity from using NewsGuard's services.

The *Dentsu* Consent Orders impose conditions that are, as the FTC concedes, "materially identical to those in the Omnicom consent order." ECF 33 at 1. Under both, Omnicom—and now Dentsu, WPP, and Publicis—are prohibited from using third-party services that evaluate "viewpoints as to the veracity of news reporting" or "adherence to journalistic standards or ethics." *Compare* ECF 33-2, 33-3, 33-4 at §§ II.C, III.B, *with* ECF 11-25 at §§ I.D, II.A. NewsGuard is the FTC's primary target for these prohibitions. *See* Compl., ECF 1 ¶¶ 111–135; *see also* Mot. for Prelim. Inj., ECF 11-1 at 34–35.

By extending the blacklist of NewsGuard's services to three additional major industry participants, the FTC has substantially broadened the scope of its retaliation campaign. Together with the Omnicom Consent Order (ECF 11-25), the FTC-imposed prohibition on making use of third-party news rating services (such as NewsGuard) now apply to five of the six largest global advertising agencies.[1] *See* ECF 33-1 at ¶ 32.

The FTC contends that its "latest action … demonstrates that the Omnicom consent order was part of a comprehensive investigation against unlawful collusion in the digital advertising market," contrary to NewsGuard's claims in this case about retaliation and viewpoint discrimination. ECF 33 at 3–4. Quite the opposite, the actions to obtain and impose the *Dentsu* Consent Orders—more than doubling the scope of the prohibition on use of news rating services—show the FTC's censorial retaliation is more serious and significant now than ever before.

---

[1] Of those firms, Havas appears to be the only one not subject to a consent decree with the FTC.

### D. The FTC Obtained the *Dentsu* Consent Orders Based on Unsupported and Misleading Allegations.

Under the terms of the Consent Orders, Dentsu, WPP, and Publicis admitted no wrongdoing and were absolved of liability by the settlement agreements they entered with the FTC. *See* ECF 33-2 at 3, ¶ 4. The FTC's *Dentsu* Complaint does not show or even allege that any of these companies ever conspired or entered into any agreement with one another or with any other ad agencies. Yet the FTC's theory to support the *Dentsu* Consent Orders is that "Dentsu, WPP, and Publicis colluded through trade associations to set brand-safety standards," and "these trade associations relied on information from entities such as NewsGuard to develop these shared brand-safety standards." ECF 33 at 2. The FTC's theory and its allegations are baseless.

Wading through the FTC's many characterizations and allusions, the one substantive claim stated in the *Dentsu* Complaint is that an effort of the Global Alliance for Responsible Media ("GARM") several years ago to develop a "Brand Safety Floor" constituted a collusive boycott among advertisers. *See FTC v. Dentsu* Compl., ECF 33-1 ¶¶ 98-105. GARM was an effort of advertising and ad agency trade associations to develop a framework of terminology to assess brand safety risks for digital advertising. The initiative began in 2019 after live-streamed videos of the Christchurch, New Zealand, mosque shootings appeared adjacent to advertising online.[2] This work resulted in promulgation of a suggested "Brand Safety Floor + Suitability Framework"[3] that defined and categorized various brand safety risks of websites and content (*e.g.*, regarding pornography, violent content, false or misleading content, misinformation) so that advertisers and

---

[2] *See Statement on the Global Alliance for Responsible Media (GARM)*, (Aug. 9, 2024), https://wfanet.org/leadership/garm.

[3] *See GARM: Brand Safety Floor + Suitability Framework*, https://4962377.fs1.hubspotusercontent-na1.net/hubfs/4962377/resource-library/GARM%20Brand%20Safety%20Floor%20Suitability%20Framework%2023%20Sept%20(3).pdf.

ad agencies could speak a common language in addressing risks about online ad placements. The GARM guidelines were advisory, and their use was entirely voluntary. Advertisers and ad agencies could choose to use the GARM guidelines—or not use them—as they saw fit. Advertisers and ad agencies applied their own brand safety standards, competing with one another on the basis of their brand-safety protections for clients, and nothing in the *Dentsu* Complaint shows any contrary agreement or collusion.[4]

But the FTC goes further in an effort to connect NewsGuard to the GARM guidelines, and in this regard the Commission knowingly misstates the facts in an effort to mislead this Court. In its Notice to the Court, the FTC contends the trade associations (through which Dentsu, WPP, and Publicis supposedly colluded) "relied on information from entities such as NewsGuard to develop … shared brand-safety standards." ECF 33 at 2.

This assertion is untrue and the FTC knows it is untrue, which underscores that there can be no presumption of regularity in this proceeding. In one of its first responses during the CID process (in June 2025), NewsGuard explained to the FTC that it never had a commercial relationship with GARM, had never been a member of GARM, and did not provide data to GARM. *See* attached Ex. 1 at 6, 9 (June 27, 2025, letter from NewsGuard's counsel to FTC). NewsGuard's

[4] It also bears noting that GARM was dissolved two years ago, after the organization's work to promote understanding of brand safety risks was attacked in a staff report of the Republican majority of the House Judiciary Committee. *See* H. Judiciary Comm., 118th Cong., *GARM'S HARM: HOW THE WORLD'S BIGGEST BRANDS SEEK TO CONTROL ONLINE SPEECH* (Interim Staff Rep. 2024), http://efaidnbmnnnibpcajpcglclefindmkaj/https://judiciary.house.gov/sites/evosubsites/republicans-judiciary.house.gov/files/evo-media-document/2024-07-10%20GARMs%20Harm%20-%20How%20the%20Worlds%20Biggest%20Brands%20Seek%20to%20Control%20Online%20Speech.pdf. Elon Musk and X then brought suit on the same theory of supposed advertiser boycotts the FTC has asserted now. GARM folded because, as it publicly stated, the organization did not have the resources to defend an assault from X. *See supra* note 2; *see also* Jonathan Vanian, *Advertising Group Suspends Brand Safety Unit After Elon Musk's Antitrust Lawsuit*, CNBC (Aug. 8, 2024), https://www.cnbc.com/2024/08/08/ad-group-suspends-garm-after-of-x-elon-musks-antitrust-lawsuit-.html.

disclosures thus make clear that GARM could not have "relied on information from entities such as NewsGuard to develop … shared brand-safety standards" because GARM did not receive *any* information from NewsGuard. Moreover, GARM's guidelines were significantly different from any data or misinformation criteria that NewsGuard has ever produced.

