**NOT YET SCHEDULED FOR ORAL ARGUMENT**

**No. 26-5138**

---

**IN THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT**

NEWSGUARD TECHNOLOGIES,
*Plaintiff-Appellant*,

v.

FEDERAL TRADE COMMISSION and ANDREW N. FERGUSON, in his official capacity as Chairman of the Federal Trade Commission,
*Defendants-Appellees*.

On Appeal from the United States District Court for the District of Columbia

# RESPONSE BRIEF OF DEFENDANTS-APPELLEES


DANIEL GUARNERA
*Director*

KELSE MOEN
*Deputy Director*

BUREAU OF COMPETITION

LUCAS CROSLOW
*General Counsel*

ALEX POTAPOV
*Deputy General Counsel*

H. THOMAS BYRON III
*Deputy General Counsel*

ALAN BAKOWSKI
ETHAN D. BECK
*Attorneys*

FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue NW
Washington, D.C. 20580
(202) 326-2527
*hbyron@ftc.gov*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), undersigned counsel certifies as follows:

### A. Parties and Amici

Plaintiff-appellant is NewsGuard Technologies. Defendants-appellees are the Federal Trade Commission and Andrew N. Ferguson, in his official capacity as Chairman of the Federal Trade Commission.

There were no amici or intervenors in the district court. No parties have sought to intervene or appear as amicus curiae in this Court.

### B. Rulings Under Review

The district court decision on appeal is the order and oral ruling (App.727-38) denying plaintiff's motion for preliminary injunction, entered on April 22, 2026, by the Honorable Dabney L. Friedrich in *NewsGuard Technologies v. Federal Trade Commission*, No. 1:26-cv-0353 (D.D.C.). The district court's order has not been published.

### C. Related Cases

This case has not previously been before this Court. The case remains pending in the court below. Counsel are aware of no related cases within the meaning of the rule.

## TABLE OF CONTENTS


TABLE OF AUTHORITIES ........................................................................ v

GLOSSARY ........................................................................................ xii

INTRODUCTION ................................................................................... 1

JURISDICTION ..................................................................................... 3

ISSUE PRESENTED FOR REVIEW ........................................................ 3

STATUTES AND REGULATIONS ........................................................... 3

STATEMENT OF THE CASE .................................................................. 3

A. Statutory and Regulatory Framework .................................................. 4

1. Investigative powers ............................................................................ 4

2. Enforcement powers ............................................................................ 6

B. The Commission's Efforts to Address Anticompetitive Advertising Boycotts ........................................................................ 7

1. NewsGuard CID .................................................................................. 8

2. Omnicom-IPG Complaint and Order ................................................... 11

3. Culmination of Advertising Boycott Investigation ................................. 13

C. Proceedings Below ............................................................................. 14

SUMMARY OF ARGUMENT ................................................................ 17

STANDARD OF REVIEW ..................................................................... 19

ARGUMENT ........................................................................................ 20

I. The District Court Properly Denied the Requested Preliminary Injunction Based on a Lack of Irreparable Harm. ..................................... 20

A. There Can Be No Irreparable Harm from the Withdrawn CID. ......... 22

B. NewsGuard Failed to Identify Any Non-Speculative Harm Related to the Omnicom Consent Order. ....24

C. NewsGuard's Admissions and Conduct Before the District Court Confirm the Absence of Irreparable Harm. ....28

D. NewsGuard Is Not Entitled to a Presumption of Irreparable Harm. ....30

1. There is no presumption of irreparable harm from economic regulations that place indirect burdens on the speech of third parties. ....30

2. The Omnicom consent order does not directly restrict NewsGuard's speech. ....35

II. This Court Can Also Affirm the District Court's Denial of a Preliminary Injunction on Other Grounds. ....38

A. NewsGuard Failed to Demonstrate a Likelihood of Success on the Merits. ....40

1. NewsGuard cannot show a likelihood of success on a claim relating to the withdrawn CID. ....40

2. NewsGuard's challenge to the Omnicom consent order is barred. ....41

3. NewsGuard is not likely to succeed on its novel claim of First Amendment retaliation. ....43

a. NewsGuard asserts an entirely unprecedented claim. ....44

b. NewsGuard's retaliation claim fails on the merits. ....44

i. The FTC investigated unlawful collusion in the advertising industry and brought enforcement actions to prevent violations of the antitrust laws. ....46

ii. NewsGuard failed to show that the consent order was retaliatory. ....48

4. NewsGuard lacks evidence to support its "jawboning" theory....54

B. The Remaining Factors Weigh Against Granting Injunctive Relief. ....56

CONCLUSION....57

## TABLE OF AUTHORITIES

### CASES

*Alexander v. Sandoval*,
532 U.S. 275 (2001) ........................................ 44

*Amacher v. City of Tullahoma*,
179 F.4th 999 (6th Cir. 2026) ........................................ 45

*AMG Cap. Mgmt., LLC v. FTC*,
593 U.S. 67 (2021) ........................................ 6

*Aref v. Lynch*,
833 F.3d 242 (D.C. Cir. 2016) ........................................ 45

*Backpage.com, LLC v. Dart*,
807 F.3d 229 (7th Cir. 2015) ........................................ 55

*Balt. Gas & Elec. Co. v. FERC*,
252 F.3d 456 (D.C. Cir. 2001) ........................................ 42, 56

*Bantam Books, Inc. v. Sullivan*,
372 U.S. 58 (1963) ........................................ 55

*Benisek v. Lamone*,
585 U.S. 155 (2018) ........................................ 29

*Block v. Cmty. Nutrition Inst.*,
467 U.S. 340 (1984) ........................................ 42

*Blue Ribbon Quality Meats, Inc. v. FTC*,
560 F.2d 874 (8th Cir. 1977) ........................................ 5

*Branch Ministries v. Rossotti*,
211 F.3d 137 (D.C. Cir. 2000) ........................................ 50

*Bronx Household of Faith v. Bd. of Educ.*,
331 F.3d 342 (2d Cir. 2003) ........................................ 31

*Carr v. Saul*,
593 U.S. 83 (2021) ........................................ 43

*Chaplaincy of Full Gospel Churches v. England*,
454 F.3d 290 (D.C. Cir. 2006) ........................................ 21, 31, 32, 33

*City of Los Angeles v. Lyons*,
461 U.S. 95 (1983) ........................................ 24

*Consumer Fed'n of Am. v. FTC*,
515 F.2d 367(D.C. Cir. 1975) .......... 42, 44

*Consumers for Auto Reliability and Safety v. FTC*,
No. 17-1038, 2017 U.S. App. LEXIS 12921 (D.C. Cir. July 14, 2017) .......... 42

*Endocrine Society v. FTC*,
__ F. Supp. 3d. __, 2026 WL 1257289 (D.D.C. 2026) .......... 34

*FTC v. Claire Furnace Co.*,
274 U.S. 160 (1927) .......... 5

*FTC v. Facebook, Inc.*,
581 F. Supp. 3d 34 (D.D.C. 2022) .......... 49

*FTC v. Invention Submission Corp.*,
965 F.2d 1086 (D.C. Cir. 1992) .......... 6

*FTC v. Standard Oil of Cal.*,
449 U.S. 232 (1980) .......... 56

*FTC v. Super. Ct. Trial Lawyers Ass'n*,
493 U.S. 411 (1990) .......... 34, 38

*FTC v. Whole Foods Mkt., Inc.*,
548 F.3d 1028 (D.C. Cir. 2008) .......... 39

*Fund for Animals v. Frizzell*,
530 F.2d 982 (D.C. Cir. 1975) .......... 29

*Gen. Fin. Corp. v. FTC*,
700 F.2d 366 (7th Cir. 1983) .......... 5

*Giboney v. Empire Storage & Ice Co.*,
336 U.S. 490 (1949) .......... 37

*Glob. Health Council v. Trump*,
153 F.4th 1 (D.C. Cir. 2025) .......... 20

*Gordon v. Holder*,
632 F.3d 722 (D.C. Cir. 2011) .......... 39

*Hanson v. District of Columbia*,
120 F.4th 223 (D.C. Cir. 2024) .......... 32

*Hartman v. Moore*,
547 U.S. 250 (2006) .......... 44, 45

*Hefferman v. City of Paterson*,
578 U.S. 266 (2016) .......... 33

*Hotchkiss v. Cedar Rapids Cmty. Sch. Dist.*,
115 F.4th 889 (8th Cir. 2024) .......... 33

*L.W. ex rel. Williams v. Skrmetti*,
83 F.4th 460 (6th Cir. 2023) .......... 44

*League of Women Voters of U.S. v. Newby*,
838 F.3d 1 (D.C. Cir. 2016) .......... 39

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) .......... 26

*Marseille-Kliniken AG v. Republic of Equatorial Guinea*,
153 F.4th 1262 (D.C. Cir. 2025) .......... 39

*Maryland v. King*,
567 U.S. 1301 (2012) .......... 56

*Media Matters for Am. v. Paxton*,
138 F.4th 563 (D.C. Cir. 2025) .......... 33

*Minneapolis Star & Trib. Co. v. Minn. Comm'r of Revenue*,
460 U.S. 575 (1983) .......... 34

*Mullin v. Doe*,
146 S. Ct. 2121 (2026) .......... 50

*Murthy v. Missouri*,
603 U.S. 43 (2024) .......... 26

*Mylan Pharms., Inc. v. Shalala*,
81 F. Supp. 2d 30 (D.D.C. 2000) .......... 29

*N.Y. Rehab. Care Mgmt., LLC v. NLRB*,
506 F.3d 1070 (D.C. Cir. 2007) .......... 49

*N.Y. State Dep't of Law v. FCC*,
984 F.2d 1209 (D.C. Cir. 1993) .......... 56

*Nat'l Lifeline Ass'n v. FCC*,
983 F.3d 498 (D.C. Cir. 2020) .......... 43

*Nat'l Soc'y of Prof'l Eng'rs v. United States*,
435 U.S. 679 (1978) .......... 35

*Nat'l Rifle Ass'n of Am. v. Vullo*,
602 U.S. 175 (2024) .......... 54, 55

*Natural Res. Def. Council v. Pena*,
147 F.3d 1012 (D.C. Cir. 1998) .......... 29

*Nieves v. Bartlett*,
587 U.S. 391 (2019) .......... 45

*NTEU v. United States*,
927 F.2d 1253 (D.C. Cir. 1991) .......... 32, 33

*Nuclear Info. & Res. Serv. v. NRC*,
509 F.3d 562 (D.C. Cir. 2007) .......... 49

*Nuclear Regul. Comm'n v. Texas*,
605 U.S. 665 (2025) .......... 42, 43

*Open Top Sightseeing USA v. Mr. Sightseeing, LLC*,
48 F. Supp. 3d 87 (D.D.C. 2014) .......... 29

*Sanders v. McLellan*,
463 F.2d 894 (D.C. Cir. 1972) .......... 32

*Sanjour v. EPA*,
56 F.3d 85 (D.C. Cir. 1995) .......... 50

*Starbucks Corp. v. McKinney*,
602 U.S. 339 (2024) .......... 20

*Swanson Grp. Mfg., LLC v. Jewell*,
790 F.3d 235 (D.C. Cir. 2015) .......... 28

*Telecomm. Rsch. & Action Ctr. v. FCC*,
750 F.2d 70 (D.C. Cir. 1984) .......... 41

*Trump v. CASA, Inc.*,
606 U.S. 831 (2025) .......... 56

*Trump v. Hawaii*,
585 U.S. 667 (2018) .......... 45

*U.S. ex rel. Heath v. AT & T, Inc.*,
791 F.3d 112 (D.C. Cir. 2015) .......... 40

*Ukiah Adventist Hosp. v. FTC*,
981 F.2d 543 (D.C. Cir. 1992) .......... 7, 41

*United States v. E.I. du Pont de Nemours & Co.*,
366 U.S. 316 (1961) .......... 38

*United States v. Fokker Servs. B.V.*,
818 F.3d 733 (D.C. Cir. 2016) .......................................................................45

*United States v. Johnson*,
2021 WL 3737681 (D.D.C. Aug. 24, 2011) ......................................................49

*United States v. Morton Salt Co.*,
338 U.S. 632 (1950) ...........................................................................................4

*United States v. Playboy Ent. Grp.*,
529 U.S. 803 (2000) .........................................................................................34

*Verizon Commc'ns Inc. v. Law Offs. of Curtis V. Trinko*,
540 U.S. 398 (2004) ...........................................................................................7

*Verlo v. Martinez*,
820 F.3d 1113 (10th Cir. 2016) .......................................................................27

*Waggel v. George Wash. Univ.*,
957 F.3d 1364 (D.C. Cir. 2020) .......................................................................49

*Wearly v. FTC*,
616 F.2d 662 (3d Cir. 1980) ...............................................................................5

*Winter v. Natural Res. Def. Council, Inc.*,
555 U.S. 7 (2008) .............................................................................................26

*Wis. Gas Co. v. FERC*,
758 F.2d 669 (D.C. Cir. 1985) .................................................................. 25, 26

*Yelp Inc. v. Paxton*,
137 F.4th 944 (9th Cir. 2025) .........................................................................49

**RULES**

Fed. R. Civ. P. 65 ...........................................................................................23

**STATUTES**

15 U.S.C. § 1 ...................................................................................................13

15 U.S.C. § 21 ...................................................................................................6

15 U.S.C. § 45 .......................................................................... 4, 6, 7, 13, 41, 42

15 U.S.C. § 46 ....................................................................................................4

15 U.S.C. § 53 ....................................................................................................6

15 U.S.C. § 57b-1 ...................................................................................... 5, 6, 52

28 U.S.C. § 1292 ................................................................................................3

**REGULATIONS**

16 C.F.R. § 2.10 ....................................................................................5

16 C.F.R. §§ 2.31-2.34 ............................................................................7

16 C.F.R. § 2.7 ......................................................................................5

16 C.F.R. §§ 3.1-3.31A ...........................................................................6

**REGULATORY MATERIALS**

90 Fed. Reg. 27,304 (June 26, 2025) ........................................ 12, 36, 48

Complaint, *In re Omnicom Grp., Inc. and Interpublic Grp. of Cos., Inc.*, FTC Dkt. No. 251-0049 (June 23, 2025) ..........................................11

Concurring Statement of Commissioner Andrew N. Ferguson, *FTC v. 1661, Inc. d/b/a GOAT*, FTC Dkt. No. 2223016 (Dec. 2, 2024) ..............................................8

Decision and Order, *Aaron's, Inc.*, 169 F.T.C. 380 (May 11, 2020), ....................................................37

Decision and Order, *Mars, Inc.*, 164 F.T.C. 821 (Nov. 30, 2017),.....................................................38

Proposed Order, *In re Valvoline, Inc.*, FTC Dkt. No. C-4824 (Nov. 14, 2025)...............................................38

**OTHER AUTHORITIES**

Final Order and Stip. Perm. Injunction, *FTC v. Havas Media Grp. USA, LLC*, No. 4:26-cv-804 (N.D. Tex. June 30, 2026), ECF No. 5.............................14

*FTC v. Cigna Grp.*, No. 1:25-mc-00004, Dkt.1-2 (D.D.C. Jan. 15, 2025) .........................................52

Merriam-Webster Dictionary (online ed.) ..............................................37

Min. Order, *Media Matters for Am. v. FTC*, No. 1:25-cv-1959 (D.D.C. May 4, 2026).................................................15

Mot. Quash CID Ex. P, *In re Police Protective Fund*, 157 F.T.C. 1913 (2014)............................................................................52

NewsGuard, *NewsGuard Offers Targeted Services* (June 30, 2022)......................................................................................8

Notice of Voluntary Dismissal, *Disinformation Index, Inc. v. FTC*, No. 1:25-cv-4137 (D.D.C. Apr. 24, 2026)....15

Pet. Quash CID Ex. 1, *In re Lexium Int'l, LLC*, 162 F.T.C. 1212 (2016)....52

Order, *Media Matters for Am. v. FTC*, No. 25-5302 (D.C. Cir. May 4, 2026)....15

Oxford Essential Dictionary (Am. ed. 1998)....37

Regulations.gov, *Comment from CPAC & Independent Media Council* (July 29, 2025)....48

Regulations.gov, *Comment from GB News Limited* (July 29, 2025)....48

Regulations.gov, *Comment from Newsmax Media Inc.* (July 28, 2025)....48

U.S. House Judiciary Comm., 2024 Interim Staff Report.... 9, 46

U.S. House Small Bus. Comm., 2024 Interim Staff Report.... 9, 46

## GLOSSARY

| | |
|---|---|
| App. | Appendix |
| CID | Civil Investigative Demand |
| FTC | Federal Trade Commission |

## INTRODUCTION

This is an appeal from a denial of a preliminary injunction. NewsGuard Technologies sought to enjoin enforcement of (1) a Civil Investigative Demand (CID) that was issued to NewsGuard and later withdrawn and (2) certain conditions in an FTC consent order to which NewsGuard was not a party. NewsGuard alleged that the CID and consent order violated its First Amendment rights. The district court denied the preliminary injunction on the ground that NewsGuard had not demonstrated irreparable harm. That ruling should be affirmed.