**E. The FTC's Latest Maneuver of Obtaining the *Dentsu* Consent Orders Underscores the Need for Injunctive Relief.**

The FTC asserts that "[f]ollowing the Commission's successful [*i.e.*, uncontested] lawsuit against Dentsu, WPP, and Publicis," it "no longer requires compliance with the CID" issued to NewsGuard. ECF 33 at 3. Indeed, the FTC goes further, representing that "[t]he relief obtained in *Dentsu* … marks the culmination of the Commission's investigation in this area" and so the FTC has withdrawn not only the NewsGuard CID but also the other 16 or so issued to other entities involved in digital advertising. *Id.* The FTC asserts: "The withdrawal of the CID at issue here moots NewsGuard's request for preliminary injunctive relief." *Id.* Quite the contrary, the FTC's withdrawal of the NewsGuard CID as part of the *Dentsu* Consent Orders gambit underscores the need for relief from this Court.

The FTC's imposition of the consent order condition as to Omnicom and IPG late last year, combined with its extraction of the same condition now from Dentsu, WPP, and Publicis is clearly designed to preclude NewsGuard from providing services to the vast majority of the world's largest ad agencies. While decrying supposed "potential advertiser boycotts" of media publishers, the FTC is itself imposing a government-mandated boycott of a journalistic organization because it does not like the ratings, opinions, and associated journalistic reports the organization provides.

The FTC's abandonment of the CIDs reveals the Commission's "investigation" was not about any legitimate concerns regarding advertiser boycotts or collusion of any sort but was instead aimed at targeting journalistic entities that provide reporting, opinions, ratings, and analyses of

news sources—NewsGuard chief among them. As discussed at length in prior briefing, this came about because conservative news outlets such as Newsmax chafed that they scored poorly on measures of accuracy and journalistic integrity and lobbied the FTC in the context of the Omnicom merger to prohibit use of NewsGuard services—and the FTC complied. *See* Mot. for Prelim. Inj., ECF 11-1 at 23–25, 35. This is impermissible viewpoint discrimination of protected speech. *See id.* at 34–37. That the FTC achieved its aim by pressuring Omnicom and IPG before—and Dentsu, WPP, and Publicis now—is jawboning and a prior restraint imposed through intermediaries contrary to black letter First Amendment law. *See Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 190 (2024); *see also* Mot. for Prelim. Inj., ECF 11-1 at 34–37. Thus, the FTC's withdrawal of the CIDs to NewsGuard and others in light of the *Dentsu* Consent Orders compounds NewsGuard's harm and its bases for relief in this Court, rather than mooting claims.[5]

* * * * *

The FTC asserts the *Dentsu* Consent Orders are the "culminat[ion of] a landmark settlement" relating to "the Commission's investigation into potential advertising boycotts." ECF 33 at 1–2. While it may be fair to say the FTC's latest actions are a "landmark," it is an ignominious one. This Court should fully understand the FTC's latest maneuvering and that the need for injunctive relief in this action is even greater than before.

---

[5] In any event, the FTC's contention that its withdrawal of the CID moots NewsGuard's challenge is wrong because the Commission has certainly not made it "absolutely clear" its conduct "could not reasonably be expected to recur." *Fellowship of Christian Athletes v. District of Columbia*, No. 24-1332, 2026 WL 275995, at *7 (D.D.C. Feb. 3, 2026) (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 190 (2000)). Nothing prevents the FTC from reissuing similar demands, whether in connection with future investigations or through the monitoring and compliance processes established in the Dentsu Settlement. *See, e.g.*, ECF 33-2, 33-3, 33-4 §§ IV, V, VII.

Dated: April 21, 2026

Respectfully Submitted,

/s/ Samuel Rudovsky
Samuel Rudovsky*
(PA Bar No. 335724)
Not Admitted to the D.C. Bar. D.C. Practice limited to U.S. federal courts and related matters under D.C. Ct. App. R. 49(c)(3).
Robert Corn-Revere
(D.C. Bar No. 375415)
James C. Grant*
(WA Bar No. 14358)
Sara E. Berinhout**
(MA Bar No. 703217)
FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION
700 Pennsylvania Ave. SE, Ste. 340
Washington, DC 20003
(215) 717-3473
bob.corn-revere@fire.org
jim.grant@fire.org
sara.berinhout@fire.org
sam.rudovsky@fire.org

*Admitted pro hac vice
**Pro hac vice forthcoming

*Counsel for Plaintiff*

GIBSON DUNN

Gibson, Dunn & Crutcher LLP

1700 M Street, N.W.
Washington, D.C. 20036
Tel 202.955.8500
gibsondunn.com

CONFIDENTIAL – FOIA EXEMPT

June 27, 2025

Justin Epner
Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
Telephone: (202) 326-2942
jepner@ftc.gov

Re: **FTC File No. 251-0061**

Dear Justin:

This letter follows up on our June 18 meet and confer and provides (i) additional information about how NewsGuard could not possibly have market power in any properly defined antitrust market, (ii) additional information about the entities listed in Specification 9 of the CID, (iii) answers to questions you posed during our June 18 call, and (iv) an explanation of why NewsGuard could not possibly be coordinating or facilitating unlawful boycotts, which we understand to be the key inquiry driving the FTC's investigation. As explained herein, NewsGuard is a very small player in the digital advertising and "brand safety" industries. The extensive information requested by the CID is extremely burdensome for NewsGuard and is chilling its constitutionally protected speech. While NewsGuard appreciates the constructive engagement Staff has provided so far, we are hopeful that based on the information NewsGuard is providing, you will feel comfortable relieving NewsGuard of further responses to the CID and closing your investigation as to NewsGuard.