*First*, the district court's irreparable harm holding was eminently correct. There can be no harm at all from the enforcement of the CID, because the CID has been withdrawn. NewsGuard therefore focuses its appellate arguments on the consent order. But it has failed to show *any* nonspeculative harm stemming from that order. NewsGuard's counsel expressly acknowledged during oral argument that NewsGuard had adduced no evidence of any chilling effect on its speech. And NewsGuard's dilatory litigation conduct—it filed the preliminary injunction motion nearly nine months after the CID was issued and more than four months after the consent order was entered—further demonstrates the absence of irreparable harm.

NewsGuard contends that irreparable harm should be presumed because it has alleged a First Amendment violation. But no such presumption attaches to economic regulations, such as the consent order, that indirectly burden the speech of third

parties (a commonplace occurrence in the antitrust field and elsewhere). To get the benefit of the presumption, NewsGuard would have to demonstrate that the consent order *directly restricts* its speech—which the order simply does not do.

*Second*, this Court can also affirm the district court's decision based on the other preliminary injunction factors (which the district court did not reach). In particular, NewsGuard has not demonstrated a likelihood of success on the merits. It cannot prevail on the CID claims, which became moot when the CID was withdrawn. And the consent-order claims fare no better.

To begin, the consent-order claims fail at the threshold on a variety of grounds. Under the Federal Trade Commission Act, challenges to agency orders must be brought (1) in a court of appeals (2) by a party subject to the order (3) within 60 days. This case was brought (1) in district court (2) by a third party (3) over four months later. In addition, NewsGuard's central claim—that the Commission unconstitutionally retaliated against it by settling litigation to which NewsGuard was not a party—is wholly novel and unprecedented.

At any rate, NewsGuard's accusations of retaliation are meritless. NewsGuard ignores the abundant evidence that the consent order was motivated by antitrust concerns about excessive concentration in the advertising industry, while itself relying on evidence that either does not support its position or actively undercuts it. In doing so, NewsGuard repeatedly misrepresents the facts, going so far as to twist

Chairman Ferguson's *criticism* of heavy-handed government tactics into an *endorsement* of those tactics. *See infra* at 50-51. These blatant mischaracterizations only underscore the weakness of NewsGuard's position.

In sum, the district court correctly denied the preliminary injunction and its decision should be affirmed.

## JURISDICTION

NewsGuard invoked the district court's jurisdiction under 28 U.S.C. § 1331. The district court denied NewsGuard's motion for a preliminary injunction on April 22, 2026, and NewsGuard filed a notice of appeal on the same date. App.727, 739. This Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

## ISSUE PRESENTED FOR REVIEW

Whether the district court acted within its discretion in denying NewsGuard's motion for a preliminary injunction against (1) the enforcement of the CID that was issued to NewsGuard and later withdrawn and (2) certain conditions in an FTC consent order to which NewsGuard was not a party.

## STATUTES AND REGULATIONS

Relevant statutes and regulations are set forth in an addendum.

## STATEMENT OF THE CASE

NewsGuard sought a preliminary injunction barring the Commission and its Chairman, Andrew Ferguson, from enforcing (1) a Civil Investigative Demand (CID), a type of administrative subpoena, which sought documents and information

from NewsGuard; and (2) certain provisions in an administrative consent order to which NewsGuard was not a party. App.53-56. The district court denied a preliminary injunction because NewsGuard had failed to show that an injunction was necessary to prevent imminent, irreparable harm. App.730. As the court explained, the CID has been withdrawn, and in any event, "NewsGuard acknowledged that it has not alleged that its speech had been chilled" by either the CID or the consent order. App.731-33.

### A. Statutory and Regulatory Framework

Section 5 of the FTC Act prohibits—and "empower[s] and direct[s]" the Commission to prevent—"unfair methods of competition in or affecting commerce." 15 U.S.C. § 45(a). Congress gave the Commission a range of investigative and enforcement tools to accomplish this goal.

#### 1. Investigative powers

The Commission has authority "to investigate ... any person, partnership, or corporation engaged in or whose business affects commerce." 15 U.S.C. § 46(a). To fulfill this "continuing duty," the Commission "can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not." *United States v. Morton Salt Co.*, 338 U.S. 632, 639, 642-43 (1950).

To aid the agency in conducting its investigations, the FTC Act authorizes the Commission to issue CIDs to "any person" who "may be in possession, custody, or

control of any documentary material or tangible things, or may have any information, relevant to unfair or deceptive acts or practices in or affecting commerce ... or to antitrust violations." 15 U.S.C. § 57b-1(c). Thus, the Commission is entitled to seek information from entities that are themselves not suspected of any wrongdoing. *See, e.g.*, *Blue Ribbon Quality Meats, Inc. v. FTC*, 560 F.2d 874, 876 (8th Cir. 1977) ("the investigatory power granted the FTC ... reaches further than [its] regulatory power").

A CID is not self-executing: "[T]here are no sanctions for failing to comply with a subpoena of this type unless and until a district court enters an order ... directing compliance." *Gen. Fin. Corp. v. FTC*, 700 F.2d 366, 368 (7th Cir. 1983); *see*, *e.g.*, *FTC v. Claire Furnace Co.*, 274 U.S. 160, 174 (1927); *Wearly v. FTC*, 616 F.2d 662, 668 (3d Cir. 1980).

Instead, the issuance of a CID is simply one step in an ongoing investigation, which initiates a process of discussion and negotiation. 16 C.F.R. § 2.7(k); *id.* § 2.7(*l*) (FTC staff may modify a CID's terms following meet-and-confer discussions). A CID recipient also may file a petition with the Commission seeking to limit or quash the CID. *Id.* § 2.10; *see* 15 U.S.C. § 57b-1(f)(1); 16 C.F.R. § 2.7(k). The deadline to comply with a CID is suspended during the pendency of a petition. 16 C.F.R. § 2.10(b); *see* 15 U.S.C. § 57b-1(f)(2).

After that administrative process, if the recipient has not complied with the CID, the Commission may file a petition for enforcement in a federal district court pursuant to Section 20(e), 15 U.S.C. § 57b-1(e). *See FTC v. Invention Submission Corp.*, 965 F.2d 1086, 1088-91 (D.C. Cir. 1992). Compliance is not required until after the federal court considers and rules on any objections raised by the recipient. *See, e.g.*, *id.* at 1089-92.

**2. Enforcement powers**

When the Commission has "reason to believe" that there has been a violation of the laws it enforces, it has authority to file suit in federal court or to bring administrative proceedings against any "person, partnership, or corporation [that] has been or is using any unfair method of competition or unfair or deceptive act or practice in or affecting commerce." 15 U.S.C. § 45(b); *see id.* §§ 21, 53(b); *AMG Cap. Mgmt., LLC v. FTC*, 593 U.S. 67, 78 (2021).

The Commission initiates an administrative enforcement proceeding by issuing and serving "a complaint stating its charges in that respect and containing a notice of a hearing" before the Commission. 15 U.S.C. § 45(b). The named respondents may dispute the allegations and litigate the charges in an adjudicative proceeding before the Commission. *See* 16 C.F.R. Part 3, §§ 3.1-3.31A. Any final order issued by the Commission directing the respondent to cease and desist is subject to judicial review in a court of appeals. The respondent named in the order

must file a petition for review within 60 days in a circuit within which the respondent resides or carries on business or where the challenged practice was used. 15 U.S.C. § 45(c). The court of appeals has exclusive jurisdiction to review the Commission's order. *Id.* "It is undisputed that review of FTC cease and desist orders is committed to the courts of appeals[.]" *Ukiah Adventist Hosp. v. FTC*, 981 F.2d 543, 549 (D.C. Cir. 1992).

Alternatively, if Commission staff and respondents negotiate a consent agreement, the respondents may consent to the entry of a final Commission order (without admitting liability) and waive judicial review. The Commission publishes the complaint and the proposed consent agreement and order in the Federal Register and provides an opportunity for public comment. *See* 16 C.F.R. §§ 2.31-2.34. If, after review of any public comments, the Commission decides to amend the complaint and modify the order, the respondent may choose to agree to any modifications, or it may decide to litigate the complaint in an adjudicative proceeding, as described above. If agreed, the Commission enters the consent order.

### B. The Commission's Efforts to Address Anticompetitive Advertising Boycotts

A core mission of the FTC is to prevent "the supreme evil of antitrust": collusion among rivals. *Verizon Commc'ns Inc. v. Law Offs. of Curtis V. Trinko*, 540 U.S. 398, 408 (2004). Consistent with that mission, Chairman Ferguson and the FTC have expressed concern about, and taken action to prevent, anticompetitive collusion

in the digital advertising industry.[1] This issue is a high priority for the Commission because unlawful collusion has suppressed competition in markets for advertising-related products or services, which in turn reduced consumer choice in content, degraded the quality of advertisements, and ultimately stifled debate on matters of public importance. *See, e.g.*, App.413.

In 2025, the Commission opened a broad investigation into potential boycotts in digital advertising against certain media (that is, concerted refusals to deal with those media) on the basis of lists or ratings using agreed-upon definitions of subjective terms such as "brand safety." App.413. While that investigation was ongoing, NewsGuard brought this suit against the FTC. The suit challenged two aspects of the investigation: a CID that was issued to NewsGuard, App.245, 585, 711, and a September 2025 administrative consent order that addressed the merger of two top advertising firms, App.307-14.

### 1. NewsGuard CID

NewsGuard provides "assessments of the reliability of [internet] news sources," App.112, including through ratings and "Exclusion Lists," NewsGuard, *NewsGuard Offers Targeted Services* (June 30, 2022), https://tinyurl.com/23dma8f4. "Advertisers and ad agencies" use these subscription

[1] *See, e.g.*, Concurring Statement of Commissioner Andrew N. Ferguson, *FTC v. 1661, Inc. d/b/a GOAT*, FTC Dkt. No. 2223016 (Dec. 2, 2024), https://tinyurl.com/32tzaf4a.

services to determine “where (on which websites) ads should and should not be placed.” App.116. Congressional investigations have connected NewsGuard’s services to “coordinated action to demonetize” disfavored media entities. U.S. House Judiciary Comm., 2024 Interim Staff Report at 1, 3, 25-26, https://tinyurl.com/2v7ej2wj (Judiciary Committee Report); *see* U.S. House Small Bus. Comm., 2024 Interim Staff Report at 43, 49, https://tinyurl.com/ymevubkd (Small Business Committee Report).

Pursuant to its investigation, the Commission issued CIDs to at least seventeen entities, including NewsGuard, “that the Commission ha[d] reason to believe possess information relating to the use of such lists to coordinate ad placement.” App.413. Recipients included ad agencies, advertising trade associations, brand safety and suitability rating organizations, and policy and advocacy groups. *Id.* The NewsGuard CID sought several categories of documents and information, including information pertaining to NewsGuard’s ratings of publishers. App.243-51.

NewsGuard “participated in ten meet-and-confer discussions [with Commission staff] over the course of eight months and produced over 40,000 pages of documents in multiple rounds” in response to the CID. App.125. That meet-and-confer process served to substantially focus the disputes between Commission staff and NewsGuard. On January 15, 2026, Commission staff sent NewsGuard a letter

significantly narrowing the scope of the CID. In response to NewsGuard's concerns, the letter modified four of the five specifications that were disputed by NewsGuard, focusing on the information that was most crucial to the FTC's investigation. App.266-67. The letter explicitly stated that NewsGuard's previous productions had "satisfied its CID obligations" as to the remaining 26 specifications. App.244-49, 267.

The day after receiving that letter, NewsGuard filed a petition to quash. *See* App.430-49. NewsGuard argued that the CID "represents unconstitutional retaliation against NewsGuard based on its protected First Amendment activities." App.435. NewsGuard also argued that the CID's scope "violate[d] the First and Fourth Amendments' restrictions on administrative subpoenas." App.435-36.

The Commission denied NewsGuard's petition. App.412-27. As to retaliation, the Commission explained that it had "ample nonretaliatory explanations" for issuing the CID, which was one of many CIDs issued as part of a wide-ranging, high-priority investigation into collusion and boycotts in the advertising industry. App.417. The Commission also found that NewsGuard failed to support its claims of a chilling effect under the First Amendment: "Indeed, NewsGuard does not allege *any* change in its speech resulting from the CID." App.415-16. Finally, the Commission rejected NewsGuard's overbreadth challenge, explaining the agency's basis for seeking disclosure of the information sought by the CID. App.425-27.

### 2. Omnicom-IPG Complaint and Order

In June 2025, the Commission filed an administrative complaint addressing antitrust concerns associated with a proposed merger between two of the six largest advertising agency holding companies, Omnicom Group, Inc. and The Interpublic Group of Companies (IPG), which would create the largest media buying advertising agency in the United States. The Commission's complaint alleged that the merger would result in a "more concentrated" market. Complaint ¶ 13, *In re Omnicom Grp., Inc. and Interpublic Grp. of Cos., Inc.*, FTC Dkt. No. 251-0049 (June 23, 2025), https://tinyurl.com/2kt5y2bp. Increased concentration, in turn, would "meaningfully increase[] the risk" of collusion among the remaining market participants. *Id.* ¶ 15. And the risk of "anticompetitive coordination" was particularly significant in this instance due to a "history of coordination" among major advertisers. *Id.* ¶¶ 16-17. As the complaint detailed, "[m]ajor advertisers have discussed and ultimately declined to advertise on certain websites" and those "decisions appear to have been coordinated through one or more associations of advertising industry players, including ad agencies." *Id.* ¶ 17. Because the acquisition increased the risk of "anticompetitive coordination," the complaint charged that it would violate both the FTC Act and the Clayton Act. *Id.* ¶¶ 23-24.