## I. Background: NewsGuard's Products and Services for Advertising Industry

As we have discussed, NewsGuard was started in 2018 to provide an alternative to the secret ratings of news websites by certain digital platforms and by left-wing partisan advocacy groups. NewsGuard deploys a team of journalists to write reviews of thousands of news and information websites based on a set of nine basic, ***apolitical*** criteria reflecting widely accepted journalistic standards. The criteria are weighted based on importance, and NewsGuard's determination of the site's performance on the criteria results in a 0-100 score for reliability. Our journalists constantly monitor these websites to revise ratings when appropriate. With that in mind, when publishers improve their accuracy or transparency practices, NewsGuard updates its ratings accordingly. To take one example, a website called Western Journal started out with an extremely low score in 2020, primarily because its editor and publisher, a highly opinionated conservative, did not have journalism experience and was not familiar with standard journalist practices, such as having a transparent corrections policy or separately

labeling news and opinion articles. At his initiative, NewsGuard engaged with him on these issues, and within a year Western Journal had a highly reliable rating and continues to have that rating today. The site's improved score was the result not of a change in its political views – it remains a staunchly conservative outlet. Instead, it improved basic journalistic practices such as adding a policy for correcting errors, disclosing its ownership and financing, revealing who is in charge of content including any potential conflicts of interest, and the like.

Given NewsGuard's demonstrated apolitical approach to rating news sources, NewsGuard was extremely troubled by Chair Ferguson's recent reliance on a source claiming NewsGuard seeks to "effect political or ideological goals."[1] That assertion is absolutely false and we are at a loss for what factual basis could possibly support it. To the extent you or the Commission have formed a view about this issue that appears to be highly relevant to the investigation we understand the agency to be conducting, we encourage you to engage with us.

NewsGuard's criteria and scoring system are public, on NewsGuard's website, with detailed definitions laying out why a website would pass or fail each of the criteria.[2] Each website's published rating includes a detailed report explaining how NewsGuard determined the site's performance on each of the criteria. This scoring system has no political or ideological goals whatsoever. Before a rating is issued that assesses underperformance on any of the criteria, the websites being rated are contacted for comment by NewsGuard analysts. Publisher comments are included in the written rating report (called a "Nutrition Label") so that subscribers to NewsGuard's ratings can understand the publisher's point of view and make their own assessment. The entire process is transparent and apolitical.

If NewsGuard determines that a website fails any of the nine criteria, NewsGuard explains in detail the evidence it relied on to make that determination. For example, if NewsGuard determines that a website does not have effective practices for correcting and clarifying factual errors, the Nutrition Label rating report will explain whether NewsGuard's analysts found any factual corrections, over what period of time, and whether those corrections clearly disclosed the factual error that had been rectified. If NewsGuard determines that a website repeatedly publishes false or egregiously misleading claims, the Nutrition Label rating report lists numerous examples of such claims. Again, in any instance where a website is thought not to meet one of the criteria, the website's proprietors are always contacted for comment prior to publication. Subscribers to NewsGuard ratings may review NewsGuard's

[1] Statement of Chairman Andrew N. Ferguson, In the Matter of Omnicom Group / The Interpublic Group of Cos., Matter Number 2510049 (June 23, 2025), at 5 (referencing a House Committee's report that "describe[ed] NewsGuard and other organizations' steering of advertising revenue with 'an unavoidable partisan lens'"), *available at* https://www.ftc.gov/system/files/ftc_gov/pdf/omnicom-ipg-ferguson-statement_0.pdf.

[2] https://www.newsguardtech.com/ratings/rating-process-criteria/.

reasoning to make their own determinations. Partisan politics plays no role in NewsGuard's ratings.

NewsGuard licenses subscriptions to these ratings to consumers and to various kinds of companies and stakeholders, including in the advertising industry. Importantly, NewsGuard does not dictate in any case whether a website it rates is monetized by any ad platform, or whether any individual advertiser advertises or does not advertise on any particular website for any particular ad campaign. In most cases, NewsGuard does not even receive feedback about how an advertiser has used its data. Instead, NewsGuard provides ratings data, and each advertiser (or its chosen proxy) makes its own decisions about whether and how to use NewsGuard's ratings to inform pursuit of its advertising goals—including by not using NewsGuard's ratings at all, which is by far the most common practice, as explained below.

## II. NewsGuard Is a Minor Player in the Advertising "Brand Safety" Industry

NewsGuard does not command anything approaching market power in any portion of the advertising industry or the "brand safety" industry, which is dominated by companies with billion-dollar-plus valuations such as Google, DoubleVerify, Integral Ad Science (IAS), and Oracle Moat. NewsGuard is a small player, competing against gargantuan, far more established competitors, and usage of NewsGuard data in the industry is far from widespread.

While NewsGuard lacks clear information about market shares in the digital advertising ecosystem, below is a summary of the various categories of programmatic advertising industry companies that use NewsGuard's data and an estimate of the scope and scale of NewsGuard's usage by that category of company:

> **Individual Advertiser Licenses:** Individual advertisers (aka brands) may license NewsGuard's ratings as data to help determine which website to target or avoid in a programmatic ad campaign. Theoretically, this could include, for example, an advertiser electing to target an ad campaign to local news outlets that NewsGuard has determined to be reliable (and, thus, unlikely to violate the brand's safety standards for preserving its brand reputation).
>
> However, direct licensing of NewsGuard's data by advertisers is extremely rare. NewsGuard has had ***less than 10 individual brand licensees*** in its eight-year history out of tens or even hundreds of thousands of brands placing advertisements at any given time. As an indication of how many advertisers there are, just one of the top ad agency holding companies (Dentsu) boasts that it represents more than 11,000 brands.[3]

[3] https://www.dentsu.com/au/en/who-we-are.