To address these concerns, the Commission also issued a proposed consent agreement. The Commission published an analysis of the proposed agreement in the

Federal Register and solicited public comment. 90 Fed. Reg. 27,304 (June 26, 2025). The analysis explained that the agreement would prohibit Omnicom from certain conduct that the FTC identified as likely to facilitate anticompetitive coordination. *See id.* at 27,306. NewsGuard did not submit a comment on the proposed agreement.

After considering the comments that were submitted, the Commission issued a decision and entered a consent order directing Omnicom to cease and desist from certain conduct. App.307-14. The consent order eliminates Omnicom's ability to deny advertising dollars to media publishers based on their political or ideological viewpoint, except at the express and individualized direction of Omnicom's advertiser customers. App.308-09. The order also prohibits Omnicom and its subsidiaries from relying on "exclusion lists" or "inclusion lists" to differentiate among media outlets on prohibited grounds; however, the use of such lists is permitted at the request of a particular client. App.310. The order does not mention NewsGuard.

The Commission determined that the restrictions in the consent order were necessary to address "harm to competition," including the risk that the acquisition "increased the likelihood of coordination among competitors in the Media Buying Services industry." App.314.

### 3. Culmination of Advertising Boycott Investigation

The investigation into collusive advertising practices continued after the 2025 Omnicom consent order. In April 2026, the Commission and eight States sued Dentsu, WPP, and Publicis—three of the largest global advertising holding companies—in federal district court, alleging that they colluded through trade associations to set brand-safety standards. App.584; s*ee* App.591-93. These trade associations allegedly relied on information from third parties—including but not limited to NewsGuard—to develop the shared standards. App.589-91, 609-11. The complaint explained that these anticompetitive agreements prevented the advertising firms from competing based on their own, independently developed brand-safety standards, to the detriment of their clients and American consumers. App.612-15. The complaint asserted that these collusive acts violated Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 5 of the FTC Act, 15 U.S.C. § 45. App.615-16.

To resolve these claims, Dentsu, WPP, and Publicis each agreed to stipulated final judgments and permanent injunctions, which the district court has since approved and entered. App.629-705. The injunctions remediate the anticompetitive conduct through terms that are materially identical to those in the Omnicom consent order. *See supra* at 11-12.

With the entry of those injunctions, the Commission had addressed the risk of collusion from five of the six largest global advertising holding companies. Shortly

after, the sole outstanding member of the "Big Six"—Havas Media Group—stipulated to a materially identical injunction. *See* Final Order and Stip. Perm. Injunction, *FTC v. Havas Media Grp. USA, LLC*, No. 4:26-cv-804 (N.D. Tex. June 30, 2026), ECF No. 5.

### C. Proceedings Below

In February 2026, while the investigation continued and while its petition to quash was pending, NewsGuard brought this lawsuit and sought a preliminary injunction against enforcement of the CID and certain provisions of the Omnicom order. *See* App.1-52 (Complaint); 53-56 (Motion). NewsGuard brought this suit over eight months after the CID was issued and over four months after the Omnicom order became final. NewsGuard nevertheless asserted that it was suffering irreparable harm because the CID "imposed significant costs" and because the Omnicom order prevented it from entering "future contracts with the largest international advertising agency." App.106. NewsGuard's motion and supporting papers did *not*, however, allege or provide evidence that the FTC's actions chilled NewsGuard's speech or prevented NewsGuard from speaking. *See* App.53-56 (motion); 57-100 (memorandum of law); 111-32 (declaration).

In April 2026, the FTC informed the district court that the NewsGuard CID had been withdrawn, along with several other CIDs issued as part of the same investigation. App.583-86 (notice to court); App.707 (withdrawal letter). The FTC

explained that the investigation had "culminat[ed]" in the successful actions against Dentsu, WPP and Publicis, which "resolved the issues related to NewsGuard that gave rise to the CID." App.585. The agency therefore "no longer require[d] compliance with the CID." App.585.[2]

The district court held a hearing on NewsGuard's preliminary injunction motion and ultimately denied the motion without prejudice. *See* App.727 (order); App.728-38 (oral ruling tr.). The Court concluded that Omnicom "failed to demonstrate imminent, irreparable harm" as required to obtain a preliminary injunction. App.730.

As an initial matter, the district court found that the Commission's withdrawal of the CID "obviate[d] the need for an order enjoining the defendants from initiating any action to enforce the CID." App.731. The district court also explained that, to make out irreparable harm in a First Amendment case like this, a plaintiff must "establish that it is or will be engaging in constitutionally protected behavior and

[2] Two other CID recipients, Media Matters for America and Global Disinformation Index, had also sued the Commission to challenge CIDs issued to them as part of this investigation. They dismissed those suits after the Commission withdrew their respective CIDs. *See* Notice of Voluntary Dismissal, *Disinformation Index, Inc. v. FTC*, No. 1:25-cv-4137 (D.D.C. Apr. 24, 2026); Min. Order, *Media Matters for Am. v. FTC*, No. 1:25-cv-1959 (D.D.C. May 4, 2026); *see also* Order, *Media Matters for Am. v. FTC*, No. 25-5302 (D.C. Cir. May 4, 2026) (per curiam) (dismissing appeal pursuant to a joint stipulation).

that the allegedly impermissible government action would chill that conduct." App.732.

As the district court found, "NewsGuard has not made such allegations here." App.732; *see* App.733. In fact, at the preliminary injunction hearing, "NewsGuard acknowledged that it has not alleged that its speech has been chilled." App.732 (citing App.494 ("THE COURT: I thought that you were not saying that you are chilled currently. And if you are, can you point me to those assertions? [NEWSGUARD'S COUNSEL]: We haven't made those allegations specifically on the record so far.")).

The district court also held that NewsGuard's expenses in complying with the CID did not amount to irreparable harm and instead constituted mere "pocketbook injuries." App.735. Likewise, NewsGuard could not show irreparable harm merely by alleging it had lost contracts, since "NewsGuard has not explained why these business harms are irreparable or why it could not reinitiate [the lost] contracts should the Court ultimately hold the CID or the merger condition unlawful." App.735-36.

NewsGuard appeals the district court's order denying the preliminary injunction.

## SUMMARY OF ARGUMENT

**I.** NewsGuard failed to identify the irreparable harm required to support a preliminary injunction. NewsGuard cannot (and does not) identify any harm from a CID that has been withdrawn. As for the Omnicom order, NewsGuard can only speculate that it caused the cancellation (and may cause the non-renewal) of certain contracts. And even if those injuries were nonspeculative, they would be purely economic and could not support a preliminary injunction. NewsGuard's delay in seeking relief confirms the absence of irreparable injury.

Nor can NewsGuard rely on the First Amendment to satisfy the irreparable harm requirement. By its own admission, NewsGuard offered no evidence that its speech was chilled. Instead, NewsGuard seeks to be excused from the irreparable harm requirement based on a presumption of harm from direct restrictions on speech. But no such presumption applies where the challenged government action does not directly regulate the plaintiff's speech. That is the case here.

The Omnicom consent order nowhere mentions NewsGuard, and it binds only Omnicom. The order restricts Omnicom from using rating services or lists provided by any third party (not limited to NewsGuard) to facilitate collusion in advertising placement. It does not prevent NewsGuard from speaking or from providing its services to individual advertisers. Any effects on NewsGuard's business were

incidental to the Commission's enforcement of the antitrust laws. Such indirect effects of economic regulations do not give rise to a presumption of irreparable harm.

**II.** NewsGuard also cannot meet the remaining requirements for a preliminary injunction. The district court did not even address the likelihood of success on the merits or the balance of the equities, let alone exercise its equitable discretion with respect to those factors. NewsGuard cannot ask this Court to do so in the first instance, particularly given that it has forfeited those arguments on appeal. However, this Court can affirm the decision below on alternative grounds, and there is ample reason to do so here.

Several threshold barriers preclude consideration of the merits of NewsGuard's First Amendment claims. Mootness bars the claims concerning the withdrawn CID. And the district court lacks jurisdiction over this belated collateral attack on the Omnicom consent order because NewsGuard is not a party to that order, did not file a petition for review in this Court, and waited over four months to bring this action. NewsGuard also failed to exhaust its arguments before the FTC before seeking judicial relief.

NewsGuard's retaliation and jawboning claims also fail on their own terms. The theory of a retaliatory settlement of antitrust claims is wholly unsupported by precedent. And there was no retaliation in any event. NewsGuard has not shown a causal link between the Omnicom consent order and any instance of NewsGuard's

speech. Just the opposite: The order was part of a wide-ranging and comprehensive inquiry into anticompetitive behavior in the advertising industry. The challenged provisions of the Omnicom consent order address that legitimate antitrust concern by prohibiting Omnicom from using third-party lists or rating services to facilitate anticompetitive collusion.

NewsGuard's purported evidence of retaliation is wholly inadequate, and certainly cannot defeat the presumption of regularity. Chairman Ferguson's statements about the agency's antitrust concerns were neither improper nor retaliatory. Indeed, NewsGuard resorts to twisting the meaning of the Chairman's statements to suggest the exact opposite of what he actually said. Likewise, the now-withdrawn CID was one of many issued in the course of the investigation, and its scope was consistent with other FTC subpoenas. Here, too, NewsGuard resorts to misrepresentation, flatly mischaracterizing an FTC letter that demonstrated the FTC's good-faith approach by substantially narrowing the limited remaining obligations. The jawboning claim fails for similar reasons, including the lack of factual support and the absence of a link between the FTC's investigation and any intent to punish NewsGuard for its speech.

## STANDARD OF REVIEW

This Court "review[s] the district court's decision whether to grant a preliminary injunction for abuse of discretion, its legal conclusions de novo and its

findings of fact for clear error." *Glob. Health Council v. Trump*, 153 F.4th 1, 12 (D.C. Cir. 2025).

## ARGUMENT

"A preliminary injunction is an 'extraordinary' equitable remedy that is 'never awarded as of right.'" *Starbucks Corp. v. McKinney*, 602 U.S. 339, 345 (2024) (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)). "[A] plaintiff seeking a preliminary injunction must make a clear showing that 'he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'" *Id*. at 346 (quoting *Winter*, 555 U.S. at 20, 22). Here, the district court correctly concluded that NewsGuard failed to show irreparable harm. This Court can affirm that decision for the same reason or because NewsGuard's motion also failed to satisfy the remaining preliminary injunction factors.

### I. THE DISTRICT COURT PROPERLY DENIED THE REQUESTED PRELIMINARY INJUNCTION BASED ON A LACK OF IRREPARABLE HARM.

The district court found that NewsGuard failed to establish it was likely to suffer irreparable harm in the absence of an injunction. App.730-31. That decision faithfully applied well-established legal principles to the factual record before the court.

Failure to show irreparable harm is grounds for denying a preliminary injunction even if the other factors weigh in favor of granting such relief. *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). This Court "has set a high standard for irreparable injury." *Id.* The plaintiff must show that the injury is "both certain and great" and "of such *imminence* that there is a 'clear and present' need for equitable relief to prevent irreparable harm." *Id.* (quoting *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam)). The district court correctly found that NewsGuard failed to meet this high standard.

First, NewsGuard cannot (and no longer attempts to) establish irreparable harm from the CID. Because the CID has been withdrawn, there can be no conceivable harm from its enforcement. Accordingly, NewsGuard has understandably (and properly) abandoned its effort to support its original request for an injunction against enforcement of the withdrawn CID.

Second, NewsGuard can only speculate about the effect of the FTC's consent order with Omnicom, and the district court correctly ruled that NewsGuard failed to show that those conditions would cause irreparable harm. NewsGuard did not even allege that its speech had been chilled, and the economic harms it identified were neither traceable to the order nor significant enough to meet the standard for a preliminary injunction. And NewsGuard cannot escape its obligation to demonstrate irreparable harm by pointing to a claimed First Amendment violation because the

order does not impose any direct restriction on NewsGuard's speech; any effects it might have on NewsGuard are indirect and incidental to the antitrust remedy imposed on Omnicom.

### A. There Can Be No Irreparable Harm from the Withdrawn CID.

The only relief NewsGuard sought with respect to the CID is an injunction prohibiting the FTC "from initiating any action to enforce the CID." App.55, 315. The FTC withdrew that CID on April 16, 2026, App.583-86, and the district court concluded that the withdrawal of the CID "address[es] NewsGuard's alleged ongoing irreparable harm as to the CID and obviate[s] the need for an order enjoining the defendants from initiating any action to enforce the CID." App.731.

That conclusion was plainly correct. Indeed, NewsGuard's opening brief on appeal identifies no prospect of irreparable harm from the now-withdrawn CID—nor could it. The withdrawal of the CID eliminated the possibility that the Commission could bring an action to enforce the CID, and therefore also eliminated the possibility of any harm from such an enforcement proceeding. That conclusively resolves the requested injunction concerning enforcement of the CID, and this Court should affirm the obviously correct denial of such an injunction.

Instead of identifying the kind of irreparable harm required to support an injunction to enforce a withdrawn CID, NewsGuard now directs its efforts at a different target altogether—what it calls "the FTC's retaliatory campaign against

NewsGuard." Br.53. But NewsGuard did not seek a preliminary injunction against "the FTC's retaliatory campaign" (whatever that means), nor would any such vague language satisfy the requirement that any injunction must "describe in reasonable detail ... the act or acts restrained or required." Fed. R. Civ. P. 65(d)(1)(C). The relevant question is whether the district court correctly denied the injunction NewsGuard sought—that is, an injunction against enforcement of the now-withdrawn CID. And NewsGuard makes no effort to show that such an injunction is necessary to remedy any harm.

NewsGuard's request for a preliminary injunction concerning the CID is therefore moot and was properly denied. NewsGuard's contention that the withdrawal of the CID does not moot the case *on the merits* (Br.53) is irrelevant because the merits of NewsGuard's underlying claims are not before the Court in this interlocutory appeal.[3]

In any event, the Commission has no intention of reissuing the CID or making similar demands on NewsGuard in the future in light of its settlement with the advertising agencies, which resolved the issues related to NewsGuard that gave rise to the CID. App.585. To the extent that NewsGuard nevertheless has concerns about

[3] The district court has stayed proceedings pending resolution of this appeal, at NewsGuard's request. *See* Min. Order (June 24, 2026). When proceedings resume in district court, the Commission will address on the merits the mootness of NewsGuard's claims relating to the CID.

this (*see* App.714 n.5), it remains free to seek other injunctive relief, if supported by evidence of irreparable harm and a viable legal theory. But those concerns provide no basis for an injunction against enforcement of the withdrawn CID, and NewsGuard does not appear to disagree. Nor can *past* compliance costs (Br.19) support *forward-looking* relief. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 102-03 (1983) (noting that past exposure to harms does not establish a basis for seeking injunctive relief).

### B. NewsGuard Failed to Identify Any Non-Speculative Harm Related to the Omnicom Consent Order.

NewsGuard also sought to enjoin enforcement of the Commission's settlement order resolving antitrust concerns related to the merger of Omnicom and IPG. App.54-55. The district court denied that requested injunction because NewsGuard failed to show irreparable harm from the Omnicom order. App.730-36. That decision was correct and amply supported by the record before the district court.

**1.** In the briefing below, NewsGuard identified only two concrete harms that were supposedly caused by the Omnicom settlement. Both are wholly speculative and insufficient to demonstrate irreparable harm.