**<u>Individual Advertiser Use of "Pre-Bid Segments" in Ad-Buying Platforms:</u>** NewsGuard also uses its ratings to generate "segments" that are licensed to certain ad-buying platforms, also known as Demand-Side Platforms (DSPs). To the extent a DSP has a relationship with NewsGuard, it can offer NewsGuard's ratings data and segments as "filters" or selections to advertisers using the platform, and each advertiser on the platform may elect—or not—to deploy NewsGuard's data as part of the suite of criteria it uses for targeting its online ads. Such activation is in all cases an "opt-in" decision by each advertiser, which requires the advertiser to proactively choose to use NewsGuard's data or segments. The advertiser chooses which, if any, of NewsGuard's segments to apply to its campaign and will typically combine NewsGuard's data with other targeting criteria or third-party data segments the advertiser chooses based on each advertiser's own unique needs and predilections. When an advertiser (or the agency acting on its behalf) does opt to use NewsGuard's data, there are countless permutations of how they can elect to apply it to their ad campaign. Those are bespoke choices made by the advertiser or its proxy; NewsGuard does not dictate or even typically receive information about how its data is deployed. Advertisers may choose to target or block domains (e.g., news websites) based on certain apolitical filters made available by the DSP, such as including local news websites with NewsGuard scores of 80+, or excluding websites generated by AI without human supervision, or websites NewsGuard has determined, for example, that have a record of publishing false claims about the Russia-Ukraine war. Advertisers may choose which segments, if any, to use as a part of their ad campaign and whether to target or to block ad placements on the websites in each segment. Again, none of NewsGuard's segments is political or ideological in nature. Quite the contrary, each segment is based on the application of the company's transparent and apolitical rating criteria, thereby resulting in a mix of left leaning and right leaning sites.

Usage of NewsGuard's data by advertisers through DSPs (or contextual targeting platforms that integrate with DSPs) represents a miniscule share of the programmatic advertising industry. In April 2025, the last month for which NewsGuard has data, NewsGuard recorded approximately 240 million ad impressions that used NewsGuard data or segments through such integrations. In comparison, there an estimated ***five to seven trillion*** total ad impressions per month industry wide. In other words, ***NewsGuard's data was used via ad buying platforms less than 0.003% of the time***.

Indeed, just one of Google's advertising platforms, Google DoubleClick, serves about 3.3 trillion ad impressions each month (40 trillion per year).[4] Google does not offer NewsGuard data in any of its ad-buying products. In fact, the Department of Justice and numerous States have recently established that Google monopolizes several advertising-related markets, such that NewsGuard's lack of relationship with Google, alone, is sufficient to show that NewsGuard is shut out of the majority of customer demand. Similarly, Facebook, another of the largest DSPs, does not use NewsGuard's data.

**Supply-Side Platforms:** Some advertising platforms that source ad inventory from publishers, or "Supply-Side Platforms" (SSPs), license NewsGuard's data to use in choosing which websites to include in their inventory among the millions of websites available on the internet.

Each platform that licenses NewsGuard's data for this purpose makes its own decision about how to utilize the data. Some may focus on whether a publisher passes or fails specific criteria out of the nine NewsGuard measures. Others may focus on whether a publisher falls below a certain NewsGuard score. Others simply read NewsGuard's Nutrition Label reports for added context on a site's reliability. NewsGuard is not privy to the specifics of how its data is used to inform decision making and/or whether and how its data is ultimately deployed. However, in no case, to NewsGuard's knowledge, is NewsGuard's rating of a website the only factor considered in determining whether a SSP will host a website on its platform—though ultimately the choice of what to do with NewsGuard's data is up to each advertiser.

Most supply-side platforms do *not* use NewsGuard's data. Indeed, of the three largest web SSPs by United States market share as of the end of 2024—Google Ad Exchange, Index Exchange, and Magnite—none subscribes to NewsGuard's ratings.[5] Top SSPs in other categories such as mobile apps (Verve) and connected TV (Freewheel and Adtelligent) also do not subscribe to NewsGuard's data.

**Ad Agencies:** No advertising agency uses NewsGuard ratings for programmatic advertising placement at the agency-wide level. The only authorized use of NewsGuard's data for programmatic ad placement by agencies is on behalf of specific brands who proactively opt to subscribe to access NewsGuard's data or to activate it through ad-buying platforms (which, as described above, constitutes a small number of brands).

[4] https://froggyads.com/blog/top-10-real-time-bidding-companies/.
[5] https://www.pixalate.com/blog/q4-2024-ssp-market-share-report-north-america.

*Put simply, if there was a conspiracy of the kind the FTC apparently is investigating, such as a conspiracy to boycott publishers based on their conservative views, NewsGuard would be the most unlikely of facilitators because (a) it does not rate publishers based on politics, and (b) it does not have the market share to facilitate any kind of boycott.*

### III. NewsGuard's Relationships With Entities Listed in CID Specification 9

As described in more detail below, NewsGuard has (or has had) limited or no relationships with the entities listed in Specification 9. As we've discussed, NewsGuard is in the process of collecting communications NewsGuard personnel have had with these entities during the Relevant Period, and NewsGuard will prepare those documents for production in the near term.

a. **World Federation of Advertisers (WFA)**: NewsGuard has never had any commercial relationship or any partnership with, and has never been a member or partner of, WFA.

b. **Global Alliance for Responsible Media (GARM)**: NewsGuard has never had a commercial relationship or a partnership with, and has never been a member of, GARM. The following section of this letter addresses the questions you posed during our last call about GARM.

c. **Global Disinformation Index (GDI)**: NewsGuard competes with GDI, which provides some services aimed at addressing "brand safety" online. NewsGuard has never had any commercial relationship or partnership with GDI.