The first is a statement by an unnamed customer that it would not renew its contract with NewsGuard due to "[r]ecent developments that require us to take a more cautious approach to this area of our business." Br.28 (quoting App.131). But

nothing in the record suggests that the vague phrase "recent developments" refers to the Omnicom order (rather than, for example, the significant public criticism and multiple congressional investigations NewsGuard has faced). Nor did NewsGuard present any evidence suggesting that the customer would have made a different decision if the Commission were not enforcing that order.

Second, NewsGuard speculated that its contract with IPG would not be renewed. App.131.[4] But NewsGuard offered no evidence that the contract would have been renewed but for the Omnicom order, and there is every reason to doubt that it would have been. After all, IPG had been acquired by Omnicom—a company that did *not* have a contract with NewsGuard. It is therefore wholly speculative whether Omnicom would choose to renew IPG's contract with NewsGuard regardless of any actions by the FTC, particularly given that NewsGuard is (by its own description) "a small player" (App.118) in the advertiser brand safety market. NewsGuard's inability to trace any harm to the Commission's order precludes an injunction against that order. *See Wis. Gas Co.*, 758 F.2d at 674 ("[T]he movant must show that the alleged harm will directly result from the action which the movant seeks to enjoin.").

---

[4] NewsGuard now asserts, without any record support, that IPG (after its acquisition by Omnicom) "did not renew with NewsGuard when its contract came up for renewal in April 2026." Br.28.

In short, NewsGuard's minimal evidence was too speculative to show irreparable harm. The purported injuries were not traceable to the Omnicom order and were not redressable by an injunction prohibiting enforcement of that order.[5] At most, NewsGuard established only a bare "possibility" that a preliminary injunction would prevent or remedy these kinds of speculative harms, which is insufficient to obtain relief. *See Winter*, 555 U.S. at 22.

Moreover, even if these asserted contract harms were sufficiently certain, the district court correctly found that "NewsGuard has not explained why these business harms are irreparable or why it could not reinitiate these contracts" if the court ultimately granted relief. App.735-36. It is "well settled that economic loss does not, in and of itself, constitute irreparable harm." *Wis. Gas Co.*, 758 F.2d at 674. NewsGuard made no attempt to quantify the magnitude of these harms or show that they were sufficiently "great," *id.*, to be irreparable.

**2.** NewsGuard now attempts to remedy its evidentiary shortcomings with an assertion that was not part of the record below. It claims that "a major supply-side/demand-side platform for digital advertising cancelled its five-year contract

[5] For the same reasons, NewsGuard lacked Article III standing to challenge the Omnicom consent order. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992); *Murthy v. Missouri*, 603 U.S. 43, 57 (2024) ("[I]t is a bedrock principle that a federal court cannot redress 'injury that results from the independent action of some third party not before the court.'" (quotation omitted)).

with NewsGuard based on apparent concerns that using NewsGuard's rating and analyses would be viewed unfavorably by the FTC." Br.28. That statement is likewise far too speculative to support irreparable harm.

NewsGuard does not even suggest that this customer identified the Omnicom order as the reason for cancellation, instead saying only that the decision was based on unexplained "apparent concerns" about how the Commission might view its relationship with NewsGuard in the future. Also, like the other harms discussed above, this is a mere monetary injury that does not amount to irreparable harm. In short, even if this statement were supported by the record, it would not satisfy the irreparable harm test.

In any event, this new assertion lacks any citation or support and is apparently based on events that took place long after NewsGuard's motion and declarations were submitted to the district court. *Id.* (describing the event as having taken place "[i]n recent months"). It is therefore not cognizable on appeal, as it would be improper to "hold that the district court abused its discretion based on evidence not before it when it ruled." *Verlo v. Martinez*, 820 F.3d 1113, 1125 (10th Cir. 2016) (declining to consider "events occurring *after* the preliminary injunction hearing to determine whether the district court abused its discretion" in granting an injunction). Indeed, "this court and [its] sister circuits generally have held that declarations that were not part of the record before the district court … are not part of the record on

appeal." *Swanson Grp. Mfg., LLC v. Jewell*, 790 F.3d 235, 240 (D.C. Cir. 2015). That conclusion holds with even more force here, where NewsGuard does not even seek to supplement the record with additional declarations.

### C. NewsGuard's Admissions and Conduct Before the District Court Confirm the Absence of Irreparable Harm.

Notably, NewsGuard conceded at the preliminary injunction hearing that it had not made "allegations specifically on the record so far"—i.e., no factual support existed in the record—that its speech was currently being chilled. App.494. NewsGuard's new assertions of chill on appeal are based solely on statements of counsel at the preliminary injunction hearing that were admittedly unsupported by evidence in the record. *See* Br.27 (citing App.494-97). And even those statements fail to tie any changed behavior to the Omnicom order. Br.27 (asserting that claimed decision to stop publishing certain reports was based on "[t]he FTC's [now-withdrawn] CID and nearly year-long 'investigation,' along with the publicized statements of Chairman Ferguson assailing NewsGuard"). The district court thus properly concluded that NewsGuard had not demonstrated a chilling effect establishing any irreparable harm. App.733-34.

NewsGuard's delay in seeking injunctive relief further highlights the lack of irreparable harm. NewsGuard did not file its motion for preliminary injunction until February 11, 2026—nearly nine months after the CID was issued and more than four months after the final Omnicom consent order was entered. "[A] party requesting a

preliminary injunction must generally show reasonable diligence," *Benisek v. Lamone*, 585 U.S. 155, 159 (2018) (per curiam), and this Court has recognized that district courts "should be reluctant to award relief" when a plaintiff fails to prosecute its claim for injunctive relief "promptly." *Natural Res. Def. Council v. Pena*, 147 F.3d 1012, 1026 (D.C. Cir. 1998); *see also Fund for Animals v. Frizzell*, 530 F.2d 982, 987 (D.C. Cir. 1975) (finding that 44-day delay in seeking injunction was "inexcusable" and "bolstered" the court's "conclusion that an injunction should not issue"). Courts in this Circuit have routinely denied relief where plaintiffs were less dilatory than NewsGuard. *See, e.g.*, *Open Top Sightseeing USA v. Mr. Sightseeing, LLC*, 48 F. Supp. 3d 87, 90-91 (D.D.C. 2014) (delay of up to 95 days "demonstrated that any alleged harm lacks the urgency and immediacy required to grant" a preliminary injunction); *Mylan Pharms., Inc. v. Shalala*, 81 F. Supp. 2d 30, 44 (D.D.C. 2000) (two-month delay "militates against a finding of irreparable harm").

NewsGuard asserts in its appeal brief that the *Dentsu* consent orders entered on April 16, 2026, are imposing the same kinds of harm as the Omnicom consent order. Br.29, 47. Yet NewsGuard did not amend its complaint to address the *Dentsu* orders, and has not pursued any injunctive relief relating to those orders. Instead, NewsGuard waited a month and then filed a motion to hold all proceedings in the district court in abeyance pending this appeal. Dkt.40. NewsGuard's consistent lack of urgency in pursuing an injunction confirms the absence of irreparable harm.

### D. NewsGuard Is Not Entitled to a Presumption of Irreparable Harm.

Instead of relying on the factual record below, NewsGuard argues on appeal that a legal presumption excuses the required showing of irreparable harm because "the harassment campaign and merger condition directly restrict[] the dissemination of NewsGuard's protected speech." Br.34 (emphasis omitted). But this argument mischaracterizes the relief that NewsGuard sought in its preliminary injunction motion, the nature and effect of the Omnicom consent order, and the legal doctrine it invokes.

As noted above, NewsGuard did not (and could not) seek to enjoin a "harassment campaign"—it sought to enjoin (1) enforcement of the CID and (2) enforcement of the challenged condition in the Omnicom consent order. Because enforcement of the now-withdrawn CID is impossible, any analysis of First Amendment harms must focus solely on the Omnicom consent order. But that order does not directly restrict NewsGuard's free speech rights or create any presumption of irreparable harm, and thus it cannot substitute for the required evidence of irreparable harm that NewsGuard has failed to produce.

#### 1. There is no presumption of irreparable harm from economic regulations that place indirect burdens on the speech of third parties.

NewsGuard argues that it need not show any actual harm because "irreparable harm may be presumed when the government takes actions that directly limit a

party's ability to speak, publish, or distribute protected expression, or threatens to do so," Br.35 (citing *Chaplaincy*, 454 F.3d at 301). But as the district court correctly recognized, App.732, *Chaplaincy* makes clear that "[t]here is no *per se* rule that a violation of freedom of expression *automatically* constitutes irreparable harm." 454 F.3d at 301. In other words, just as the language quoted by NewsGuard indicates, the key question is whether the challenged government action "directly limit[s]" NewsGuard's speech. Br.35. If not, no presumption applies.

This rule is sensible. Courts appropriately absolve litigants from the requirement of demonstrating irreparable harm only where the chilling effect on speech is apparent from the direct nature of the restriction and no further evidence is needed. *See, e.g.*, *Bronx Household of Faith v. Bd. of Educ.*, 331 F.3d 342, 350 (2d Cir. 2003) (school board policy prohibiting religious services in schools "directly limits plaintiffs' speech" by prohibiting the use of school property for worship services). *Chaplaincy* applied such a presumption to an Establishment Clause claim "[b]ecause, when an Establishment Clause violation is alleged, infringement occurs the moment the government action takes place." 454 F.3d at 302-03. This Court expressly contrasted that with "other First Amendment rights," including freedom of speech and "variants of the freedom to express oneself," where irreparable injury *cannot* ordinarily be presumed because those rights require "affirmative conduct on the part of the individual before [the First Amendment's] guarantees are implicated

by government action." *Id.* at 302; *see Hanson v. District of Columbia*, 120 F.4th 223, 244 (D.C. Cir. 2024) ("Even in the sensitive areas of freedom of speech and religion … we do not 'axiomatically' find that a plaintiff will suffer irreparable harm simply because it alleges a violation of its rights." (quoting *Chaplaincy*, 454 F.3d at 302)); *Sanders v. McLellan*, 463 F.2d 894, 903 (D.C. Cir. 1972) (evaluating chilling effects in assessing "whether we should use the extraordinary equity remedy of injunction" with respect to a First Amendment claim that did not involve "direct suppression of speech").

There is no support in the caselaw for presuming irreparable harm when a plaintiff alleges First Amendment harm from an economic regulation (such as one resulting from the enforcement of the antitrust laws) that only indirectly burdens the plaintiff's commercial speech interests. Indeed, NewsGuard itself acknowledges that a presumption of harm is not appropriate where the government regulation does not "directly suppress[]" speech or has merely "incidental" effects on First Amendment rights. Br.39-40.

None of NewsGuard's authorities are to the contrary. NewsGuard relies heavily on *NTEU v. United States*, 927 F.2d 1253 (D.C. Cir. 1991), but there this Court declined to presume irreparable harm even though plaintiffs were challenging a law that prohibited them from receiving compensation for speeches. *Id.* at 1254-55. The Court explained that, while the "'loss of First Amendment freedoms' ... may

constitute irreparable injury, ... [a] preliminary injunction is not appropriate" absent a showing that a plaintiff's First Amendment interests are actually being threatened or impaired. *Id.* at 1254 (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)); *see Media Matters for Am. v. Paxton*, 138 F.4th 563, 585 (D.C. Cir. 2025) (same); *Hotchkiss v. Cedar Rapids Cmty. Sch. Dist.*, 115 F.4th 889, 893-94 (8th Cir. 2024) (same). The plaintiffs in *NTEU* failed to make that showing. *NTEU*, 927 F.2d at 1254-55. In *Chaplaincy*, this Court cited *NTEU* and confirmed that, in the absence of a direct restriction on a plaintiff's speech, "the moving party must demonstrate some likelihood of a chilling effect on their rights." 454 F.3d at 301. This Court further explained that, "in instances where a plaintiff alleges injury from a rule or regulation that may only potentially affect speech, the plaintiff must establish a causal link between the injunction sought and the alleged injury, that is, the plaintiff must demonstrate that the injunction will prevent the feared deprivation of free speech rights." *Id.* (quoting *Bronx Household of Faith*, 331 F.3d at 350).[6]

---

[6] NewsGuard's cases involving retaliation (Br.52-53) are consistent with these principles as they address "*direct* government retaliation"—that is, government actions taken *directly* against an entity. *Paxton*, 138 F.4th at 585 (emphasis added) (citing *Cate v. Oldham*, 707 F.2d 1176, 1189 (11th Cir. 1983)); *see also Hefferman v. City of Paterson*, 578 U.S. 266, 268-70 (2016) (police department demoted employee due to its perception of his speech). NewsGuard does not cite a case where a court presumed irreparable harm based on anything resembling the scenario in this case: a government settlement with a third party. That is not surprising because, as discussed below, this appears to be the first retaliation case to ever invoke such a theory. *See infra* at 44.

NewsGuard relies on *United States v. Playboy Entertainment Group*, 529 U.S. 803 (2000), for the proposition that economic burdens on a media organization are inherently irreparable First Amendment harm. Br.42-43. But *Playboy* involved a statute that itself imposed a "significant restriction" on speech, 529 U.S. at 812, and here (as explained below) the Omnicom order imposes no such direct restriction. At any rate, *Playboy* is a *merits* decision that says nothing about establishing irreparable injury for purposes of a preliminary injunction (and indeed does not even mention the concept of irreparable injury). Similarly, NewsGuard points to *Minneapolis Star and Tribune Co. v. Minnesota Commissioner of Revenue*, 460 U.S. 575 (1983), but that case did not involve any claim for injunctive relief and thus says nothing about a presumption of irreparable harm based on alleged First Amendment injury. Nor did the court rely on a presumption of irreparable harm in *Endocrine Society v. FTC*, __ F. Supp. 3d. __, 2026 WL 1257289 (D.D.C. 2026).

Critically, none of the cases cited by NewsGuard involved speech that was incidentally burdened by government restrictions aimed at enforcing the antitrust laws. The Supreme Court has repeatedly held that orders enforcing the antitrust laws are not subject to heightened First Amendment scrutiny merely because they impose burdens on a party's speech. *See FTC v. Super. Ct. Trial Lawyers Ass'n*, 493 U.S. 411, 431-32 (1990) ("A rule that requires courts to apply the antitrust laws 'prudently and with sensitivity' whenever an economic boycott has an 'expressive component'

would create a gaping hole in the fabric of those laws."); *Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 697-98 (1978) ("In fashioning a remedy [for a violation of the antitrust laws], the District Court may … consider the fact that its injunction may impinge upon rights that would otherwise be constitutionally protected, but those protections do not prevent it from remedying the antitrust violations. The standard against which the order must be judged is whether the relief represents a reasonable method of eliminating the consequences of the illegal conduct.").

In short, the doctrinal rule is clear. NewsGuard can satisfy the irreparable harm requirement only by demonstrating an irreparable injury or by pointing to a direct restriction on its speech. It cannot do the former, so the only remaining question is whether the Omnicom order directly limited NewsGuard's speech.

### 2. The Omnicom consent order does not directly restrict NewsGuard's speech.

Contrary to NewsGuard's repeated assertions (e.g., Br.39), the Omnicom consent order does not directly limit or suppress NewsGuard's speech. If it has any effect on NewsGuard's speech at all, that effect is indirect. The consent order imposes no restrictions on NewsGuard itself and does not prohibit NewsGuard from publishing or disseminating ratings of news sources to anyone, *including to Omnicom*.