   NewsGuard's ratings differ from those produced by GDI, which NewsGuard's team has publicly described as partisan, biased, and untransparent. NewsGuard Co-CEO Gordon Crovitz described GDI's ratings in the Washington Examiner as "secret, biased, [and] unaccountable." GDI published a public report naming the 10 "Riskiest" publishers in the United States, nine of which were conservative or libertarian. Of the 10 publishers GDI rated as "riskiest," NewsGuard rates five as overall reliable, with one of the 10 receiving a perfect 100/100 score from NewsGuard.

d. **Interactive Advertising Bureau (IAB)**: NewsGuard briefly held a membership in the IAB in 2023. NewsGuard declined to renew the membership after finding it had no value to its business development efforts and was not worth the dues.

e. **Ad Fontes Media**: NewsGuard competes with Ad Fontes, which provides some services aimed at addressing "brand safety" online. NewsGuard has never had any commercial relationship or partnership with this entity.

f. **The Check My Ads Institute**: CheckMyAds is an advocacy group that publishes reports about the advertising industry and conducts campaigns to pressure ad industry entities to change their advertising practices, including avoiding ad placements on publishers CheckMyAds deems to be disinformation sources—which CheckMyAds invariably defines as conservative publishers. NewsGuard has never had any partnership or relationship with CheckMyAds or collaborated on any reports with CheckMyAds.

CheckMyAds and NewsGuard have historically differed dramatically about what constitutes an unreliable source. Indeed, CheckMyAds has been highly and publicly critical of NewsGuard. In August 2022, CheckMyAds wrote an article titled, "How NewsGuard boosts the American disinformation economy," which criticized NewsGuard for rating various conservative media outlets as reliable, including: The Daily Wire, The Daily Signal, The Daily Caller, Timcast, and Fox News. On social media, its founder wrote that NewsGuard, "claims to 'combat disinformation' - without examining transphobia, homophobia, misogyny, racism, etc. Put these fools back on a rocket ship to the '80s. We don't need that here."

The founder also implied (falsely and without evidence) on multiple occasions that NewsGuard Co-CEO Gordon Crovitz might take bribes from publishers in exchange for giving conservative publishers high ratings. For instance, in a social post, the founder wrote: "it's very @NewsGuardRating likely has a backdoor deal w/ Fox News to keep them 'green'" and followed up by publicly asking Crovitz whether he "ever accepted financial compensation from any publisher you have reviewed - including consulting agreements?" To be clear, neither NewsGuard nor its leadership has or would ever accept financial compensation from publishers relating to their ratings.

g. **Integral Ad Services (IAS)**: NewsGuard and IAS began a small ($60,000/year) licensing contract in 2024 focused only on using NewsGuard's feed of data about false claims spreading online to inform the team working on a brand safety product for social media. This data stream of false claims is separate from the reliability ratings of news websites. There is no automated use of NewsGuard data as a part of this partnership with IAS; NewsGuard's

data is simply used via a web dashboard by the team in charge of the product as an added information source.

IAS does not have any license for NewsGuard's ratings of publishers, nor does it have access to NewsGuard's data to determine which publishers' websites (or pages on those websites) will be monetized. Instead, IAS had indicated publicly that it relies on ratings from the Global Disinformation Index (GDI).

h. **DoubleVerify**: NewsGuard competes with DoubleVerify, which provides some services aimed at addressing the same customer need. NewsGuard has never had any commercial relationship or partnership with DoubleVerify. (NewsGuard has explored potential licensing proposals with DoubleVerify in the past multiple times, unsuccessfully.)

i. **Barometer**: NewsGuard launched a partnership publicly with Barometer in 2023. The partnership aimed to use NewsGuard's false claim data stream (not its ratings data) as a data source combined with Barometer's tool for checking podcast transcripts for certain types of content. The goal was to identify podcast episodes repeating false claims. However, NewsGuard and Barometer were not able to get the technology to work at a level of precision that either party was happy with, and NewsGuard and Barometer abandoned the partnership in late 2023 without having sold the product to any clients.

j. **Media Matters for America**: Media Matters is an advocacy group that publishes reports, some of which are about misinformation. NewsGuard, which operates apolitically, has never had any partnership or relationship with Media Matters or collaborated on any reports with Media Matters. Media Matters has a news opinion website, mediamatters.org, which is among the many websites NewsGuard has rated as a part of its ratings product. (Its rating is lower than the rating NewsGuard has given to what is widely perceived to be its conservative counterpart, the Newsbusters website.)

k. **The Center for Countering Digital Hate (CCDH)**: CCDH is an advocacy group that publishes reports, some of which are about misinformation. NewsGuard has never had any partnership or relationship with CCDH or collaborated on any reports with CCDH.

l. **Nelez**: NewsGuard is unfamiliar with Nelez.

m. **The Media Roundtable**: NewsGuard is unfamiliar with the Media Roundtable.

## IV. Responses to Questions Posed During Our June 18 Call

First, you asked for data on the number of large advertisers that block all news content on their own, preferring to place ads on social media platforms and sports, entertainment, and culture content instead. Please refer to the testimony of Christian Juhl, Global Chief Executive Officer, GroupM (the largest ad agency holding company), in which he stated that news in all forms gets less than 5% of advertising and online news gets only 1.28%.[6]

Second, you asked for more information about NewsGuard's statement in our June 6 letter that "The vast majority of advertisers do not use NewsGuard's data," and for more information on the types of SSPs, DSPs, and agencies that use NewsGuard's data. The information provided above in Section III of this letter addresses your request.