The consent order settled a dispute under the antitrust laws between the FTC, Omnicom, and IPG over Omnicom's acquisition of IPG. App.307-14. As the Commission explained, Omnicom's acquisition of IPG would significantly increase market concentration in the advertising industry, making it far easier for market participants to engage in anticompetitive agreements to adopt shared lists of disfavored media publishers—and thus avoid competition in the market for media-buying services—just as the Commission found they had done in the recent past. *See* 90 Fed. Reg. at 27,305-06. Such collusive agreements threatened significant harms to competition. *See id.* at 27,306.

The Commission sought to remedy the potential for anticompetitive effects by "eliminat[ing] Omnicom's ability to participate in [such] ongoing or future coordination." *Id.* at 27,305. Accordingly, the order prohibits Omnicom from using products such as exclusion lists or rating services as well as similar means of differentiating between media publishers based on certain criteria (such as ideological viewpoints or journalistic ethics). App.308-10. The order applies to services provided by any entity (not just NewsGuard). App.308-10.[7]

---

[7] Nor is NewsGuard the only organization that provides such services. The Commission's *Dentsu* complaint explained that "a number of organizations," including NewsGuard, the Global Disinformation Index, Check My Ads, and Media Matters for America, "pursued strategies that involved classifying disfavored opinions as 'misinformation' and then lobbying the digital ad-buying ecosystem to demonetize sites that hosted or shared such content." App.589-90.

The consent order therefore does not directly restrict NewsGuard's speech. NewsGuard is not a party to the order, is not subject to it, and is not even named or otherwise singled out in it. The consent order imposes limitations only on Omnicom. And even those limitations do not preclude dealings with NewsGuard, as the order explicitly *permits* Omnicom to use exclusion lists and ratings (including those provided by NewsGuard) at the direction of a particular advertiser. App.310. In other words, NewsGuard, like any other third party that produces ratings of media publishers, could continue to provide Omnicom and its advertising clients with ratings of news sources.[8]

In sum, any effects the order might have on NewsGuard's speech are demonstrably *indirect*—a downstream consequence of restrictions on *Omnicom* that are designed to prevent illegal collusion by Omnicom.[9] Such incidental effects on third parties are routine and unavoidable in remedying antitrust violations.[10] The

---

[8] For these reasons, NewsGuard's repeated characterization of the consent order as a "blacklist[]" is wholly baseless. *E.g.*, Br.20. A blacklist is a "list of people in disfavor." *Blacklist*, Oxford Essential Dictionary 59 (Am. ed. 1998); *Blacklist* Merriam-Webster Dictionary (online ed.), https://tinyurl.com/bdhd2uws (same). By contrast, the order here makes no mention of NewsGuard or any other entity. Instead, it addresses Omnicom's ability to purchase certain services from *any* supplier.

[9] NewsGuard does not rely on Omnicom's rights, and the antitrust laws in any event permit such restrictions on Omnicom. *See Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949).

[10] For example, FTC consent orders have prohibited covered parties from entering into certain types of contracts with third parties, *see* Decision and Order, *Aaron's, Inc.*, 169 F.T.C. 380, 386 (May 11, 2020), from signing new leases with certain

government must seek remedies that "pry open" the market to competition, *United States v. E.I. du Pont de Nemours & Co.*, 366 U.S. 316, 323 (1961) (quotation omitted), even if those remedies "entail harsh consequences" or "economic hardship," *id.* at 327-28 (holding that full corporate divesture was appropriate remedy despite adverse tax and market consequences for investors). And as the Supreme Court has explained, there are "unusually compelling" reasons to enforce the antitrust laws even if doing so has incidental effects on speech. *See Super. Ct. Trial Lawyers Ass'n*, 493 U.S. at 430-32.

In sum, NewsGuard has not shown any non-speculative harm from the Omnicom order. Nor is it entitled to a presumption of irreparable harm, as any injury that might be caused by the Omnicom order would be demonstrably indirect and incidental. The district court was therefore correct in holding that NewsGuard has failed to demonstrate irreparable harm.

## II. THIS COURT CAN ALSO AFFIRM THE DISTRICT COURT'S DENIAL OF A PRELIMINARY INJUNCTION ON OTHER GROUNDS.

As explained above, this Court should affirm because NewsGuard failed to make the required showing of irreparable harm. But even if this Court has any doubt

---

landlords, *see* Proposed Order, *In re Valvoline Inc.*, FTC Dkt. No. C-4824 (§ XI) (Nov. 14, 2025), https://tinyurl.com/2vmy8ekz, or from hiring certain specified employees, *see* Decision and Order, *Mars, Inc.*, 164 F.T.C. 821, 843 (Nov. 30, 2017).

on that point, NewsGuard would not be entitled to an order directing the district court to issue a preliminary injunction. Br.54.

*First*, the district court only analyzed irreparable harm and declined to address the other preliminary injunction factors. App.729-36. As this Court has explained, "the proper course of action" in such cases is to "remand to the district court" so that it can assess the remaining factors and "independently exercise its discretion." *FTC v. Whole Foods Mkt., Inc.*, 548 F.3d 1028, 1041 (D.C. Cir. 2008); *see Gordon v. Holder*, 632 F.3d 722, 725 (D.C. Cir. 2011) (remanding "to allow the district court the opportunity to weigh the factors in determining whether a preliminary injunction is warranted"). After all, this is "a court of review, not first view," and thus it "ordinarily [will] not decide contested questions not resolved below." *Marseille-Kliniken AG v. Republic of Equatorial Guinea*, 153 F.4th 1262, 1271 (D.C. Cir. 2025) (quotation omitted). NewsGuard identifies no reason to depart from that well-established norm here.

*Second*, in any event, NewsGuard does not even argue on appeal that the other preliminary injunction factors are met. *Cf. League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 7 (D.C. Cir. 2016) (parties "amply" briefed "all four factors" "both in the district court and on appeal"). It has therefore forfeited the argument that a preliminary injunction is warranted.

On the other hand, this Court is free to "affirm a judgment on any basis adequately preserved in the record below," even where "the district court did not reach the issue." *U.S. ex rel. Heath v. AT & T, Inc.*, 791 F.3d 112, 123 (D.C. Cir. 2015). And as discussed below, there are several additional grounds on which this Court can affirm the district court's decision.

### A. NewsGuard Failed to Demonstrate a Likelihood of Success on the Merits.

NewsGuard cannot prevail on its First Amendment claims.[11] And its failure to address the likelihood of success precludes a preliminary injunction.

#### 1. NewsGuard cannot show a likelihood of success on a claim relating to the withdrawn CID.

NewsGuard cannot demonstrate that it is likely to succeed on a claim challenging a withdrawn CID. Tellingly, it does not *even attempt* to do so on appeal. That's because the claim is clearly moot, as the FTC intends to demonstrate when this case resumes in district court. And while NewsGuard might eventually contest that merits issue, Br.53-54, it cannot dispute that mootness presents a substantial obstacle to its ultimate likelihood of success on the merits.

Moreover, as explained below, NewsGuard's allegations of retaliation are legally unsupportable and egregiously mischaracterize the record. All of this

[11] NewsGuard has forfeited its First and Fourth Amendment overbreadth theory (App.42) by failing to address it in its opening brief.

precludes any conclusion that NewsGuard is likely to succeed on the merits of its CID claims, especially in light of the failure to address this critical factor at all in the opening brief on appeal.

### 2. NewsGuard's challenge to the Omnicom consent order is barred.

NewsGuard cannot show a likelihood of success on its claims relating to the Omnicom consent order for multiple threshold reasons.

*First*, the district court lacks jurisdiction to review the Omnicom order. Congress has provided for judicial review of FTC adjudicatory orders, but has specified that challenges to those orders must be initiated in the courts of appeals. Section 5 of the FTC Act states that persons subject to FTC orders "[may] obtain a review of such order in the court of appeals of the United States," 15 U.S.C. § 45(c), and that "the jurisdiction of the court of appeals ... shall be exclusive," *id.* § 45(d). In so providing, Congress "cut[] off original jurisdiction in other courts." *Telecomm. Rsch. & Action Ctr. v. FCC*, 750 F.2d 70, 77 (D.C. Cir. 1984). Accordingly, "review of FTC cease and desist orders is committed to the courts of appeals," *Ukiah Adventist Hosp. v. FTC*, 981 F.2d 543, 549 (D.C. Cir. 1992), and the district court therefore lacked jurisdiction to entertain a challenge to the Omnicom order.

Moreover, even if NewsGuard had filed in the appropriate forum, its challenge would be untimely. The FTC Act provides that any petition for review of a Commission order must be filed in the court of appeals "within sixty days from the

date of the service of such order." 15 U.S.C. § 45(c). But NewsGuard sought review *more than four months* after the Omnicom order was issued.

*Second*, NewsGuard is not entitled to collaterally challenge the Omnicom order. Congress provided judicial review of FTC orders "only ... for parties subject to an FTC cease and desist order." *Consumer Fed'n of Am. v. FTC*, 515 F.2d 367, 369 (D.C. Cir. 1975) (citing 15 U.S.C. § 45(c)); Order, *Consumers for Auto Reliability and Safety v. FTC*, No. 17-1038, 2017 U.S. App. LEXIS 12921, at *1 (D.C. Cir. July 14, 2017) (per curiam) ("Petitioners are not subject to the requirements of the consent orders at issue and therefore may not challenge those orders in this court under 15 U.S.C. § 45(c)."). NewsGuard cannot challenge the Omnicom order because it is not a party subject to that order.

Congress often limits judicial review to the entities which are bound by an agency order. *See, e.g.*, *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 346-48 (1984); *Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 674-78 (2025). Congress sensibly adopted that course here to ensure that third parties, who are routinely affected by FTC consent orders, cannot interfere with the Commission's discretionary decisions to settle enforcement litigation. *See Block*, 467 U.S. at 348 (noting that allowing third-party challenges would enable gamesmanship that interferes with agency enforcement power); *Balt. Gas & Elec. Co. v. FERC*, 252 F.3d 456, 457 (D.C. Cir.

2001) (agency's "decision to settle [enforcement action] is committed to the agency's nonreviewable discretion").[12]

*Finally*, NewsGuard's challenge to the consent order fails for lack of exhaustion, *see Carr v. Saul*, 593 U.S. 83, 88 (2021), because NewsGuard did not submit a comment during the public comment period. Accordingly, even if NewsGuard otherwise had a right to judicial review, failure to exhaust would defeat its case. *E.g.*, *Nat'l Lifeline Ass'n v. FCC*, 983 F.3d 498, 509 (D.C. Cir. 2020) ("[W]e will not review arguments that have not first been presented to the Commission."). Nor can NewsGuard argue that it was not obligated to comment because it was only affected by the *final* order. After all, it contends that the proposed order "was intended to target and debilitate—if not eliminate—new rating services" and "NewsGuard was at the top of the FTC's and Ferguson's hit list." Br.21.[13]

#### 3. NewsGuard is not likely to succeed on its novel claim of First Amendment retaliation.

Even if NewsGuard's Omnicom claims were reviewable, they would fail on the merits.

[12] NewsGuard does not contend that it meets the requirements for ultra vires review of an FTC order. *See Nuclear Regul. Comm'n*, 605 U.S. at 680-83.

[13] In addition, as noted above, NewsGuard's asserted harms from the Omnicom order are far too speculative to establish standing. *See supra* at 26 n.5.

**a. NewsGuard asserts an entirely unprecedented claim.**

NewsGuard's Omnicom claims rest on a wholly novel theory that might be termed "retaliatory settlement of litigation," whereby the government unconstitutionally retaliates against a party by settling litigation with a wholly separate entity. NewsGuard identifies no example of a court even considering (let alone endorsing) such a claim, and the FTC is aware of none.

There is no reason to believe that such a claim for relief is cognizable, especially where Congress has expressly limited judicial review of FTC consent orders to those who are parties to such orders. *See Alexander v. Sandoval*, 532 U.S. 275, 290 (2001); *Consumer Fed'n of Am.*, 515 F.2d at 370. The profound uncertainty (at best) as to whether NewsGuard has even identified a potentially valid legal theory "suggest[s] that the key premise of a preliminary injunction—a showing of likelihood of success on the merits—is missing." *L.W. ex rel. Williams v. Skrmetti*, 83 F.4th 460 (6th Cir. 2023), *aff'd*, 605 U.S. 495 (2025).[14]

**b. NewsGuard's retaliation claim fails on the merits.**

To prevail on its First Amendment retaliation claim, NewsGuard must show, among other things, "a causal link" between its protected First Amendment conduct

[14] Similarly, NewsGuard's challenge to the CID relies on a retaliatory *investigation* claim. The Supreme Court has expressly left open whether such a claim exists. *Hartman v. Moore*, 547 U.S. 250, 262 n.9 (2006). This is yet another reason why NewsGuard cannot show a likelihood of success on the merits of its CID claims.

and the FTC's "adverse action." *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016) (quotation omitted). This requires NewsGuard, at a minimum, to demonstrate that the consent order "would not have been [issued] absent the retaliatory motive." *Nieves v. Bartlett*, 587 U.S. 391, 399 (2019).[15] In making that but-for showing, NewsGuard must overcome the "presumption of regularity" that attaches to government action. *Hartman*, 547 U.S. at 263. That presumption is at its apex in the context of law-enforcement investigations, an area of "executive discretion of such high order" that "judicial intrusion ... should be minimal." *Id.* Excessive judicial interference "could 'chill law enforcement,' cause delay, and 'impair the performance of a core executive constitutional function.'" *United States v. Fokker Servs. B.V.*, 818 F.3d 733, 741 (D.C. Cir. 2016) (quotation omitted); *see Trump v. Hawaii*, 585 U.S. 667, 702 (2018). It is NewsGuard's burden to put forward enough evidence to displace the presumption and demonstrate that a retaliatory motive was the but-for cause of the Omnicom consent order.

[15] In fact, the applicable test is more stringent: NewsGuard must demonstrate that there was no reasonable basis for the consent order. For example, in the similar context of retaliatory arrests, the Supreme Court has held that plaintiffs must show that the government lacked probable cause. *Nieves*, 587 U.S. at 399-400. NewsGuard contended below that *Nieves* was "inapplicable in the context of civil cases,"App.394, but the Sixth Circuit recently held that the "no-probable-cause" standard applies in the civil context where a plaintiff brought "a First Amendment retaliation claim" in response to a quo warranto petition that allegedly retaliated "against her for her political and other speech," *Amacher v. City of Tullahoma*, 179 F.4th 999, 1001-04 (6th Cir. 2026). The same logic applies here.

NewsGuard cannot meet that standard because the consent order, like the *Dentsu* settlements, was a legitimate law enforcement action addressing concerns about unlawful collusion by ad agencies. *See supra* at 11-12, 35-38. None of the evidence cited by NewsGuard suggests otherwise.

#### *i. The FTC investigated unlawful collusion in the advertising industry and brought enforcement actions to prevent violations of the antitrust laws.*

The record shows that the FTC had legitimate, nonretaliatory reasons for investigating whether certain entities unlawfully agreed to withhold the placement of advertisements on disfavored media using lists created by entities such as NewsGuard. App.266. Two congressional committees published reports on the subject in 2024. One of these reports concluded that certain advertising entities may have "participated in boycotts and other coordinated action to demonetize" disfavored entities and that this "anticompetitive behavior" included "push[ing] [advertisers] to use [entities] like ... NewsGuard." Judiciary Committee Report at 1, 3, 25-26, 38. The other report similarly found that advertising organizations were pressuring their members to use these lists, including through "agreements" that "may have antitrust implications," and that NewsGuard's "aim" is to "systemically defund[]" outlets it deems "untrustworthy" by creating "exclusion lists" that operate as "blacklists" for advertisers. Small Business Committee Report at 43, 49, 59. These congressional reports in and of themselves furnished an ample basis for the FTC to

investigate the possibility that NewsGuard had relevant information about unlawful collusion among participants in the digital advertising market.