Third, you asked about two references to GARM on NewsGuard webpages. Those statements refer to contemplated partnerships, but none ever came to fruition. The statement you asked about on a portion of NewsGuard's website—that NewsGuard "joined the Global Alliance for Responsible Media to aid in their new effort to address misinformation as new category of concern"—was posted in error and during a period when NewsGuard was considering joining GARM. NewsGuard ultimately determined that the fees for membership to GARM were too high and did not join, but never took down the page. NewsGuard will promptly correct that statement on that webpage. The other statement you asked about in a press release—that NewsGuard provides a solution for advertisers to adhere to GARM's "misinformation" category within its brand-safety framework—is accurate. It does not state that NewsGuard has a commercial relationship with GARM or coordinated on that GARM framework, but rather that advertisers can use NewsGuard's products to comply with what was then a new GARM framework if advertisers choose to do so. NewsGuard hereby confirms that it has never been a member or commercial partner of GARM and has never licensed its data to GARM.

Fourth, you asked why our June 6 letter referred to DailyKos.com as having a 45 score (on page 6 FN 5) and a 7.5 score (on page 7). NewsGuard confirms that 45 is the more recent score and that the 7.5 score was accurate as of when NewsGuard produced documents to Congress in 2023.

---

[6] https://www.congress.gov/118/meeting/house/117518/witnesses/HHRG-118-JU00-Wstate-JuhlC-20240710-U3.pdf.

### V. NewsGuard's Data and Pre-Bid Segments Could Not Have Organized Boycotts

As described above, most advertisers do not access NewsGuard's data. To our knowledge, every advertiser (or its proxy) that does, individually and unilaterally decides whether and how to employ NewsGuard's data to inform its targeted advertising campaigns. These decisions reflect advertisers' choices about where to spend their advertising dollars, which is quintessential First Amendment-protected speech. NewsGuard does not tell advertisers where they should spend their dollars. And advertisers don't tell NewsGuard where they decided to spend their dollars. So there have been no actual or *de facto* agreements among them to boycott, exclude competitors, or harm competition.

Furthermore, NewsGuard's ratings are apolitical. NewsGuard does not rate websites based on whether they are liberal or conservative. And NewsGuard's data and segment lists do not allow any media platform or advertiser to target or block websites based on political or ideological views. So, there is no way NewsGuard could have organized advertising boycotts based on political or ideological views. To the contrary, NewsGuard rates websites based on apolitical criteria reflecting widely accepted journalistic standards focused on identifying misinformation.

NewsGuard has a First Amendment right to publish its journalistic reliability ratings and to share that quintessential speech with anyone who wants to purchase it. We trust that the information NewsGuard has provided in response to your CID so far, including the information contained in this letter, will allow the Commission to expeditiously close this investigation as to NewsGuard so as to avoid further unwarranted burden and avoid further chilling its protected speech.

* * *

This letter and the production it references contain NewsGuard's highly confidential business information. NewsGuard thus requests that the Commission afford this letter and the materials submitted in this production with the greatest possible protections against disclosure under 16 C.F.R. §§ 4.9(c) and 4.10(a)(2), 5 U.S.C. § 552(b)(4), 15 U.S.C. § 46(f) and § 57b-2, and all other applicable statutes or regulations. Should the Commission receive any request for these materials, NewsGuard requests that it be given an opportunity to object to such disclosure. Further, NewsGuard respectfully requests that all materials provided in response to the CID be destroyed or returned to NewsGuard at the conclusion of the Commission's investigation.

This letter and the production it references shall not be construed as a waiver of any protection from disclosure or confidential treatment accorded by law, including, but not limited

to, the attorney-client privilege or the work-product doctrine, and NewsGuard reserves all rights and intends to rely on and invoke any such protection as appropriate. If protected documents or information are inadvertently produced, NewsGuard reserves the right to notify the Commission, stating the bases for such protection, and requesting that the Commission promptly return or destroy the identified materials.

Moreover, this letter and the production it references are made in the spirit of cooperation and shall not be construed as a waiver of any of NewsGuard's objections to the CID, such as overbreadth, unreasonable burden, and First Amendment protections, or arguments which NewsGuard may raise in a Petition to Limit or Quash the CID.

Respectfully submitted,

*/s/ Sophie Hansell*

Sophie Hansell

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NEWSGUARD TECHNOLOGIES,<br>*Plaintiff*,<br>v.<br>FEDERAL TRADE COMMISSION, *et al.*,<br>*Defendants*. | No. 26-cv-00353 (DLF) |

**ORDER**

For the reasons stated on the record in the Court's oral ruling during proceedings held on April 22, 2026, it is

**ORDERED** that the plaintiff's Motion for Preliminary Injunction, Dkt. 11, is **DENIED** without prejudice.

**SO ORDERED.**

DABNEY L. FRIEDRICH
United States District Judge

April 22, 2026

BEFORE THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NEWSGUARD TECHNOLOGIES, . Case Number 26-cv-353

Plaintiff,

vs.

FEDERAL TRADE COMMISSION, et al., . April 22, 2026 . 2:04 p.m.

Defendants.

- - - - - - - - - - - - - - - - -

TRANSCRIPT OF ORAL RULING
BEFORE THE HONORABLE DABNEY L. FRIEDRICH
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiff: ROBERT CORN-REVERE, ESQ.
SAMUEL RUDOVSKY, ESQ.
Foundation for Individual Rights and Expression
700 Pennsylvania Avenue Southeast
Suite 340
Washington, D.C. 20003

For the Defendants: ALEX POTAPOV, ESQ.
ETHAN BECK, ESQ.
THOMAS BYRON, ESQ.
ALAN BAKOWSKI, ESQ.
ROBERT ZUVER, JR., ESQ.
Federal Trade Commission
600 Pennsylvania Avenue Northwest
Washington, D.C. 20580

Official Court Reporter: SARA A. WICK, RPR, CRR
333 Constitution Avenue Northwest
Room 4704-B
Washington, D.C. 20001
202-354-3284

Proceedings recorded by stenotype shorthand.
Transcript produced by computer-aided transcription.

P R O C E E D I N G S

(All participants present telephonically.)