The FTC pursued a broad investigation into such unlawful collusion, and issued CIDs to more than a dozen entities, including NewsGuard. The breadth of the investigation illustrates that the FTC had general concerns about potential collusion in the advertising industry, refuting NewsGuard's theory that it was singled out. That investigation culminated in the *Dentsu* lawsuit filed by the Commission and eight state co-plaintiffs against three of the largest global advertising holding companies, which alleged that those companies unlawfully colluded to set brand-safety standards using information provided by entities such as NewsGuard. App.584. Those companies agreed to settle the alleged antitrust violations through consent orders that, among other things, limited the companies' ability to use exclusion lists or similar information. Those restrictions—which were materially identical to the terms of the Omnicom consent order—are tailored to prevent future collusion by the advertising holding companies. The orders thus confirm that the FTC's advertising boycott investigation was a routine law enforcement effort, not retaliation against NewsGuard.

The same is true for the Commission's adoption of the Omnicom consent order. As the FTC's analysis of the proposed order explained, Omnicom's acquisition of IPG would significantly increase market concentration in the

advertising industry, making it far easier for market participants to engage in anticompetitive boycotts of disfavored media publishers, just as the Commission found they had done in the recent past. *See* 90 Fed. Reg. at 27,304-06. The proposed order sought to remedy this problem by "eliminat[ing] Omnicom's ability to participate in [such] ongoing or future coordination." *Id.* at 27,305. The Commission subsequently revised the proposed order after several commenters expressed concerns that the initial proposed order might not achieve that goal. *See* Regulations.gov, *Comment from CPAC & Independent Media Council* (July 29, 2025), https://tinyurl.com/yf5nw8p2; *Comment from GB News Limited* (July 29, 2025), https://tinyurl.com/4jcumwyp; *Comment from Newsmax Media Inc.* (July 28, 2025), https://tinyurl.com/3ruxx5vp. In short, the Omnicom order was motivated by legitimate antitrust concerns rather than by any improper retaliatory motive toward NewsGuard.

#### ***ii. NewsGuard failed to show that the consent order was retaliatory.***

NewsGuard's purported contrary evidence is categorically inadequate (and certainly cannot overcome the presumption of regularity).

NewsGuard points to statements by Chairman Ferguson that purportedly evince retaliatory motive. *E.g.*, Br.49. But those statements simply express concern about NewsGuard's potential involvement in antitrust violations. For example, the Chairman correctly observed that "[c]ongressional investigations revealed [that] …

NewsGuard [and another entity] … led collusive ad-boycotts—possibly in violation of our antitrust laws." App.193. It is entirely appropriate for Chairman Ferguson to identify potential violations of the law and articulate law enforcement objectives, particularly given that his role is analogous to "that of a prosecutor" who is "necessarily permitted to be zealous in [his] enforcement of the law." *FTC v. Facebook, Inc.*, 581 F. Supp. 3d 34, 63-64 (D.D.C. 2022) (quotation omitted); *see Nuclear Info. & Res. Serv. v. NRC*, 509 F.3d 562, 571 (D.C. Cir. 2007) (presumption that agency officials are "objective" "cannot [be] overcome ... with a mere showing that an official 'has taken a public position, or has expressed strong views, or holds an underlying philosophy'" (quotation omitted)); *Yelp Inc. v. Paxton*, 137 F.4th 944, 956 (9th Cir. 2025) ("officials are entitled to have enforcement priorities and policy positions" and "[law] enforcement action[s] consistent with [those policies]" do not "establish a retaliatory motive").[16]

[16] NewsGuard recounts statements by government officials other than Chairman Ferguson, but it does not apply them in its retaliation analysis and has thus forfeited reliance on them. *See N.Y. Rehab. Care Mgmt., LLC v. NLRB*, 506 F.3d 1070, 1076 (D.C. Cir. 2007); *United States v. Johnson*, 2021 WL 3737681, at *4 (D.D.C. Aug. 24, 2011), *aff'd*, 2021 WL 5537704 (D.C. Cir. Nov. 17, 2021). Regardless, statements by third parties are irrelevant because none of them were made by decisionmakers for the FTC actions at issue. *See, e.g.*, *Waggel v. George Wash. Univ.*, 957 F.3d 1364, 1374 (D.C. Cir. 2020) ("Our cases recognize that stray remarks by non-decisionmakers are not generally direct evidence of discrimination.").

In its attempts to manufacture evidence of retaliation, NewsGuard distorts Chairman Ferguson's statements and misrepresents multiple key facts. For example, NewsGuard suggests there is something untoward about Chairman Ferguson's statement that the FTC "ought to conduct ... an investigation" into "collusion that may suppress competition ... and suppress free speech online." Br.12; App.213. But this is simply another run-of-the-mill statement regarding enforcement priorities. And in any event, NewsGuard quotes it selectively, failing to note that Chairman Ferguson also wrote that "NewsGuard is, of course, free to rate websites by whatever metric it wants. But the antitrust laws do not permit third parties to facilitate group boycotts among competitors." App.213. In other words, the statement only underscores Chairman Ferguson's respect for NewsGuard's First Amendment rights and his focus on enforcement of the antitrust laws.[17]

NewsGuard also egregiously misrepresents Chairman Ferguson's remarks in an April 2025 interview where Chairman Ferguson criticized *other* government

---

[17] Nor does it help NewsGuard to frame Chairman Ferguson's statements as partisan or ideological. *E.g.*, Br.10-12. To begin, officials are entitled to have policy views. *See supra* at 49; *cf. Mullin v. Doe*, 146 S. Ct. 2121, 2138-39 (2026) (rejecting argument that even "heated language" expressing "policy views" supported allegation of animus). Furthermore, this is not a retaliation concern; instead, NewsGuard is attempting to transform its First Amendment retaliation claim into a Fifth Amendment selective enforcement claim, which it did not bring and which would necessarily fail even if it had been brought. *Sanjour v. EPA*, 56 F.3d 85, 92 n.9 (D.C. Cir. 1995); *see Branch Ministries v. Rossotti*, 211 F.3d 137, 144 (D.C. Cir. 2000) (describing the claim's "demanding" burden).

officials for coercing social media platforms to censor speech. *See* App.229-31, 235-36. In doing so, Chairman Ferguson emphasized his own belief that "the government should not threaten private people with punishment because of things they're saying." App.231. That is precisely the opposite of NewsGuard's false characterization. Chairman Ferguson emphatically did not say that "*the FTC* could use its 'tremendous array of investigative tools' and 'coercive power—formal and informal' to demand compliance to its views about supposed online 'censorship.'" Br.14 (emphasis added). And he did not suggest that *the FTC* would coerce parties to "knuckle under," as NewsGuard contends multiple times in its brief. Br.14, 20, 46. To the contrary, Chairman Ferguson could not have been clearer that he categorically *rejected* such coercive tactics. App.230. The fact that NewsGuard so brazenly twists Chairman Ferguson's words illustrates its lack of genuine evidence of retaliation.[18]

The CID issued to NewsGuard also does not reflect a retaliatory motive. The Commission issued the CID because it had "reason to believe" that NewsGuard, as an entity prominently addressed in congressional investigations, was likely to have

[18] Similarly, NewsGuard falsely claims that Chairman Ferguson "called out NewsGuard" during an interview. Br.11; *see* App.75 (asserting that "he called out NewsGuard by name"). In fact, the Chairman did not say the word "NewsGuard," or otherwise refer to NewsGuard, at any point in the interview. *See* App.121 n.15 (providing link to interview).

information "relevant to" the FTC's investigation into unlawful collusion in the advertising industry. 15 U.S.C. § 57b-1(c). Far from being singled out, NewsGuard was one of at least seventeen entities to receive CIDs in that investigation. And the CID's scope is wholly typical for an FTC investigation.[19]

NewsGuard once again blatantly misrepresents the facts in contending that a January 15, 2026 letter from FTC staff "doubl[ed] down" on the CID's demands and "insisted NewsGuard remained obligated to provide all documents called for by the *original* CID." Br.19-20. This is false, as a glance at the letter will reveal. In reality, the letter expressly stated that NewsGuard had "satisfied its CID obligations" as to 26 of the 31 specifications in the CID (regardless of whether NewsGuard had in fact fully complied with those specifications). App.266-67. And as for the remaining five, the FTC substantially narrowed four of them, and insisted on full compliance with only one. *Id.* Indeed, even NewsGuard's own petition to quash recognized that the letter provided that "NewsGuard 'has satisfied its CID obligations'" for certain

---

[19] *E.g.*, Mot. Quash CID Ex. P, *In re Police Protective Fund*, 157 F.T.C. 1913 (2014) (76 interrogatories and 53 document requests), https://tinyurl.com/5264tuh8; Pet. Quash CID Ex. 1, *In re Lexium Int'l, LLC*, 162 F.T.C. 1212 (2016) (42 interrogatories and 36 document requests), https://tinyurl.com/bds3mwn9; *FTC v. Cigna Grp.*, No. 1:25-mc-00004, Dkt.1-2 (D.D.C. Jan. 15, 2025) (43 specifications).

specifications. App.442 n.14. Again, NewsGuard's brazen mischaracterization of the FTC's actions betrays a lack of any plausible claim of retaliation.[20]

Finally, there is no evidence that the Commission adopted the final consent order language "because of the antipathy of Chairman Ferguson and Newsmax towards NewsGuard." *Contra* Br.37. NewsGuard points to a public statement issued by Chairman Ferguson in which he purportedly alleged that NewsGuard steers "advertising revenue with 'an unavoidable partisan lens.'" Br.22. However, that phrasing comes not from Chairman Ferguson but from the congressional committee report cited in the public statement. App.277 n.34. Similarly, NewsGuard claims that Chairman Ferguson said that NewsGuard "publicly sought to use the chokepoint of the advertising industry to effect political or ideological goals" (Br.22), but what he actually said was that "[n]umerous other industry groups and private organizations" were engaged in such behavior, again citing to the findings of the congressional committee report, App.277 & n.34. And even setting aside these mischaracterizations, these were simply more run-of-the mill statements expressing Chairman Ferguson's views on enforcement issues.

[20] NewsGuard made the same blatant misrepresentations about Chairman Ferugson's statements and the January 15 letter in the district court, as the Commission pointed out in that court. App.338 & n.3, 349-51. NewsGuard's persistence in making these false claims reflects a willful disregard for the accuracy of its statements to this Court and the district court.

Nor did the conditions in the Omnicom or *Dentsu* consent orders "target[] NewsGuard 'with the precision of a laser beam.'" Br.26, 37. Those orders do not mention NewsGuard, nor do they apply uniquely to NewsGuard. Rather, the conditions apply equally to all organizations that produce ratings of media publishers, including three other organizations that were identified in the *Dentsu* complaint. *See* App.590. Although NewsGuard speculates (Br.49) that the Commission adopted these conditions in the final Omnicom order at the urging of Newsmax, the record shows that the challenged portions of the final order were not proposed by Newsmax's public comment, and the Commission largely declined to adopt the proposals that Newsmax did include in its comment. App.368-69 & n.12. Moreover, the final Omnicom consent order was approved by the full Commission with both Chairman Ferguson and then-Commissioner Melissa Holyoak voting in support. The fact that NewsGuard does not even attempt to identify any retaliatory motive on the part of Commissioner Holyoak further underscores the weakness of its theory.

In sum, NewsGuard has not come close to showing that it is likely to succeed on its retaliation claim.

#### 4. NewsGuard lacks evidence to support its "jawboning" theory.

NewsGuard's cursory attempt to invoke *National Rifle Association of America v. Vullo*, 602 U.S. 175 (2024), which addresses unlawful "jawboning" by

the government, fares no better. As *Vullo* explains, "[t]o state a claim that the government violated the First Amendment through coercion of a third party, a plaintiff must plausibly allege conduct that, viewed in context, could be reasonably understood [1] to convey a threat of adverse government action [2] in order to punish or suppress the plaintiff's speech." *Id.* at 191.

NewsGuard presented no evidence that Omnicom was coerced into agreeing to the conditions in the final consent order. NewsGuard is thus miles away from *Vullo* and similar cases (*see* Br.45), which featured explicit threats from government actors demanding that intermediaries cease dealing with a disfavored speaker because of its speech. *See Vullo*, 602 U.S. at 192-94 (insurance regulator explicitly pressuring entities to cease doing business with gun groups); *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 60-63 (1963) (state commission pressuring booksellers to not sell certain "objectionable" books); *Backpage.com, LLC v. Dart*, 807 F.3d 229, 230 (7th Cir. 2015) (local sheriff threatened Visa and MasterCard with prosecution for processing payments for a disfavored website).

NewsGuard's jawboning claim also fails because, as explained above, it cannot show that the conditions in the Omnicom order were designed to "punish or suppress" NewsGuard's speech. *Vullo*, 602 U.S. at 190; *see id.* at 201 (Jackson, J., concurring) (explaining that a jawboning claim arises only if the government coercion "indirectly worked a violation of the plaintiff's First Amendment rights").

NewsGuard thus cannot establish a likelihood of success under any First Amendment claim.

### B. The Remaining Factors Weigh Against Granting Injunctive Relief.

Finally, the balance of the equities and the public interest also weigh against a preliminary injunction. "[T]he Government is likely to suffer irreparable harm from the District Courts' entry of injunctions that likely exceed the [courts'] authority." *Trump v. CASA, Inc.*, 606 U.S. 831, 860 (2025); *see Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, J., in chambers). And an injunction would be particularly damaging here because it would invade the core executive function of settling enforcement actions. *See Balt. Gas & Elec. Co.*, 252 F.3d at 457 (agency's "decision to settle [enforcement action] is committed to the agency's nonreviewable discretion"); *N.Y. State Dep't of Law v. FCC*, 984 F.2d 1209, 1214 (D.C. Cir. 1993) (same). An injunction would likewise harm the public's interest in effective antitrust enforcement by disrupting a settlement designed to alleviate the acute collusion risks of a large merger in an important industry. *See FTC v. Standard Oil of Cal.*, 449 U.S. 232, 242 (1980). The public interest would also be harmed if an injunction were granted because NewsGuard's novel and expansive theories of relief will open the door to future challenges by third parties to other final orders entered by the FTC (or other agencies), overturning well-settled expectations. The equitable factors thus overwhelmingly favor the FTC.

## CONCLUSION

The district court's ruling should be affirmed.

Respectfully submitted,

LUCAS CROSLOW
*General Counsel*

ALEX POTAPOV
*Deputy General Counsel*

*/s/ H. Thomas Byron III*
H. THOMAS BYRON III
*Deputy General Counsel*

ALAN BAKOWSKI
ETHAN D. BECK
*Attorneys*

FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, N.W.
Washington, D.C. 20580

Of Counsel:

DANIEL GUARNERA
*Director*

KELSE MOEN
*Deputy Director*

BUREAU OF COMPETITION

August 10, 2026

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), it contains 12,987 words. It complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman Type.