COURTROOM DEPUTY: We are on the record in Civil Action 26-353, NewsGuard Technologies versus the Federal Trade Commission, et al.

Starting with plaintiff's counsel, please state your appearance for the record.

MR. CORN-REVERE: This is Robert Corn-Revere for NewsGuard.

MR. RUDOVSKY: This is Samuel Rudovsky for NewsGuard.

THE COURT: Who do we have for the FTC?

MR. POTAPOV: Alex Potapov for defendants, Your Honor.

MR. BYRON: And Thomas Byron for defendants.

MR. BECK: Ethan Beck for defendants.

MR. BAKOWSKI: Alan Bakowski for defendants.

MR. ZUVER: And Robert Zuver for defendants.

THE COURT: Is that everybody?

UNIDENTIFIED SPEAKER: It is.

THE COURT: Okay. Since the plaintiff's motion for a preliminary injunction, the Court has received the defendants' notice of withdrawal of the Civil Investigative Demand and the plaintiff's response to the notice. The Court also understands that the government has moved to dismiss the *Media Matters* appeal.

The Court is now prepared to rule on NewsGuard's motion for

preliminary injunction. This oral ruling will constitute my ruling on the motion.

Before the Court is NewsGuard's motion for a preliminary injunction enjoining the defendants from initiating any action to enforce the Civil Investigative Demand or the OmniCom-IPG merger condition during the course of this litigation until otherwise ordered by this Court. For the reasons that follow, the Court will deny the motion.

A preliminary injunction is an extraordinary remedy that may be awarded only upon a clear showing that the plaintiff is entitled to such relief. *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 22.

To prevail, a party seeking preliminary relieve must make a clear showing that four factors taken together warrant relief: Likely success on the merits; likely irreparable harm in the absence of preliminary relief; a balance of the equities in its favor; and accord with the public interest. *League of Women Voters of the United States v. Newby*, 838 F.3d 1, 6, D.C. Circuit 2016.

The party seeking a preliminary injunction bears the burden of production and persuasion. *Qualls v. Rumsfeld*, 357 F.Supp.2d 274, 281, D.D.C. 2005.

At a minimum, NewsGuard has failed to demonstrate imminent, irreparable harm. To satisfy the irreparable harm requirement, the alleged injury must be both certain and great, actual and

not theoretical, imminent, and beyond remediation. *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297, D.C. Circuit 2006.

NewsGuard alleges that it will suffer irreparable harm absent an injunction because, one, the alleged First Amendment harms caused by the CID and merger conditions are themselves irreparable; two, compliance with the CID has been burdensome and costly; and three, the CID and merger condition have caused NewsGuard to lose existing and future contracts.

None of NewsGuard's asserted injuries constitutes irreparable harm sufficient to establish entitlement to preliminary relief.

To start, the defendants notified the Court on April 17 that they have withdrawn the CID that NewsGuard challenges. While a defendant's voluntary cessation of a challenged activity does not render a case moot unless it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur, *Friends of the Earth, Inc., v. Laidlaw Environmental Services*, 528 U.S. 167, 190, the Commission's withdrawal of the CID does not address NewsGuard's alleged ongoing -- does address NewsGuard's alleged ongoing irreparable harm as to the CID and obviate the need for an order enjoining the defendants from initiating any action to enforce the CID.

Furthermore, an alleged deprivation of a constitutional right does not, standing alone, amount to irreparable harm.

Even in the sensitive area of freedom of speech where the risk of chilling protected conduct is especially high, courts do not axiomatically find that a plaintiff will suffer irreparable harm simply because it alleges a violation of its rights. *Hanson v. District of Columbia*, 120 F.4th 223, 224, D.C. Circuit 2024.

Accordingly, a party seeking a preliminary injunction must do more than merely allege a violation of freedom of expression in order to satisfy the irreparable injury prong. It must establish that it is or will be engaging in constitutionally protected behavior and that the allegedly impermissible government action would chill that conduct. *Chaplaincy of Full Gospel Churches*, 454 F.3d at 301. There is no per se rule that a violation of freedom of expression automatically constitutes irreparable harm. *Chaplaincy of Full Gospel Churches*, 454 F.3d at 301.

NewsGuard has not made such allegations here. Indeed, at the preliminary injunction hearing, NewsGuard acknowledged that it has not alleged that its speech had been chilled. PI hearing transcript 5, 9 through 13. Rather, NewsGuard asserts that the proper inquiry is whether the conditions being imposed or the regulations or threats being imposed would chill a person of ordinary firmness. PI hearing transcript 21, 19 through 23.

That standard, however, is a component of the merits standard for NewsGuard's First Amendment retaliation claim. It is not the standard by which the Court assesses irreparable

harm.

Citing *Elrod v. Burns*, 427 U.S. 347, NewsGuard argues that any loss of First Amendment freedom constitutes irreparable injury. But in *National Treasury Employees Union v. United States*, 927 F.2d 1253, D.C. Circuit 1991, the D.C. Circuit did not find irreparable harm where federal employees sought a preliminary injunction against ethics laws that allegedly violated their First Amendment rights by restricting their ability to make appearances, deliver speeches, and write articles for compensation.

While the Court acknowledged Elrod's broad pronouncement that the loss of First Amendment freedoms for even minimal periods of time may constitute irreparable injury, it emphasized that a preliminary injunction is not appropriate unless the party seeking it can demonstrate that First Amendment interests are either threatened or in fact being impaired at the time the relief is sought. 927 F.2d at 1254.

Because nothing in the record convinced the Court that the federal employees would cease speaking or writing before the district court resolved their constitutional challenges, the Court held that the employees had not satisfied the irreparable harm requirement. 427 -- I'm sorry, 927 F.2d at 1255.

As stated, NewsGuard has not alleged any such chilling effect here. Contrast, for example, *Media Matters for America v. FTC*, Civil Action Number 25-5302, 2025 Westlaw

2988966 at 10, D.C. Circuit, October 23, 2025. Irreparable harm satisfied where media watchdog documented concrete harms to its speech activities.