August 10, 2026

*/s/ H. Thomas Byron III*
H. Thomas Byron III

# ADDENDUM

# TABLE OF CONTENTS

**STATUTES**


15 U.S.C. § 1 .......... A-1

15 U.S.C. § 21 .......... A-2

15 U.S.C. § 45 .......... A-4

15 U.S.C. § 46 .......... A-8

15 U.S.C. § 57b-1 .......... A-9


**REGULATIONS**


16 C.F.R. § 2.7 .......... A-15

16 C.F.R. § 2.10 .......... A-18

16 C.F.R. § 2.31 .......... A-20

16 C.F.R. § 2.32 .......... A-21

16 C.F.R. § 2.33 .......... A-22

16 C.F.R. § 2.34 .......... A-23

## 15 U.S.C. § 1
## Trusts, etc., in restraint of trade illegal; penalty

Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal. Every person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $100,000,000 if a corporation, or, if any other person, $1,000,000, or by imprisonment not exceeding 10 years, or by both said punishments, in the discretion of the court.

## 15 U.S.C. § 21
## Enforcement Provisions

**(a) Commission, Board, or Secretary authorized to enforce compliance.** Authority to enforce compliance with sections 13, 14, 18, and 19 of this title by the persons respectively subject thereto is vested in the Surface Transportation Board where applicable to common carriers subject to jurisdiction under subtitle IV of title 49; in the Federal Communications Commission where applicable to common carriers engaged in wire or radio communication or radio transmission of energy; in the Secretary of Transportation where applicable to air carriers and foreign air carriers subject to part A of subtitle VII of title 49; in the Board of Governors of the Federal Reserve System where applicable to banks, banking associations, and trust companies; and in the Federal Trade Commission where applicable to all other character of commerce to be exercised as follows:

**(b) Issuance of complaints for violations; hearing; intervention; filing of testimony; report; cease and desist orders; reopening and alteration of reports or orders.** Whenever the Commission, Board, or Secretary vested with jurisdiction thereof shall have reason to believe that any person is violating or has violated any of the provisions of sections 13, 14, 18, and 19 of this title, it shall issue and serve upon such person and the Attorney General a complaint stating its charges in that respect, and containing a notice of a hearing upon a day and at a place therein fixed at least thirty days after the service of said complaint. The person so complained of shall have the right to appear at the place and time so fixed and show cause why an order should not be entered by the Commission, Board, or Secretary requiring such person to cease and desist from the violation of the law so charged in said complaint. The Attorney General shall have the right to intervene and appear in said proceeding and any person may make application, and upon good cause shown may be allowed by the Commission, Board, or Secretary, to intervene and appear in said proceeding by counsel or in person. The testimony in any such proceeding shall be reduced to writing and filed in the office of the Commission, Board, or Secretary. If upon such hearing the Commission, Board, or Secretary, as the case may be, shall be of the opinion that any of the provisions of said sections have been or are being violated, it shall make a report in writing, in which it shall state its findings as to the facts, and shall issue and cause to be served on such person an order requiring such person to

cease and desist from such violations, and divest itself of the stock, or other share capital, or assets, held or rid itself of the directors chosen contrary to the provisions of sections 18 and 19 of this title, if any there be, in the manner and within the time fixed by said order. Until the expiration of the time allowed for filing a petition for review, if no such petition has been duly filed within such time, or, if a petition for review has been filed within such time then until the record in the proceeding has been filed in a court of appeals of the United States, as hereinafter provided, the Commission, Board, or Secretary may at any time, upon such notice and in such manner as it shall deem proper, modify or set aside, in whole or in part, any report or any order made or issued by it under this section. After the expiration of the time allowed for filing a petition for review, if no such petition has been duly filed within such time, the Commission, Board, or Secretary may at any time, after notice and opportunity for hearing, reopen and alter, modify, or set aside, in whole or in part, any report or order made or issued by it under this section, whenever in the opinion of the Commission, Board, or Secretary conditions of fact or of law have so changed as to require such action or if the public interest shall so require: Provided, however, That the said person may, within sixty days after service upon him or it of said report or order entered after such a reopening, obtain a review thereof in the appropriate court of appeals of the United States, in the manner provided in subsection (c) of this section.

*     *     *

## 15 U.S.C. § 45
## Unfair methods of competition unlawful; prevention by Commission

**(a) Declaration of unlawfulness; power to prohibit unfair practices; inapplicability to foreign trade.**

**(1)** Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are hereby declared unlawful.

**(2)** The Commission is hereby empowered and directed to prevent persons, partnerships, or corporations, except banks, savings and loan institutions described in section 57a(f)(3) of this title, Federal credit unions described in section 57a(f)(4) of this title, common carriers subject to the Acts to regulate commerce, air carriers and foreign air carriers subject to part A of subtitle VII of Title 49, and persons, partnerships, or corporations insofar as they are subject to the Packers and Stockyards Act, 1921, as amended, except as provided in section 406(b) of said Act, from using unfair methods of competition in or affecting commerce and unfair or deceptive acts or practices in or affecting commerce.

* * *

**(b) Proceeding by Commission; modifying and setting aside orders.** Whenever the Commission shall have reason to believe that any such person, partnership, or corporation has been or is using any unfair method of competition or unfair or deceptive act or practice in or affecting commerce, and if it shall appear to the Commission that a proceeding by it in respect thereof would be to the interest of the public, it shall issue and serve upon such person, partnership, or corporation a complaint stating its charges in that respect and containing a notice of a hearing upon a day and at a place therein fixed at least thirty days after the service of said complaint. The person, partnership, or corporation so complained of shall have the right to appear at the place and time so fixed and show cause why an order should not be entered by the Commission requiring such person, partnership, or corporation to cease and desist from the violation of the law so charged in said complaint. Any person, partnership, or corporation may make application, and upon good cause shown may be allowed by the Commission to intervene and appear in said

proceeding by counsel or in person. The testimony in any such proceeding shall be reduced to writing and filed in the office of the Commission. If upon such hearing the Commission shall be of the opinion that the method of competition or the act or practice in question is prohibited by this subchapter, it shall make a report in writing in which it shall state its findings as to the facts and shall issue and cause to be served on such person, partnership, or corporation an order requiring such person, partnership, or corporation to cease and desist from using such method of competition or such act or practice. Until the expiration of the time allowed for filing a petition for review, if no such petition has been duly filed within such time, or, if a petition for review has been filed within such time then until the record in the proceeding has been filed in a court of appeals of the United States, as hereinafter provided, the Commission may at any time, upon such notice and in such manner as it shall deem proper, modify or set aside, in whole or in part, any report or any order made or issued by it under this section. After the expiration of the time allowed for filing a petition for review, if no such petition has been duly filed within such time, the Commission may at any time, after notice and opportunity for hearing, reopen and alter, modify, or set aside, in whole or in part any report or order made or issued by it under this section, whenever in the opinion of the Commission conditions of fact or of law have so changed as to require such action or if the public interest shall so require, except that (1) the said person, partnership, or corporation may, within sixty days after service upon him or it of said report or order entered after such a reopening, obtain a review thereof in the appropriate court of appeals of the United States, in the manner provided in subsection (c) of this section; and (2) in the case of an order, the Commission shall reopen any such order to consider whether such order (including any affirmative relief provision contained in such order) should be altered, modified, or set aside, in whole or in part, if the person, partnership, or corporation involved files a request with the Commission which makes a satisfactory showing that changed conditions of law or fact require such order to be altered, modified, or set aside, in whole or in part. The Commission shall determine whether to alter, modify, or set aside any order of the Commission in response to a request made by a person, partnership, or corporation under paragraph [1] (2) not later than 120 days after the date of the filing of such request.

**(c) Review of order; rehearing.** Any person, partnership, or corporation required by an order of the Commission to cease and desist from using any method of competition or act or practice may obtain a review of such order in the court of appeals of the United States, within any circuit where the method of competition or the act or practice in question was used or where such person, partnership, or corporation resides or carries on business, by filing in the court, within sixty days from the date of the service of such order, a written petition praying that the order of the Commission be set aside. A copy of such petition shall be forthwith transmitted by the clerk of the court to the Commission, and thereupon the Commission shall file in the court the record in the proceeding, as provided in section 2112 of title 28. Upon such filing of the petition the court shall have jurisdiction of the proceeding and of the question determined therein concurrently with the Commission until the filing of the record and shall have power to make and enter a decree affirming, modifying, or setting aside the order of the Commission, and enforcing the same to the extent that such order is affirmed and to issue such writs as are ancillary to its jurisdiction or are necessary in its judgement to prevent injury to the public or to competitors pendente lite. The findings of the Commission as to the facts, if supported by evidence, shall be conclusive. To the extent that the order of the Commission is affirmed, the court shall thereupon issue its own order commanding obedience to the terms of such order of the Commission. If either party shall apply to the court for leave to adduce additional evidence, and shall show to the satisfaction of the court that such additional evidence is material and that there were reasonable grounds for the failure to adduce such evidence in the proceeding before the Commission, the court may order such additional evidence to be taken before the Commission and to be adduced upon the hearing in such manner and upon such terms and conditions as to the court may seem proper. The Commission may modify its findings as to the facts, or make new findings, by reason of the additional evidence so taken, and it shall file such modified or new findings, which, if supported by evidence, shall be conclusive, and its recommendation, if any, for the modification or setting aside of its original order, with the return of such additional evidence. The judgment and decree of the court shall be final, except that the same shall be subject to review by the Supreme Court upon certiorari, as provided in section 1254 of title 28.

**(d) Jurisdiction of court.** Upon the filing of the record with it the jurisdiction of the court of appeals of the United States to affirm, enforce, modify, or set aside orders of the Commission shall be exclusives.

* * *

## 15 U.S.C. § 46
## Additional Powers of Commission

The Commission shall also have power—

**(a) Investigation of persons, partnerships, or corporations.** To gather and compile information concerning, and to investigate from time to time the organization, business, conduct, practices, and management of any person, partnership, or corporation engaged in or whose business affects commerce, excepting banks, savings and loan institutions described in section 57a(f)(3) of this title, Federal credit unions described in section 57a(f)(4) of this title, and common carriers subject to the Act to regulate commerce, and its relation to other persons, partnerships, and corporations.

* * *

> *Provided*, That the exception of "banks, savings and loan institutions described in section 57a(f)(3) of this title, Federal credit unions described in section 57a(f)(4) of this title, and common carriers subject to the Act to regulate commerce" from the Commission's powers defined in subsections (a), (b), and (j) of this section, shall not be construed to limit the Commission's authority to gather and compile information, to investigate, or to require reports or answers from, any person, partnership, or corporation to the extent that such action is necessary to the investigation of any person, partnership, or corporation, group of persons, partnerships, or corporations, or industry which is not engaged or is engaged only incidentally in banking, in business as a savings and loan institution, in business as a Federal credit union, or in business as a common carrier subject to the Act to regulate commerce.

* * *

## 15 U.S.C. § 57b-1
## Civil Investigative Demands

**(a) Definitions.** For purposes of this section:

**(1)** The terms "civil investigative demand" and "demand" mean any demand issued by the Commission under subsection (c)(1).

**(2)** The term "Commission investigation" means any inquiry conducted by a Commission investigator for the purpose of ascertaining whether any person is or has been engaged in any unfair or deceptive acts or practices in or affecting commerce (within the meaning of section 45(a)(1) of this title) or in any antitrust violations.

**(3)** The term "Commission investigator" means any attorney or investigator employed by the Commission who is charged with the duty of enforcing or carrying into effect any provisions relating to unfair or deceptive acts or practices in or affecting commerce (within the meaning of section 45(a)(1) of this title) or any provisions relating to antitrust violations.

* * *

**(6)** The term "person" means any natural person, partnership, corporation, association, or other legal entity, including any person acting under color or authority of State law.

**(7)** The term "violation" means any act or omission constituting an unfair or deceptive act or practice in or affecting commerce (within the meaning of section 45(a)(1) of this title) or any antitrust violation.

**(8)** The term "antitrust violation" means—

**(A)** any unfair method of competition (within the meaning of section 45(a)(1) of this title);

**(B)** any violation of the Clayton Act or of any other Federal statute that prohibits, or makes available to the Commission a civil remedy with respect to, any restraint upon or monopolization of interstate or foreign trade or commerce;

**(C)** with respect to the International Antitrust Enforcement Assistance Act of 1994, any violation of any of the foreign antitrust laws (as defined in section 12 of such Act) with respect to which a request is made under section 3 of such Act; or

**(D)** any activity in preparation for a merger, acquisition, joint venture, or similar transaction, which if consummated, may result in any such unfair method of competition or in any such violation.

**(b) Actions conducted by Commission respecting unfair or deceptive acts or practices in or affecting commerce.** For the purpose of investigations performed pursuant to this section with respect to unfair or deceptive acts or practices in or affecting commerce (within the meaning of section 45(a)(1) of this title); all actions of the Commission taken under section 46 and section 49 of this title shall be conducted pursuant to subsection (c).

**(c) Issuance of demand; contents; service; verified return; sworn certificate; answers; taking of oral testimony.**

**(1)** Whenever the Commission has reason to believe that any person may be in possession, custody, or control of any documentary material or tangible things, or may have any information, relevant to unfair or deceptive acts or practices in or affecting commerce (within the meaning of section 45(a)(1) of this title), or to antitrust violations, the Commission may, before the institution of any proceedings under this subchapter, issue in writing, and cause to be served upon such person, a civil investigative demand requiring such person to produce such documentary material for inspection and copying or reproduction, to submit such tangible things, to file written reports or answers to questions, to give oral testimony concerning documentary material or other information, or to furnish any combination of such material, answers, or testimony.

**(2)** Each civil investigative demand shall state the nature of the conduct constituting the alleged violation which is under investigation and the provision of law applicable to such violation.

**(3)** Each civil investigative demand for the production of documentary material shall—

**(A)** describe each class of documentary material to be produced under the demand with such definiteness and certainty as to permit such material to be fairly identified;

**(B)** prescribe a return date or dates which will provide a reasonable period of time within which the material so demanded may be assembled and made available for inspection and copying or reproduction; and

**(C)** identify the custodian to whom such material shall be made available.

**(4)** Each civil investigative demand for the submission of tangible things shall—

**(A)** describe each class of tangible things to be submitted under the demand with such definiteness and certainty as to permit such things to be fairly identified;

**(B)** prescribe a return date or dates which will provide a reasonable period of time within which the things so demanded may be assembled and submitted; and

**(C)** identify the custodian to whom such things shall be submitted.

**(5)** Each civil investigative demand for written reports or answers to questions shall—

**(A)** propound with definiteness and certainty the reports to be produced or the questions to be answered;

**(B)** prescribe a date or dates at which time written reports or answers to questions shall be submitted; and

**(C)** identify the custodian to whom such reports or answers shall be submitted.

**(6)** Each civil investigative demand for the giving of oral testimony shall—

**(A)** prescribe a date, time, and place at which oral testimony shall be commenced; and

**(B)** identify a Commission investigator who shall conduct the investigation and the custodian to whom the transcript of such investigation shall be submitted.

* * *

**(13)** Each reporting requirement or question in a civil investigative demand shall be answered separately and fully in writing under oath, unless it is objected to, in which event the reasons for the objection shall be stated in lieu of an answer, and it shall be submitted under a sworn certificate, in such form as the demand designates, by the person, if a natural person, to whom the demand is directed or, if not a natural person, by any person responsible for answering each reporting requirement or question, to the effect that all information required by the demand and in the possession, custody, control, or knowledge of the person to whom the demand is directed has been submitted.