The costs associated with complying with the CID also fall short of establishing irreparable harm. NewsGuard alleges that the CID has placed substantial burdens on the organization, requiring it to produce 40,000 documents and expend over 30 percent of its profits. PI hearing transcript 4, 7 through 11.

But the D.C. Circuit has held that recoverable monetary loss may constitute irreparable harm only where the loss threatens the very existence of the movant's business. *Wisconsin Gas Company v. FERC*, 458 F.2d 669, 674, D.C. Circuit 1984.

NewsGuard has not alleged facts suggesting that standard has been met here.

Finally, NewsGuard's reliance on *United States v. Playboy Entertainment Group, Inc.*, 529 U.S. 803, is misplaced. In *Playboy*, the Supreme Court affirmed a three-judge district court's order declaring a federal statute unconstitutional under the First Amendment and enjoining its enforcement. As relevant here, the Supreme Court found that the statute violated the First Amendment in part because it limited *Playboy*'s market as a penalty for its programming choice. 529 U.S. at 812.

NewsGuard seizes on that language, arguing that the loss of profits to a First Amendment business constitutes irreparable

harm when the business has been targeted because of its editorial viewpoint. PI hearing transcript 12, 25, through 13, 4.

The Court disagrees. To start, the Supreme Court did not conduct an irreparable harm analysis in *Playboy*. Rather, the language on which NewsGuard relies comes from the Court's reasoning as to why the statute in question constituted a content-based restriction. See *Playboy*, 529 U.S. at 811 through 13.

Further, *Playboy* involved a permanent injunction, not a preliminary one. And while a party seeking a permanent injunction satisfies the irreparable harm requirement by demonstrating that it actually has suffered or is likely to suffer irreparable harm, *in re Federal Bureau of Prisons' Execution Protocol Cases*, 980 F.3d 123, 137, D.C. Circuit 2020, a party seeking a preliminary injunction must show that it is facing ongoing irreparable harm warranting the Court's immediate intervention.

For the reasons already explained, NewsGuard's pocketbook injuries do not constitute such harm.

For similar reasons, NewsGuard's alleged loss of existing and future contracts does not satisfy its irreparable harm burden. NewsGuard has not explained why these business harms are irreparable or why it could not reinitiate these contracts should the Court ultimately hold the CID or the merger condition

unlawful. *Cf. Chaplaincy of Full Gospel Churches*, 454 F.3d at 298. Mere injuries, however substantial, in terms of money, time, and energy necessarily expended in the absence of a stay are not enough to establish irreparable harm.

For these reasons, the Court will deny NewsGuard's motion for a preliminary injunction enjoining the defendants from initiating any action to enforce the CID or merger condition, and the denial is without prejudice.

I'm going to suggest that the parties confer and propose a schedule for further proceedings.

Let me ask counsel, starting with Mr. Corn-Revere, is seven days adequate time for you to confer and file something with the Court?

MR. CORN-REVERE: I believe it is, Your Honor.

THE COURT: All right. Is that okay with the defendants?

MR. POTAPOV: Absolutely, Your Honor.

THE COURT: All right. In that case, I will order that the parties confer and that you file a proposed schedule for further proceedings on or before April 29. And to the extent you disagree, of course, feel free to provide your respective positions, and if necessary, I will arrange another hearing to discuss, if the Court needs your input.

Any remaining questions?

MR. CORN-REVERE: Yes, Your Honor. This is Robert

Corn-Revere.

My question is whether or not there will be any written opinion that is issued.

THE COURT: No. That's what I said at the outset, that this oral ruling would constitute my ruling. I will just issue a brief order denying the motion on the docket, but the transcript serves as the opinion.

MR. CORN-REVERE: Thank you, Your Honor.

THE COURT: Anything else?

MR. POTAPOV: No questions from defendants, Your Honor.

THE COURT: All right, everyone. Thank you for being available.

(Proceedings adjourned at 2:17 p.m.)

CERTIFICATE OF OFFICIAL COURT REPORTER

I, Sara A. Wick, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

/s/ Sara A. Wick                    April 22, 2026

SIGNATURE OF COURT REPORTER          DATE

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NEWSGUARD TECHNOLOGIES, INC.,<br>*Plaintiff*,<br>v.<br>FEDERAL TRADE COMMISSION and ANDREW FERGUSON, in his official capacity as Chairman of the Federal Trade Commission,<br>*Defendants*. | Case No.: 1:26-cv-00353-DLF<br>Hon. Dabney L. Friedrich |

**NOTICE OF APPEAL**

Pursuant to Rule 4(a) of the Federal Rules of Appellate Procedure, notice is hereby given that Plaintiff NewsGuard Technologies appeals to the United States Court of Appeals for the District of Columbia Circuit from the judgment of this Court entered on the 22nd day of April, 2026, denying NewsGuard's motion for a preliminary injunction. This appeal is subject to the expedited review provisions of D.C. Circuit Rule 47.2(a) and 28 U.S.C. § 1657.

Dated: April 22, 2026

Respectfully Submitted,

/s/ Robert Corn-Revere
Robert Corn-Revere
(D.C. Bar No. 375415)
James C. Grant
(WA Bar No. 14358)
Sara E. Berinhout
(MA Bar No. 703217)
Samuel Rudovsky
(PA Bar No. 335724)
Not Admitted to the D.C. Bar. D.C. Practice limited to U.S. federal courts and related matters under D.C. Ct. App. R. 49(c)(3).

FOUNDATION FOR INDIVIDUAL
RIGHTS AND EXPRESSION
700 Pennsylvania Ave. SE, Ste. 340
Washington, DC 20003
(215) 717-3473
bob.corn-revere@fire.org
jim.grant@fire.org
sara.berinhout@fire.org
sam.rudovsky@fire.org

*Counsel for Plaintiff*