* * *

**(e) Petition for enforcement.** Whenever any person fails to comply with any civil investigative demand duly served upon him under this section, or whenever satisfactory copying or reproduction of material requested pursuant to the demand cannot be accomplished and such person refuses to surrender such material, the Commission, through such officers or attorneys as it may designate, may file, in the district court of the United States for any judicial district in which such person resides, is found, or transacts business, and serve upon such person, a petition for an order of such court for the enforcement of this section. All process of any court to which application may be made as provided in this subsection may be served in any judicial district.

**(f) Petition for order modifying or setting aside demand.**

**(1)** Not later than 20 days after the service of any civil investigative demand upon any person under subsection (c), or at any time before the return date specified in the demand, whichever period is shorter, or within such period

exceeding 20 days after service or in excess of such return date as may be prescribed in writing, subsequent to service, by any Commission investigator named in the demand, such person may file with the Commission a petition for an order by the Commission modifying or setting aside the demand.

**(2)** The time permitted for compliance with the demand in whole or in part, as deemed proper and ordered by the Commission, shall not run during the pendency of such petition at the Commission, except that such person shall comply with any portions of the demand not sought to be modified or set aside. Such petition shall specify each ground upon which the petitioner relies in seeking such relief, and may be based upon any failure of the demand to comply with the provisions of this section, or upon any constitutional or other legal right or privilege of such person.

* * *

**(h) Jurisdiction of court.** Whenever any petition is filed in any district court of the United States under this section, such court shall have jurisdiction to hear and determine the matter so presented, and to enter such order or orders as may be required to carry into effect the provisions of this section. Any final order so entered shall be subject to appeal pursuant to section 1291 of Title 28. Any disobedience of any final order entered under this section by any court shall be punished as a contempt of such court.

**(i) Commission authority to issue subpoenas or make demand for information.** Notwithstanding any other provision of law, the Commission shall have no authority to issue a subpoena or make a demand for information, under authority of this subchapter or any other provision of law, unless such subpoena or demand for information is signed by a Commissioner acting pursuant to a Commission resolution. The Commission shall not delegate the power conferred by this section to sign subpoenas or demands for information to any other person.

**(j) Applicability of this section.** The provisions of this section shall not—

**(1)** apply to any proceeding under section 45(b) of this title, any proceeding under section 11(b) of the Clayton Act (15 U.S.C. 21(b)), or any adjudicative proceeding under any other provision of law; or

**(2)** apply to or affect the jurisdiction, duties, or powers of any agency of the Federal Government, other than the Commission, regardless of whether such jurisdiction, duties, or powers are derived in whole or in part, by reference to this subchapter.

## 16 C.F.R. § 2.7
## Compulsory Process in Investigations

**(a) In general.** When the public interest warrants, the Commission may issue a resolution authorizing the use of compulsory process. The Commission or any Commissioner may, pursuant to a Commission resolution, issue a subpoena, or a civil investigative demand, directing the recipient named therein to appear before a designated representative at a specified time and place to testify or to produce documentary material, or both, and in the case of a civil investigative demand, to provide a written report or answers to questions, relating to any matter under investigation by the Commission. For the purposes of this subpart, the term:

> **(1)** Electronically stored information ("ESI") means any writings, drawings, graphs, charts, photographs, sound recordings, images and other data or data compilations stored in any electronic medium from which information can be obtained either directly or, if necessary, after translation by the responding party into a reasonably usable form.
>
> **(2)** "Documentary material" includes all documents, materials, and information, including ESI, within the meaning of the Federal Rules of Civil Procedure.
>
> **(3)** "Compulsory process" means any subpoena, CID, access order, or order for a report issued by the Commission.
>
> **(4)** "Protected status" refers to information or material that may be withheld from production or disclosure on the grounds of any privilege, work product protection, or statutory exemption.

**(b) Civil Investigative Demands.** Civil Investigative Demands ("CIDs") shall be the only form of compulsory process issued in investigations with respect to unfair or deceptive acts or practices under section 5(a)(1) of the Federal Trade Commission Act (hereinafter referred to as "unfair or deceptive acts or practices").

> **(1)** CIDs for the production of documentary material, including ESI, shall describe each class of material to be produced with sufficient definiteness and certainty as to permit such material to be fairly identified, prescribe a return date providing a reasonable period of time within which the material so

demanded may be assembled and made available for inspection and copying or reproduction, and identify the Commission's custodian to whom such material shall be made available. Documentary material, including ESI, for which a CID has been issued shall be made available as prescribed in the CID. Such productions shall be made in accordance with the procedures prescribed by section 20(c)(11) of the Federal Trade Commission Act.

**(2)** CIDs for tangible things, including electronic media, shall describe each class of tangible thing to be produced with sufficient definiteness and certainty as to permit each such thing to be fairly identified, prescribe a return date providing a reasonable period of time within which the things so demanded may be assembled and submitted, and identify the Commission's custodian to whom such things shall be submitted. Submission of tangible things in response to a CID shall be made in accordance with the procedures prescribed by section 20(c)(12) of the Federal Trade Commission Act.

**(3)** CIDs for written reports or answers to questions shall propound with sufficient definiteness and certainty the reports to be produced or the questions to be answered, prescribe a return date, and identify the Commission's custodian to whom such reports or answers to questions shall be submitted. The submission of written reports or answers to questions in response to a CID shall be made in accordance with the procedures prescribed by section 20(c)(13) of the Federal Trade Commission Act.

**(4)** CIDs for the giving of oral testimony shall prescribe a date, time, and place at which oral testimony shall commence, and identify the hearing official and the Commission custodian. Oral testimony in response to a CID shall be taken in accordance with the procedures set forth in section 20(c)(14) of the Federal Trade Commission Act.

*　　*　　*

**(k) Mandatory pre-petition meet and confer process.** Unless excused in writing or granted an extension of no more than 30 days by a Commission official identified in paragraph (l) of this section, a recipient of Commission compulsory process shall meet and confer with Commission staff within 14 days after receipt of process or before the deadline for filing a petition to quash, whichever is first, to discuss

compliance and to address and attempt to resolve all issues, including issues relating to protected status and the form and manner in which claims of protected status will be asserted. The initial meet and confer session and all subsequent meet and confer sessions may be in person or by telephone. The recipient must make available personnel with the knowledge necessary for resolution of the issues relevant to compliance with compulsory process. Such personnel could include individuals knowledgeable about the recipient's information or records management systems, individuals knowledgeable about other relevant materials such as organizational charts, and persons knowledgeable about samples of material required to be produced. If any issues relate to ESI, the recipient shall have a person familiar with its ESI systems and methods of retrieval participate in the meeting. The Commission will not consider petitions to quash or limit absent a pre-filing meet and confer session with Commission staff and, absent extraordinary circumstances, will consider only issues raised during the meet and confer process.

**(*l*) Delegations.** The Directors of the Bureaus of Competition, Consumer Protection, and Economics and the Office of Policy Planning, their Deputy Directors, the Assistant Directors of the Bureaus of Competition and Economics, the Associate Directors of the Bureau of Consumer Protection, the Regional Directors, the Assistant Regional Directors, the Chief Technology Officer, and the Deputy Chief Technology Officer are all authorized to modify and, in writing, approve the terms of compliance with all compulsory process, including subpoenas, CIDs, reporting programs, orders requiring reports, answers to questions, and orders requiring access. If a recipient of compulsory process has demonstrated satisfactory progress toward compliance, a Commission official identified in this paragraph may, at his or her discretion, extend the time for compliance with Commission compulsory process. The subpoena power conferred by section 329 of the Energy Policy and Conservation Act (42 U.S.C. 6299) and section 5 of the Webb–Pomerene (Export Trade) Act (15 U.S.C. 65) are specifically included within this delegation of authority.

## 16 C.F.R. § 2.10
## Petitions to Limit or Quash Commission Compulsory Process

**(a) In general.**

**(1) Petitions.** Any petition to limit or quash any compulsory process shall be filed with the Secretary within 20 days after service of the Commission compulsory process or, if the return date is less than 20 days after service, prior to the return date. Such petition shall set forth all assertions of protected status or other factual and legal objections to the Commission compulsory process, including all appropriate arguments, affidavits, and other supporting documentation. Such petition shall not exceed 5,000 words, including all headings, footnotes, and quotations, but excluding the cover, table of contents, table of authorities, glossaries, copies of the compulsory process order or excerpts thereof, appendices containing only sections of statutes or regulations, the statement required by paragraph (a)(2) of this section, and affidavits and other supporting documentation. Petitions to limit or quash that fail to comply with these provisions shall be rejected by the Secretary pursuant to § 4.2(g) of this chapter.

**(2) Statement.** Each petition filed pursuant to paragraph (a)(1) of this section shall be accompanied by a signed separate statement representing that counsel for the petitioner has conferred with Commission staff pursuant to § 2.7(k) of this part in an effort in good faith to resolve by agreement the issues raised by the petition and has been unable to reach such an agreement. If some of the issues in controversy have been resolved by agreement, the statement shall, in a nonargumentative manner, specify the issues so resolved and the issues remaining unresolved. The statement shall recite the date, time, and place of each conference between counsel, and the names of all parties participating in each such conference. Failure to include the required statement may result in a denial of the petition.

* * *

**(4) Staff reply.** Commission staff may, without serving the petitioner, provide the Commission a statement that shall set forth any factual and legal response to the petition to limit or quash.

**(5) Extensions of time.** The Directors of the Bureaus of Competition, Consumer Protection, and Economics and the Office of Policy Planning, their Deputy Directors, the Assistant Directors of the Bureaus of Competition and Economics, the Associate Directors of the Bureau of Consumer Protection, the Regional Directors, the Assistant Regional Directors, the Chief Technology Officer, and the Deputy Chief Technology Officer are delegated, without power of redelegation, the authority to rule upon requests for extensions of time within which to file petitions to limit or quash Commission compulsory process.

**(b) Stay of compliance period.** The timely filing of a petition to limit or quash any Commission compulsory process shall stay the remaining amount of time permitted for compliance as to the portion or portions of the challenged specifications or provisions. If the petition is denied in whole or in part, the ruling by the Commission shall specify new terms for compliance, including a new return date, for the Commission's compulsory process.

**(c) Disposition and review.** The Commission will issue an order ruling on a petition to limit or quash within 40 days after the petition is filed with the Secretary. The order may be served on the petitioner via email, facsimile, or any other method reasonably calculated to provide notice to the petitioner of the order.

**(d) Public disclosure.** All petitions to limit or quash Commission compulsory process and all Commission orders in response to those petitions shall become part of the public records of the Commission, except for information granted confidential treatment under § 4.9(c) of this chapter.

## 16 C.F.R. § 2.31
## Opportunity to submit a proposed consent order

**(a)** Where time, the nature of the proceeding, and the public interest permit, any individual, partnership, or corporation being investigated shall be afforded the opportunity to submit through the operating Bureau or Regional Office having responsibility in the matter a proposal for disposition of the matter in the form of a consent order agreement executed by the party being investigated and complying with the requirements of § 2.32, for consideration by the Commission in connection with a proposed complaint submitted by the Commission's staff.

**(b)** After a complaint has been issued, the consent order procedure described in this part will not be available except as provided in § 3.25(b).

## 16 C.F.R. § 2.32
## Agreement

Every agreement in settlement of a Commission complaint shall contain, in addition to an appropriate proposed order, either an admission of the proposed findings of fact and conclusions of law submitted simultaneously by the Commission's staff or an admission of all jurisdictional facts and an express waiver of the requirement that the Commission's decision contain a statement of findings of fact and conclusions of law. Every agreement also shall waive further procedural steps and all rights to seek judicial review or otherwise to challenge or contest the validity of the order. In addition, where appropriate, every agreement in settlement of a Commission complaint challenging the lawfulness of a proposed merger or acquisition shall also contain a hold-separate or asset-maintenance order. The agreement may state that the signing thereof is for settlement purposes only and does not constitute an admission by any party that the law has been violated as alleged in the complaint. Every agreement shall provide that:

**(a)** The complaint may be used in construing the terms of the order;

**(b)** No agreement, understanding, representation, or interpretation not contained in the order or the aforementioned agreement may be used to vary or to contradict the terms of the order;

**(c)** The order will have the same force and effect and may be altered, modified or set aside in the same manner provided by statute for Commission orders issued on a litigated or stipulated record;

**(d)** Except as provided by order of the Commission, any order issued pursuant to the agreement will become final upon service;

**(e)** The agreement will not become a part of the public record unless and until it is accepted by the Commission; and

**(f)** If the Commission accepts the agreement, further proceedings will be governed by § 2.34.

## 16 C.F.R. § 2.33
## Compliance procedure

The Commission may in its discretion require that a proposed agreement containing an order to cease and desist be accompanied by an initial report signed by the respondent setting forth in precise detail the manner in which the respondent will comply with the order when and if entered. Such report will not become part of the public record unless and until the accompanying agreement and order are accepted by the Commission. At the time any such report is submitted a respondent may request confidentiality for any portion thereof with a precise showing of justification therefor as set out in § 4.9(c) and the General Counsel or the General Counsel's designee will dispose of such requests in accordance with that section.

## 16 C.F.R. § 2.34
## Disposition

**(a) Acceptance of proposed consent agreement.** The Commission may accept or refuse to accept a proposed consent agreement. Except as otherwise provided in paragraph (c) of this section, acceptance does not constitute final approval, but it serves as the basis for further actions leading to final disposition of the matter.

**(b) Effectiveness of hold-separate or asset-maintenance order.** Following acceptance of a consent agreement, the Commission will, if it deems a hold-separate or asset-maintenance order appropriate, issue a complaint and such an order as agreed to by the parties. Such order will be final upon service. The issuance of a complaint under this paragraph will neither commence an adjudicatory proceeding subject to part 3 of this chapter nor subject the consent agreement proceeding to the prohibitions specified in § 4.7 of this chapter.

**(c) Public comment.** Promptly after its acceptance of the consent agreement, the Commission will place the order contained in the consent agreement, the complaint, and the consent agreement on the public record for a period of 30 days, or such other period as the Commission may specify, for the receipt of comments or views from any interested person. At the same time, the Commission will place on the public record an explanation of the provisions of the order and the relief to be obtained thereby and any other information that it believes may help interested persons understand the order. The Commission also will publish the explanation in the Federal Register. The Commission retains the discretion to issue a complaint and a Final Decision and Order, incorporating the order contained in a consent agreement, in appropriate cases before seeking public comment. Unless directed otherwise by the Commission, such Decision and Order will be final upon service.

**(d) Comment on initial compliance report.** If respondents have filed an initial report of compliance pursuant to § 2.33, the Commission will place that report on the public record, except for portions, if any, granted confidential treatment pursuant to § 4.9(c) of this chapter, with the complaint, the order, and the consent agreement.

**(e) Action following comment period.**

**(1)** Following the comment period, on the basis of comments received or otherwise, the Commission may either withdraw its acceptance of the agreement and so notify respondents, in which event it will take such other action as it may consider appropriate, or issue and serve its complaint in such form as the circumstances may require and its decision in disposition of the proceeding.

**(2)** The Commission, following the comment period, may determine, on the basis of the comments or otherwise, that a Final Decision and Order that was issued in advance of the comment period should be modified. Absent agreement by respondents to the modifications, the Commission may initiate a proceeding to reopen and modify the decision and order in accordance with § 3.72(b) of this chapter or commence a new administrative proceeding by issuing a complaint in accordance with § 3.11 of this chapter.